```
 1                   IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            WESTERN DIVISION

 3   IN RE:  DEERE & COMPANY REPAIR    )  Docket No. 22 CV 50188
     SERVICES ANTITRUST LITIGATION     )
 4                                      )  Rockford, Illinois
                                        )  Thursday, September 8,
 5                                      )  2022
                                           10:00 o'clock a.m.
 6
                          TRANSCRIPT OF PROCEEDINGS
 7                 BEFORE THE HONORABLE IAIN D. JOHNSTON

 8   APPEARANCES:

 9   For the Plaintiffs:        COTCHETT PITRE & MCCARTHY LLP
                                (840 Malcolm Road,
10                               Suite 200,
                                 Burlingame, CA  94010) by
11                              MR. ADAM J. ZAPALA

12                              FOOTE MIELKE CHAVEZ & O'NEIL LLC
                                (10 West State Street,
13                               Suite 200,
                                 Geneva, IL  60134) by
14                              MS. ELIZABETH C. CHAVEZ
                                MS. KATHLEEN CURRIE CHAVEZ
15                              MR. ROBERT M. FOOTE

16                              GUSTAFSON GLUEK PLLC
                                (120 South Sixth Street,
17                               Suite 2600,
                                 Minneapolis, MN  55402) by
18                              MS. KAITLYN L. DENNIS
                                MR. DANIEL C. HEDLUND
19
                                MASTANDO & ARTRIP LLC
20                              (301 Washington Street, NW
                                 Suite 302,
21                               Huntsville, AL  35801) by
                                MR. DENNIS A. MASTANDO
22
                                WEXLER BOLEY & ELGERSMA LLP
23                              (311 South Wacker Drive,
                                 Suite 5450,
24                               Chicago, IL  60606) by
                                MR. KENNETH A. WEXLER
25
```

```
 1                              WILLIAMS MCCARTHY LLP
                                (120 West State Street,
 2                               Rockford, IL  61105) by
                                MR. MARC C. GRAVINO
 3                              MR. JOHN J. HOLEVAS

 4   For the Defendants:        JONES DAY
                                (325 John H. McConnell Boulevard,
 5                               Suite 600,
                                 Columbus, OH  43215) by
 6                              MS. TIFFANY D. LIPSCOMB-JACKSON
                                (901 Lakeside Avenue,
 7                               Cleveland, OH  44114) by
                                MR. COREY A. LEE
 8
     Court Reporter:            Heather M. Perkins-Reiva
 9                              327 South Church Street
                                Rockford, IL  61101
10                              (779)772-8309

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  Let's get appearances.

2          Start with Mr. Foote, and we will go

3    counterclockwise.

4          MR. FOOTE:  Robert Foote on behalf of the plaintiffs.

5          MR. ZAPALA:  Good morning, Your Honor.  Adam Zapala

6    from Cotchett Piere & McCarthy on behalf of plaintiffs.

7          MR. GRAVINO:  Good morning, Your Honor.  Marc Gravino

8    on behalf of the plaintiffs.

9          MR. HOLEVAS:  Good morning, Your Honor.  John Holevas

10   on behalf of the plaintiffs.

11         MS. CHAVEZ:  Good morning, Your Honor.  Elizabeth

12   Chavez on behalf of plaintiffs.

13         MR. WEXLER:  Good morning.  Ken Wexler, Your Honor,

14   on behalf of the plaintiffs.

15         THE COURT:  Good morning.

16         MS. CHAVEZ:  Good morning, Your Honor.  Kathleen

17   Chavez on behalf of plaintiffs.

18         THE COURT:  Good morning.

19         MR. DENNIS:  Good morning, Your Honor.  Kaitlyn

20   Dennis, Gustafson Gluek, on behalf of the plaintiffs.

21         THE COURT:  Good morning.

22         MR. MASTANDO:  Good morning, Your Honor.  Tony

23   Mastando on behalf of the plaintiffs.

24         MR. HEDLUND:  And good morning, Your Honor.  Dan

25   Hedlund, Gustafson Gluek, also on behalf of the plaintiffs.

```
 1              THE COURT:  Good morning.
 2              MS. LIPSCOMB-JACKSON:  Good morning, Your Honor.
 3  Tiffany Lipscomb-Jackson, Jones Day, on behalf of the
 4  defendants.
 5              THE COURT:  Good morning.
 6              MR. LEE:  And good morning, Your Honor.  Corey Lee,
 7  also from Jones Day, on behalf of defendants.
 8              THE COURT:  Corey Lee, the one name that is not on
 9  here.  Okay.
10              C-o-r-y?
11              MR. LEE:  C-o-r-e-y.
12              THE COURT:  Okay.  Got you.
13              All right.  I have five pages of stuff to talk about.
14  Actually, it is the life cycle of the case -- Mr. Holevas and
15  Mr. Gravino have heard versions of this in the past, and I
16  think Mr. Foote has as well -- just to set the groundwork and
17  the expectations, how I run things.
18              I do have some sort of substantive questions about
19  things that might be beyond our control, but like I said, that
20  is sort of a life cycle of the case.
21              I assume everybody has done a lot of work up to this
22  point.  You did your factual investigation, built your
23  complaints, those types of things, so I got that.
24              You probably have been on notice for a while that
25  this is going to come down the pike.  So I'm ready to proceed
```

1    pretty extensively today.

2         If you haven't done it already, I have a lot of

3    standing orders.  I think you can kind of figure out judges by

4    looking at their home page.  You look at Jeff Cole's home

5    page, and you know Judge Cole, right?  Mine is pretty

6    extensive.  It is all in there.  Learn to live and love them.

7    They are there for a reason.

8         So before I launch into my life cycle of the case and

9    sort of expectations, how I want to proceed, that type of

10   thing, anything on your guys' agenda?

11        MR. FOOTE:  Judge, Mr. Zapala and counsel for Deere

12   have worked out a scheduling order.

13        THE COURT:  Okay.  That's good.

14        Do you have a copy for me?

15        MR. ZAPALA:  Your Honor, we can submit a proposed

16   order.  We were prepared to present sort of our thoughts

17   orally to you, and then to the extent that queues with your

18   thinking, we are happy to submit something.

19        THE COURT:  We can do that.  Maybe after you hear

20   what I have to say, you might want to amend it.  Just saying.

21        MR. ZAPALA:  Absolutely.

22        So I don't know if you would like to proceed first or

23   you want to hear kind of our thoughts.

24        THE COURT:  I will go through that, and then maybe

25   you can tell me where things stand on that.

1          How about on the defense side, anything?

2          MR. LIPSCOMB-JACKSON:  The same.

3          THE COURT:  Okay.  Anything else you want to talk

4    about?

5          Okay.  There was some discussion of a consolidated

6    amended complaint.  That's still the plan?

7          MR. FOOTE:  Yes.

8          MR. ZAPALA:  Correct.

9          THE COURT:  Okay.  By hard calculations, there is

10   about eight types of claims under the Sherman Act, Section 1,

11   Section 2, and then there is a promissory estoppel, unjust

12   enrichment.  That kind of covers the waterfront.

