## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| IN RE: DEERE & COMPANY REPAIR SERVICES ANTITRUST LITIGATION | Case No. 3:22-cv-50188 MDL No. 3030 <br><br> Hon. Iain D. Johnston |

## DEFENDANT DEERE & COMPANY'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT

Defendant Deere & Company ("John Deere"), by and through its undersigned counsel, hereby submits this Answer and Affirmative Defenses to Plaintiffs' Consolidated Class Action Complaint (the "Complaint").

Headings, sub-headings, images, and footnotes in the Complaint do not constitute well-pleaded allegations of fact and therefore require no response. Further, unless expressly stated otherwise, John Deere denies, generally and specifically, each and every allegation in the Complaint, including any allegations in the preamble, unnumbered and numbered paragraphs, titles, table of contents, and characterization of documents, and specifically denies any liability to Plaintiffs. To the extent not expressly denied, all allegations for which John Deere denies possessing knowledge or information sufficient to form a belief are denied.

John Deere further states that its investigation of the present matter is ongoing. Accordingly, John Deere reserves the right to amend or supplement its Answer as may be necessary. In response to the numbered paragraphs in the Complaint, John Deere states as follows:

1.     This case is about John Deere and its affiliated dealerships' monopolization, attempted monopolization, exclusionary conduct, and restraint of the repair service market for John Deere ("Deere") brand agricultural equipment (such as tractors, combines, and other large agricultural machinery)[1] with onboard computers known as electronic control units, or "ECUs." For the sake of simplicity, this category of equipment is collectively referred to herein as "Tractors."

**ANSWER:**  John Deere denies the allegations in Paragraph 1.

2.     This is an antitrust class action pursuant to Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) brought by Plaintiffs, on their own behalf and on behalf of a class of persons and entities similarly situated.  Plaintiffs seek to represent those persons and entities who purchased repair services for Deere Tractors from January 10, 2018 to the present, from Defendant Deere and Co. (d/b/a John Deere) and co-conspirator authorized Deere dealerships (the "Dealerships" or "Dealers").

**ANSWER:**  John Deere admits that the Complaint purports to bring claims under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2).  John Deere admits that Plaintiffs purport to bring the action as a class action.  John Deere denies that the class described is proper for certification, denies that it has violated any law, and denies that Plaintiffs are entitled to any of the relief they seek.  John Deere denies all remaining allegations in Paragraph 2.

3.     A Tractor requires a substantial amount of maintenance and repair work over the course of its useful life, although the nature and extent of such repairs vary and are extremely difficult to predict.  Farmers have traditionally repaired and maintained their own equipment when and as needed, or else have had the ability to choose to hire an independent mechanic to perform those repairs.  However, for newer generations of Deere Tractors equipped with ECUs, that is no longer the case.

**ANSWER:**  John Deere denies the allegations in Paragraph 3.

4.     That is because Deere and its Dealerships monopolize and restrain the market for repair and maintenance services ("Repair Services") of its Tractors by designing the Tractors so that diagnosis and/or completion of certain maintenance and repairs requires the use of critical software and other Deere and Deere Dealer-controlled informational resources (collectively "Repair Tools") available only to Deere authorized technicians which it withholds from farmers and independent repair shops.

**ANSWER:**  John Deere denies the allegations in Paragraph 4.

---

[1] Deere agricultural equipment includes, e.g., tractors, application equipment, tillage, planters, air seeders, self-propelled forage harvesters, balers, windrowers, combines, cotton harvesters and pickers, sprayers, and sugar cane harvesters.

5. Because of Deere's refusal to provide access to Repair Tools, farmers and independent mechanics cannot effectively perform (diagnose and/or complete) certain critical repairs on Tractors. Farmers are forced to use Deere-affiliated Dealerships for Repair Services when they would otherwise fix the Tractor themselves or utilize the services of a lower-cost and/or more convenient independent mechanic.

**ANSWER:** John Deere denies the allegations in Paragraph 5.

6. Deere dominates the concentrated market for sales of agricultural machinery in the United States, with a larger market share than that of its next two largest competitors, Case New Holland and Kubota Corp., combined.[2]

**ANSWER:** John Deere denies the allegations in Paragraph 6.

7. Deere maintains control over the Repair Services Market through its increasingly highly-consolidated network of authorized Dealerships. Dealerships are independently-owned businesses that work in close collaboration with Deere, which maintains significant and active oversight, support, and direction for the Dealerships' operations. For example, in the Dealership agreement, Deere closely outlines how it oversees its Dealers' service departments:

> 2. Dealer will actively and aggressively promote the sale of Parts and Service. Dealer's compliance with this commitment will be evaluated based on performance in Dealer's AOR and not on performance outside Dealer's AOR.
>
> Dealer will maintain:
>
> a) highly qualified parts and service personnel;
>
> b) personnel development programs, including participation in appropriate Company training for marketing, sales, service and management;
>
> c) inventories of Parts, including Competitive Parts;
>
> d) state of the art diagnostic equipment, service equipment, field service vehicles and tools; and
>
> e) parts and service facilities that in each case are sufficient to achieve the Performance Standards set by Company.

---

[2] Peter Waldman & Lydia Mulvany, Farmers Fight John Deere Over Who Gets to Fix an $800,000 Tractor, Bloomberg Businessweek (Mar. 5, 2020, 2:00 AM PST), https://www.bloomberg.com/news/features/2020-03-05/farmers-fight-john-deere-over-who-gets- to-fix-an-800-000-tractor.

**ANSWER:** John Deere admits that its authorized Dealerships are independently-owned businesses and that they provide repair services. John Deere denies the remaining allegations in Paragraph 7.

8. Only authorized Dealerships are permitted to sell new Deere Tractors and parts, subject to Dealership agreements that control how the Dealership conducts its business and maintains records.

**ANSWER:** John Deere admits that only authorized John Deere Dealerships can sell new John Deere-branded equipment. John Deere further admits that it enters into agreements with authorized John Deere Dealerships that govern the parties' relationship. John Deere denies the remaining allegations in Paragraph 8.

9. When a Tractor manufactured by Deere breaks down, a Dealership, rather than Deere itself, provides the technician to make the repair. Deere provides the Dealership with access to software and other resources that enables technicians to—at least in theory—diagnose mechanical and electrical issues and complete any necessary repairs.

**ANSWER:** John Deere denies the allegations in Paragraph 9.

10. Deere, in concert and agreement with its Dealerships, withholds repair software and other informational repair resources such as bulletins or service manual pages (or their content) to any person or entity that is a competitor of Deere or a Dealership.

**XIV. Use of Price Lists, Catalogs and Manuals**

The Manual and any bulletins, price lists, catalogs, and service manual pages furnished to Dealer by Company, either printed material or electronic version, must be kept in good condition and returned to Company upon termination of Dealer's appointment. Dealer will not disclose, directly or indirectly, the contents of such Manual, bulletins, price lists, catalogs, and service manual pages or electronic communications to a person or entity that is a competitor of Company or a John Deere dealer.

**ANSWER:** John Deere denies the allegations in Paragraph 10.

11. Authorized Dealerships use a software tool called Service ADVISOR ("Dealer Service Advisor") to diagnose and repair Tractors. Dealer Service Advisor is loaded onto a laptop, which connects to a Tractor to scan, update, and communicate with a Tractor's onboard embedded software. Dealer Service Advisor has extensive functionality, allowing technicians to view data related to the past performance of the Tractor, clear error codes, communicate and pair newly-installed parts so that the Tractor recognizes them, and program ECUs. Access to Dealer Service Advisor is also often necessary to resolve issues that stem from glitches or malfunctions in software, rather than correct or repair a mechanical issue.

**ANSWER:** John Deere denies the allegations in Paragraph 11.

12.     Dealerships rely increasingly on the Dealer Technical Assistance Center ("DTAC"), a central service with informational resources controlled and operated by Deere. DTAC includes a searchable troubleshooting database, with a library of information (e.g., service bulletins) that is not included within the Tractor Manuals and is not otherwise available in any format to non-Dealers. Dealership technicians can run searches on DTAC, and if they are still unable to determine the root cause of an issue or cannot determine how to complete a repair, Dealership technicians can email or call DTAC to get live assistance.

**ANSWER:** John Deere denies the allegations in Paragraph 12.

13.     Through DTAC, Dealerships also have access to Product Improvement Programs ("PIPs") which are instructions on how to troubleshoot and repair more complex problems that impact large numbers of Deere Tractors.[3] The existence of *some* PIPs are publicly disclosed, but there are also "secret" PIPs that are known only to Deere and the Dealerships. Dealerships may choose not to inform the farmer of PIPs for their Tractors until after a serious problem has manifested. Even when a PIP is "public", the troubleshooting steps and repair information are not independently accessible.

**ANSWER:** John Deere denies the allegations in Paragraph 13.

14.     Deere does not provide, and has never provided, access to Dealer Service Advisor or DTAC to anyone but its authorized Dealerships.

**ANSWER:** John Deere denies the allegations in Paragraph 14.

15.     Despite the stark discrepancy in access to Repair Tools, Deere has polluted the discourse around the ability of farmers and independent technicians to perform repairs through years of false and misleading statements. Deere and the Dealerships, along with industry groups directly representing their interests, have perpetuated misinformation about how repairable Deere Tractors are, what resources are necessary to perform comprehensive repairs, and whether Deere and its Dealerships have made repair resources available to non-Dealers.[4] Such misinformation further prevents farmers from reasonably predicting their ability to independently repair Tractors or to anticipate the costs of repairs over the useful life of their Tractors.

**ANSWER:** John Deere denies the allegations in Paragraph 15.

---

[3] PIPs are either mandatory or "fix as fail." Deere and its Dealers typically do not disclose such "fix as fail" PIPs or the likelihood of associated repairs but will make the repair as needed when the product or component eventually does fail. This can be particularly problematic for farmers who, without the ability to forecast the need or such a repair, are unable to avoid experiencing the failure at a critical time in the agricultural cycle.

[4] As discussed in more detail below, Deere, the Dealerships, and their industry representatives have stated repairing Deere Tractors does not require access to software tools; that Deere Dealerships had already provided access to the information and tools necessary for the vast majority of repairs; that as of 2021, comprehensive repair tools had been made newly available; and that Deere does not provide specific functionality or information on repairs for very good reasons.

16.     Tactical misinformation perpetuated by Deere and co-conspirator Dealerships and their trade groups is nothing new for the industry; it is not even limited to the availability of the Repair Tools.  Publications and statements are disseminated by Deere and its proxies which assert that the demand for the full spectrum of Repair Tools is motivated by any number of things *except* for the farmer's actual need to repair their tractors in an efficient and timely manner.[5]

**ANSWER:**  John Deere denies the allegations in Paragraph 16.

17.     Frustrated farmers began speaking to state lawmakers about the repair restrictions and the lack of competition in the Repair Services market.  To stave off legislation that could force Deere and other manufacturers to provide Dealer-level repair tools, Deere committed to making comprehensive repair tools available to farmers and independent shops by January 1, 2021.

**ANSWER:**  John Deere denies the allegations in Paragraph 17.

18.     Deere did not make these promised comprehensive repair resources available by this date.

**ANSWER:**  John Deere denies the allegations in Paragraph 18.

19.     In 2021, multiple investigative journalists attempted to determine whether the promised Repair Tools were available.  The Dealerships' response was that they did not sell the Software to customers, or that it was only available to licensed Dealers, and the Dealership was not allowed to sell it to anyone else.[6]

**ANSWER:**  To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 19, it denies them.  John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

---

[5] Some of the proffered reasons include (1) farmers only want Repair Tools because there is insufficient access to rural broadband, and therefore farmers are only dissatisfied about the difficulty of getting remote diagnostics performed by their dealer; (2) farmers do not understand that all the resources have always been available (or alternatively, that all of the resources necessary for repairs have recently been made available); (3) farmers actually have no real issues repairing their equipment, and the push for Repair Tools are from a few outlier farmers who are being used as pawns by nefarious techies and hackers who want to gain access to Deere's source code; (4) the demand for Repair Tools comes from farmers' overwhelming desire to flout environmental regulations; and (5) farmers and independent mechanics are naive to think they have the technical ability to effectively understand and work on their Deere equipment.

[6] Jason Koebler & Matthew Gault, *John Deere Promised Farmers It Would Make Tractors Easy to Repair. It Lied.*, Vice Motherboard (Feb. 18, 2021, 10:17 AM), https://www.vice.com/en/article/v7m8mx/john-deere-promised-farmers-it-would-make-tractors-easy-to-repair-it-lied.

20.     In January 2022, the first case in this litigation was filed.  In March, a significant coalition of farmers unions from around the country filed a petition to the FTC to investigate Deere's repair restrictions.[7]

**ANSWER:**  John Deere admits the first case in this litigation was filed on January 12, 2022.  John Deere further admits that in March 2022, a complaint was filed with the Federal Trade Commission regarding John Deere's repair services.  John Deere denies the remaining allegations in Paragraph 20 because it lacks knowledge or information sufficient to form a belief as to their truth.

21.     With an increasing amount of public scrutiny and the growing volume of farmers' demand for repair tools (on top of the negative press Deere had received in late 2021 related to the Deere UAW labor strike), Deere was forced to take some type of action to repair its public image.

**ANSWER:**  John Deere denies the allegations in Paragraph 21.

22.     Deere's Dealerships had widely failed to sell or even recognize the existence of the supposedly-available customer version of its diagnostic software ("Customer Service Advisor"). In June 2022, Deere began to directly sell this customer-version software on its website.  However, Customer Service Advisor is an overpriced, inferior product with limited capabilities that cannot be used to perform comprehensive Tractor repairs.  The availability of this product for purchase did not, and cannot, restore competition to the market for Repair Services.

**ANSWER:**  John Deere admits that it sells Customer Service ADVISOR directly to customers and has since May 2022.  John Deere denies the remaining allegations in Paragraph 22.

23.     Deere's varying justifications for continuing to withhold vital Repair Tools are factually unsupported, inherently insincere, and anti-competitive.  The simple and far more credible explanation for Deere's repair restrictions is that Deere and the Dealerships are unwilling to release their chokehold on the extremely-profitable Repair Services market.

**ANSWER:**  John Deere denies the allegations in Paragraph 23.

24.     The Dealerships receive most of the direct profit from the sale of Repair Services, but Deere has additional incentives to prevent farmers and independent mechanics from accessing Dealer-level Repair Tools.  By limiting DTAC access, Deere can withhold information on known software and mechanical issues from farmers, limiting Deere's exposure for covering warranty repairs.[8]  Moreover, Deere is commonly the party providing the financing for the Tractors'

---

[7] Complaint for Action to Stop Unfair Methods of Competition and Unfair and Deceptive Trade Practices, *Nat'l Farmers Union, et al. v. Deere & Co.* (Mar. 3, 2022), https://farmaction.us/wp-content/uploads/2022/03/Deere-Right-To-Repair-FTC-Complaint.pdf.

[8] For example, Deere can use DTAC to provide its Dealerships with information necessary to diagnose and repair a known defect in a new Tractor, but its tight control over access to DTAC keeps this information from becoming public.  If a defect manifests within the warranty period for a Tractor, Deere may be responsible for covering the cost of the repair.  If, however, a defect is known and may manifest

frequent and expensive repairs. Farmers commonly charge the cost of Repair Services to an account with Deere Financial, which provides Deere with another opportunity to make money on interest charged to these accounts.

**ANSWER:** John Deere denies the allegations in Paragraph 24.

25. Not only have Deere's repair restrictions shut out independent mechanics who previously competed with Dealerships in the Repair Services market, but Deere's strategy of aggressively pushing for consolidation among its Dealers has reduced the number and convenience of authorized Dealers. This consolidation further degrades the quality of Deere Repair Services. As farmers have been forced to rely on a smaller number of overbooked and more remotely located Dealers, the result is less timely and less efficient service.

**ANSWER:** John Deere denies the allegations in Paragraph 25.

26. Farmers now not only lack the choice to go to an independent mechanic, but also lack meaningful choices among authorized Dealerships. For most farmers, if there are Dealership locations within a reasonable distance to provide Repair Services, they are frequently all owned by one of Deere's chosen "Big Dealers."

**ANSWER:** John Deere denies the allegations in Paragraph 26.

27. Without another option for Repair Services—either through self-repair or through an independent shop—farmers frequently must endure undertrained and overworked technicians, incorrectly-performed or incomplete repairs, extensive waits for technicians during the time-critical harvest season, and exorbitant repair costs. Farmers often derisively refer to the company as "Mother Deere" when they are forced to purchase overly expensive parts or Repair Services from a Dealership.

**ANSWER:** To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 27, it denies them. John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

28. Farmers cannot simply purchase new equipment from another manufacturer to avoid these issues. Deere's main competitors also have similar repair restrictions. Farmers also make sizeable investments in their Tractors (e.g., equipment like the CP690 Cotton Picker has a starting price of nearly one million dollars)[9] and have invested in other technological products and services that work only with Deere equipment.

---

after the warranty period expires, Deere is incentivized to not release the information publicly and hope that most of the equipment failures occur outside of the period where they would be responsible for the cost of the repair.
[9] *John Deere CP690 FAQ's*, Certi-Pik, USA (May 26, 2020), https://certipik.com/2020/05/john-deere-cp690-faqs/ (last visited Oct. 20, 2022) ("If you are looking for a brand new CP690 picker, you can expect to pay anything from $978,897 for the base machine. However, the manufacturer allows customers to build their own equipment, with the changes resulting in adjustments in the price.").

