**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

IN RE: DEERE & COMPANY REPAIR
SERVICES ANTITRUST LITIGATION

Case No.: 3:22-cv-50188
Hon. Iain D. Johnston

**DEFENDANT DEERE & COMPANY'S MEMORANDUM**
**IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 2

LEGAL STANDARDS ........................................................................................... 3

ARGUMENT .......................................................................................................... 4

I.      PLAINTIFFS LACK STANDING ................................................................. 4

      A.      Plaintiffs Lack Article III Standing ...................................................... 4

      B.      As Indirect Purchasers, Plaintiffs Also Lack Antitrust Standing ........................... 6

              1.      The Complaint Fails to State a Plausible Conspiracy ............................... 7

              2.      The Complaint Fails to Join its Alleged Co-Conspirators ........................ 11

II.      PLAINTIFFS CANNOT PLEAD A PLAUSIBLE RELEVANT MARKET ................. 14

      A.      Plaintiffs Fail to Plausibly Allege a Relevant Primary Market ........................... 16

      B.      Plaintiffs Fail to Plausibly Allege A Relevant Aftermarket ................................ 18

      C.      Plaintiffs' Proposed Class Is Facially Overbroad Given Its Proposed Market ..................... 21

III.     THE INDIVIDUAL COUNTS ARE EACH FACIALLY DEFECTIVE ...................... 22

      A.      The Complaint Does Not State a Claim Under Section 1 of the Sherman Act ..................... 22

              1.      The Complaint Does Not State a *Per Se* Section 1 Claim ........................ 23

              2.      The Complaint Does Not State a "Quick Look" Section 1 Claim ............ 23

              3.      The Complaint Does Not State a Rule of Reason Section 1 Claim ......... 24

      B.      The Complaint Does Not State a Claim Under Section 2 of the Sherman Act ..................... 26

              1.      The Complaint Does Not State a Plausible Monopolization Claim ........ 26

              2.      The Complaint Does Not State Any Other Plausible Section 2 Claim ..................... 28

CONCLUSION ..................................................................................................... 28

# TABLE OF AUTHORITIES

Page

CASES

*Adams v. City of Indianapolis*,
   742 F.3d 720 (7th Cir. 2014) ........................................................................................3

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
   836 F.3d 1171 (9th Cir. 2016) ....................................................................................27

*Agnew v. NCAA*,
   683 F.3d 328 (7th Cir. 2012) .....................................................................................23

*Am. Needle, Inc. v. Nat'l Football League*,
   560 U.S. 183 (2010)...................................................................................................27

*Apex Digit., Inc. v. Sears, Roebuck & Co.*,
   572 F.3d 440 (7th Cir. 2009) ......................................................................................4

*Apple v. Pepper*,
   139 S. Ct. 1514 (2019)...........................................................................................4, 6

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...............................................................................................3, 10

*Com. Data Servers, Inc. v. IBM*,
   166 F. Supp. 2d. 891 (S.D.N.Y. 2001).......................................................................17

*Cupp v. Alberto-Culver USA, Inc.*,
   310 F. Supp. 2d 963 (W.D. Tenn. 2004)....................................................................17

*Dickson v. Microsoft Corp.*,
   309 F.3d 193 (4th Cir. 2002) ......................................................................................8

*Digit. Equip Corp. v. Uniq Digit. Techs., Inc.*,
   73 F.3d 756 (7th Cir. 1996) ................................................................................15, 19

*E. & G. Gabriel v. Gabriel Bros., Inc.*,
   No. 93 CIV. 0894, 1994 WL 369147 (S.D.N.Y. July 13, 1994) .............................17

*EEOC v. Concentra Health Servs., Inc.*,
   496 F.3d 773 (7th Cir. 2007) ......................................................................................4

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

*Epic Games, Inc. v. Apple Inc.*,
559 F. Supp. 3d 898 (N.D. Cal. 2021) ..................................................14, 15, 16, 18

*EuroTec Vertical Flight Sols., LLC v. Safran Helicopter Engines S.A.A.*,
No. 15-CV-3454, 2019 WL 3503240 (N.D. Tex. Aug. 1, 2019)..........................................25

*Frank v. Gaos*,
139 S. Ct. 1041 (2019) ..........................................................................4

*FTC v. Facebook, Inc.*,
560 F. Supp 3d 1 (D.D.C. 2021) ......................................................26

*Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*,
No. C-09-3854 2010 WL 1541257 (N.D. Cal. Apr. 16, 2010)..............................................17

*Howard Hess Dental Lab'y, Inc. v. Dentsply Int'l, Inc.*,
602 F.3d 237 (3d Cir. 2010)..........................................................9

*In re Beef Industry Antitrust Litig.*,
600 F.2d 1148 (5th Cir. 1979) ..................................................12

*In re Brand Name Prescription Drugs Antitrust Litig.*,
123 F.3d 599 (7th Cir. 1997) ..................................................11, 12

*In re Brand Name Prescription Drugs Antitrust Litig.*,
177 F.R.D. 414 (N.D. Ill. 1997).....................................................12

*In re Indep. Serv. Orgs. Antitrust Litig.*,
203 F. 3d 1322 (Fed. Cir. 2000).....................................................27

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010).....................................................10

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ..................................................8, 9, 10

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
533 F.3d 1 (1st Cir. 2008).....................................................12

*In re Ry. Indus. Emp. No-Poach Antitrust Litig.*,
395 F. Supp. 3d 464 (W.D. Pa. 2019).....................................................22

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
797 F.3d 538 (8th Cir. 2015) ..................................................12

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

*Jackson v. Resol. GGF Oy*,
    136 F.3d 1130 (7th Cir. 1998) ....................................................................5

*John v. Nat'l Sec. Fire & Cas. Co.*,
    501 F.3d 443 (5th Cir. 2007) ...................................................................22

*Korea Kumho Petrochemical v. Flexsys Am. LP*,
    No. C07-01057, 2008 WL 686834 (N.D. Cal. Mar. 11, 2008)...............25

*Ladik v. Wal-Mart Stores, Inc.*,
    291 F.R.D. 263 (W.D. Wis. 2013)...........................................................22

*Loeb Indus., Inc. v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) .....................................................................6

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
    29 F.4th 337 (7th Cir. 2022) .............................................................4, 5, 6

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
    952 F.3d 832 (7th Cir. 2020) .....................................................................7

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).................................................................................13

*McCarthy v. Recordex Serv., Inc.*,
    80 F.3d 842 (3d Cir. 1996).......................................................................12

*Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*,
    524 F.3d 726 (6th Cir. 2008) ...................................................................21

*Miles Distribs., Inc. v. Specialty Const. Brands, Inc.*,
    476 F.3d 442 (7th Cir. 2007) ...................................................................14

*NCAA v. Alston*,
    141 S. Ct. 2141 (2021)........................................................................23, 24

*Newcal Ind., Inc. v. Ikon Off. Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ...................................................................15

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ..........................................................27, 28

*NYNEX Corp. v. Discon, Inc.*,
    525 U.S. 128 (1998)................................................................................28

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) ................................................................................................ 14, 23

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
  555 U.S. 438 (2009) ............................................................................................................ 27

*Paper Sys. Inc. v. Nippon Paper Indus. Co.*,
  281 F.3d 629 (7th Cir. 2002) ..................................................................................... 7, 12, 13

*PKS, Inc. v. Leegin Creative Leather Prod., Inc.*,
  615 F.3d 412 (5th Cir. 2010) ............................................................................................... 8

*PSI Repair Servs. Inc. v. Honeywell, Inc.*,
  104 F.3d 811 (6th Cir. 1997) ........................................................................................ 15, 16

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
  381 F.3d 717 (7th Cir. 2004) ............................................................................................. 24

*Schor v. Abbott Lab'y*,
  378 F. Supp. 2d 850 (N.D. Ill. 2005) ................................................................................ 28

*Schor v. Abbott Lab'y*,
  457 F.3d 608 (7th Cir. 2006) ....................................................................................... 15, 28

