**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| IN RE: DEERE & COMPANY REPAIR SERVICES ANTITRUST LITIGATION | Case No.: 3:22-cv-50188<br>MDL No. 3030<br><br>Hon. Iain D. Johnston<br><br>**PLAINTIFFS' CORRECTED MEMORANDUM IN OPPOSITION TO DEFENDANT DEERE & COMPANY'S MOTION FOR JUDGMENT ON THE PLEADINGS** |

i

# TABLE OF CONTENTS

Page

**INTRODUCTION**.................................................................................................................. 1

**STATEMENT OF FACTS**.................................................................................................. 3

**LEGAL STANDARD** ......................................................................................................... 5

**ARGUMENT** ....................................................................................................................... 5

    I.    Plaintiffs Adequately Plead Article III and Antitrust Standing. ........................................ 5

        A.    Plaintiffs Have Article III Standing ................................................................. 5

        B.    Plaintiffs Are Direct Purchasers of Repair Services and the First Purchasers of Repair Services Outside of the Alleged Conspiracy .................................................. 9

            1.    Plaintiffs Are Not Indirect Purchasers and Need Not Be in Privity with Deere. ............................................................................................................... 9

            2.    Plaintiffs Are the First Purchasers Outside of the Alleged Conspiracy ............. 10

    II.    Plaintiffs Plausibly Allege Each of Their Claims ............................................................ 11

        A.    Plaintiffs Plausibly Allege a Conspiracy Among Deere and Its Dealers ................. 13

            1.    The Dealers' Actions Reflect a Conscious Commitment to a Common Plan, the Hallmark of Conspiracy. .............................................................................. 14

            2.    Plaintiffs Allege Facts Demonstrating That Dealers' Parallel Conduct Was Against Their Independent Self-Interest ............................................................ 18

            3.    Deere's Cited Authority Applies an Evidentiary Standard Inapplicable to Plaintiffs' Claims at the Pleadings Stage .......................................................... 20

            4.    Plaintiffs Are Not Required to Join Co-Conspirators as Named Defendants .... 21

            5.    Plaintiffs Adequately Plead a Vertical Conspiracy Under Section 1 ................. 23

            6.    Deere's Participation in the Conspiracy is Economically Rational ................... 26

        B.    Plaintiffs Allege a Plausible Tying Claim Under Section 1 ..................................... 27

        C.    Plaintiffs Allege Plausible Monopolization Claims Under Section 2...................... 28

    III.    Plaintiffs Plead the Relevant Market for Each of Their Claims ................................... 29

        A.    The Deere Repair Services Market is a Relevant Single-Brand Aftermarket ......... 30

ii

1.   Plaintiffs Allege That Deere Repair Tools and Services Are Not Interchangeable with Other Manufacturers' Tools and Services ...................... 31

2.   Plaintiffs Sufficiently Plead That They Are "Locked In" to the Deere Repair Services Market ................................................................................. 32

3.   Plaintiffs Allege That Deere Has Appreciable Economic Power in the Tractor Market ................................................................................. 37

B.   Determination of the Relevant Antitrust Market is an Intensely Factual Inquiry Not Appropriate for Resolution at This Stage of Litigation .................................... 39

**CONCLUSION** ............................................................................................................. **40**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABU Chowdhury v. Marathon Oil Co.*,
No. 95 C 0805, 1996 WL 19584 (N.D. Ill. Jan. 16, 1996) ........................................................8

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
683 F.3d 328 (7th Cir. 2012) .................................................................24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).................................................................................5

*Avnet, Inc. v. Motio, Inc.*,
No. 12 C 2100, 2015 WL 5307515 (N.D. Ill. Sept. 9, 2015)..................................40

*Batson v. Live Nation Entm't, Inc.*,
746 F.3d 827 (7th Cir. 2014) ...............................................................27

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................26

*Bishop v. Air Line Pilots Ass'n, Int'l*,
900 F.3d 388 (7th Cir. 2018) ...............................................................5

*In re Brand Name Drugs Antitrust Litig.*,
177 F.R.D. 414 (N.D. Ill. 1997)............................................................22

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)...........................................................................36

*City of Rockford v. Mallinckrodt ARD, Inc.*,
360 F.Supp.3d 730 (N.D. Ill. 2019) ...............................................23, 24

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)..............................................................................28

*Copperweld Corp. v. Indep. Tube Corp.*,
467 U.S. 752 (1984)...........................................................................11

*Dang v. San Francisco Forty Niners*,
964 F.Supp.2d 1097 (N.D. Cal. 2013) .................................................39

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
313 F. Supp. 3d 931 (N.D. Ill. 2018) ................................................. *passim*

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  360 F. Supp. 3d 788 (N.D. Ill. 2019) ..............................................................3, 32

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  362 F. Supp. 3d 477 (N.D. Ill. 2019) ......................................................................3

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  581 F. Supp. 3d 1029 (N.D. Ill. 2022) ...................................................................9

*Eastman Kodak Co. v. Image Tech. Servs, Inc.*,
  504 U.S. 451 (1992).................................................................................. *passim*

*Epic Games, Inc. v. Apple Inc.*,
  559 F.Supp.3d 898 (N.D. Cal. 2021) ..............................................................28, 34

*Fontana Aviation, Inc. v. Cessna Aircraft Co.*,
  617 F.2d 478 (7th Cir. 1980) ................................................................................22

*Force Partners, LLC v. KSA Lighting & Controls, Inc.*,
  No. 19-CV-07776, 2022 WL 580808 (N.D. Ill. Feb. 25, 2022) ............................17

*Fortner Enterprises, Inc. v. U.S. Steel Corp.*,
  394 U.S. 495 (1969)..............................................................................................38

*Gen. Refractories Co. v. Stone Container Corp.*,
  No. 98 C 3543, 1999 WL 14498 (N.D. Ill. Jan. 8, 1999) ........................................9

*Havoco of Am., Ltd. v. Shell Oil Co.*,
  626 F.2d 549 (7th Cir. 1980) ................................................................................12

*Hecker v. Deere & Co.*,
  556 F.3d 757 (7th Cir. 2009) ............................................................................5, 18

*Howard Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*,
  602 F.3d 237 (3d Cir. 2010)..................................................................................18

*Hytera Commc'ns Corp. v. Motorola Sol., Inc.*,
  No. 19-CV-176, 2022 WL 3645908 (N.D. Ill. Aug. 24, 2022) ..................24, 26, 28

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1997)................................................................................... *passim*

*Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*,
  No. 13 C 1129, 2013 WL 4599903 (N.D. Ill. Aug. 29, 2013).................................30

*Interstate Circuit Inc. v. United States*,
  306 U.S. 208 (1939)........................................................................................20, 21

v

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ............................................................................................27

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    383 F. Supp. 3d 187 (S.D.N.Y. 2019) .......................................................14

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ...............................................................................12, 24

*In re Loc. TV Advert. Antitrust Litig.*,
    No. 18 C 6785, 2020 WL 6557665 (N.D. Ill. Nov. 6, 2020) ...................19

*Loeb Indus., Inc. v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) ...........................................................6, 9, 10

*In re Loestrin 24 Fe Antitrust Litig.*,
    814 F.3d 538 (1st Cir. 2016) .................................................................11, 31

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .........................................................................................6

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
    29 F.4th 337 (7th Cir. 2022) ..................................................................6, 11

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
    952 F.3d 832 (7th Cir. 2020) ........................................................... *passim*

*Metzler v. Bear Auto. Serv. Equip. Co.*,
    10 F.Supp.2d. 1345 (S.D. Fla. 1998) .........................................................32

*Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*,
    524 F.3d 726 (6th Cir. 2008) .......................................................................35

*Miles Distributors, Inc. v. Specialty Const. Brands, Inc.*,
    476 F.3d 442 (7th Cir. 2007) .......................................................................23

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984) .......................................................................................15

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F. 3d 1186 (9th Cir. 2005) ....................................................................21

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
    533 F.3d 1 (1st Cir. 2008) .............................................................................25

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
    472 U.S. 284 (1985) .......................................................................................14

*Ohio v. Am. Express Co.*,
    138 S.Ct. 2274 (2018) ...............................................................................................29, 30

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
    629 F.3d 697 (7th Cir. 2011) .......................................................................................12

*Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advert. Ass'n,*
    Inc.*, 672 F.2d 1280 (7th Cir. 1982) ............................................................................12

*In re*: *Processed Egg Prod. Antitrust Litig.*,
    No. 08-MD-2002, 2016 WL 5539592 (E.D. Pa. Sept. 28, 2016) ..........................17

*PSI Repair Servs. Inc. v. Honeywell, Inc.*,
    104 F.3d 811 (6th Cir. 1997) .......................................................................................35

*PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*,
    615 F.3d 412 (5th Cir. 2010) .......................................................................................21

*Republic Tobacco Co. v. North Atl. Trading Co., Inc.*,
    381 F.3d 717 (7th Cir. 2004) .......................................................................................37

*Return on Inv. Sys. v. Translogic Corp.*,
    702 F. Supp. 677 (N.D. Ill. 1988) ...............................................................................29

*Rossi v. Standard Roofing, Inc.*,
    156 F.3d 452 (3d Cir. 1998)..........................................................................................14

*Schor v. Abbott Lab'ys*,
    457 F.3d 608 (7th Cir. 2006) .......................................................................................29

*Siva v. Am. Bd. of Radiology*,
    512 F. Supp. 3d 864 (N.D. Ill. 2021) ...........................................................................3

*Staley v. Gilead Scis., Inc.*,
    No. 19-CV-02573-EMC, 2020 WL 5507555 (N.D. Cal. July 29, 2020)................19

*In re Sulfuric Acid Antitrust Litig.*,
    743 F.Supp.2d 827 (N.D. Ill. 2010) ...........................................................................13

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) .......................................................................................17

*Tichy v. Hyatt Hotels Corp.*,
    376 F. Supp. 3d 821 (N.D. Ill. 2019*)* ........................................................................19

*U.S. Gypsum Co. v. Ind. Gas Co.*,
    350 F.3d 623 (7th Cir. 2003) .........................................................................................9

*United States v. Apple, Inc.,*
  791 F.3d 290 (2d Cir. 2015)............................................................14, 18

*United States v. Grinnell Corp.,*
  384 U.S. 563 .....................................................................................28

*United States v. Loew's, Inc.,*
  371 U.S. 38 (1962)............................................................................39

*Us, Inc. v. F.T.C.,*
  221 F.3d 928 (7th Cir. 2000) ..............................................14, 20, 21

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP,*
  540 U.S. 398 (2004)..........................................................................29

*Viamedia, Inc. v. Comcast Corp.,*
  951 F.3d 429 (7th Cir. 2020) .............................................................3

**Statutes**

15 USC §§ 1, 2...........................................................................................1, 2

Sherman Act Section 2.........................................................................11, 28

**Rules**

Federal Rules of Civil Procedure
  Rule 9(b) ...........................................................................................8
  Rule 12 .............................................................................................39
  Rule 12(b)(6).....................................................................................5
  Rule 12(c).........................................................................................5

**Other Authorities**

https://shop.deere.com/jdb2cstorefront/JohnDeereStore/en/product/John-Deere-
  Customer-Service-ADVISOR%E2%84%A2-Agriculture-%26-Turf-
  Equipment-Web-and-Downloaded-Applications-One-year-license-and-data-
  (Year-1)/p/SPRSA20212AG..............................................................36

*Repair*, Equip. Dealer Magazine (May 24, 2022),
  https://www.equipmentdealermagazine.com/repair-done-right-changing-the-
  narrative-on-right-to-
  repair/.https://www.equipmentdealermagazine.com/repair-done-right-
  changing-the-narrative-on-right-to-repair/...........................................16

## INTRODUCTION

Whatever other disputes exist in this litigation, the parties agree on one underlying fact: for a certain category of repairs, owners of Deere Tractors are forced to purchase Repair Services[1] from a Deere Dealer. CAC ¶ 4; Br. at 1. Whether farmers *should* have the right to perform comprehensive repairs on their Tractors (or, as Deere revealingly puts it, the "unfettered ability to make whatever repairs they want") (Br. at 1) themselves, or otherwise be able to have these repairs performed by a professional technician of their choice, is the question at the heart of this case.

