UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

|  |  |  |
|---|---|---|
| In re: Deere & Company Repair Services Antitrust Litigation | ) ) ) ) ) ) ) ) ) ) | No. 3:22-cv-50188 MDL No. 3030 Hon. Iain D. Johnston |

**STATEMENT OF INTEREST OF THE UNITED STATES**

JONATHAN S. KANTER
  *Assistant Attorney General*

DOHA G. MEKKI
  *Principal Deputy Assistant Attorney General*

MAGGIE GOODLANDER
  *Deputy Assistant Attorney General*

DAVID B. LAWRENCE
  *Policy Director*

DANIEL E. HAAR
NICKOLAI G. LEVIN
MATTHEW CHOU
ANDREW L. KLINE
MATTHEW C. MANDELBERG
  *Attorneys*

U.S. Department of Justice, Antitrust Division
San Francisco Office
450 Golden Gate Avenue
Room 10-0101, Box 36045
Telephone: (415) 218-9633
Email: matthew.chou@usdoj.gov
  *Attorneys for the United States of America*

TABLE OF CONTENTS

Interest of the United States ................................................................................. 1

Background ........................................................................................................... 2

    A.    Background on the Right to Repair ........................................................ 2

    B.    Allegations in This Case ...................................................................... 5

    C.    Procedural Posture and Deere's Pending Rule 12(c) Motion .................... 7

Discussion ............................................................................................................ 8

    I.    SUPREME COURT PRECEDENT DOES NOT SUPPORT DEERE'S PROPOSED PRESUMPTION .. 9

    A.    *Kodak* Should Guide the Court's Analysis in This Case ........................ 9

    B.    Deere's Proposed Presumption Contravenes *Kodak* ............................ 10

    II.    CIRCUIT COURT PRECEDENT DOES NOT SUPPORT DEERE'S PROPOSED PRESUMPTION .. 14

    A.    Seventh Circuit Precedent Does Not Support Deere's Proposed Presumption .......... 14

    B.    Deere Ignores Circuit Court Precedents Correctly Applying *Kodak* .......................... 17

    C.    Deere's Other Out-of-Circuit Citations are Inapposite and Unpersuasive ................. 19

Conclusion ......................................................................................................... 23

TABLE OF AUTHORITIES

**Cases**

*Avana Inc., RP v. Telecom Labs, Inc.*,
  838 F.3d 354 (3d Cir. 2016) ................................................................................... 17

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ............................................................................................... 9

*Datagate, Inc. v. Hewlett Packard Co.*,
  60 F.3d 1421 (9th Cir. 1995) ................................................................................ 18

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ........................................................................................ *passim*

*Digital Equipment Corporation v. Uniq Digital Technologies, Inc.*,
  73 F.3d 756 (7th Cir. 1996) ................................................................... 14, 15, 16

*FTC v. Indiana Fed'n of Dentists*,
  476 U.S. 447 (1986) ............................................................................................. 10

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
  423 F.3d 374, 384 (3d Cir. 2005) .......................................................... 17, 19, 20

*Image Tech. Servs., Inc. v. Eastman Kodak Co.* (*Kodak I*),
  903 F.2d 612 (9th Cir. 1990) ........................................................................ 17, 18

*Image Tech. Servs., Inc. v. Eastman Kodak Co.* (*Kodak II*),
  125 F.3d 1195 (9th Cir. 1997) ...................................................................... 17, 18

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  313 F. Supp. 3d 931 (N.D. Ill. 2018) ..................................................... 16, 20, 21

*Lee v. Life Insurance Co. of North America*,
  23 F.3d 14 (1st Cir. 1994) .................................................................................... 20

*Maple Flooring Manufacturers Assn. v. United States*,
  268 U.S. 563 (1925) ............................................................................................. 11

*Matrix IV, Inc. v. Am. Nat. Bank & Tr. Co. of Chicago*,
  649 F.3d 539 (7th Cir. 2011) ................................................................................. 1

*Nat'l Collegiate Athletic Ass'n v. Alston*,
    141 S. Ct. 2141 (2021) ............................................................................... 12

*United States v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) .................................................................................... 9

*Newcal Industries, Inc. v. Ikon Office Solution*,
    513 F.3d 1038 (9th Cir. 2008) ................................................................... 19

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) ......................................................................... 12, 23

*PSI Repair Services, Inc. v. Honeywell, Inc.*,
    104 F.3d 811 (6th Cir. 1997) ..................................................................... 22

*Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*,
    63 F. Supp. 2d 1218 (E.D. Cal. 1999) ................................................. 17, 18

*Schor v. Abbott Laboratory*,
    457 F.3d 608 (7th Cir. 2006) ............................................................... 14, 16

*SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*,
    188 F.3d 11 (1st Cir. 1999) ................................................................. 20, 21

*United Farmers Agents Association v. Farmers Insurance Exchange*,
    89 F.3d 233 (5th Cir. 1996) ....................................................................... 20

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019) ........................................................................ 19

*United States v. Krieger*,
    628 F.3d 857 (7th Cir. 2010) ..................................................................... 21

*United States v. S.-E. Underwriters Ass'n*,
    322 U.S. 533 (1944) .................................................................................... 1

**Statutes**

15 U.S.C. §§ 1–2 ............................................................................................. 1, 5

28 U.S.C. § 517 .................................................................................................. 1

**Other Authorities**

Exec. Order No. 14,036, 86 Fed. Reg. 36987 (July 9, 2021)...........................................................1

Federal Trade Commission, *Nixing the Fix: An FTC Report to Congress on Repair Restrictions*
(May 2021)....................................................................................................................2, 3

James M. MacDonald, Robert A. Hoppe, and Doris Newton, *Three Decades of Consolidation in
Agriculture*, U.S. Dept. of Agriculture (2018)..........................................................................4

Mae Anderson, *Without 'right to repair,' businesses lose time and money*
(Aug. 10, 2021)........................................................................................................................7

Neil W. Averitt & Robert H. Lande, *Using the "Consumer Choice" Approach to Antitrust Law*,
74 Antitrust L.J. 175, 185 (2007) ..........................................................................................3

