**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

**IN RE: DEERE & COMPANY REPAIR**
**SERVICES ANTITRUST LITIGATION**

**Case No.: 3:22-cv-50188**
**Hon. Iain D. Johnston**

**DEFENDANT DEERE & COMPANY'S REPLY**
**IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................... 1

ARGUMENT .......................................................................................................................... 2

I.      PLAINTIFFS LACK STANDING. ............................................................................ 2

     A.    Plaintiffs Lack Article III Standing......................................................... 3

     B.    Plaintiffs Lack Antitrust Standing. ......................................................... 4

II.     PLAINTIFFS CANNOT PLEAD A PLAUSIBLE RELEVANT MARKET. ............... 12

     A.    Plaintiffs Fail to Plausibly Allege a Relevant Primary Market.......................... 12

     B.    Plaintiffs Fail to Plausibly Allege a Relevant Aftermarket. ................................ 15

III.    PLAINTIFFS' OTHER ARGUMENTS ARE WITHOUT MERIT............................... 19

CONCLUSION...................................................................................................................... 21

## **TABLE OF AUTHORITIES**

**Page**

**C**ASES

*Avaya Inc., RP v. Telecom Labs, Inc.*,
838 F.3d 354 (3d Cir. 2016).......................................................................................16

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................................................11

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995) .........................................................................................5

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962).....................................................................................................14

*Collins Inkjet Corp. v. Eastman Kodak Co.*,
2014 WL 11516553 (S.D. Ohio Mar. 21, 2014).........................................................17

*Conrad v. Jimmy John's Franchise, LLC*,
2021 WL 3268339 (S.D. Ill. July 30, 2021) .................................................................8

*Conte v. Newsday, Inc.*,
703 F. Supp. 2d 126 (S.D.N.Y. 2010).........................................................................14

*Digit. Equip. Corp. v. Uniq Digit. Techs., Inc.*,
73 F.3d 756 (7th Cir. 1996) ...................................................................................18, 19

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992).....................................................................................................18

*EuroTec Vertical Flight Sols., LLC v. Safran Helicopter Engines S.A.A.*,
2019 WL 3503240 (N.D. Tex. Aug. 1, 2019)..............................................................20

*F.T.C. v. Facebook, Inc.*,
560 F. Supp. 3d 1 (D.D.C. 2021).................................................................................20

*Glynn-Brunswick Hosp. Auth. v. Becton*,
159 F. Supp. 3d 1361 (S.D. Ga. 2016)........................................................................15

*Golden Gate Phar. Servs., Inc. v. Pfizer, Inc.*,
2010 WL 1541257 (N.D. Cal. Apr. 16, 2010) ............................................................15

**TABLE OF AUTHORITIES**
Continued

Page

**CASES**

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    485 F. Supp. 3d 1137 (N.D. Cal. 2020) ...................................................................19

*Hosp. Corp. of Am. v. FTC*,
    807 F.2d 1381 (7th Cir. 1986) (Posner, J.) ...........................................................14

*ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.*,
    249 F. Supp. 2d 622 (E.D. Pa. 2003) .....................................................................18

*In re Brand Name Prescription Drugs Antitrust Litig.*,
    123 F.3d 599 (7th Cir. 1997) ...................................................................................11

*In re Brand Name Prescription Drugs Antitrust Litig.*,
    177 F.R.D. 414 (N.D. Ill. 1997)...............................................................................11

*In re Brand Name Prescription Drugs Antitrust Litig.*,
    1998 WL 474146 (N.D. Ill. Aug. 6, 1998) .............................................................11

*In re Dealer Mgmmt. Sys. Antitrust Litig.*,
    313 F. Supp. 3d 931 (N.D. Ill. 2018) .....................................................................19

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ...................................................................................8

*In re New Motor Vehicles Canadian Export*,
    307 F. Supp. 2d 136 (D. Me. 2004) ........................................................................11

*In re NorthShore University HealthSystem Antitrust Litig.*,
    2018 WL 2383098 (N.D. Ill. Mar. 31, 2018).............................................................6

*In re Processed Egg Prods. Antitrust Litig.*,
    2016 WL 5539592 (E.D. Pa. Sept. 28, 2016) ...........................................................9

*Int'l Bhd. of Teamsters v. Philip Morris, Inc.*,
    196 F.3d 818 (7th Cir. 1999) .....................................................................................5

*Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*,
    2013 WL 4599903 (N.D. Ill. Aug. 29, 2013) .........................................................14

## <u>TABLE OF AUTHORITIES</u>
### Continued

Page

**CASES**

*Loeb Indus., Inc. v. Sumitomo Corp.*,
306 F.3d 469 (7th Cir. 2002) ............................................................................7

*Marion Diagnostic Center, LLC v. Becton Dickinson & Co.*,
29 F.4th 337 (7th Cir. 2022) ..................................................... *passim*

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
952 F.3d 832 (7th Cir. 2020) ..................................................... *passim*

*Maui Jim, Inc. v. SmartBuy Guru Enters.*,
386 F. Supp. 3d 926 (N.D. Ill. 2019) ..............................................15

*Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*,
524 F.3d 726 (6th Cir. 2008) ...........................................................15

*Multiple Energy Techs., LLC v. Under Armour, Inc.*,
2021 WL 2661827 (W.D. Pa. June 29, 2021) ..................................15

*NCAA v. Alston*,
141 S. Ct. 2141 (2021) .....................................................................20

*Océ N. Am., Inc. v. MCS Servs., Inc.*,
795 F. Supp. 2d 337 (D. Md. 2011) .................................................17

*Prescient Med. Holdings, LLC v. Lab'y Corp. of Am. Holdings*,
2019 WL 635405 (D. Del. Feb. 14, 2019) .......................................15

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
104 F.3d 811 (6th Cir. 1997) ...........................................................17

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
615 F.3d 412 (5th Cir. 2010) .......................................................8, 15

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997)..............................................................13

*Radio Music License Comm., Inc. v. SESAC, Inc.*,
29 F. Supp. 3d 487 (E.D. Pa. 2014) ...................................................8

