UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| **IN RE: DEERE & COMPANY REPAIR SERVICES ANTITRUST LITIGATION**<br><br>**THIS DOCUMENT RELATES TO:**<br>**ALL CASES** | Case No.: 3:22-cv-50188<br><br>Hon. Iain D. Johnston |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL DEFENDANT DEERE & COMPANY'S PRODUCTION OF DOCUMENTS <u>RESPONSIVE TO REQUESTS FOR PRODUCTION NOS. 8, 36, AND 49</u>**

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION .................................................................................................................. 1

II. BACKGROUND FACTS AND DOCUMENT REQUESTS ............................................. 2

    A. Summary of Relevant Facts ................................................................................. 2

    B. RFPs ....................................................................................................................... 3

III. ARGUMENT ......................................................................................................................... 4

    A. Relevance Is Construed Broadly under the Federal Rules of Civil Procedure and in Antitrust Cases in Particular ............................................................................ 5

    B. The Party Resisting Discovery Must Establish with Specificity That a Request Is Irrelevant and/or Unduly Burdensome. ................................................ 6

    C. The Court Should Compel Deere to Produce Documents Responsive to the Three RFPs at Issue ................................................................................................ 7

        i. RFP No. 8: Deere has not carried its burden to demonstrate the collection and production of error codes, information of incontrovertible relevance, is unduly burdensome. .................................... 7

        ii. RFP No. 36: Deere cannot escape its discovery obligation by unilaterally excluding relevant documents from production ......................................... 9

        iii. RFP No. 49: Plaintiffs' request for Deere's data services is undeniably relevant to Plaintiffs' switching cost analysis .......................................... 12

IV. CONCLUSION ................................................................................................................... 14

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Aircrash Disaster Near Roselawn*,
  172 F.R.D. 295 (N.D. Ill. 1997)...................................................................................................5

*American Rock Salt Co., LLC v. Norfolk Southern Corp.*,
  228 F.R.D. 426 (W.D. N.Y. 2004)..............................................................................................11

*Baxter Int'l Inc. v. AXA Versicherung*,
  320 F.R.D. 158 (N.D. Ill. 2017)...............................................................................................4, 8

*Bd. of Educ. Of Evanston Twp. High Sch. Dist. No. 202 v. Admiral Heating & Ventilating, Inc.*,
  104 F.R.D. 23 (N.D. Ill. 1984)....................................................................................................6

*In re Brand Name Drugs Antitrust Litig.*,
  Nos. 94 C 897, MDL 997, 1995 WL 360526 (N.D. Ill. June 15, 1995)......................................8

*Callahan v. A.E.V. Inc.*,
  947 F. Supp. 175 (W.D. Penn. 1996)..........................................................................................6

*Eastman Kodak Co. v. Image Tech. Servs.*,
  504 U.S. 451 (1992)............................................................................................................13, 14

*In re Folding Carton Antitrust Litig.*,
  83 F.R.D. 251 (N.D. Ill. 1978)....................................................................................................5

*Hansen v. Country Mutual Ins. Co.*,
  18 CV 244, 2020 WL 5763588 (N.D. Ill. Sept. 28, 2020).........................................................11

*Hosp. Bldg. Co. v. Trs. of Rex Hosp.*,
  425 U.S. 738, 96 S. Ct. 1848, 48 L. Ed. 2d 338 (1976)..............................................................6

*Jackson v. Montgomery Ward & Co.*,
  173 F.R.D. 524 (D. Nev. 1997)...................................................................................................6

*Kellam Energy Inc. v. Duncan*,
  616 F. Supp. 215 (D. Del. 1985).................................................................................................6

*Kleen Products LLC v. Packaging Corp. of America*,
  Case No. 10 C 5711, 2012 U.S. Dist. LEXIS 139632 (N.D. Ill. Sept. 28, 2012).......................6

*Oppenheimer Fund, Inc. v. Sanders*,
  437 U.S. 340 (1978)....................................................................................................................5

*Ortho-McNeil-Janssen Pharm., Inc. v. Watson Lab. Inc.*,
   No. 08-5103 (SRC)(MAS), 2010 WL 11473887 (D. N.J. June 4, 2020) ................................11

*Parkdale Am., LLC v. Travelers Casualty & Surety Co. of Am., Inc.*,
   No. 3:06CV78-R, 2007 WL 4165247 (W.D. N.C. Nov. 19, 2007) ..........................................8

*PSI Repair Services, Inc. v. Honeywell, Inc.*,
   104 F.3d 811 (6th Cir. 1997) ...................................................................................................14

