UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| IN RE: DEERE & COMPANY REPAIR SERVICES ANTITRUST LITIGATION | Case No.: 3:22-cv-50188<br>MDL No. 3030<br><br>Hon. Iain D. Johnston |

**DEFENDANT DEERE & COMPANY'S OPPOSITION TO
<u>PLAINTIFFS' MOTION TO COMPEL DISCOVERY</u>**

**TABLE OF CONTENTS**

                                                          **Page**

I.     LEGAL STANDARD ................................................................................................... 1

II.    ARGUMENT .............................................................................................................. 3

        A.     Plaintiffs' Request for Diagnostic and Error Codes for All Tractors (RFP No. 8) Is Not Proportionate to the Needs of the Case ............................................ 3

        B.     Plaintiffs' Request for Documents Beyond the Limitations of Customers' and Independent Repair Shops' Ability to Program, Reprogram or Recalibrate ECUs (RFP No. 36) is Irrelevant and Overly Broad .......................... 8

        C.     Plaintiffs Fail to Show Their Request for "All Data Services" (RFP No. 49) is Relevant and Deere's Burden Outweighs Any Likely Benefit to Plaintiffs ................................................................................................................ 11

III.   CONCLUSION......................................................................................................... 15

## TABLE OF AUTHORITIES

Page

**CASES**

*BankDirect Cap. Fin., LLC v. Cap. Premium Fin., Inc.*,
   No. 15 C 10340, 2018 WL 946396 (N.D. Ill. Feb. 20, 2018) ...................................................... 2

*Deslandes v. McDonald's USA, LLC*,
   No. 1:17-CV-04857, 2019 WL 7480646 (N.D. Ill. July 17, 2019) .......................................... 4

*Eternity Mart, Inc. v. Nature's Sources, LLC*,
   No. 19-CV-02436, 2019 WL 6052366 (N.D. Ill. Nov. 15, 2019) .................................. passim

*In re Brand Name Drugs Antitrust Litig.*,
   Nos. 94 C 897, MDL 997, 1995 WL 360526 (N.D. Ill. June 15, 1995) ................................... 5

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   No. 18 C 864, 2018 WL 6047082 (N.D. Ill. Nov. 19, 2018) ...................................................... 4

*Motorola Sols., Inc. v. Hytera Commc'ns Corp.*,
   365 F. Supp. 3d 916 (N.D. Ill. 2019) ........................................................................................ 3

*Parkdale Am., LLC v. Travelers Casualty & Surety Co. of Am., Inc.*,
   No. 3:06CV78-R, 2007 WL 4165247 (W.D. N.C. Nov. 19, 2007) .......................................... 5

*Soto v. City of Concord*,
   162 F.R.D. 603 (N.D. Cal. 1995) .............................................................................................. 2

*Ye v. Cliff Veissman, Inc.*,
   No. 14-CV-01531, 2016 WL 950948 (N.D. Ill. Mar. 7, 2016) ................................................. 2

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26 ............................................................................................................... passim

Plaintiffs' Motion to Compel Defendant Deere & Company's ("John Deere") Production of Documents Responsive to Requests for Production Nos. 8, 36, and 49 should be denied. After numerous meet and confers on Plaintiffs' 61 requests, the parties reached an impasse on only three: RFP No. 8, which seeks diagnostic and error codes and related information that must be manually compiled, for over 8,500 John Deere Tractors;[1] RFP No. 36, which requests *all* documents and communications related to *all* repair services and tools offered by John Deere, including those that are not relevant to the claims and defenses in this matter; and RFP No. 49, which seeks information on optional data services and subscriptions that John Deere offers for Tractors. The impasse was not because John Deere refused to provide any information responsive to these requests—to the contrary, John Deere agreed to produce a subset of documents or information responsive to each, tailored to what is relevant and proportionate to this matter. This offer is in addition to the 54 other requests to which John Deere also agreed to produce responsive documents. But Plaintiffs demand more. They ask the Court to compel John Deere to produce documents that are irrelevant to the case and require significant time and resources to produce. This does not meet the proportionality requirement of Rule 26. For these reasons and those set forth below, John Deere respectfully asks this Court to deny Plaintiffs' Motion to Compel.