13         Kind of looking the same way?

14         Okay.  All right.  So no surprises for you folks.

15   What you are going to see is what you have seen so far.

16         So when could you get that filed?

17         MR. ZAPALA:  Your Honor, our thinking on that is that

18   we would file that 45 days from today, the consolidated

19   amended complaint, and one of the reasons that we need some

20   additional time is, obviously, now leadership has been

21   appointed, there are a number of plaintiffs from the

22   constituent cases that need to be vetted in terms of whether

23   they would be appropriate class representatives.

24         THE COURT:  Okay.

25         MR. ZAPALA:  We intend to go through that process.

1   We also want to look at the relevant market issues as they are

2   defined in the complaint, perhaps revise those slightly.  So

3   the thinking on our end and with defendant's agreement would

4   be filing a consolidated amended complaint 45 days from today.

5           THE COURT:  Okay.

6           MR. ZAPALA:  Which I believe takes us to

7   October 24th.

8           THE COURT:  All right.  Does 10/24 work for you?

9           MS. LIPSCOMB-JACKSON:  Yes, Your Honor.

10          THE COURT:  Okay.  So how much time -- obviously, you

11  haven't seen it.  The legal issues sound like they are going

12  to be the same.  In my experience, I don't see a whole lot of

13  admits in answers.  There is only three options, right?  There

14  is admit, deny, lack knowledge sufficient to form a belief as

15  to the truth of the averment in paragraph whatever.

16          So how much time do you think you need?

17          MS. LIPSCOMB-JACKSON:  Yes, Your Honor.  As we

18  discussed with plaintiffs' counsel, 45 days from the filing of

19  the complaint, we could answer or otherwise respond, and I

20  don't have the date in front of me given the slight

21  adjustments we made this morning.

22          MR. ZAPALA:  We did the calculations.  November 7th.

23  But we could confer and submit that for the Court.

24          THE COURT:  That's fine.

25          MR. ZAPALA:  November 7th.

1          THE COURT:  All right.  And like I said last time, if

2    you are going to answer --

3          MR. ZAPALA:  Oh, I'm sorry.  I'm sorry.  It is

4    December.  I was looking at the wrong date.  December 8th.

5          THE COURT:  So that's like two weeks.

6          It is December 8th.  Okay.

7          If you are going to answer some and move to dismiss

8    some claims, just do an answer and then a judgment on the

9    pleadings, not "I'm going to answer paragraphs 1, 6, 12, 19,

10   good luck figuring out the rest," and then a motion to

11   dismiss.  Just answer the whole thing and give me a motion for

12   a judgment on the pleadings, okay?

13         You don't have to file a Rule 12 motion.  There is

14   no -- it says "may."  I think it says "may" right there in

15   Rule 12.  You don't have to, but if you feel compelled, if

16   your client needs you to do it, go ahead and do it, but do it

17   that way.

18         All right.  So, obviously, the goal is to get to

19   issue as soon as possible.  Generally, I do not stay

20   discovery.  If there is a motion to dismiss pending, and

21   certainly if there are claims moving forward, if claims have

22   been answered, and we are moving forward, there is not going

23   to be a stay on discovery.  And, again, none of this is new, I

24   assume.  You know, part of the investigation on the defense

25   side has already taken place to the extent it can.

1       All right.  Hopefully, this doesn't derail us either,

2  today or in the future.

3       There was some kind of complaint filed over at the

4  FTC; is that right?

5       MR. ZAPALA:  Not by us, Your Honor.  We haven't

6  received notice of that.  We had received notice that it may

7  be coming.

8       THE COURT:  Individuals filed something with the FTC,

9  not that the FTC has filed a complaint?

10       MR. ZAPALA:  That's our understanding, is that there

11  may be or has been a petition to the FTC for the FTC to file

12  its own case, but we don't know anything more about it at this

13  point.

14       THE COURT:  Okay.  Anyone want to play a game of

15  what-if?

16       They come in.  Do they mess up our schedule --

17       MR. ZAPALA:  I don't think so.

18       THE COURT:  -- and cause chaos, or do they play well

19  with others in the sandbox?

20       MR. ZAPALA:  I think the latter, Your Honor.  They

21  have their own proceeding that would proceed through the FTC

22  process.  This is a separate case, and I think our view would

23  be, without having spoken to the defendants about it, that our

24  case should proceed, and the FTC is going to do whatever the

25  FTC does, but I don't think it will interfere with this

1    litigation.

2             THE COURT:  Okay.  What are your thoughts?

3             MS. LIPSCOMB-JACKSON:  The same as Mr. Zapala's.

4    Again, we need to discuss it, but I wouldn't foresee that

5    being an issue here.

6             THE COURT:  Okay.  We will see what happens.  Okay.

7             MR. ZAPALA:  We did have, Your Honor, if you are

8    interested in hearing, we do believe -- and I think

9    Ms. Jackson's client does intend to file a Rule 12 motion.

10   Again, they can take your advice and perhaps not do that after

11   today.  But assuming that they do, we did also work out a

12   briefing schedule, a proposed briefing schedule, for your

13   review if you want to check it out.

14            THE COURT:  All right.  I usually like to eyeball a

15   motion to dismiss.

16            Who was the judge over in circuit court, in chancery,

17   who didn't take briefings on motions to dismiss?  He would

18   say, "I know if it states a claim."

19            But I usually just eyeball them and figure it out.

20   But if that's where it goes, that's where it goes, and we will

21   take a look at it.

22            MS. LIPSCOMB-JACKSON:  Sorry, Your Honor, just so I

23   am clear, because I do think that there is a high likelihood

24   that we will file a Rule 12 motion of some form, just so we

25   are clear on the procedure, when you say you would like to

1   eyeball it, you would like us to file our motion first and

2   then consider --

3          THE COURT:  I will consider it, exactly.  You file

4   it.  If you are going to file it, I will look at it.  I will

5   know what your sort of suggested briefing schedule is, and I

6   will work off of that.  So we will go from there.  But just

7   let me look at it.  Sometimes people fight about things they

8   don't need to fight about, okay?  And if I can look at

9   something and say, "Don't bother with this, that's a waste of

10  time," I will do that, okay?

11         But get it on file, and then you will get a minute

12  order from me sort of directing how to do it, and obviously I

13  will take input on any kind of schedule that you need, okay?

14         All right.  It's obviously an antitrust case.  Am I

15  going to need to -- I don't think I need a tutorial on the

16  software.  This is we are talking about a right-to-repair,

17  essentially, case; is that right?

18         MR. ZAPALA:  Correct, Your Honor.

19         THE COURT:  Okay.  Do you think there is any need to

20  educate me on anything?

21         MR. ZAPALA:  I don't think so orally.  I think we

22  should plead a good complaint that lays out what the theories

23  are, how that interacts with the technology.  If you feel, of

24  course, that you need a tutorial after the filing of our

25  consolidated complaint, we are always happy to see you, but I

1   think to the extent the technology is relevant, and we think

2   it is for purposes of the amended complaint, it will be laid

3   out there, and then, of course, we will learn more through the

4   course of discovery.

5          THE COURT:  Okay.  All right.  That's fine.

6          And if you think I need to be brought up to speed on

7   technical aspects, just let me know.