**ANSWER:** To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 28, it denies them. John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

29.     Deere continues to exploit its relationship with customers who have purchased extremely expensive Tractors, locking customers into paying for expensive and inconvenient Repair Services from Deere and its Dealerships. Deere has created an effective tying arrangement, whereby the purchases of Deere Repair Services are tied to the purchase of Deere Tractors.

**ANSWER:** John Deere denies the allegations in Paragraph 29.

30.     Deere and the Dealerships, as alleged in this Complaint, successfully restricted competition in the Repair Services Market in the United States for Deere Tractors—which would otherwise have been a robust and competitive aftermarket—and derived supracompetitive profits from the sale of Deere Repair Services by shutting out farmers and independent repair shops from accessing the Repair Tools necessary for comprehensive repairs.

**ANSWER:** John Deere denies allegations in Paragraph 30.

31.     Deere's scheme to prevent independent repairs creates additional revenue for Deere and its co-conspirator Dealerships over the entire useful life of every Deere Tractor sold.

**ANSWER:** John Deere denies the allegations in Paragraph 31.

32.     Deere violated Section 1 of the Sherman Act through its agreements with Co-conspirator Dealerships to withhold the Repair Tools from farmers and independent repair shops.

**ANSWER:** John Deere denies the allegations in Paragraph 32.

33.     Deere also violated Section 1 of the Sherman Act through forcing Plaintiffs and Class Members to purchase Deere Repair Services from Dealerships once they were locked into ownership of an expensive Deere Tractor. Deere's tying arrangement between Deere Tractors and Repair Services had both the intent and effect of harming competition in the market for Deere Repair Services.

**ANSWER:** John Deere denies the allegations in Paragraph 33.

34.     Deere violated Section 2 of the Sherman Act by monopolizing or attempting to monopolize the Deere Repair Services Market in a manner that harmed competition and reduced choice, increasing prices in this market to supracompetitive levels. Deere has also leveraged its monopoly power over Deere Repair Tools to tie sales of its Tractors to sales of Deere Repair Services, in violation of Section 2 of the Sherman Act.

**ANSWER:** John Deere denies the allegations in Paragraph 34.

35.     Deere's illegal monopoly of the Deere Repair Services Market should be enjoined and dismantled, and Plaintiffs and the Class should be reimbursed by Deere for the amounts they overpaid for Deere Repair Services.

**ANSWER:** John Deere denies the allegations in Paragraph 35.

36.     Plaintiffs seek declaratory and injunctive relief, treble damages, costs, and attorneys' fees.  As for equitable relief, Plaintiffs seek an order requiring Deere to make the Repair Tools available, at reasonable cost, to individuals and independent repair shops.

**ANSWER:** John Deere admits that the Complaint purports to seek the relief stated in Paragraph 36.  John Deere denies that it has violated any law and denies that Plaintiffs are entitled to any of the relief they seek.  John Deere denies the remaining allegations in Paragraph 36.

37.     Plaintiffs bring this action on behalf of themselves and the proposed Class under Section 16 of the Clayton Act (15 U.SC. § 26) to secure injunctive relief against Defendant for violating Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), and to recover actual and compensatory damage, treble damages, interest, costs, and attorneys' fees for the injury caused by Defendant's conduct.

**ANSWER:** John Deere admits that Plaintiffs purport to assert claims on behalf of themselves and the proposed Class under Section 16 of the Clayton Act (15 U.SC. § 26).  John Deere further admits that the Complaint purports to assert claims under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2).  John Deere denies that it has violated any law, and denies that Plaintiffs are entitled to any of the relief they seek.  John Deere denies all remaining allegations in Paragraph 37.

38.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

**ANSWER:** John Deere states that the allegations in Paragraph 38 consist of legal conclusions, and therefore no response is required.  To the extent a response is required, John Deere denies the allegations.

39.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because sufficient diversity of citizenship exists between parties in this action, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are 100 or more members of the proposed class.

**ANSWER:** John Deere states that the allegations in Paragraph 39 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

40. Venue is appropriate in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. 28 U.S.C. §15(a), and 28 U.S.C. § 1391(b), (c) and (d) because Defendant Deere & Company transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

**ANSWER:** John Deere admits venue in this District is appropriate for pre-trial proceedings. John Deere states that the remaining allegations in Paragraph 40 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere admits that it transacted business in the state of Illinois, and denies all remaining allegations.

41. The activities of Defendant and its co-conspirators as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

**ANSWER:** John Deere denies the allegations in Paragraph 41.

42. Plaintiff **Plum Ridge Farms, Ltd.** ("Plum Ridge") is a limited liability company with its principal place of business in Elizabeth, Illinois. Plum Ridge is an agricultural crop farm of approximately 2,800 acres that grows corn, soybeans, wheat, and hay. In connection with its farming, Plum Ridge owns at least one Deere Tractor with an ECU and purchased Deere Repair Services from at least one Deere-affiliated Dealership during the Class Period. Plum Ridge suffered antitrust injury as a direct result of Deere and the Dealerships' anticompetitive and unlawful conduct alleged herein.

**ANSWER:** To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 42, it denies them. John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

43. Plaintiff **Colvin Farms, LLC** ("Colvin Farms") is a limited liability company with its principal place of business in Marianna, Florida. Colvin Farms is an agricultural crop farm of approximately 1,200 acres that grows peanuts, cotton, field corn, sweet corn, watermelons, snap beans, and small grains. In connection with its farming, Colvin owns at least one Deere Tractor with an ECU and purchased Deere Repair Services from at least one Deere-affiliated Dealership during the Class Period. Colvin suffered antitrust injury as a direct result of Deere and the Dealerships' anticompetitive and unlawful conduct alleged herein.

**ANSWER:** To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 43, it denies them. John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

44. Plaintiff **England Farms & Harvesting, LLC** ("England Farms") is a limited liability company with its principal place of business in Mercedes, Texas. England Farms is an agricultural crop and cattle farm of approximately 3,000 acres that grows cotton and row crops and raises cattle. In connection with its farming operations, England Farms owns at least one Deere Tractor with an ECU and purchased Deere Repair Services from at least one Deere-affiliated Dealership during the Class Period. England Farms suffered antitrust injury as a direct result of Deere and the Dealerships' anticompetitive and unlawful conduct alleged herein.

**ANSWER:** To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 44, it denies them. John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

45. Plaintiff **Robbins Family Grain Co., LLC** ("Robbins Family Grain") is a limited liability company with its principal place of business in Sackets Harbor, New York. Robbins Family Grain is an agricultural crop farm of approximately 7,000 acres that grows corn, soybeans, wheat, hay, oats, barley, and rye. In connection with its farming, Robbins Family Grain owns at least one Deere Tractor with an ECU and purchased Deere Repair Services from at least one Deere-affiliated Dealership during the Class Period. Robbins Family Grain suffered antitrust injury as a direct result of Deere and the Dealerships' anticompetitive and unlawful conduct alleged herein.

**ANSWER:** To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 45, it denies them. John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

46. Plaintiff **Wilson Farms Land & Cattle Co. LLC** ("Wilson Farms") is a limited liability company with its principal place of business in Butler, Missouri. Wilson Farms is an agricultural crop and cattle farm of approximately 4,000 acres that grows corn and soybeans along with raising cattle. In connection with its farming, Wilson Farms owns at least one Deere Tractor with an ECU and purchased Deere Repair Services from at least one Deere-affiliated Dealership during the Class Period. Wilson suffered antitrust injury as a direct result of Deere and the Dealerships' anticompetitive and unlawful conduct alleged herein.

**ANSWER:** To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 46, it denies them. John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

47.     Plaintiff **Hapka Farms, Inc.** ("Hapka Farms") is a corporation with its principal place of business in Warren, Minnesota. Hapka Farms is an agricultural crop farm of approximately 5,900 acres. In connection with its farming, Hapka Farms owns at least one Deere Tractor with an ECU and purchased Deere Repair Services from at least one Deere-affiliated Dealership during the Class Period. Hapka Farms suffered antitrust injury as a direct result of Deere and the Dealerships' anticompetitive and unlawful conduct alleged herein.

**ANSWER:** To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 47, it denies them. John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

48.     Plaintiff **Eagle Lake Farms Partnership** ("Eagle Lake Farms") is a partnership with its principal place of business in Newport, Arkansas. Eagle Lake Farms is an agricultural crop farm of approximately 4,000 acres that grows corn and soybeans. In connection with its farming, Eagle Lake Farms owns at least one Deere Tractor with an ECU and purchased Deere Repair Services from at least one Deere-affiliated Dealership during the Class Period. Eagle Lake Farms suffered antitrust injury as a direct result of Deere and the Dealerships' anticompetitive and unlawful conduct alleged herein.

**ANSWER:** To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 48, it denies them. John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

49.     Plaintiff **Blake Johnson** is a resident of Michie, Tennessee. Mr. Johnson is a cattle and hay farmer on approximately 250 acres of farmland. In connection with his farming, Mr. Johnson owns at least one Deere Tractor with an ECU, and purchased Deere Repair Services from at least one Deere-affiliated Dealership during the Class Period. Mr. Johnson suffered antitrust injury as a direct result of Deere and the Dealerships' anticompetitive and unlawful conduct alleged herein.

**ANSWER:** To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 49, it denies them. John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

50.     Plaintiff **Trinity Dale Wells** is a resident of Spruce Pine, Alabama. Mr. Wells is a cattle and hay farmer on approximately 125 acres of farmland. In connection with his farming, Mr. Wells owns at least one Deere Tractor with an ECU and purchased Deere Repair Services from at least one Deere-affiliated Dealership during the Class Period. Mr. Wells suffered antitrust injury as a direct result of Deere and the Dealerships' anticompetitive and unlawful conduct alleged herein.

**ANSWER:** To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 50, it denies them. John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

51. **Deere & Co**. is a corporation organized under the laws of Delaware that is headquartered in Moline, Illinois.

**ANSWER:** John Deere admits the allegations in Paragraph 51.

52. "Defendant" as used herein, includes, in addition to those identified specifically above, all of the named Defendant's predecessors, including companies that merged with or were acquired by the named Defendant, as well as Defendant's wholly-owned or controlled subsidiaries, and affiliates, who sold Deere Repair Services directly and/or through affiliated Dealerships, to purchasers in the United States during the Class Period.

**ANSWER:** John Deere admits that the Complaint purports to refer to "Defendant," as Defendant's predecessors, successors, parents, wholly-owned or controlled subsidiaries or affiliates, but denies that such a reference provides any legal basis for attributing actions to Defendant.

53. Co-conspirators include independently-owned Dealerships with agreements with Deere giving them the right to sell new Deere Tractors, parts, and Deere Repair Services, which sold Deere Repair Services in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States during the Class Period.

**ANSWER:** John Deere denies the allegations in Paragraph 53.

54. In 2022, 95% of Deere Dealerships are owned by a "Big Dealer," i.e., a Dealer that owns 5 or more individual locations.[10] The largest agricultural Deere Dealership groups are **Ag-Pro Companies** (79 locations), **United Ag & Turf** (63 locations)**, C&B Operations** (36 locations), **Papé Machinery** (35 locations); **RDO Equipment** (30 locations); **Brandt Holdings** (32 locations); **Greenway Equipment** (32 locations); **Van Wall Group** (31 locations); **Quality Equipment** (30 locations) **Hutson's** (31 locations), **Midwest Machinery** (30 locations); **Quality Equipment** (30 locations), **P&K Equipment/P&K Midwest** (29 locations); **Trigreen Equipment** (29 locations), **AKRS Equipment** (27 locations); **James River Equipment** (27 locations); **SN Partners – Sydenstricker-Noble** (27 locations); **Sloan Implement** (22 locations); Tellus (22 locations); **Western Implement** (22 locations); **Heritage Tractor** (21 locations);

---

[10] Ag Equipment Intelligence, 2022 'Big Dealer' Report 4 (2022) (95% of an estimated 1,544 Deere agriculture store locations are owned by Big Dealers).

**SunSouth** (21 locations); **LandMark Equipment** (20 locations); and **LandPro Equipment** (20 locations).[11]

**ANSWER:** John Deere admits that the 2022 Big Dealer Report referenced in Footnotes 10 & 11 contains the information alleged in Paragraph 54, with the exception of the number of locations for Papé Machinery, which is 44 locations according to the 2022 Big Dealer Report. John Deere denies that the "Big Dealers" listed in Paragraph 54 include all of the largest independently owned authorized John Deere Dealerships according to the 2022 Big Dealer Report.

55.     During the Class Period, Defendant, directly or through its subsidiaries or affiliated co-conspirator Dealerships, sold Deere Repair Services in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

**ANSWER:** John Deere denies the allegations in Paragraph 55.

56.     During the Class Period, Defendant and its co-conspirators controlled the market for Deere Repair Services in the United States.

**ANSWER:** John Deere denies the allegations in Paragraph 56.

57.     Defendant's and its co-conspirators' business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

**ANSWER:** John Deere denies the allegations in Paragraph 57.

58.     **Deere Repair Services Market.**   The principal relevant market to evaluate Defendant's and its co-conspirators' anticompetitive conduct is the Deere Repair Services Market.

**ANSWER:** John Deere denies that the definition of "Deere Repair Services Market" alleged in this Complaint and Paragraph is proper and denies the remaining allegations in Paragraph 58.

59.     The Deere Repair Services Market constitutes various services to repair, maintain, and clear fault codes from Deere Tractors.[12]

---

[11] *Id.*

[12] As described above, "Tractors" for purposes of this litigation includes Deere agricultural equipment, e.g., tractors, application equipment, tillage, planters, air seeders, self-propelled forage harvesters, balers, windrowers, combines, cotton harvesters and pickers, sprayers, and sugar cane harvesters.

**ANSWER:** John Deere denies that the definition of "Deere Repair Services Market" alleged in

this Complaint and Paragraph is proper and denies the remaining allegations in Paragraph 59.

60.     There are no available substitutes for Deere Repair Services, and Deere Repair Services are not interchangeable with any other manufacturers' service.

**ANSWER:** John Deere denies the allegations in Paragraph 60.

61.     The relevant geographic market is the United States.

**ANSWER:** John Deere denies the allegations in Paragraph 61.

62.     Defendant Deere has market power in the relevant market through its control over access to the Repair Tools.

**ANSWER:** John Deere denies the allegations in Paragraph 62.

63.     Defendant's effective total control of the Repair Tools means that independent repair shops are unable to access the necessary resources to be able to meaningfully compete with Deere.  Similarly, any farmers who wish to perform their own repairs and/or maintenance are also unable to access the resources necessary to do so.

**ANSWER:** John Deere denies the allegations in Paragraph 63.

64.     **Deere Repair Tools Market.**  As discussed above, Defendant maintains market and monopoly power over the market for Deere Repair Tools.

**ANSWER:** John Deere denies that the definition of "Deere Repair Tools Market" alleged in this

Complaint and Paragraph is proper and denies the remaining allegations in Paragraph 64.

65.     There is no available substitute for Deere Repair Tools, and Deere Repair Tools are not interchangeable with any other manufacturers' products.

**ANSWER:** John Deere denies the allegations in Paragraph 65.

66.     **Tractor Market.**  The Deere Repair Services market and the market for Tractors are distinct.  The "Tractor Market" includes the United States product market for agricultural equipment (described as "Tractors" in this Complaint), which include tractors, application equipment, tillage, planters, air seeders, self-propelled forage harvesters, balers, windrowers, combines, cotton harvesters, and sugar cane harvesters.

**ANSWER:** John Deere denies that the definition of "Tractor Market" alleged in this Complaint

and Paragraph is proper and denies the remaining allegations in Paragraph 66.

67.    Deere is indisputably the biggest player in the market for Tractors in the United States.  Deere wields significant economic power in the market for Tractors in North America[13] and, as noted above, has a larger market share than that of its next two largest competitors, Case New Holland and Kubota Corp., combined.[14]

**ANSWER:**  John Deere denies the allegations in Paragraph 67.

68.    Defendant Deere has appreciable economic power in the U.S. Tractor Markets, controlling approximately 55% and 63% of the large tractor and combine markets, respectively.

**ANSWER:**  John Deere denies the allegations in Paragraph 68.

69.    Deere's share of its US sales in the Tractor markets are high, but even that may understate its true market power.

**ANSWER:**  John Deere denies the allegations in Paragraph 69.

70.    Tractors and combines are highly differentiated products, with unique specifications and capabilities.  Agricultural machinery is often highly specialized in terms of its functionality and as such, each specialized product is unlikely to have many close substitute products or brands.  Moreover, purchasers of Tractors are typically in rural and remote locations where choice between brands may already be limited, particularly given the frequent necessity of repairing the equipment at the Dealer.

**ANSWER:**  John Deere admits that each of the products in Plaintiffs' definition of "Tractor" has

unique specifications and capabilities and is not substitutable for other products in Plaintiffs'

"Tractor" definition.  This is one reason why the definition of "Tractor" alleged in this Complaint

and Paragraph is improper.  John Deere denies the remaining allegations in Paragraph 70.