*Serv. & Training, Inc. v. Data Gen. Corp.*,
  963 F.2d 680 (4th Cir. 1992) ............................................................................................. 24

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
  950 F.3d 911 (7th Cir. 2020) ....................................................................................... 14, 16

*SMS Sys. Maint. Servs., Inc. v. Digit. Equip. Corp.*,
  188 F.3d 11 (1st Cir. 1999) .......................................................................................... 15, 21

*SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*,
  841 F.3d 827 (10th Cir. 2016) ........................................................................................... 27

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993) ........................................................................................................... 28

*Synthes, Inc. v. Emerge Med., Inc.*,
  No. 11-CV-1566, 2012 WL 4473228 (E.D. Pa. Sept. 28, 2012) ....................................... 25

*Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
  552 F.3d 430 (6th Cir. 2008) ............................................................................................. 26

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Toys "R" Us, Inc. v. FTC,*
    221 F.3d 928 (7th Cir. 2000) ............................................................................10, 23

*TransUnion LLC v. Ramirez,*
    141 S. Ct. 2190 (2021) ...........................................................................................4

*U.S. Gypsum Co. v. Ind. Gas Co.,*
    350 F.3d 623 (7th Cir. 2003) .................................................................................7

*United Farmers Agents Ass'n v. Farmers Ins. Exch.,*
    89 F.3d 233 (5th Cir. 1996) .................................................................................15

*United States v. Apple, Inc.,*
    791 F.3d 290 (2d Cir. 2015)..................................................................................9

*United States v. E.I. du Pont de Nemours & Co.,*
    351 U.S. 377 (1956).............................................................................................15

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP,*
    540 U.S. 398 (2004).....................................................................................26, 28

*Viamedia, Inc. v. Comcast Corp.,*
    951 F.3d 429 (7th Cir. 2020) ...........................................................................24, 25

**OTHER AUTHORITIES**

Areeda & Hovenkamp, *Antitrust Law* (Aug. 2022)........................................................15

Fed. R. Civ. P. 12 ...........................................................................................................3

Fed. R. Civ. P. 23 .........................................................................................................22

## INTRODUCTION

For 185 years, John Deere has been manufacturing agricultural machinery for America's farmers. And as those farmers' operations have grown more sophisticated and efficient, Deere's equipment has kept pace. Deere's products—once entirely mechanical—have become increasingly high-tech, relying on software and built-in computers to function. These are not your grandfather's tractors, and that is a good thing. These advances in technology are critical for American farmers' productivity, profitability, sustainability, and competitive standing.

This is a case about how Deere's modern agricultural products are repaired. Today, the lion's share of repairs for this equipment can be done by dealerships, independent mechanics, or farmers themselves. But a small subset of these repairs—typically involving the reprogramming of an electronic control unit—can be done only by independently owned Deere-authorized dealerships. In light of concerns about customer safety, security, and the environment (among other things), Deere generally provides the software and informational resources necessary to make those repairs only to authorized dealers and their technicians. Deere has never hidden the fact that some of its repairs require its dealers.

Plaintiffs nonetheless take issue with this system, and contend that they should have the unfettered ability to make whatever repairs they want to this highly sophisticated equipment. In plain terms, Plaintiffs say that the federal antitrust laws compel Deere to give *all* of its proprietary repair tools and software to *anyone* who happens to want them. That remarkable assertion has no basis in law—and unsurprisingly, the Complaint is riddled with numerous deficiencies that cannot survive the pleadings. Even taking their allegations as true, Plaintiffs lack standing to pursue their claims. And, in all events, those claims are without merit. Collectively, they all rest upon the same flawed relevant antitrust market. And, individually, they each harbor fundamental defects.

-1-

Plaintiffs are trying to warp the antitrust laws to accomplish what they cannot in the market. This Court should not approve that effort. Rather, it should dismiss this case on the pleadings.

## BACKGROUND

Deere & Company, commonly known as "John Deere," is a corporation headquartered in Moline, Illinois. Compl. ¶¶ 2, 51. Among other things, Deere is a manufacturer of agricultural equipment, ranging from tractors to harvesters to production-scale combines. *Id.* ¶ 67.

Deere "Tractors"—a term the Complaint defines as including a wide-ranging collection of large agricultural machinery (*id.* ¶ 66)—are technologically complex machines. *Id.* ¶ 72. Once purely mechanical in nature, Deere Tractors have now for decades relied on built-in computers to operate. *Id.* ¶¶ 72-73. Repairing a Deere Tractor therefore involves more than what is found in an ordinary toolbox; more sophisticated equipment needs more sophisticated tools. *Id.* ¶¶ 72-78. The Complaint defines these latter tools as "Repair Tools"—a catch-all for the "software and other … informational resources" that are needed to make certain repairs on Deere Tractors. *Id.* ¶¶ 3-4.

The Complaint does not allege that Deere itself provides "Repair Services"—which Plaintiffs define as including all repair and maintenance services for Deere Tractors. *Id.* ¶ 4. Rather, the Complaint states that when a Tractor needs outside repairs, they are done by "independently-owned Dealerships" or independent mechanics. *Id.* ¶¶ 9, 53, 96. The Complaint further alleges that Deere makes Repair Tools available only to certain dealerships. *Id.* ¶¶ 4-5, 8. Certain Repair Services thus can only be performed by authorized dealerships, because only those dealerships have the Repair Tools needed for performing those repairs. *E.g.*, *id*. ¶ 122.

In this light, Plaintiffs—a selection of farms and farmers, all of whom have purportedly bought Repair Services from a dealership since January 2018 (*id.* ¶¶ 42-50)—contend that Deere has violated the federal antitrust laws many times over. The Complaint further contends that Deere has promised to make its Repair Tools more available outside of dealerships (but has not), and that

Deere has gone about a campaign pressuring its dealerships to consolidate (thus making the above problem worse). *Id.* ¶¶ 124-40, 102-14. Put together, the Complaint alleges that Deere has entered into a conspiracy with some of its dealerships to make Repair Services more expensive and less available than they ought to be. *Id.* ¶ 186. And, in response, the Complaint asserts that the antitrust laws compel Deere to make its Repair Tools available to any person who wants them. *See, e.g.*, ¶ 154. Anything less, so say the Plaintiffs, amounts to violations of the Sherman Act's prohibitions regarding unreasonable restraints on trade and certain monopolistic practices. *Id.* ¶¶ 33-34.

The Complaint alleges three Section 1 claims—conspiracy in restraint of trade (Count One); group boycott (Count Two); and unlawful tying (Count Three)—and four Section 2 claims— monopolization (Count Four); monopoly leveraging (Count Five); attempted monopolization (Count Six); and conspiracy to monopolize (Count Seven). The Complaint identifies the "principal relevant market" for each count as the "Deere Repair Services Market" (as defined above). *Id.* ¶ 58. And Plaintiffs seek to represent a proposed nationwide class of all persons who have purchased Deere Repair Services from Deere or certain of its authorized dealerships since January 10, 2018. *Id.* ¶ 190. The Complaint in turn seeks declaratory, injunctive, and monetary remedies.

## LEGAL STANDARDS

A motion for judgment on the pleadings under Rule 12(c) is governed by the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Adams v. City of Indianapolis*, 742 F.3d 720, 727-28 (7th Cir. 2014). For a Rule 12(c) motion, "[f]actual allegations are accepted as true at the pleading stage, but allegations in the form of legal conclusions are insufficient." *Id.* at 728 (quotation marks omitted). To survive a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). Accordingly, "it is not enough for a complaint to *avoid foreclosing* possible

bases for relief; it must actually *suggest* that the plaintiff has a right to relief by providing allegations that raise a right to relief above the speculative level." *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 777 (7th Cir. 2007) (quotation marks and citations omitted).