The Consolidated Class Action Complaint[2] paints a detailed picture of how Defendant Deere & Company ("Deere") and its affiliated dealerships ("Dealers" or "Dealerships") have unlawfully restrained competition in the market for Repair Services of Deere-brand agricultural equipment with onboard computers known as electronic control units, or "ECUs."[3] Plaintiffs allege with great specificity how Deere and its Dealers keep necessary Repair Tools[4] out of the hands of farmers and independent repair shops who would otherwise provide competition for the Dealers. Farmers are therefore forced to purchase Repair Services from the Dealerships at inflated prices.

Based on this conduct, Plaintiffs assert claims under Sections 1 and 2 of the Sherman Act (15 USC §§ 1, 2) alleging a conspiracy in restraint of trade among Deere and its Dealers as well as monopoly and tying claims. Each of the Plaintiffs, on their own behalf, and on behalf of a proposed class of similarly situated purchasers of Repair Services, assert claims for damages

---

[1] "Repair Services" in the context of this case refer to "repair and maintenance services of Deere-brand agricultural equipment." CAC ¶ 4.

[2] Plaintiffs' Consolidated Class Action Complaint (ECF 85) ("Complaint" or "CAC").

[3] Referred to herein as "Tractors" for the sake of brevity.

[4] "Repair Tools" in the context of this case refer to "critical software and other Deere and Deere Dealer-controlled informational resources" (CAC ¶ 4), which are primarily compiled in or otherwise accessed via a tool called Service ADVISOR. CAC ¶ 11. After the initial case was filed in this litigation, Deere and the Dealerships began to offer Customer Service ADVISOR (a stripped down and lower-functionality version of Dealer-level Service ADVISOR) for sale. *See* CAC ¶ 155.

arising from their payment of past anticompetitive overcharges on Repair Services and for injunctive relief to remedy the ongoing anticompetitive business practices alleged.

Deere argues that the Court should dismiss each of Plaintiffs' claims for a lack of Article III and antitrust standing under the *Illinois Brick*[5] doctrine and various claimed deficiencies in the Plaintiffs' pleadings.[6] None of its arguments have merit. Plaintiffs easily satisfy the low bar of Article III standing, and *Illinois Brick* provides no bar to any of their claims. Equally misguided are Deere's arguments challenging the "plausibility" or sufficiency of the pleading of the antitrust claims. As set out in detail below, Deere's claimed deficiencies are assembled out of inapplicable or misinterpreted case law, are based on a strategic misreading of the Complaint, or are simply misplaced merits arguments not cognizable on this limited pleading motion.

Deere also conspicuously fails to directly confront the United States Supreme Court decision, *Kodak* and its full discussion of market conditions that support the viability of a relevant single-brand aftermarket.[7] *Kodak* is not only the seminal case addressing the type of aftermarket antitrust claims asserted in this case, but it is also factually analogous to the present litigation.[8] In its opening brief, Deere avoids engagement with the Supreme Court's nuanced market analysis in *Kodak*, instead reducing the analysis of the viability of single-brand aftermarkets to an improper reductionist inquiry. Deere uses this oversimplification to push for a resolution of the market definition question at the pleadings stage, where it should not be, and customarily never is, decided.

---

[5] *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1997) ("*Illinois Brick*").
[6] Deere & Company's Memorandum in Support of Its Motion for Judgment on the Pleadings (ECF 105) ("Br.").
[7] *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ("*Kodak*").
[8] *Kodak*, 504 U.S. at 456 (outlining claims brought by independent service organizations under Sections 1 and 2 of the Sherman Act premised on harm to competition in the repair service aftermarket for Kodak copying and micrographic equipment).

As described in *Kodak* and in cases within the Seventh Circuit following its reasoning,[9] the determination of whether a single-brand aftermarket is the relevant antitrust market demands a complex, multi-factor, fact-sensitive analysis of whether foremarket competition prevents a firm from exercising market power in the single-brand aftermarket. *See Kodak*, 504 U.S. at 473-78. Plaintiffs' allegations of market realities demonstrating that competition in the equipment foremarket would not check Deere's power to exploit the repair aftermarket include: (1) the inherent difficulty of forecasting accurate "lifecycle" repair pricing for complex durable goods such as Tractors[10]; (2) high switching costs due to the large initial expense of Tractors and sunk costs in brand-specific product functionality[11]; (3) the absence of forthright and reliable guidance from Deere on the extent of its repair restrictions and the frequency and cost of the repairs subject to those restrictions[12]; (4) the proliferation of misinformation by Deere, the Dealers, and their industry proxies[13]; and (5) the lack of foremarket alternatives due to similar restraints by Deere's competitors in the Tractor market.[14]

The Court should deny Deere's motion in its entirety.

## STATEMENT OF FACTS

A Tractor requires substantial maintenance and repair over its useful life, although the nature and extent of such repairs are extremely difficult to predict. This unpredictability is

---

[9] *See, e.g., Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 483 (7th Cir. 2020) (describing *Kodak* as a "foundational tying case"); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 477 (N.D. Ill. 2019) ("*DMS I*"); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 360 F. Supp. 3d 788 (N.D. Ill. 2019) ("*DMS II*"); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 960 (N.D. Ill. 2018) ("*DMS III*"); *Siva v. Am. Bd. of Radiology*, 512 F. Supp. 3d 864, 867-68 (N.D. Ill. 2021).
[10] CAC ¶ 3.
[11] CAC ¶ 28.
[12] CAC ¶ 142.
[13] CAC ¶¶ 141-54.
[14] CAC ¶¶ 28, 164.

exacerbated by the misinformation disseminated by Deere, its Dealers, and their industry organization proxies, as they attempt to defend their monopoly of Repair Services against adverse publicity and right to repair initiatives. CAC ¶ 3. Whereas farmers traditionally performed maintenance and repairs themselves or used an independent technician of their choice, that is no longer the case. *Id*. Modern Tractors are increasingly designed so that the diagnoses and/or completion of many repairs requires specialized information and specific software-based repair capabilities to which Deere and its Dealers have sole access. These repairs involve the increased cost, inconvenience, and delay of an intervention by an ever-more consolidated network of Deere dealers.[15] CAC ¶¶ 4; 72-87.

Deere and its Dealers work in close collaboration (CAC ¶¶ 7, 10) for their collective, and substantial, financial benefit. Deere and the Dealers exercise tight control over who has access to Repair Tools, and through that control, also exercise control over who can compete in the market for Repair Services. CAC ¶¶ 5-14.

Deere's varying justifications for withholding these Repair Tools are pretext, "factually unsupported, inherently insincere, and anti-competitive." CAC ¶ 23. Deere's false narrative that the restraints are justified by safety, intellectual property, or environmental reasons, has been thoroughly undermined by an FTC inquiry. CAC ¶ 169. Deere and its Dealers' stranglehold on the Repair Services market is all about monopoly profits from repair and associated parts and financing revenues. *See*, *e.g.*, CAC ¶ 187, n. 90 (parts and maintenance service reportedly accounted for a fifth of Deere's sales in 2020). Nowhere is the right to repair issue so clearly stated

---

[15] CAC ¶ 152 (citing farmer describing their reliance on dealers in 2017: "Things are so automated that the last time the [dealer] came out to my farm to fix my combine, he sat in the chair with a laptop, pushed some buttons on the console, didn't change any parts, and that's all it needed. We are not capable of doing that anymore, we are so dependent on these [dealers] to come out and if we can't get up and running again it could cost us thousands of dollars a day.").

as a matter of a competitive threat to Dealer profits than in a rare admission by a publicly-traded Dealer for a competing Tractor manufacturer, who in a recent SEC filing, pulled back the curtain and disclosed to its shareholders that right to repair could have an adverse impact on its sales and profitability due to "increased competition for Repair Services . . . Loss of part sales . . . [and] margin compression on Parts and Service Revenue" all due to "increased competition for repair service and part sales." CAC ¶ 165.

## LEGAL STANDARD

A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) is governed by the same standard as a Rule 12(b)(6) motion to dismiss. To survive the motion, "a complaint must state a claim to relief that is plausible on its face." *Bishop v. Air Line Pilots Ass'n, Int'l*, 900 F.3d 388, 397 (7th Cir. 2018) (citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). The court must "constru[e] the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in [the plaintiff's] favor." *Hecker v. Deere & Co.*, 556 F.3d 757, 580 (7th Cir. 2009).

## ARGUMENT

## I. Plaintiffs Adequately Plead Article III and Antitrust Standing.

### A. Plaintiffs Have Article III Standing.

There is nothing hypothetical about Plaintiffs' injuries, which flow directly from the alleged legal violations asserted in the Complaint. Plaintiffs allege Deere and its authorized Dealerships combined to impose restraints on access to necessary repair resources, preventing

competition in the Deere Repair Services market. As a result of these restrictions, Deere was able to foreclose competition from farmers and independent repair technicians, in turn, causing farmers to pay higher prices for Repair Services for their Deere tractors than they would have absent the anticompetitive restraints. *See* CAC ¶¶ 1, 4, 5, 7, 9, 10, 30, 32-34, 42-50.

Article III standing has three elements: (1) the plaintiff must suffer an injury in fact that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) there must be a fairly traceable causal connection between plaintiff's injury and the challenged action of the defendant; and (3) it must be likely that the plaintiff's injury can be redressed by a favorable decision by the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). All three elements are met here.