Nigel Key, Jonathan Law, and Christine Whitt, *Chapter 12 Bankruptcy Rates Have Increased in
Most Agricultural States*, USDA Economic Research Service
(Nov. 30, 2021) .......................................................................................................................4

Nilay Patel, *John Deere Turned Tractors Into Computers – What's Next?*,
The Verge (August 10, 2021).................................................................................................7

Peter Waldman & Lydia Mulvany, *Who Really Owns a John Deere?*,
Bloomberg Businessweek (Mar. 9, 2020)............................................................................5, 6

U.S. Dep't of Agriculture, *Farm Production Expenditures: 2021* (July 2022) ..............................5

iv

### INTEREST OF THE UNITED STATES

The United States respectfully submits this Statement under 28 U.S.C. § 517, which permits the Attorney General to direct "any officer of the Department of Justice . . . to attend to the interests of the United States in a suit pending in a court of the United States." *Id.* This suit affects the United States' interest in promoting a correct interpretation of the federal antitrust laws. The Department of Justice's Antitrust Division enforces these laws to protect economic freedom and competition in the marketplace.

Most relevant here, the United States has a strong interest in the correct application of the Sherman Antitrust Act. Plaintiffs' putative class action arises under Sherman Act §§ 1 and 2 (15 U.S.C. §§ 1–2). Plaintiffs allege that Deere & Company's anticompetitive conduct has prevented farmers and independent repair shops from performing certain repairs on Deere-branded agricultural equipment. *See, e.g.*, Compl. ¶¶ 4, 72–87, 237, ECF No. 85.[1]

Consistent with Supreme Court precedent, the policy of the United States is "to enforce the antitrust laws to combat the excessive concentration of industry, the abuses of market power, and the harmful effects of monopoly and monopsony—especially as these issues arise in . . . agricultural markets, . . . repair markets," and elsewhere too. Exec. Order No. 14,036, § 1, 86 Fed. Reg. 36987 (July 9, 2021); *see also United States v. S.-E. Underwriters Ass'n*, 322 U.S. 533, 558 (1944) (holding that "Congress wanted to go to the utmost extent of its Constitutional power in restraining trust and monopoly agreements" with the Sherman Act). The United States thus

---

[1] The United States files this Statement of Interest in response to Deere's motion for judgment on the pleadings. To resolve this motion, the Court will "tak[e] the facts alleged in the complaint as true and draw[] all reasonable inferences in favor of the plaintiff." *E.g.*, *Matrix IV, Inc. v. Am. Nat. Bank & Tr. Co. of Chicago*, 649 F.3d 539, 547 (7th Cir. 2011). Thus, for the limited purpose of this Statement, the United States also assumes the facts in the complaint to be true.

1

submits this Statement of Interest to ensure that repair aftermarkets are analyzed under the correct legal framework to protect against anticompetitive abuses of market power in repair aftermarkets.

BACKGROUND

### A. Background on the Right to Repair

There is a growing body of economic literature and consumer effort to protect consumers' freedom to repair their own products. This recognition, which is often styled around a "right to repair," is rooted in consumers' seeming lack of options for maximizing the value of products they already own. Increasingly, product manufacturers have made products harder to fix and maintain. For example, manufacturers have (1) hindered access to internal components; (2) monopolized parts, manuals, and diagnostic tools; and (3) used software to impede repairs with substantially identical aftermarket[2] parts. *See* Federal Trade Commission, *Nixing the Fix: An FTC Report to Congress on Repair Restrictions* at 18–24 (May 2021), https://www.ftc.gov/reports/nixing-fix-ftc-report-congress-repair-restrictions (congressionally mandated report based on public comments, third-party empirical research, and FTC research). There is an important role for competition in these markets.

Repair restrictions like these can harm consumers, and the public more broadly, in at least three related ways. First, repair restrictions can drive independent repair shops out of business by raising their costs or denying them key inputs, which, in turn, leaves consumers with fewer choices. *See id.* at 42–44; *see also, e.g.*, *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 458, 465 (1992) (crediting this harm and denying summary judgment).

---

[2] The term "aftermarket" often refers to goods or services affecting a product that a consumer already owns, such as repairs of durable equipment—like tractors in this case or photocopiers in *Kodak*—while the corresponding term "foremarket" often refers to the initial acquisition of that good or equipment. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466, 497 (1992).

2

Second, manufacturers' restrictions can delay repairs. FTC, *supra*, at 39. To start, by forcing independent repair shops from the market, these restrictions can cut the number of repair shops available to consumers. Consumers (including farmers) then have fewer options for their time-sensitive repairs. *See id.* And even if a farmer finds an available independent shop, repair restrictions can stymie its work. For instance, proprietary software may prevent a tractor's central computer from recognizing a replacement part until an *authorized* technician essentially "unlocks" the tractor. *See id.* at 23, 39. Needless delay results if technicians are scarce or demand is high. And during harvest season, time is of the essence.

Third, restrictions on repair aftermarkets can raise prices and reduce quality.[3] For example, automotive collision repair parts can be twice as expensive to repair through manufacturers versus independent servicers. *See* FTC, *supra*, at 40 n.219. Medical imaging equipment is about three times as expensive. *See id.* at 40 ($150–$250 per hour vs. $500–$600 per hour). As to quality, surveys suggest that "consumers who used independent repair shops were more satisfied with the repairs than those who used factory service." *Id.* at 38 & n.206 (quoting Consumer Reports, *Should you repair or replace that product?* (Jan. 2014)) (surveying 29,281 people on home appliances, electronics, and yard equipment). About 75% of car owners use independent servicers, for instance. *Id.* at 38. Yet manufacturers can impose restrictions that prevent independent repairs.