## TABLE OF AUTHORITIES
### Continued

Page

CASES

*Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*,
    87 F. Supp. 3d 874 (N.D. Ill. 2015) ...................................................................19

*Schor v. Abbott Labs.*,
    457 F.3d 608 (7th Cir. 2006) ...........................................................................18

*Sharif Pharm., Inc. v. Prime Therapeutics, LLC*,
    950 F.3d 911 (7th Cir. 2020) ...........................................................................12

*Sheahan v. State Farm Gen. Ins. Co.*,
    442 F. Supp. 3d 1178 (N.D. Cal. 2020) ...............................................................8

*Sherwin-Williams Co. v. Dynamic Auto Images, Inc.*,
    2017 WL 3081822 (C.D. Cal. Mar. 10, 2017) .....................................................20

*Siva v. Am. Bd. of Radiology*,
    418 F. Supp. 3d 264 (N.D. Ill. 2019) ................................................................19

*Synthes, Inc. v. Emerge Med., Inc.*,
    2012 WL 4473228 (E.D. Pa. Sept. 28, 2012) .....................................................20

*Toys "R" Us, Inc. v. FTC*,
    221 F.3d 928 (7th Cir. 2000) ...........................................................................10

*United States v. Townsend*,
    924 F. 2d 1385 (7th Cir. 1991) ..........................................................................9

## INTRODUCTION

Rule 12 was designed for complaints like this one. Plaintiffs allege that they were victims of a sprawling nationwide conspiracy, but remain silent as to whether they ever interacted with any purported co-conspirator. Plaintiffs insist that Deere has engaged in a longstanding project of misinformation, but fail to cite a single inaccurate statement. Plaintiffs say that consumers have been broadly locked-in as a result of Deere's conduct, but do not offer even one example of this happening in the real world—including with the named plaintiffs themselves. And Plaintiffs assert that Deere has been doing all this for years, although Plaintiffs also admit they have no idea when this supposedly started or what any lock-in actually looks like. In so many words, Plaintiffs' pitch is that this Court needs to let their claims pass the pleadings to find out what is really behind them.

That is wrong. The Complaint harbors fundamental legal defects—defects that are fatal right now, and that prevent this action from going forward. Namely, Plaintiffs fall well short of establishing the two core prerequisites for an antitrust complaint: jurisdiction and a relevant market.

As for jurisdiction, the Complaint satisfies neither Article III nor *Illinois Brick*. Plaintiffs accept that they must have purchased Repair Services from a co-conspirator to have standing, but excuse their failure to specify whom they bought services from, stating it is fine to assume every dealer is part of their alleged conspiracy. That cannot be right, though, as the Complaint itself names dealers who are not co-conspirators. Plaintiffs also concede they have not purchased any Repair Services from Deere. But that is dispositive under *Illinois Brick*, as Plaintiffs cannot avoid its "bright-line rule allocating the right to sue to direct purchasers alone." *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 840 (7th Cir. 2020) ("*Marion I*").

As for a market, the Complaint does not identify a plausible primary market nor a relevant aftermarket. Plaintiffs' main refrain is that market issues are generally fact-bound, and do not lend

themselves to resolution on the pleadings.  But that is not true where, as here, a proposed market is facially deficient.  By the Complaint's own terms, its primary market of "Tractors" includes products that are not interchangeable—defying the requirement that product markets be defined only to include such goods.  And while Plaintiffs concede they must plausibly allege a "lock-in" before using a single-brand aftermarket as the relevant market, the Complaint is without a single example of Deere concealing its repair policies on the front-end, or changing them on the back-end.  Again, Plaintiffs do not even hint that their own *named plaintiffs* were locked-in— information that, if true, Plaintiffs would have at the ready, but which appears nowhere in their Complaint.

In reality, Plaintiffs designed this suit around a policy pursuit and a defendant.  But in trying to shoehorn that agenda into the antitrust laws, Plaintiffs have pressed a Complaint that is irredeemably flawed.  There is no need for anything further.  This Court should end this campaign.

## ARGUMENT

## I.    PLAINTIFFS LACK STANDING.

The foremost obligation of any federal complaint is to establish jurisdiction.  When it fails to do so, it is common course for courts to dismiss it on the pleadings.  Just last year, for instance, the Seventh Circuit affirmed the dismissal of an antitrust complaint because the plaintiffs "lack[ed] standing … under both Article III and *Illinois Brick*."  *Marion Diagnostic Center, LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 346 (7th Cir. 2022) ("*Marion II*").  The same outcome should follow here.  Even taking all of the Complaint's allegations as true, Plaintiffs have not shown that they have standing to carry the banner for their misguided claims.

2

A.      **Plaintiffs Lack Article III Standing**.

Plaintiffs agree that to satisfy Article III, the Complaint must allege that the named plaintiffs bought Repair Services from a dealership involved in the alleged conspiracy.  Opp. at 8; *see also, e.g.*, *Marion II*, 29 F.4th at 346 (holding this is required).  The Complaint does not do so. Plaintiffs nonetheless say that this is okay because (i) they allege that each named plaintiff bought Repair Services from at least one dealer, and (ii) the Complaint does not "create[] two categories of Dealers; those which are within the alleged conspiracy and those which are not."  Opp. at 7–8.

Even in their response, Plaintiffs are careful not to say that *every* Deere-affiliated dealer is part of their alleged conspiracy.  This makes sense.  Their Complaint is premised on the opposite being true.  Plaintiffs' whole theory is that Deere orchestrated a wide-reaching conspiracy with two interlocking parts:  One, Deere provides Repair Tools only to Deere-affiliated dealers (thus limiting who provides Repair Services); and two, Deere and certain chosen (yet unidentified) dealers pursue an "aggressive strategy" of "consolidat[ion]" (thus lessening competition among dealers).  *See, e.g.*, Compl. ¶ 103.  Under Plaintiffs' theory, both aspects work in tandem.  After all, if there is robust competition among dealers, Repair Services will be priced at the market rate.