*Sailsbery v. Village of Sauk Village*,
   No. 15-cv-10564, 2020 WL 5570091 (N.D. Ill. Sept. 17, 2020) ...............................................5

*Scott v. Edinburg*,
   101 F.Supp.2d 1017 (N.D. Ill. 2000) .........................................................................................5

*Soto v. City of Concord*,
   162 F.R.D. 603 (N.D. Cal. 1995) ..............................................................................................5

*United States v. International Business Machines Corp.*,
   66 F.R.D. 186 (S.D.N.Y. 1974) ................................................................................................6

*In re Urethane Antitrust Litig.*,
   261 F.R.D. 570 (D. Kan. 2009) .............................................................................................5, 6

**Other Authorities**

*CPI Inflation Calculator*, U.S. BUREAU OF LABOR STATISTICS,
   https://www.bls.gov/data/inflation_calculator.htm (last visited May 5, 2023) ........................8

**Rules**

Federal Rules of Civil Procedure
   Rule 26 ......................................................................................................................................6
   Rule 26(b)(1) .................................................................................................................. *passim*

I.  **INTRODUCTION**

The crux of this case concerns Plaintiffs' allegations of Deere and Co. (d/b/a John Deere) ("Deere") and its affiliated authorized dealerships' ("Authorized Dealers") attempted monopolization, tying conduct, and restraint of the Deere Repair Services Market for Tractors[1] with onboard computers known as electronic control units or "ECUs." Consolidated Class Action Complaint ("CCAC") ¶¶ 58-63 (defining Deere Repair Services Market). The parties engaged in extensive negotiations for six weeks regarding Deere's Objections and Responses to Plaintiffs' First Set of Requests for Production ("RFPs") but have reached an impasse on three specific RFPs that seek highly relevant information regarding Deere Tractor error codes (RFP No. 8), restrictions on the ability of farmers and independent mechanics to repair issues related to ECUs (RFP No. 36), and Deere's data services (RFP No. 49). Deere Tractor error and diagnostic codes, and how they can be cleared, are a key mechanism of Deere's alleged unlawful anticompetitive conduct. Likewise, the data services that Deere offers in connection with the sale of Tractors and, as part of its data services, the transferability of data collected to competitor (*i.e.*, non-Deere) Tractors, are directly related to Plaintiffs' switching costs. Because the relevance of the information and documents responsive to RFP Nos. 8, 36, and 49 far outweigh any purported burden of production, the Court should grant Plaintiffs' Motion to Compel with respect to these RFPs.

---

[1] The parties have agreed to interpret "Tractor" to mean: "equipment manufactured by John Deere that: (A) has a primary purpose for use in the production of agricultural products, including: large, medium, and utility tractors; tractor loaders; combines, cotton pickers, cotton strippers, and sugarcane harvesters; harvesting front-end equipment; sugarcane loaders and pull-behind scrapers; tillage, seeding and application equipment, including sprayers, nutrient management and soil preparation machinery; hay and forage equipment, including self-propelled forage harvesters and attachments, balers and mowers; and (B) depends for its functioning, in whole or in part, on digital electronics embedded in or attached to the product. This definition does not include equipment manufactured, assembled, or sold by John Deere as Lawn & Garden, Construction, Roadbuilding, Landscaping & Grounds Care, Golf & Sports Turf, and Forestry equipment."

## II. BACKGROUND FACTS AND DOCUMENT REQUESTS

### A. Summary of Relevant Facts

A Deere Tractor requires substantial maintenance and repair work over the course of its life, although the nature and extent of such maintenance and repair vary and are difficult to predict. Historically, farmers have had the ability to repair and maintain their own tractors or hire an independent mechanic to perform such tasks in a timely manner. CCAC ¶ 3. Plaintiffs allege that farmers are no longer able to do this with newer generations of Deere Tractors containing ECUs because they are designed to display error codes requiring software to decipher and clear, which Deere has refused to make available to farmers and independent mechanics. *Id.* ¶¶ 3–4.

Beginning in the early 2000s, Plaintiffs allege Deere began using electrical and computer systems in its Tractors. These electrical and computer systems incorporate sensors throughout a Tractor and the ECUs monitor those sensors. *Id.* ¶¶ 74, 76. When a sensor detects a problem with the Tractor, or the sensor itself malfunctions, the Tractor displays what is known as a diagnostic trouble code or error code. *Id.* ¶ 77.