I. **LEGAL STANDARD**

Under the Federal Rules of Civil Procedure, discovery is permitted only if the

---

[1] The parties agree the following definition of "Tractor" will apply to Plaintiffs and John Deere's discovery responses: "equipment manufactured by John Deere that: (A) has a primary purpose for use in the production of agricultural products, including: large, medium, and utility tractors; tractor loaders; combines, cotton pickers, cotton strippers, and sugarcane harvesters; harvesting front-end equipment; sugarcane loaders and pull-behind scrapers; tillage, seeding and application equipment, including sprayers, nutrient management and soil preparation machinery; hay and forage equipment, including self-propelled forage harvesters and attachments, balers and mowers; and (B) depends for its functioning, in whole or in part, on digital electronics embedded in or attached to the product. This definition does not include equipment manufactured, assembled, or sold by John Deere as Lawn & Garden, Construction, Roadbuilding, Landscaping & Grounds Care, Golf & Sports Turf, and Forestry equipment."

1

information sought is (1) relevant to a party's claim or defense, and (2) proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1). Plaintiffs ignore this dual requirement, and instead cite a number of cases for the proposition that discovery is broad, and even more liberal in antitrust litigation. Pls. Mot. at 5–6. But the cases Plaintiffs cite predate the 2015 amendment to Rule 26, which defines the scope of discovery, and are therefore inapplicable. For example, Plaintiffs cite *Soto v. City of Concord*, 162 F.R.D. 603, 611 (N.D. Cal. 1995) and its reference that discovery should be permitted unless it has "no conceivable bearing on the case." Plaintiffs disregard the fact that Rule 26(b)(1) has been amended significantly ***twice*** since then, resulting in the current standard: "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense ***and proportional to the needs of the case***. . ." Fed. R. Civ. P. 26(b)(1). The narrowing effect of these amendments has been recognized by numerous courts in this district. *Ye v. Cliff Veissman, Inc.*, No. 14-CV-01531, 2016 WL 950948, at *2 (N.D. Ill. Mar. 7, 2016) ("[Th]e amendments to the Federal Rules of Civil Procedure . . . narrowed the concept of relevance for purposes of discovery. They deleted from Rule 26 a party's ability, for good cause, to obtain discovery of any information relevant to the subject matter of the case, and the notion that information is discoverable, even if not directly relevant, if it is reasonably calculated to lead to the discovery of admissible evidence.").

A party bringing a motion to compel has the burden to establish the relevancy of the discovery it seeks. *See, e.g., Eternity Mart, Inc. v. Nature's Sources, LLC,* No. 19-CV-02436, 2019 WL 6052366, at *2 (N.D. Ill. Nov. 15, 2019). As courts in this district have held, "the core requirement for any discovery request is that the information be relevant." *BankDirect Cap. Fin., LLC v. Cap. Premium Fin., Inc.*, No. 15 C 10340, 2018 WL 946396, at *4 (N.D. Ill. Feb. 20, 2018) (citations omitted) ("[T]he courts are unanimous in prohibiting discovery from being used as a

'fishing expedition' . . . Unless the requestor can demonstrate that the materials sought are relevant, judges should not hesitate to exercise appropriate control over the discovery process."). Only if the moving party can establish relevance does the burden shift to the party objecting to discovery to show why that request is improper. *Eternity Mart*, 2019 WL 6052366, at *2.