8          MS. LIPSCOMB-JACKSON:  Yes, Your Honor.  After we see

9   the amended complaint, I agree, we can revisit whether that

10  might be helpful.  But if Your Honor thinks it would be

11  helpful, please let us know.

12         THE COURT:  Okay.  All right.  It sounds like you

13  have already got a case management order, a CMO, sort of ready

14  to roll.  Does it have a Rule 502(d) component to it?

15         MR. ZAPALA:  It does, Your Honor.  As I said, we

16  worked out sort of the filing date of the consolidated

17  complaint, the briefing on any Rule 12 motion, and then our

18  thinking was within 60 days of the appointment order that we

19  would come to you with a stipulated protective order for the

20  case, an ESI protocol, and then a Rule 502(d) protocol.

21         THE COURT:  Okay.

22         MR. ZAPALA:  And then we were also thinking that

23  within 60 days of the filing, and this may change according to

24  what we hear today, obviously, but we would file with Your

25  Honor a Rule 26(f) report going through the factors in Rule 26

13

1   and proposing a schedule through trial, but obviously we will

2   have the benefit of your thoughts before submitting that.

3           THE COURT:  Okay.  What were the thoughts, if you had

4   any, on bifurcating discovery?  I hope you didn't --

5           MR. ZAPALA:  Bifurcating in terms of class recovery?

6           THE COURT:  Yes.

7           MR. ZAPALA:  Our view and experience and strong

8   belief is that where the law stands now, it is not very

9   workable.  Our experience has been that you end up fighting

10  more about where the line is rather than -- and we see the

11  merits and class certification issues as being highly

12  intermeshed.  So our view would be bifurcation would not be

13  appropriate in the case.

14          THE COURT:  I get your view, but here are my notes:

15  Line between merits and class cert issue is very thin and

16  blurry.

17          What do you think?

18          MS. LIPSCOMB-JACKSON:  Well, Your Honor, I think in

19  certain cases it can work, and we would certainly be

20  interested in exploring bifurcation here.  I do think that the

21  class issues, there are some things that would be unique about

22  them as related to merits, and also, as we discussed, the

23  overall case schedule, class obviously will come much sooner

24  than some of the merits issues in the case.  So we would not

25  be opposed to discussing bifurcation.  We have not discussed

1    that yet with plaintiffs.

2            THE COURT:  Okay.  All right.  Just so you know, my

3    general view is bifurcation is one of those procedures that's

4    put forward to "streamline the case."

5            Did you get that?

6            It is a sidetrack.  It derails the case, and it does

7    not streamline.  It is the opposite.  That's my general view,

8    but of course I will be happy to hear your thoughts on that.

9            We have -- as you probably know, there is a model

10   protective order that's online.  Use that to the extent you

11   can, and if you change it, just show me your changes with a

12   red-line, and then I can see what you have changed, and if I

13   need to tweak it, I will tweak it.  And you can just submit

14   that any time through the proposed order portal, and then I

15   will look at it.  If I have any issues, I will talk to you

16   about it, but if I can adopt it or just modify it slightly, I

17   will do that, and I will turn that around in a day so that I'm

18   not the logjam, I'm not the bottleneck in the case, okay?  So

19   use that to the extent you can and just show me what your

20   changes are.

21           ESI protocol, are you thinking you want that as a

22   standalone agreement between the parties, or are you going to

23   ask me to adopt it and incorporate it into an order?

24           MR. ZAPALA:  Typically, we have done the latter where

25   there is an agreement between the parties, or to the extent

1   there are certain provisions that are disputed, we would

2   present those disputes to the Court and the Court would decide

3   those and then issue essentially a blended order from what

4   parts are agreed to and then what parts have been disputed but

5   resolved by the Court.

6           So I think the hope is that we can just reach full

7   agreement on the ESI protocol, submit it to Your Honor.

8   Certainly, if there are provisions that the Court were

9   concerned about and wanted to alter, the Court could do that,

10  but it would hopefully be an agreement between the parties

11  that the Court would ultimately bless.

12          THE COURT:  Okay.  And by "bless" you mean attach it

13  and incorporate it as a Court order?

14          MR. ZAPALA:  Correct.

15          THE COURT:  Okay.  What are your thoughts on that?

16          MS. LIPSCOMB-JACKSON:  The same as Mr. Zapala's.

17          THE COURT:  Okay.  So long as everybody goes into

18  that with their eyes wide open.  It is a Court order.  It

19  opens up other issues.  So long as you know that, that's fine.

20  I just don't want somebody going, "Well, I didn't know by

21  agreeing in a Court order that I was subject to other

22  sanctions under Rule 37."  It is just a consequence, but

23  that's fine.  I will do that.  I'm okay with that as long as

24  people understand that.

25          Have you talked at all about an ESI protocol, or just

1    generally in the big picture, have you talked about certain

2    details yet?

3         MR. ZAPALA:  We haven't discussed any details of an

4    ESI protocol.  We have done this a lot, obviously, in other

5    cases, so there has been a lot of ground tread, and this is an

6    issue in courts all the time.  So we are not starting from

7    scratch, but we haven't had the opportunity to propose a

8    protocol and sort of discuss and negotiate over various

9    provisions yet.

10        THE COURT:  Okay.  ESI protocols can be extremely

11   helpful, but, you know, remember back in the day when people

12   would haggle and litigate for weeks on end over a protective

13   order and no discovery occurs while they are fighting over the

14   size and shape of the table like in Vietnam?  So get agreement

15   on what you can get agreement on.  If you get to a sticking

16   point and you need my input, just let me know, but

17   don't -- you know, try to work things out on your own, but if

18   you are at an impasse, that's what I'm here for, okay?

19        MR. ZAPALA:  Thank you.

20        THE COURT:  All right.  For case management, statuses

21   are telephonic.  Even pre-COVID, I did statuses

22   telephonically.  No sense having everybody come in for ten

23   minutes and then you bill time and it is lost time.  So we do

24   a status telephonically.  That's what we do.

25        Contested motions are in person, okay?  It is just

 1    too hard to do it telephonically.  I don't have the skill set

 2    to do a virtual argument on a contested motion.

 3           So let me tell you this.  If you have a discovery

 4    issue, and this is only going to be for this case

 5    only -- don't tell anybody; I will deny it if you do -- for

 6    this case only, if you have a discovery issue that you can't

 7    work out on your own, call Ms. Pedroza with a date that works

 8    mutually for both sides.  Have three days ready.  Provide

 9    Ms. Pedroza with those three days.  Hopefully, one will work

10    for me.  I will set it for one of those three days; if not, I

11    will let you know and give you options on three days when I'm

12    available.  I will set it.  The motion gets filed.

13           If one side or the other wants -- if the nonmoving

14    party wants to file a written response, knock yourself out.  I

15    will read it.  I will think about it.  It will be a part of

16    the discussion and part of the analysis and part of the

17    ultimate decision on the discovery issue.  If you don't want

18    to, you don't have to.  We will just come in, and you will

19    argue your discovery motion, and I'm going to rule that day,

20    all right, so that, again, I'm not the bottleneck.  That's for

21    most discovery issues.