71.    Farmers historically have been able to perform their own repairs on their Tractors or have them repaired by their independent mechanic of choice.  However, as computers and software have become increasingly intertwined with basic operations of farming equipment, Deere has restricted access to necessary Repair Tools, thereby preventing owners and independent repair shops from competing with Deere-affiliated Dealerships to make repairs on newer, ECU-equipped Tractors.

**ANSWER:**  John Deere denies the allegations in Paragraph 71.

72.    Modern Deere Tractors are technologically complex machines.  These Tractors run firmware, i.e., software code, necessary for the performance of their basic functions, replacing

---

[13] Jennifer Reibel, *Manufacturer Consolidation Reshaping the Farm Equipment Marketplace*, Farm Equipment (Aug. 29, 2018), https://www.farm-equipment.com/articles/15962-manufacturer-consolidation-reshaping-the-farm-equipment-marketplace.
[14] Waldman & Mulvany, *supra* note 2.

systems which historically were purely mechanical in nature. Without the firmware, the product will not run, making the firmware as vital a part of a Tractor as a steering wheel or an engine. The internal engine and the transmission components of a Tractor are run by code, which makes the code effectively part of the machine. The Tractors will not operate without code, or if the code is corrupted or incompatible.

**ANSWER:** John Deere admits that modern John Deere agriculture equipment is more

technologically complex than historic products, including an increase in the use of software, but

otherwise denies the allegations in Paragraph 72.

73.     Tractors contain several computers throughout that are known as Electronic Control Units, or "ECUs." ECUs determine how—and if—the Tractor functions. Depending on the model, a Tractor may have as many as 40 ECUs. The image below shows two ECUs installed on a Deere combine:



**ANSWER:** John Deere admits that the Complaint purports to include an image showing two

ECUs installed on a John Deere combine. John Deere denies the remaining allegations in

Paragraph 73.

74.     Since about 2000, Deere Tractors began using what is known as a "CAN bus" systems in their machinery, standing for Controller Area Network. CAN bus is essentially a central electrical system that allows communications between different parts of the machinery, i.e., the different ECUs throughout a Tractor. Sales manuals for Deere Tractors explain that an advantage of the system is to "allow[] the technician at the dealership to plug into the system using the Service

ADVISOR™ computer program. The Service ADVISOR program links up to the tractor's electrical system to read the communications between the [ECUs] to determine where the problem is located and how it can be fixed."[15]

**ANSWER:** John Deere admits the quoted language appears on the website at the link in Footnote

15. John Deere denies the remaining allegations of this Paragraph, including to the extent that

they improperly summarize, paraphrase or take the language out of context.

> 75. Dealer Service Advisor, per John Deere's sales manual materials, is
>
> a tool used by John Deere **dealerships** capable of providing technical and mechanical support for technicians and service managers through the use of a laptop computer. Service ADVISOR provides symptom-based diagnostics information, specific machine information, and electronic technical information. It also offers a connection to John Deere help and solutions through an extranet connection at the workshop and in the field.
>
> Service ADVISOR is a fast diagnostic testing system for all controller area network (CAN) bus tractors. This system is the cutting edge of service technology and will save time and money by faster equipment repair.

(emphasis added).

**ANSWER:** Plaintiffs fail to provide a citation for the purported source of the information in

Paragraph 75. John Deere admits that the description of Dealer Service Advisor in Paragraph 75

appears to be accurate.

> 76. Like cars and highway trucks, Deere Tractors contain numerous sensors throughout the equipment that are constantly monitored by several different ECUs within the Tractor.

**ANSWER:** John Deere lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 76, including which cars and trucks Plaintiffs seek to compare to

John Deere products and, accordingly, denies the allegations in Paragraph 76.

> 77. When a sensor notices an error, or the sensor itself malfunctions, it can put the machine into "limp mode," where the engine will only run at significantly reduced power. This allows the machine to move slowly, but the Tractor cannot reliably and effectively perform its

---

[15] *See* John Deere & Co Sales Manual, Electrical, CAN bus electrical system (2017), http://salesmanual.deere.com/sales/salesmanual/en_NA/tractors/2011/feature/electrical_and_lights/6030p _7030p/6030_7030_can_bus_story.html.

functions. The Tractor may display what is known as a diagnostic trouble code or "DTC" (referred to herein as an "error code").

**ANSWER:** John Deere denies the allegations in Paragraph 77.

78. After the Tractor's problem is diagnosed (i.e., the meaning behind the error code is determined) and a repair is completed (according to the Tractor's sensors), the error code may be automatically cleared, and the machine can continue working.[16] There are certain codes that are "non-self-healing" that require a Dealer technician to clear.

**ANSWER:** John Deere admits the allegations in Paragraph 78.

79. Deere has deliberately designed its Tractors so that both the diagnosis and the completion of a repair frequently requires software tools and other Dealership-only resources.

**ANSWER:** John Deere denies the allegations in Paragraph 79.

80. First, Dealer-level software and other informational resources are frequently needed to figure out what the error code means and what repair is required. Then, for at least some repairs, once the repair is made, Dealer-level software is needed to authorize the repair, in order to "pair" the new part to the machine within the CAN bus system. For certain parts that are replaced, the Tractor will not function with a new part installed until the Tractor is given a code that will clear error messages and allow the Tractor to function again.

**ANSWER:** John Deere denies the allegations in Paragraph 80.

81. Even if the farmer can interpret an error code to determine what the problem is with the Tractor, it doesn't matter how tech-savvy or experienced a mechanic or the farmer is; without access to the necessary Repair Tools, farmers must still frequently call a Dealership. A technician from the Dealership will then travel to where the Tractor is, plug in the necessary tools, and clear the error codes. Alternatively, the farmer may need to haul the Tractor to the Dealership themselves for the repair.

**ANSWER:** John Deere denies the allegations in Paragraph 81.

82. A report from the U.S. Public Interest Research Group ("PIRG") notes that the John Deere S760 combine harvester has at least 125 different sensors.[17] If any one of those sensors throw an error code, the farmer may be required to pay a Dealership technician to use Dealer Service Advisor to diagnose and repair the issue. And according to one agricultural equipment expert, sensors and their associated ECU networks are now the highest point of failure on the product.[18]

---

[16] Koebler & Gault, *supra* note 6.
[17] Kevin O'Reilly, *Deere in the Headlights*, U.S. PIRG Educ. Fund, 5 (2021), https://publicinterestnetwork.org/wp-content/uploads/2022/07/WEB_USP_Deere-in-the-Headlights_V3-1.pdf.
[18] *Id.* at 6.

**ANSWER:** John Deere admits that the U.S. Public Interest Research Group issued a report entitled "Deere in the Headlights." John Deere denies the remaining allegations in Paragraph 82.

83. Tractors' emission systems are a common source of an error code that can result in the Tractor going into limp mode (also known as "de-rating"). The Tractor cannot get out of "limp mode" until the code is cleared. De-rating can happen even when the only reason the error code occurred is a software glitch or an electronic sensor malfunctioning, rather than a true mechanical problem with the emissions system. If a farmer is fortunate, a Dealership nearby may be able to send a technician relatively quickly. But during a busy harvest season, farmers can wait days for a technician with Dealer Service Advisor to plug into their Tractor and do something as simple as reset an ECU or replace a sensor. In the meantime, they watch their crops rot.

**ANSWER:** John Deere denies the allegations in Paragraph 83.

84. Troubleshooting issues on Deere Tractors also frequently requires informational resources that Deere refuses to make available to farmers or independent mechanics. As Deere pushes new, sometimes insufficiently-tested technology into the market, farmers have increasingly experienced problems with their Tractors that cannot be efficiently diagnosed or repaired without access to diagnostic capability and information available only in Dealer-level Repair Tools.

**ANSWER:** John Deere denies the allegations in Paragraph 84.

85. Deere claims that its diagnostic error codes are all published and that a farmer can look the codes up when needed to diagnose an issue. But the Diagnosis and Tests Service Manuals for Deere's 8130, 82390, 8330, 8430, and 8530 machines tell a very different story. Of the diagnostic error codes the Manual lists, 627—more than 89%—state that to solve the issue the farmer should "Have your John Deere dealer repair as soon as possible." The Operator Manuals, available for purchase from Deere, offer little to no guidance on how a farmer could repair the machine. In newer models of Tractors, the number of error codes has increased dramatically. This aspect of the Deere repair system also clearly steers revenue to Deere Dealers.

**ANSWER:** John Deere denies the allegations in Paragraph 85.

86. Replacing an ECU on a Tractor also can render the machine inoperable until a farmer pays a Dealership technician to ask Deere for a "payload" file, which provides the required software code for the ECU. For example, a farmer may be able to physically install a new ECU on a Tractor if the old one needs to be replaced, but completion of that installation requires the farmer to pay for a Deere Technician to provide the serial number of the specific Tractor to DTAC. DTAC will then send an encrypted payload file that can be loaded onto the ECU only through Dealer Service Advisor. Only after Deere has created and sent the Payload file to the technician can the operation of the Tractor be restored. Payload files for Tractors are akin to printer drivers for printers, which are also software files that allow the computer system to interact with the new device.

**ANSWER:** John Deere denies the allegations in Paragraph 86.

87.     During harvest time, when Tractors are running at full throttle for weeks on end, it is common for mechanical issues to arise.  Farmers who try to solve problems themselves or take their Tractors to more convenient repair shops are blocked from completing the repairs without the necessary Repair Tools.  For example, one customer who hired an independent agricultural equipment repair shop to replace a faulty moisture meter on a combine still had to wait and pay for the Dealer to come out and use Dealer Service Advisor to authorize the part.[19]

**ANSWER:**  To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 87, it denies them.  John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

88.     Representatives of Deere and the Dealerships continue to strategically downplay the necessity of access to Dealer-level Repair Tools and conceal how frequently the Repair Tools are required.  Following the filing of the first complaint in this litigation, a trade group representing the Dealerships, in apparent concert with Deere and the equipment manufacturer trade organizations, launched an aggressive campaign that instructed Dealerships to hang a flyer claiming that "Through your dealer, everything a customer needs to diagnose and repair their equipment is already available."[20]



**ANSWER:**  John Deere denies the allegations in Paragraph 88.

---

[19] Mae Anderson, *Without 'right to repair,' businesses lose time and money*, Associated Press (Aug. 10, 2021), https://apnews.com/article/technology-business- 9f84a8b72bb6dd408cb642414cd28f5d.

[20] *See* NAEDA, *Repair Done Right—Changing the Narrative on Right to Repair,* Equip. Dealer Magazine (May 24, 2022), https://www.equipmentdealermagazine.com/repair-done-right-changing-the-narrative-on-right-to-repair/.

89.     Deere notably does not allow farmers or independent repair shops to access its DTAC database, or access any of the information controlled by DTAC, which includes PIPs and the ability to request payload files.

**ANSWER:** John Deere denies the allegations in Paragraph 89.

90.     DTAC primarily operates as a searchable database of known solutions to common technical problems impacting large numbers of Tractors. Much of DTAC's information, which includes new and helpful guidance for many repairs and numbered "Solutions" to specific Tractor problems, is unavailable in any other format.

**ANSWER:** John Deere denies the allegations in Paragraph 90.

91.     DTAC does not require a person to have extensive technical capabilities to perform searches for solutions. For example, in a training for Deere employees, the advice for running searches is to "use simple words."



**ANSWER:** John Deere denies the allegations in Paragraph 91.

92.    An example of a DTAC problem/solution is excerpted below, which provides an example of the type of Repair Tools that only Dealers have access to through DTAC.

---

**Solution Number: 85589**

**Solution Summary: "Engine Load Profile Information" in Service ADVISOR**

**Publication Date: Feb 19 2018**

---

\*\*Paper copies of solutions may not be the most current solutions\*\*

**Complaint or Symptom :**

How do I obtain engine load information on Tier 2, Tier 3, iT4, or FT4 engines?

**Problem or Situation :**

Dealers need a way to download engine load data from the engine controller.

**Solution :**

The Engine Load Profile Information interactive test is a tool meant to allow the John Deere technician to determine usage of the engine over time. This usage data can assist when diagnosing certain problems. The load information is displayed from left to right with zero engine speed and zero load percentage displayed as the start point on the lower left with the maximum load and maximum speed operating points displayed on the upper right hand side of the graph.

\*\* **Warning #1**– Do not compare the Percent Load at Current Speed parameter directly with the Engine Load Profile Information test results. The two parameters are calculated differently and cannot be used in direct comparison. \*\*

\*\* **Warning #2**– Total engine hours and amount of time stored in the Engine Load Profile Information may not be the same based on whether or not the ECU has been replaced and whether the original data was transferred to the new ECU. Whenever possible, make sure to connect the old ECU when prompted during the ECU Programming process..

The **data usually** displays time versus load (Y axis) and engine speed (X axis) on a 15 by 15 grid. This load data is considered raw and may or may not appear to be skewed (up or down) based on the application and what the user expects to see within that data. Please see the warning #1 at the beginning of the solution for the explanation.

If you run the test and it displays the data **as a percentage of overall engine operating time.** A reference curve will now be displayed overtop of the data. The reference curve represents the general operating range of that application. Please see the list of applications later in this solution that can be accurately reviewed without assistance from DTAC. If your engine/application uses the original mode to display the data and it is not on the list you will need to contact DTAC for additional assistance

---

**ANSWER:** John Deere admits the image in Paragraph 92 appears to be a DTAC Solution. John Deere denies the remaining allegations of this Paragraph, including to the extent that they improperly summarize, paraphrase or take the language out of context.

93.     As of 2022, the reported cost for Repair Services from Deere or an authorized Dealer could range them $150–$180 per hour, with additional charges for travel and parts.  If a technician travels between the Dealership and the farmer multiple times because they have not correctly or completely finished a repair, the farmer is routinely still charged for the additional labor and travel.

**ANSWER:**  To the extent John Deere has knowledge or information sufficient to form a belief as

to the truth of allegations in Paragraph 93, it denies them.  John Deere denies the remaining

allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

94.     Regardless of a farmer's (or their chosen independent mechanic's) ability and knowledge regarding how to repair the Tractor they own, without the relevant Repair Tools, an authorized Deere technician must be called to perform many repairs.

**ANSWER:**  John Deere denies the allegations in Paragraph 94.

95.     Logistically, this is a nightmare for many farmers.  When a farmer calls a Dealer to perform a repair, the farmer is at the mercy of the Dealer's schedule and location and must pay whatever the cost is—including travel expenses—even if the problem could be fixed in 15 minutes with access to the Repair Tools.  Farmers also may work far away from the nearest Dealership or technician, leading them to have to pay substantial amounts for travel time or the cost of having their equipment hauled to a Dealership.

**ANSWER:**  John Deere denies the allegations in Paragraph 95.

96.     There are relatively few remaining independent mechanics who work on Tractors, but even those mechanics who do work on older Deere models cannot effectively work on the modern equipment due to lack of access to the Repair Tools.  Farmers can therefore no longer compare prices and decide between a Dealership or an independent shop.

**ANSWER:**  John Deere denies the allegations in Paragraph 96.

97.     Practical considerations also prevent farmers and independent shops from doing maintenance on Tractors, even when repairs do not initially appear like they should require the functionality of Dealer Service Advisor to complete.  For example, a large combine may need to be taken apart to a considerable degree to perform regular maintenance and preventative repairs on an annual or semi-annual basis.  If an independent shop could be found that agrees to undertake this maintenance work and then discovers a repair that requires Dealer-level Repair Tools to complete, the farmer is put in an unenviable position.  A Dealership technician must be persuaded to travel to its competitor and plug in Dealer Service Advisor, or alternatively, the owner of the Tractor could reassemble their combine, deliver it to a Deere Dealership for repair, and ultimately pay for the same maintenance twice.  Because repairs requiring Dealer Service Advisor are frequent and independent shops are denied access to Dealer-level resources, independent repair shops are not viable alternatives.  In any case, most independent mechanics who work on Deere equipment have been driven out of many Dealerships' customer territory.

**ANSWER:** John Deere denies the allegations in Paragraph 97.

98.     Deere has thus made farmers dependent on Deere's Dealerships for repairs. Farmers, who often have a lifetime of skills built up enabling them to fix their own equipment, are forced to sit and wait for a service technician from Deere to arrive on site and charge $150 or more per hour for labor, on top of other costs. Farmers are also prevented from using trusted, less expensive, and more conveniently-located skilled mechanics who are not affiliated with Deere.

**ANSWER:** John Deere denies the allegations in Paragraph 98.

99.     Farmers' investments in Deere Tractors, prices of which can run up to nearly a million dollars, effectively leave them no choice other than to pay for Deere's Repair Services. The farmers are locked in to using Deere Tractors, as switching costs are high and farmers purchase equipment expecting to be able to use a Tractor for decades.

**ANSWER:** John Deere denies the allegations in Paragraph 99.

100.    Deere also locks in farmers by offering data services that incentivize using exclusively Deere equipment, while at the same time using that data to pad its own profits. Once a farmer, for example, has invested in an expensive tracking system which provides agronomic data for their fleet of Deere Tractors, they heavily rely on that system, which has no interoperability with other manufacturers' equipment.