## ARGUMENT

### I. PLAINTIFFS LACK STANDING.

Plaintiffs bear the burden of establishing standing. *Apex Digit., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). Here, Plaintiffs fail to carry that burden twice over. First, in deliberately concealing essential facts about the named plaintiffs, the Complaint fails to satisfy Article III. *See id.* at 443-44. And, second, where the Complaint *does* allege specific facts, those allegations show that Plaintiffs are quintessential "indirect purchasers," and thus lack antitrust standing under the "direct purchaser rule." *See Apple v. Pepper*, 139 S. Ct. 1514, 1520-21 (2019).

### A. Plaintiffs Lack Article III Standing.

Plaintiffs allege a nationwide conspiracy in the "Deere Repair Services" market, which has supposedly caused a number of Deere customers to overpay for certain repairs. But the Complaint fails to adequately plead why the named plaintiffs have Article III standing to make that charge. And for this threshold reason, the Complaint cannot get beyond the pleadings. *Frank v. Gaos*, 139 S. Ct. 1041, 1046 (2019) ("[F]ederal courts lack jurisdiction if no named plaintiff has standing.").

To demonstrate Article III standing, a plaintiff "must be able to sufficiently answer the question: What's it to you?" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (quotation marks omitted). Or, in more doctrinal terms, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.*

Applied here, that means that at least one named plaintiff must have purchased Repair Services from an entity that is a member of the proffered conspiracy. *See, e.g.*, *Marion Diagnostic*

-4-

*Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 346-47 (7th Cir. 2022) (holding that plaintiffs lacked Article III standing to challenge alleged conspiracy where no plaintiff bought product from conspirator). This is because, in order to have Article III standing, the named plaintiffs must establish that "their injur[ies] [were] fairly traceable to the alleged conspiracy." *Id.* at 346. That traceability requirement is satisfied when a plaintiff purchases a product directly from the conspiracy. *Id.* But it is *not* satisfied when a plaintiff suffers only the downstream effects of an alleged conspiracy. *Id.*; *see also, e.g.*, *Jackson v. Resol. GGF Oy*, 136 F.3d 1130, 1132 (7th Cir. 1998). That is, if the named plaintiffs only purchased Repair Services from a *non-conspirator* dealership, any injury would be attributable to the alleged conspiracy's potential follow-on effects on the general market. *See Marion*, 29 F.4th at 346. But that sort of vague and tenuous connection falls well short of satisfying standing's traceability requirement. *Id.*

The Complaint does not state that any of its named plaintiffs purchased Repair Services from a Deere dealership involved in the alleged conspiracy. To start, the Complaint does not allege that *every* authorized dealership is a member of the alleged conspiracy. Compl. ¶ 53. Some are allegedly in; some are allegedly out. And the Complaint strongly suggests Plaintiffs know who is who. *Compare id.* ¶ 54 (listing "Big Dealer[s]"), *with id.* ¶ 105 (identifying 76 "single-location" dealers). But the Complaint does not name any particular dealership as an actual co-conspirator.

At the same time, the Complaint is conspicuously silent about its named plaintiffs' basic background information. *Id.* ¶¶ 42-50. The Complaint does not say *where* the named plaintiffs bought their Deere Tractors, *when* the named plaintiffs bought their Deere Tractors, *what* specific piece of agricultural equipment the named plaintiffs bought, or from *which* dealership they bought Repair Services. Rather, the Complaint simply repeats the generic phrase that each plaintiff "owns at least one Deere Tractor with an ECU [(*i.e.*, an electronic control unit)] and purchased Deere

-5-

Repair Services from at least one Deere-affiliated Dealership during the Class Period." *E.g.*, *id.* ¶ 42. Whether that "affiliated" dealer is also an alleged co-conspirator is anyone's guess.

In obscuring these fundamental facts, Plaintiffs fail to carry their jurisdictional burden. Article III requires a plausible allegation that a named plaintiff purchased Deere Repair Services from a purported co-conspirator. And, here, the Complaint has none. As discussed further below, *infra* Part II.C, there are reasons the Complaint may have deliberately decided to try to glide by without providing this basic information—information that Plaintiffs assuredly have at the ready. Regardless, because Plaintiffs cannot "piggy-back on the injuries of the unnamed class members who may have purchased [Repair Services] from [dealers involved in the alleged conspiracy]," their attempted end-run around Article III fails. *Marion*, 29 F.4th at 346 (quotation marks omitted).

### B. As Indirect Purchasers, Plaintiffs Also Lack Antitrust Standing.

When it comes to what the Complaint *does* say, Plaintiffs fare no better. Again, Plaintiffs' basic theory is they are being injured by having to pay for overpriced and unnecessary Deere Repair Services that they would like to perform on their own or purchase from an independent mechanic. But, critically, Plaintiffs never claim to have purchased Deere Repair Services from Deere itself; indeed, Plaintiffs never say Deere itself even provides Repair Services. *See, e.g.*, Compl. ¶¶ 9, 42-50. Rather, the Complaint states only that *dealerships* provide Repair Services— dealers the Complaint admits are "independently-owned." *Id.* ¶ 53. The Complaint thus alleges that each named plaintiff purchased Repair Services *only* from a dealer (not Deere). *Id.* ¶¶ 42-50.

These allegations run headlong into antitrust's direct purchaser rule. As the Supreme Court put it just a few years ago, under that rule: "[I]f manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A. But B may sue A if A is an antitrust violator. And C may sue B if B is an antitrust violator." *Apple*, 139 S. Ct. at 1521; *see also Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 482 (7th Cir. 2002) ("The same paradigm applies in all of the cases

-6-

cited by the defendants: Party A, the antitrust violator, sells to Party B, and then Party C, a down-stream purchaser from B, seeks to recover the implicit overcharges that B passed on to C.").

That precisely describes this case: According to the Complaint, Deere (A) sells Repair Tools to independently-owned dealerships (B) who then provide Repair Services to customers (C). But, here, the customers are seeking to sue Deere directly, notwithstanding having never purchased any Repair Services from Deere. That is the exact sort of claim foreclosed by the direct purchaser rule. While the Seventh Circuit has recognized a narrow exception to this rule for certain conspiracies, Plaintiffs cannot avail themselves of it. They have not plausibly alleged any conspiracy and, even if they did, they failed to join any alleged co-conspirators to this action.[1]

### 1. The Complaint Fails to State a Plausible Conspiracy.

When a plaintiff is the first purchaser *outside* of an alleged conspiracy—that is, when the plaintiff is the first available purchaser to have "dealt with a member of the conspiracy"—the direct purchaser rule is not a "barrier" to that plaintiff suing all members of the conspiracy. *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 839 (7th Cir. 2020); *see also, e.g.*, *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 629-31 (7th Cir. 2002). In other words, borrowing from the letters above, C is then able to sue both A and B.

Plaintiffs do not qualify for this exception for two reasons. First, the Complaint does not allege that any named plaintiff dealt with a member of the conspiracy. *See supra* Part I.A. That alone is dispositive. But, second, and as fundamental, the Complaint also does not plausibly state that a conspiracy exists *at all*. Simply declaring that a conspiracy exists is not enough; any "allegation must still reach the level of baseline plausibility." *Marion*, 952 F.3d at 841. And

---

[1] The Seventh Circuit has held that the direct purchaser rule applies only to damages actions, and does not apply to claims for injunctive or declaratory relief. *See, e.g., U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 627 (7th Cir. 2003).

where, as here, a complaint fails to state a plausible conspiracy, the indirect purchaser's "case falls apart:  no conspiracy, no direct purchaser status, no right to recover."  *Id.*

The Complaint attempts to allege what is commonly called a "hub-and-spoke" conspiracy among Deere and certain authorized dealerships, with Deere as the "hub" and individual dealers as the "spokes."   The Complaint puts forth two interrelated theories in support.   First, the Complaint alleges that Deere has agreed to provide Repair Tools to only certain dealerships, thus giving those authorized dealers the exclusive ability to provide Repair Services (and, in turn, suppress competition from others).  *E.g.*, Compl. ¶ 4.  Second, the Complaint contends that Deere has caused many of those dealers to artificially consolidate, thus further suppressing competition even among the Deere dealerships themselves.  *E.g.*, *id.* ¶ 25.