The Seventh Circuit recognizes "that 'financial injuries are prototypical of [Article III] injuries,' meaning that paying inflated prices due to an anticompetitive scheme will satisfy injury-in-fact." *Marion Diagnostic Ctr.*, *LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 345 (7th Cir. 2022) ("*Marion II*") (citations omitted); *Loeb Indus.*, *Inc. v. Sumitomo Corp.*, 306 F.3d 469, 480-81 (7th Cir. 2002) ("*Loeb*") ("There is no dispute that the plaintiffs in these cases have been injured by paying an inflated price for copper; their Article III standing is therefore secure.").

There is also a traceable causal connection between the inflated prices for Repair Services and the anticompetitive conduct alleged. Deere and its Dealers withhold necessary Repair Tools to eliminate competition in the market for Deere Repair Services, both from farmers performing their own repairs and from independent repair companies. Through this elimination of competition, Deere and the Dealerships also eliminate sources of pricing competition for these services. *See*, *e.g.*, CAC ¶ 96 (noting that there are few remaining independent mechanics, and even those with

familiarity and skill to repair older Deere equipment cannot effectively work on the modern Deere Tractors with the Repair Tools).

A favorable decision by the Court in the form of damages for the alleged past anticompetitive overcharges and an injunction eliminating the alleged anticompetitive restraints would redress Plaintiffs' injury. These remedies are available to the Plaintiffs and are directly responsive to the claims alleged. *See* CAC ¶ 35 ("Deere's illegal monopoly of the Deere Repair Services Market should be enjoined and dismantled, and Plaintiffs and the Class should be reimbursed by Deere for the amounts they overpaid for Deere Repair Services."). All the elements of Article III standing are therefore present.

Deere's challenge to Plaintiffs' Article III standing is based on the false premise that the Complaint creates two categories of Dealers; those which are within the alleged conspiracy and those which are not. Deere next argues that since Plaintiffs do not specify that they purchased from a *conspirator* Dealer, injury flowing from the conduct alleged—and therefore standing—has not been established. Br. at 4-6. The argument fails because it relies on a misreading of the Complaint.

The Complaint, in fact, does not draw any distinction, expressly or inferentially, between two separate categories of Dealerships. *See*, *e.g*., CAC ¶ 4 ("Deere and **its Dealerships** monopolize and restrain the market for repair and maintenance services ("Repair Services")…"); ¶ 2 (describing the class as purchasers of Repair Services for Deere Tractors… from Deere … and "**co-conspirator authorized Deere dealerships** (the "Dealership" or "Dealers')"); ¶ 7 ("Deere maintains control over the Repair Services Market through its increasingly highly consolidated network of authorized **Dealerships . . . independently-owned businesses that work in close collaboration with Deere, which maintains significant and active oversight, support, and direction for the Dealership's operations**"); ¶ 10 ("Deere, **in concert and agreement with its**

7

**Dealerships,** withholds repair software and other informational repair resources…to any person or entity that is a competitor of Deere or a Dealership"; ¶ 30 ("**Deere and the Dealerships**…successfully restricted competition in the Repair Services Market"); ¶ 53 ("Co-conspirators include independently owned Dealerships with agreements with Deere giving them the right to sell new Deere tractors, parts and Deere Repair Services…") (emphasis added). Deere's stated perception of Plaintiffs' identification of two categories of Dealers is not inferable from, much less, "alleged" in the Complaint. Deere's standing argument is based on this misreading and must therefore be rejected.

As a corollary to Deere's misreading of the Complaint, Deere suggests something is afoul because the Complaint does not identify the Dealer from whom each Plaintiff purchased Repair Services. Br. at 5-6. With the erroneous "some-are-in-and-some-are-out" premise swept aside, it is clear that Plaintiffs provide sufficient detail regarding the circumstances of their purchases.

Each Plaintiff alleges they purchased Repair Services from at least one Deere-affiliated Dealership during the Class Period. *See*, *e.g.*, CAC ¶¶ 42-50. As discussed *supra*, the Complaint also alleges the authorized Dealers acted in concert with Deere to restrict access to Repair Tools and thereby drive up the price of Repair Services. There is therefore no ambiguity regarding whether each Plaintiff purchased from a Dealership that was part of the alleged conspiracy.

These are the fundamental and only necessary facts that Plaintiffs need to allege at this stage of litigation. There is no heightened pleading requirement for antitrust claims that would require Plaintiffs to plead any further details around their purchases of Repair Services. *See ABU Chowdhury v. Marathon Oil Co*., No. 95 C 0805, 1996 WL 19584, at *3 (N.D. Ill. Jan. 16, 1996) ("[T]here is no heightened pleading requirement in antitrust cases. Thus, an antitrust plaintiff is not required to plead the particulars of its claim unless some other provision, such as Rule 9(b),

comes into play.") (citations omitted); *see also Gen. Refractories Co. v. Stone Container Corp.*, No. 98 C 3543, 1999 WL 14498, at *3 (N.D. Ill. Jan. 8, 1999) (holding that because there is no heightened pleading standard for antitrust claims, the fact that plaintiffs did not expressly name defendants' alleged co-conspirators was not grounds for dismissal).

### B. Plaintiffs Are Direct Purchasers of Repair Services and the First Purchasers of Repair Services Outside of the Alleged Conspiracy.

Imprecisely characterizing the argument as one of "antitrust standing," Deere argues that Plaintiffs are indirect purchasers barred from recovering damages on any of their claims by *Illinois Brick*.[16] They are incorrect. *See Loeb*, 306 F.3d at 480-81 (noting that the *Illinois Brick* rule is among the doctrines addressed to right to sue under the antitrust law which is sometimes "incautiously lumped together" under the umbrella term of "antitrust standing").

#### 1. Plaintiffs Are Not Indirect Purchasers and Need Not Be in Privity with Deere.

The *Illinois Brick* doctrine is one under which an antitrust plaintiff may not seek damages based on alleged supracompetitive prices *passed through by a purchaser earlier* in the distribution chain. *Illinois Brick*, 431 U.S. at 741(emphasis added); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1062 (N.D. Ill. 2022) ("*DMS IV*"). The inapplicability of the doctrine is readily apparent. The Repair Services at issue in this litigation, by their nature, only exist in the first instance at the Dealer level and do not descend down a chain of distribution. The Complaint does not allege that the Dealers purchase some product from Deere that is then resold to Plaintiffs in this case—the quintessential distribution chain scenario forbade by *Illinois Brick*.

The rule of *Illinois Brick* does not require privity. In *Loeb*, purchasers of copper products brought claims against alleged manipulators of copper futures prices, which they claimed

---

[16] Br. at 7, n.1. As noted by Deere, *Illinois Brick* does not apply to claims for injunctive or declaratory relief. *See*, *e.g.*, *U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 627 (7th Cir. 2003).

artificially inflated the prices of the copper products purchased. The court held that even though Plaintiffs purchased copper products from parties other than the named defendants and had not purchased copper futures directly from the Defendants, their claims were not barred by the *Illinois Brick* doctrine. *Loeb*, 306 F.3d at 481-82. The court explained:

> *Illinois Brick* does not stand for the proposition, as the defendants would seem to have it, that a defendant cannot be sued under the antitrust laws by any plaintiff to whom it does not sell (or from whom it does not purchase). . . . The reason the plaintiffs' suit in *Illinois Brick* failed was not because the defendants did *not* sell to them. Rather, it was because the defendants *did* sell to a third party who (after *Hanover Shoe*) could recover for any injury they claimed. . . . Here, in contrast, the plaintiffs are not indirect purchasers along a supply chain. As far as the plaintiffs' claims are concerned, [Defendants] Global, CLR, and Sumitomo did not sell cathode to integrated producers who in turn sold to any of the plaintiffs. Instead, the alleged conspiracy operated in the separate but related futures market, through which it sought directly to manipulate the price of copper the plaintiffs were buying.

*Id*. at 481.

### 2. Plaintiffs Are the First Purchasers Outside of the Alleged Conspiracy.

Likewise, Plaintiffs here are not "indirect purchasers along a supply chain" of Repair Services. Even assuming arguendo that Plaintiffs are able to purchase Repair Services indirectly (they cannot), Plaintiffs' purchases were from alleged co-conspirators, not parties outside of the alleged conspiracy. As the Seventh Circuit explained in *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 839 (7th Cir. 2020) ("*Marion I*"): "It is better to think of the right to sue co-conspirators not as an exception to *Illinois Brick*, but instead as a rule inhering in *Illinois Brick* that allocates the right to collect 100% of the damages to the first non-conspirator in the supply chain." *Id*. at 839 (citing *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 631-32 (7th Cir. 2022); *see also* Br. at 7 ("[w]hen a plaintiff is the first purchaser outside of an alleged conspiracy—that is when the plaintiff is the first available purchaser to have 'dealt with a member of the conspiracy—the direct purchaser rule is not a 'barrier ' to that plaintiff suing all members

10

of the conspiracy."). Deere's reliance on *Marion II* is misplaced. *Marion II* involved a claim of a vertical conspiracy to fix the prices of medical devices bought and resold down a manufacturer-distributor-plaintiff chain of distribution. *Marion II*, 29 F.4th at 340. The plaintiff in *Marion II*, however, was not a purchaser of those products in that chain of distribution.

Plaintiffs allege that they and all class members purchased Repair Services from Deere's authorized Dealers, who are alleged co-conspirators both with Deere and with each other. *Illinois Brick* in no way impedes their ability to assert any of their claims against Deere, who as an alleged conspirator, is liable jointly and severally for all the damages caused by the alleged conspiracy. *Marion I*, at 839.

## II.    Plaintiffs Plausibly Allege Each of Their Claims.

Plaintiffs allege plausible claims for each count alleged in the Complaint. Under Section 1, Plaintiffs allege ample facts to plead group boycott, conspiracy, and unlawful tying. Under Section 2 of the Sherman Act, Plaintiffs sufficiently plead their monopolization claims (monopolization, attempted monopolization, conspiracy to monopolize, and monopoly leveraging).

The analysis of the plausibility of claims brought under the Sherman Act "is aimed at substance rather than form." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 760 (1984) ("*Copperweld*"); *see also Kodak*, 504 U.S. at 466–67 ("[F]ormalistic distinctions rather than actual market realities are generally disfavored in antitrust law. This Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the particular facts disclosed by the record.") (internal quotations and citation omitted); *In re Loestrin 24 Fe Antitrust Litig.*, 814 F.3d 538, 550 (1st Cir. 2016) ("*Loestrin*") (antitrust law "consistently prioritize[s] substance over form"). When it comes to tying and claims brought under related theories such as monopoly leveraging, antitrust law's substantive and "core concern" is that the practice "prevents goods from competing directly

for consumer choice on their merits." *DMS III*, 313 F.Supp.3d at 960 (citing *United States v. Microsoft Corp.*, 253 F.3d 34, 87 (D.C. Cir. 2001))

There are two basic lines of analysis used to gauge the competitive reasonableness of certain practices challenged under Section 1. *Per se* violations, those with which courts have "considerable experience" and "inevitably result[ ] in a finding of anticompetitive effect" are presumed to be unreasonable restraints on trade. *Phil Tolkan Datsun*, *Inc. v. Greater Milwaukee Datsun Dealers' Advert. Ass'n, Inc.*, 672 F.2d 1280, 1284 (7th Cir. 1982); *see also*, *e.g.*, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011) (an unreasonable restraint is "conclusively presumed once the first [element] is proved" in *per se* cases).