These repair restrictions can worsen the pressures that farmers increasingly face. For the past three decades, for instance, U.S. agriculture has required growing investment in equipment—

---

[3] Price and quality are two sides of the same coin. A decrease in quality can harm consumers like an increase in price. Thus, "[e]conomists commonly say that when they use the term 'price,' it is a shorthand for the relevant price/quality and price/variety combinations." Neil W. Averitt & Robert H. Lande, *Using the "Consumer Choice" Approach to Antitrust Law*, 74 Antitrust L.J. 175, 185 (2007).

a substantial fixed cost that can be hard to defray.[4]  And since 2014, falling commodity and farmland prices have forced a historic uptick in family farmer bankruptcies nationwide.[5]

The leading Supreme Court precedent addressing aftermarkets is *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992).  In *Kodak*, the defendant manufactured and sold photocopiers and micrographic equipment, and also offered repair services and replacement parts for its equipment.  *Id.* at 456.  The plaintiffs—a number of "independent service organizations" (ISOs)—offered repair services for Kodak machines in competition with Kodak. *Id.* at 457.  To block competition from ISOs, Kodak "implemented a policy of selling replacement parts . . . only to buyers of Kodak equipment who use Kodak service or repair their own machines," which drove many ISOs out of business.  *Id.* at 458, 465.  The ISOs sued under the Sherman Act, raising theories similar to those raised by Plaintiffs here: tying under § 1 of the Sherman Act; and monopolization under § 2.  *Id.* at 479 (§ 1 tying), 485–86 (§ 2 monopolization and attempted monopolization); *accord* Compl. ¶¶ 221–32 (§ 1 tying), 233–66 (§ 2 monopolization, monopoly leveraging, attempted monopolization in the alternative, and conspiracy to monopolize).  As discussed in more detail in the Discussion below, the Supreme Court held that the ISOs were entitled to a trial because they had shown that "Kodak's control over the parts market has excluded service competition, boosted service prices, and forced unwilling consumption of Kodak service." *Id.* at 465.

---

[4] James M. MacDonald, Robert A. Hoppe, and Doris Newton, *Three Decades of Consolidation in U.S. Agriculture* at 40, U.S. Dept. of Agriculture (2018), https://www.ers.usda.gov/webdocs/publications/88507/eib-189.pdf.

[5] *See* Nigel Key, Jonathan Law, and Christine Whitt, *Chapter 12 Bankruptcy Rates Have Increased in Most Agricultural States*, USDA Economic Research Service (Nov. 30, 2021), https://www.ers.usda.gov/amber-waves/2021/november/chapter-12-bankruptcy-rates-have-increased-in-most-agricultural-states/.

4

### B.  Allegations in This Case

American farmers spend roughly $17.6 billion per year on tractors and other self-propelled farm machinery.[6]  *See* Compl. ¶ 154 ("multi-billion-dollar" repair market).  And John Deere equipment accounts for more than half of this spend, according to some estimates.[7]

In this case, Plaintiffs are a putative class of farms and farmers that own and use equipment manufactured by Deere & Company (Deere).  Compl. ¶¶ 42–50.  They allege that Deere has violated Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1–2) by preventing them from performing certain repairs on Deere-branded agricultural equipment.  *See, e.g.*, *id.* ¶¶ 4, 72–87, 237.  Plaintiffs allege that Deere's conduct has restrained trade in, and monopolized, an aftermarket for "Deere Repair Services."  *Id.* ¶¶ 58–63.

Plaintiffs allege that Deere has denied customers the freedom to perform certain repairs without the use of Deere's authorized network, even when the repair could efficiently be performed by the farmer or by lower-cost or more convenient independent mechanics.  *See, e.g.*, *id.* ¶¶ 4–5, 7–16, 72–92.  Specifically, Plaintiffs allege that "Deere has deliberately designed its tractors so that both the diagnosis and the completion of a repair frequently requires [Deere] software tools and other Dealership-only resources."  *Id.* ¶ 79.  Without this proprietary software and accompanying instructions, farmers (or independent servicers) cannot troubleshoot the computers on each tractor that determine how—and if—the tractor functions.  *See id.* ¶¶ 13, 73.  Nor may farmers or independent servicers replace any such computers that break.  *Id.* ¶ 86.  These computers, or Engine Control Units (ECUs), monitor many sensors.  *See, e.g.*, *id.* ¶ 82 (125

---

[6]    USDA, *Farm Production Expenditures: 2021* at 7 (July 2022), https://www.nass.usda.gov/Publications/Highlights/2022/2021_FarmExpenditures.pdf.

[7] Peter Waldman & Lydia Mulvany, *Who Really Owns a John Deere?* at 43, Bloomberg Businessweek (Mar. 9, 2020); *see also* Compl. ¶ 187 (Deere's billions in income growth).

different sensors for a combine harvester). If a sensor notices a problem, such as a broken part, an ECU can throttle the tractor (also known as forcing the tractor into "limp mode"). *Id.* ¶¶ 82–83. The same happens if an ECU experiences even a software glitch. *Id.* In some cases, a tractor can even become inoperable. *Id.* ¶ 86.

Restoring the tractor's functionality can be difficult and expensive. A farmer cannot simply replace the broken part. *Id.* ¶¶ 87, 147 (*e.g.*, faulty moisture meter and exhaust filters). Nor can a farmer ask a local independent repair shop to service the tractor, like someone might ask that shop to fix their car. *Id.* ¶¶ 94, 175. Instead, farmers must pay—and wait for—a technician authorized by Deere. Only Deere technicians have the proprietary software that can fully access an ECU. *Id.* ¶¶ 4, 11. Thus, only they can command the ECU to, say, recognize a replacement part or reset an overzealous sensor. *Id.* ¶¶ 82, 147. The only software available to farmers and third-parties, by contrast, has limited functionality despite Deere charging about $3,000 per year (originally $8,500 per year before the filing of this lawsuit). *Id.* ¶¶ 158–162.

The repair restrictions at issue here affect Deere agricultural equipment that are important, costly investments to the workings of a farm. *See* Compl. ¶ 1 n.1 (list of equipment), ¶¶ 28, 99 (alleging that tractor prices can "run up to nearly a million dollars"). These various machines, or "tractors" for short, enable American agriculture. When they break or fail to operate and repair markets function poorly, agriculture suffers. Crops waste. Land lies fallow. *See id.* ¶¶ 83, 95. Even a short delay can result in farmers "watch[ing] their crops rot." *Id.* ¶¶ 83, 143.[8] Farmers thus place significant value on not only the quality but also the timeliness of repair services. Yet

---

[8] *See also* Waldman & Mulvany, *supra*, at 44 (according to one farmer, "the five-hour wait for someone to show up and do a half-hour software fix contributed to a loss of at least 15% of the crop").

waits for repair can stretch for valuable hours, if not days or weeks. *Id.* ¶¶ 87, 117.[9] And, as of 2022, the cost for Deere's repair services was $150–$180 per hour for labor alone, with extra charges for travel and parts. *Id.* ¶ 93. Plaintiffs allege that they "are forced to use Deere-affiliated Dealerships for Repair Services when they would otherwise fix the Tractor themselves or utilize the services of a lower-cost and/or more convenient independent mechanic." *Id.* ¶ 5.