Accordingly, on the Complaint's own terms, some dealers are in and some are out.  And the Complaint actually names small dealerships that have purportedly been forced to consolidate. As Plaintiffs tell it, at least three small dealerships—Roy Dufault (*id.* ¶ 106), R.N. Johnson Inc. (*id.* ¶ 107), and Tri-County Equipment (*id.* ¶ 109)—were squeezed out as part of a consolidation effort by Deere and the "Big Dealers."  It is impossible to maintain that these supposed *victims* of the alleged conspiracy are also its *members*.  Rather, the Complaint explicitly maintains in plain terms that some dealers are part of its proffered conspiracy while others are not.  *See id.* ¶ 110.

Nevertheless, as noted, the Complaint does not say from which dealership the named plaintiffs bought Repair Services—or, for that matter, what brand, model year, or type of machinery they have and when they bought it. Plaintiffs may well have done so for perceived strategic reasons: In not naming their dealers, Plaintiffs are not only free to design the Complaint around generalized grievances rather than real life experiences; they also are able to avoid offending their actual dealers—dealers who may be outside the alleged conspiracy, and even supportive of Plaintiffs' suit. For evidence of this, look no further than Plaintiffs' attempt to defend the adequacy of their "hub-and-spoke" conspiracy (discussed more below), which depends entirely on actions performed by just a subset of dealers (whom named plaintiffs never claim to have interacted with). Opp. at 16–17.

Article III demands more. As soon as one accepts that dealers like Roy Dufault or R.N. Johnson Inc. fall outside the alleged conspiracy—again, on the Complaint's own terms—the named plaintiffs must plead that they purchased Repair Services from an actual co-conspirator. They did not do so. And this Court may not excuse Plaintiffs' conscious, strategic decision to stay silent, any more than it can assume its own jurisdiction. Instead, it must reject the Complaint for lack of Article III standing. *Marion II*, 29 F. 4th at 346.

### B. Plaintiffs Lack Antitrust Standing.

The Complaint harbors another threshold defect: Plaintiffs cannot get around *Illinois Brick*'s direct purchaser rule. And for this independent reason, Plaintiffs lack antitrust standing. *See, e.g.*, *id.* (affirming dismissal because plaintiffs "lack[ed] standing … under … *Illinois Brick*").

1.      Plaintiffs concede they never bought any Repair Services from Deere. Opp. at 9. In fact, Plaintiffs do not even allege that Deere itself provides Repair Services. *Id.* Instead, Plaintiffs allege that Deere supplies dealerships with Repair Tools, which those independent

4

dealers then use to sell Repair Services to consumers. *Id.* at 25. That is a textbook *Illinois Brick* situation. And because Plaintiffs have not bought Repair Services directly from Deere, they lack antitrust standing to bring this suit. "*Illinois Brick* is a bright-line rule allocating the right to sue to direct purchasers alone, not a rule that requires analysis of competing policy justifications in each case." *Marion I*, 952 F.3d at 840–41.

Plaintiffs resist this straightforward conclusion. Opp. at 9. As they tell it, *Illinois Brick* does not apply to services, because services do not involve a "distribution chain." *Id.* And because purchasers of Repair Services are allegedly affected by Deere even if not buying anything from it, they should be allowed to bring suit directly against Deere.

That is wrong. When it comes to the sales of goods and services, what matters for *Illinois Brick* is not whether some party was *affected* by an alleged antitrust violator; rather, what matters is who paid whom. *See Int'l Bhd. of Teamsters v. Philip Morris, Inc.*, 196 F.3d 818, 823 (7th Cir. 1999) (holding that *Illinois Brick* barred insurers from bringing antitrust suit against tobacco companies on the theory that those companies' conduct increased cost of insuring smokers); *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1414 (7th Cir. 1995) (treating paying health insurer as the direct purchaser of medical services under *Illinois Brick*).

This Court has repeatedly applied *Illinois Brick* in this fashion to bar suits involving services. For instance, in *Leeder National Association of Realtors*, a home buyer brought a putative class action against the National Association of Realtors, alleging that prices of homes were artificially high because they "baked into" both brokers' commissions that were themselves the product of anticompetitive conduct. 601 F. Supp. 3d 301, 306–07 (N.D. Ill. 2022). The court held that *Illinois Brick* barred the suit, because it was the sellers who paid the commissions for the brokerage services. *Id.* at 309. The buyer could not reach past the seller (whom he bought the

home from) to sue the brokers he had issue with (but paid nothing directly). As the court put it: "To the extent that Leeder contends that the end-consumer must be considered the direct purchaser, he finds no support in the caselaw." *Id.* at 310. Likewise, in *In re NorthShore University HealthSystem Antitrust Litig.*, the court held that a putative class—which included both patients and an ERISA plan—could not sue a hospital network, because they did not actually pay for the medical services at issue. 2018 WL 2383098, at *6 (N.D. Ill. Mar. 31, 2018). Their suit was foreclosed by the "principle" that "direct payers are the direct purchasers." *Id.*

Neither case turned on the presence or absence of a "distribution chain," or whether the product at issue was a good or a service. In one, buyers bought homes from sellers, with brokers advising on each end; in the other, patients received medical services from providers, with insurers footing the bill. In both cases, what mattered was who paid whom. Be it with the sale of a good or service, *Illinois Brick* means that purchasers may bring antitrust suits against only those parties from whom they made their purchase.

The Supreme Court reaffirmed all of this in *Apple Inc. v. Pepper*—a decision that goes uncited (and unanalyzed) in Plaintiffs' response. 139 S. Ct. 1514, 1522 (2019). There, the Court recognized that *Illinois Brick*'s "bright-line rule" applies whether plaintiff purchased "a good or service." *Id.* at 1522. It also reiterated that the "absence of an intermediary" between the plaintiff and proposed defendant is "dispositive." *Id.* at 1521. Under *Illinois Brick*, Plaintiffs are "direct purchasers" from the dealers alone, which means they cannot sue Deere for those transactions. *Id.*

The Seventh Circuit took immediate note of *Apple*. The court has observed since *Apple* that the "relevant inquiry in determining the applicability of *Illinois Brick* focuses on the relationship between the seller and the purchaser." *Marion I*, 952 F.3d at 840. Put slightly

differently, the "relationship between the buyer and the seller, rather than the nature of the alleged anticompetitive conduct, governs whether the buyer may sue under the antitrust laws." *Id.*