Software and information resources that Deere makes available to Authorized Dealers are routinely required to determine what the error code means and what maintenance or repair is needed. *Id.* ¶ 80. Authorized Dealers use a software tool made available by Deere called Service ADVISOR to decipher error codes and to fix and maintain Tractors. Service ADVISOR is loaded onto a laptop, which connects to a Tractor to read the communications between the Tractor's ECUs, determine what the problem is and where it is located, and how it can be fixed. *Id.* ¶¶ 11, 74.

Errors sensed by an ECU can put the Tractor into "limp mode" wherein the engine will only run at significantly reduced power, allowing the Tractor to move slowly but making it unable to effectively perform its functions, or make the Tractor completely inoperable. *Id.* ¶¶ 72, 77. For

2

a subset of repairs, Authorized Dealer software is also required to "pair" new parts to the Tractor. *Id.* ¶ 80. For certain parts that are replaced, the Tractor will not function with a new part installed until the Tractor receives a code from the Authorized Dealer that will clear the error code. *Id.*

These repair restrictions have real costs. During a busy harvest season, farmers must sometimes wait days for a technician with Dealer Service ADVISOR to plug into their Tractor to clear an error code. These delays can result in farmers watching their crops rot. *Id.* ¶¶ 14, 83. And, as of 2022, the cost for Deere's repair services was $150–$180 per hour for labor alone, with extra charges for travel and parts. *Id.* ¶ 93.[2]

Farmers heavily invest in Deere Tractors, with the price of one potentially running up to nearly a million dollars. This heavy initial investment effectively leaves farmers no choice other than to be locked into using Deere Tractors and thus pay for artificially inflated Deere Repair Services. Because the switching costs are so high, farmers purchase equipment expecting to be able to use the Tractor for decades. *Id.* ¶¶ 28, 99–100, 189.

Deere also pads its profits and further locks in farmers by offering data services that incentivize using Deere equipment exclusively. Once a farmer has invested in an expensive data service, such as a tracking system which provides agronomic data for its tractor fleet, it heavily relies on that system, which has no interoperability with non-Deere equipment. *Id.* ¶ 100.

**B.    RFPs**

On February 13, 2023, Plaintiffs served Deere with 61 RFPs. Castillo Decl., Ex. A. On March 15, 2023, Deere served Plaintiffs with its Objections and Responses thereto. *Id.*, Ex. B. On April 3, 2023, Plaintiffs sent Deere a letter addressing Deere's major objections and identifying deficiencies in Deere's responses. In the ensuing six weeks, Plaintiffs and Deere diligently met and

---

[2] One farmer reported that he purchased a new Tractor for $300,000 and spent nearly $8,000 on clearing error codes over the course of a few years. *Id.* ¶ 189.

3

conferred over videoconference on multiple occasions and exchanged multiple letters to resolve their disputes. *Id.* ¶¶ 5-7.

As a result of these significant efforts and compromises, the parties have disputes concerning only three out of 61 RFPs: RFP No. 8, which seeks documents sufficient to identify the error codes, which are central to Plaintiffs' case, for all models of Tractors manufactured; RFP No. 36, which seeks documents regarding Deere's communications regarding restrictions on the ability of the class and independent mechanics to repair Tractors; and RFP No. 49, which seeks documents sufficient to describe the data services that Plaintiffs contend, in part, contribute to locking in farmers to using Deere Tractors. *Id.*, Ex. A at RFP Nos. 8, 23, and 49.

### III.  ARGUMENT

Plaintiffs are entitled to discovery of information relevant to their antitrust claims. *See* Fed. R. Civ. P. 26(b)(1). Federal Rule of Civil Procedure ("Rule") 37(a) permits parties to move to compel the production of discovery sought. Ultimately, once the party seeking discovery demonstrates that the sought after information is relevant, as is unquestionably the case here, the party objecting to discovery "bears the burden to show the requested discovery is improper." *Baxter Int'l Inc. v. AXA Versicherung*, 320 F.R.D. 158, 161 (N.D. Ill. 2017). In refusing to produce documents responsive RFP Nos. 8, 36, and 49, Deere has largely asserted burden and relevance objections. But Deere has offered nothing more than general statements about what burden might result in producing the error codes in response to RFP No. 8. It further fails, or refuses, to recognize that the transferability of data collected and analyzed on its data services sought in RFP No. 49 is directly relevant to Plaintiffs' switching costs. And, as to RFP No. 36, Deere attempts to skirt its discovery obligations by unilaterally, and impermissibly, rewriting the RFP. Because Deere has

4

fallen short of demonstrating burden and lack of relevance in connection with RFP Nos. 8, 36, and 49, the Court should grant Plaintiffs' motion to compel documents responsive to these RFPs.