Discovery must also be "proportional to the needs of the case" and the Court must consider "whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1); *see id.* at Fed. R. Civ. P. 26(b) Advisory Committee's Note to 2015 Amendment ("A party claiming undue burden or expense ordinarily has far better information—perhaps the only information—with respect to that part of the determination."). "[T]he [p]roportionality analysis involves consideration of various factors, including the importance of the issues at stake, the amount in controversy, the parties' relative access to information, the parties' resources, the importance of the discovery in resolving the issue, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 365 F. Supp. 3d 916, 924 (N.D. Ill. 2019) (internal citation omitted). District courts have broad discretion to limit discovery when the burden of compliance outweighs its likely benefit or relevance. *See* Fed. R. Civ. P. 26 (b)(2)(C).

II. ARGUMENT

    A. **Plaintiffs' Request for Diagnostic and Error Codes for All Tractors (RFP No. 8) Is Not Proportionate to the Needs of the Case.**

Request for Production No. 8 seeks diagnostic trouble codes ("DTCs") for all models of John Deere Tractors going back to 2015, as well as the meaning of such DTCs and whether they are, as Plaintiffs describe, "self-healing":

3

> With respect to all models of Deere Tractors manufactured since January 1, 2000, Documents sufficient to identify, describe, or list error or diagnostic codes for such Tractors, including the meaning of such codes and whether such codes are self-healing or non- self-healing codes (also referred to as "latched" codes), along with the procedures or Repair Services necessary to clear any such codes.

Although ignored by Plaintiffs in their Motion, John Deere agreed to conduct a reasonable search to produce responsive and non-privileged documents regarding the error or diagnostic trouble codes for a representative sample of Tractors.[2] John Deere further expanded its offer by extending the time period for which it would search for DTCs to January 12, 2015 to October 24, 2022.

Plaintiffs refused to compromise, instead demanding that John Deere produce DTCs for *all* Tractors manufactured since 2015, over 8,500 models in total. The Court should deny their request because (1) Plaintiffs have not met their burden to show the delta between what John Deere has agreed to produce and what Plaintiffs want is relevant to their claims and defenses in this action and, (2) even if it is relevant, the burden for John Deere to collect, analyze and produce the requested information is immense and disproportionate to the needs of the case.

First, Plaintiffs have not met their burden of showing that the production of DTCs for *all* Tractors since 2015 is necessary for Plaintiffs to prove their claims. John Deere agreed to produce DTCs for a representative sample of Tractors, which would cover 25 models of Tractors. Parties in antitrust cases frequently use representative sampling and statistical methods to support allegations regarding injury at the class certification stage and this practice has been endorsed by courts in this district. *See In re Dealer Mgmt. Sys. Antitrust Litig.,* No. 18 C 864, 2018 WL 6047082, at *3 (N.D. Ill. Nov. 19, 2018) (ordering the parties to confer on a "representative sampling of the information Plaintiffs are seeking" . . . such that the burden to the defendant

---

[2] In addition to the definition of "Tractor," the parties have also agreed on a representative sample of Tractors to be used for other Requests for Production that require model-specific information due to the breadth of the Request.

4

"would be substantially reduced and may not be disproportional to the needs of the case."); *see also Deslandes v. McDonald's USA, LLC,* No. 1:17-CV-04857, 2019 WL 7480646, at *2 (N.D. Ill. July 17, 2019) (granting defendant's motion for protective order and ordering parties to confer on a representative sample, finding "[i]n light of the burdens identified by Defendants, the Court finds that sampling serves as an appropriate discovery method.").

Plaintiffs have offered no argument for why the representative sample of DTCs that John Deere has agreed to produce would not be sufficient here. Surely it is not Plaintiffs' position that each Tractor presents individualized issues, so that each Tractor requires individualized analysis—a position that would be contrary to their attempt to certify a nationwide class. To the extent Plaintiffs plan to utilize this information in support of their argument for certification of their proposed class (which John Deere does not believe should be certified) and their claims against John Deere (none of which John Deere believes have merit), Plaintiffs should be able to utilize the information from the representative sample of Tractors.