22           If it's a very difficult issue, say a privilege

23    issue, I'm probably not going to rule that day unless it is so

24    obvious, but if it were so obvious, then you would have worked

25    it out on your own.  So if it is a privilege issue, then I

1    will probably set a briefing schedule.

2           Let me tell you about in-camera review.  Those occur

3    on the weekends.  I'm here enough on the weekends.  Sitting

4    here on a Saturday morning or Sunday reviewing documents for

5    privilege, not one of the highlights of the job.  I do it.

6    It's necessary sometimes.  It is extremely frustrating when

7    you go through hundreds and hundreds, if not thousands of

8    documents, and they are clearly not privileged or they clearly

9    are privileged, and I'm thinking "Why am I the one doing

10   this?"  So you have to do a true meet-and-confer and try to

11   work out what's really at issue, okay?

12          I submit an annual bill.  I don't get paid by the

13   hour anymore or a contingency or anything.  I get annual

14   compensation.

15          So if you can work those out, that would be fine,

16   but, again, if you need my help on a privilege issue, let me

17   know.  I assume most would be sort of attorney-client work

18   product type privilege.  Maybe something else is out there.  I

19   don't know.  But we will find out.

20          I was talking about status hearings and those being

21   telephonic.  It used to annoy me, and Judge Doherty and I used

22   to talk about this all the time, you get on a 60-day wheel.

23   "Come back in 60 days.  Come back in 60 days."  Well, who

24   cares if you come back in 60 days if nothing has happened?  So

25   I would rather have fewer statuses but more productive

1    statuses.  So generally after a status, I will say, "Okay.

2    Here are the expectations going forward.  We are going to get

3    together in 30 days or 60 days or 45 days," whatever it is,

4    "and when we get back on a status, these things will have

5    happened, and we will talk about what has happened," and then

6    moving forward.

7           None of this should be earth-shattering, but it

8    doesn't seem to happen very often in civil case management,

9    because otherwise you end up on a 60-day wheel, and you just

10   keep spinning, and nothing really gets accomplished.

11          So that's the goal on how statuses will work.

12          Deadlines, I believe I have been labeled a "stickler"

13   on deadlines.  I have probably become less of a stickler now

14   that I'm a district judge and not a magistrate judge.  But if

15   you were just curious on my views on deadlines, *McCann*, M,

16   little c, capital C, a-n-n, *v. Cullinan*, 2015 U.S. District

17   LEXIS 91362.  That pretty much sums it up on deadlines and my

18   view on deadlines.

19          You guys know Judge Reinhard's two rules in federal

20   court, right?  First rule, be on time; second rule, don't be

21   late.  When deadlines get blown, then everything else gets

22   sideways.  There are legitimate reasons to extend deadlines.

23   I mean, there is all kinds of things in life that happen that

24   we have no control over.  If those happen, not a problem.  If

25   it is just slothfulness, that is not a legitimate reason,

1    okay?

2           I look forward to seeing what you have proposed on

3    the case management order.  No one size fits all.  I have

4    never had everything gets done within six months and then we

5    get a trial date with the district judge.  That doesn't work.

6    So a traffic collision is not the same as an employment

7    discrimination case, which isn't the same as a trademark case.

8    So I will obviously take your input on that.

9           But you need to know, and especially because I'm

10   taking your input on the case management order, once I set

11   that case management order, you are going to meet those dates,

12   okay?  I'm going to keep you on track to meet the dates.  So

13   don't sell yourself short.  Don't think, "Oh, I'm going to

14   impress the judge by getting something done quickly."  You are

15   not.  You are going to piss me off by not getting something

16   done by the date.  So give yourself sufficient time.  You are

17   all experienced litigators.  You know how long things take.

18          It is amazing to this day that people know that they

19   never meet deadlines, but then when you ask for a schedule,

20   they still give you a deadline that they are not going to

21   meet, instead of just saying, "You know, I have written a

22   complicated complaint in the past.  It is going to take 45

23   days."  And they go, "Oh, I can do it in two weeks."  You know

24   they are not going to do it in two weeks.

25          So give yourself enough time to get what you need to

1    get done, and then we are going to meet those dates.

2            Again, I mentioned this at the last status.  There

3    will not be a general referral to the magistrate judge, who I

4    believe is Judge Jensen.  I think that is who has this case.

5    If I think something needs to be referred to her specifically,

6    I will do that.  Obviously, if you folks want a

7    mediation -- sorry -- a settlement conference, I will send

8    that to Judge Jensen, and that can happen any time.  I do have

9    the Mike Mahoney habit of asking at almost every status, "Have

10   you thought about settlement?  Have you thought about a

11   settlement conference?  Have you talked settlement?"  That's

12   what he taught me.  I can't break myself of it.  So don't get

13   annoyed, but I will probably say that more times than you will

14   want to hear it.

15           But if you need the magistrate judge for a settlement

16   conference, you just let me know, and we will make the

17   magistrate judge available.  We have a panel of mediators.  If

18   you want to use somebody on the panel, that's fine.  You guys

19   know your cases better than I do at this point.  Sometimes you

20   need Mike Mahoney on a settlement conference; sometimes you

21   need Jack O'Malley, and you just need a hand, okay?  You will

22   know which one you need.  So if you need to use one of those,

23   pick one, or if you just want to go to JAMS or ADR, that's

24   fine too.  I don't care.

25           Just so you know and to make sure this is abundantly

1    clear because I know it is the case management thought

2    de jour, I don't take letters or calls to chambers, informal

3    calls or letters to chambers, about "Oh, we have got this

4    discovery dispute we would like to talk to you about."  I

5    don't do that.  File your motion.  Get it on file.  Make a

6    record of it.  I'm moving forward just as fast, but I don't do

7    that informal process.

8              What communication systems are we talking about here?

9    Has there been a transfer from Lotus Notes, for example, to

10   Microsoft Outlook?

11             What are we talking about?  Are we talking Outlook?

12   Are we talking Lotus Notes?  Are we talking Salesforce?  Are

13   we talking Skype?

14             I mean, what are we talking about?

15             MS. LIPSCOMB-JACKSON:  I'm going to defer to my

16   colleague.

17             THE COURT:  Okay.

18             MS. LIPSCOMB-JACKSON:  This is his area of expertise.

19             MR. LEE:  For the relevant time period, as we

20   understand it, we are probably talking about communications

21   primarily within Outlook.

22             THE COURT:  Okay.  That's good.

23             Any idea as to -- again, you haven't seen the

24   consolidated amended complaint, so I understand that.  But,

25   again, this isn't a new case, so I'm assuming you have done a

1   lot of groundwork like custodians, numbers of custodians,

2   where they are at and what types of devices.

3          MR. LEE:  So number of custodians, I think we would

4   probably put that in the ten to fifteen range based on our

5   understanding of who is likely to have unique, relevant

6   information.  As far as devices, I think it is largely going

7   to be information stored on cloud-based sources, which is not

8   going to require collections from individual hard drives or

9   mobile devices.