**ANSWER:** John Deere denies the allegations in Paragraph 100.

101.    While some farmers own their Tractors outright, many farmers lease the equipment. The leaseholder is often Deere itself, which has become the fifth-largest agricultural lender in the sector.[21]

**ANSWER:** John Deere denies the allegations in Paragraph 101.

102.    In addition to being forced to purchase Repair Services from Deere, farmers in many areas are faced with little choice as to the Deere Dealership from which they may purchase Repair Services. This is attributable to Deere's concerted efforts to force its Dealerships to consolidate under threat of losing their affiliation with Deere.

**ANSWER:** John Deere denies the allegations in Paragraph 102.

103.    Starting approximately in the early 2000s (coinciding with when ECUs were first being widely used in Deere Tractors), Deere implemented an aggressive strategy that pressured Dealerships to consolidate.

**ANSWER:** John Deere denies the allegations in Paragraph 103.

---

[21] Jesse Newman & Bob Tita, *America's Farmers Turn to the Bank of John Deere*, Wall Street Journal (July 18, 2017), https://www.wsj.com/articles/americas-farmers-turn-to-bank-of-john-deere-1500398960.

104.    In a series of meetings in the summer of 2002, Deere told Dealers they should plan on a future in which they would either be a buyer or a seller.[22]  One former owner of a Dealership in Virginia reported that in 2002 he began receiving letters, emails, and visits from Deere officials almost monthly urging him to either acquire another Dealer or cash out.[23]

**ANSWER:**  To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 104, it denies them.  John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

105.    Deere's strategy worked.  In 1996, the total number of Deere Dealership locations was approximately 3,400.  By 2007, this number had decreased to 2,984.[24]  In 2022, only 1,544 Dealership locations remained, 1,468 of which are operated by Big Dealers, i.e., Dealerships that operate five or more individual Dealership locations.[25]  In 2021, 144 Dealerships were not owned by Big Dealers.  In 2022, that number dropped precipitously down to 76.[26]  Very few single-location Dealerships remain.

**ANSWER:**  John Deere admits that the 2007 article from the Wall Street Journal at the link in Footnote 24 says:  "Deere had 2,984 dealer locations in the U.S. and Canada as of last year, down 12% from the 3,400 it counted in 1996."  John Deere further admits that the 2022 Big Dealer Report referenced in Footnotes 25 & 26 contains the information alleged in Paragraph 105.  John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

106.    In 2009, a former owner of a Deere-affiliated Dealership, Roy Dufault, reported to AgWeek, a weekly agricultural newspaper, that representatives from Deere pressured him to sell his small Dealership in Fosston, Minnesota.  Deere told him that for the large Dealers in the area to continue to grow, Dufault needed to get out of the way, as his Dealership was a hindrance to their profitability.[27]  Deere's representatives told Dufault that there was no need for a location in Fosston, and that another Dealership could cover the trade area remotely.  At the time Deere terminated its Dealer agreement with Dufault, customers expressed their concern about where they would have their Deere equipment serviced.  In 2021, there is not a Deere Dealership within 20 miles of Fosston, and none within 100 miles that are not owned by a Big Dealer.

---

[22] Ilan Brat & Timothy Aeppel, *Why Deere Is Weeding Out Dealers Even as Farms Boom*, Wall Street Journal (Aug. 14, 2007), https://www.wsj.com/articles/SB118705668767896842.
[23] *Id.*
[24] *Id.*
[25] 2022 'Big Dealer' Report, *supra* note 10, at 4.
[26] *Id.*
[27] *John Deere leaves a dealer and his customers high and dry*, AgWeek (Sept. 21, 2009), https://www.agweek.com/news/3787513-john-deere-leaves-a-dealer-and-his-customers-high-and-dry.

**ANSWER:** John Deere admits that as of 2021 there is a John Deere Dealership within 30 miles of Fosston, MN.  John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

107.   In 2013, a single-location Dealership in New Hampshire, R.N. Johnson Inc., had its Dealer agreement with Deere canceled after being in business 84 years.  The former owner said that this action was part of Deere's corporate philosophy of "eliminat[ing] all the single-location small dealers."[28]  After Deere terminated the Dealership agreement, farmers were forced to rely on a Dealership 60 miles away in Massachusetts to get their Tractors serviced.

**ANSWER:** John Deere admits the dealership agreement with R.N. Johnson Inc. was terminated in 2013.  John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

108.   An industry publication tracking consolidation among Dealership groups noted that, "By equipment brand, John Deere remains the most aggressive when it comes to consolidating its dealers."[29]

**ANSWER:** John Deere admits the quoted language appears in the report referred to in Footnote 29.  John Deere denies the remaining allegations of Paragraph 108.

109.   In 2021, Deere terminated the contract of Tennessee's last remaining single-store Deere Dealership, Tri-County Equipment, which had operated as a Deere Dealership since 1977.  Tri-County Equipment was the only single-store Dealership in Tennessee for four years prior to Deere's termination of the agreement.  Deere reportedly had specified a single potential buyer for the store, but the Dealer chose to operate the store as a non-Deere dealership instead of selling the business.

**ANSWER:** John Deere admits the dealership agreement with Tri-County Equipment was terminated in 2021.  John Deere further admits Tri-County Equipment was the only single location Dealership in Tennessee from 2017-2021.  John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

---

[28] Meghan Foley, *Former John Deere Dealer Closing After 84 Years*, Farm Equipment (Feb. 28, 2013), https://www.farm-equipment.com/articles/8588-former-john-deere-dealer-closing-after- 84-years.
[29] Ag Equip. Intelligence, 2015 'Big Dealer' Report 3 (2015).

110.    In the last decade, the industry-wide number of agricultural equipment stores owned by Big Dealers increased by 59%.[30]   And while this large degree of consolidation among agricultural stores in general is substantial, Deere is a noticeable outlier in number of affiliated Dealerships owned by Big Dealers.   In the entire industry, the total percentage of Big Dealer-owned Agricultural Equipment Stores is around 38%, whereas a full 95% of Deere's "Independent" agricultural Dealerships are owned by Big Dealers.[31]



[32]

**ANSWER:**  John Deere admits that the article at the link in Footnote 30 says:  "Compared to 2011, though, the number of stores operated by big dealers is up 59% from 1,479 stores back then."  John Deere further admits that the 2022 Big Dealer Report referenced in Footnote 31 contains the information alleged in Paragraph 110.  John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

111.    The staggering amount of consolidation among Deere Dealerships is the result of Deere systematically picking off small Dealerships by coercing them to sell to a larger Dealer.  An industry expert described this process in 2015:  Dealers "typically target[] adjacent Deere Dealers

---

[30] Kim Schmidt, *Big Dealers Continue to Get Bigger*, Ag Equip. Intelligence (Apr. 22, 2021), https://www.agequipmentintelligence.com/articles/4798-big-dealers-continue-to-get-bigger.
[31] 2022 Big Dealer Report, *supra* note 10, at 4.
[32] Kevin O'Reilly, *Deere in the Headlights II*, U.S. PIRG Educ. Fund, 6 (2022), https://publicinterestnetwork.org/wp-content/uploads/2022/02/Deere-In-The-Headlights-II.pdf.

with 1 or 2 stores—and they [] also … tweak[] their footprint by either closing and/or consolidating two locations into one, or by moving locations."[33]  Even among the Big Dealers, "Bigs buying other Bigs" has been a notable trend.[34]

**ANSWER:**  John Deere admits the quoted language appears in the article referred to in Footnotes 33 & 34.  John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

112.    If a single-location Dealer wants to sell the business, Deere dictates who the purchaser can be, funneling Dealership sales to preferred Big Dealers.  Deere will terminate its affiliation with the Dealership altogether if the Dealership refuses to sell to the specified buyers.

**ANSWER:**  John Deere denies the allegations in Paragraph 112.

113.    One farmer complained:  "I can go to a JD dealer 20 miles away.  Or one 40 miles away in another direction.  Or one 80 miles away in a different direction.  But they all have the same name.  All owned by the same franchise.  So, I get 10 or 15 choices all of which are exactly the same."[35]  A map of the Deere Dealership chains that serve Montana[36] provides an illustration of what this looks like:



---

[33] 2015 'Big Dealer' Report, *supra* note 29, at 4.
[34] *Id.* at 3.
[35] *John Deere's poor dealership decision making IMO.*, post by Diggin It, TractorByNet (Aug. 18, 2018), https://www.tractorbynet.com/forums/threads/john-deeres-poor-dealership-decision-making-imo.400429/page-5.
[36] Kevin O'Reilly, *Deere in the Headlights II*, U.S. PIRG Educ. Fund, 6 (2022), https://publicinterestnetwork.org/wp-content/uploads/2022/02/Deere-In-The-Headlights-II.pdf.

**ANSWER:** John Deere admits that the quoted statements in this Paragraph appear on a message board on the website at the link in Footnote 35 but lacks knowledge or information sufficient to form a belief as to the truth of those statements, and therefore denies them. John Deere further admits that the map of John Deere Dealerships at Paragraph 113 appears in the article at the link in Footnote 36. John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

114.    As Deere and its Dealerships push for ever-increasing consolidation, fewer and fewer farmers can make a meaningful choice even among the Dealership groups.[37]



Large Deere chain coverage areas leave farmers with less choice

Acres of farmland per John Deere Chain

- No dealers
- 2 million or less
- 2 - 5 million
- 5 - 10 million
- More than 10 million

**ANSWER:** John Deere denies the allegations in Paragraph 114.

115.    Deere's restriction on access to comprehensive Repair Tools has foreclosed competition in the Repair Services Market. Without an alternative for repairs, farmers cannot walk away from the heavily-consolidated Deere Dealerships. While Deere maintains its tight restriction on Repair Tools, farmers have little choice but to return to Dealerships which are located far away, provide slow service, charge exorbitant rates for repairs, and often fail to even competently complete repairs.

---

[37] *Id.* at 12.

**ANSWER:** John Deere denies the allegations in Paragraph 115.

116.    If a farmer's relationship with its local Dealership or its employees is strained for any reason, the farmer may have difficulty getting the Dealership to perform or effectively complete repairs. In one situation, a farmer learned that his local Dealership had hired that farmer's fired former employee as their service operations coordinator. For obvious reasons, farmers often are hesitant to speak out about the severity of their dissatisfaction with their Dealership, knowing that they have no other choice but go back to that Dealership for repairs.

**ANSWER:** To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 116, it denies them. John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

117.    Deere's Dealerships are frequently understaffed. Farmers may have equipment sitting at the Dealership for months untouched by any technicians or may be waiting for days or weeks to have a technician travel to their farm.

**ANSWER:** To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 117, it denies them. John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

118.    Dealership technicians frequently do not have adequate training or experience to meet customers' repair needs. Dealership technicians sent to work on Tractors effectively learn on the job in many scenarios, performing multiple rounds of ineffective repairs. The farmer, of course, is billed for the technician's travel time, a diagnostic charge, the labor for the repair (whether effective or not), and any parts the technician uses for attempted repairs (whether necessary or not).

**ANSWER:** To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 118, it denies them. John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

119.    Contrary to Deere's portrayal of its affiliated repair technicians as an elite team of mechanics with the rare ability to understand how to use Dealer Service Advisor and DTAC, technicians are often inexperienced and unable to complete repairs.

**ANSWER:** To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 119, it denies them. John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

120.     Dealership technicians are not infrequently undertrained, drastically overbooked, and are incentivized to perform cursory "plug and play" repairs, i.e., relying exclusively on Dealer Service Advisor diagnostic data to decide to replace parts.  This "plug and play" approach frequently fails to fix the underlying issue and drives up the overall cost of repair.

**ANSWER:**  To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 120, it denies them.  John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

121.     Repeated ineffective "repairs" are frustrating for a farmer, but highly profitable for the Dealership.  The Tractor owner ends up paying for (1) unnecessary replacement parts that the Dealership sells at a high markup; (2) travel time for the technician to go back and for the between the Dealership and the farmer; and (3) labor for the "repairs", whether or not the issue is finally resolved or could have been quickly resolved by a well-informed Tractor owner or an experienced independent mechanic.

**ANSWER:**  To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 121, it denies them.  John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

122.     Farmers have been made dependent on "Mother Deere" and the Dealerships for repairs, giving the Dealers an outsized amount of power over farmers.  Without meaningful competition from other Dealerships, independent repair shops, or the farmers themselves, if a Dealer is not performing repairs completely or efficiently, a farmer has little option rather than to stay quiet or risk not being able to have their Tractor repaired at all.

**ANSWER:**  To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 122, it denies them.  John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

123.     Dealers are not incentivized to have their technicians perform repairs right the first time, nor are they threatened by a farmer taking their business elsewhere.  This frequently results in an inferior Repair Services "product"; one that is less efficient, more expensive, and less timely than what would be offered in a competitive market.

**ANSWER:**  To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 123, it denies them.  John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

124.    Because of how difficult and expensive Deere had made it for farmers to repair their Tractors, the growing "right to repair" movement began to focus on farmer's rights to repair John Deere agricultural equipment.

**ANSWER:** John Deere denies the allegations in Paragraph 124.

125.    Deere has a history of fighting its customers' access to the onboard technology on Deere Tractors.  In 2015, Deere argued that Section 1201 of the Digital Millennium Copyright Act gave it power to prevent purchasers of Deere Tractors from bypassing Technical Protection Measures ("TPMs")[38] "for the purposes of lawful diagnosis and repair, or aftermarket personalization, modification, or other improvement." This was, according to Deere, because the owners did not actually own the software that made the Tractor run.  Deere argued that the owner only "receives an implied license for the life of the vehicle to operate the vehicle."[39]

**ANSWER:** John Deere admits that the quoted language appears in a statement issued by John

Deere entitled "Long Comment Regarding a Proposed Exemption Under 17 U.S.C. 1201."  John

Deere denies the remaining allegations of this Paragraph, including to the extent that they

improperly summarize, paraphrase or take the language out of context.

126.    When this argument proved unconvincing to the U.S. Copyright Office and bypassing TPMs on agricultural equipment for the purpose of repair was deemed to be fair use, Deere took another approach to blocking farmers from accessing Tractor Repair Tools.  In 2016, Deere issued an end-user "License Agreement for John Deere Embedded Software" that forbade customers from accessing, reverse-engineering, or modifying the software running on its Tractors (the "EULA").[40]  Deere states it "may terminate the license [to the embedded Tractor software] granted under this License Agreement . . . if you violate any material term of this License Agreement. . ."[41]

**ANSWER:** John Deere admits that the quoted language appears in the License Agreement for

John Deere Embedded Software at the link in Footnote 41.  John Deere denies the remaining

---

[38] A TPM is a general term for software, or a device placed on copyrighted material to prevent unauthorized access.
[39] Deere & Company, *Long Comment Regarding a Proposed Exemption Under 17 U.S.C. 1201*, https://copyright.gov/1201/2015/comments-032715/class%2021/John_Deere_Class21_1201_2014.pdf (last accessed Oct. 24, 2022).
[40] *License Agreement for John Deere Embedded Software*, https://www.deere.com/assets/pdfs/common/privacy-and-data/docs/agreement_pdfs/english/2016-10-28-Embedded-Software-EULA.pdf (last accessed Oct. 24, 2022).
[41] *Id.*

allegations of this Paragraph, including to the extent that they improperly summarize, paraphrase or take the language out of context.

127.    As public awareness of and frustration with increasingly prohibitive repair restrictions grew, state lawmakers began to act.  As of 2022, numerous states have introduced some form of "right to repair" legislation.  A proposed bill in Minnesota would require manufacturers to "make available, on fair and reasonable terms, documentation, parts, and tools, inclusive of any updates to information or embedded software, to any independent repair provider or to the owner of digital electronic equipment manufactured by or on behalf of, or sold by, the original equipment manufacturer for purposes of diagnosis, maintenance, or repair."[42]

**ANSWER:**  John Deere admits that the quoted language appears in the proposed Minnesota Legislature bill at the link in Footnote 42.  John Deere lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 127 and therefore denies them.

128.    In September 2018, the Equipment Dealers Association ("EDA"),[43] a trade and lobbying group that represents Deere and other manufacturers' Dealerships, and the Association of Equipment manufacturers ("AEM"), a trade group that often acts as Deere's mouthpiece on right to repair issues, made a promise intended to stave off increasing pressure from customers and lawmakers to pass similar "right to repair" legislation pending around the country.[44]

**ANSWER:**  John Deere denies the allegations in Paragraph 128.

129.    The EDA and AEM committed to make *comprehensive* repair tools, Software, and diagnostics available to the public by January 1, 2021.[45]

**ANSWER:**  To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 129, it denies them.  John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

---

[42] Minnesota Legislature, DIGITAL FAIR REPAIR, HF 1138, 91ST LEG., 2ND ENGROSSMENT (2020), https://www.revisor.mn.gov/bills/text.php?number=HF1138&type=bill&version=2&session=ls91&session_year=2019&session_number=0.
[43] Now re-organized and re-branded as the North American EDA, or "NAEDA".
[44] Koebler & Gault, *supra* note 6.
[45] *Agreement Streamlines Repair of High-Tech Farm Equipment*, Far West Equip. Dealers Assoc. (Sept. 9, 2018), https://fweda.com/industry-news/agreement-streamlines-repair-of-high-tech-equipment (last accessed Jan. 4, 2022).