Both theories—alone or in conjunction—fail for the same reason.  The defining trait of a hub-and-spoke conspiracy is that there is not just a series of agreements among the "hub" and each individual "spoke," but that there is an agreement across the *spokes themselves.  Marion*, 952 F.3d at 842.  That spoke-to-spoke agreement is what makes the "rim" for the wheel, and parses a valid hub-and-spoke conspiracy from an invalid "rimless wheel."  *Id.* ("[T]he plaintiffs must show that similarly situated members of the conspiracy coordinated not only with the manufacturer, but also with each other"); *see also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015) (A "hub-and-spoke conspiracy has three elements: (1) a hub, such as a dominant purchaser; (2) spokes, such as competing manufacturers or distributors that enter into vertical agreements with the hub; and (3) the rim of the wheel, which consists of horizontal agreements among the spokes."); *PKS, Inc. v. Leegin Creative Leather Prod., Inc.*, 615 F.3d 412, 420 (5th Cir. 2010) ("In the absence of an assertion that [the spokes] agreed ... among themselves, there is no wheel and therefore no hub-and-spoke conspiracy"); *Dickson v. Microsoft Corp.*, 309

-8-

F.3d 193, 203 (4th Cir. 2002) ("A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement [with] each [one].").

Here, the Complaint fails to put any rim around its alleged wheel. At no point does it allege any agreement *between* Deere dealerships. In fact, as explained below, the Complaint seems to disclaim that any dealerships "coordinated" with one another. *Marion*, 952 F.3d at 842.

Begin with Plaintiffs' first theory, that Deere provides Repair Tools only to certain dealerships, thus giving those dealers the exclusive ability to perform certain Repair Services. At most, these allegations suggest that a number of dealerships have independently entered into an agreement with Deere. Nowhere does the Complaint allege that the dealers have any agreements with each other, or only entered an agreement with Deere on the condition the others did too.

There is also no basis to *infer* an agreement between the dealerships. Sometimes, courts infer coordination from parties taking collective action that would otherwise be against their self-interest, but for everyone else doing it. *E.g.*, *United States v. Apple, Inc.*, 791 F.3d 290, 318 (2d Cir. 2015). But here, it is entirely in a dealership's self-interest to agree to a contract with Deere, irrespective of what anyone else does. Indeed, Plaintiffs' entire case is premised on the fact that it is impossible to provide certain Repair Services without cutting a deal with Deere. Because each agreement with Deere independently furthers a dealership's self-interest, there is no basis to infer coordinated behavior among the dealers who have entered into such arrangements. *In re Musical Instruments*, 798 F.3d at 1194-95 (no conspiracy where parallel decisions were "self-interested"); *see also, e.g.*, *Howard Hess Dental Lab'y, Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010) (dismissing complaint alleging that dealers were "required to agree to the same exclusive dealing arrangement" but failing to allege any "agreement among the Dealers themselves").

Relatedly, the Complaint does not allege any "plus factors" that might justify inferring an unlawful horizontal conspiracy from lawful parallel conduct. *Twombly*, 550 U.S. at 553. There is no allegation that dealers communicated in any way about the provision of Repair Services or about consolidation of dealer footprints. *See Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 935 (7th Cir. 2000) (noting that the record included "direct evidence of communications"). There is no allegation that dealers changed their repair policies abruptly or that Deere consolidated its dealerships in short order. *See In re Musical Instruments*, 798 F.3d at 1196 ("[a]llegations of such slow adoption of similar policies does not raise the specter of collusion"); Compl. ¶¶ 103, 204 (tracing alleged actions back to early 2000s). And there is no allegation that dealers have set prices in a manner so unusual that it would be against self-interest or unreasonable absent some agreement. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322 (3d Cir. 2010). The hallmarks of a "traditional conspiracy" are all completely absent here. *Id.*

*Toys "R" Us* is illustrative. There, Toys "R" Us forced ten manufacturers into individual agreements that limited those manufacturers' ability to sell to (rival) discount clubs. 221 F.3d at 932-34. The Seventh Circuit found a hub-and-spoke conspiracy involving Toys "R" Us and the manufacturers. The critical fact, however, was that the manufacturers would enter into the agreement only on the condition that their competitors did the same; going at it alone would be against their self-interest, because they would lose discount club market share. *Id.* at 932-36. Plaintiffs here allege the opposite: dealerships cannot enter the purported market for certain Repair Services without contracting with Deere. Doing so is therefore in their self-interest no matter the decision of any other dealer.

Plaintiffs' second theory—that Deere has pressured dealerships into consolidating with one another—suffers the same fate. As above, nowhere does the Complaint allege that dealerships are

coordinating with *each other* about any efforts to consolidate. Nowhere does the Complaint say, for instance, that dealers are divvying up geographic areas or coordinating with each other on price.

If anything, the Complaint disclaims as much. An overarching theme of the Complaint is that *Deere alone* is deciding who buys who, regardless of what individual dealerships might happen to want. *See, e.g.*, Compl. ¶¶ 102 ("Deere's concerted efforts to force its Dealerships to consolidate"), 103 ("Deere [has] implemented an aggressive strategy that pressure[s] Dealerships to consolidate"), 111 ("The staggering amount of consolidation among Deere Dealerships is the result of Deere systematically picking off small Dealerships by coercing them to sell to a larger Dealer."). In other words, on the Complaint's own account, there is no agreement *among* dealers when it comes to any alleged consolidation. Rather, Deere (and only Deere) calls the shots.

Again, the defining trait of a hub-and-spoke conspiracy is an agreement across the spokes. The Complaint alleges none. Instead, the Complaint's proffered conspiracy amounts to a textbook rimless wheel. Any attempt to circumvent the direct purchaser rule thus necessarily "falls apart: no conspiracy, no direct purchaser status, no right to recover." *Marion*, 952 F.3d at 841.[2]

## 2. The Complaint Fails to Join its Alleged Co-Conspirators.

But *even if* the Complaint adequately alleged a hub-and-spoke conspiracy, and *even if* Plaintiffs had antitrust standing under the direct purchaser rule, the Complaint still must be dismissed. This is because, when a plaintiff seeks to use the direct purchaser rule's co-conspirator exception, it must also name and join the alleged co-conspirators as defendants. This

---

[2] The Complaint also falls short of the "own or control" exception, which applies when one company "owns or controls" its middlemen. *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 605 (7th Cir. 1997). As noted, Plaintiffs concede that the dealerships here are "independently owned." Compl. ¶ 53. And nowhere does the Complaint plausibly allege that Deere otherwise "control[s] the [dealerships] through interlocking directorates, minority stock ownership, loan agreements that subject the [dealerships] to [Deere's] operating control, trust agreements, or other modes of control separate from ownership of a majority of the wholesalers' common stock." *In re Brand Name*, 123 F.3d at 605-06.

"requirement," *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 605 (7th Cir. 1997), is animated by the direct purchaser rule's concern with duplicative damages against antitrust defendants, *Marion*, 952 F.3d at 841. If an indirect purchaser *and* an intermediary sued the original seller, each may well be entitled "to recover the whole overcharge," such that the total recovery against the original seller would exceed the treble damages provided by the Sherman Act. *Paper Sys.*, 281 F.3d at 633. Accordingly, federal courts have long held that "co-conspirator middlemen [must be] named as parties defendant." *In re Beef Industry Antitrust Litig.*, 600 F.2d 1148, 1163 (5th Cir. 1979); *see also, e.g.*, *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 542 (8th Cir. 2015) ("[I]ndirect purchasers may bring an antitrust claim if they allege the direct purchasers are party to the antitrust violation and join the direct purchasers as defendants.") (quotation marks omitted); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 533 F.3d 1, 5-6 (1st Cir. 2008) ("Further, even were we to consider this argument, failure to join the dealers in this case would risk duplicative recovery."); *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 854 (3d Cir. 1996) ("[W]e expressly refused to adopt such an exception where the alleged co-conspirators immediately upstream were not also joined as codefendants").