"Rule-of-reason violations require allegations of anticompetitive effects," and that "the injury complained of be of a type that the antitrust laws were designed to guard against, and further that the antitrust violation be the direct cause of plaintiff's injury." *Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 556 (7th Cir. 1980); *see also Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) ("*Leegin*") (rule of reason ultimately requires "the factfinder [to] weigh[ ] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition").

At the pleadings stage, a rule-of-reason inquiry requires "that the plaintiff identify the relevant market affected by the challenged conduct and allege an actual adverse effect on competition in the identified market." *DMS III*, 313 F.Supp.3d at 950 (citing *Watkins v. Smith*, No. 12 CIV. 4635 DLC, 2012 WL 5868395, at *7 (S.D.N.Y. Nov. 19, 2012), *aff'd*, 561 F. App'x 46 (2d Cir. 2014)).

Deere contends that Plaintiffs have not adequately alleged a plausible conspiracy among the Dealers. Br. at 7-11. Deere first reprises its faulty misreading that the Complaint alleges that

12

there is a second category of Deere Dealers outside the alleged conspiracy (Br. At 7); and second, contends Plaintiffs' allegations of conspiracy fall short of what is required to plead a so-called "hub and spoke" conspiracy. It is incorrect on both counts.[17]

### A.     Plaintiffs Plausibly Allege a Conspiracy Among Deere and Its Dealers.

Plaintiffs allege plausible claims of conspiracy. The Complaint contains detailed factual allegations of a contract, combination, and conspiracy by and among Deere and the Dealerships to withhold necessary Repair Tools from farmers and independent mechanics in order to eliminate competition and inflate prices for Repair Services.

In general, to state a Section 1 claim, "a plaintiff must plead facts plausibly suggesting: (1) a contract, combination, or conspiracy (an agreement); (2) a resulting unreasonable restraint of trade in a relevant market; and (3) an accompanying injury." *DMS III*, 313 F.Supp.3d at 931 (citing *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012)). Whether a restraint is "unreasonable" is judged under the *per se* rule, the "quick look" analysis, or the full-blown rule of reason test. *See In re Sulfuric Acid Antitrust Litig.*, 743 F.Supp.2d 827, 864 (N.D. Ill. 2010) (citing *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993)). Deere here challenges the adequacy of the allegations of a horizontal "contract combination or conspiracy" among Deere's dealers.[18]

The alleged conspiracy between and among Deere's Dealers consists of an agreement to not provide access to Repair Tools to farmers and independent service organizations. This

---

[17] As discussed above, Deere misconstrued the Complaint to create a false dichotomy of two groups of Dealers, one of which was outside of the alleged conspiracy. Deere's "plausibility" argument based on this misreading of the Complaint falls for the same reason as its standing argument. *See supra*, Section I.A.

[18] *See* Br. at 8-11 (asserting that Plaintiffs have not sufficiently alleged a horizontal conspiracy among the Dealers). Deere does not address or challenge the sufficiency of the pleading of a vertical "agreement" between Deere and its respective Dealers for obvious reasons.

agreement inflates the prices of Repair Services, which are only available through the Dealers. Conspiracies with these characteristics are sometimes referred to as "hub and spoke" conspiracies. Courts recognize "conspiracies in which an entity at one level of the market structure, the 'hub,' coordinates an agreement among competitors at a different level, the 'spokes.'" *United States v. Apple*, *Inc.*, 791 F.3d 290, 318 (2d Cir. 2015) (citation omitted) ("*Apple*").[19] "These arrangements consist of both vertical agreements between the hub and each spoke and a horizontal agreement among the spokes 'to adhere to the hub's terms,' often because the spokes 'would not have gone along with the vertical agreements except on the understanding that the other spokes were agreeing to the same thing.'" *Id.* at 314 (citation omitted) (alteration adopted).

As the Supreme Court has observed, "joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle" is a violation of the antitrust laws. *Nw. Wholesale Stationers*, *Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 245 (S.D.N.Y. 2019). When "the alleged conduct is facially anticompetitive and exactly the harm the antitrust laws aim to prevent, no special care need be taken in assigning inferences to circumstantial evidence." *Rossi v. Standard Roofing*, *Inc.*, 156 F.3d 452, 467 (3d Cir. 1998) (quoting *Kodak*, 504 U.S. at 478) (internal citations omitted).

### 1. The Dealers' Actions Reflect a Conscious Commitment to a Common Plan, the Hallmark of Conspiracy.

---

[19] Or as the Seventh Circuit put it, the coordinating entity acts as "ringmaster." *Toys* "*R*" *Us*, *Inc. v. F.T.C.*, 221 F.3d 928, 934 (7th Cir. 2000) ("*Toys*").

The plausibility of the alleged conspiracy does not hinge on whether Plaintiffs allege facts relating to specific, express, and communicated agreements between each of the Dealership "spokes." The necessary agreement, or common commitment to a mutual objective, between the Dealers is created by the facts pleaded in the Complaint, which are fairly read at this preliminary pleading stage as demonstrating a shared understanding between and among the Dealerships and Deere to keep the Repair Services market to itself. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (evidence to exclude the possibility of independent action can include "direct or circumstantial evidence that reasonably tends to prove that [the alleged co-conspirators] "had a conscious commitment to a common scheme designed to achieve an unlawful objective.").

In the first instance, inference need not even be invoked where the facts may reasonably support the conclusion that the common commitment is express. The prohibition of disclosing the contents of repair tools, *i.e.*, "manual[s], [service] bulletins . . . catalogs and service manual pages or electronic communications" to "a person or entity that is a competitor of [Deere] or a John Deere dealer]" is not a common undertaking or agreement which needs to be inferred at all. It is reflected in the Dealership agreement. CAC ¶ 10.

Facts demonstrating a "conscious commitment to participate in an illegal scheme" where the downstream participants knowingly engage in parallel anticompetitive conduct and profit from their involvement in the anticompetitive conduct creates an inference of the horizontal agreement. *Marion I*, 952 F.3d at 844. The Complaint alleges facts sufficient to infer that the Dealerships were aware that the other Dealerships all joined in covenants to withhold access to Repair Tools from farmers or independent mechanics. *See*, e.g., CAC ¶ 10 (listing provisions of Dealership agreements); CAC ¶ 19 (multiple Dealers claimed that they did not sell Software to customers and that it was available only for licensed Dealers); *id.* Plaintiffs also allege that various trade and

15

lobbying groups representing Dealerships disseminated misleading statements on behalf of the Dealerships regarding the availability of Repair Tools. *See*, *e.g.*, CAC ¶ 128 (alleging that Equipment Dealers Association ("EDA") promised to make comprehensive repair tools, software, and diagnostics available to the public by January 1, 2021, and failed to do so).

EDA, the primary trade group representing Dealers, actively spread misinformation on the availability of comprehensive repair tools, working in concert with Deere. *See* CAC ¶ 88. (instructing Dealerships to hang flyers informing customers that "everything a customer needs to diagnose and repair their equipment is already available.") By Deere's own admission, any statement claiming comprehensive repair tools are available is untrue and contradicts its claim that "Deere has never hidden the fact that some of its repairs require its dealers." Br. at 1. This campaign by the EDA was described in its own words as "[a] concerted campaign to provide dealership personnel and customers with irrefutable information about what our industry actually does to support repair." *Id.* at n.20 (linking to announcement of North American EDA's "Repair Done Right" campaign).[20] One of the major features of this campaign was the manufacturers' involvement (which can be fairly read to include Deere's involvement). NAEDA announced:

> First, the association will be hosting a training platform for dealership personnel. In that training, **the association and manufacturers have teamed up to create a brand-specific video that talks about what Right to Repair is and provide details about what is available to customers and third parties** under the Industry Commitment to support customer repair.

*Id.* (emphasis added).

---

[20] Citing NAEDA, *Repair Done Right—Changing the Narrative on Right to Repair*, Equip. Dealer Magazine (May 24, 2022), https://www.equipmentdealermagazine.com/repair-done-right-changing-the-narrative-on-right-to-repair/.https://www.equipmentdealermagazine.com/repair-done-right-changing-the-narrative-on-right-to-repair/.

These allegations of concerted efforts from the Dealer associations to fight against a requirement to make Repair Tools available, along with Deere's involvement, provide factual support that the Dealers engaged in concerted action. *See In re*: *Processed Egg Prod. Antitrust Litig.*, No. 08-MD-2002, 2016 WL 5539592, at *10 (E.D. Pa. Sept. 28, 2016), *aff'd sub nom. In re Processed Egg Prod. Antitrust Litig.*, 850 F. App'x 142 (3d Cir. 2021) (citing *In re Processed Egg Prod. Antitrust Litig.*, 821 F.Supp.2d 709, 724 (E.D. Pa. 2011)) ("Hence, agreement to the overarching conspiracy is plausibly suggested when a company . . . that attended meetings where . . . effects of alleged coordinated actions were extolled, is alleged also to have been certified under and participated in the UEP Certification Program and concomitantly followed the Program's guidelines").

Moreover, the allegations that Dealerships expressly signed agreements not to make repair tools available to Dealer competitors, took common action at the behest of Deere, and were being spoken for collectively by the same trade and lobbying groups, are more than enough to infer, that the Dealerships did so based on a common understanding and commitment to a common course of action at this preliminary stage of the litigation. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) (finding that circumstantial evidence of an agreement can support an antitrust conspiracy and holding that, at the motion to dismiss stage, the test of whether to dismiss turns on the complaint's "plausibility."); *see also Force Partners*, *LLC v. KSA Lighting & Controls*, *Inc.*, No. 19-CV-07776, 2022 WL 580808, at *9 (N.D. Ill. Feb. 25, 2022) (finding plaintiffs sufficiently alleged a conspiracy where plaintiffs pointed to multiple paragraphs of the FAC alleging a program was implemented among distributors, as well as a general timeline).

17

## 2. Plaintiffs Allege Facts Demonstrating That Dealers' Parallel Conduct Was Against Their Independent Self-Interest.

Plaintiffs allege facts demonstrating Dealerships' universal adherence to restricting access to Repair Tools is the result of a system-wide agreement to a common rule of the game. Deere argues that Dealers' behavior is merely "consciously parallel" conduct that can be ascribed to the Dealerships' individual self-interest. Br. at 9.