Deere has offered various responses to these allegations. In public, Deere has largely attributed complaints about repair restrictions to consumers' unawareness of their right to repair. *See, e.g.*, Compl. ¶¶ 142–143. In the words of Deere's Chief Technology Officer, "98 percent of the repairs that customers want to do on John Deere products today, they can do."[10] *See id.* ¶ 142 & n.53. Similarly, in this case, Deere's pending motion for judgment on the pleadings (filed on December 8, 2022) claims that only "a small subset" of repairs are restricted to Deere-authorized dealerships. Deere's Mem. in Support of its Mot. for Judgment on the Pleadings at 1, ECF No. 105 (Mot.). Deere further argues that farmers have long known about those restricted repairs. *See id.* at 18–19. In short, Deere claims that it has neither deceived nor surprised farmers with its longstanding repair restrictions.

### C. Procedural Posture and Deere's Pending Rule 12(c) Motion

Deere has filed a motion under Rule 12(c) asking this Court to "dismiss this case on the pleadings." Mot. at 2. Most relevant here, Deere asks this Court to apply a factual presumption: unless Deere had deceived or surprised its customers, competition in the tractor foremarket *must*

---

[9] *See also* Mae Anderson, *Without 'right to repair,' businesses lose time and money* (Aug 10, 2021), https://apnews.com/article/technology-business-9f84a8b72bb6dd408cb642414cd28f5d (cited at Compl. ¶ 87) (four hours for a controller, and a day for installation).

[10] Nilay Patel, *John Deere Turned Tractors Into Computers – What's Next?*, The Verge (June 15, 2021), https://www.theverge.com/22533735/john-deere-cto-hindman-decoder-interview-right-to-repair-tractors (cited at Compl. ¶ 142 n.53) (interviewing CTO Jahmy Hindman).

*have* negated any power Deere had in its repair aftermarkets. *See* Mot. at 18. According to Deere, "[t]o overcome this presumption—and proceed on a single-brand aftermarket theory—Plaintiffs must plausibly allege that Deere either [1] hid its repair policies from customers before they bought a Tractor, or [2] changed those policies after the fact." *Id.* This is incorrect.

The United States respectfully submits this Statement of Interest to oppose Deere's Rule 12(c) motion on this issue.[11]

## DISCUSSION

The federal antitrust laws have long protected competition in aftermarkets. *See Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992). But Deere asks this Court to nullify that protection unless two narrow circumstances are shown. Namely, Deere argues that its repair restrictions are effectively immune from antitrust scrutiny unless Deere either (1) *deceived* Plaintiffs by hiding the restrictions before Plaintiffs bought their tractors; or (2) *surprised* Plaintiffs by imposing the restrictions after Plaintiffs' purchases. *See* Mot. at 15, 18. Deere proposes a safe harbor where the law provides none. Deere would have the Court presume that, in every other circumstance, a competitive foremarket (as Deere argues the tractor market to be) necessarily shields consumers from any possible market power or monopoly power in a single-brand aftermarket (such as the market for Deere repair services).

Deere is wrong. As detailed below, Deere's proposed presumption contravenes the Supreme Court's decision in *Kodak* and the weight of circuit court authority. Although deception or surprise can be relevant to a proper *Kodak* analysis, they are not alone dispositive or required. Indeed, Deere's requested presumption is very similar to the one sought by the defendant in *Kodak*

---

[11] The United States takes no position on other issues, such as whether Plaintiffs are direct or indirect purchasers. *See, e.g.*, Mot. at 6–14.

and rejected by the Court in favor of a fact-specific analysis of "actual market realities." *Kodak*, 504 U.S. at 466–67.

## I.   SUPREME COURT PRECEDENT DOES NOT SUPPORT DEERE'S PROPOSED PRESUMPTION

The Supreme Court's decision in *Kodak* controls here. Yet, tellingly, in asking this Court to dismiss this case on the pleadings, Deere fails to even cite it. Far from supporting Deere's proposed presumption disfavoring single-brand aftermarkets, *Kodak* analyzed and protected those markets much like any other. Among other things, *Kodak* defined single-brand aftermarkets based on traditional economic principles, not a formulaic fixation on whether plaintiffs had shown deception or surprise.

### A.   *Kodak* Should Guide the Court's Analysis in This Case

A "relevant market" or "relevant product market" in antitrust cases refers to the set of products or services that customers would switch to in the event of a price increase or quality decrease. *See, e.g.*, *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."); *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956) ("Th[e] market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered.").

In a case involving aftermarket parts or repairs for durable equipment, the "relevant market" or "market definition" analysis also begins with the choices or reasonably interchangeable "substitutes" available to the owner of that equipment. *Kodak*, 504 U.S. at 481–82 ("The relevant market for antitrust purposes is determined by the choices available to Kodak equipment owners.") In *Kodak*, the Supreme Court explained that "[b]ecause service and parts for Kodak equipment are

9

not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines." *Id.* at 482. Plaintiffs in this case have followed these traditional principles in alleging that repair services and tools for Deere equipment are not interchangeable with services and tools for equipment from other manufacturers. Compl. ¶¶ 60, 65.

### B. Deere's Proposed Presumption Contravenes *Kodak*

In *Kodak*, the plaintiffs' claims required the defendant to have market power in the aftermarket for replacement parts, 504 U.S. at 464 (§ 1 tying claim), and monopoly power in aftermarkets for parts and service, *id.* at 480–82 (§ 2 monopolization claim). As the Supreme Court explained, "[m]arket power is the power 'to force a purchaser to do something that he would not do in a competitive market.'" *Id.* at 464 (quoting *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 (1984)). The plaintiffs had presented sufficient evidence of Kodak's market power by showing that Kodak's conduct had "excluded service competition, boosted service prices, and forced unwilling consumption of Kodak service" which "was of higher price and lower quality than the preferred [independent] service." *Id.* at 465; *see id.* at 481 (explaining that this evidence was also sufficient to show monopoly power); *see also FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986) (explaining that market power can be established through evidence of "actual, sustained adverse effects on competition").