Plaintiffs ignore all of these cases and instead hitch their wagon to the Seventh Circuit's 2002 decision in *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002)—a case that predates *Apple* by nearly two decades. Of course, to the extent *Loeb* is inconsistent with *Apple*, the former must give way. But regardless, there is no conflict: Plaintiffs just misread *Loeb*. Indeed, the Seventh Circuit recently rejected Plaintiffs' attempted reframing of *Loeb*—that a plaintiff has standing so long as it buys a product at prices *affected by* the defendant's conduct—on the ground that it would "eviscerate *Illinois Brick*'s direct-purchaser rule." *Marion II*, 346 F.4th at 346. Rather, as both the Supreme Court and the Seventh Circuit have made clear, the presence of an intermediary is dispositive under *Illinois Brick*. *See, e.g.*, *Apple*, 139 S. Ct. at 1521. And that proposition settles this issue, because Plaintiffs—by their own account—purchased Repair Services only from dealers, never Deere. Accordingly, Plaintiffs cannot reach beyond dealers to sue Deere unless an exception to *Illinois Brick* applies.

**2.** Plaintiffs agree that, to the extent *Illinois Brick* applies, they are relying on the co-conspirator exception to get around its bar. Opp. at 10. Plaintiffs agree as well that the Complaint turns on an alleged "hub-and-spoke" conspiracy "between and among Deere's Dealers." *Id.* at 14. And Plaintiffs agree too that in order to state a plausible hub-and-spoke—and thus survive the pleadings—the Complaint must identify some agreement across the dealerships themselves. *Id.*

But merely incanting "hub-and-spoke" is not pleading one. Rather, federal courts routinely dismiss antitrust complaints like this one, premised on threadbare conspiracy recitals that lack any plausible indication of agreements across the alleged "spokes." *See, e.g.*, *Marion I*, 952 F.3d at

842 (affirming dismissal of complaint where plaintiffs failed to plausibly identify any "rim" uniting the spokes for their alleged hub-and-spoke conspiracy).[1]

Plaintiffs' main argument in favor of their alleged hub-and-spoke is that the dealers all knew they were entering into the same contract with Deere, and the premise that a crowd opting for the same thing is enough to infer a "conscious commitment to a common plan." Opp. at 15; *see also* Opp. at 17 (noting dealers signed same agreements and acted pursuant to their terms). That is baseless. The fact that spokes are aware the hub is engaged in similar conduct with other spokes says nothing about the spokes' relationship with each other. Every time a person agrees to become a franchisee, for instance, he agrees to a franchise agreement with standardized terms, conditions, and restrictions. But nobody would think every KFC or Subway franchise owner is a *co-conspirator* with one another simply because they all knowingly signed the same contract; otherwise, virtually every franchise agreement would become evidence of an antitrust violation. Instead, something more is required to establish a hub-and-spoke conspiracy. Knowledge of parallel action, standing alone, is not enough. *See Conrad v. Jimmy John's Franchise, LLC*, 2021 WL 3268339, at *8 (S.D. Ill. July 30, 2021) ("For such a conspiracy to exist, those people who form the wheel's spokes must have been aware of each other *and* must do something in furtherance of some single, illegal enterprise.") (emphasis added; internal markings omitted); *see also, e.g.*,

---

[1] *See also, e.g., In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193–98 (9th Cir. 2015) (affirming dismissal of complaint where each spoke adopted policies for its "own interest" and did not enter separate "horizontal agreements" with each other); *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 420 (5th Cir. 2010) (same where complaint failed to plausibly allege any agreement "among [the spokes] themselves"); *Sheahan v. State Farm Gen. Ins. Co.*, 442 F. Supp. 3d 1178, 1195 (N.D. Cal. 2020) (dismissing complaint where "Plaintiffs fail[ed] to allege specific facts establishing any agreement among [the spokes]"); *Radio Music License Comm., Inc. v. SESAC, Inc.*, 29 F. Supp. 3d 487, 497 (E.D. Pa. 2014) (similar).

*United States v. Townsend*, 924 F. 2d 1385, 1397 (7th Cir. 1991) (holding "knowledge alone" of hub's parallel activities with other spokes is not enough to create a tacit agreement across spokes).

Plaintiffs' only authority on this score is an unexplained cite to *Marion I* for a proposition the case never states. Opp. at 15. In fact, in dismissing the complaint there, *Marion I* confirmed that it is not enough for spokes to merely engage in "parallel conduct"; rather, they must have "coordinated their actions" with one another. 952 F.3d at 842. The court thus held that the plaintiffs' allegations that the spokes all followed the same "terms of [a] contract[]" did not "suffice to describe a hub-and-spokes conspiracy," because it did not establish any "coordinat[ion]" across the spokes themselves toward an unlawful end. *Id.* at 843.

Perhaps sensing the need for something more, Plaintiffs reach for a single example: As they tell it, a trade association representing some Deere-affiliated dealers has "actively spread misinformation on the availability of comprehensive repair tools." Opp. at 16. But this holds no water. As one of the cases invoked *by Plaintiffs* puts it: "[C]ourts have held that mere membership in a trade group or trade association, even when coupled with implementations of suggestions made by that group, does not qualify as concerted action." *In re Processed Egg Prods. Antitrust Litig.*, 2016 WL 5539592, at *10 (E.D. Pa. Sept. 28, 2016). Yet the Complaint does not even allege that much. It never says that any dealer is required to be a member of any trade association. And it never alleges that any dealer (much less all of them) is a member of any of the trade associations it names. More still, the Complaint never alleges that any dealer has directed the activities of any trade association, or that any of the dealers have agreed with each other to use any trade association in some given manner. *Compare* Compl. ¶ 88 (saying trade group acted "in apparent concert with Deere"). At bottom, there is nothing in the Complaint's sparse references

to trade associations that might give rise to even a strained inference of an agreement across the dealers.