      **A.    Relevance Is Construed Broadly under the Federal Rules of Civil Procedure and in Antitrust Cases in Particular**

The scope of discovery under the Federal Rules of Civil Procedure is extremely broad. *In re Folding Carton Antitrust Litig.*, 83 F.R.D. 251, 254 (N.D. Ill. 1978). Discovery may be obtained "regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Discovery requests "should be considered relevant if there is any possibility that the information sought may be relevant to the subject matter of the action." *In re Aircrash Disaster Near Roselawn*, 172 F.R.D. 295, 303 (N.D. Ill. 1997); *see also Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (explaining that a relevant matter is anything that could bear on any issue in the case). Relevance is necessarily broad "in order to allow the parties essentially equal access to the operative facts." *Scott v. Edinburg*, 101 F.Supp.2d 1017, 1021 (N.D. Ill. 2000) (citation omitted). Questions of relevance should be construed "liberally and with common sense" and discovery should be permitted unless it has "no conceivable bearing on the case." *Soto v. City of Concord*, 162 F.R.D. 603, 610 (N.D. Cal. 1995); *see also Sailsbery v. Village of Sauk Village*, No. 15-cv-10564, 2020 WL 5570091, at *2 (N.D. Ill. Sept. 17, 2020) ("[T]he [c]ourt should be permissive when considering relevance objections."). Requesting parties need not "prove a prima facie case to justify a request which appears reasonably calculated to lead to the discovery of admissible evidence." *In re Urethane Antitrust Litig.*, 261 F.R.D. 570, 573 (D. Kan. 2009). Furthermore, because any violation of antitrust laws is a blow to the free enterprise system, "there

is a general policy of allowing liberal discovery in antitrust cases." *Kellam Energy Inc. v. Duncan*, 616 F. Supp. 215, 217 (D. Del. 1985) (citations omitted).[3]

### B. The Party Resisting Discovery Must Establish with Specificity That a Request Is Irrelevant and/or Unduly Burdensome.

The party resisting discovery must establish the requested documents are irrelevant by demonstrating that the information requested either (1) does not come within the broad scope of relevance, as defined under Rule 26 or (2) is of such marginal relevance that the potential burden occasioned by the discovery would outweigh the ordinary presumption in favor of broad disclosure. *In re Urethane*, 261 F.R.D. at 573; *see also Bd. of Educ. Of Evanston Twp. High Sch. Dist. No. 202 v. Admiral Heating & Ventilating, Inc.*, 104 F.R.D. 23, 29 n.10 (N.D. Ill. 1984) ("[T]he burden is on the objecting parties to show why release of the requested information would be improper.") (citing *In re Folding Carton Antitrust Litig.*, 83 F.R.D. at 254). Similarly, "[t]he party claiming that a discovery request is unduly burdensome must allege specific facts which indicate the nature and extent of the burden, usually by affidavit or other reliable evidence." *Jackson v. Montgomery Ward & Co.*, 173 F.R.D. 524, 528–29 (D. Nev. 1997). Even if a party can demonstrate burden with sufficient specificity, the burden associated with production must be disproportionate to the claims at stake in the litigation. *See* Fed. R. Civ. P. 26(b)(1) (directing courts

---

[3] *See also Kleen Products LLC v. Packaging Corp. of America*, Case No. 10 C 5711, 2012 U.S. Dist. LEXIS 139632, at *40 (N.D. Ill. Sept. 28, 2012) ("In antitrust cases, courts generally take an expansive view of relevance and permit broad discovery") (citing *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 U.S. Dist. LEXIS 29160, at *7-8 (E.D. Penn. Oct. 29, 2004)); *United States v. International Business Machines Corp.*, 66 F.R.D. 186, 189 (S.D.N.Y. 1974) (observing that "discovery in antitrust litigation is most broadly permitted and the burden or cost of providing the information sought is less weighty a consideration than in other cases") (citation omitted); *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746, 96 S. Ct. 1848, 48 L. Ed. 2d 338 (1976) (in antitrust cases, relevant evidence is "largely in the hands of the alleged conspirators.") (citation omitted); *Callahan v. A.E.V. Inc.*, 947 F. Supp. 175, 179 (W.D. Penn. 1996) ("Discovery in an antitrust case is necessarily broad because allegations involve improper business conduct. Such conduct is generally covert and must be gleaned from records, conduct, and business relationships.") (citation omitted).

to consider, *inter alia*, the issues at stake in the action, the amount in controversy, and the importance of the discovery).