Second, Plaintiffs' vague arguments regarding the alleged minimal burden to John Deere to collect and produce documents responsive to this Request are unavailing. Plaintiffs cite two cases, both of which again pre-date the proportionality amendments to Rule 26(b)(1) and which quantify the burden of requiring the production of the documents at issue in terms of the cost to the producing party.[3] But here Plaintiffs make no attempt to quantify what the burden to John Deere would be to comply with the Request as Plaintiffs have drafted it, and instead assume that the production should be required.

The burden and cost for John Deere is immense. As evidenced by the declaration of

---

[3] Plaintiffs cite *Parkdale Am., LLC v. Travelers Casualty & Surety Co. of Am., Inc.*, No. 3:06CV78-R, 2007 WL 4165247, at *13 (W.D. N.C. Nov. 19, 2007) and *In re Brand Name Drugs Antitrust Litig.*, Nos. 94 C 897, MDL 997, 1995 WL 360526, at *2 (N.D. Ill. June 15, 1995)). Pls. Mot. at 8.

5

Courtenay N. Cramer, Manager of Integrated Technologies Product Support at John Deere, the effort by John Deere to collect, analyze and produce the requested material would be nothing short of "massive." Ex. A, Declaration of Courtenay N. Cramer ("Cramer Decl.") at ¶ 13. The parties' definition of "Tractor" is broad, and Tractors can be customized with various options and other capabilities, including the type of engine, transmission and overall design. For example, the 8 Series of John Deere Tractors includes three different models of Tractors (8R Models, 8RT Models, and 8RX Models), all of which customers can purchase in various configurations (for wheel and track configurations, as well as horsepower and transmission options). Each configuration of a Tractor has its own set of DTCs. Cramer Decl. at ¶ 6. In total, there are over 8,500 products, including all the different kinds of configurations available, that fall within the definition of "Tractor." *Id.* John Deere estimates that it would take at least one hour to pull the DTCs for each product. *Id.* at ¶ 8. That means that it would take over 8,500 hours or ***354 days*** of machine time just to pull the DTCs at issue if John Deere were to produce DTCs for all Tractors since 2015. *Id.* at ¶ 9.

Pulling the DTCs is just the first step of the burden to John Deere. Analyzing the DTCs to describe what they mean and whether they are "self-healing" as Plaintiffs have requested, is another burden altogether. As John Deere explained during the parties' meet and confer process and as detailed in Ms. Cramer's declaration, John Deere does not have an off-the-shelf guide that states whether each DTC is designed to be resolved by an authorized John Deere dealer when it appears on a machine.[4] *Id.* at ¶ 12. Analyzing DTCs is a time-intensive and manual process that requires a team of engineers from multiple different departments at John Deere, all of whom must

---

[4] Plaintiffs do not define what a "non-self-healing" DTC is. John Deere interprets this to mean a DTC that is designed for resolution by an authorized John Deere dealer.

be pulled away from their regular jobs to perform this analysis. *Id.* at ¶¶ 13, 31. First, a systems engineer from the equipment product line must review each DTC for the product at issue to categorize the DTCs that may be designed for resolution by an authorized John Deere dealer; engineers may also review the product's technical manuals and consult with other engineers to confirm the DTCs' attributes. *Id.* at ¶¶ 16-18. Then the DTCs that may be designed for resolution by an authorized John Deere dealer are cross-checked first against Customer Service Advisor, a tool available to customers to purchase since 2017 and which offers support for customers to clear certain DTCs themselves, and then against Service Advisor, to determine which subset of DTCs are designed to be resolved by an authorized John Deere dealer. *Id.* at ¶ 19. John Deere estimates that this analysis will take 45 hours for each of the 8,500 individual products that fall within the definition of "Tractor." *Id.* at ¶ 21. While some of the analysis can be utilized across different products, much of it will have to be performed on each product. In total, John Deere estimates that analyzing all DTCs for all John Deere Tractors since 2015, including whether they are designed to be resolved by an authorized John Deere dealer, would take ***over 382,000 hours***. *Id.*