10         THE COURT:  Okay.  All right.  And as far as you

11  know, there has been no migration from one system to another.

12  It sounds like --

13         MR. LEE:  Not during the relevant -- of course there

14  has been migrations but not during the relevant time period.

15         THE COURT:  Okay.  All right.  Have written

16  litigation holds been provided to those custodians?

17         MR. LEE:  Yes, Your Honor.

18         THE COURT:  Okay.  How far back does this go?  What

19  kind of time frame are we talking about?

20         MR. ZAPALA:  The current class period goes back to

21  2018.  So it is a four-year period in terms of the damage

22  period.  I think what is yet to be determined in this case,

23  and, obviously, I would like to discuss with my colleagues, is

24  it is likely that we will need discovery that goes back

25  further.  I mean, this right to repair is an issue that has

1    been going on for some time.  We are obviously limited to

2    damages for the four-year period, but I do think there is

3    relevant information that we will want from Deere that

4    certainly predates 2018.  So in our view, the class period for

5    damages purposes doesn't necessarily cabin the time period for

6    the discovery that we are going to need.

7              THE COURT:  Okay.  That's fair.

8              And I know where you are going, what you are going to

9    say, I get that, but at least we have a demarcation for

10   damages that's not too bad.  All right.  We are not going back

11   20 years or things like that.

12             Have there been any public statements by John Deere

13   about right to repair, anything like a press release?  Have

14   they talked to Congress people?  Have they been yanked to D.C.

15   to talk at a committee hearing, anything like that?

16             MS. LIPSCOMB-JACKSON:  Well, Your Honor, in the

17   complaints that have been filed, there are certainly John

18   Deere statements that have been cited by plaintiffs about John

19   Deere's policies on right to repair, and there are

20   website -- John Deere has a website that has its policies up

21   on it.  So the short answer is, yes, there is some information

22   in the public spectre on this.

23             THE COURT:  Okay.  But no one has been pulled to

24   Springfield or pulled to Washington, D.C. and gave statements

25   to a committee or anything like that?

1          MS. LIPSCOMB-JACKSON:  So there has certainly been

2     legislation about repair issues that I believe John Deere has

3     had participation in some of the hearings generally about

4     that, but if you are asking has there been a congressional

5     oversight committee that has asked John Deere to come and

6     testify on behalf of these issues, not that I am aware of, no.

7          THE COURT:  When you say "participate," what do you

8     mean?

9          MS. LIPSCOMB-JACKSON:  So my understanding is that

10    when certain bills, depending on the state legislature, come

11    up for consideration, sometimes there is testimony that is

12    elicited related to a bill.  John Deere has had some

13    participation, and I can't tell you offhand which state, but

14    there has been some participation in that process.

15         THE COURT:  Okay.  Would those have been captured in

16    a document, in some fashion?

17         MS. LIPSCOMB-JACKSON:  I think it probably depends on

18    the statehouse, whether it would have been transcript or some

19    other documentation.  I don't know that offhand.

20         THE COURT:  Would those -- as far as you know, would

21    those be in your possession, custody, or control?

22         MS. LIPSCOMB-JACKSON:  I don't know the answer to

23    that.

24         THE COURT:  Okay.

25         MS. LIPSCOMB-JACKSON:  I'm sorry.  I'm looking at my

1   colleague to see.

2           MR. LEE:  I'm not sure we have -- I'm sure we have

3   some of them.  I do not know if we have a complete record of

4   those documents.

5           THE COURT:  Is there -- and I don't know how John

6   Deere operates.  Does John Deere operate with an internal

7   government relations person?  We used to call them lobbyists.

8           MR. LEE:  There is a government relations function

9   within the company, yes, sir.  Yes, sir.

10          THE COURT:  Okay.  All right.  So maybe they have got

11  it.

12          MR. LEE:  We can definitely inquire, yes.

13          THE COURT:  Okay.  All right.  I have got a friend

14  who has worked at Caterpillar in government relations for

15  30 years.  So I know they are very different companies and

16  all, but I thought maybe that might exist.

17          Do you happen to know?  Have you stumbled across

18  anything along those lines?

19          MR. ZAPALA:  In terms of testimony before political

20  bodies?

21          THE COURT:  Yes.

22          MR. ZAPALA:  Our understanding is consistent with

23  what Ms. Jackson referred to, but we are not aware of the

24  entire universe.

25          THE COURT:  Okay.  Have any of your clients talked at

1     any legislative body hearing or anything like that?

2          MR. ZAPALA:  We don't believe so, but, again, it

3     remains to be seen in terms of who we vet and bring into the

4     consolidated complaint.

5          THE COURT:  That's fair.

6          MR. ZAPALA:  But to my knowledge, currently, no.

7          THE COURT:  How about letters to the editor,

8     blistering emails, those types of things, the you-guys-suck

9     emails?

10          MR. ZAPALA:  Same answer at this point, yes.

11          THE COURT:  Okay.  Because, obviously, they would

12     want to see those.

13          MR. ZAPALA:  They will want it.

14          THE COURT:  The same thing goes for social media.  An

15     angry Facebook post regarding this by a party is going to be

16     relevant.  So I asked them specifically about a written

17     litigation hold, and they said yes.  If you have got

18     clients -- I don't know who; again, you are going to be

19     vetting people -- if they are heavy into Facebook, among other

20     social media devices or programs, and they have launched into

21     these things on those programs, they are going to be relevant,

22     okay?  So what's good for the goose is good for the gander,

23     okay?  I do not ever want to have an ESI sanctions motion.

24     I'm done.  Mr. Holevas knows I'm done.

25          MR. HOLEVAS:  Yes, I do, Your Honor.

1          THE COURT:  I keep finding them.  They find me.  I

2     don't want any, okay?  They are done.  I don't want to keep

3     giving talks on it.  So make sure you have got those things

4     covered.

5          30(b)(6) either was just amended or was about to be

6     amended.  There is all kinds of issues.  I have got an article

7     online on my web page about 30(b)(6) and what I think about

8     it.  The rules committee kind of used that article when they

9     proposed the amendments.  Don't have unnecessarily

10    Rule 30(b)(6) fights.

11         I'm all for you guys figuring out creative ways to

12    speed up a Rule 30(b)(6), and if you can agree on it, great.

13    I think, and I don't know if you can say the term anymore, it

14    used to be called "hot tubbing."  If a 30(b)(6) notice goes

15    out, and you say there is four people that will cover that,

16    you know, someone, John Smith, Sally Jones, Tom Smith, and

17    Steve Stack, and you do them all in order, which is very

18    inefficient and cumbersome, if that's the way you want to do

19    it, that's fine.  If you want to hot tub them, bring all four

20    people into the 30(b)(6), ask a question, and instead of Sally

21    Smith being able to answer it, Tom Jones can answer it, well,

22    you have just probably saved yourself a lot of time.  It's

23    something to consider.  It is done, and I think the term is

24    "hot tubbing," although I don't know if you can use that

25    phrase anymore.  So just something to think about.