130.    The EDA went so far as to put out a "Statement of Principles," laying out this promise.  In a heavily-publicized ceremony and photo op, the EDA signed a "Memorandum of Understanding" with the California Farm Bureau that enshrined this statement of principles.[46]

**ANSWER:**  John Deere admits that the Equipment Dealers Association issued a Statement of Principles and signed a "Memorandum of Understanding" with the California Farm Bureau in 2018.  John Deere denies the remaining allegations of this Paragraph, including to the extent that they improperly summarize, paraphrase or take the language out of context.

131.    The Far West EDA president and CEO Joani Woelfel said in a 2018 press release that the statement of principles "says a lot about the relationship between dealers and their customers."

**ANSWER:**  John Deere admits that the quoted language appears in the article at the link in Footnote 46.  John Deere lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 131 and therefore denies them, including to the extent that they improperly summarize, paraphrase or take the language out of context.

132.    The statement of principles reads:

**STATEMENT OF PRINCIPLES:**

To the extent not already available, the maintenance, diagnostic and repair information listed below will be made available to end users through authorized agricultural dealers at fair and reasonable terms, beginning with tractors and combines put into service on or after January 1, 2021. End users will also be able to purchase or lease diagnostic tools through authorized agricultural dealers. Certain information and tools may be available earlier. Agricultural dealers are committed to provide access to:

- Manuals (Operator, Parts, Service)
- Product Guides
- Product Service Demonstrations, Training, Seminars or Clinics
- Fleet Management Information
- On-Board Diagnostics via diagnostics port or wireless interface
- Electronic Field Diagnostic Service Tools and training on how to use them
- Other publications with information on service, parts, operation and safety

Using this information and these tools, which will be available for purchase, lease or subscription from dealers, farmers will be able to identify and repair numerous problems they may encounter with their equipment. FWEDA and CFBF support equipment users' ability to maintain, diagnose and repair their machinery. However, the ability to diagnose and repair does not mean the right to modify. For safety, durability, environmental and liability reasons, diagnostic and repair information and tools will not permit consumers to do the following:

- Reset an immobilizer system or security-related electronic modules.
- Reprogram any electronic processing units or engine control units,
- Change any equipment or engine settings negatively affecting emissions or safety compliance,
- Download or access the source code of any proprietary embedded software or code

**ANSWER:**  John Deere admits that the Complaint purports to include certain text of the statement of principles, which is taken out of context.

---

[46] Koebler & Gault, *supra* note 6.

133.    As journalists from the magazine Vice noted, the commitment "did not promise to actually sell repair parts, and it also contains several carve-outs that allow tractor manufacturers to continue using software locks that could prevent repair."[47]

**ANSWER:**  John Deere admits that the quoted language appears in the article at the link in

Footnote 47.  John Deere denies the remaining allegations of this Paragraph.

134.    Three years later in mid-2021, farmers were struggling to get what was promised in the agreement with the EDA.

**ANSWER:**  John Deere denies the allegations in Paragraph 134.

135.    Posing as a customer, Right to Repair advocate Kevin O'Reilly called 12 Deere Dealerships in six states.  Of those, 11 told Mr. O'Reilly that they don't sell diagnostic software, and the last one provided an email address of someone to ask for the tools.  When Mr. O'Reilly sent an email to the individual identified, he did not receive a response.[48]

**ANSWER:**  To the extent John Deere has knowledge or information sufficient to form a belief as

to the truth of allegations in Paragraph 135, it denies them.  John Deere denies the remaining

allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

136.    Similarly, journalists from Vice attempted to assess the availability of the promised software, called nine Dealerships in seven states, and were told by representatives that the Repair Tools promised by the EDA and AEM were not available.  The journalists called three Dealerships in California; two said no immediately, and a third told the journalists that the repair software and tools could not be sold to the public and required the purchaser to be a licensed Dealer.[49]

**ANSWER:**  To the extent John Deere has knowledge or information sufficient to form a belief as

to the truth of allegations in Paragraph 136, it denies them.  John Deere denies the remaining

allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

137.    A spokesperson for the AEM told the news website Vice that, "*[c]omprehensive repair and diagnostic information is now available for the vast majority of the tractor and combine market through authorized dealers.*"[50]  However, the spokesperson failed to respond when Vice

---

[47] Jason Koebler, *Farmer Lobbying Group Sells Out Farmers, Helps Enshrine John Deere's Tractor Repair Monopoly*, Vice Motherboard (Sept. 11, 2018), https://www.vice.com/en/article/kz5qgw/california-farm-bureau-john-deere-tractor-hacking- right-to-repair.
[48] Koebler & Gault, *supra* note 6.
[49] *Id.*
[50] *Id.* (emphasis added).

asked if the spokesperson could point to a single instance where this is actually the case, or a single manufacturer that explains to farmers where they can get this information or these tools.

**ANSWER:** John Deere admits the quoted language appears in the article at the link in Footnote 50. John Deere lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 137 and therefore denies them.

138.    Deere continued to insist that much of the information was readily available, despite all evidence to the contrary, while emphatically paying lip service to farmers' right to repair their own equipment.[51]

**ANSWER:** John Deere admits that there is ample information on its website, including information to aid customers in making repairs and purchasing Customer Service ADVISOR, which has been available for sale from authorized Dealers since 2017 and has been available for sale directly from John Deere since May 2022. John Deere denies the remaining allegations in Paragraph 138.

139.    In response to Vice's article calling out Deere for its failure to make good on its commitment, Ag Equipment Intelligence, an agriculture industry magazine, interviewed Natalie Higgins, at the time a vice president of Government Relations at the EDA (and currently employed by Deere as Manager for State Public Affairs). Higgins blamed the evident lack of availability of the resources on a "lack of communication," saying that "I think the rush on the technical side to get the products and resources for farmers to market led us to not take the time to really contemplate how we communicate the availability to our customers."[52]

**ANSWER:** John Deere admits the quoted language appears in the article at the link in Footnote 52. John Deere denies the remaining allegations of this Paragraph, including to the extent that they improperly summarize, paraphrase or take the language out of context.

140.    This absurd explanation—that the promised software and tools only *appeared* unavailable because the industry was too preoccupied with rushing to make it available to ever effectively communicate with its customers or Dealers—is largely in line with the contradictory positions Deere has taken on the issue.

---

[51] *Id.*
[52] *John Deere Responds to Vice Article on Right to Repair*, Ag Equipment Intelligence (Mar. 30, 2021), https://www.agequipmentintelligence.com/articles/4738-john-deere-responds-to-vice- article-on-right-to-repair (hereinafter "Ag Equipment Intelligence").

**ANSWER:** John Deere denies the allegations in Paragraph 140.

141. Over the last several years, Deere and industry spokespeople have taken inconsistent positions, equivocating regarding what Repair Tools are necessary to make and complete repairs on Tractors. Such obfuscation is one of the key factors which render it impossible for farmers to even approximate the lifecycle cost of repairs on Deere Tractors.

**ANSWER:** John Deere denies the allegations in Paragraph 141.

142. Deere and industry representatives have stated at various times that: (1) customers can do 98 precent of repairs on Deere Tractors without access to the tools that Right to Repair advocates have pushed for;[53] (2) the Repair Tools have been available to farmers and independent repair shops for years;[54] (3) that as of 2021, the repair tools were newly available, but Deere had not prioritized adequately communicating this to the Dealerships or customers;[55] and, most recently, (4) that the stripped down Customer Service Advisor can do everything necessary to allow farmers and independent repair shops to perform comprehensive repairs on their Tractors.[56] All of these claims are untrue or extremely misleading.

**ANSWER:** John Deere admits that the quoted language appears in the articles at the links in

Footnotes 53-56. John Deere denies the remaining allegations of this Paragraph, including to the

extent that they improperly summarize, paraphrase or take the language out of context.

143. Deere has never substantiated or explained its claim that 98% of Tractor repairs do not require Dealer Service Advisor. However, even if that statistic had some basis in fact, it neglects to recognize that the type of repairs that require access to Dealer-level Repair Tools are often the most costly and important to a farmer. At the height of the harvest season, when Tractors are being pushed their hardest, Dealer-level Repair Tools are often required in circumstances where Tractor has become inoperable and owners are desperately trying to get their equipment fixed so they can get back to time-sensitive work.

**ANSWER:** John Deere denies the allegations in Paragraph 143.

---

[53] Nilay Patel, *John Deere Turned Tractors Into Computers – What's Next?,* The Verge (June 15, 2021), https://www.theverge.com/22533735/john-deere-cto-hindman-decoder-interview-right-to- repair-tractors ("The statistics are real: 98 percent of the repairs that happen on a product can be done by a customer today.").
[54] Ag Equipment Intelligence, *supra* note 52 ("for many years, John Deere has supported our customers' right to repair their equipment…[w]e've offered a broad range of diagnostic, maintenance and repair tools for farmers that are available through John Deere dealers."); *see also* Deere & Co. Position Paper (uploaded by Vice Motherboard on Feb. 14, 2017), https://www.scribd.com/document/339340098/John-Deere-letter#from_embed ("John Deere [] provides access to service information and diagnostic information for both producer customers and non-producers. The format and cost of this access is similar to those charged our authorized John Deere dealers.").
[55] *Id.* (citing David Gilmore, Senior Vice President, Sales and Marketing Regions 3 & 4 at John Deere, stating that Deere had met all the requirements laid out in the Vice Article) ("we've met all of the commitments that we made to the industry and to our customers, in terms of providing them with the tools and the software that they need to not only maintain and diagnose but also repair their machines.").
[56] Koebler & Gault, *supra* note 6.

144.    In 2021, the deadline by which the manufacturers had committed to making repair resources available, AEM spokesperson David Ward represented that comprehensive repair and diagnostic equipment was available through authorized Dealers.  Ward did not return emails when Vice followed up, asking for a single instance of where this is actually the case, or a single manufacturer that explains to farmers where they could get the information or the tools.

**ANSWER:**  To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 144, it denies them.  John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

145.    If comprehensive Repair Tools had been actually available to farmers and independent repair shops, then it would have been simple to point to where they could be accessed and where they could be purchased.  Although industry representatives claimed the comprehensive Repair Tools were available, this could not be substantiated by any real-world examples.

**ANSWER:**  John Deere denies the allegations in Paragraph 145.

146.    However, there have been plenty of examples that demonstrate how comprehensive Repair Tools remain inaccessible, even to individuals and businesses who are by all accounts highly sophisticated parties familiar with the industry.

**ANSWER:**  John Deere denies the allegations in Paragraph 146.

147.    In 2020, one owner of an independent equipment mechanic shop in Nebraska reported that about half of the repairs he sees involve code faults triggered by emission-control systems.  The faults render vehicles inoperable, and while the shop can replace the exhaust filters and particulate traps that might throw a Tractor's code, the Dealerships would not provide the Dealer-level software necessary to restart the Tractor.  This forced the owner or the shop to haul the machine to a Deere Dealership or pay for a Deere mechanic to make a house call with the Dealer Service Advisor.[57]

**ANSWER:**  To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 147, it denies them.  John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

148.    While Deere claims that software reprogramming "can increasingly be done remotely," that claim does not reflect farmers' experiences.  Instead, farmers must wait at the convenience of their local Dealership to have necessary repairs performed during critical times.

**ANSWER:**  John Deere denies the allegations in Paragraph 148.

---

[57] Waldman & Mulvany, *supra* note 2.

149.     The EDA blamed a "lack of communication" as the culprit for why most farmers and media think the Repair Tools remain unavailable and promised that industry organizations like the EDA would "step up to bridge that communication gap" by "educating dealers… focusing on the fundamentals like putting information on our websites and using social media to promote these resources."[58]  Between the date that the Ag Equipment Intelligence article was published quoting Higgins on March 30, 2021 and the date of the filing of the first complaint in this litigation in January 2022 nearly nine months later, the EDA had not posted on their frequently-updated Twitter page about where farmers or independent repair shops could access these resources.  Instead, the only Twitter post by the EDA referencing "repair" in any way in that period was a July 19, 2021 tweet advertising a webinar about reasons the EDA opposes Right to Repair.[59]

**ANSWER:**  To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 149, it denies them.  John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

150.     Around that same time, Deere issued a company statement that "John Deere supports a customer's right to safely maintain, diagnose and repair their own equipment."[60]  Deere is also quoted as stating "When customers buy from John Deere, they own the equipment and can choose to personally maintain or repair the product."[61]

**ANSWER:**  John Deere admits that the quoted language in this Paragraph appears in the article referenced at Footnotes 60 & 61.  John Deere denies the remaining allegations of this Paragraph, including to the extent that they improperly summarize, paraphrase or take the language out of context.

151.     Deere's consistent position has been that it does not require farmers to rely on Dealerships for repairs, and that their business practices do not foreclose farmers or independent mechanics from working on Deere equipment.  Regardless of how many times this is repeated, it does not make it true.

**ANSWER:**  John Deere admits only that it has made public statements that customers can perform 98% of repairs on John Deere-branded equipment without requiring Dealer intervention.  John

---

[58] Ag Equipment Intelligence, *supra* note 52.
[59] @NaedaEquip, Twitter (July 19, 2021, 2:00 PM), https://twitter.com/Equip_Dealers/status/1417197594388975620.
[60] Tyne Morgan, *AEM, John Deere Respond to Biden's Planned Executive Order Over Right to Repair Equipment*, AgWeb Farm Journal (July 7, 2021).
[61] *Id.*

Deere denies the remaining allegations of this Paragraph, including to the extent that they improperly summarize, paraphrase or take the language out of context.

152.    In fact, Dealers themselves have recognized that their customers are dependent on them for many repairs.  In 2017, the CEO of the North Dakota Implement Dealers Association submitted an affidavit that contained a description of farmers' reliance on the Dealers:  "Things are so automated that the last time the guy [dealer] came out to my farm to fix my combine, he sat in the chair with a laptop, pushed some buttons on the console, didn't change any parts, and that's all it needed.  We are not capable of doing that anymore, we are so dependent on these guys [dealers] to come out and if we can't get up and running again it could cost us thousands of dollars a day."[62]

**ANSWER:**  Deere admits the quoted language in this Paragraph appears in the declaration referred to in Footnote 62.  John Deere lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 152 and therefore denies them.

153.    By taking the position there are no real repair restrictions, Deere intentionally obscures the fact that the Repair Tools are necessary for diagnosis and completion of many time-sensitive, crucial repairs.  Deere's misleading statements fail to provide information on the scope of repairs and maintenance that can be accomplished without the Repair Tools, preventing farmers from being able to accurately assess the overall cost of owning a Deere Tractor.

**ANSWER:**  John Deere denies the allegations in Paragraph 153.

154.    Deere, by restricting access to comprehensive Repair Tools, has successfully foreclosed competition from farmers and independent repair shops in the multi-billion-dollar Repair Services Market for Deere Tractors.

**ANSWER:**  John Deere denies the allegations in Paragraph 154.

155.    After years of farmers asking for access to comprehensive Repair Tools, Deere began to offer a watered-down version of the Service Advisor software known as "Customer Service Advisor." Although some version of Customer Service Advisor existed before 2022, Deere did not advertise it or sell it directly to farmers or repair shops.  The only way for a farmer to get a copy of Customer Service Advisor before 2022 was to ask a Dealership (which had no financial interest in permitting the farmer to effectively compete with it) to sell it to them.

---

[62] Declaration of Matthew Larsgaard at 3, *AEM, et al., v. North Dakota,* Case No. 1:17-cv-151, (Nov. 7, 2017), ECF No. 60-27.

**ANSWER:** John Deere admits only that Customer Service ADVISOR has been available for sale from authorized Dealers since 2017 and has been available for sale directly from John Deere since May 2022. John Deere denies the remaining allegations in Paragraph 155.

156. As detailed above, Dealerships are heavily disincentivized from giving up any repair revenue and are reluctant to provide any software tools, even limited versions. During the time Customer Service Advisor was supposedly available through the Dealerships, the Dealerships often denied the existence of the software, refused to provide it, or told farmers that they were forbidden from selling the software to its customers.[63]

**ANSWER:** John Deere denies the allegations in Paragraph 156.

157. After facing backlash about failing to meet its commitment to make Repair Tools available, John Deere created a web page on their main company site around June 2021[64] for Customer Service Advisor, with a form to "request more info" about a subscription.

**ANSWER:** John Deere admits that it created a web page dedicated to Customer Service ADVISOR in May 2021. John Deere denies the remaining allegations in Paragraph 157.

158. One Dealer website describes Customer Service Advisor as a way for customers to access "much of the same" technical and diagnostic information used by Dealership technicians.[65]

**ANSWER:** John Deere admits the allegations in Paragraph 158.

159. As of January 2022, one Dealer website listed the *starting* cost for access to the limited-functionality Customer Service Advisor as $8,500 for the first year alone.[66]

**ANSWER:** John Deere admits that the website at the link in Footnote 66 states that pricing for Customer Service Advisor starts at $8,500 for the first year. John Deere denies the remaining allegations of this Paragraph to the extent that they improperly summarize, paraphrase or take the language from the website out of context.

---

[63] Koebler & Gault, *supra* note 6.
[64] Customer Service ADVISOR™, John Deere, https://www.deere.com/en/parts-and- service/manuals-and-training/customer-service-advisor/ (last accessed Jan. 4, 2022).
[65] Customer Service Advisor, United Ag & Turf, https://www.unitedagandturf.com/service/customer-service-advisor/ (archived version last accessed Oct. 20, 2022), available at (*see* archived version captured 10/27/2021, available at https://web.archive.org/web/20211027234259/https://www.unitedagandturf.com/service/customer-service-advisor/).
[66] *Id.*

160.    In May 2022, a few months after the initial complaint in this litigation, Deere began to make Customer Service Advisor—an expensive subscription service with limited capabilities—directly available for the first time directly through Deere's website.