Here, the Complaint does not name anyone besides Deere as a party defendant. Yes, the Complaint brands dealers as "co-conspirators." Compl. ¶ 53. And yes, the Complaint identifies certain "Big Dealers." *Id.* ¶ 54. But that sort of name-checking is not enough. *See In re Brand Name Prescription Drugs Antitrust Litig.*, 177 F.R.D. 414, 418 (N.D. Ill. 1997) ("Thus, it would seem that the Seventh Circuit now adheres to the legal position that, to qualify for the co-conspirator exception to *Illinois Brick*, intermediaries in an alleged vertical conspiracy must be formally joined as defendants and not merely named as co-conspirators."). A plaintiff must join co-conspirators as party defendants in order to avail itself of the co-conspirator exception.

-12-

Anything less hazards bringing about the very sort of duplicative recovery that the direct purchaser rule was designed to prevent. *See Paper Sys.*, 281 F.3d at 632.

This joinder requirement is especially appropriate here given that the Complaint—while long on rhetoric and eager to collapse the distinction between Deere and the dealers—actually takes issue mostly with conduct *other* than Deere's. As noted, the Complaint does not allege that Deere itself provides Repair Services, or that Deere gets a cut from dealerships that do. *See, e.g.*, Compl. ¶ 9, 24. Instead, the Complaint contends that *dealerships* have each independently tried different ways to augment profits by inflating certain costs. *See, e.g., id.* ¶¶ 121, 165.

The failure to join any alleged co-conspirator dealers is all the more striking because the Complaint's economic story involving Deere makes little sense. The Complaint spins a narrative where Deere has orchestrated an elaborate Repair Services scheme that makes consumers pay more money for worse services, harming relations with existing customers while deterring future ones. But the Complaint is largely silent as to any actual explanation of *why* Deere would do any of this. Again, the Complaint does not allege that Deere profits directly from performing Repair Services. *See, e.g., id.* ¶ 24. And while the Complaint accuses Deere of making more money on parts in recent years, *id.* ¶¶ 186-89, Plaintiffs never link this point to their claims about Repair Tools. The Complaint does not allege that Deere has charged *more* for its parts based on how it has allocated its Repair Tools, and never explains how Deere's decisions about its Repair Tools would somehow drive up the *demand* for its parts. Plaintiffs simply say that Deere's income based on parts has risen in recent years—a wholly unremarkable point well in line with the fact that Deere Tractors have become increasingly technologically advanced (and also successful). *Cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596 (1986).

At most, the Complaint offers a single paragraph for Deere's rationale, and one that is in

tension with itself. On the one hand, Plaintiffs speculate that Deere might be trying to *suppress* the number of repairs so it can make fewer warranty payments. Compl. ¶ 24. On the other hand, Plaintiffs say that Deere is doing all this to *increase* the number of repairs so it can make more money from financing. *Id.* Inconsistency aside, these rationales are flimsy even on their own terms. It defies ordinary sense to think Deere would invite wide-ranging costs for such speculative short-term benefits. *See Miles Distribs., Inc. v. Specialty Const. Brands, Inc.*, 476 F.3d 442, 451-52 (7th Cir. 2007) (underscoring importance of stating a plausible motive to conspire).

In short, the direct purchaser rule was designed for cases like this. Because Plaintiffs cannot conjure a way to circumvent that rule, the Complaint must be dismissed for lack of standing.

## II.    PLAINTIFFS CANNOT PLEAD A PLAUSIBLE RELEVANT MARKET.

The Complaint suffers from another basic defect: It fails to plead a plausible relevant market with which to measure all of its claims. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) ("Without a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition.") (quotation marks omitted); *see also, e.g.*, *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916-19 (7th Cir. 2020) (affirming dismissal of claims under both Sections 1 and 2 of the Sherman Act for failing to identify a relevant antitrust market).

The relevant market that supports every count is not the U.S. market for "Tractors" (which, as touched on above, is defined to include a range of agricultural equipment). Rather, the Complaint's relevant market is the "aftermarket" for repair services for *Deere* Tractors that have already been purchased. Compl. ¶ 30; *see also id.* ¶ 58 ("The principal relevant market to evaluate Defendant's and its co-conspirators' anticompetitive conduct is the Deere Repair Services Market."). The Complaint thus turns not on the market for the underlying primary goods at issue (Tractors), but rather on the derivative repair market for a *single-brand* of those goods (Deere's).

These sorts of markets are strongly disfavored in antitrust. *Epic Games, Inc. v. Apple Inc.*,

-14-

559 F. Supp. 3d 898, 1021 (N.D. Cal. 2021) ("It is an understatement to say that single-brand markets are disfavored. From nearly the inception of modern antitrust law, the Supreme Court has expressed skepticism of single-brand markets.") (quotation marks omitted); *see also, e.g.*, *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 393 (1956). Among other things, a problem inherent to single-brand aftermarkets is that they risk branding "every maker of unique parts for its own product" a *de facto* monopolist within that product's aftermarket. Areeda & Hovenkamp, *Antitrust Law* ¶ 564b (Aug. 2022). Single-brand aftermarkets thus may not constitute the relevant market absent narrow circumstances. *Id.* ¶ 1740a.

In this light, the federal courts, including the Seventh Circuit, have held that a single-brand aftermarket may constitute the relevant antitrust market only if consumers are problematically "locked in" after making a purchase in the primary market.[3] A consumer is "locked in" if a company either hides its post-sale policies on the front-end, or changes its post-sale policies on the back-end. But absent some sort of lock-in problem, courts presume "competition in the initial market suffices to discipline anticompetitive practices in the aftermarkets." *Epic Games*, 559 F. Supp. 3d at 1024. The First Circuit put this overall point well:

> In any market with some degree of product differentiation, goods of a single brand will enjoy a certain degree of uniqueness. While that uniqueness may account for a manufacturer having a large market share in the services aftermarket for its own brand, that fact, without more, does not suffice to establish that the manufacturer enjoys monopoly power in that market. Unless the evidence shows that the manufacturer can exert raw power in the aftermarket without regard for commercial consequences in the foremarket, the aftermarket is not the relevant market.

*SMS Sys. Maint. Servs., Inc. v. Digit. Equip. Corp.*, 188 F.3d 11, 17-18 (1st Cir. 1999).

---

[3] *See Schor v. Abbott Lab'y*, 457 F.3d 608, 614 (7th Cir. 2006); *Digit. Equip Corp. v. Uniq Digit. Techs., Inc.*, 73 F.3d 756, 763 (7th Cir. 1996); *see also, e.g., Newcal Ind., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1049-50 (9th Cir. 2008); *SMS Sys. Maint. Servs., Inc. v. Digit. Equip. Corp.*, 188 F.3d 11, 19 (1st Cir. 1999); *PSI Repair Servs. Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997); *United Farmers Agents Ass'n v. Farmers Ins. Exch.*, 89 F.3d 233, 238 (5th Cir. 1996).

To our knowledge, there is not a single example of a court of appeals finding a valid single-brand aftermarket "where customers had knowledge of the alleged restrictive policies and were not subject to a post-purchase policy change." *Epic Games*, 559 F. Supp. 3d at 1022; *see also, e.g.*, *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 817-18, 820 (6th Cir. 1997) (such claims "cannot succeed" if the "defendant has not changed its policy after locking-in some of its customers, and the defendant has been otherwise forthcoming about its pricing structure and service policies"). Rather, to proceed on a single-brand aftermarket theory, a complaint must plausibly allege (1) a relevant market for the primary good, and (2) something that causes buyers in the primary market to be "locked in" to the aftermarket. Here, the Complaint fails both prongs.

### A.    Plaintiffs Fail to Plausibly Allege a Relevant Primary Market.

There cannot be a plausible aftermarket without a plausible primary market from which it derives. The Complaint alleges that the relevant primary market is the "Tractor Market," which Plaintiffs define as almost every piece of machinery one might find on any kind of farm. *See* Compl. ¶ 66 (defining as "the United States product market for agricultural equipment … which include[s] tractors, application equipment, tillage, planters, air seeders, self-propelled forage harvesters, balers, windrowers, combines, cotton harvesters, and sugar cane harvesters"). This is deficient; Plaintiffs' proffered "Tractor Market" is too broad and indefinite to be a plausible primary market.