It is well established that where adherence to common conduct is reasonably asserted to be in an individual's independent interest only where all firms adhere to the same conduct, this parallel conduct itself is circumstantial evidence from which the existence of a conspiracy can be inferred. *Apple*, 791 F.3d at 318. That is the case here.

Deere's contrary argument, that a Dealer has an independent interest in restricting the availability of repair tools through "cutting a deal with Deere" which furthers its interest in garnering repair revenues (Br. at 9) is flawed for two reasons: one procedural and one substantive. As previously noted, the Court, on a pleading motion must "construe[e] the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in [the plaintiff's] favor." *Hecker*, 556 F.3d at 580. Thus, a motion on the pleadings is not the appropriate context for contesting the relative persuasiveness of competing inferences.[21]

Further, when determining whether parallel conduct can be explained by independent "self-interest," the question is not whether the alleged co-conspirator has a rational economic self-interest *that flows from its participation in a conspiracy* with its competitors. Dealers have an

---

[21] Deere's other authority cited is distinguishable from the facts of this litigation. In *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 256 (3d Cir. 2010), the parallel action alleged was "not placed in a context that raises a suggestion of a preceding agreement" or knowledge among dealers of dental products. Plaintiffs in the present case extensively allege the Dealers' active knowledge, involvement, and coordination.

economically understandable rationale to use anticompetitive means to increase profits from sales of Repair Services in their geographic areas by participating in a conspiracy that eliminates competition in the market which would occur if Repair Tools were freely available. That is why conspiracies in restraint of trade occur—they maximize profits of the conspirators beyond what would be earned in a competitive market where firms were operating independently. *See* CAC ¶ 156 (Dealerships are heavily disincentivized to give up repair revenue by allowing customers to perform repairs). Instead, the relevant question is whether the parallel conduct makes sense for an individual dealer absent a mutually assured commitment by all or nearly all of them. *See Staley v. Gilead Scis.*, *Inc.*, No. 19-CV-02573-EMC, 2020 WL 5507555, at *8 (N.D. Cal. July 29, 2020) (noting that showing that an alleged conspirator's benefit depends upon the success of the entire venture between multiple conspirators suggests overarching antitrust conspiracy) (quoting *U.S. v. Briscoe*, 896 F.2d 1476, 1505 (7th Cir. 1990)). Here, the agreement only works if there are no significant defectors from the plan. In other words, it is reasonable to infer that withholding access to Repair Tools is not in the independent individual interest of any given Dealer, unless they knew that the other Dealers would not deviate from the agreement and make Repair Tools available to Tractor owners or independent repair shops. In such a case and combined with the other facts alleged, it is appropriate to draw an inference of agreement from parallel conduct. *Tichy v. Hyatt Hotels Corp.*, 376 F. Supp. 3d 821, 839 (N.D. Ill. 2019*)*; *In re Loc. TV Advert. Antitrust Litig.*, No. 18 C 6785, 2020 WL 6557665, at *9 (N.D. Ill. Nov. 6, 2020) (citing *Anderson News*, *L.L.C. v. Am. Media*, *Inc.*, 899 F.3d 87, 104 (2d Cir. 2018)).

### 3. Deere's Cited Authority Applies an Evidentiary Standard Inapplicable to Plaintiffs' Claims at the Pleadings Stage.

Deere's "rimless wheel" argument relies mostly on out-of-circuit support and inapt cases. The single Seventh Circuit case relied on by Deere, *Toys*,[22] fails to support its argument, and in fact supports the Plaintiffs' position. In *Toys*, Toys "R" Us appealed an FTC determination, made upon review of "an extensive administrative record," that Toys "R" Us coordinated a horizontal conspiracy between manufacturers. *Id*. at 930. The appeal challenged the sufficiency of the evidence after the conclusion of discovery, not on the face of the Complaint, and the court noted that the challenge was "fact-intensive and face[d] the hurdle of the substantial evidence standard of review." *Id*. Thus, the court's analysis in *Toys* occurred not at the pleadings stage, but at a far later stage in the proceedings. At that point in the litigation, the court relied on the evidentiary record, including the specific communications between manufacturers, which came to light during discovery. *See*, *e.g.*, *id*. at 932 (reasoning based on the FTC's review of internal documents from the manufacturers); *id*. at 933 (noting the FTC drew conclusions of law based on the evidentiary record); *id*. at 934 (noting the "critical question" was "whether substantial evidence supported the Commission's finding that there was a horizontal agreement").

Thus, while the *Toys* case illustrates how such a conspiracy can function, it is not authority for what must be pled at the pleading stage. Deere's argument ignores that, *Toys*, instead stands for the proposition that it is the facts developed in discovery that would fully inform whether a conspiracy among the "spokes" can ultimately be inferred. Moreover, the court's citation to *Interstate Circuit* to illustrate the type of evidence which would support a plausible horizontal

---

[22] In *Toys*, Toys "R" Us forced ten manufacturers into individual agreements that limited their ability to sell to competing distributors. *Toys*, 221 F.3d at 935. The Court upheld the FTC's determination that a horizontal conspiracy existed, based in part on the fact that the manufacturers entered into agreements with Toys "R" Us only on the condition that their competitors did the same. *Id*.

conspiracy is instructive, *i.e.*, the manner in which the "hub" or "ringmaster" communicated with all of the "spokes" such that each knew that identical action was being required of all, and the consequent unanimity of action taken. *See Toys*, 221 F.3d at 935 (discussing *Interstate Circuit Inc. v. United States*, 306 U.S. 208, 223-24 (1939)). These types of evidence find analogues in the present case. Whether circumstantial evidence supports the drawing of a reasonable inference of agreement is a fact-sensitive inquiry; the facts in the present case are markedly more consistent with the type of relationships that would tend toward agreed common action than among the wholesale competitors in *Musical Instruments*.[23] At this early stage of litigation, Plaintiffs sufficiently allege facts that plausibly infer a horizontal agreement among the Dealerships existed.

### 4. Plaintiffs Are Not Required to Join Co-Conspirators as Named Defendants.

There is no requirement for Plaintiffs to name all co-conspirators as defendants in the case. Deere relies on out-of-circuit case law to support its position that "co-conspirator middlemen [must be] named as parties defendant [*sic*]." Br. at 12 (citing *In re Beef Industry Antitrust Litig.*, 600 F.2d 1148, 1163 (5th Cir. 1979); *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 542 (8th Cir. 2015); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 533 F.3d 1, 5-6 (1st Cir.

---

[23] *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F. 3d 1186 (9th Cir. 2005) involved a bottom-up conspiracy with a buyer as the hub and competing sellers as the spokes; there were no formal dealer agreements effectuating the very restraint at issue, nor were the alleged conspirators formally represented by the same trade group proxies who lobbied in their interest for the very same restraints. In the present case, the conspiracy was coordinated from the top down by Deere, with whom the Dealers have a common agreement with respect to the restraint at issue and share a long history of cooperation and common interest. With respect to *PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*, 615 F.3d 412 (5th Cir. 2010), Deere omits an important part of the court's statement. *See* Br. at 8. The courted noted PSKS had not "alleged that any dominant retailer imposed the RPM policy on Leegin, **nor has it alleged an agreement among retailers to implement the RPM policy.**" *PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*, 615 F.3d at 420 (emphasis added). Here, the Complaint clearly alleges an agreement among the Dealers and with Deere to implement the boycott of farmers and independent repair organizations. *See*, *supra*, § II(A).

2008); *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 854 (3d Cir. 1996)). That is not the law in the Seventh Circuit. *Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 617 F.2d 478, 479, 482 (7th Cir. 1980) (upholding claim where plaintiff purchased "from Aviation Activities, Inc., an independent Cessna distributor. Aviation Activities, Inc., however, was alleged to be a co-conspirator although not named as a defendant.").

The only Seventh Circuit case cited by Deere in support of its argument is *In re Brand Name Drugs Antitrust Litig.*, 177 F.R.D. 414, 418 (N.D. Ill. 1997) ("*Brand Name Drugs*"). But that decision supports Plaintiffs. On remand, the *Brand Name Drugs* district court interpreted the Seventh Circuit's opinion to hold that plaintiffs need not name co-conspirators to invoke the *Illinois Brick* exception. *Brand Name Drugs*, 94 C 897, MDL 997, 1998 WL 474146 (N.D. Ill. Aug. 6, 1998). The district court "continue[d] to read the relevant Seventh Circuit precedent to recognize a co-conspirator exception to the general rule prohibiting indirect purchaser claims[,]" and this exception "*does not further require that the intermediary also be formally named as a defendant.*" *Id.* at *13 (emphasis added).

Moreover, the rationale suggested by Deere for such a rule, has no application under the facts pled here. Deere relies on inapposite dicta in *Marion I* and *Paper Systems*. Br. at 19 (citing *Marion I*, 952 F.3d at 841; *Paper Sys.*, 281 F.3d at 633). Deere purports to find the reason for a name-all-conspirators rule in a "concern with duplicative damages" which would be threatened "if a conspirator defects and sues its former comrade." See Br. 12-13 (citing *Marion I*, 952 F. 3d at 841). The overcharged "product" here is Repair Services, which Dealers do not buy, nor do they act as "middlemen" when providing the product. The Circuit's words in *Marion I* are fully apt here: "Nothing in the case even hints at a… [dealer] who defected and then sued and so we have no need to explore that possibility further." *Marion I*, 952 F. 3d at 841. Similarly, nothing in the

case even hints that a Dealer either could sue Deere for overpricing a product, repair services, which it does not buy; nor has defected, or is likely to defect, from the alleged agreement to withhold repair tools from farmers and independents. Deere's argument is based on unsupported and counterfactual conjecture.

### 5. Plaintiffs Adequately Plead a Vertical Conspiracy Under Section 1.

Through pleading numerous facts regarding the alleged conspiracy between Deere and the Dealerships, including the explicit contractual agreement between Deere and the Dealerships, Plaintiffs state sufficient facts to allege a plausible vertical conspiracy under a rule of reason analysis. The Complaint alleges that Deere and the Dealerships engaged in a conspiracy to restrict access to Repair Tools and to shrink the market of Dealerships with the effect of artificially inflating prices for Repair Services. This is an agreement that imposes a vertical restraint on trade. *See Miles Distributors*, *Inc. v. Specialty Const. Brands*, *Inc.*, 476 F.3d 442, 448 (7th Cir. 2007) ("Trade restraining agreements between firms at different levels of distribution, e.g., a wholesale supplier and a retail distributor, are deemed vertical restraints.") (citing *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988), holding modified by *Leegin*, 551 U.S. 877 (2007)).