Plaintiffs here have made a variety of similar allegations. Plaintiffs allege, for example, that they are "forced to use Deere-affiliated Dealerships for Repair Services when they would otherwise fix the Tractor themselves or utilize the services of a lower-cost and/or more convenient independent mechanic." Compl. ¶ 5. What's more, repairs through Deere's authorized network are "frequently" performed incorrectly, only after "extensive waits," and at "exorbitant" cost. *Id.*

¶ 27; *see id.* at ¶¶ 115–23 (detailing aspects of poor service and higher costs for customers compared to "what would be offered in a competitive market"); *id.* at ¶¶ 186–89 (alleging Deere earns supra-competitive profits from withholding Repair Tools).

Rather than grapple with Plaintiffs' allegations relevant to Repair Services, Deere argues that the complaint fails because it does not "plausibly allege that consumers who bought Deere Tractors did not realize that some Repair Services for their Tractors would need to be performed by dealers." Mot. at 18. It may be true that tractor customers will weigh the information they know about aftermarket parts or repairs at the time they purchase the tractor, and that this may reduce the manufacturer's incentive to charge high prices for repairs or replacement parts in the first place. But to presume this without factual analysis violates *Kodak*. As the Supreme Court explained, a "theory, although perhaps intuitively appealing, may not accurately explain the behavior of the primary and derivative markets for complex durable goods." *Kodak*, 504 U.S. at 473. *Kodak* claims therefore require an actual "case-by-case" [] focus[] on the 'particular facts disclosed by the record." *Id.* at 467 (quoting *Maple Flooring Manufacturers Assn. v. United States*, 268 U.S. 563, 579 (1925)).

For example, Kodak had argued that it "[could not] actually exercise the necessary market power for a Sherman Act violation" because once customers realized that their service costs were increasing, Kodak would suffer a "loss in profits from lower equipment sales." *Kodak*, 504 U.S. at 451. But Kodak had not presented any "actual data" to support this claim. *Id.* at 466. And given the Supreme Court's insistence on a fact-bound approach, the *Kodak* Court rejected the idea that "competition in the equipment market *necessarily* prevents market power in the aftermarkets" as a matter of law. *Id.* at 470 (emphasis added). As the Supreme Court explained then and since reaffirmed, "[l]egal presumptions that rest on formalistic distinctions rather than actual market

11

realities are generally disfavored in antitrust law." *Id.* at 466–67; *see also Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) (quoting *Kodak* on this point); *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2158 (2021) (noting, in a rule of reason case, that "[w]hether an antitrust violation exists necessarily depends on a careful analysis of market realities").

Furthermore, Kodak's argument assumed that price increases in the aftermarket "above competitive levels" would mean "potential customers would simply stop buying" equipment in a foremarket. 504 U.S. at 470. But the Court reasoned that there could "easily" be a price increase in an aftermarket that "would more than compensate for the lower revenues" in the foremarket, *id.* at 471, and thus the claim "may not accurately explain the behavior of the primary and derivative markets for complex durable goods," *id.* at 473. In other words, to understand the defendant's ability and incentives to exercise market power or monopoly power, the court must understand all the relevant underlying facts.

A firm's ability to exercise market power or monopoly power in an aftermarket can depend on whether there is a "responsive connection" between the aftermarket and the foremarket. *Kodak*, 504 U.S. at 473. As the Supreme Court explained, "[f]or the service-market price to affect equipment demand, consumers must inform themselves of the total cost of the 'package'— equipment, service, and parts—at the time of purchase; that is, consumers must engage in *accurate lifecycle pricing*." *Id.* (emphasis added). "Accurate lifecycle pricing," in turn, requires a "sophisticated analysis" based on a wealth of information, and the calculation "is likely to be customer-specific." *See id.* at 473–74 (listing over a dozen pieces of necessary information). "Much of this information is difficult—some of it impossible—to acquire at the time of purchase." *Id.* at 473. And even where the information is technically available, some customers may "choose not" to perform the necessary calculations because doing so may not be cost efficient or may be

12

inconsistent with a customer's procurement practices. *Id.* at 474–75. Thus, in situations where customers cannot or do not engage in accurate lifecycle pricing, a competitive foremarket may not discipline anticompetitive conduct in an aftermarket, regardless of whether a defendant may have "conspicuously made its repair policies known to consumers." Mot. at 18. *Kodak* requires this Court to resolve Plaintiffs' claims by "examin[ing] closely the economic reality of the market at issue" and rejecting formalistic distinctions such as whether a defendant made a particular disclosure. *Id.* at 466–67.

The Supreme Court's concern with information costs does not square with Deere's proposed requirement of deception or surprise. Indeed, in *Kodak*, customers had made the "vast bulk" of equipment purchases *after* Kodak had stopped selling parts to independent service organizations in 1985. *See id.* at 492 (Scalia, J., dissenting) (quoting factual proffer). So "at least all post-1985 purchasers of micrographic equipment, like all post-1985 purchasers of new Kodak copiers, *could have been aware of Kodak's parts practices*." *Id.* (emphasis added). Yet the Court held that information costs made purchasers' awareness of Kodak's policies merely theoretical, and thus permitted plaintiffs' claims to proceed.

Deere's deception-or-surprise requirement is not just an unduly narrow lens for assessing information costs. It also is blind to equipment owners' switching costs, as the *Kodak* Court's analysis shows. The Supreme Court explained that "consumers who already have purchased the equipment, and are thus 'locked in,' will tolerate some level of service-price increases before changing equipment brands." *Id.* at 476. Again, there was no insistence on deception or surprise: high sunk costs sufficed. *See id.* at 476–77. Namely, "the heavy initial outlay for Kodak equipment, combined with the required support material that works only with Kodak equipment, ma[de] switching costs very high for existing Kodak customers." *Id.* at 477. This Court's analysis

13

of market realities should give due consideration to Plaintiffs' allegations of switching costs. *See, e.g.,* Compl. ¶ 28.