As a final effort, Plaintiffs contend that partnering with Deere is somehow *not* in a dealer's self-interest absent like conduct by other dealers. Opp. at 18–19. Beyond their own say so, Plaintiffs offer no explanation for this assertion. Nor could they. Providing Repair Services is a profitable business line—something that is in a dealer's self-interest no matter what anyone else does. This is not an instance where parties take actions that are ordinarily harmful *but for* cooperation—for example, where manufacturers agree not to sell their goods to certain buyers and forgo those revenues (something a business ordinarily does not do), only on the condition their competitors did the same (so as not to lose market share), *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 932–36 (7th Cir. 2000). Here, there is economic upside for each dealer to sign agreements that allow them to perform Repair Services, regardless of whether other dealers do the same.

Likewise, Plaintiffs suggest dealers would otherwise want to share Repair Tools with others, but refuse to do so only because other dealers have agreed to do the same. Opp. at 19. But Plaintiffs offer nothing—whether it be facts or elaboration—to support this counterintuitive claim. And this is not a matter of dueling inferences. Plaintiffs' allegations simply provide no basis for drawing such an inference at all. *See id.*

At bottom, the Complaint is fundamentally deficient in alleging any facts that might support a plausible hub-and-spoke. Contrary to Plaintiffs' appeals (Opp. at 20–21), that deficiency is a pleadings problem. When a Complaint fails to include sufficient allegations, it cannot gain entry into the costly and onerous stage of fact-finding. Rather, as the Seventh Circuit has made clear: "*Twombly* demonstrates that courts should dismiss antitrust conspiracy complaints for failure to state a claim when the allegations, taken as true, could just as easily reflect innocent

conduct or rational self-interest." *Marion II*, 29 F.4th at 351; *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556–63 (2007) (applying pleading standard to an antitrust claim). The Complaint fails to clear this bar.

    **3.**    The Complaint also fails for a more basic reason: Plaintiffs have not joined any of the alleged co-conspirators as defendants. In justifying this omission, Plaintiffs focus entirely on one district court case (Opp. at 22), ignoring the Seventh Circuit precedent that Deere actually relied upon (Mot. at 12).[2] *See In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 605 (7th Cir. 1997). In *Prescription Drugs*, Judge Posner labeled joining co-conspirators as a "requirement." *Id.*; *accord In re New Motor Vehicles Canadian Export*, 307 F. Supp. 2d 136, 141 (D. Me. 2004) (citing *In re Brand Name* for notion joinder is required). Enforcing this requirement is common practice across the federal circuits. Mot. at 12. Yet Plaintiffs fail to satisfy it here.

    **4.**    Lastly, in a briefings-stage hedge, Plaintiffs now suggest they also pled a *vertical* conspiracy. Opp. at 23–26. But this late-breaking reframing cannot save the Complaint from *Illinois Brick*. The pleadings need to rise and fall on what they actually say. And the Complaint is clear that its claims turn on an alleged horizontal conspiracy. The Complaint exclusively refers to dealers as "co-conspirators" within the same conspiracy; its theory is premised on those dealers

---

[2] Contrary to Plaintiffs' claim, the district court actually came out on both sides of the issue here. *Compare In re Brand Name Prescription Drugs Antitrust Litig.*, 177 F.R.D. 414, 418 (N.D. Ill. 1997) (finding the Seventh Circuit may require intermediaries to be "formally joined as defendants and not merely named as co-conspirators"), *with In re Brand Name Prescription Drugs Antitrust Litig.*, 1998 WL 474146, at *13 (N.D. Ill. Aug. 6, 1998) (holding formal joinder is not required). With the former, the court allowed the plaintiffs to amend their complaint in light of a joinder requirement; with the latter, in a complicated posture, the court allowed a small selection of claims involving non-named defendants to proceed after the plaintiffs had already joined a number of intermediaries. But here, of course, Plaintiffs have not joined *any* intermediaries, proceeding only against Deere.

working together; it leads with a *per se* theory of liability (which is reserved for horizontal conspiracies); and it never once uses the word "vertical" in its seventy-plus pages. For better or worse, Plaintiffs must rely on what they wrote; they cannot amend the Complaint via motions practice. *See, e.g.*, *Marion I*, 952 F.3d at 843 (holding plaintiffs failed to plead a horizontal conspiracy and would need to amend complaint to press a vertical theory).

## II. PLAINTIFFS CANNOT PLEAD A PLAUSIBLE RELEVANT MARKET.

An antitrust complaint must also identify the relevant market. Plaintiffs fail to do so twice over. Instead, Plaintiffs mostly insist they will iron out any problems with their proposed markets down the road, after evidentiary hearings and fact-finding. But those some-day intentions are no answer to the basic legal defects that pervade the Complaint, and that prove fatal on the pleadings.

### A. Plaintiffs Fail to Plausibly Allege a Relevant Primary Market.

Plaintiffs agree that they must plead a plausible relevant primary market to plead a plausible aftermarket from which it derives. Opp. at 36. And Plaintiffs agree their proposed primary market is that for "Tractors." *Id.* Despite Plaintiffs' attempt to walk back in their briefing that market's open-ended nature,[3] the Complaint defines "Tractors" as "including"—but not limited to—essentially any piece of agricultural machinery that might end up on a farm.

Regardless, the fundamental problem with Plaintiffs' proposed primary market is that it is not defined in any way by reference to the rule of reasonable interchangeability. In plain terms, a product market must be defined around those products that are "reasonably interchangeable by consumers for the same purposes." *Sharif Pharm., Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916 (7th Cir. 2020) (internal quotation marks omitted). Where a proposed product market makes

---

[3] *Compare* Compl. ¶¶ 66 (defining market as all agricultural equipment, "includ[ing]" a host of examples); 59 n.12 (same but using "e.g."), *with* Opp. at 36 n.28 (listing machines but omitting "including" and "e.g.").

no effort toward this showing, it cannot survive the pleadings. *See, e.g.*, *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (Scirica, J.) ("Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability … the relevant [product] market is legally insufficient and a motion to dismiss may be granted.").