> C. **The Court Should Compel Deere to Produce Documents Responsive to the Three RFPs at Issue.**
>
> i. **RFP No. 8: Deere has not carried its burden to demonstrate the collection and production of error codes, information of incontrovertible relevance, is unduly burdensome.**

John Deere's proprietary error codes reside at the heart of this case. Plaintiffs allege that Deere unlawfully restrains the Deere Repair Services Market and ultimately denies Plaintiffs and farmers their right to repair, through unlawful monopolization, monopoly leveraging, tying and other anticompetitive conduct implemented, in part, by these codes. *See, e.g.,* CCAC ¶¶ 4–5, 7–16, 72–79. Deere's antitrust conduct centers on the inoperability of its Tractors when the ECU detects and signals an issue, such as a broken part, or when the ECU has a software glitch, which forces the Tractors into "limp mode" or even making them inoperable until repaired by Authorized Dealers, all resulting in the generation—and the need to resolve—error codes. *See, e.g., id.* ¶¶ 13, 72, 82–83, 86.

Information regarding Deere's error and diagnostic codes is undeniably relevant to the alleged unlawful conduct, and Deere's denial of the same. Only by understanding the full and complete scope of the various error codes, and how those error codes are cleared, for all of Deere's Tractors, can Plaintiffs establish the true extent of Deere's restraints in the Deere Repair Services Market. Plaintiffs seek this information for the period from January 1, 2015 to October 24, 2022.

Deere's primary objection focuses on their purported burden, but it has offered nothing more than generalized statements about what burden *may* result in producing documents responsive to this RFP. Castillo Decl. ¶ 8 (" . . . collecting error and diagnostic trouble codes is a time-intensive and manual process that requires the collection of data from multiple platforms. As

7

such, John Deere cannot agree to expand its response to search for documents regarding all Tractors because such an endeavor would not be proportionate to the needs of the case[.]"). Deere has not even attempted to quantify this statement in terms of time, effort, or costs. *Id.* Deere falls far short of establishing undue burden. *See Baxter Int'l Inc.*, 320 F.R.D. at 161 (the party objecting to discovery "bears the burden to show the requested discovery is improper.").

Whatever Deere's specified burden *may* be, that purported burden must be weighed against the important issues in this case. *See* Fed. R. Civ. P. 26(b)(1) (parties are entitled to relevant information that is proportional to the needs of the case taking into account, *inter alia*, the issues at stake in the action, the amount in controversy, and the parties' resources). Courts frequently weigh defendants' cost burden arguments against the claims at stake and find that even significant costs of production do not excuse the party's obligation to produce responsive documents. *See, e.g.*, *Parkdale Am., LLC v. Travelers Casualty & Surety Co. of Am., Inc.*, No. 3:06CV78-R, 2007 WL 4165247, at *13 (W.D. N.C. Nov. 19, 2007) (finding costs of $20,000 was not sufficient burden to excuse production in a case involving a $3,000,000 insurance policy); *In re Brand Name Drugs Antitrust Litig.*, Nos. 94 C 897, MDL 997, 1995 WL 360526, at *2 (N.D. Ill. June 15, 1995) (requiring a defendant to produce e-mails from backup tapes in an antitrust case despite costs ranging between $50,000 to $70,000[4] associated with formatting and searching the backup tapes).

This case involves a defendant that has a larger market share than its two next largest competitors combined[5] and that generates billions of dollars in annual net income.[6] Plaintiffs and

---

[4] Or, adjusted for inflation, $99,463.28 to $139,248.59 in today's dollars. *See CPI Inflation Calculator*, U.S. BUREAU OF LABOR STATISTICS, https://www.bls.gov/data/inflation_calculator.htm (last visited May 5, 2023).
[5] *See* CCAC ¶¶ 67, 68, 154 ("multi-billion-dollar" repair market).
[6] *Id.* ¶ 187 ("Deere's 2021 net income was $5.96B, . . . The forecast for Deere's net income in 2022 is estimated to be between $7 and $7.2B.").

the class undertake sizeable risks in purchasing Deere Tractors.[7] Consumer right to repair, a significant allegation in this case, has garnered national attention.[8] Plaintiffs allege Deere has obfuscated and mislead consumers about Tractor repairability. CCAC ¶¶ 141–54. Deere's supposed burden is far outweighed by Deere's ample resources and the error codes' importance to this antitrust case.

Plaintiffs appreciate that Deere's production may not be easy or simple—although the process has never been described—but that is not a basis to withhold information that is directly relevant to the central claims and defenses at issue here. RFP No. 8 reflects the importance of this issue and is proportionate to the needs of their case against Deere. *See* Fed. R. Civ. P. 26(b)(1). Accordingly, the Court should order Deere to produce the information requested for all of its Tractors that are responsive to RFP No. 8 from January 1, 2015 to October 24, 2022.