To be clear, John Deere has already agreed to undertake some of this burden and do this analysis for the 25 models of Tractors in the representative sample of Tractors that the parties have already agreed to. Additionally, John Deere is willing to provide Plaintiffs with DTCs for the product families that the models in the representative sample of Tractors fall into. John Deere Tractors are organized into series or families, which correspond to the size and capability of the machines, as illustrated above by the 8 Series Tractor. *Id.* at ¶ 23. Providing the information for the families of the 25 models of Tractors in the representative sample of Tractors will take John Deere approximately ***854 hours*** to complete. *Id.* at ¶ 31. Plaintiffs have not shown why this is not sufficient, particularly given their allegations that they can certify a nationwide class, nor, more

importantly, why requiring John Deere to perform the extremely burdensome task of analysis on DTCs for all Tractors since 2015 is proportional to the needs of the case. Their motion should be denied.

> **B.   Plaintiffs' Request for Documents Beyond the Limitations of Customers' and Independent Repair Shops' Ability to Program, Reprogram or Recalibrate ECUs (RFP No. 36) is Irrelevant and Overly Broad.**

Request for Production No. 36 seeks:

> [a]ll Documents relating to, identifying, describing and/or containing Communications internal to, between, and/or among Deere, Deere Dealerships, and/or any Trade Associations or industry groups related to: a) Repair Tools and/or Repair Services for Tractors; b) environmental concerns, including state and federal emissions regulations and/or compliance, the Clean Air Act, or the Environmental Protection Agency ('EPA'); c) safety topics or concerns related to Repair Tools or Repair Services; d) security topics or concerns related to Repair Tools or Repair Services; e) proprietary or intellectual property rights related to Tractors, Repair Tools, parts, maintenance, or Repair Services; [and] f) Right to Repair, 'Repair Done Right', 'R2R', or any other customer requests, demands, or complaints related to access to Repair Tools or restrictions on repairs or Repair Services.

In response, John Deere agreed to search for responsive and non-privileged documents and communications for the time period of January 12, 2016 to October 24, 2022, relating to limitations of customers' and independent repair shops' ability to program, reprogram or recalibrate ECUs due to 1) safety and security issues for repair tools and services for Tractors, 2) emissions regulations related to ECU restrictions for Tractors, and/or 3) proprietary or intellectual property rights for repair tools and services for Tractors. John Deere's response is tailored to provide Plaintiffs with documents related to their claims, which center around the repairs that customers and independent repair shops allegedly cannot do but that John Deere independent authorized dealers can. John Deere's response also accounts for what it agreed to produce in response to Plaintiffs' other requests for production, of which Request No. 36 is duplicative.[5]

---

[5] John Deere agreed to produce documents in response to the following Requests for Production, which are duplicative of or overlap with the information requested in Request No. 36: Request Nos. 9 (documents regarding

8

Plaintiffs state their claims relate to repairs outside of the programming, reprogramming or recalibration of ECUs and offer the example of when a Tractor is thrown into "limp mode" due to a broken part or malfunctioning sensor, which Plaintiffs claim would not involve an ECU.

Clearing a code after a Tractor has entered "limp mode" fits into the definition of programming, reprogramming or recalibrating an ECU, and would fall into the category of documents that John Deere *has already agreed to produce*. As Plaintiffs note, clearing a latched code that has forced a Tractor into "limp mode" may require the replacement or reset of a sensor. Pls. Mot. at 11. But that would necessarily involve programming, reprogramming or calibrating an ECU as the sensor would need to be programed to function in the particular machine configuration. Thus, documents and communications regarding that type of repair are already included in what John Deere has agreed to produce.