1          Again, hopefully, you don't have fights over 30(b)(6)

2     and the specificity of the notice, those types of things.  Try

3     to work those out as best you can.  If you need me, you know

4     where to find me, but that doesn't seem like a good use of

5     anybody's resources.

6          I generally follow Sedona principles.  I have some

7     personal issues with some of them that I have expressed in

8     various meetings, Sedona Conference meetings.  They are mine.

9     But since this is my case, I can do what I want to do.  They

10    are not the Federal Rules of Civil Procedure, but they do give

11    good guidance.  It's a great resource.  There is lots of

12    things there.  So if you are having an issue, and you can't

13    agree, if there is a Sedona principle that seems to apply,

14    maybe you should go there.  Again, I don't buy them wholesale.

15    They are not binding on me, but they are helpful.

16         I tried a soft opening on the discovery framework,

17    and I sent, I think, you the link to that.  I think there

18    should be like you send in a notice that you are doing it, and

19    that's ex parte, and you just send it in.  I'm going to do

20    that anyways, whether we adopt it or not.  If they say there

21    is only two custodians, and that's it, I might look at it a

22    little fish-eyed; if you say there are 102 custodians, I might

23    look at that a little fish-eyed as well, and I'm going to want

24    facts supporting people's positions on these things as I try

25    to figure out all of those factors under Rule 26 to make sure

1    it's not privileged, relevant, and proportionate to the case,

2    and it's the proportionality.  Relevance, I think in this case

3    we are not going to have a whole lot of relevance issues.

4    Privilege, I don't know, but we will deal with them.

5    Proportionality, we shouldn't have problems, but if we do, we

6    will work them out, and when we discuss them, if there is a

7    motion, I'm going to drill down on both sides.

8            I'm not just going to take attorneys' say-so on what

9    they think is proportionate.  I need facts and affidavits; I

10   need declarations; I need documents; I need org charts, those

11   kind of things, work flow, before I can start determining what

12   proportionality is, okay?  So that's kind of what that

13   framework is.  I know it got attacked on the plaintiffs' side

14   for some were okay; we worked out those.  Some were pretty

15   weak arguments.  Now it is getting attacked by the corporate

16   side.  So it is either terrible or it is pretty good because

17   both sides are attacking it.

18           Look for, obviously, the cheapest, best information

19   relevant to the case you can get, right?  You want that.  You

20   don't want to look at a bunch of irrelevant emails.  They

21   don't want to dig them up and send them, okay?  So look for,

22   obviously, the cheapest, easiest discovery information you can

23   get.

24           All right.  Any questions on that?  I mean, it is

25   pretty -- it looks complicated.  It is not.  It gets a little

1   -- it's like looking at the sentencing guidelines.  You look,

2   and you go, "Oh, are you kidding me?  It is like a 600-page

3   book.  What are you doing to me?"  But once you get into it,

4   it makes some sense.  So there is some sense to that.

5          We talked about ESI protocol.  We talked about

6   incorporating it.  Got that down, litigation holds.

7          Privilege logs, who knew that was such an exciting

8   topic?  I don't know why all of a sudden privilege logs have

9   become the issue to fight over lately.

10         Have you ever used categorical privilege logs?

11         MR. LEE:  Yes, Your Honor.

12         THE COURT:  Okay.  How did the other side react when

13  you did it?

14         MR. LEE:  They worked well when we had discussion

15  around the categories that are going to be used for the log.

16         THE COURT:  Okay.  All right.  Have you guys received

17  categorical privilege logs, and when you saw them, what was

18  your view on them?

19         MR. GRAVINO:  Haven't seen them.

20         THE COURT:  I mean, because they are relatively new.

21  No one used them before 2013 as far as I knew.  I never saw

22  them.  I never used them.  But they can be helpful.  It is one

23  of those things that might speed up the process, and if you

24  really have an issue, you can dig into it and have a

25  meet-and-confer and see if there is really a concern.  But

1   instead of having them spin your wheels and money on something

2   that is not an issue, they can say, "Here is a category," and

3   you cover it.  That works.  But if there is something, and you

4   have information, say somebody says something in a deposition,

5   testifies to something, and it doesn't gibe with the

6   categorical privilege log, well, let them know.  If you need

7   my help, I will figure it out, okay?

8          But if you can agree on those, that's fine.  I'm fine

9   with it.  So just so you know, if you are going to use them, I

10  don't have some personal rule that says no categorical

11  privilege logs, okay?  But just make sure that they understand

12  what documents are being withheld and why.

13         Okay.  Experts.  Yay.  I know it is early.  It is an

14  antitrust case.  Has there ever been an antitrust case where

15  experts weren't used?  Anybody see that?

16         Okay.  I don't like experts.  They are a necessary

17  evil in modern litigation and certainly antitrust cases.

18         Any idea if you would need expert testimony for a

19  class cert issue?

20         MR. ZAPALA:  Yes, Your Honor.  We anticipate having,

21  at a minimum, an econometrician build a common impact model

22  for purposes of class certification.  So we do think we will

23  have at least one expert, probably two, because we think there

24  will be a need for an engineering expert or an industry

25  expert, if you will, that would support the economist.

1      THE COURT:  Okay.

2      MR. ZAPALA:  But largely our experience in antitrust

3  cases is that the class certification stage is expert-heavy,

4  but that doesn't mean there is multiple experts per se.

5  Probably, one or two economists providing a report.

6      THE COURT:  Okay.  It seems to make sense to me that

7  before you brief substance, the merits of anything, you want

8  to know what evidence will be used in that briefing, like

9  summary judgment, class cert.  If that's true, it seems like

10  it would make sense to address any admissibility issues of the

11  expert that would be used in any briefing before you went

12  ahead and wrote a bunch of briefs because it would seem really

13  frustrating for you folks to be writing briefs in favor of

14  class cert or against class cert, assuming that expert

15  testimony is going to come in, and then I start tearing it

16  apart, and then your brief ain't so good anymore.

17      So those are my views.  I would take Daubert,

18  Daubert -- however you want to pronounce it -- motions to

19  exclude expert testimony.  I would determine those before the

20  merits of either a class cert or summary judgment.

21      You probably knew they would have experts on at least

22  those two topics.  You don't have to depose their experts.

23  You can.  You don't have to.  There are good reasons not to

24  depose experts.

25      Did you think you would need any experts?

1          MS. LIPSCOMB-JACKSON:  Yes, Your Honor, and I think

2     consistent with what counsel said, that's what we see in other

3     cases.  Typically, we then also have a rebuttal econometrician

4     and potentially additional rebuttal experts depending on what

5     their expert slate looks like.  So the short answer is, yes,

6     we anticipate having experts because we anticipate seeing

7     experts on their side.

8          THE COURT:  Okay.  So do you folks want to get

9     through all fact discovery so that your experts have all the

10    facts necessary to form their opinions and the bases for the

11    opinions before the reports are due and you go into expert

12    discovery?