**ANSWER:**  John Deere admits only that Customer Service ADVISOR has been available for sale

directly from John Deere since May 2022.  John Deere denies the remaining allegations in

Paragraph 160.

161.    Deere charges $2,700 for a one-year license of the Customer Service ADVISOR web application database, which gives owners the ability to pay thousands of dollars to read manuals for their equipment during the subscription period.  This version provides no ability to connect to a Tractor to run diagnostics or clear codes.[67]

**ANSWER:**  John Deere denies the allegations in Paragraph 161.

162.    Deere charges $3,160.00 for a one-year license to a version of Customer Service ADVISOR that can connect to Tractors, which provides no access to DTAC, ambiguously-described "diagnostics and readings", and limited calibrations ability.  To make use of this license, a customer must also purchase an additional Machine Interface Kit, which costs an additional $1,376.93.[68]

**ANSWER:**  John Deere admits that Customer Service ADVISOR is available for a fee and

requires a tool called an electronic data link to connect to John Deere-branded equipment.  John

Deere denies the remaining allegations in Paragraph 162.

163.    Customer Service Advisor is an inferior, stripped-down program that provides minimal functionality compared to the Dealer-level software.  A farmer or independent repair shop is not able to use the customer version of the software, for example, to replace a sensor and perform all necessary calibrations a Tractor requires.

**ANSWER:**  John Deere denies the allegations in Paragraph 163.

164.    Dealers are rarely up front about their true motivations for obstructing access to comprehensive Repair Tools.  However, Titan Machinery, the largest dealership group for Deere's

---

[67] John Deere, *John Deere Customer Service ADVISOR™ Agriculture & Turf Equipment Web Application One-year license (Year 1)*, https://shop.deere.com/jdb2cstorefront/JohnDeereStore/en/product/John-Deere-Customer- Service-ADVISOR (follow "Agriculture" hyperlink; then follow "Turf-Equipment-Web- Application-One-year-license (Year-1) hyperlink).
[68] John Deere, *John Deere Customer Service ADVISOR™ Agriculture & Turf Equipment Web and Downloaded Applications One-year license and data (Year 1)*, https://shop.deere.com/jdb2cstorefront/JohnDeereStore/en/product/John-Deere-Customer-Service-ADVISOR (follow "Agriculture" hyperlink; then follow "Turf-Equipment-Web-and-Downloaded-Applications-One-year-license-and-data--Year-1" hyperlink).

next-largest competitor Case New Holland (which, like Deere also signed on to the "Statement of Principles" and has taken the position that comprehensive repair tools have been made sufficiently available), aptly summed up the threat that Dealerships face if required to provide Dealer-level Repair Tools. In its most recent 10-K Filing with the SEC, Titan explicitly identifies that ***"Enactment of 'right to repair' legislation could adversely affect the sales and profitability of our parts and service business."***[69]

**ANSWER:** John Deere admits that the quoted language appears in the document referenced in Footnote 69. John Deere lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 164 and therefore denies them.

165. Titan noted that, if manufacturers of products are required "to provide the purchaser and/or independent repair technicians with documents, diagnostic software, and other information that would allow the equipment to be repaired without having it returned to the dealer for repair" the following negative impacts to Titan's business could occur:

- ***Increased competition for repair services***. We would become subject to additional competition from independent repair shops and/or other equipment dealers' repair shops, who would have greater access to manufacturer-furnished diagnostic tools as necessary to perform repair and maintenance services on CNH Industrial branded equipment.

- ***Loss of parts sales.*** If customers, third-party repair shops, and/or parts vendors are able to purchase parts directly from the manufacturer at the same price as available to us, then our parts business would be negatively impacted.

- ***Margin Compression on Parts and Service Revenue***. With the increased competition for repair service and parts sales, we would expect that this new competition would result in margin compression in our sales.[70]

**ANSWER:** John Deere admits that the quoted language appears in the document referenced in Footnote 70. John Deere denies the remaining allegations in Paragraph 165 because it lacks knowledge or information sufficient to form a belief as to their truth.

166. Obstructing the availability of repair tools to farmers and independent repair shops is not about any of the pretextual rationalizations offered up by Deere, other equipment manufacturers, and their proxy Trade Groups; it is about preserving supracompetitive monopoly profits.

**ANSWER:** John Deere denies the allegations in Paragraph 166.

---

[69] Titan Machinery, Annual Report (Form 10-K) (March 31, 2022), at 17.
[70] *Id.*

167.    Like CNH and Titan Machinery, Deere and its Dealerships have much to lose by being required to make Dealer-level Repair Tools available.  By publicizing the availability of Customer Service ADVISOR—an overpriced tool with limited functionality—Deere gives the appearance of providing repair and diagnostic tools to its customers, while avoiding having to provide the Dealer-level Repair Tools that would pose an actual risk to Deere's monopoly in the Deere Repair Services Market.

**ANSWER:**  John Deere denies the allegations in Paragraph 167.

168.    In May 2021, the FTC issued a report titled "Nixing the Fix:  An FTC Report to Congress on Repair Restrictions" that examined, among other things, how repair restrictions implemented by various industries increase costs and limit consumer choice, and how these restrictions might implicate federal consumer protection and antitrust laws.[71]

**ANSWER:**  John Deere admits that in May 2021 the Federal Trade Commission issued a report entitled "Nixing the Fix: An FTC Report to Congress on Repair Restrictions."  John Deere denies the remaining allegations of this Paragraph, including to the extent that they improperly summarize, paraphrase or take the report out of context.

169.    The report synthesized knowledge gained from a July 16, 2019 workshop, as well as public comments, responses to a Request for Empirical Research and Data, and independent research.[72] The FTC concluded there was "scant evidence to support manufacturers' justifications for repair restrictions" and that access to information, manuals, spare parts, and tools, were "well-supported by comments submitted for the record and testimony provided at the Workshop."[73]

**ANSWER:**  John Deere admits that the quoted language appears in the report at the link in Footnote 73.  John Deere denies the remaining allegations of this Paragraph, including to the extent that they improperly summarize, paraphrase or take the report out of context.

170.    The FTC received research submissions and comments from the EDA and AEM, as well as "the full spectrum of interested parties."

**ANSWER:**  John Deere admits that the quoted language appears in the report at the link in Footnote 73.

---

[71] Fed. Trade Comm'n, *Nixing the Fix: An FTC report to Congress on Repair Restrictions* (May 2021), *available at* https://www.ftc.gov/system/files/documents/reports/nixing-fix-ftc-report-congress-repair-restrictions/nixing_the_fix_report_final_5521_630pm-508_002.pdf (hereinafter "FTC Report").
[72] *Id*. at 3.
[73] *Id*. at 6.

171.    More specifically, the FTC noted that restricting repairs to authorized repair networks was not automatically justified just because of the existence of possible safety concerns. The FTC noted that manufacturers provided no factual support for their statements that "authorized repair persons are more careful or that individuals or independent repair shops fail to take appropriate safety precautions."[74]

**ANSWER:** John Deere admits that the quoted language appears in the report at the link in Footnote 74. John Deere denies the remaining allegations of this Paragraph, including to the extent that they improperly summarize, paraphrase or take the report out of context.

172.    Similarly, the FTC pointed out that manufacturers had failed to offer evidence that providing access to the same tools made available to authorized service providers created additional security risks.  The FTC concluded "[m]anufacturers can provide others with the same parts and tools that they provide to their authorized service providers.  And, by providing access to individuals and independent repair shops, manufacturers would have greater confidence in the repair activities that occur outside of their authorized networks."[75]

**ANSWER:** John Deere admits that the quoted language appears in the report at the link in Footnote 75. John Deere denies the remaining allegations of this Paragraph, including to the extent that they improperly summarize, paraphrase or take the report out of context.

173.    The FTC stated that, beyond bare assertions of liability exposure and reputational harm from allowing independent repairs, manufacturers "provided no empirical evidence to support their concerns about reputational harm or potential liability resulting from faulty third party repairs."[76] The report further noted that manufacturers' arguments regarding the "superior service" were anecdotal, whereas there was evidence that consumers were generally satisfied with repairs made by independent repair shops.  The FTC concluded that "[t]he record does not establish that repairs conducted by independent repair shops would be inferior to those conducted by authorized repair shops if independent repair shops were provided with greater access to service manuals, diagnostic software and tools, and replacement parts as appropriate."[77]

**ANSWER:** John Deere admits that the quoted language appears in the report at the link in Footnotes 76 & 77.  John Deere denies the remaining allegations of this Paragraph, including to the extent that they improperly summarize, paraphrase or take the report out of context.

174.    The EDA had ample opportunity to provide empirical data to the FTC to support their position, but later claimed that the FTC relied on "sham studies" only because the EDA did

---

[74] *Id.* at 28.
[75] *Id.* at 31.
[76] *Id.* at 33.
[77] *Id.* at 38.

not have any information to rebut repair advocates' data.[78] The EDA thought that this was very unfair, even though it had been lobbying against right to repair advocates for six years at that point.[79]

**ANSWER:** To the extent John Deere has knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 174, it denies them. John Deere denies the remaining allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

175. There is no defensible basis for Deere to withhold comprehensive Dealer-level Repair Tools that a farmer or independent repair shop would need to diagnose or perform repairs. In fact, the automotive industry is an example of manufacturers agreeing to do just that. Industrywide, vehicle owners and independent repair shops have had access to Dealer-level diagnostic and repair tools from the manufacturers for nearly eight years. In 2014, the automotive industry, through representative trade organizations, facing the prospect of right to repair legislative initiatives, voluntarily agreed to make available for purchase by owners of motor vehicles manufactured by such manufacturer and by independent repair facilities **the same diagnostic and repair information**, including repair technical updates, **that such manufacturer makes available to its dealers** through the manufacturer's internet-based diagnostic and repair information system or other electronically accessible manufacturer's repair information system. All content in any such manufacturer's repair information system shall be **made available to owners and to independent facilities in the same form and manner and to the same extent as is made available to dealers** utilizing such diagnostic and repair information system for purchase by owners and independent repair facilities on a daily, monthly, and yearly subscription basis and upon fair and reasonable terms.[80]

**ANSWER:** John Deere denies the allegations in Paragraph 175.

176. Deere and its Dealerships' most recent justification for the continued restriction of access to comprehensive Repair Tools is that, by letting farmers or independent repair shops have access to repair tools for Tractors' emissions systems, the Dealerships would be liable for any "illegal tampering" from farmers that impact emissions. Grant Suhre, Deere's manager of customer support of the U.S. and Canada, testified before the Nebraska legislature against pending right to repair legislation that Deere was "required as a manufacturer to protect the emissions controls" and would be "liable to the EPA under the Clean Air Act."[81]

---

[78] Eric Wareham, *Repair Done Right – Changing the Narrative on Right to Repair*, Equip. Dealer Magazine (May 24, 2022), https://www.equipmentdealermagazine.com/repair-done-right- changing-the-narrative-on-right-to-repair/ ("The FTC relies on that contrived data because there has been no information to rebut it.").

[79] *Id.* ("The Western Equipment Dealers Association has been involved in this issue since day one – and day one began more than six years ago.").

[80] All. of Auto. Mfrs., *et al.*, *Memorandum of Understanding*, (Jan. 15, 2014) (emphasis added), https://www.autocare.org/docs/default-source/government-affairs/r2r-mou-and-agreement-signed.pdf.

[81] *Deere Shareholders: "It doesn't add up."*, PIRG (Dec. 8, 2021), https://pirg.org/articles/deere-shareholders-it-doesnt-add-up/

**ANSWER:** John Deere admits only that Grant Suhre has provided testimony to the Nebraska legislature and that the Complaint purports to cite to an article that quotes from the testimony of Mr. Suhre. John Deere denies the remaining allegations in this Paragraph, including to the extent that they improperly summarize, paraphrase or take Mr. Suhre's testimony out of context.

177. However, when the EPA was asked to clarify their position, Francisco J. Acevedo, the Mobile Source Program Manager of the EPA, Region 5, explained that "the Clean Air Act gives EPA the authority to set emissions standards and all that goes along with that, but it does not give EPA the authority to regulate the usage or operation of such engines by the end user. Because of that, manufacturers are not responsible for the end user tampering with their engines/equipment."[82]

**ANSWER:** John Deere admits that the quoted language appears in the article at the link at Footnote 82. John Deere denies the remaining allegations in Paragraph 177.

178. Dealers are also not responsible for so-called "tampering."

**ANSWER:** John Deere denies the allegations in Paragraph 178.

179. Regardless, Deere and the Dealers continue to take the false position that they would be held liable by the EPA for customers' actions. Deere and the EDA have provided Dealerships with extensive training and talking points on this topic within the last year alone.

**ANSWER:** John Deere denies the allegations in Paragraph 179, which improperly characterize John Deere's stated position.

180. Deere's own manuals even undermine their position about restricting access to emissions-related Repair Tools. These manuals contain a provision stating that "[a] qualified repair shop or person of the owner's choosing may maintain, replace, or repair emission control devices and systems with original or equivalent replacement parts."

**ANSWER:** John Deere states that it does not know which "manuals" the Complaint purports to quote and on that basis denies that allegation in this Paragraph. John Deere denies the remaining allegations in Paragraph 180.

181. Deere has continually misstated what farmers and independent repair advocates have asked for, when they have asked for Dealer-level Repair Tools. The most common talking

---

[82] *Id.*

point is that Deere is unwilling to provide any Repair Tools that would allow what it terms "modification" of a Tractor's software, rather than repair.

**ANSWER:** John Deere denies the allegations in Paragraph 181.

182.    Deere has also conflated granting access to Dealer-level Repair Tools to granting access to source code. Deere has argued, in response to farmer demands for Repair Tools, that it against "[a]llowing untrained individuals to modify equipment software" because "the embedded software code to ensure the equipment operates safely and accurately."[83]

**ANSWER:** John Deere admits that the quoted language appears in the article at the link in

Footnote 83. John Deere denies the remaining allegations of this Paragraph, including to the extent

that they improperly summarize, paraphrase or take the quoted statements out of context.

183.    AEM spokesperson Michael O'Brien rehashed this argument again, noting AEM's opposition to "any legislation that would provide access to source code."[84] However, providing access to Dealer-level Repair Tools is not equivalent to providing access to source code.

**ANSWER:** John Deere admits that the quoted language appears in the article at the link in

Footnote 84. John Deere denies the remaining allegations in Paragraph 183.

184.    As noted by PIRG, "Access to embedded software would allow a farmer to program new parts, giving him the same access to a routine process that dealerships enjoy."[85] Furthermore, "translating this information back into source code originally written by the software engineers is essentially impossible. That's why Apple, HP, and others freely make embedded code available for their products in the form of firmware updates."[86]

**ANSWER:** John Deere admits that the quoted language appears in the article at the link in

Footnotes 85 & 86. John Deere denies the remaining allegations in Paragraph 184.

185.    The term "reprogramming" refers to a necessary step in certain repairs, and it is plainly not an illegal or unsafe software modification requiring access to source code. Instead, reprogramming is a common and relatively straightforward step of many repairs involving replacement of an ECU which involves uploading software to the new controller.[87] There is no way for a farmer to perform these types of repairs without being required to pay for service at a

---

[83] Jemima Burt, *Tractor-hacking farmers in the US fight for right to repair under equality law*, ABC Rural (Feb. 21, 2018), https://www.abc.net.au/news/rural/2018-02-22/tractor-hacking-farmers-in-the-us-fight-for-right-to-repair/9470658.
[84] Koebler & Gault, *supra* note 6.
[85] Kevin O'Reilly, *supra* note 17, at 14.
[86] *Id.*
[87] ZK MasterTech, *John Deere 8295R ECU failure (JD Link saves the day!)*, YouTube (Apr. 10, 2021), https://youtu.be/J32QicahEVc?t=370 (video showing reprogramming step of newly- installed ECU by a Deere Dealership technician with Dealer Service Advisor).

Dealership.[88] Deere does not address the importance of these repairs, choosing instead to downplay their frequency.