A product market must be limited to those goods that are "reasonably interchangeable by consumers for the same purposes." *Sharif Pharmacy, Inc.*, 950 F.3d at 916 (quotation marks omitted). Plaintiffs' "Tractor Market" self-evidently fails this test. While products do not have to be the exact same to be "reasonably interchangeable"—think a box wrench versus a socket wrench—it defies logic to say someone in the market for an air seeder could be content coming off the lot with a sugar cane harvester. Even the Complaint stumbles into this commonsense

-16-

conclusion, recognizing that its proposed primary market includes "highly differentiated products, with unique specifications and capabilities," Compl. ¶ 70, and "specialized product[s]" that are "unlikely to have many close substitute products or brands," *id.* That is, Plaintiffs accept (as they must) that their market covers products that are not reasonably interchangeable with each other. That alone is enough to reject their proposed market. *E. & G. Gabriel v. Gabriel Bros., Inc.*, No. 93 CIV. 0894, 1994 WL 369147, at *3 (S.D.N.Y. July 13, 1994) ("Plaintiffs' failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal."); *see also, e.g.*, *Com. Data Servers, Inc. v. IBM*, 166 F. Supp. 2d. 891, 896 (S.D.N.Y. 2001) (collecting cases).

But Plaintiffs' "Tractor Market" is not only exceedingly broad—it is also indeterminate. Again, Plaintiffs define the Tractor Market as *including* (but not limited to) a wide-ranging array of machines. Compl. ¶¶ 1 n.1, 66. This makes a problematic product market worse. Courts cannot reasonably analyze a given product market without knowing what products are covered in the first place. *See, e.g.*, *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 971 (W.D. Tenn. 2004) ("Without a[n] ... accounting of the brands and suppliers to be included in the relevant market, the Court cannot determine [its] boundaries … [and is] unable to assess Defendants' market power.").

Put together, Plaintiffs' "Tractor Market" is too ill-defined to constitute a plausible relevant primary market. Courts routinely reject such markets for these reasons. *E.g.*, *Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*, No. C-09-3854, 2010 WL 1541257, at *3-4 (N.D. Cal. Apr. 16, 2010) (rejecting proposed "prescription pharmaceutical products" market because courts "cannot simply assume that [products] are reasonably interchangeable for the same purposes" (quotation marks omitted)). This Court should do the same.

-17-

### B.    Plaintiffs Fail to Plausibly Allege A Relevant Aftermarket.

Even assuming the Complaint states a plausible primary market, it still fails to identify a relevant single-brand aftermarket because Plaintiffs do not plausibly allege a lock-in problem.

For starters, the Complaint does not—because it cannot—allege that the "Tractor Market" is uncompetitive.  *E.g.*, Compl. ¶ 227; *infra* Part III.A.3.  The presumption is thus that "competition in the [Tractor Market will] suffice[] to discipline anticompetitive practices in the aftermarkets." *Epic Games*, 559 F. Supp. 3d at 1024.  To overcome this presumption—and proceed on a single-brand aftermarket theory—Plaintiffs must plausibly allege that Deere either hid its repair policies from customers before they bought a Tractor, or changed those policies after the fact.  That is, they must plausibly allege that consumers who bought Deere Tractors did not realize that some Repair Services for their Tractors would need to be performed by dealers.  The Complaint does not do so.

Indeed, on its own terms, the Complaint details how Deere clearly and conspicuously made its repair policies known to consumers for almost two decades.  When Deere started selling more technologically advanced Tractors before the turn of the millennium, it was apparent to buyers that those machines would require technical repairs over the course of the product's life.  Compl. ¶¶ 74-79.  Dating back to the same time, Deere Operator Manuals explained that certain of those repairs would require a "John Deere dealer."  *Id.* ¶ 85.  And this practice continued year after year, including an alleged attempt by Deere to codify its policies in its licensing agreements.  *Id.* ¶¶ 125-26 (detailing long "history" of Deere insisting some Repair Services be done by dealers).

None of this was a secret, as the Complaint admits.  Deere's practices were well-known among farmers, allegedly earning the company the nickname of "Mother Deere."  *Id.* ¶ 27.  The "public awareness" around Deere's practices was so pronounced that it got the attention of state legislatures.  *Id.* ¶ 127.  And both trade associations and activists openly debated Deere's repair policies for years.  *Id.* ¶¶ 127-28.  Here is the upshot:  According to the Complaint, everyone who

bought a Deere Tractor from 2000 to 2018 understood that Deere's repair policies entailed some limits on independent- or self-repairs. There is thus no lock-in problem for those purchasers, because they could have factored any concern about those repair policies into their initial decision to purchase equipment from either Deere or another manufacturer in the first instance. *See Digit. Equip Corp. v. Uniq Digit. Techs., Inc.*, 73 F.3d 756, 763 (7th Cir. 1996).

As Plaintiffs tell it, things started to change in 2018, when Deere allegedly promised consumers (only to later recant) that they would soon have the "[c]omprehensive" ability to repair Deere Tractors without needing a dealer. Compl. ¶ 124. But the Complaint fails to plead any facts to support this threadbare claim. The Complaint's main piece of evidence on the point is a September 2018 "Statement of Principles" a trade association representing Deere (and many others) entered into with the California Farm Bureau. *Id.* ¶¶ 128-32. But even if the aspirational "commitments" of a trade association could somehow bind Deere (*id.* ¶ 132), the Statement of Principles would still not help. This is because, as Plaintiffs concede, the Statement did not guarantee a "comprehensive" ability to make all repairs to any Deere Tractor; rather, the Statement "contain[ed] several carve-outs that allow tractor manufacturers to continue using software locks that could prevent repair." *Id.* ¶ 133. Likewise, the Statement also did not apply to all Tractors, but only applied "beginning with *tractors* and *combines* put into service *on or after* January 1, 2021." *Id.* ¶ 132 (emphases added). At best, the Statement pledged a commitment to make *more* repair services available for *certain* products that came to market *starting* in 2021.

The other cherry-picked statements included in the Complaint offer nothing more. One is the caveated comment from a spokesperson for a different trade group stating that "comprehensive repair and diagnostic *information* is now available for the *vast majority* of the *tractor* and *combine* market." Compl. ¶ 137 (emphasis altered). Next is a statement from a Deere Representative that

-19-

the company has consistently "offered a broad range of diagnostic, maintenance and repair tools for farmers" through dealers. *Id.* ¶ 142 n.54 (quotation marks omitted). Another is that Deere has claimed that 98% (not all) of repairs for its Tractors can be done without Deere dealerships—a claim that Plaintiffs say Deere has never backed up, but one that Plaintiffs do not challenge. *Id.* ¶ 143. And one more is a statement from Deere that some remote repairs will be made "increasingly" available. *Id.* ¶ 148.

Simply put, while the Complaint charges Deere with making a blanket promise regarding Repair Services, it fails to plead a single fact to back it up. None of the above items suggest that Deere ever promised consumers that they would be able to make *all* repairs to *all* Deere Tractors without *ever* using a dealership. Rather, these statements suggest that *some* repairs would still require the involvement of authorized dealers. And as the Complaint is forced to concede, Deere has actually followed through on the commitment to make Repair Tools increasingly available, with its "Customer Service Advisor." *Id.* ¶¶ 155-62. To be sure, Plaintiffs express dissatisfaction with that product. *Id.* ¶ 163. But dissatisfaction is a customer service issue, not an antitrust violation. Similarly, the Complaint adds that there are "plenty of examples" showing how "comprehensive Repair Tools remain inaccessible." *Id.* ¶ 146. And the Complaint insists "farmers' experiences" show as much. *Id.* ¶ 148. But the only actual example the Complaint references is from an independent mechanic shop trying to perform repairs in *2020* (*id.* ¶ 147)— one year before the Statement of Principles said its commitments would begin to apply (*id.* ¶ 129).