As an initial point, Plaintiffs allege there is an express agreement between Deere and the Dealerships to withhold access to Repair Tools. *See* CAC ¶ 10 (excerpting Dealership agreement section prohibiting disclosure of repair information to competitors of Deere or a Deere Dealer); *see also* CAC ¶¶ 7-8 (discussing Dealership agreements). Agreements used as the means to maintain and achieve the end result of the conspiracy by controlling output "may be considered with the pleadings as a whole in determining the existence of a plausible conspiracy." *City of Rockford v. Mallinckrodt ARD*, *Inc.*, 360 F.Supp.3d 730, 749 (N.D. Ill. 2019) (citing *In re Flash*

23

*Memory Antitrust Litig.*, 643 F.Supp.2d 1133, 1147 (N.D. Cal. 2009) (quoting *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 534 (1973)).

Plaintiffs also sufficiently allege that the conspiracy was an "unreasonable restraint of trade" with an anticompetitive effect on the Deere Repair Services market. *See City of Rockford*, 360 F.Supp.3d at 753. Plaintiffs plead that the agreements had significant anti-competitive effects (CAC ¶ 199), that there were not legitimate pro-competitive reasons for the restraints ((CAC ¶¶ 168-85) and that "there is and was, no legitimate, non-pretextual, pro-competitive business justification for Deere's conduct which outweighs its harmful effect" (CAC ¶ 261). The elimination of competition without procompetitive justifications is the type of conduct that the antitrust laws were designed to guard against. *See DMS III*, 313 F.Supp.3d at 950 (citing *Havoco of Am., Ltd.*, 626 F.2d at 556 (citation omitted)). The allegations in their totality allege a vertical restraint of trade which is unreasonable under either the quick look or full-blown rule of reason analysis. *See Agnew*, 683 F.3d at 337; *Leegin*, 551 U.S. at 885.

Deere's attempt to characterize its conduct as exclusive dealing entitled to a presumption of legality fails. Plaintiffs' allegations "paint a picture of an anticompetitive market that is no accident" where Deere has "reduc[ed] market output below what would have prevailed without its anticompetitive conduct." *Hytera Commc'ns Corp. v. Motorola Sol., Inc.*, No. 19-CV-176, 2022 WL 3645908, at *15 (N.D. Ill. Aug. 24, 2022) ("*Hytera*") (internal citation omitted) (citing *DMS III*, 313 F.Supp.3d at 958). In any event, the question of whether the alleged exclusive dealing arrangements foreclosed a substantial share of the line of commerce is a merits question not proper for the pleading stage. *Id*.

Plaintiffs allege numerous facts demonstrating that Deere's repair restrictions have damaged competition in the Repair Services market by restricting output, increasing prices, and

reducing efficiency, *inter alia*, forcing farmers to travel to more remotely located Dealerships, face longer wait times for less convenient and inferior repairs, and accept higher costs. CAC ¶¶ 115-21.

Deere's policies plainly do not encourage competition within the Repair Services market. *See Kodak*, 504 U.S. at 479, n.28 (expressing doubt over the alleged procompetitive rationale of similar repair restrictions and noting that two major consumers of service and parts contended they were worse off when the equipment manufacturer restricted the market for service and parts). The only results of Deere's conspiracy are anticompetitive: farmers must purchase Repair Services through Deere Dealerships, and Deere will only provide the necessary comprehensive Repair Tools to its authorized Dealerships. The essentially anticompetitive nature of such restrictions is reinforced by a statement in a recent SEC filing from a dealer from Deere's next-largest competitor, Case New Holland. *See* CAC ¶ 164. This dealer noted that being forced to make comprehensive, dealer-level tools and information available "could adversely affect the sales and profitability of our parts and service business" because they "would become subject to additional competition from independent repair shops and/or other equipment dealers' repair shops, who would have greater access to manufacturer-furnished diagnostic tools as necessary to perform repair and maintenance services." CAC ¶¶ 164-65.

Even if the Court considered Deere's proffered rationales for why the repair restrictions were counterintuitively procompetitive,[24] weighing competing inferences regarding

---

[24] One particularly strange assertion from Deere is that the repair restrictions were so successful at eliminating competitors from the existing Deere Repair Services Market, that it therefore has actually created a *new* "authorized dealer" Repair Services aftermarket—which is itself pro-competitive. Br. at 28. Under this logic, successful monopolists should be congratulated for creating "new" markets defined in relation to the effectively excluded competition. It is sufficient to state that the factual and doctrinal merits of Deere's novel view of pro-competitive benefits is not appropriately addressed at this stage of the litigation.

competitiveness is "not the inquiry at this stage." *DMS III*, 313 F.Supp.3d, at 952. "Under *Twombly*, the [c]ourt abdicates probability weighing, assumes that all the well-pleaded 'allegations in the complaint are true (even if doubtful in fact),'" *Id.* (citing *Twombly*, 550 U.S. at 556); *see also Hytera*, 2022 WL 3645908, at *1. Plaintiffs therefore adequately plead a vertical restraint on trade under Section 1 as a result of the conspiracy between Deere and the Dealerships.

### 6. Deere's Participation in the Conspiracy is Economically Rational.

Finally, Deere, departing again from the standards which govern this motion on the pleadings, raises an issue with what it describes as a "largely silent" explanation of the economic "sense" of the alleged conspiracy to Deere. Br. at 13. It would be sufficient to dismiss this argument as a merits argument based on differing contentions about reasonable incentives, procedurally several steps ahead of the game. But in fact, the economic story of this conspiracy is fully alleged, and is an old one. The restraints were designed to achieve, and did achieve, monopoly profits for Deere and its Dealers. The Complaint alleges throughout that Deere makes common cause with its dealers in keeping Repair Tools out of the hands of farmers and independent repair providers as a means of preserving that lucrative repair revenue to its Dealers and which, in the form of parts and repair financing (at the very least) inures directly to Deere's economic benefit. *See*, *e.g.*, CAC ¶ 24, n.8. The Complaint also cites coverage of Deere's investor communications from 2020, in which Deere stated, "it was betting on its parts and maintenance services business to contribute 50 basis points in added profits over the next two years." CAC ¶ 188. In the same article, Reuters reported that Deere's parts and maintenance services business "currently accounts for a fifth of the company's sales." *Id*. Deere's restrictive policy and agreement with its Dealers also benefits Deere financially by limiting customers' access to information on failure rates of Deere Tractors. The Complaint alleges that the restriction on Repair Tools has the effect of concealing known latent

product problems until they manifest—hopefully outside the warranty period—when Deere will no longer be responsible for covering the cost, and which, if known, might have been anticipated and avoided by the farmer within the warranty period. CAC ¶ 24.

### B.     Plaintiffs Allege a Plausible Tying Claim Under Section 1.

 "A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" *Kodak*, 504 U.S. at 461–62 (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958)). "Such an arrangement [also] violates § 1 of the Sherman Act if the seller has appreciable economic power in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market." *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 832 (7th Cir. 2014) (quoting *Kodak*, 504 U.S. at 462). The Supreme Court has emphasized that the "essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984); *see also DMS III*, 313 F.Supp.3d at 960. Deere does not specifically attack Plaintiffs' tying claim on any grounds except for the relevant market definition. Br. at 23. Plaintiffs allege all elements of a tying claim, including (1) Deere Tractors and Repair Services are distinct and separate products (CAC ¶ 224); (2) Plaintiffs were coerced through their purchase of Tractors into purchasing Repair Services as a separate tied product from Deere and the Dealers (CAC ¶ 225); (3) that Deere has appreciable economic power[25] in the tying market for Tractors (CAC ¶ 227); and (4) that this arrangement affected a substantial amount of interstate commerce (CAC ¶ 228).

---

[25] *See* § III, *infra* (discussing relevant market and Deere's economic power in the tying market).

### C.    Plaintiffs Allege Plausible Monopolization Claims Under Section 2.

Plaintiffs state plausible monopolization claims in appropriately stated relevant markets. To plead a claim for monopolization under Section 2, a plaintiff must allege (1) that the defendant "possessed monopoly power" in an antitrust market, and (2) that the defendant "willfully acquired or maintained that power by means other than the quality of its product, its business acumen, or historical accident." *DMS III*, 313 F. Supp. 3d, at 961 (citing *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011)); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 43 (2013).

**Monopolization, Attempted Monopolization, Conspiracy to Monopolize.** Plaintiffs allege Deere has monopoly power in the Repair Services market. CAC ¶ 235. Deere argues, without reference to any authority, that it could not exercise monopoly power in a market in which it was not the entity selling a service. This is incorrect. Monopoly power is not defined in relation to whether a party is the seller in a market, but whether the party has "the power to control prices or exclude competition." *United States v. Grinnell Corp.*, 384 U.S. 563, 571; *Epic Games, Inc. v. Apple Inc.*, 559 F.Supp.3d 898, 1028 (N.D. Cal. 2021) ("*Epic*"). Plaintiffs clearly allege facts supporting a finding that Deere has the power to exclude competition in the Repair Market—this is in fact one of the fundamental assertions of the Complaint.

Deere's argument that its conduct was not anticompetitive similarly fails. Br. at 34. Plaintiffs allege facts sufficient to suggest that Deere has maintained its monopoly power through exclusionary conduct not entitled to a presumption of lawfulness at the pleadings stage. *See Hytera*, 2022 WL 3645908, at *14 (finding plaintiffs stated a plausible Section 2 claim defendant was alleged to have maintained monopoly power by entering into an exclusive dealing

arrangement that foreclosed competition where exclusive dealing arrangements were critical to competing in the industry at all).

**Monopoly Leveraging.** Deere does not make any specific challenge to Plaintiffs' monopoly leveraging claim, nor does it engage in any analysis of the claim. Instead, Deere states that the Seventh Circuit may not recognize the viability of *any* monopoly leveraging claim. Br. at 28. Neither of the two cases cited by Deere supports this categorical condemnation. *See Schor v. Abbott Lab'ys*, 457 F.3d 608, 610 (7th Cir. 2006) (in the particular context of that case, which did not involve claims for "any of the normal exclusionary practices" such as a group boycott or tie, monopoly leveraging was an unhelpful theory); *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 n.4 (2004) (suggesting in a footnote that the district court failed to correctly apply a standard for analyzing monopoly leveraging claims). Moreover, even if only rarely encountered, courts in this district have recognized monopoly leveraging claims. *See*, *e.g.*, *Return on Inv. Sys. v. Translogic Corp.*, 702 F. Supp. 677, 680 (N.D. Ill. 1988) (recognizing unlawful attempt to monopolize by leveraging).

## III. Plaintiffs Plead the Relevant Market for Each of Their Claims.

As discussed in further detail in the sections below, Plaintiffs plausibly allege the relevant market for each of their claims: the Deere Repair Services Market, *i.e.*, the repair aftermarket in which Plaintiffs allege that Deere's conduct foreclosed competition. *See* CAC ¶¶ 58-63. In the context of Plaintiffs' monopoly leveraging claim, Plaintiffs identify another relevant market, the Deere Repair Tools market, over which Deere exercises monopoly power. CAC ¶¶ 64-65; 240-45.