More fundamentally, Deere is asking for a version of the type of *factual* presumption that the Supreme Court emphatically rejected in *Kodak*. The defendant in *Kodak* argued for a presumption that its "lack of power in the equipment market necessarily precludes power in the aftermarkets." *Kodak*, 504 U.S. at 469. In ruling for plaintiffs, the *Kodak* Court instead demanded a fact-bound analysis of the relationship between the market for equipment and the aftermarkets for parts and service. *See id.* ("The extent to which one market prevents exploitation of another market depends on the extent to which consumers will change their consumption of one product in response to a price change in another."). Deere would have this Court presume that competition in the foremarket is sufficient to discipline anticompetitive conduct in the aftermarket, *unless* Plaintiffs "plausibly allege that Deere either hid its repair policies from customers before they bought a Tractor, or changed those policies after the fact." Mot. at 18. This is precisely the type of formalistic legal distinction that is not only inappropriate in antitrust cases generally, but also forbidden by *Kodak* itself.

## II. CIRCUIT COURT PRECEDENT DOES NOT SUPPORT DEERE'S PROPOSED PRESUMPTION

Deere's proposed presumption also fails to find support in Seventh Circuit precedent. And Deere ignores precedent correctly applying *Kodak*, while relying on out-of-circuit cases that are inapposite or wrong.

### A. Seventh Circuit Precedent Does Not Support Deere's Proposed Presumption

Deere is wrong in claiming that two Seventh Circuit cases—*Digital Equipment Corporation v. Uniq Digital Technologies, Inc.*, 73 F.3d 756, 763 (7th Cir. 1996) and *Schor v. Abbott Laboratory*,

457 F.3d 608, 614 (7th Cir. 2006)—require Plaintiffs to show that they were deceived or surprised. *See* Mot. at 15 n.3, 19. Neither case does.

Deere's reliance on *Digital Equipment* is misplaced as the case did not involve an alleged aftermarket. *Digital Equipment* was a "mundane commercial case" in which a computer manufacturer sued a distributor in diversity for money owed, and the distributor filed an antitrust counterclaim that "charged [the manufacturer] with attempting to monopolize the market for operating systems for [its] own computers." 73 F.3d at 758, 763. The Seventh Circuit "could hardly imagine a weaker case" for applying *Kodak*. *Id.* at 763. The manufacturer was "selling a fungible commodity" in a rapidly-expanding market with easy substitution, and "[n]othing in th[e] record suggest[ed] that [the manufacturer] was able to raise prices, or exploit any customer, by deciding to include an [operating system] with every machine." *Id.* Customers "c[ould] substitute brands [of computer] without changing operating systems." *Id*. Thus, *Kodak* was readily distinguishable from the facts at issue.

*Digital Equipment* nevertheless addressed *Kodak* and observed that "competition among manufacturers fully protects buyers who accurately calculate life-cycle costs." *Digital Equip.*, 73 F.3d at 762. This observation acknowledges that these calculations may not always be possible. Indeed, *Digital Equipment* stated that "not all customers do this [*i.e.*, 'accurately calculate life-cycle costs']." *Id. Digital Equipment* also did not purport to ignore that buyers may not be protected when there is insufficient "competition among manufacturers," such as when "customer[s are] locked in to [their] equipment." *Id.* at 762–63. The Seventh Circuit therefore appreciated that various market imperfections missing from *Digital Equipment* can support *Kodak* claims. Here, for example, Plaintiffs' case involves expensive and complex equipment, with

uncertain and variable repair costs over its useful life, and customers who are allegedly locked-in. *See, e.g.*, Compl. ¶¶ 3, 15, 99–100.

Applying *Digital Equipment* in an MDL in this District, then-District Judge St. Eve found that aftermarkets are not limited to cases in which deception or surprise are alleged. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 962, 964 (N.D. Ill. 2018). In *In re Dealer Management*, plaintiffs survived a motion to dismiss against not only a defendant whose alleged conduct could satisfy a deception/surprise requirement, *see id.* at 963–64 (defendant CDK), but also a defendant whose conduct could not, *id.* at 964 (defendant Reynolds). As the court explained, these rulings flowed from precedent. Quoting *Digital Equipment*, Judge St. Eve reasoned that whenever customers cannot "*accurately* calculate life-cycle costs"—whether because of information costs or other "market imperfections"—a supplier-defendant can charge supracompetitive prices in the aftermarket. *Id.* at 964 (quoting *Digital Equip.*, 73 F.3d at 762). Accordingly, just as the *Kodak* suit withstood summary judgment, a complaint may survive a Rule 12 motion even if it "affirmatively pleads that [defendant]'s closed architecture was *generally known* to customers *before* they purchased the product." *Id.* (emphasis added). It would turn the law on its head to suggest that the act of disclosure by a dominant firm would render an otherwise anticompetitive and exclusionary act lawful.

Deere's reliance on *Schor* is likewise misplaced. The case involved the sale of pharmaceutical products that could be purchased standalone or in combination with complementary products, not aftermarkets. *See Schor*, 457 F.3d at 609–10. And *Schor* did not address market definition under *Kodak* for single-brand aftermarkets. *Schor* only discussed *Kodak* to explain why the decision was not relevant, principally because the *Schor* plaintiff's theory of monopoly leveraging was not addressed in *Kodak*. *See id.* at 614 (declining to "generalize" *Kodak*

16

to "a rule against selling products that complement those in which the defendant has market power").

**B.    Deere Ignores Circuit Court Precedents Correctly Applying *Kodak***

The weight of authority has recognized that *Kodak* requires a fact-specific inquiry, not bright-line tests.  In addition to this District in *In re Dealer Management Systems*, courts in at least three more circuits have correctly recognized that *Kodak* requires a fact-specific inquiry, not bright-line tests.