Here, Plaintiffs do not ever state—let alone attempt to satisfy—this standard. Nor could they, as the Complaint affirmatively disclaims that the Tractor Market is defined by what machines are "reasonably interchangeable by consumers for the same purpose." Rather, the Complaint readily admits that machines like tractors, air seeders, sprayers, and cotton harvesters are "highly differentiated products" that are "unlikely to have many close substitute products." Compl. ¶ 70. And with credit to candor, Plaintiffs are correct. As raised before, a farmer who is in the market for an air seeder is not going to be happy coming off the lot with a sugar cane harvester. *See* Mot. at 16–17.

Tellingly, Plaintiffs respond to none of this. Instead, they maintain only that "industry publications" and Deere's posted "repair sources" often discuss agricultural machinery together. Opp. at 36. Of course, that is not enough; what publications use as labels (be it "vehicles" or "food" or "agricultural machinery") does not decide what goods are reasonably interchangeable. Worse still, Plaintiffs' cited examples do not even help their cause. The cited trade publication references in the same line Deere's "farm" *and* "industrial" business lines; but not even Plaintiffs think that the two (the latter of which covers construction equipment like road graders) can conceivably be part of the same product market. And the quote from Deere's website discusses "agriculture" *and* "turf" equipment; again, two business lines (the latter of which covers lawn mowers, golf course equipment, and specialized agricultural equipment) that are distinct.

13

As for legal authority, Plaintiff's only citation is to *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), for the proposition that a relevant product market may sometimes include sub-markets. Opp. at 36. Even so, that says nothing about whether *this* market is too broad, given that by its own admission it includes products that are not reasonably interchangeable with one another. Still, the fact Plaintiffs were forced to turn to *Brown Shoe* (and only *Brown Shoe*) is itself revealing. Significant developments in modern antitrust law have "cast doubt on the continued vitality of such cases as *Brown Shoe*." *See, e.g.*, *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1386 (7th Cir. 1986) (Posner, J.); Areeda & Hovenkamp, *Antitrust Law* ¶ 533c (Aug. 2022) ("Speaking of submarkets is both superfluous and confusing in an antitrust case, where the courts correctly search for a 'relevant market'—that is, a market relevant to the particular legal issue being litigated."). To the extent Plaintiffs put up *Brown Shoe* as license to excuse the open-ended nature of their chosen primary market, the Court should decline the offer.

Most of all, Plaintiffs' main argument here is that market definition is a fact-issue that should not be resolved on the pleadings. But as above, this position has been rejected time and again by federal courts. While the precise contours of a market often involve a "deeply fact-intensive inquiry," this "does not mean that a court should blindly accept a market definition proposed in a complaint." *Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*, 2013 WL 4599903, at *3 (N.D. Ill. Aug. 29, 2013) (internal quotation marks omitted). Where, as here, a proposed market harbors a fundamental legal defect on its face—such as avoiding the rule of reasonable interchangeability—courts routinely hold that the market must be rejected on the pleadings. *See, e.g.*, *Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 142 (S.D.N.Y. 2010) (granting motion to dismiss

where "Plaintiff ma[de] no effort to explain the alleged market [of print advertising sales] with reference to the interchangeability of the product at issue").[4]  This Court should do the same here.

## B.     Plaintiffs Fail to Plausibly Allege a Relevant Aftermarket.

Plaintiffs acknowledge that their proposed relevant market—a single-brand aftermarket limited to a subset of repair services for a particular company's goods—is disfavored in antitrust, and exceedingly rare.  Opp. at 30, 34.  And Plaintiffs accept that in order to enter this narrow class, they must plausibly allege a "lock-in" problem for consumers.  Opp. at 32.  As one of the cases Plaintiffs rely upon explains, a complaint may do so in one of two ways:  "[A] lock-in claim requires specific factual allegations in the complaint that the defendant either changed its rules after the initial sale was made or concealed its rules from its customers."  *Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 737 (6th Cir. 2008).  Here, the Complaint alleges neither, and Plaintiffs offer nothing to rehabilitate that fatal omission.

1.     Begin with concealment.  Plaintiffs charge Deere with engaging in a "proliferation of misinformation."  Opp. at 3.  With that sort of rhetoric, one would expect concrete examples. But the Complaint has none.  The one statement Plaintiffs point to in their response was published by a trade association (NAEDA), not Deere.  Opp. at 33.  And it publicly states the *very policy*

---

[4] *See, e.g.*, *PSKS, Inc.*, 615 F.3d at 418 (affirming dismissal of complaint where proposed "women's accessories" market was "too broad and vague," and not defined by those products "reasonably interchangeable by consumers for the same purposes"); *Maui Jim, Inc. v. SmartBuy Guru Enters.*, 386 F. Supp. 3d 926, 945 (N.D. Ill. 2019) ("[A] plaintiff has the burden of identifying the existence of a relevant product market [in the complaint]," which is "defined by 'the reasonable interchangeability of the products'"); *Multiple Energy Techs., LLC v. Under Armour, Inc.*, 2021 WL 2661827, at *2 (W.D. Pa. June 29, 2021) (similar); *Prescient Med. Holdings, LLC v. Lab'y Corp. of Am. Holdings*, 2019 WL 635405, at *6 (D. Del. Feb. 14, 2019) (same where proposed market of "laboratory services" was "too broad and imprecise"); *Glynn-Brunswick Hosp. Auth. v. Becton*, 159 F. Supp. 3d 1361, 1381 (S.D. Ga. 2016) (rejecting argument that "fact-intensive nature of antitrust cases" resists dismissal when there is no plausible market); *Golden Gate Phar. Servs., Inc. v. Pfizer, Inc.*, 2010 WL 1541257, at *3–4 (N.D. Cal. Apr. 16, 2010) ("[Courts] cannot simply assume that [products] are reasonably interchangeable").

Plaintiffs are challenging: "*Through your dealer*, everything a customer needs to diagnose and repair their equipment is already available." Compl. ¶ 88 (emphasis added). (Tellingly, Plaintiffs omit at times the italicized language in their brief. Opp. at 16.)