        **ii.     RFP No. 36: Deere cannot escape its discovery obligation by unilaterally excluding relevant documents from production**

Request No. 36 seeks documents and communications between or among Deere and its Authorized Dealers (including through Deere's Dealer Technical Assistance Center ("DTAC")), or with industry groups regarding, *inter alia*, environmental, safety, security, and intellectual property concerns related to its Repair Tools and Repair Services. Castillo Decl., Ex. A. In Deere's Answer and Affirmative Defenses to the CCAC, Deere's Sixth Affirmative Defense (Independent and Legitimate Business Interest) relies on "limiting access to its proprietary software and other repair tools in light of concerns about customer safety, security and the environment (among other things)."[9] Despite the fact that Plaintiffs' request does not reference ECU's, Deere has unilaterally

---

[7] *Id.* ¶ 28 (". . . equipment like the CP690 Cotton Picker has a starting price of nearly one million dollars . . ."), ¶ 189 ("One farmer reported that he purchased a new Tractor for $300,000 . . ."), ¶ 83 (when Deere Tractors breakdown, land lies fallow and farmers "watch their crops rot.").
[8] ECF No. 120 at 2–4.
[9] ECF No. 103 at 73–74.

9

limited its proposed production on those topics, however, to documents and communications related to customers' and independent repair shops' ability to *program*, *reprogram*, *or calibrate* ECUs, asserting its response "tracks" Plaintiffs' claims because Plaintiffs "identify" reprogramming of ECUs as repairs Deere must complete. *Id.* ¶ 9. In addition, Deere seeks to limit its production on environmental issues to documents regarding emissions regulation despite the fact that its Affirmative Defense 6 is not so limited. Deere mischaracterizes Plaintiffs' allegations and impermissibly attempts to rewrite RFP No. 36.

      RFP No. 36 does not distinguish between the reprogramming or recalibration of the ECU itself and the less complicated repairs farmer and independent servicers cannot do without Deere. *Id.*, Ex. A. Plaintiffs specifically requested *all* documents and communication regarding environmental, safety, security, and intellectual property concerns related to its Repair Tools and Repair Services. *Id.* Deere cannot escape its discovery obligations by unilaterally narrowing RFP No. 36 to reprogramming and recalibration of the ECUs. *See American Rock Salt Co., LLC v. Norfolk Southern Corp.*, 228 F.R.D. 426, 434 (W.D. N.Y. 2004) (overruling defendant's objection because its "qualifications on the nature of the records sought by Plaintiff constitute[d] an attempt to unilaterally 'rewrite' Plaintiff's Requests so as to avoid compliance."); *see also Ortho-McNeil-Janssen Pharm., Inc. v. Watson Lab. Inc.*, No. 08-5103 (SRC)(MAS), 2010 WL 11473887, at *4 (D. N.J. June 4, 2020) (ordering defendant to respond to plaintiff's 30(b)(6) deposition topics as written, in part, because discovery rules do not permit parties "to unilaterally rewrite a topic so that no information or only partial information is provided."); *see also Hansen v. Country Mutual Ins. Co.*, 18 CV 244, 2020 WL 5763588, at *4 (N.D. Ill. Sept. 28, 2020) (parties are generally precluded from making unilateral redactions to otherwise responsive documents on grounds of relevancy) (citing cases).

Further, Plaintiffs do not allege that the reprogramming or recalibrating of ECUs is *the only* repair customers and independent mechanics cannot perform without Deere. Far from it. Rather, as alleged throughout, Plaintiffs identify a host of other, simpler repairs that farmers and independent mechanics cannot do without Deere or Authorized Dealers' intervention.

When a Tractor ECU detects an issue due to a *broken part, malfunctioning sensor*, or if there is a software glitch within the ECU itself, the Tractor is either thrown into "limp mode," wherein the engine runs at reduced power, or becomes entirely inoperable until the resulting error code is cleared by a Deere authorized technician. CCAC ¶¶ 77–78. Regardless of how tech-savvy or experienced a farmer or independent mechanic may be, Tractors cannot exit "limp mode," or otherwise become operable, until the error code is cleared, which can be as simple as resetting or replacing a single sensor related to a Tractor's emission system. *Id.* ¶¶ 80–83, ¶ 82 (explaining that Deere's S760 combine harvester has at least 125 different sensors, any one of which can throw an error code rendering the Tractor inoperable). Therefore, documents and communications responsive to RFP No. 36 include those that a related to these less complicated repairs. Indeed, Deere acknowledges that Plaintiffs' allegations are far broader than reprogramming or recalibrating of the ECU itself. Deere asserted that "Plaintiffs identify the reprogramming [and recalibrating] of ECUs *as repairs* that customers cannot do themselves" but it *did not claim* that the reprogramming or recalibrating of the ECU itself *was the only repair* that Deere must perform. Castillo Decl. ¶ 9.