To the extent Plaintiffs seek documents and communications related to *all* repair tools and services for John Deere Tractors, without any limitation, regarding the subjects outlined above, Plaintiffs' request is overbroad and Plaintiffs have not met their threshold burden of explaining

---

the availability or accessibility of repair tools manufactured or sold by John Deere), 12 (rates and prices for repair services charged by John Deere, the cost of warranty-covered repairs for Tractors, discounts or rebates for repair services for Tractors and other charges and fees associated with repairs for Tractors to the extent charged by John Deere), 14 (customers' complaints about Service Advisor, Parts Advisor, pricing, the quality of repairs, and the inability of customers or independent repair shows to perform repairs), 15 (price and how the price is established for Customer Service Advisor, Service Advisor and Parts Advisor), 21 (documents that show the connection between repair services and the consolidation, merger or sale of authorized John Deere dealerships), 27 (cooperation, communication, shared information, areas of responsibility, coverage and competition for repair services among authorized John Deere dealers), 28 (documents and communications with other manufacturers of Tractors sold in the U.S. relating to the Right to Repair), 29 (documents and communications directed to or received from the identified trade associations), 30 (documents and communications regarding political or advocacy groups, organizations or initiatives that describe the Right to Repair movement for Tractors), 32 (media coverage relating to the ability of customers or independent repair shops to perform repairs on Tractors), 34 (government and public relations initiatives, policies or programs relating to the Right to Repair for Tractors), 37 (documents and communications regarding the alleged markets for new and used Tractors, repair services, and aftermarket parts for Tractors), 39 (John Deere's practices, policies, procedures and business strategies related to repair tools and services for Tractors), 47 (complaints related to ECUs, the availability of aftermarket parts for Tractors and ability of customers or independent repair shops to make repairs on Tractors), and 48 (documents and communications regarding the Right to Repair for Tractors).

9

why documents regarding repairs that customers can themselves do are relevant to the claims in this litigation, especially when their Complaint focuses only on repairs customers and independent repair shops cannot do. *Eternity Mart*, 2019 WL 6052366, at *2; *see, e.g.,* CAC ¶¶ 4-5, 15, 71 ("Deere has restricted access to necessary Repair Tools, thereby preventing owners and independent repair shops from competing with Deere-affiliated Dealerships to make repairs on newer, ECU-equipped Tractors."). In their Complaint, Plaintiffs specifically identify the reprogramming of ECUs as repairs that require a John Deere dealer to resolve. *See, e.g.,* CAC ¶ 148 ("While Deere claims that software reprogramming 'can increasingly be done remotely' that claim does not reflect farmers' experiences."); ¶ 185 ("[R]eprogramming is a common and relatively straightforward step of many repairs involving replacement of an ECU which involves uploading software to the new controller. There is no way for a farmer to perform these types of repairs without being required to pay for service at a Dealership."). Thus, John Deere's agreement to produce documents and communications relating to limitations on customers' and independent repair shops' ability to program, reprogram or recalibrate ECUs aligns with Plaintiffs' claims regarding the repairs that they allege must be completed by independent, authorized John Deere dealers.

To require John Deere to go further than its current offer would impose a substantial burden that is disproportionate to the needs of the case. While John Deere cannot estimate the time it would expend to respond to the Request as drafted by Plaintiffs because it would implicate such an extensive set of documents, expanding the set of documents responsive to this Request beyond those related to the programing, reprogramming or recalibration of ECUs would require a significant investment of additional time and cost. For example, the current model of the S790 STS Combine has an approximately 6,900-page Diagnostic Technical Manual, an approximately

2,200-page Repair Technical Service Manual, as well as an Operator's Manual.[6] In addition to identifying potential repairs that John Deere has already agreed to produce documents for, these manuals identify many other possible areas of maintenance and repairs for the S790 STS Combine, including to the hydraulic system, air intake and cooling systems, steering, brakes, air conditioning, and the grain tank and unloading system. Searching for, reviewing, and producing documents and communications for such wide range of repairs would be a significant burden to John Deere. To be clear, Plaintiffs' Request asks for documents regarding ***all repairs*** (including simple repairs like changing the tire, windshield on a cab, or the body parts on a Tractor) for ***all Tractors*** manufactured since 2015. The categories of repairs in which Plaintiffs move to compel are plainly not the kind of repairs at issue in this case. Plaintiffs' request for all documents and communications regarding all repair tools and services should be denied.