13         MR. ZAPALA:  I haven't had an opportunity to discuss

14    it with my colleagues.  That is my emerging view, frankly, in

15    the cases that I have done schedules in before.  I think it is

16    useful to have, if not all of the discovery done, the vast

17    majority of it done because, obviously, the expert is basing

18    his or her opinion on the fact record and the sort of record

19    as it relates to experts.  If that record is moving under

20    their feet, it creates some complications not only for the

21    parties but especially for the Court.

22         So it used to be the case that class certification

23    would come a lot earlier.  I think that has changed with the

24    case law, with the rigorous analysis that the Supreme Court

25    requires.  My view is that it is better to complete the

1    majority of fact discovery, frankly, before you have your

2    expert do the analysis, spend that kind of money.

3           Again, I would like to talk about it internally with

4    my colleagues, but we haven't gotten that far in terms of

5    where we are in the schedule, and obviously with the

6    defendants as well, as part of the Rule 26(f) process, but

7    that's my off-the-cuff view, Your Honor.

8           THE COURT:  Have you ever taken an expert's dep and

9    all of a sudden they started spouting off a bunch of opinions

10   that weren't in the report?

11          "When did you come up with that?"  "Two days ago."

12          A little frustrating, and now you have deposed them,

13   and now you are on notice of what their opinion is.  Try to

14   avoid that.

15          What are your guys' thoughts on this?

16          MS. LIPSCOMB-JACKSON:  Again, we would like to talk

17   internally and with the other side.  I think it depends on

18   whether or not we can come up with a framework, even if it is

19   not bifurcation, prioritization of discovery, because if we

20   can do class certification sooner, I think that is something

21   that would benefit all parties, but again that is going to

22   come down to the specifics of the shape and scope of

23   discovery, which we need to talk to plaintiffs' counsel about.

24          THE COURT:  Okay.  All right.  My view is fact

25   discovery should be complete before you start heading into

1   expert discovery for all those reasons.  The factual framework

2   upon which the experts have based their opinions should be

3   established and not changed midstream.  If you take the

4   deposition of an expert in the middle of fact discovery, and

5   all of a sudden some witness starts spouting off about

6   something, and their opinion changes, now the expert has to

7   amend their report, and if you took the expert's dep, now you

8   have got to take the dep again.  It just doesn't seem to make

9   much sense to me.  That's my view, but, again, I'm more than

10  willing to hear you folks out on that.

11          Does anybody agree to class certification anymore?

12  Does that happen?

13          MR. ZAPALA:  It used to be the case where we

14  stipulated to class certification.

15          THE COURT:  I've got collateral estoppel,

16  res judicata, whatever you want.  I have got bars on everybody

17  on the planet now.  It seemed like it was helpful.  But it is

18  your case and your client.  If there is a fight over class

19  cert, that's fine.  That's what I'm here for.

20          MR. ZAPALA:  And, Your Honor, we are amenable.

21          THE COURT:  But that's the thinking of it.

22          Yes, I agree we used to do class cert super early,

23  and now it seems to be later for a lot of reasons.

24          Timing on summary judgment.  You don't have to file a

25  motion for summary judgment.  You don't have to file a motion

1    for summary judgment.  And if there is competing experts, huh,

2    that seems like that's a credibility call.  That probably

3    isn't ripe for summary judgment.  But there is plenty of cases

4    that summary judgment has been granted with competing experts

5    on antitrust cases and it gets affirmed on appeal.  So just my

6    thoughts.

7              So what are your thoughts on the timing of any class

8    cert?  I know you mentioned just sort of pushing it off, and

9    you are thinking of maybe having it earlier.  You are going to

10   think and talk to your client about what I have already

11   described as the merits versus class cert as a thin and blurry

12   line.  We don't want to go through the class cert more than

13   once, okay?  It is an interlocutory order.  I deny it and all

14   of a sudden they come back with another one.  Successive

15   motions, I'm not too happy with, but it can happen, and it is

16   now potentially an interlocutory appeal, which then stops

17   everything in its tracks unless I say we keep going forward.

18   But we will figure that out.

19             Talk among yourselves on the timing, and obviously

20   incorporate in whatever your draft CMO looks like, but the

21   timing of that is going to be, obviously, very important.

22             Summary judgment.  Again, summary judgment may be

23   filed.  It's not necessary.  We have trials for a reason.  We

24   have jury trials for a reason.  If you want to do a trial on

25   the paper, we can do that, too, if everybody agrees.  That's

1   fine.  But the overuse of summary judgment is a real problem

2   in civil litigation.  I have yet to see an employment

3   discrimination case where the employer did not move for

4   summary judgment.  It is like, "Well, it is on the to-do list.

5   Okay.  Close of expert discovery, summary judgment."

6   Sometimes it is not -- it just doesn't work.  So think about

7   it before you file.  I have a very long and detailed not just

8   standing order on summary judgment motions.  Take a look at

9   that.

10         Rule 56.1, that's one of those rules that was

11  designed to streamline that has now done the opposite.  There

12  is cage matches over the 56.1 statements of facts.  Most of

13  the fights are not about the actual fact.  It is about the

14  inference drawn from a fact.  Okay.  Well, that doesn't mean

15  the fact isn't admitted.  It is just you don't like the

16  inference drawn.  Well, that's my job.  I draw all reasonable

17  inferences in the light most favorable to the nonmoving party.

18         So don't fight over inferences.  If it's a fact, it's

19  a fact, and then you can brief it to death in the summary

20  judgment motion, but don't make me go through 500 pages of

21  fights over 56.1 statements of fact.  Admit and then say you

22  dispute the inference, and then raise it in a motion or the

23  response, and brief it that way, but not in a statement of

24  facts.

25         Trials.  Trials are a good thing.  There is nothing

1    wrong with a trial.  My plan is to try all the cases.  If they

2    go to trial, I will do an inter-circuit and an intra-circuit.

3    Yes, it would be both because there is a Central District of

4    Illinois case, isn't there?  There is one in the Central

5    District.  So Judge Sykes would send me there.  I'm already

6    set on an inter-circuit to try cases in Oklahoma.  I know

7    there is one of these that is in the Western District of

8    Oklahoma, right?  Somebody has got one in the Western

9    District.  Okay.  So I could go see Charles Goodwin.

10           There is a case -- there is a couple in northern

11   Alabama, right?  So I can see John England there.  I can see

12   all kinds of friends.  This will be great for me.  I have got

13   no problem.  I can go all over the country.

14           There is like Mississippi, northern Mississippi.  I

15   can head out to Tupelo.  I can go see Elvis stuff.  I have got

16   no problem.  But I'm not going to go through this whole

17   process on pretrial and then dump it on some unsuspecting

18   judge who is going to say, "Well, what happened, and what's

19   that knucklehead in Rockford doing, and why did he manage the

20   case this way" and didn't want to do it his or her way.  I

21   will go around and try all these cases.  I think there is one

22   in upstate New York, too; isn't there?  They are all over the

23   place.  But that's how we will go.  I will be trying them.

24           You guys don't have to go, okay?  (Addressing court

25   staff.)

1          MS. LIPSCOMB-JACKSON:  Your Honor, on that point,

2     just to clarify the record, I believe the Oklahoma case was

3     dismissed.  That's the Ferrell case.