**ANSWER:** John Deere denies the allegations in Paragraph 185.

186.    Deere's motivation for keeping Dealer-level Repair Tools out of the hands of farmers and independent mechanics has nothing to do with a commitment to environmental protection or farmer safety; Deere's obvious motive for restricting access to the Repair Tools is money.  For Deere and its Dealerships, parts and services are far more profitable than sales of the original equipment.  The repair segment of Deere's business has also been growing far faster than original equipment sales.  From 2013 to 2019, Deere's annual parts sales went up 22%, while the company's total agricultural equipment sales went down 19% in this same period.[89]

**ANSWER:** John Deere denies the allegations in Paragraph 186.

187.    As Deere's Tractors with ECUs reached greater market penetration and as Deere systematically eliminated small Dealerships, the company's income skyrocketed.  In 2000, Deere's net income was around a half billion dollars.  Deere's 2021 net income was $5.963B, over 11 times its income from 2000, and over twice its net income of $2.75B in 2020.  The forecast for Deere's net income in 2022 is estimated to be between $7 and $7.2B.  Although Deere does not break down the income received from the Dealerships' sales of Repair Services in its company filings, sales of "parts and maintenance services" are reported to account for a fifth of Deere's sales.[90]

**ANSWER:** John Deere denies the allegations in Paragraph 187.

188.    In the last several years, the reported profit margins not associated with direct sales increased dramatically (as illustrated in the graph below), and the company stated to investors in 2020 that it was betting on its parts and maintenance services business to contribute 50 basis points in added profits over the next two years.[91]

**ANSWER:** John Deere denies the allegations in Paragraph 188.

---

[88] Letter from Cory J. Reed, President, Worldwide Agriculture & Turf Division, Re Right to Repair and July 21 Open Commission Meeting (July 18, 2021), https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2021/greencenturydeere101521-14a8-incoming.pdf ("[A]ccess to software for purposes of reprogramming is needed in less than two percent of all repairs.  It is also important to note that technology continues to evolve such that software reprogramming, when required, can increasingly be done remotely.  This alleviates the need for an authorized technician to manually perform the reprogramming in person.").

[89] Waldman & Mulvany, *supra* note 2.

[90] Rajesh Kumar Singh, *Deere bets on cost cuts, services push to boost profits*, Reuters (Jan. 8, 2020), https://www.reuters.com/article/us-deere-strategy/deere-bets-on-cost-cuts-services-push- to-boost-profits-idUSKBN1Z72TA.

[91] *Id.*



Source: John Deere SEC filings; Fideres calculations

189. Without access to the Repair Tools to perform repairs and clear fault codes, owners of Deere Tractors have been forced to give Deere and its Dealerships more money for Deere Repair Services that the farmers would have expended had they performed the repairs themselves or hired less expensive, and often more convenient, independent repair shops to perform them. One farmer reported that he purchased a new Tractor for $300,000 and spent nearly $8,000 on clearing fault codes over the course of a few years.[92]

**ANSWER:** To the extent John Deere has knowledge or information sufficient to form a belief as

to the truth of allegations in Paragraph 189, it denies them. John Deere denies the remaining

allegations because it lacks knowledge or information sufficient to form a belief as to their truth.

190. Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedures, seeking damages and equitable and injunctive relief on behalf of the following class (the "Class"):

> All persons and entities residing in the United States who, during the Class Period of January 10, 2018 to the present, purchased Deere Repair Services for Deere agricultural equipment equipped with ECUs from Defendant or Deere's authorized Dealers and/or technicians.

**ANSWER:** John Deere admits that Plaintiffs purport to bring the action as a class action and that

Plaintiffs purport to define the class as alleged. John Deere denies that the class described is proper

---

[92] *Id.*

for certification, denies that it has violated any law and denies that Plaintiffs are entitled to any of the relief they seek. John Deere denies all remaining allegations in Paragraph 190.

191.    Specifically excluded from the Class are Deere and its employees, affiliates, subsidiaries, and joint venturers; and the co-conspirator authorized Dealers and their employees, affiliates, subsidiaries, and joint venturers, whether or not named in this Complaint.

**ANSWER:** John Deere admits that Plaintiffs purport to bring the action as a class action and that Plaintiffs purport to define the class as alleged. John Deere denies that the class described is proper for certification, denies that it has violated any law and denies that Plaintiffs are entitled to any of the relief they seek. John Deere denies all remaining allegations in Paragraph 191.

192.    **Numerosity**. Plaintiffs do not know the exact number of class members because such information presently is in the exclusive control of Defendant and its co-conspirators. Plaintiffs believe that due to the nature of the trade and commerce involved, there are thousands of class members geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

**ANSWER:** John Deere states that the allegations in Paragraph 192 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

193.    **Typicality**. Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs purchased Deere Repair Services from the co-conspirator Dealerships, and therefore Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

**ANSWER:** John Deere states that the allegations in Paragraph 193 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

194.    **Common Questions Predominate**. There are questions of law and fact common to the Class, including, but not limited to:

  a.    Whether the United States Deere Repair Services Market constitutes a Relevant Market;
  b.    Whether Deere possesses market power in this Relevant Market;

c.   Whether Deere colluded with Co-conspirator Dealerships to suppress competition for Deere Repair Services between Deere Dealerships in violation of Section 1 of the Sherman Act;

d.   Whether Deere colluded with Co-conspirator Dealerships to prevent farmers and independent repair shops from having access to the Repair Tools in violation of Section 1 of the Sherman Act;

e.   Whether Deere illegally tied the sale of Deere Repair Services to Deere Tractors in violation of Section 1 of the Sherman Act;

f.   Whether Deere and the co-conspirator Dealerships monopolized or attempted to monopolize the Deere Repair Services Market in the United States in violation of Section 2 of the Sherman Act;

g.   Whether Deere engaged in monopoly leveraging by using its monopoly power in the Deere Repair Tools Market to gain or attempt to gain or maintain monopoly power in the Deere Repair Services Market in violation of Section 2 of the Sherman Act;

h.   Whether the conduct of Defendant and its co-conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiffs and the other members of the Class;

i.   The effect of Defendant's alleged monopolization or attempted monopolization on the prices of Deere Repair Services sold in the United States during the Class Period;

j.   Whether Plaintiffs and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

k.   The appropriate class-wide measure of damages.

These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual members of the Class.

**ANSWER:** John Deere states that the allegations in Paragraph 194 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

195.   **Adequacy**. Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class who purchased Deere Repair Services from Defendant's co-conspirator Dealerships and Plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

**ANSWER:** John Deere states that the allegations in Paragraph 195 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

196. **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged members of the Class is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

**ANSWER:** John Deere states that the allegations in Paragraph 196 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

197. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

**ANSWER:** John Deere states that the allegations in Paragraph 197 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

198. Defendant has acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

**ANSWER:** John Deere states that the allegations in Paragraph 198 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

199. Defendant's and its co-conspirators' anticompetitive conduct had the following effects, among others:

  a.  Price competition has been restrained or eliminated with respect to Deere Repair Services;
  b.  The prices of Deere Repair Services have been fixed, raised, stabilized, or maintained at artificially inflated levels;
  c.  Purchasers of Deere Repair Services, including Plaintiffs, have been deprived of free and open competition; and

       d.      Purchasers of Deere Repair Services, including Plaintiffs, paid artificially inflated prices.

**ANSWER:** John Deere states that the allegations in Paragraph 199 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

200.    The purpose of Deere and its co-conspirators' conduct was to exclude competition and raise, fix, or maintain the price of Deere Repair Services. As a direct and foreseeable result, Plaintiffs and the Class paid supracompetitive prices for Deere Repair Services during the Class Period.

**ANSWER:** John Deere states that the allegations in Paragraph 200 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

201.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury to their businesses or property, having paid higher prices for Deere Repair Services than they would have paid in the absence of Deere's illegal conduct, and as a result have suffered damages.

**ANSWER:** John Deere states that the allegations in Paragraph 201 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

202.    This is an antitrust injury of the type that the antitrust laws were meant to compensate and prevent.

**ANSWER:** John Deere states that the allegations in Paragraph 202 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

### COUNT ONE
### Violation of Section 1 of the Sherman Act
### Conspiracy in Restraint of Trade
### 15 U.S.C. § 1

203.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:** John Deere incorporates and realleges its responses to each and every allegation set forth in the preceding paragraphs.

204.    Beginning at a time unknown to the Plaintiffs but no later than 2000, Defendant entered into and engaged in unlawful contracts, combinations in the form of trust or otherwise, and/or conspiracies in restraint of trade and commerce with co-conspirator Dealerships in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**ANSWER:** John Deere denies the allegations in Paragraph 204.

205.    Defendant and co-conspirator Dealerships engaged in anticompetitive behavior by agreeing to withhold necessary Repair Tools from farmers and independent repair shops, which unfairly suppressed price competition for Deere Repair Services and unreasonably restrained trade.

**ANSWER:** John Deere denies the allegations in Paragraph 205.

206.    Defendant's conduct included concerted efforts, actions and undertakings among Defendant and the Co-conspirator Dealerships with the intent, purpose, and effect of artificially suppressing competition for Repair Services.

**ANSWER:** John Deere denies the allegations in Paragraph 206.

207.    Defendant perpetrated the scheme with the specific intent of reducing competition in the Deere Repair Services market to the benefit of Defendant and the Co-conspirator Dealerships.

**ANSWER:** John Deere denies the allegations in Paragraph 207.

208.    Defendant's conduct in furtherance of its contracts, combinations and/or conspiracies were authorized, ordered, or done by its respective officers, directors, agents, employees, or representatives while actively engaging in the management of Defendant's affairs.

**ANSWER:** John Deere denies the allegations in Paragraph 208.

209.    Plaintiffs and Class Members paid higher rates for Deere Repair Services from Deere and its Co-Conspirator Dealerships than they otherwise would have in the absence of Defendant's unlawful conduct, and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

**ANSWER:** John Deere states that the allegations in Paragraph 209 consist of legal conclusions, and therefore no response is required.  To the extent a response is required, John Deere denies the allegations.

210.    Defendant's contracts, combinations, and/or conspiracies are per se violations of Section 1 of the Sherman Act.

**ANSWER:** John Deere states that the allegations in Paragraph 210 consist of legal conclusions, and therefore no response is required.  To the extent a response is required, John Deere denies the allegations.

211.    In the alternative, Defendant is liable under a "quick look" analysis where an observer with a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.

**ANSWER:** John Deere states that the allegations in Paragraph 211 consist of legal conclusions, and therefore no response is required.  To the extent a response is required, John Deere denies the allegations.

212.    Defendant's contracts, combinations, and/or conspiracies have had a substantial effect on interstate commerce.

**ANSWER:** John Deere states that the allegations in Paragraph 212 consist of legal conclusions, and therefore no response is required.  To the extent a response is required, John Deere denies the allegations.

213.    As a direct and proximate result of Defendant's contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiffs and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

**ANSWER:** John Deere states that the allegations in Paragraph 213 consist of legal conclusions, and therefore no response is required.  To the extent a response is required, John Deere denies the allegations.

## COUNT TWO
### Violation of Section 1 of the Sherman Act
### Group Boycott
### 15 U.S.C. § 1

214.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:** John Deere incorporates and realleges its responses to each and every allegation set forth in the preceding paragraphs.

215. Beginning at a time unknown to the Plaintiffs but no later than 2000 and continuing thereafter to the present, Defendant, by and through its officers, directors, employees, agents, or other representatives, has explicitly or implicitly colluded with Co-conspirator Dealerships to jointly boycott entities that would have introduced price-reducing sales of Deere Repair Services in the United States, in order to artificially raise, fix, maintain, and/or stabilize prices in the Deere Repair Services market, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**ANSWER:** John Deere denies the allegations in Paragraph 215.

216. Defendant's and the Co-conspirator Dealerships' refusal to make Repair Tools available to individual farmers and independent repair shops constitutes a per se violation of Section One of the Sherman Act.

**ANSWER:** John Deere states that the allegations in Paragraph 216 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

217. Defendant's and the Co-conspirator Dealerships' boycott cut off access to the Repair Tools, a necessary resource that would enable farmers and independent repair shops to compete in the Deere Repair Services market.

**ANSWER:** John Deere denies the allegations in Paragraph 217.

218. Together, Defendant and the Co-conspirator Dealerships wholly control the market for Deere Repair Services.

**ANSWER:** John Deere denies the allegations in Paragraph 218.

219. No plausible pro-competitive reasons exist for Defendant's and the Co-conspirator Dealerships' refusal to sell the Repair Tools to farmer or independent repair shops.

**ANSWER:** John Deere denies the allegations in Paragraph 219.

220. As a direct and proximate result of Defendant's contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiffs and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

**ANSWER:** John Deere states that the allegations in Paragraph 220 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

### COUNT THREE
### Violation of Section 1 of the Sherman Act
### Unlawful Tying Arrangement
### 15 U.S.C. § 1

221.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:** John Deere incorporates and realleges its responses to each and every allegation set forth in the preceding paragraphs.

222.    This cause of action is brought under Section 1 of the Sherman Act, 15 U.S.C. § 1.

**ANSWER:** John Deere admits that Plaintiffs purport to bring a cause of action against John Deere under Section 1 of the Sherman Act, 15 U.S.C. § 1. John Deere denies that it has violated any law and denies that Plaintiffs are entitled to any of the relief they seek. John Deere denies all remaining allegations in Paragraph 222.

223.    A tying arrangement exists when a seller exploits power over one product (the tying product) to force the buyer to accept a second product (the tied product). *Batson v. Live Nation Entm't*, 746 F.3d 827, 832 (7th Cir. 2014). Such an arrangement violates Section 1 of the Sherman Act if the seller has appreciable economic power in the tying product market and the arrangement affects a substantial volume of commerce in the tied market. *Eastman Kodak Co. v. Image Tech. Servs. Inc.*, 504 U.S. 451, 462 (1992).

**ANSWER:** John Deere states that the allegations in Paragraph 223 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

224.    Deere Tractors and Deere Repair Services are distinct and separate products and services.

**ANSWER:** John Deere denies that the definitions of "Deer Tractors" and "Deere Repair Services" alleged in the Complaint are proper. John Deere denies the remaining allegations in Paragraph 224.

225. Plaintiffs and Class members through their purchase of Deere Tractors were coerced into purchasing a second tied product, Deere Repair Services, from Defendant and its Co-Conspirator Dealerships.

**ANSWER:** John Deere states that the allegations in Paragraph 225 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

226. Furthermore, Defendant represented to Plaintiffs and the Class that most necessary repair tools were available and that almost all repairs could be done on the Tractors without the Software or other Dealer-level Repair Tools. These misleading statements meant that Plaintiffs and the Class could not, from Deere's representations, engage in accurate lifecycle pricing for Deere Tractors before they were locked into purchasing Deere Repair Services from Defendant and the Dealerships.

**ANSWER:** John Deere denies the allegations in Paragraph 226.

227. As set out above, Defendant has appreciable economic power in the relevant Tractor Markets, i.e., the "tying" markets.

**ANSWER:** John Deere denies the allegations in Paragraph 227.

228. This tying arrangement affected a substantial amount of interstate commerce.

**ANSWER:** John Deere states that the allegations in Paragraph 228 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

229. Defendant's conduct amounts to a per se tying violation, as Defendant has significant power in the tying markets which has led to a significant and actual impact on competition in the Deere Repair Services market.

**ANSWER:** John Deere states that the allegations in Paragraph 229 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

230.    Alternatively, Defendant's conduct is an illegal tying arrangement under the rule of reason, as Defendant's actions to coerce farmers to purchase Deere Repair Services from Defendant is an unreasonable restraint on competition in the market for Deere Repair Services.

**ANSWER:**  John Deere states that the allegations in Paragraph 230 consist of legal conclusions, and therefore no response is required.  To the extent a response is required, John Deere denies the allegations.

231.    There are no legitimate pro-competitive business justifications for Defendant's illegal tying arrangement.

**ANSWER:**  John Deere states that the allegations in Paragraph 231 consist of legal conclusions, and therefore no response is required.  To the extent a response is required, John Deere denies the allegations.

232.    Defendant has a substantial economic interest in sales of Deere Repair Services.

**ANSWER:**  John Deere denies the allegations in Paragraph 232.

**COUNT FOUR**
**Violation of Section 2 of the Sherman Act**
**Monopolization**
**15 U.S.C. § 2**

233.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**  John Deere incorporates and realleges its responses to each and every allegation set forth in the preceding paragraphs.

234.    This cause of action is brough under Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits "monopoliz[ation of] any part of the trade or commerce among the several states, or with foreign nations."

**ANSWER:**  John Deere admits only that this Paragraph includes a portion of the text of 15 U.S.C. § 2.  John Deere denies any violation of the statute.

235.    Deere has monopoly power in the Deere Repair Services Market, including the power to control prices and exclude competition.

**ANSWER:**  John Deere denies the allegations in Paragraph 235.

236.    Deere has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in this market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**ANSWER:**  John Deere states that the allegations in Paragraph 236 consist of legal conclusions, and therefore no response is required.  To the extent a response is required, John Deere denies the allegations.

237.    Deere has unreasonably restrained, and further threatens to unreasonably restrain competition in the Deere Repair Services Market by:

(a)    restricting the availability of the Repair Tools necessary to perform comprehensive diagnostics and repairs for Deere Tractors;

(b)    knowingly misrepresenting the availability and necessity of the Repair Tools required for comprehensive diagnostics and repairs for Deere Tractors;

(c)    tying the purchase of Repair Services through Deere to the purchase of Deere Tractors; and

(d)    limiting farmers' rights over their own Tractors through the terms of the 2016 EULA with the aim of restricting farmers' ability to choose to perform Deere Repair Services themselves or take their Tractor to an independent repair shop.

**ANSWER:**  John Deere denies the allegations in Paragraph 237.

238.    While some of these anticompetitive acts themselves constitute an individual antitrust violation on a stand-alone basis, together they support a broader monopolization claim.

**ANSWER:**  John Deere states that the allegations in Paragraph 238 consist of legal conclusions, and therefore no response is required.  To the extent a response is required, John Deere denies the allegations.

239.    As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiffs and the Class have been damaged by, among other things: (i) the payment of supracompetitive prices for Deere Repair Services; and (ii) the lack of availability of independent Deere Repair Services and self-repair options.