Perhaps most telling, the Complaint does not even allege its named plaintiffs were locked-in at any point by Deere—for example, that any of the named plaintiffs were unaware of the repair policies that governed their customer experience. And the Complaint is silent on this score because there have never been any hidden policies; there was never a bait-and-switch; and there has never

been a lock-in problem.

All told, to press forward on a single-brand aftermarket theory, a plaintiff must plausibly allege "specific factual allegations in the complaint that the defendant either changed its rules after the initial sale was made or concealed its rules from its customers." *Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 737 (6th Cir. 2008). Here, the Complaint does not do so. Stripped of its rhetoric, the Complaint fails to show anything but the inescapable reality that consumers have always known what they are getting when they buy a Deere Tractor. The Complaint therefore fails to plausibly allege a relevant antitrust market.

### C. Plaintiffs' Proposed Class Is Facially Overbroad Given Its Proposed Market.

Nevertheless, *even if* the Complaint alleges a plausible product market, it still cannot survive the pleadings because its proposed market is irreconcilable with its proposed class. As the above makes plain, even if the Statement of Principles represented a change in policy, the only conceivable consumers locked-in by it would have been those who purchased certain Tractors put into service *after* January 2021—the date that the Statement of Principles said certain machines would start having more flexible repair policies. Nobody who bought a Tractor that was put into service *before* that time could possibly say they had been locked-in, given that (at most) Deere only promised to liberalize the repair policies those purchasers had already accepted. *See SMS Sys. Maint. Servs., Inc.*, 188 F.3d at 23 (rejecting alleged lock-in claim where the policy change at issue beneficially *increased* length of warranty).

The problem, though, is the Complaint's proposed Class is all those who purchased Deere *Repair Services* after January 10, 2018. Compl. ¶ 190. That cannot be right. Assuming for the moment that the Complaint states a viable lock-in theory, the only plaintiffs who could continue forward on that theory would be those who had actually been locked-in—that is, those who bought certain Tractors after 2021 and, subsequently, purchased Repair Services.

-21-

When a complaint alleges a facially defective class, a court may dismiss that allegation on the pleadings. *See John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007); *see also* Fed. R. Civ. P. 23(c)(1), (d)(1)(D). For instance, a district court recently held on the pleadings that a complaint's "class definition" was facially "overbroad," because the Complaint was pegged to an allegedly unlawful conspiracy starting in 2014, but the proposed class included plaintiffs dating back to 2009. *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 514-16 (W.D. Pa. 2019); *see also Ladik v. Wal-Mart Stores, Inc.*, 291 F.R.D. 263, 269 (W.D. Wis. 2013). The same result makes sense here. Even on its own terms, there is a fundamental mismatch between the Complaint's theory and the Complaint's proposed class. Given that unavoidable incongruity, this Court should reject the proposed class here as overbroad.

As a final point, this all only underscores that the named plaintiffs lack Article III standing. *Supra* Part I.A. Given the above, it is perhaps more apparent why the Complaint stays silent about its named plaintiffs' basic background information; after all, people who bought Tractors that were in service *before* 2021 cannot logically champion an antitrust claim premised on an alleged change-in-policy *from* 2021. That gambit offends Article III. This Court should not allow it.

## III. THE INDIVIDUAL COUNTS ARE EACH FACIALLY DEFECTIVE.

Even if Plaintiffs had standing and even if the Complaint stated a plausible relevant market, it makes no difference. Each individual claim is deficient, and should be rejected on the pleadings.

### A. The Complaint Does Not State a Claim Under Section 1 of the Sherman Act.

Plaintiffs assert three claims under Section 1 of the Sherman Act: Conspiracy in restraint of trade; group boycott; and unlawful tying. Plaintiffs press their boycott claim solely under a *per se* theory. Compl. ¶ 216. They assert their conspiracy and tying claims under both a *per se* theory and also a quick look or rule of reason theory (respectively). *Id.* ¶¶ 210-11, 229-30. None works.

### 1. The Complaint Does Not State a *Per Se* Section 1 Claim.

The Complaint's *per se* claims lack merit. Agreements are only "unlawful *per se*" when they "so obviously threaten to reduce output and raise prices" that antitrust courts may condemn them out of hand without any detailed market analysis. *NCAA v. Alston*, 141 S. Ct. 2141, 2156 (2021). Given the categorical nature of this remedy coupled with "the inherent limits on a court's ability to master an entire industry," courts "take special care not to deploy these condemnatory tools" outside of a narrow (and still narrowing) band of plainly illicit conduct. *Id.* As relevant here, within that narrow band are "horizontal restraints—restraints imposed by agreement between competitors." *Am. Express Co.*, 138 S. Ct. at 2283-84 (quotation marks omitted); *see also, e.g.*, *Toys "R" Us*, 221 F.3d at 936.

The alleged horizontal restraint that supports each of the Complaint's Section 1 *per se* claims is the "hub-and-spoke" conspiracy discussed above. But, as detailed, Plaintiffs' conspiracy theory is fundamentally flawed as a matter of law. *Supra* Part I.B.1. In short, the Complaint fails to plausibly allege—and at times, seems to disclaim—that the dealerships at issue had any agreement *among themselves* that would create "a 'rim' connecting the various [alleged] horizontal agreements." *Marion*, 952 F.3d at 842. That failure not only dooms the Complaint for purposes of the direct purchaser rule, but it also forecloses each of Plaintiffs' *per se* claims under Section 1.

### 2. The Complaint Does Not State a "Quick Look" Section 1 Claim.

The Complaint's related "quick look" claim is also meritless. The "quick look" doctrine is limited to cases where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets, but there are nonetheless reasons to examine potential procompetitive justifications." *Agnew v. NCAA*, 683 F.3d 328, 336 (7th Cir. 2012) (quotation marks and citation omitted). As above, an agreement may be condemned after a "quick look" only when it is "obviously" unlawful

(even if slightly less obvious than an arrangement unlawful *per se*). *Alston*, 141 S. Ct. at 2155-56.

Absent a hub-and-spoke conspiracy, however, the Complaint's grievances revolve around the individual agreements Deere has with certain dealerships. But it is well-settled that general "exclusive distributorship[]" agreements are "presumptively legal." *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 736 (7th Cir. 2004). Indeed, courts often uphold agreements akin to the ones at issue under the far-less-demanding rule of reason. *See, e.g.*, *Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 686 (4th Cir. 1992) (rejecting Section 1 claim based on "selective[] licens[ing]" because a defendant may "lawfully license" its software "to whomever it chooses"). For good reason: Such agreements often create broad efficiencies, allow distributors to achieve economies of scale, and reduce transaction costs. In any event, whatever might be said for the specific agreements here, there is no possibility that a "quick look" is the right doctrinal framework for analyzing them. An agreement that is ordinarily lawful cannot be condemned after only a cursory analysis. The Complaint thus fails to state a plausible "quick look" Section 1 claim.

### 3. The Complaint Does Not State a Rule of Reason Section 1 Claim.

The Complaint's last Section 1 claim is a rule of reason "tying" claim.[4] "The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 466 (7th Cir. 2020) (quotation marks omitted). In this case, the Complaint says Deere has used its market power in the so-called Tractor Market (tying market) to force buyers to buy Repair Services (tied market). Compl. ¶¶ 223-25. As explained, the Complaint

---

[4] The Complaint also presses its tying claim under a *per se* theory. Compl. ¶ 229. But, as the Seventh Circuit has explained, tying claims are substantively analyzed under the rule of reason. *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 468 (7th Cir. 2020).

has failed to propose a viable tying market to which any abuse of a tied market might be alleged. *Supra* Part II.A.  But even ignoring that, Plaintiffs' claim cannot survive the pleadings.