Courts define the "relevant market" for a claim to be "the area of effective competition," typically "the arena within which significant substitution in consumption or production occurs." *Ohio v. Am. Express Co.*, 138 S.Ct. 2274, 2285 (2018). Courts should "combin[e]" different

products or services into "a single market" when "that combination reflects commercial realities." *Id.* (citing *Grinnell Corp.*, 384 U.S. at 572). Furthermore, there is "no dispute that a relevant market can be limited to a single brand," provided no substitute exists for that brand's products or services. *Int'l Equip. Trading*, *Ltd. v. AB SCIEX LLC*, No. 13 C 1129, 2013 WL 4599903, at *1 (N.D. Ill. Aug. 29, 2013); *See Kodak*, 504. U.S. at 482 ("Because service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines.").[26]

The upstream market for Tractors (which includes some level of competition from other brands of agricultural equipment) is referred to as the "primary" market in relation to the single-brand "aftermarket" for the repairs of Deere agricultural equipment. In the context of Plaintiffs' tying claim, the Tractor Market is also referred to as the "tying" product market and the Deere Repair Services market is referred to as the "tied" market.

### A. The Deere Repair Services Market is a Relevant Single-Brand Aftermarket.

For all of Plaintiffs' claims, the Deere Repair Services Market is the properly defined relevant market. Single-brand aftermarkets are undoubtedly encountered less frequently under the antitrust laws than typical "primary" markets, but there is "no dispute that a relevant market can be limited to a single brand," under certain market realities. *Int'l Equip. Trading*, 2013 WL 4599903 at *4. Courts within the Seventh Circuit have examined and affirmed the viability of

---

[26] Deere does not challenge the viability of Plaintiffs' single-brand market on the question of interchangeability, only reserving this challenge for the Tractor market. *See* Br. at 23. Plaintiffs adequately plead this element of the relevant single-brand aftermarkets. *See* CAC ¶ 60 (there are no substitutes for Deere Repair Services, nor are they interchangeable with any other manufacturers' service); CAC ¶ 65 (there are no available substitutes for Deere Repair Tools, and they are not interchangeable with other manufacturers' products.).

single-brand aftermarkets, their analysis guided by the understanding that the Sherman Act "is aimed at substance rather than form." *DMS III*, 313 F.Supp.3d at 960 (citing *Copperweld*, 467 U.S. at 760). As noted in the seminal Supreme Court case addressing single-brand aftermarkets, *Kodak*, 504 U.S. at 466–67, "formalistic distinctions rather than actual market realities are generally disfavored in antitrust law" and [the Supreme Court] has preferred to resolve antitrust claims on a case-by-case basis, focusing on the particular facts disclosed by the record." *See also Loestrin*, 814 F.3d at 550 (antitrust law "consistently prioritize[s] substance over form")).

The Supreme Court's opinion in *Kodak* is regarded as the "principal authority" discussing single-brand aftermarkets. *See DMS III*, 313 F.Supp.3d at 961 (citing *Kodak*, 504 U.S. at 459). There, the Court specified the analytical framework and rationale for determining whether a given single-brand aftermarket is a viable relevant market. *Id*. The underlying facts and claims at issue in *Kodak* are remarkably similar to the present litigation:

> After doing well selling equipment, Kodak moved to control the repairs of its equipment. It specifically implemented a new policy of selling replacement parts only to owners that used Kodak's services or repair their own machines. As part of the same policy, manufacturers agreed not to sell replacement parts to anyone but Kodak, and Kodak "pressured" owners and distributors not to sell replacement parts to independent service providers.

*DMS III*, 313 F.Supp.3d, at 961 (citing *Kodak*, 504 U.S. at 459).

### 1. Plaintiffs Allege That Deere Repair Tools and Services Are Not Interchangeable with Other Manufacturers' Tools and Services.

The Supreme Court found that respondents had pled a relevant single-brand aftermarket, reasoning that "[b]ecause service and parts for Kodak equipment [were] not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines." *Id*. at 482 (citations omitted). Like in *Kodak*, Plaintiffs allege that Deere Repair Tools and Deere Repair

Services are not interchangeable with other manufacturers' tools and service. *See* CAC ¶¶ 60, 65. Deere does not challenge this aspect of Plaintiffs' definition of the Deere Repair Services Market or Plaintiffs' definition of the Deere Repair Tools market.

      2.     **Plaintiffs Sufficiently Plead That They Are "Locked In" to the Deere Repair Services Market.**

*Kodak* held that a brand-specific aftermarket can constitute a relevant market for antitrust purposes when consumers effectively are "locked-in" to that brand's market because of structural barriers and/or commercial realities (*e.g.*, high transaction costs for switching brands). *DMS II*, 360 F.Supp.3d at 804 (citing *Kodak*, 504 U.S. at 461-62). First, as *Kodak* explicitly recognized, "complex, durable goods" have "significant information and switching costs" that "could create a less responsive connection between service and parts prices and equipment sales." *Kodak*, 504 U.S. at 473. Additionally, a company failing to be "forthcoming about their pricing structure and service policies" can also provide a basis for "lock in" in the aftermarket. *Metzler v. Bear Auto. Serv. Equip. Co.*, 10 F.Supp.2d. 1345, 1358 (S.D. Fla. 1998) (noting that coercive practices which conceal the true cost of parts and repairs would be an exception to the general rule that the relevant market is the primary equipment market). For example, in *DMS III*, the complaint made "detailed allegations" showing that one of the Defendants "publicly and loudly took the position that it permitted third-party integrator access" and therefore it was "inferable that dealers did not in fact 'knowingly and voluntarily' agree to third-party blocking when they purchased DMSs." *DMS III*, 313 F.Supp.3d at 963. Also, because the defendant's contracts prohibited vendors from informing plaintiffs how much the integration services cost, the court found that it was reasonable to infer that the plaintiffs could not price shop for "lifecycle." *Id.*

      Here, Plaintiffs point to numerous market realities sufficient to create an inference of "lock-in." Tractors are durable, expensive goods with a long useful life and high information and

switching costs. *See*, *e.g.*, CAC ¶ 99 (farmers invest hundreds of thousands of dollars in Tractors and switching costs for durable agricultural equipment are high); CAC ¶ 100 (farmers' use of Deere's integrated data services creates switching costs). Moreover, Deere and the Dealerships have made, and continue to make, misleading statements about the *actual* availability of Repair Tools. The Complaint alleges that Deere's inconsistent positions and equivocation "regarding what Repair Tools are necessary to make and complete repairs on Tractors . . . render[s] it impossible for farmers to even approximate the lifecycle cost of repairs on Deere Tractors." CAC ¶ 141; *see also* CAC ¶¶ 142-43 (detailing the history of Deere's confusing and conflicting statements regarding its repair policies); CAC ¶¶ 144-54 (outlining several more examples of Deere and Dealerships' contradictory statements about repairs).

Deere argues that Plaintiffs should have known about limitations to repairability of Tractors but fails to account for statements from Deere representatives and Dealer organizations that infer or explicitly state the opposite. For example, the North American Dealers Association instructed Dealerships to hang flyers claiming that through the Dealers, "everything a customer needs to diagnose and repair their equipment is already available." CAC ¶ 88.

As *Kodak* explained, competition in the primary market cannot control for the prices in the service market. *Kodak*, 504 U.S. at 473. *Kodak* notes the particular difficulty of lifecycle pricing for complex, durable equipment, because:

> in order to arrive at an accurate price, a consumer must acquire a substantial amount of raw data and undertake sophisticated analysis. The necessary information would include data on price, quality, and availability of products needed to operate, upgrade, or enhance the initial equipment, as well as service and repair costs, including estimates of breakdown frequency, nature of repairs, price of service and parts, length of "downtime," and losses incurred from downtime.

*Id*. Farmers do not have this information. Even worse, Deere's misleading and shifting statements regarding its repair policies and the true availability and necessity of Repair Tools makes lifecycle

pricing for modern Tractors—equipment far more complex and expensive than Kodak equipment in the 1990s—impossible.

An aftermarket policy change is not the *sine qua non* of a *Kodak* claim. *DMS III*, 313 F. Supp.3d at 964 (citing *Harrison Aire*, *Inc*. *v*. *Aerostar Int'l*, *Inc*., 423 F.3d 374, 384 (3d Cir. 2005). Nevertheless, Plaintiffs allege that Deere *has* instituted a policy change, albeit one that is not accurately or consistently communicated to Plaintiffs. *See* CAC ¶ 71 ("Farmers historically have been able to perform their own repairs on their Tractors or have them repaired by their independent mechanic of choice."). Even for a farmer who may be generally aware that there could be *some* restrictions, it would be impossible for anyone to learn the extent of its repair restrictions and the impact on the lifecycle pricing of a Tractor purchase by relying on Deere's misleading, inconsistent, and frankly incoherent statements on the subject. As the Complaint also alleges, Deere's competitors likewise limit equipment repairability, leaving a farmer with nowhere to turn even if they somehow were able to factor lifecycle pricing into their purchase decision. *See* CAC ¶¶ 164-65.

The underlying question is whether there are market realities that prevent competition in the foremarket from disciplining anticompetitive conduct in the aftermarket. *Kodak*, 504 U.S. at 486. That question cannot be answered by looking at explicit policy changes alone. Deere's own authority recognizes other types of market imperfections that can cause lock-in, as outlined above. *Compare* Br. at 23 (citing *Epic*, 559 F.Supp.3d at 1022); *with Epic*, 559 F.Supp.3d at 1023-24 (explicitly stating that even absent a policy change, market imperfections such as high information costs or whether the policy itself was sufficiently disclosed, can create lock-in and citing numerous cases undermining Deere's contention that a policy change is the only way to prove lock-in). While true that numerous courts have declined to find viable single-brand markets, two relevant lessons

may be drawn from those authorities: (1) the issue is highly fact sensitive, and (2) courts recognize the economic validity of the *Kodak* analysis and apply it in an appropriate case. For example, in *PSI Repair Servs. Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820-21 (6th Cir. 1997), the court was clear: if the defendant "took advantage of its customers' imperfect information in order to reap supracompetitive profits in the aftermarkets for its equipment, we would not hesitate to allow a *Kodak*-type theory to be submitted to the jury." *Id*.

Deere's attempt to narrow the class definition period in relation to the "Statement of Principles" should also be disregarded. Br. at 21. Deere identifies no fundamental flaw that would justify micromanaging the class definition on a pleadings motion. Moreover, Plaintiffs' allegations illustrate that the change in Deere's policy over time was not properly defined or clarified by Deere's Statement of Principles. Rather, Deere's pattern of misrepresentation, inconsistency, and active concealment of its repair practices occurred over a longer period of time, most likely predating 2018.[27] Invariably, this time period also encompasses Plaintiffs' and Class members' initial purchase dates for Deere equipment. *Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 737 (6th Cir. 2008).