The Third Circuit has "emphasize[d] [] that an 'aftermarket policy change' is *not* the *sine qua non* of a *Kodak* claim.  An aftermarket policy change is an important consideration, *but only one of several relevant factors.*"  *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 384 (3d Cir. 2005) (emphasis added); *accord Avana Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 404 (3d Cir. 2016).  In addition to any surprise or deception, a court should also consider "evidence of (1) supracompetitive pricing, (2) [a defendant]'s dominant share of the relevant aftermarket, (3) significant information costs that prevented lifecycle pricing, and (4) high 'switching costs' that served to "lock in" [a defendant]'s aftermarket customers."  *Harrison Aire*, 423 F.3d at 384; *see also* Section I, *supra* (summarizing *Kodak*).

Similarly, the Ninth Circuit has never "identif[ied] Kodak's policy change as an essential element of the plaintiffs' aftermarket claim."  *Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*, 63 F. Supp. 2d 1218, 1231 & n.12 (E.D. Cal. 1999) (Levi, J.).  This is apparent not only in the Ninth Circuit's opinion reviewed in *Kodak*, but also in the Ninth Circuit's analysis on remand from the Supreme Court.  *See Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 903 F.2d 612, 614 (9th Cir. 1990) (*Kodak I*), *aff'd*, 504 U.S. 451; *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997) (*Kodak II*) (review after jury trial).  In *Kodak I*, the Ninth Circuit relied

17

primarily on evidence of supracompetitive repair prices. *See* 903 F.2d at 617 (Kodak prices "up to twice as much" despite "lower quality"); *see also Kodak*, 504 U.S. at 457, 469 (likewise noting that Kodak's prices were substantially higher and had increased). Similarly, in *Kodak II*, the Ninth Circuit affirmed that Kodak was a liable monopolist[12] without mentioning—let alone requiring—specific timing for Kodak's policy change. *See* 125 F.3d at 1212; *see also Kodak*, 504 U.S. at 492 (Scalia, J., dissenting) (arguing unsuccessfully that timing favored Kodak). And between *Kodak I* and *II*, the Ninth Circuit reversed summary judgment on a *Kodak* tying claim—again without analyzing the timing of repair restrictions. *See Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1426–27 (9th Cir. 1995). *Datagate* instead considered deposition testimony that (1) the manufacturer's tying arrangement deterred a customer from considering a competing option; and (2) the independent servicer's prices were lower than the manufacturer's. *Id.* at 1426.

In focusing on deception or surprise, Deere has the analysis "backwards." *Red Lion*, 63 F. Supp. 2d at 1230. As a district court in the Ninth Circuit explained correctly, "[Kodak's] policy change did not create lock-in; instead, the existence of lock-in—high switching costs—made it both possible and economically desirable for Kodak to change its policy and exploit aftermarket consumers." *Id.* Thus, there is not "an implicit limitation on aftermarket antitrust claims to situations involving a change of policy or pricing as to after[]market parts and services." *Id.* Such an interpretation of *Kodak*, Judge Levi explained, "is not supported by the text or reasoning of that opinion." *Id.* "*Kodak* [] d[id] not hold that an aftermarket claim is contingent on a change in a manufacturer's parts or service policy; it simply acknowledge[d] that Kodak's *ability* to make a

---

[12] In *Kodak II*, the Ninth Circuit reviewed only monopolization claims under Sherman Act § 2. "Before closing arguments, the [independent servicers] withdrew their § 1 tying and conspiracy claims." *Kodak II*, 125 F.3d at 1201.

policy change without suffering losses in the equipment market was *evidence* that the service market was not disciplined by competition in the equipment market." *Id.* (citing *Kodak*, 504 U.S. at 477) (emphasis added). *Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038 (9th Cir. 2008), cited by Deere, is not to the contrary. The *Newcal* decision analyzed factors beyond surprise and deception; it held that plaintiffs' allegations of repair and service aftermarkets for customers with specific photocopier equipment were sufficient to survive a Rule 12 motion. *See id.* at 1045–46, 1050.

More recently, the Second Circuit analyzed a *Kodak* claim based on the economic realities alleged in the complaint, rather than deception, surprise, or other formalistic distinctions. In *US Airways, Inc. v. Sabre Holdings Corp.*, the plaintiff claimed that the defendant had "monopoliz[ed] the Sabre travel agent sub-market," defined as "the distribution of [global distribution system] services to Sabre subscribers." 938 F.3d 43, 64 (2d Cir. 2019). The plaintiff "alleged that travel agents are locked into the Sabre platform because of the prohibitively high costs of switching to alternative booking channels and incentive payment structures." *Id.* at 66. Applying *Kodak*, and without mentioning deception or surprise, the court held that the plaintiff had pled a valid "Sabre-only market" that was "capable of being monopolized under Section 2 of the Sherman Act." *Id.*

In sum, in-circuit and out-of-circuit precedent follows *Kodak* itself in "emphasiz[ing] [] that an 'aftermarket policy change' is not the *sine qua non* of a *Kodak* claim." *Harrison Aire*, 423 F.3d at 384. What Deere calls "lock-in" is not needed for Plaintiffs' antitrust claims to proceed.

### C.    Deere's Other Out-of-Circuit Citations are Inapposite and Unpersuasive

Deere's remaining authority is from the First, Fifth, and Sixth Circuits. *See* Mot. at 15 n.3. None is persuasive.

19

To start, Deere's cited Fifth Circuit case is inapposite. In *United Farmers Agents Association v. Farmers Insurance Exchange*, the court found that plaintiffs' alleged aftermarket was "essentially an *intracompany* dispute over how to run a computer system." 89 F.3d 233, 236 (5th Cir. 1996) (emphasis added). At issue was how much Farmers could charge its insurance agents for computers to access its systems with policyholder information. But Plaintiffs here do not work for Deere, nor are they agents or franchisees of Deere. Moreover, the Fifth Circuit found that plaintiffs "cited no evidence that information or switching costs were high for most agents." *Id.* at 237. The allegations here are different. *See, e.g.*, Compl. ¶¶ 99–101, 141–154.

The First and Sixth Circuits' cases have addressed inapposite facts and pronounced holdings broader than necessary to resolve the claims at hand. Respectfully, to the extent those circuits' cases can be said to undercut *Kodak*, they have misinterpreted *Kodak* and taken the wrong side of a circuit split. *See, e.g.*, *In re Dealer Mgmt. Sys.*, 313 F. Supp. 3d at 964 (analyzing *Harrison Aire*, 423 F.3d at 384). They purport to demand that plaintiffs show a bait-and-switch—namely, that a manufacturer's repair restrictions would have been unknown to a perfectly rational consumer at the time of her purchase—but this demand contravenes *Kodak*.