As Deere explained before, the rest of the Complaint fares no better, and does not invoke a single inaccurate statement, much less a campaign of misinformation. Mot. at 19–20. And as also explained before, the Complaint actually portrays Deere's repair policies as being consistent, public, and well-known. *Id.* at 18–19. This is not a matter of competing inferences: The Complaint *never* alleges anything otherwise.[5]

Despite Deere raising these points statement-by-statement in its motion, Plaintiffs offer no response. They do not contest Deere on any specific statement. They do not cite a single other example of Deere concealing its repair policies. And they do not cite any instance of customers— including any named plaintiff—alleging they were misled, unaware, or confused about what they were purchasing with a Deere tractor or what repair policies would apply. The Complaint is silent about these central facts, which would be in Plaintiffs' possession if they existed. These omissions alone require dismissal of their Complaint. *See, e.g.*, *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 405 (3d Cir. 2016) (holding there can be no liability under *Kodak* where customers were on notice of policies).

**2.** Plaintiffs largely abandoned any argument that Deere has changed its repair policies, thus locking-in consumers on the back-end. Opp. at 34; *see also id.* at 35 (disclaiming any reliance on 2018 Statement of Principles). As Deere has already detailed, the Complaint has

---

[5] *See, e.g.*, Compl. ¶¶ 74–75 (observing that sales manuals described repair policies as soon as Deere started using ECUs), 85 (same), 125 (describing "history" of Deere "fighting" for its repair policies through at least 2015), 126 (noting this continued through at least 2016), 122 (saying Deere's policies earned it the nickname "Mother Deere"), 127 (identifying "public awareness of and frustration with" Deere's well-known policies).

no allegations of Deere going back on any promises, or restricting its existing repair policies. Mot. at 19–20. If anything, the Complaint outlines a recent effort by Deere to *liberalize* those policies, which by definition cannot give rise to a lock-in claim. *Id.* at 20–21. Plaintiffs do not contest these points, nor dispute any of Deere's characterizations.

Instead, the only "policy change" identified by Plaintiffs is that generations ago the nature of farm equipment was sufficiently rudimentary that farmers were able to repair fully mechanical tractors without assistance from a dealer. Opp. at 34. That Plaintiffs feel bound to make this argument reveals the strength of their case. Whatever the repair policies were for mechanical Tractors sold decades ago, they do not bear on whether Deere changed its policies as to modern Tractors.

Here too, none of the named plaintiffs even hint that they were subject to a change in policy after they bought their Deere Tractors (indeed, they do not even allege when or which tractors they bought). Again, in both the Complaint and their response, Plaintiffs are silent as to these salient facts, which would plainly be in their possession if they existed.

**3.** Plaintiffs' argument boils down to a claim that Tractors are costly, complex machines, and it is thus hard for farmers to fully assess their lifecycle prices. Opp. at 33–34. But absent front-end concealment or a back-end policy change, "these additional information costs stem from the fact that our economy is not one of perfect information, a factor that alone should not invoke antitrust condemnation." *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997).[6] This makes good sense, as the alternative would expose every maker of complex

---

[6] *See also, e.g.*, *Collins Inkjet Corp. v. Eastman Kodak Co.*, 2014 WL 11516553, at *9 (S.D. Ohio Mar. 21, 2014) ("[T]he Supreme Court did not require that consumers have exact knowledge of every potential cost facing them at the time of purchase."); *Océ N. Am., Inc. v. MCS Servs., Inc.*, 795 F. Supp. 2d 337, 343 (D. Md. 2011) ("Despite MCS's repeated assertions regarding lifecycle cost information asymmetry, it fails to plausibly explain exactly why printer purchasers cannot

goods who deals in complementary products to antitrust liability. *See Schor v. Abbott Labs.*, 457 F.3d 608, 614 (7th Cir. 2006). *Kodak*-style claims would be omnipresent, not exceedingly rare, as Plaintiffs admit they are. Information asymmetry inherent to a market, without more, is not enough.

It bears mention, too, that Plaintiffs never actually plead anything to support their assertion that farmers cannot assess the lifecycle price of Deere Tractors. Nor, again, do they ever state that any of the named plaintiffs had trouble doing so either. Rather, as above, the Complaint rests only on vague assertions about nameless "farmers," all without any detail or support. *See, e.g.*, Compl. ¶ 141 (declaring it is "impossible for farmers to even approximate the lifecycle cost of repairs").

**4.** Plaintiffs spend little time with the decades of precedent that has followed *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992). Instead, Plaintiffs suggest this case is on all fours with *Kodak* itself. Far from it. In *Kodak*, the company sold a substantial number of copiers that customers could service themselves (or through independent repair shops). But after having achieved a large number of sales, the company changed its repair policies, and then tried to claim all of the repair work for itself. *See, e.g.*, *Schor*, 457 F.3d at 614 (describing *Kodak* and identifying this change in policy as the relevant event); *Digit. Equip. Corp. v. Uniq Digit. Techs., Inc.*, 73 F.3d 756, 762–63 (7th Cir. 1996) (same). But here, there is nothing of the sort. As just explained, there is no front-end concealment or back-end policy change that may implicate *Kodak*. And, unlike *Kodak*, Deere is not alleged to perform any Repair Services itself. Opp. at 9.

---

obtain this information."); *ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622, 642 (E.D. Pa. 2003) ("[S]everal courts writing post-*Kodak* have found that the existence of uniqueness of aftermarket goods and the existence of switching and information costs in the foremarket are insufficient to establish the aftermarket as the relevant market, unless an antitrust defendant has actually changed its policy after locking-in some of its customers.").

Plaintiffs resort to the refrain that none of this should be decided on the pleadings, and that *Kodak*-claims are quintessentially fact-bound ones that defy early resolution. Opp. at 34–35. That is just wrong. Plaintiffs cite no example of where a complaint premised on a *Kodak*-style claim survived the pleadings without alleging a plausible lock-in problem. *See, e.g.*, *In re Dealer Mgmmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 963–64 (N.D. Ill. 2018) (noting specific examples of policy change and concealment). And they ignore that courts regularly dismiss *Kodak*-style claims where such allegations are absent. *See, e.g.*, *Siva v. Am. Bd. of Radiology*, 418 F. Supp. 3d 264, 277–78 (N.D. Ill. 2019) (dismissing complaint where plaintiff failed to plausibly allege a lock-in because he was on notice about policy); *Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*, 87 F. Supp. 3d 874, 887 (N.D. Ill. 2015) (same where no plausible allegations "consumers [were] effectively 'locked in'"); *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1153 (N.D. Cal. 2020) (same). This case should not be the lone exception.