The allegations in this case include Deere intentionally misleading consumers about their alleged right to repair their Tractors. *See, e.g.*, CCAC ¶¶ 141–54 (explaining Deere's history of false and misleading statements about the repairability of its Tractors and availability of its Repair Tools). It is, therefore, to Deere's advantage to withhold documents and communications regarding

11

environmental, safety, security, and intellectual property concerns related to its Repair Tools and Repair Services. The Court should not allow Deere to escape its discovery obligations by unilaterally dictating the terms of its response to RFP No. 36. Deere itself has asserted these concerns as an Affirmative Defense, and as such Plaintiffs are entitled to all the documents and communications between or among Deere, Authorized Dealers (including through DTAC), or with industry groups regarding both the reprogramming or recalibrating of the ECUs, *see, e.g.*, CCAC ¶¶ 148, 185, and of the less severe and less complicated repairs that farmers and independent mechanics cannot do without Deere intervention as specifically alleged. *See, e.g.*, *id.* ¶¶ 77–78, 80–83. The Court should thus compel Deere to produce all documents and communications responsive to RFP No. 36 regarding: (1) safety and security issues for Repair Tools and Services for Tractors, (2) environmental concerns, including emissions regulations, and )3) proprietary or intellectual property rights for Repair Tools and Services for Tractors.

### iii. RFP No. 49: Plaintiffs' request for Deere's data services is undeniably relevant to Plaintiffs' switching cost analysis

Request No. 49 seeks documents sufficient to describe the data services that Plaintiffs contend, in part, lock in farmers to exclusively use Deere Tractors. Deere will not produce responsive documents, stating that the Request seeks irrelevant information because consumers are not required to buy or remain enrolled in any of Deere's data or subscription services to operate Deere Tractors. Castillo Decl. ¶ 10. Deere's objection, however, is a red herring. Deere's data management services, subscriptions, and other precision technologies are relevant to Plaintiffs' switching costs; not because these services are tied to any of Deere's Tractors or repair services but because of the costs farmers incur in transferring that data—if it is even possible—and using it with other, non-Deere data services. In other words, it is unclear whether, and to what extent, the data gathered and analyzed by Deere's data services can in fact be transferred to a competitor's

Tractor, which again, is relevant to the switing costs analysis. *See id.* (during the parties' May 9 meet and confer, Deere insinuated that some of the data gathered by its data subscription services cannot be transferred to competitors); *see also* CCAC ¶ 100 (alleging the inoperability of Deere's data services).

So-called "switching costs" are directly relevant to Plaintiffs' claims. Where switching costs are particularly high, as alleged here, single-brand aftermarkets, as is Deere's Repair Services Market, are cognizable markets for antitrust purposes. *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 476–77 (1992). In *Kodak*, the Court found that there was "evidence that the heavy initial outlay [*i.e.*, investment] for Kodak equipment, combined with the required support material that works *only with Kodak equipment*, makes switching costs very high for existing Kodak customers." *Id.* at 477 (emphasis supplied). Thus, under *Kodak*, regardless of whether farmers voluntarily opted-in or remained customers of Deere's data subscription services, the investments that would be lost upon switching, in this case non-transferrable data collected by Deere's data subscription services, *see, e.g.*, CCAC ¶ 100, are switching costs. The same is true for the costs of transferring data that *is operable* with competitor Tractors. *See PSI Repair Services, Inc. v. Honeywell, Inc.*, 104 F.3d 811, 818 (6th Cir. 1997) (explaining that "switching costs" are any additional expenses consumers incur by switching from one product to another).