> C. **Plaintiffs Fail to Show Their Request for "All Data Services" (RFP No. 49) is Relevant and Deere's Burden Outweighs Any Likely Benefit to Plaintiffs.**

While Plaintiffs state in their Motion that Request for Production No. 49 only requests information sufficient to describe certain data services, Plaintiffs actually seek:

> [d]ocuments sufficient to identify and describe all data services, subscriptions, or other precision agriculture technologies or services available for Deere Tractors and equipment, including but not limited to technologies, applications, solutions, or other services for Data Management, Remote Management, Guidance, and Variable Rate Application, including information on customer pricing, usage, and the commercial benefits to Deere and the Dealerships of such services.

As the party seeking discovery, Plaintiffs must show that these documents are "relevant to any party's claim or defense" as required by Federal Rule of Civil Procedure 26(b)(1); *Eternity Mart*, 2019 WIL 6052366 *2-3. They fail to do so. The core of Plaintiffs' Complaint concerns John Deere's decision to make certain repair tools available only to its authorized dealers. There

---

[6] *See* Equipment Publications, John Deere Technical Information Store, *available at* https://techpubs.deere.com/en-US/Search/Equipment.

11

is no allegation that data services—like John Deere's AutoTrac or Active Implement Guidance—have any relationship to this allegedly anticompetitive conduct or repair services more broadly. In fact, as John Deere explained during the parties' meet and confers, data services and subscriptions offered by John Deere are entirely optional and not required for John Deere Tractors to be operable or repaired. As such, there is no facial relevance to this information.

Nor do Plaintiffs demonstrate relevance. They do not even try to define or explain the kinds of services or subscriptions they seek and certainly do not explain why they need documents regarding "*all* data services, subscriptions, or other precision agriculture technologies, or services available for John Deere equipment." John Deere offered to provide Plaintiffs with documents regarding three data services and subscriptions (Customer Service Advisor, JDLink and John Deere Operations Center) as a compromise on this Request. To be clear, those products are still optional data services and subscriptions. Plaintiffs refused.

Instead, Plaintiffs assert that information on *all* data and subscription services are relevant to their switching costs analysis because the data at issue cannot be transferred to a competitor's Tractor. But that argument does not align with their actual Request, as Plaintiffs are not seeking information about *whether* the data or information collected from the subscription services can be transferred to a competitor's product—they simply assume that it cannot be. That is not something John Deere represented during the parties' meet and confer process (*see* Pls. Motion at 13-14), and it simply is not true. Data and functionality from certain services and subscriptions, like AutoTrac Universal and John Deere Operations Center, can be transferred to or used on a competitor's product.[7] Plaintiffs have not explained how the requested information will support their switching

---

[7] AutoTrac Universal can be used on non-John Deere machines. *See* AutoTrac™ Activation, Features, https://www.deere.com/en/technology-products/precision-ag-technology/guidance/auto-trac/.

12

costs argument and have thus not met their burden to establish the requested information is relevant to their claims.

And even if Plaintiffs could assert some kind of argument regarding how such data services and subscriptions are relevant to their case, it is not proportional for John Deere to produce documents for "all data services, subscriptions or precision agriculture technologies or services" available for Tractors. This is exactly the type of discovery that the amendments to Rule 26(b)(1) were aimed at limiting. "While the scope of discovery is broad, ***the discovery rules are not a ticket to an unlimited, never-ending exploration of every conceivable matter that captures an attorney's interest***. . . . [D]iscovery is not a means for a party to test every conceivable theory of a claim or defense without any limitation.'" *Eternity Mart*, 2019 WL 6052366, at *3 (citations omitted).