4          THE COURT:  Is that the voluntary one?

5          MS. LIPSCOMB-JACKSON:  Yes.

6          THE COURT:  I thought that was in Kansas, or is he

7     just located in Kansas?

8          MS. LIPSCOMB-JACKSON:  He may be located in Kansas,

9     but I believe that case was filed in Oklahoma.

10          THE COURT:  Monty Ferrell?

11          MS. LIPSCOMB-JACKSON:  Yes.

12          THE COURT:  Yes, okay.  Well, then I won't see

13     Charles Goodwin.  That's fine.

14          I already talked about settlement, mediation.  Again,

15     any time you need it, just let me know.

16          Both sides provide in-camera information on

17     litigation funding.  That will be ex parte, in camera.  Just

18     submit it through the proposed order portal, and then I will

19     get it that way, okay?

20          So those are everything that I wanted -- well, that's

21     everything I wanted to talk about.  It is essentially the life

22     cycle of the case -- or cases and how I hope things go.

23          Let's see if there is anything else.

24          Production in native format, there is certain types

25     of documents under the definition of "documents" that should

1    be in native:  PowerPoint, Excel spreadsheets.  If you have

2    ever tried to look at those in a PDF, you know why they should

3    be in native.  But otherwise, you work it out on your own in

4    what needs to be native, but those are the two that come top

5    of mind.

6            Go ahead, Mr. Foote.

7            MR. FOOTE:  Judge, my partner Kathleen Chavez has an

8    issue in Alabama.  Is it okay if she is excused?

9            THE COURT:  Oh, you have an issue?

10           MR. FOOTE:  On a Blue Cross/Blue Shield case.

11           THE COURT:  Oh, Judge Proctor.  See, Proctor should

12   have got this thing.

13           MS. CHAVEZ:  I didn't expect him to stand up.  I was

14   going to miss that issue.

15           THE COURT:  That's fine.  Tell him I said hello.

16           MS. CHAVEZ:  Thank you, Your Honor.

17           THE COURT:  I have covered everything in my notes.

18           What do you guys want to talk about?  What else?

19           MR. WEXLER:  I have one question, Your Honor.  Ken

20   Wexler.

21           You had mentioned not calling or writing letters to

22   the Court, which I totally get, but once in a blue moon, in a

23   deposition, you run into a problem.  So what do we do?

24           THE COURT:  Call me at a dep.  I will call you in the

25   dep.  I allow that because that's different.  You are all

1    there.  You have got a witness there who may be subpoenaed or

2    whatever.  You have spent a lot of money.  It doesn't make a

3    lot of sense to break the dep, reconvene the dep over

4    something that I can resolve on a call.  So I do take calls

5    from depositions.

6              I have yet to receive a call from a deposition

7    involving anything substantive and nothing privileged.  It is

8    stupid things, who is in the room, who can be in the room.

9    There is the lunch break, when they can take a lunch break.

10   There is a lunch break order.

11             MR. WEXLER:  I can assure the Court you will not get

12   any of those calls from us.

13             THE COURT:  Thank you.

14             There is the lunch break and who can be in the room

15   and why are they in the room and that kind of stuff.  But it

16   is a standing order.  I allow calls from deps for that exact

17   reason.  No one has ever called me on one of those things.  It

18   is dumb stuff.

19             Anything else?

20             MR. ZAPALA:  I don't think so, Your Honor.  This has

21   been extremely helpful.  Thank you for having us in.

22             THE COURT:  From the defense?

23             MS. LIPSCOMB-JACKSON:  Yes.  Just one clarification,

24   Your Honor, so we follow the procedure you prefer.

25             Assuming that we do decide to move forward with a

1    Rule 12 motion and that motion does seek complete dismissal of

2    the complaint, because I heard you earlier talking about

3    answers, if you have to bifurcate, what you would be

4    responding, what not, what is your -- if we were going to move

5    to dismiss the entire complaint, may we forgo the answer in

6    that circumstance?

7        THE COURT:  Well, I would like to see the complaint.

8    If it is short and all you are going to be doing is admits,

9    denies, and lack knowledge, and it is not going to be too

10   burdensome, I would probably have you answer.  If it is a

11   60-page complaint with all kinds of things that is going to be

12   extremely burdensome, then maybe I will stay the answer.

13       Even in cases where I did motions to dismiss, if the

14   motion to dismiss was filed, I would sit down with my client,

15   print out the complaint for me, for the client.  Paragraph 1,

16   jurisdiction, we are admitting.  Then you admit it.  Then it

17   is admits, denies.  And if the motion is denied, we are ready

18   to roll, because, again, I have got to keep you on track, and

19   this case is not going to be a decade-long case.  I have

20   enough of those, okay?  And I don't need another one.

21       So I will take a look at the complaint.  If there is

22   a motion to dismiss, I will let you know whether or not you

23   should be working on the answer, okay?  Because maybe I will

24   give you a shorter period of time.  But it couldn't hurt, and

25   it is not expensive or time consuming to sit down with your

 1  client and find out what they agree to and what they don't

 2  agree to.  It's an educational process for you, if anything

 3  else, and you would rather learn it then than in the middle of

 4  a deposition because that's terrible, okay?

 5          So those are my thoughts on that, okay?

 6          MS. LIPSCOMB-JACKSON:  All right.

 7          THE COURT:  Any other questions?

 8          MS. LIPSCOMB-JACKSON:  No, Your Honor.  Thank you so

 9  much.

10          THE COURT:  Okay.  All right.  Are we good?

11          MR. ZAPALA:  Thank you, Your Honor.

12          THE COURT:  If there is donuts and coffee left there,

13  take them, go ahead; otherwise, we are all going to eat them.

14          Okay.  All right.  Thanks.

15          MR. ZAPALA:  Thank you, Your Honor.

16          THE COURT:  On the proposed scheduling order, when

17  were you planning on -- why don't you just send me a draft so

18  I know what your guys' thinking is.  So talk among yourselves.

19  Get me sort of a proposed thing.  We have your consolidated

20  amended complaint due the 24th of October, and then the answer

21  or a motion under Rule 12 due December 8th.  That's your

22  calculations as well?

23          MR. LEE:  Yes.

24          THE COURT:  Okay.  So we will go with that.  That's

25  the only thing that we are going to require, the consolidated

1    amended complaint by that date, and then the response, if

2    that.  But get me your proposed case management order, and,

3    again, submit it through the proposed order portal so I know

4    kind of what your thinking is.

5          MR. ZAPALA:  We will get that to you promptly since

6    most of this is agreed upon, at least the initial issues.

7          THE COURT:  Okay.  Thanks.  We're good.

8          Okay.  Have a good day, everybody.

9      (Which were all the proceedings heard.)

10                        CERTIFICATE

11     I certify that the foregoing is a correct transcript from

12    the record of proceedings in the above-entitled matter.

13    */s/Heather M. Perkins-Reiva*            *September 19, 2022*

14    _____        _____

      Heather M. Perkins-Reiva                    Date
15    Official Court Reporter

16

17

18

19

20

21

22

23

24

25