**ANSWER:**  John Deere states that the allegations in Paragraph 239 consist of legal conclusions, and therefore no response is required.  To the extent a response is required, John Deere denies the allegations.

**COUNT FIVE**
**Violation of Section 2 of the Sherman Act**
**Monopoly Leveraging**
**15 U.S.C. § 2**

240.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:** John Deere incorporates and realleges its responses to each and every allegation set forth in the preceding paragraphs.

241.     As detailed above, Deere has monopoly power over Deere Repair Tools.

**ANSWER:** John Deere denies the allegations in Paragraph 241.

242.     Deere has willfully and intentionally used its monopoly power over Deere Repair Tools to gain or attempt to gain or maintain monopoly power in the Deere Repair Services Market, specifically, by tying purchases of Deere Tractors to Deere-provided Repair Services through deliberate restriction of access to the full spectrum of Repair Tools necessary to run diagnostics, approve repairs, and perform maintenance.  Deere's actions cannot be justified on the basis of any legitimate consumer benefit.

**ANSWER:** John Deere states that the allegations in Paragraph 242 consist of legal conclusions, and therefore no response is required.  To the extent a response is required, John Deere denies the allegations.

243.     Furthermore, Deere also leveraged its monopoly power over Deere Repair Tools to effectuate the 2016 EULA, limiting farmers' ownership rights over their own Tractors and forcing farmers to purchase Deere-provided Repair Services.  The EULA impermissibly restricts farmers' ability to perform Deere Repair Services themselves by prohibiting attempts to reverse engineer, adapt, or otherwise circumvent the Software.  Deere threatens that it may terminate the license to the Software—and therefore access to a functional Tractor—if a farmer interacts with the Software in a way that Deere deems to be a violation of the EULA.

**ANSWER:** John Deere denies the allegations in Paragraph 243.

244.     Deere willfully has acquired or maintained monopoly power by the exclusionary conduct detailed above, rather than through legitimate business acumen, skill, efficiency, or legitimate innovation.

**ANSWER:** John Deere states that the allegations in Paragraph 244 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

245. As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiffs and the Class have been damaged by, among other things, (i) the payment of supracompetitive prices for Deere Repair Services; and (ii) the lack of availability of independent Deere Repair Services and self-repair options.

**ANSWER:** John Deere states that the allegations in Paragraph 245 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

## COUNT SIX
### Violation of Section 2 of the
### Sherman Act Attempted
### Monopolization in the Alternative
### 15 U.S.C. § 2

246. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:** John Deere incorporates and realleges its responses to each and every allegation set forth in the preceding paragraphs.

247. As detailed above, Deere has monopoly power, or at a minimum, a dangerous probability of success in acquiring monopoly power, in the Deere Repair Services Market, including the power to control prices and exclude competition.

**ANSWER:** John Deere states that the allegations in Paragraph 247 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

248. Deere has willfully, knowingly, and with specific intent to do so, attempted to monopolize the Repair Services Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**ANSWER:** John Deere states that the allegations in Paragraph 248 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

249. Deere's anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the Repair Services Market. Deere's ongoing anticompetitive conduct presents a dangerous probability that Deere will succeed, to the extent it has not already, in its attempt to monopolize the Repair Service Market.

**ANSWER:** John Deere states that the allegations in Paragraph 249 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

250. As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiffs and the Class have been damaged by, among other things, (i) the payment of supracompetitive prices for Deere Repair Services; and (ii) the lack of availability of independent Deere Repair Services and self-repair options.

**ANSWER:** John Deere states that the allegations in Paragraph 250 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

## COUNT SEVEN
### Violation of Section 2 of the Sherman Act Conspiracy to Monopolize
### 15 U.S.C. § 2

251. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:** John Deere incorporates and realleges its responses to each and every allegation set forth in the preceding paragraphs.

252. Beginning approximately in 2000 and continuing thereafter to the present, Defendant, by and through its officers, directors, employees, agents, or other representatives, have explicitly or implicitly conspired with Co-conspirator Dealerships to jointly boycott entities that would have introduced price-reducing sales of Deere Repair Services in the United States, in order to acquire and maintain monopoly power in the Deere Repair Services market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**ANSWER:** John Deere denies the allegations in Paragraph 252.

253.    Defendant's and the Co-conspirator Dealerships' boycott cut off access to the Repair Tools, necessary resources that would enable farmers and independent repair shops to compete in the Deere Repair Services market.

**ANSWER:** John Deere denies the allegations in Paragraph 253.

254.    Deere and the Dealerships have willfully, knowingly, and with specific intent to do so, conspired to monopolize the Repair Services Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**ANSWER:** John Deere states that the allegations in Paragraph 254 consist of legal conclusions,

and therefore no response is required.  To the extent a response is required, John Deere denies the

allegations.

255.    No plausible pro-competitive arguments exist for Defendant's and the Co-conspirator Dealerships' refusal to make the Repair Tools available to farmers or independent repair shops.

**ANSWER:** John Deere denies the allegations in Paragraph 255.

256.    As a direct and proximate result of Deere and the Dealerships' conspiracy to restrain trade and commerce, Plaintiffs and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

**ANSWER:** John Deere states that the allegations in Paragraph 256 consist of legal conclusions,

and therefore no response is required.  To the extent a response is required, John Deere denies the

allegations.

### Violation of Sections 1 and 2 of the Sherman Act
### Declaratory and Injunctive Relief
### 15 U.S.C. §§ 1, 2

257.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:** John Deere incorporates and realleges its responses to each and every allegation set

forth in the preceding paragraphs.

258.    Plaintiffs seek declaratory and injunctive relief under the federal antitrust laws.

**ANSWER:** John Deere admits that the Complaint purports to seek declaratory and injunctive relief. John Deere denies that it has violated any law, and denies that Plaintiffs are entitled to any of the relief they seek. John Deere denies all remaining allegations in Paragraph 258.

259. Plaintiffs' allegations described herein constitute violations of Sections 1 and 2 of the Sherman Act.

**ANSWER:** John Deere states that the allegations in Paragraph 259 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

260. Deere effectuated an illegal tying arrangement and a scheme to restrain trade and monopolize a market.

**ANSWER:** John Deere states that the allegations in Paragraph 260 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

261. There is, and was, no legitimate, non-pretextual, pro-competitive business justification for Deere's conduct that outweighs its harmful effect.

**ANSWER:** John Deere denies the allegations in Paragraph 261.

262. As a direct and proximate result of Deere's illegal tying arrangement and anticompetitive scheme, as alleged herein, Plaintiffs and the Class were harmed.

**ANSWER:** John Deere states that the allegations in Paragraph 262 consist of legal conclusions, and therefore no response is required. To the extent a response is required, John Deere denies the allegations.

263. The goal, purpose, and/or effect of the tying arrangement and anticompetitive scheme was to prevent competition or self-repair in order to continue charging supracompetitive prices for Repair Services.

**ANSWER:** John Deere denies the allegations in Paragraph 263.

264. Plaintiffs and the Class have been injured in their business or property by reason of Deere's antitrust violations as alleged in this Complaint. Their injury consists of paying higher

prices for Repair Services than they would have paid in the absence of those violations. These injuries will continue unless halted.

**ANSWER:** John Deere denies it has violated any law and denies that Plaintiffs are entitled to any of the relief they seek. John Deere denies all remaining allegations in Paragraph 264.

265. Plaintiffs and the Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), hereby seek a declaratory judgment that Deere's conduct constitutes a violation of Sections 1 and 2 of the Sherman Act.

**ANSWER:** John Deere admits that the Complaint purports to seek a declaratory judgment. John Deere denies that it has violated any law, and denies that Plaintiffs are entitled to any of the relief they seek. John Deere denies all remaining allegations in Paragraph 265.

266. Plaintiffs and the Class further seek equitable and injunctive relief pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Deere's unlawful conduct.

**ANSWER:** John Deere admits that the Complaint purports to seek injunctive relief. John Deere denies that it has violated any law, and denies that Plaintiffs are entitled to any of the relief they seek. John Deere denies all remaining allegations in Paragraph 266.

WHEREFORE, Plaintiff, on behalf of itself and the Class of all others so similarly situated, respectfully requests judgment against Defendant as follows:

267. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

**ANSWER:** John Deere admits that the Complaint purports to seek the relief stated in Paragraph 267. John Deere denies that it has violated any law and denies that Plaintiffs are entitled to any of the relief they seek. John Deere denies the remaining allegations in Paragraph 267.

268. The unlawful conduct herein be adjudged and decreed in violation of Section 1 and Section 2 of the Sherman Act.

**ANSWER:** John Deere admits that the Complaint purports to seek the relief stated in Paragraph 268. John Deere denies that it has violated any law and denies that Plaintiffs are entitled to any of the relief they seek. John Deere denies the remaining allegations in Paragraph 268.

269. Plaintiffs and the Class recover damages, to the maximum extent allowed, and that a joint and several judgment in favor of Plaintiffs and the members of the Class be entered against Defendant in an amount to be trebled to the extent the laws permit;

**ANSWER:** John Deere admits that the Complaint purports to seek the relief stated in Paragraph 269. John Deere denies that it has violated any law and denies that Plaintiffs are entitled to any of the relief they seek. John Deere denies the remaining allegations in Paragraph 269.

270. Defendant, its affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct alleged herein, or from engaging in other conduct having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

**ANSWER:** John Deere admits that the Complaint purports to seek the relief stated in Paragraph 270. John Deere denies that it has violated any law and denies that Plaintiffs are entitled to any of the relief they seek. John Deere denies the remaining allegations in Paragraph 270.

271. Plaintiffs and the members of the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

**ANSWER:** John Deere admits that the Complaint purports to seek the relief stated in Paragraph 271. John Deere denies that it has violated any law and denies that Plaintiffs are entitled to any of the relief they seek. John Deere denies the remaining allegations in Paragraph 271.

272. Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

**ANSWER:** John Deere admits that the Complaint purports to seek the relief stated in Paragraph 272. John Deere denies that it has violated any law and denies that Plaintiffs are entitled to any of the relief they seek. John Deere denies the remaining allegations in Paragraph 272.

273.     Plaintiffs and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

**ANSWER:** John Deere admits that the Complaint purports to seek the relief stated in Paragraph 273.  John Deere denies that it has violated any law and denies that Plaintiffs are entitled to any of the relief they seek.  John Deere denies the remaining allegations in Paragraph 273.

274.     Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

**ANSWER:** John Deere admits that the Plaintiffs have demanded a jury trial on all triable matters.

## AFFIRMATIVE DEFENSES

Without prejudice to the denials set forth above, and without admitting any of Plaintiffs' allegations not otherwise admitted, and without undertaking any of the burdens imposed by law against Plaintiffs, John Deere asserts the following affirmative defenses to Plaintiffs' claims. John Deere reserves its right to assert additional affirmative defenses at such time and to such extent as warranted by discovery and the factual developments in this case.

## FIRST AFFIRMATIVE DEFENSE
### (FAILURE TO STATE A CLAIM)

The Complaint fails to state a claim upon which relief can be granted, including because the Complaint fails to plead a plausible relevant primary market or aftermarket and because Plaintiffs are indirect purchasers who lack standing to bring claims.  In support of this Affirmative Defense, John Deere also incorporates by reference its Memorandum in Support of Its Motion for Judgment on the Pleadings, filed on December 8, 2022 in this proceeding.

## SECOND AFFIRMATIVE DEFENSE
### (DUE PROCESS VIOLATION)

The certification and maintenance of this action as a class action would violate John Deere's due process rights under the Fifth Amendment and the Fourteenth Amendment to the United States Constitution and would deny John Deere the right of access to the courts to the extent that the certification and maintenance of a class action would deprive John Deere of procedural and substantive safeguards and of traditional defenses to liability, including, but not limited to, interpretations of state and federal laws and the imposition of any statutory and/or punitive damages related to a particular plaintiff that would result if Plaintiffs were asserting their claims individually.

## THIRD AFFIRMATIVE DEFENSE
### (WAIVER, RATIFICATION, ESTOPPEL, LACHES, AND UNCLEAN HANDS)

Plaintiffs' claims are barred, in whole or in part, by the doctrines of waiver, ratification, estoppel, laches, unclean hands, and other equitable defenses because, among other things, Plaintiffs knowingly and voluntarily purchased John Deere-branded equipment with notice that such equipment was becoming increasingly technologically advanced and would require that certain repairs be performed by authorized Dealers over the course of the equipment's life. Plaintiffs' knowledge is supported by their allegations throughout the Complaint that modern John Deere-branded equipment is technologically advanced and requires repair services. *See, e.g.*, Complaint ¶¶ 3, 70, 72. Additionally, Plaintiffs either discovered or should have discovered with reasonable diligence their alleged past and future injuries long before they filed this Complaint. Plaintiffs' allegations in the Complaint are based on publicly available information, including John Deere's public statements, made since at least 2015. *See, e.g.*, Complaint ¶¶ 125, 126, 142.

Plaintiffs' failure to sue until now has prejudiced John Deere because the passage of time without notice of Plaintiffs' suit has harmed John Deere's ability to prepare its defense.

**FOURTH AFFIRMATIVE DEFENSE**
**(SPECULATIVE AND REMOTE DAMAGES)**

Plaintiffs' claims and/or entitlement to damages are barred, in whole or in part, because the damages they seek are too speculative, remote, or difficult to ascertain. Plaintiffs have alleged no damages amount in their Complaint and have failed to allege any information whatsoever about the alleged repairs Plaintiffs or the putative class members have had done to their John Deere-branded equipment. Instead, the Complaint merely seeks to recover "damages to the maximum extent allowed," which provides John Deere with no information about the amount of damages Plaintiffs seek. Complaint ¶ 269.

**FIFTH AFFIRMATIVE DEFENSE**
**(FAILURE TO MITIGATE)**

Plaintiffs' claims and/or entitlement to damages are barred, in whole or in part, because they have failed to mitigate, prevent or avoid their alleged damages, if any. Plaintiffs have knowingly and voluntarily purchased and/or continue to purchase John Deere-branded equipment despite knowing that such equipment was becoming increasingly technologically advanced and would require repairs from authorized John Deere Dealers over the course of the equipment's life. Plaintiffs' knowledge is supported by their allegations throughout the Complaint that modern John Deere-branded equipment is technologically advanced and requires certain repair services. *See, e.g.*, Complaint ¶¶ 3, 70, 72.

**SIXTH AFFIRMATIVE DEFENSE**
**(INDEPENDENT AND LEGITIMATE BUSINESS INTEREST)**

Plaintiffs' claims are barred, in whole or in part, because John Deere has and/or had independent and legitimate business interests in its conduct, including, but not limited to, limiting

access to its proprietary software and other repair tools in light of concerns about customer safety, security and the environment (among other things). Furthermore, John Deere's conduct was at all times procompetitive, including, but not limited to, by creating a market for others (i.e. independent authorized John Deere Dealers) that would not otherwise exist.

## SEVENTH AFFIRMATIVE DEFENSE
### (STATUTE OF LIMITATIONS)

Plaintiffs' claims are barred by the applicable statute of limitations because Plaintiffs have included in their potential class individuals who purchased repair services outside of the alleged class period because Plaintiffs do not allege when repairs were done to their John Deere-branded equipment. Instead, Plaintiffs allege only that the named Plaintiffs "purchased Deere Repair Services from at least one Deere-affiliated Dealership during the Class Period." *See, e.g.*, Complaint ¶¶ 42-50. Plaintiffs do not provide information about the repairs done to their John Deere-banded equipment or which authorized John Deere Dealer allegedly performed the repairs. Additionally, Plaintiffs' claims are barred by the applicable statute of limitations because their allegations are based on the alleged consolidation of independent John Deere Dealers that pre-date the class period. *See, e.g.*, Complaint ¶¶ 103-108.

## EIGHTH AFFIRMATIVE DEFENSE
### (JOINDER)

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have failed to join one or more necessary and indispensable parties to this action, including the independent authorized John Deere Dealers that Plaintiffs allege are John Deere's "co-conspirators" throughout the Complaint. *See, e.g.*, Complaint ¶¶ 2, 16, 41, 53, 55-58, 191-195, 199-200.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), John Deere demands a trial by jury of all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Defendant John Deere prays as follows:

1) That Plaintiffs take nothing by virtue of the Complaint and that this action be dismissed in its entirety with prejudice;

2) An award of attorneys' fees, costs, and disbursement; and

3) For such other and further relief as the Court may deem just and appropriate.

Dated: December 8, 2022

Respectfully submitted,

*/s/ Tiffany D. Lipscomb-Jackson*

John M. Majoras
jmmajoras@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 879-3939

Tiffany D. Lipscomb-Jackson
tdlipscombjackson@jonesday.com
JONES DAY
325 John H. McConnell Boulevard,
Suite 600
Columbus, OH 43215-2673
Telephone:  (614) 281-3876

Corey A. Lee
calee@jonesday.com
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone:  (216) 586-3939

Amanda B. Maslar (6321073)
amaslar@jonesday.com
JONES DAY
110 North Wacker, Suite 4800
Chicago, IL  60606
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585

*Counsel for Defendant Deere & Company*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on December 8, 2022, a copy of the foregoing was filed using the CM/ECF system, which will effectuate service on all counsel of record.

*/s/ Tiffany D. Lipscomb-Jackson*