Namely, the Complaint fails to plausibly allege that Deere has *market power* in the tying market (Tractors).  Establishing market power is an essential element of a tying claim.  *Viamedia*, 951 F.3d at 468.  But here, the Complaint leaves the Court at sea.  The only evidence of market power in the Tractor Market the Complaint alleges is that Deere "control[s] approximately 55% and 63% of the large tractor and combine markets, respectively."  Compl. ¶ 68.  This is deficient twice over.  *See, e.g.*, *EuroTec Vertical Flight Sols., LLC v. Safran Helicopter Engines S.A.A.*, No. 15-CV-3454, 2019 WL 3503240, at *3 (N.D. Tex. Aug. 1, 2019) (noting that bare allegation of "market share of over 50 percent" was "conclusory" (quotation marks omitted)); *Synthes, Inc. v. Emerge Med., Inc.*, No. 11-CV-1566, 2012 WL 4473228, at *11 (E.D. Pa. Sept. 28, 2012) (allegation that defendant "is a monopoly ... with over 50% market share" was a "threadbare recital[] unsupported by any factual allegation[] [that] the Court need not accept ... as true" (quotation marks omitted)); *Korea Kumho Petrochemical v. Flexsys Am. LP*, No. C07-01057, 2008 WL 686834, at *9 (N.D. Cal. Mar. 11, 2008) (holding that "[a]lthough [p]laintiff need not necessarily quantify [defendant's] market share with precision," allegation that defendant "domina[ted] ... the [relevant] market" fell short of requirement on the pleadings to "assert some *facts* in support of its assertions of market power" (quotation marks omitted)).

*First*, the Complaint says *nothing* about Deere's purported market power with respect to the many distinct and disparate machines apparently included in its nebulous definition of "Tractor" (which includes, without limitation, tractors, combines, planters, balers, and the like).  It would be plainly insufficient for a complaint to allege a company had sizable market power in the U.S. produce market by simply declaring the company held large shares of the grape and apple

-25-

markets. So too here. *See, e.g.*, *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008) ("Without an explanation of the other insurance companies involved, and their products and services, the court cannot determine the boundaries of the relevant product market and must dismiss the case for failure to state a claim.").

*Second*, the Complaint leaves the reader to guess *what* the stated percentages (55% and 63%) purport to represent. That is too vague to substantiate any plausible claim of market power. *See, e.g.*, *FTC v. Facebook, Inc.*, 560 F. Supp 3d 1, 18 (D.D.C. 2021) (dismissing complaint where, among other things, alleged market share "[did] not even allege what it is measuring" (*e.g.*, units versus revenue) such that "excess of 60%" figure was without meaning).

The Complaint fails to plausibly define a product market upon which a Section 1 rule of reason "tying" claim might be based. Even absent this defect, it does not and cannot establish the required claim of market power in the purported product market needed to support a "tying" claim.

**B.    The Complaint Does Not State a Claim Under Section 2 of the Sherman Act.**

Plaintiffs assert four claims under Section 2 of the Sherman Act: Monopolization; monopoly leveraging; attempted monopolization; and conspiracy to monopolize. As above, each of these claims contains fundamental defects. None should be permitted to get past the pleadings.

**1.    The Complaint Does Not State a Plausible Monopolization Claim.**

To state a monopolization claim, a plaintiff must plausibly allege that the defendant has (i) monopoly power in the relevant market, and (ii) engaged in some form of anticompetitive conduct. *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). Here, the Complaint alleges that Deere has (i) monopoly power in its Repair Services Market, and (ii) engaged in anticompetitive conduct by (among other things) limiting who is able to provide certain Repair Services. Plaintiffs falter at both turns.

*First*, the Complaint fails to plausibly allege that Deere has monopoly power in the Repair

-26-

Services Market because the Complaint does not allege that Deere provides Repair Services *at all*. The Complaint never states that *Deere* sets prices for Repair Services at dealerships, or that *Deere* gets a cut from any Repair Services or labor costs. Indeed, the Complaint is clear on this point: "When a Tractor manufactured by Deere breaks down, [an independently-owned] Dealership, rather than Deere itself, provides the technician to make the repair." Compl. ¶¶ 9, 53.

*Second*, the Complaint fails to plausibly allege any anticompetitive conduct. At bottom, the Plaintiffs' argument reduces to this: Deere is engaging in anticompetitive conduct by providing its Repair Tools to only *some* dealerships even though antitrust purportedly commands that Deere share them with *whoever* wants them. That far-reaching claim is baseless. Indeed, absent a small set of exceptions not relevant here, "businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). This is especially so where one company is licensing its intellectual property. *See, e.g.*, *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F. 3d 1322, 1329 (Fed. Cir. 2000) ("[T]o sell or license … copyrighted works [is] squarely within the rights granted by Congress to the copyright holder and d[oes] not constitute a violation of the antitrust laws."); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013) (Gorsuch, J.) ("Even a monopolist generally has no duty to share . . . its intellectual or physical property with a rival."); *SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827, 843 (10th Cir. 2016) ("invocation of intellectual property rights [is] a presumptively rational business justification" for a refusal to share materials); *see also Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178-80, 1183 (9th Cir. 2016).

Relatedly, given that Deere is under no obligation to share its Repair Tools at all, it is hard to see how its decision to do so in part *eliminates* competition rather than *promotes* it. *See Am.*

*Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010) (the central concern of the antitrust laws is "elimin[ation of] competition that would otherwise exist" (quotation marks omitted)). Anticompetitive conduct is that conduct which "has little or no value beyond the capacity to protect the monopolist's market power." *Novell*, 731 F.3d at 1072. That proves a poor fit where, as here, a company is *creating* a market for others (i.e., authorized dealers) that would not otherwise exist, as opposed to *protecting* an existing market for its own benefit.

In short, the Complaint fails to plausibly allege either monopoly power or any form of anticompetitive conduct. As a result, the Complaint fails to state a Section 2 monopolization claim.

### 2. The Complaint Does Not State Any Other Plausible Section 2 Claim.

The Complaint's failure to plausibly allege anticompetitive conduct forecloses its other Section 2 claims. A monopoly leveraging claim "presupposes anticompetitive conduct." *Schor v. Abbott Lab'y*, 378 F. Supp. 2d 850, 856 (N.D. Ill. 2005), *aff'd*, 457 F.3d at 612 (affirming dismissal of monopoly leveraging claim).[5] And the same is true of claims for attempted monopolization and conspiracy to monopolize. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) (explaining that a claim under Section 2 for attempted monopolization requires allegations of "predatory or anticompetitive conduct," just as a claim for monopolization does); *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 139 (1998) (same for Section 2 claim of conspiracy to monopolize).

### CONCLUSION

For the above reasons, this Court should enter judgment on the pleadings in favor of Deere.

---

[5] The viability of *any* monopoly leveraging claim is dubious in the Seventh Circuit. *See, e.g.*, *Schor*, 457 F.3d at 611 ("The problem with 'monopoly leveraging' as an antitrust theory is that the practice cannot increase a monopolist's profits."); *see also Trinko*, 540 U.S. at 415 n.4.

Dated:  December 8, 2022          Respectfully submitted,

*/s/ Tiffany D. Lipscomb-Jackson*

John M. Majoras
jmmajoras@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Telephone: (202) 879-3939

Tiffany D. Lipscomb-Jackson
tdlipscombjackson@jonesday.com
JONES DAY
325 John H. McConnell Boulevard,
Suite 600
Columbus, OH 43215-2673
Telephone:  (614) 281-3876

Corey A. Lee
calee@jonesday.com
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939

Amanda B. Maslar (6321073)
amaslar@jonesday.com
JONES DAY
110 North Wacker, Suite 4800
Chicago, IL  60606
Telephone:  (312) 782-3939
Facsimile:   (312) 782-8585

*Counsel for Defendant Deere & Company*

## CERTIFICATE OF SERVICE

I hereby certify that, on December 8, 2022, a copy of the foregoing was filed using the CM/ECF system, which will effectuate service on all counsel of record.

*/s/ Tiffany D. Lipscomb-Jackson*