Plaintiffs adequately plead relevant market conditions under the reasoning of *Kodak*.

**Plaintiffs Adequately Define the "Primary" Tractor Market.**

The Complaint's definition of the Tractor Market is also sufficient at the pleadings stage. Plaintiffs do not contend that Deere's anticompetitive conduct directly impacted or reduced competition for Tractors, and accordingly, the Tractor Market is not the "relevant market" to

---

[27] In fact, Deere admits that it was only in 2017 that it made Customer Service ADVISOR available in some form. Def. Deere's Answer & Affirmative Defenses to Pls.' Consolidated Class Action Compl. ¶ 138 (ECF No. 103). Deere cannot rely on an old tool that it represented it had made available years earlier to back up its subsequent claims about working to improve repairability. Br. at 20.

examine for competitive harm. However, the Tractor Market is the "primary" equipment market for Tractors, making it a relevant piece of the analysis in Plaintiffs' tying claim and in the assessment of the viability of the derivative single-brand aftermarket for Deere Repair Services.

The Tractor Market is defined in the Complaint as the product market for agricultural equipment in the United States.[28] The fact that there may be additional sub-markets within this market does not mean market definition is deficient. Within a broadly defined market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) ("*Brown Shoe*"). In any case, Plaintiffs' characterization aligns with market realities. For example, Plaintiffs' definition of the Tractor Market and their specific allegations regarding sub-markets mirrors how agricultural industry publications characterize and report on the equipment manufacturers. *See* CAC ¶ 68 (citing and linking to industry publication noting Deere's status as "the world's largest producer and seller of farm and industrial tractors and equipment" and describing Deere's share of the North American market for large farm tractors as 53%, and Deere's "even more commanding [60% share] in the combine segment."). This market definition also reflects how Deere itself categorizes agricultural equipment together for purposes of assembling repair resources. *See* CAC ¶¶ 67-68 (citing link to Deere's page for Customer Service ADVISOR, which if followed to the purchase page for the "Agriculture and Turf Equipment" segment, lists the specific types of agricultural equipment manuals bundled together in the yearly subscription).[29]

---

[28] More specifically, the Complaint describes the Tractor Market is comprised of the submarkets for tractors, application equipment, tillage, planters, air seeders, self-propelled forage harvesters, balers, windrowers, combines, cotton harvesters and pickers, sprayers, and sugar cane harvesters.
[29] The originally cited link is no longer active, but the same information is available at the following link: https://shop.deere.com/jdb2cstorefront/JohnDeereStore/en/product/John-Deere-Customer-Service-ADVISOR%E2%84%A2-Agriculture-%26-Turf-Equipment-Web-and-

Even under the heightened scrutiny of the summary judgment stage of litigation, Plaintiffs' defined market would be sufficient. In *Republic Tobacco Co. v. North Atlantic Trading Co., Inc.*, the Seventh Circuit cited several cases relied on by Deere in their briefing, summarizing that "these cases stand for the proposition that if a plaintiff can show the rough contours of a relevant market, and show that the defendant commands a substantial share of the market, then direct evidence of anticompetitive effects can establish the defendant's market power—in lieu of the usual showing of a precisely defined relevant market and a monopoly market share." *Republic Tobacco Co. v. North Atl. Trading Co., Inc.*, 381 F.3d 717, 738 (7th Cir. 2004). Thus, Plaintiffs have defined a cognizable Tractor Market, even when examined under a stricter evidentiary standard.

Deere cites inapposite authority in support of its argument that the Tractor market has not been sufficiently defined. None of the cases cited by Deere discusses the adequacy of a primary market's definition in the context of an antitrust claim alleging competitive harm in a relevant single-brand aftermarket. Br. at 16-17.

### 3. Plaintiffs Allege That Deere Has Appreciable Economic Power in the Tractor Market.

Plaintiffs' allegations of Deere's well-established dominant share of the Tractor Market (the "tying market" for Plaintiffs' tying claim) demonstrates that Deere has the requisite "appreciable economic power" in the primary Tractor market, one of the necessary elements in a Section 1 tying claim. *See Kodak*, 504 U.S. at 464 (holding that the existence of appreciable economic power for tying claims can be inferred from the possession of a predominant share of the tying market); CAC ¶ 7 (alleging Deere has a larger market share than its next two largest competitors combined).

---

Downloaded-Applications-One-year-license-and-data-(Year-1)/p/SPRSA20212AG (last visited on January 23, 2023)

Plaintiffs' allegations of Deere's dominance in the Tractor market are made with specificity and are grounded in market realities and industry publications. Deere's assertion that it is unable to decipher any meaning from Plaintiffs' explicit statement, citing an industry publication, that "Deere . . . controls approximately 55% and 63% of the large tractor and combine markets, respectively" strains credulity. Br. at 33; CAC ¶ 68; *see also* CAC ¶ 67 (citing an industry publication reporting on competing equipment manufacturers' relative shares of the equipment market). Even if Plaintiffs could not allege that Deere had a dominant share in every potential sub-market encompassed within the broader Tractor Market, this would not be fatal to any of Plaintiffs' claims. Courts have held there are other ways to infer the existence of appreciable market power in the tying market that do not require alleging that a defendant possesses monopoly or market power in that market.

Deere's arguments presume that Deere's market power in the primary Tractor Market is an essential element of all Plaintiffs' claims. But this exact presumption is squarely addressed and rejected by the Supreme Court in the most apposite authority that goes uncited in Deere's brief, *Kodak*. *Kodak* frames the central question as whether "a defendant's lack of market power in the primary equipment market precludes—as a matter of law—the possibility of market power in derivative aftermarkets." *Kodak*, 504 U.S. at 454. The Supreme Court rejected this requirement, which would have created the type of "[l]egal presumption[] that rest[s] on formalistic distinctions rather than actual market realities." *Id*. at 466-67. "[T]here is no immutable physical law—no "basic economic reality"—insisting that competition in the equipment market cannot coexist with market power in the aftermarkets." *Id*. at 471.

The requisite element of alleging defendant's "appreciable economic power" for a tying claim is conceptually distinct from market or monopoly power. *See Fortner Enterprises*, *Inc. v.*

*U.S. Steel Corp.*, 394 U.S. 495, 502 (1969) ("The standard of 'sufficient economic power' does not . . . require that the defendant have a monopoly or even a dominant position throughout the market for the tying product. Our tie-in cases have made unmistakably clear that the economic power over the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only with respect to some of the buyers in the market."); *United States v. Loew's*, *Inc.*, 371 U.S. 38, 102 (1962), *abrogated in part by Illinois Tool Works Inc. v. Indep. Ink*, *Inc.*, 547 U.S. 28 (2006) ("Market dominance—some power to control price and to exclude competition—is by no means the only test of whether the seller has the requisite economic power. Even absent a showing of market dominance, the crucial economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes.").

Accordingly, in the present case, sufficient or appreciable economic power in the primary tying market is demonstrated through either (1) allegations of Deere's dominant share of the Tractor Market, or (2) Plaintiffs' factual allegations that directly allege that Deere has the power to restrict competition in the aftermarket and "force unwanted purchases of the tied market, service." *Id*. The Supreme Court in *Kodak* held that, even absent a dominant share of the primary equipment market, "[i]t is clearly reasonable to infer that Kodak has market power to raise prices and drive out competition in the aftermarkets, since respondents offer direct evidence that Kodak did so." *Id*. at 477-78. The Court should likewise reject Deere's identical argument here.

### B.     Determination of the Relevant Antitrust Market is an Intensely Factual Inquiry Not Appropriate for Resolution at This Stage of Litigation.

As discussed above, whether Plaintiffs have alleged a relevant market for antitrust purposes is an intensely factual inquiry. At the pleadings stage, an antitrust plaintiff's "relevant market" definition cannot be the basis for dismissal under a Rule 12 motion unless the definition is facially unsustainable. *See Dang v. San Francisco Forty Niners*, 964 F.Supp.2d 1097, 1104 (N.D. Cal.

2013). The proper market definition in this case "can be determined only after a factual inquiry into the 'commercial realities' faced by consumers." *Kodak*, 504 U.S. at 482.

While each of these markets is adequately defined for this stage of litigation, the Court should defer the factual inquiry into appropriate market definition until after the completion of discovery. *Avnet, Inc. v. Motio, Inc.*, No. 12 C 2100, 2015 WL 5307515, at *4 (N.D. Ill. Sept. 9, 2015) (citing *Kodak*, 504 U.S. at 451, 482).

### CONCLUSION

For the reasons above, Plaintiffs respectfully request that the Court deny Deere's Motion in its entirety. To the extent the Court finds any merit to the arguments made by Deere, Plaintiffs respectfully request leave to amend the Complaint.

Dated: January 27, 2023

/s/ Daniel C. Hedlund
Daniel E. Gustafson
Daniel C. Hedlund
Michelle J. Looby
Kaitlyn L. Dennis
**GUSTAFSON GLUEK PLLC**
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
kdennis@gustafsongluek.com

Dennis J. Stewart
**GUSTAFSON GLUEK PLLC**
600 W. Broadway, Suite 3300
San Diego, CA 92101
dstewart@gustafsongluek.com

/s/ Kenneth A. Wexler
Kenneth A. Wexler
Justin N. Boley
Tyler J. Story
Margaret L. Shadid
**WEXLER BOLEY & ELGERSMA LLP**
311 S. Wacker Dr., Suite 5450

40

Chicago, IL 60606
Telephone: (312) 346-2222
kaw@wbe-llp.com
jnb@wbe-llp.com
tjs@wbe-llp.com
ms@wbe-llp.com

*/s/ Adam J. Zapala*
Adam J. Zapala
Elizabeth T. Castillo
James G. Dallal
Gayatri S. Raghunandan
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com
abarnett@cpmlegal.com
jdallal@cpmlegal.com
graghunandan@cpmlegal.com

Alexander E. Barnett
**COTCHETT, PITRE & McCARTHY, LLP**
40 Worth Street
New York, NY 10013
Telephone: (212) 201-6820
Facsimile: (917) 398-7753

*Interim Co-Lead Counsel for Plaintiffs*

Robert M. Foote (3124325)
Kathleen C. Chavez (6255735)
Elizabeth C. Chavez (6323726)
Bret K. Pufahl (6325814)
**FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC**
10 W. State Steet, Suite 200
Geneva, IL 60134
rmf@fmcolaw.com
kcc@fmcolaw.com
ecc@fmcolaw.com
bkp@fmcolaw.com

*Interim Liaison Counsel for Plaintiffs*

41

Marc C. Gravino (6188531)
**WILLIAMS MCCARTHY LLP**
P.O. Box 219
Rockford, IL 61105
(815) 987-8936
mgravino@wilmac.com

*Interim Local Facilitating Counsel for Plaintiffs*