The First Circuit instigated the doctrinal clash in a tying case about college health insurance, *Lee v. Life Insurance Co. of North America*, 23 F.3d 14 (1st Cir. 1994). *See also SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 19 (1st Cir. 1999) (citing *Lee* for "bait and switch" requirement); Mot. at 15 (quoting *SMS Sys.*). *Lee* stated that "the *timing* of the 'lock-in' at issue in *Kodak* was central to the Supreme Court's decision." 23 F.3d 14 at 20. That is, the First Circuit assumed that *Kodak* would have been decided differently "[h]ad previous customers known, at the time they bought their Kodak copiers, that Kodak would implement its restrictive parts-servicing policy." *Id.* Later, in *SMS Systems*, the First Circuit relied on *Lee* in rejecting an

"odd" claim against warranties bundled with equipment—warranties which did *not* stop consumers from using independent servicers. 188 F.3d at 14. In *SMS Systems* too, part of the First Circuit's reasoning was the timing of any policy change. *See id.* at 19.

The First Circuit's timing assumption was wrong. It stemmed from the dissent in *Kodak*, *Lee*, 23 F.3d at 20 (citing *Kodak*, 112 S. Ct. at 2095–96 (Scalia, J., dissenting)), not the majority opinion. But in the controlling view of the *Kodak* Court, the dissent "urge[d] a radical departure in th[e] Court's antitrust law." *Kodak*, 504 U.S. at 479 n.29. This Court is bound by the majority opinion "unless and until the Supreme Court explicitly overrules a case." *United States v. Krieger*, 628 F.3d 857, 869 (7th Cir. 2010).

Indeed, the *Kodak* majority rejected timing as dispositive. Specifically, the dissent had argued that "the only thing lacking" from Kodak's defense was "concrete evidence that the restrictive parts policy was announced or generally known." *Compare Kodak*, 504 U.S. at 492 (Scalia, J., dissenting), *with id.* at 477 n.24 (opinion of the Court). The Supreme Court majority vigorously disagreed. Kodak needed to "provide evidence" on the multifaceted factual question of "whether the equipment market prevents the exertion of market power in the parts market." *Id.* at 477 n.24. Such evidence would compel "careful consideration . . . give[n] to the particular facts." *See id.* at 467 n.13.

In addition, most consumers in *Kodak* bought their equipment *after* Kodak stopped selling parts to independent servicers in 1985. *See id.* at 492 (Scalia, J., dissenting) (quoting servicers' factual proffer). Thus, "at least all post-1985 purchasers of micrographic equipment, like all post-1985 purchasers of new Kodak copiers, *could have been aware of Kodak's parts practices*." *Id.* (emphasis added); *accord In re Dealer Mgmt. Sys.*, 313 F. Supp. 3d at 937, 964 (denying Rule 12 motion despite defendant's "long-standing" policy predating the lawsuit by at least 8 years). Even

21

so, the Supreme Court denied summary judgment for Kodak. Summary judgment would have at least required evidence of actual widespread consumer awareness—not merely the public timing of repair restrictions. *See, e.g.*, *Kodak*, 504 U.S. at 473–75 (analyzing the nature of consumer knowledge and "the number of sophisticated customers"). All told, the First Circuit's reasons for limiting *Kodak* were wrong in many respects.

Deere's reliance on *PSI Repair Services, Inc. v. Honeywell, Inc.*, 104 F.3d 811 (6th Cir. 1997), is unavailing for similar reasons. There, to apply *Kodak* at summary judgment, the Sixth Circuit relied on the fact that "*nothing* in the record or [plaintiff's] brief" suggested that Honeywell exploited any information asymmetries or charged supracompetitive prices. *Id.* at 820–21 (emphasis added). To the contrary, Honeywell empowered customers to "more accurately [] estimate the cost of the equipment" and engaged them in "lengthy negotiations" before sale. *Id.* at 820.

Despite these factual defects in the *Honeywell* plaintiffs' claims, the Sixth Circuit unnecessarily tried to go further. It relied on *Lee* to prescribe a bright-line test like Deere's: "an antitrust plaintiff cannot succeed on a *Kodak*-type theory when [1] the defendant has not changed its policy after locking-in some of its customers, and [2] the defendant has been otherwise forthcoming about its pricing structure and service policies." *Id.* at 820. This statement is best read in the context of the case, where "[plaintiff] ha[d] not alleged or shown that Honeywell ha[d] market power in the relevant market." *Id.* at 821. To read it more broadly would risk defying *Kodak*. Out of context, the first prong ignores that, in *Kodak*, the company had imposed its repair restrictions *before* consumers made most of their purchases. *See supra* Discussion I-B. The other prong ignores the *Kodak* Court's admonition that "even if consumers were capable of acquiring and processing the complex body of [lifecycle] information, they may not choose to do so" for

22

various reasons. *Kodak*, 504 U.S. at 474. And overall, the test wrongly sacrifices "actual market realities" for "legal presumptions that rest on formalistic distinctions." *E.g.*, *Am. Express Co.*, 138 S. Ct. at 2285 (quoting *Kodak*, 504 U.S. at 466–467).

CONCLUSION

This Court should reject Deere's argument that deception or surprise is required to delineate a repair aftermarket.

Respectfully submitted,

JONATHAN S. KANTER
  *Assistant Attorney General*

DOHA G. MEKKI
  *Principal Deputy Assistant Attorney General*

MAGGIE GOODLANDER
  *Deputy Assistant Attorney General*

DAVID B. LAWRENCE
  *Policy Director*

DANIEL E. HAAR
NICKOLAI G. LEVIN
MATTHEW CHOU
ANDREW L. KLINE
MATTHEW C. MANDELBERG
  *Attorneys*

Dated: February 13, 2023

/s/ Matthew Chou
MATTHEW CHOU
U.S. Department of Justice, Antitrust Division
San Francisco Office
450 Golden Gate Avenue
Room 10-0101, Box 36045
Telephone: (415) 218-9633
Email: matthew.chou@usdoj.gov
*Attorneys for the United States of America*