## III. PLAINTIFFS' OTHER ARGUMENTS ARE WITHOUT MERIT.

The above points cut across all claims, and justify rejecting the Complaint in full. But the Complaint also presents multiple deficiencies on a more claim-specific level. Mot. at 22–28. Plaintiffs effectively respond to none of these. Three points, in particular, bear mention.

*First*, Plaintiffs cannot rehabilitate their tying claim. To state a tying claim a plaintiff must, among other things, both identify the relevant primary market—a distinct point, discussed above— and plausibly allege the defendant has substantial economic power within that market. *See* Areeda & Hovenkamp, *supra*, at ¶ 1702 (noting it is "black letter doctrine" that a tying claim requires "substantial economic power" in the tying market), *id.* ¶ 1733f2 (similar); *Digit. Equip. Corp.*, 73 F.3d at 761–63 (similar). Here, the problem is not that Plaintiffs failed to allege *substantial* economic power; it is that the Complaint fails to plausibly allege *any* market power at all. The

19

Complaint's sole allegation as to market power is a single statistic that Deere controls "approximately 55% and 63% of the large tractor and combine markets, respectively." Compl. ¶ 68. But this is both uninformative—Plaintiffs never say what these percentages are measuring (for instance, revenue versus units)—and incomplete—it only relates to *two* machines within the innumerable products within Plaintiffs' so-called "Tractor" market. Courts have routinely dismissed complaints when they rely on such unadorned statistics as to an entire proposed market. *See, e.g.*, *F.T.C. v. Facebook, Inc.*, 560 F. Supp. 3d 1, 18 (D.D.C. 2021) (allegation that Facebook had "excess of 60%" of market was "too conclusory to establish market power").[7] The same should hold here where Plaintiffs' sole "statistic" relates to only a subset of the proffered market. Plaintiffs say courts "have held" otherwise (Opp. at 38), but then move on without citation.

*Second*, Plaintiffs effectively abandon their *per se* theories. Practices may be condemned as *per se* unlawful only when they "so obviously threaten to reduce output and raise[] prices" that antitrust courts may invalidate them out of hand without any fact-intensive analysis. *NCAA v. Alston*, 141 S. Ct. 2141, 2156 (2021). As Deere showed before, nothing alleged in the Complaint merits this treatment. Mot. at 23–24. And at no point in their response do Plaintiffs contest this. Rather, Plaintiffs emphasize that their claims are overwhelmingly fact-bound and require a careful weighing of the evidence. But that admission, at minimum, is enough to foreclose the claims in the Complaint that are premised on any *per se* theory of liability.

---

[7] *See also e.g.*, *EuroTec Vertical Flight Sols., LLC v. Safran Helicopter Engines S.A.A.*, 2019 WL 3503240, at *3 (N.D. Tex. Aug. 1, 2019) (finding bare allegation of "market share of over 50 percent" to be "conclusory"); *Sherwin-Williams Co. v. Dynamic Auto Images, Inc.*, 2017 WL 3081821, at *7 (C.D. Cal. Mar. 10, 2017) (claim that firm maintains "a stranglehold in the automotive paint industry" was too "conclusory" and lacked "sufficient detail for the Court to plausibly infer … sufficient market power"); *Synthes, Inc. v. Emerge Med., Inc.*, 2012 WL 4473228, at *11 (E.D. Pa. Sept. 28, 2012) (finding allegation defendant "is a monopoly … with over 50% market share" was a "threadbare recital[] unsupported by any factual allegations").

*Third*, Plaintiffs cannot defend their proposed class, or the named plaintiffs' standing to represent it. Plaintiffs accept that a problematic class can be rejected on the pleadings. Opp. at 35. But Plaintiffs make no real effort to answer the problems raised with theirs. Mot. at 21–22. In fact, Plaintiffs concede they have no idea when Deere's allegedly nefarious conduct started (yet they assert it was public and rampant). *Id.* In the same breath, they also insist (as they must) that whenever Deere's conduct happened to start, it "[i]nvariably" started before named plaintiffs bought their Tractors (*id.*)—even though, once more, the Complaint is silent as to *when* they did so, *what* they bought, and *from whom*. This cannot be enough. To lead a class premised on a lock-in claim, the Plaintiffs must, at minimum, offer something to suggest the named plaintiffs were locked-in. For no reason other than the Plaintiffs' own choices, the Complaint has only silence.

Regardless of the time period, Plaintiffs also do not try to justify their decision to structure their class around when people bought *Repair Services* rather than *Tractors*. A *Kodak*-style claim turns on the conditions that existed when people bought the initial good in the primary market, and a *Kodak*-class thus must be pegged to those who were locked-in as a result of their initial purchase. Whether or when someone bought services in the aftermarket has no bearing on whether someone was locked-in. It thus makes no sense to structure a class around aftermarket purchasers.

## CONCLUSION

For the reasons given, this Court should enter judgment on the pleadings in favor of Deere.

Dated:  February 21, 2023     Respectfully submitted,


*/s/ Tiffany D. Lipscomb-Jackson*

John M. Majoras
jmmajoras@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Telephone: (202) 879-3939

Tiffany D. Lipscomb-Jackson
tdlipscombjackson@jonesday.com
JONES DAY
325 John H. McConnell Boulevard,
Suite 600
Columbus, OH 43215-2673
Telephone:  (614) 281-3876

Corey A. Lee
calee@jonesday.com
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939

Amanda B. Maslar (6321073)
amaslar@jonesday.com
JONES DAY
110 North Wacker, Suite 4800
Chicago, IL  60606
Telephone:  (312) 782-3939
Facsimile:   (312) 782-8585

*Counsel for Defendant Deere & Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 21, 2023, a copy of the foregoing was filed using the CM/ECF system, which will effectuate service on all counsel of record.

*/s/ Tiffany D. Lipscomb-Jackson*