The costs of switching to competitor Tractor manufacturers are, in and of itself, incredibly high due to the large initial expense of Tractors, *see id.* ¶ 28 (". . . equipment like the CP690 Cotton Picker has a starting price of nearly one million dollars . . ."), ¶ 189 ("One farmer reported that he purchased a new Tractor for $300,000 . . ."), and complex equipment having an uncertain and variable repair costs over the useful life. *See id.* ¶ 99 (farmers invest hundreds of thousands of dollars in Tractors and switching costs for durable agricultural equipment are high). Those already

exorbitant switching costs are exacerbated if famers enroll in Deere's data subscription services. And, Deere offers data services where at least some have "*no interoperability with other manufacturers'* equipment." *Id.* ¶ 100 (emphasis supplied). Thus, the data collected by Deere data services subscriptions that cannot be transferred to a competitor Tractor are lost investment costs, making switching further unattractive. *See Kodak*, 504 U.S. at 477. On the other hand, for data collected that can be transferred to a competitor Tractor, the information regarding how that data can be migrated and maintained, without loss of data, and its post-transfer usability may also entail additional costs Plaintiffs, the class, and farmers generally must bear, which also constitute switching costs. *See PSI Repair Services, Inc.*, 104 F.3d at 818 (defining "switching costs" as any additional expense consumers incur by switching from one product to another). The functionality, operability, and transferability of Deere's data subscription services, as requested in RFP No. 49, will show the high switching costs associated with transferring, or of losing, the data collected by Deere when switching to a competitor Tractor. Thus, while these data services offered by Deere may be optional services, they are relevant to Plaintiffs' claims. Moreover, Deere touts these data services as a substantial benefit to farmers, further inducing them to utilize these services, thereby further locking them into the inflated Deere Repair Services (CCAC ¶ 100).

No matter how it is interpreted, RFP No. 49 is laser-focused on Plaintiffs' switching costs and thus the information sought is unquestionably relevant to the issues at stake in this case. There is no basis to shield this information from discovery. Deere's objection on relevance is simply wrong. The Court should compel Deere to produce all documents responsive to RFP No. 49.

## IV. CONCLUSION

Plaintiffs are entitled to discovery of all information responsive to RFP No. 8 and 49 from January 1, 2015 to October 24, 2022 (*i.e.*, the relevant time period that the parties have agreed on

for structured data). As to RFP No. 36, Plaintiffs are entitled to all documents responsive to: (1) safety and security issues for Repair Tools and Services for Tractors, (2) environmental concerns, including emissions regulations, and (3) proprietary or intellectual property rights for Repair Tools and Services for Tractor for January 12, 2016 through October 24, 2022 (*i.e.*, the relevant time period that the parties have generally agreed on for non-structured data). The information requested is relevant to Plaintiffs' claims of Deere's unlawful inflation of prices in the Deere Repair Services Market and a fulsome analysis of switching costs. Deere has not carried out its burden to show otherwise. Nor has Deere established why RFP No. 8 is unduly burdensome, particularly in light of the issues presented in this case. Accordingly, Plaintiffs respectfully request that the Court grant their motion and order Deere to produce information responsive to RFP Nos. 8, 36, and 49.

Dated: May 12, 2023     Respectfully submitted,

By: */s/ Adam J. Zapala*
Adam J. Zapala
Elizabeth T. Castillo
James G. Dallal
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com
jdallal@cpmlegal.com

Alexander E. Barnett
**COTCHETT, PITRE & McCARTHY, LLP**
40 Worth Street, Suite 602
New York, NY 10013
Telephone: (212) 201-6820
Facsimile: (917) 398-7753

By: */s/ Daniel C. Hedlund*
Daniel E. Gustafson
Daniel C. Hedlund
Michelle J. Looby
Kaitlyn L. Dennis
**GUSTAFSON GLUEK PLLC**
120 South Sixth Street #2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
kdennis@gustafsongluek.com

Dennis Stewart
**GUSTAFSON GLUEK PLLC**
600 W. Broadway, Suite 3300
San Diego, CA 92101
dstewart@gustafsongluek.com

15

abarnett@cpmlegal.com

<table>
<tr><td>

By: */s/ Kenneth A. Wexler*
Kenneth A. Wexler
Justin N. Boley
Tyler J. Story
**WEXLER BOLEY & ELGERSMA LLP**
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
kaw@wbe-llp.com
jnb@wbe-llp.com
tjs@wbe-llp.com

*Interim Co-Lead Counsel for Plaintiffs*

</td><td>

Robert Foote, Esq. (3124325)
Kathleen C. Chavez, Esq. (6255735)
**FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC**
10 W. State Steet, Suite 200
Geneva, IL 60134
kcc@fmcolaw.com
rmf@fmcolaw.com

*Interim Liaison Counsel for Plaintiffs*

Marc C. Gravino (6188531)
**WILLIAMS MCCARTHY LLP**
P.O. Box 219
Rockford, IL 61105
(815) 987-8936
mgravino@wilmac.com

*Interim Local Facilitating Counsel for Plaintiffs*

</td></tr>
</table>

16