The burden for John Deere to collect and produce the requested information is again massive. The number of data services and subscriptions that could fall within Plaintiffs' Request is several thousand. Ex. B, Declaration of Quincy J. Beck ("Beck Decl.") at ¶ 6. Information regarding pricing and customers' use of those produces would have to be pulled from multiple databases and then cross-referenced against other databases to confirm the actual price charged to customers, if known. Beck Decl. at ¶ 7. Data services and subscription products can be used in a large number of John Deere programs and products, and there is no easy way to extract the codes that identify individual data services and subscriptions that are used in a product. *Id.* at ¶ 8. To collect pricing information on services and subscriptions after 2019,[8] an analyst would have to manually sort through the database that has information on which products utilize data services

---

[8] Information regarding pricing from before 2019 is on an archived and difficult to access database that would require engineers and other technicians to first to receive access to the database and then identify, locate, process and analyze the data. Ex. B, Beck Decl. at ¶ 9.

13

and subscriptions to isolate products that utilize the data services and subscriptions products. *Id.* at ¶¶ 9-10. Once that step is done, the analyst would have to review information on the individual product, like a Tractor, to determine what pricing information is available. A single Tractor could have multiple codes that relate to pricing, and the analyst would need to enter those codes into another set of tables to determine pricing options for the data service or subscription. *Id.* at ¶ 11. The analyst would then need to attempt to account for changes to any of the codes over time and attempt to determine whether those changes were pricing related. *Id.* at ¶ 12. This process would be complex, burdensome and would take a significant amount of time and resources to achieve. *Id.*

Additionally, newer generations of John Deere Tractors may have some of the data services and subscriptions at issue built into the products themselves; this means that activating the subscription may only be an upgrade price, instead of a stand-alone price. *Id.* at ¶ 13. And because whole Tractors are generally purchased from John Deere's independent authorized dealers, and not John Deere, John Deere may not even have the actual price charged for certain subscription services. *Id.* at ¶ 14.

Furthermore, information to identify and describe John Deere's data services and subscriptions is available at John Deere's publicly available website, https://www.deere.com/en/technology-products/precision-ag-technology/. And since discovery should be obtained from the least burdensome source, Plaintiffs should obtain this information from John Deere's website. *The Sedona Conference, Commentary on Proportionality in Electronic Discovery*, 18 SEDONA CONF. J. 141 (2017) ("Discovery should . . . generally be obtained from the most convenient, least burdensome, and least expensive sources.").

The information Plaintiffs seek in Request No. 49 is not relevant to their claims in this

14

litigation. And even if Plaintiffs could explain how such documents are relevant, the burden and expense for John Deere to collect and produce the broad and amorphous set of documents that Plaintiffs have requested is not proportional to the needs of the case.

### III. CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion to compel.

| | |
|---|---|
| Dated: June 6, 2023 | Respectfully submitted,<br><br>*/s/ Corey A. Lee*<br><br>John M. Majoras<br>jmmajoras@jonesday.com<br>JONES DAY<br>51 Louisiana Avenue, N.W.<br>Washington, DC 20001<br>Telephone: (202) 879-3939<br><br>Tiffany Lipscomb-Jackson<br>tdlipscombjackson@jonesday.com<br>JONES DAY<br>325 John H. McConnell Boulevard, Suite 600<br>Columbus, OH 43215-2673<br>Telephone: (614) 281-3876<br><br>Corey A. Lee<br>calee@jonesday.com<br>JONES DAY<br>North Point<br>901 Lakeside Avenue<br>Cleveland, Ohio 44114<br>Telephone: (216) 586-3939<br><br>Amanda B. Maslar (6321073)<br>amaslar@jonesday.com<br>JONES DAY<br>110 North Wacker, Suite 4800<br>Chicago, IL 60606<br>Telephone: (312) 782-3939<br>Facsimile: (312) 782-8585<br><br>*Counsel for Defendant Deere & Company* |

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed using the CM/ECF system, which will effectuate service on all counsel of record.

/s/ *Corey A. Lee*
Corey A. Lee
calee@jonesday.com
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939