```
 1                     IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                              WESTERN DIVISION

 3    IN RE:  DEERE & COMPANY REPAIR    )  Docket No. 22 CV 50188
      SERVICES ANTITRUST LITIGATION     )
 4                                       )  Rockford, Illinois
                                         )  Monday, August 7, 2023
 5                                       )  9:30 o'clock a.m.
                                         )
 6                          TRANSCRIPT OF PROCEEDINGS
                    BEFORE THE HONORABLE IAIN D. JOHNSTON
 7
      APPEARANCES:
 8
      For the Plaintiffs:         COTCHETT PITRE & MCCARTHY LLP
 9                                (840 Malcolm Road,
                                   Suite 200,
10                                 Burlingame, CA  94010) by
                                  MR. ADAM J. ZAPALA
11
                                  FOOTE MIELKE CHAVEZ & O'NEIL LLC
12                                (10 West State Street,
                                   Suite 200,
13                                 Geneva, IL  60134) by
                                  MS. KATHLEEN CURRIE CHAVEZ
14                                MR. ROBERT M. FOOTE

15                                GUSTAFSON GLUEK PLLC
                                  (120 South Sixth Street,
16                                 Suite 2600,
                                   Minneapolis, MN  55402) by
17                                MR. DANIEL C. HEDLUND

18                                WEXLER BOLEY & ELGERSMA LLP
                                  (311 South Wacker Drive,
19                                 Suite 5450,
                                   Chicago, IL  60606) by
20                                MR. KENNETH A. WEXLER

21                                WILLIAMS MCCARTHY LLP
                                  (120 West State Street,
22                                 Rockford, IL  61105) by
                                  MR. MARC C. GRAVINO
23                                MR. JOHN J. HOLEVAS

24

25
```

```
 1   For the Defendants:        JONES DAY
                                (901 Lakeside Avenue,
 2                               Cleveland, OH  44114) by
                                MR. COREY A. LEE
 3                              (325 John H. McConnell Boulevard,
                                 Suite 600,
 4                               Columbus, OH  43215) by
                                MS. TIFFANY D. LIPSCOMB-JACKSON
 5                              (51 Louisiana Avenue N.W.,
                                 Washington, DC  20001) by
 6                              MR. JOHN M. MAJORAS

 7   For the United States:     UNITED STATES DEPARTMENT OF JUSTICE
                                ANTITRUST DIVISION
 8                              (450 Golden Gate Avenue,
                                 Room 10-0101,
 9                               San Francisco, CA  94102) by
                                MR. MATTHEW CHOU
10
     Court Reporter:            Heather M. Perkins-Reiva
11                              327 South Church Street
                                Rockford, IL  61101
12                              (779)772-8309

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  22 CV 50188, *In re Deere & Company Repair*

2  *Services Antitrust Litigation.*

3          THE COURT:  All right.  Good morning, everybody.

4          I don't know -- I can't have everybody step up to the

5  podium, but for folks who are going to be arguing today, make

6  any statements, anything like that, we will get your

7  appearances on the record.

8          On the plaintiffs' side, I thought some people were

9  going to be on the phone.  I don't know if that happened or

10  not.

11          THE CLERK:  Yes, Your Honor.  We do have some people

12  on the phone.

13          THE COURT:  We do have some people on the phone.

14          I assume the people on the phone will not be arguing.

15  They just wanted to listen in?

16          MR. FOOTE:  That's right.

17          THE COURT:  I do apologize.  Last week got a little

18  hectic.  If you read the funny papers, there was some activity

19  in the courtroom over the last couple days.  I'm a little

20  tired.  So it is going to be a pure listening day for me.  I

21  will have some questions for you; there is no doubt about

22  that, but I'm going to be -- it's information gathering for me

23  today and a lot of listening that's going to be going on.

24          So I was told that we have got a representative from

25  DOJ present; is that right?

 1            MR. CHOU:  Good morning, Your Honor.  Matt Chou for

 2    the United States.

 3            THE COURT:  Okay.  Welcome.  Happy to have you here.

 4            So your position -- and I read, obviously, your

 5    statement of interest -- that could probably slot in kind of

 6    wherever.  I mean, I know it goes to the whole single-brand

 7    aftermarket issue.

 8            You have the questions.  Well, they are what they

 9    are.  Take them for what they are worth.  At some point, I

10    would like to hear, not surprisingly -- one of the critical

11    questions is -- on this issue of whether co-conspirators need

12    to be named and joined.  We have got, certainly, I would say,

13    the weight of authority is on Deere's side.  I mean, there is

14    lots and lots of circuit court cases that support their

15    position.  I have a view of what the Seventh Circuit's

16    position or non-position is, as well as -- and, trust me, I

17    read Judge Kocoras' opinions multiple times.

18            I would like to hear everybody's view on, assuming

19    there is a split -- or not there is a split -- assuming the

20    Seventh Circuit hasn't ruled, you look at *Fontana Aviation* and

21    then you look at *In Re Name Brand* Drug whatever.  If they

22    haven't decided, the assumption is the Seventh Circuit hasn't

23    decided, I know what you are going to say on whether or not

24    they need to be named and joined, but I'm very interested in

25    your thinking on the rationale of *Illinois Brick* and which

1  rule makes more sense.  I don't have an opinion yet on that,

2  but that's going to be, obviously, an issue.  So that's the

3  big picture.

4          Before we start, do you have any questions for me?

5          MR. FOOTE:  No questions, Judge.

6          Do you want our appearances on file now?

7          THE COURT:  Let's do that, and it will make it much

8  easier since you are here in person.

9          MR. FOOTE:  Judge, your entire leadership on the

10  plaintiffs' side is here:  Robert Foote, Adam Zapala, Dan

11  Hedlund, Ken Wexler --

12          THE REPORTER:  Wait, wait, wait.

13          THE COURT:  And she had a very rough day on Thursday.

14          MR. FOOTE:  Sorry, Judge.

15          Adam Zapala, who we have elected to be our speaker of

16  the day.

17          THE COURT:  Okay.

18          MR. FOOTE:  Mr. Dan Hedlund, Ken Wexler, my partner

19  Kathleen Chavez.  You know Marc Gravino and John.  They are

20  both here also, Judge.

21          THE COURT:  Okay.

22          MR. FOOTE:  So your entire steering committee is

23  here.  We represent all of the plaintiffs throughout.

24          One other introduction.  We have one of the class

25  reps here.  Gerald Wilson from Wilson Farms is here, Judge.

1  He is standing up.

2         THE COURT:  Good morning, Mr. Wilson.

3         MR. FOOTE:  And, Judge, real quick -- I know this

4  isn't a topic today, but just if you are interested on how we

5  are doing on the case -- the status, we are right on track.

6         THE COURT:  Okay.  And I appreciate that because I

7  figured -- next week we had a scheduled status.  I know the

8  status now.

9         MR. FOOTE:  Right.

10        THE COURT:  So we have got that.  So I appreciate

11 that.

12        MR. FOOTE:  So with that, Judge, I will leave it to

13 Mr. Zapala.

14        THE COURT:  And is there anybody on the phone for

15 plaintiffs' side that needs an appearance, or are they just

16 going to be listening in?

17        If they are just listening in, we don't need an

18 appearance.

19        Okay.  And then let's hear from -- who is here from

20 John Deere?

21        MR. MAJORAS:  Good morning, Your Honor.  John Majoras

22 from the Jones Day firm on behalf of defendant, Deere &

23 Company, which we often refer to as "Deere," sometimes "John

24 Deere."  I'm joined at counsel table by my partners Tiffany

25 Lipscomb-Jackson and Corey Lee.  It's a pleasure for me to be

1   here in person finally.  I think you have met them before.

2           THE COURT:  Yes.

3           MR. MAJORAS:  Also at counsel table with us is Amanda

4   Sanchez Johnson, who is with the general counsel's office of

5   Deere.

6           THE COURT:  Okay.

7           MR. MAJORAS:  And the three of us outside counsel

8   will address different issues.  In terms of the motion to

9   dismiss, I will handle our initial reaction to some of your

10  questions and Ms. Lipscomb-Jackson will continue on.  Mr. Lee

11  will handle anything you may have on the motion to compel.

12          THE COURT:  Okay.  All right.  I appreciate that.

13          MR. MAJORAS:  And I don't know what your preference

14  is.  It is our motion.  Do you want us first, or do you want

15  us second?  How would you like to proceed, Your Honor?

16          THE COURT:  I was thinking about this yesterday.

17  Traditionally, we would hear -- it's your motion -- we would

18  hear all from you, and then I would hear everything from you,

19  and then I would come back to you, and then we would slot DOJ

20  somewhere in the process.  It might be easier but more

21  cumbersome if we sort of went issue by issue.

22  Administratively, management might be difficult for all of us

23  to do it that way.  It might result in a better argument

24  because we will be focusing issue by issue, but I don't know

25  what you have got on your outline to do it issue by issue.

1    MR. MAJORAS:  It is your pleasure, Your Honor.  I

2  suppose if it were up to me --

3    THE COURT:  Yes.

4    MR. MAJORAS:  -- we do have some summary arguments

5  that we are going to make.  We do not look to simply restate

6  what's in our papers --

7    THE COURT:  Okay.

8    MR. MAJORAS:  -- but generally about our motion, and

9  then we are able to respond directly to each of the questions.

10  We have split some of those.  So either we can go through my

11  section, and then the plaintiffs; or I can do my intro, their

12  intro, and then go to questions.  Either is fine with us.

13    THE COURT:  Okay.  What are your thoughts?

14    MR. ZAPALA:  Your Honor, first let me say -- and I

15  know Deere's counsel agrees with this, so I'm not trying to

16  get brownie points -- thank you for the questions.  I mean, it

17  is extraordinary for a district court judge and very helpful,

18  obviously, to the parties to be able to prepare for the

19  hearing.

20    THE COURT:  I appreciate that.  I'm laughing because

21  on Thursday, they took a very different view on getting

22  questions from the Court, and, in fact, objected to me

23  questioning and wanted a sidebar based upon their objection.

24  So I appreciate that.

25    MR. ZAPALA:  It is just very helpful, and it's clear,

1   obviously, the Court and its staff have looked at these issues

2   carefully and are grappling with them, and we're happy to be

3   here today to try to provide some clarity to Your Honor.

4         I think going through the questions makes sense to

5   me.  Those are the things that the Court has articulated in

6   terms of what it is grappling with.  So happy to do that.

7         THE COURT:  Okay.

8         MR. ZAPALA:  But if Mr. Majoras would like to have

9   some introductory comments, I could do that as well.

10         THE COURT:  Sure.  Let's do sort of some summaries,

11   look at the high level.  We will figure out where things go.

12   Maybe when we are talking about the issue of naming and

13   joining co-conspirators, we do that separately and do it up

14   front because that, I mean, look, I have fronted it.  I'm a

15   huge fan of Judge Kocoras.  I respect him greatly.  And

16   reading through his opinions, you can see a judge, who I

17   consider to be extremely bright and very hardworking, very

18   intelligent, struggle with the issue, and if Chuck Kocoras is

19   having problems, I'm having problems.  So I really want to

20   focus on that and figure that out at some point.

21         But I know there is a lot more in the motions, so we

22   can do that sort of separate.  But let's hear sort of the

23   summary things at first.

24         So go ahead.

25         MR. MAJORAS:  Let me grab my papers, Your Honor.

1      THE COURT:  No problem.

2      Whenever you are ready.

3      MR. MAJORAS:  Good morning again, Your Honor, and I

4  will reiterate what counsel just said, that we do appreciate

5  the questions and knowing which way you would like to take

6  some of the issues in this case, and we are prepared to

7  address each of those in course.

8      Your Honor, in this case, the plaintiffs are pursuing

9  a policy of establishing a so-called right to repair under the

10  guise of an antitrust claim.  Because they cannot directly

11  litigate a right that does not exist, they are left to

12  shoehorn it into cognizable legal theories, but they have

13  failed to do that here, and the claim should be dismissed.

14  The antitrust case that they have brought and the facts that

15  they have alleged in their complaint do not amount to what is

16  necessary to sustain this case going forward, and it should

17  end at this stage.

18      Your Honor, we have three principal elements that we

19  are going to talk about today in terms of our argument because

20  all three of them paint broadly across the complaint -- in

21  some cases we believe result in dismissal in and of

22  themselves, others certainly narrows the case -- but by no

23  means, however, are we abandoning any of the other individual

24  arguments that we make within our motion.

25      THE COURT:  Okay.  And that's fair.  And I should

1    have said this up front:  If you don't cover something today,

2    you haven't waived it.  You have a lot in your filings.  So if

3    it is not covered in the arguments today, it is not that you

4    have given it up.

5              MR. MAJORAS:  Thank you, Your Honor.

6              Of course with any practice, Your Honor, companies

7    may not adopt unfair or deceptive policies as to their

8    products.  A company cannot generally hide its policies from

9    customers at the front end nor change them in a

10   bait-and-switch at the back end, but absent that sort of

11   anticompetitive conduct, the propriety of companies' policies

12   is for the market and not antitrust concerns.

13             There are two significant issues of standing that are

14   presented in this case and are briefed at length and many of

15   your questions go to them as well and we think look very

16   closely at the primary issues that we have tried to raise.

17             The first is Article III standing and that is simply

18   whether there is a plaintiff in front of the Court that has

19   made an allegation and offered sufficient support to show that

20   that person bought a product from the defendant for which

21   there is a case, and the plaintiffs haven't done that.  The

22   plaintiffs haven't pointed to any particular product that any

23   of the named plaintiffs have bought from Deere, the defendant

24   named in this case, and that, of course, also goes then to the

25   questions that you have about joinder and one of the reasons

1    why joinder, as a matter of policy, is so significant here and

2    is well-supported by the case law.

3           Plaintiffs' claims rest on an alleged conspiracy

4    among Deere and its dealers, yet on the complaint's own terms,

5    there are some dealers that appear to be within the conspiracy

6    and some that are not.  That itself is dispositive because it

7    goes to the point that until you understand who are the

8    parties from whom the plaintiffs bought their products, is

9    there a plaintiff in the case that has bought a product from

10   someone the plaintiff considers a conspirator in the case

11   because we know it is not Deere.  Then there is no Article III

12   standing and without that the case should be dismissed of its

13   own accord.

14          Tied together with that is the concept of antitrust

15   standing and this brings us to the *Illinois Brick* decision.

16   The plaintiffs here at best are classic indirect purchaser

17   plaintiffs under *Illinois Brick*.  They have not bought

18   anything from Deere.  To the extent they say they are tracing

19   something back to Deere, that makes them an indirect

20   purchaser.  There is no issue on that particular score.

21          As you have noted and related to that, the plaintiffs

22   have failed to join any alleged co-conspirator party

23   defendants.  It is actually a point that the Court need not

24   reach, but it is fatal nonetheless because, as you will hear

25   and as you see in our papers, we do not believe that the

1    plaintiffs have made the allegations necessary to sustain even

2    the conspiracy argument that they seem to be bringing in this

3    case.  As I said, the Article III standing alone is grounds

4    for dismissal.  But if the Court should get to the point of

5    deciding whether joinder is the key issue, that too is a place

6    where the plaintiffs fail.

7            Third, the complaint fails to state a plausible

8    relevant market.  To proceed on this particular claim or this

9    type of claim, a complaint must have a plausible aftermarket

10   and a plausible primary market from which it derives.  Here

11   there is neither.  The complaint's primary market fails rule

12   number one for product markets.  It does not even try to limit

13   itself to reasonably interchangeable products and that's the

14   definition one must satisfy to allege an antitrust product

15   market.

16           The complaint's aftermarket likewise fails because

17   there is no allegation to support any possible lock-in after

18   one has purchased a product from Deere, whether it's a

19   tractor, whether it's a combine or any of the other products

20   that plaintiffs have jumbled together into their definition of

21   tractors, which I'm not a farmer, but most of us know what a

22   tractor looks like and can see that many of the other products

23   that are included within their definition do not meet what one

24   would expect with a typical tractor.

25           THE COURT:  Well, if you drove in on the bypass and

1    you went up South Main, you saw a Deere dealership and you saw
2    lots of different products there.

3          MR. MAJORAS:  I have worked for Deere over the years,
4    which I have been very fortunate to do.  I can't help but as I
5    fly over farm country always pointing out where the green
6    products are, and I don't mean grass by that or crops.

7          Ms. Lipscomb-Jackson is going to talk more about the
8    market issues, but before doing that, looking at the
9    Article III standing, I think the easiest way to go through it
10   is beginning with common ground.  Everyone agrees that in
11   order for the plaintiffs to have standing, they need to allege
12   that a named plaintiff purchased repair services from a member
13   of the alleged conspiracy.  They allege that repair services
14   have been purchased but not from whom, nor, since Deere,
15   again, doesn't sell the repair service, what the relationship
16   is back to Deere.  And when we talk about the hub-and-spoke
17   conspiracy issues, which is the only way one might be able to
18   make that kind of a claim, they are unable to make those
19   necessary connections.

20         So the Article III issue here rises and falls on
21   whether the complaint plausibly alleges that every dealer is a
22   member of the proffered conspiracy; otherwise, it is simply
23   impossible to know whether one of the named plaintiffs
24   purchased repair services from someone involved, as is
25   squarely required under the Seventh Circuit in the *Marion 2*

1    case.

2            Your Honor, we cite frequently to two *Marion* cases.

3    If I can use the *Marion 1* and *2* terminology?

4            THE COURT:  Absolutely.

5            MR. MAJORAS:  Thank you.

6            But the complaint here does not state that every

7    dealer is a member of the conspiracy; in fact, it says the

8    opposite.  A core piece of the plaintiffs' theory is that

9    Deere and its big dealers are engaged in a campaign of

10   consolidation at the expense of smaller dealers.  The

11   complaint even names specific dealers who allegedly have

12   been squeezed out of business due to this campaign.

13   Presumably, those dealers are not part of the conspiracy, but

14   there is no way to know that.  There is no way to know whether

15   a dealer who has not, by plaintiffs' terms, been squeezed out

16   of the market is in the process of being squeezed and

17   therefore might or might not be a member of the so-called

18   conspiracy of dealers.

19           It is implausible that these purported victims of the

20   conspiracy are somehow members of the same, and by that I mean

21   the dealers.  Rather, on the complaint's own terms, some

22   dealers are in and some apparently are out, and that is

23   dispositive in light of the plaintiffs' conscious decision not

24   to name the dealers they dealt with.  This is information that

25   easily could have been available, at least from the named

1  plaintiffs' standpoint, to understand where they purchased

2  their products that they are alleging was part of an antitrust

3  conspiracy.  They have declined to do so.

4          Discovery in this case should not be the method by

5  which plaintiffs go about seeking that information.  That's

6  the classic fishing expedition that we try to avoid in the

7  antitrust cases where they haven't alleged a plausible theory

8  of liability to move forward, and that's where we are right

9  now, Your Honor.

10          Turning to *Illinois Brick*, plaintiffs barely dispute

11 that the suit falls within *Illinois Brick*.  As the Supreme

12 Court recently affirmed in the *Apple* case and as the Seventh

13 Circuit clearly understood in *Marion 1*, the relevant inquiry

14 for determining the applicability of *Illinois Brick* focuses on

15 the relationship between the seller and the purchaser.  Those

16 are the issues I just discussed.  And just as they have not

17 alleged sufficient relationships between or even identified

18 the relationship between the seller and the purchaser that

19 does not provide them the Article III standing or does not

20 provide the Court Article III standing, they certainly have

21 not done so with respect to *Illinois Brick*.

22          Plaintiffs appear to be relying on the co-conspirator

23 exception to get around this bar, as the Court identified at

24 the beginning of this argument, but this offers them no help

25 because the complaint still fails to state a plausible

conspiracy. The first is that the complaint seems to plead a

hub-and-spoke conspiracy and only a hub-and-spoke conspiracy.

Going through the complaint and the allegations in the

complaint, there is no other vertical conspiracy that is

alleged. There is, again, no identification of the parties to

the vertical conspiracy. There is no allegations, other than

a dealership agreement, as to what makes up whatever

individual conspiracies there are. This is a hub-and-spoke

conspiracy that plaintiffs are moving forward on, and there,

again, they fail, and the primary reason they fail is the

inability to identify the rim of the wheel around the

hub and spoke. Even more important -- well, I don't know is

it more important, but equally important --

THE COURT: And by that, you mean -- just so I

understand, and I apologize for interrupting -- when you say

the rim of the wheel, you mean the conspiracies -- here's my

little drawing -- the conspiracies between the dealerships,

not the conspiracy between Deere and the dealerships; is that

right?

MR. MAJORAS: Right.

THE COURT: Got you. Okay.

MR. MAJORAS: Two-part analysis. The first question

is what's the relationship between the hub and the spokes of

the wheel, and then the spokes have to be gathered together at

the rim by agreements between the dealers.

1          THE COURT:  Got you.

2          MR. MAJORAS:  They haven't made any allegation of

3    what those agreements are among the dealers.  There is nothing

4    in the complaint that suggests that the dealers have gotten

5    together, either broadly or individually or anything else, to

6    form the rim of that conspiracy.  That is fatal for a claim of

7    a hub-and-spoke conspiracy.

8          Add to that, we don't really know who the spokes are.

9    Now I am back to my Article III standing and my indirect

10   purchaser standing.  We don't -- which distributors -- which

11   of the Deere dealers are involved in the case?  Who are the

12   spokes?  Is everyone a spoke?  Are there some spokes that are

13   inactive, don't count?  We don't know.  And the only way to

14   know that is to identify who the players are, who the

15   dealerships are that the plaintiffs are claiming is a part of

16   the conspiracy in this particular case.

17         The reasons why joinder is so significant come in a

18   number of ways.  One, we do believe, and we cite the case law,

19   we believe that *In Re Brand Name*, a case I actually worked on

20   back in the day, Your Honor -- I feel very dated -- *In Re*

21   *Brand Name*, we think the court, the Seventh Circuit, was very

22   clear, and it talks about joinder referring to another case,

23   but then refers to the case in front of it, and Judge Posner

24   says joinder is a requirement.  Joinder is a requirement.  In

25   the other cases --

1          THE COURT:  Does he say that?

2          I should have brought it down, and I do apologize.  I

3     had last week set up for you guys.  It went sideways on me.

4     So I had things that were cut-and-paste, and we could put them

5     up.

6          But he cites *Fontana Aviation*.  Doesn't say boo about

7     it, but he cites it.  And we know *Fontana Aviation* allows that

8     case -- sub silentio allows that case -- to proceed without

9     naming and joining a co-conspirator.

10          Then he cites -- off the top of my head, I can't

11     remember --

12          MR. ZAPALA:  *Shamrock*, Your Honor.

13          THE COURT:  -- *Shamrock*.  And then he cites *In re*

14     *Beef* with this parenthetical that says -- in fact, he may say

15     "required."  He uses a word in there.  He puts something in

16     there.  But in the context at that point, the case that he had

17     in front of him, they had been named and joined, whereas the

18     consumer class did not name and join them.  So when I went

19     back, everybody freaks out, and then you have the amendment.

20          But if you can read it to me?  I don't have it.  Does

21     he use the word "required"?

22          MR. MAJORAS:  He does.  I can either read it or I can

23     put it up on the screen.

24          THE COURT:  Put it on the screen.  We were having fun

25     with that last week.  The Elmo is right there.  Yvonne will

1    put it on.  Because I think it was in the parenthetical to

2    *In re Beef*.

3              Oh, thank you very much.  You did what I was going to

4    do.

5              MR. MAJORAS:  I have got a citation for you at the

6    bottom, Your Honor, 123 F.3d 599.

7              THE COURT:  Yes, it is the *In re Beef* required.  I'm

8    with you.  Okay.

9              MR. MAJORAS:  Right.

10             So in the parenthetical after *In re Beef*, as you just

11   described, the parenthetical says --

12             THE COURT:  We need to move the microphone closer to

13   you.

14             MR. MAJORAS:  Oh, I'm sorry.

15             THE COURT:  That's all right.  No problem.

16             MR. MAJORAS:  The parenthetical that you just

17   identified from *In re Beef*, Judge Posner writes:  "requiring

18   that the direct sellers, here the wholesalers, be joined as

19   defendants," discussion of what is required under *In re Beef*,

20   then dash, dash -- and dash as some would say -- "but that

21   requirement is satisfied."

22             So I believe the judge doesn't really mince words,

23   particularly in antitrust cases, but very clearly saying that

24   requirement, and it is satisfied in the particular case at

25   issue, the *In re Brand Name* case, because the co-conspirators

 1    were identified in that case.

 2              THE COURT:  In the -- again, there were two sets of

 3    plaintiffs; there was the class, and then there was the

 4    nonclass, like the pharmacy-type folks.  The case that

 5    was -- when this appeal went up, no doubt that what was before

 6    the Seventh Circuit is the case where the co-conspirators were

 7    named and joined.  So put my hat on.  I'm not an appellate

 8    court judge, but I'm looking at the facts that are before me,

 9    which makes some sense why you would say -- can I do this?

10    No, mine is not a touchscreen.  They are touchscreens.  If you

11    want to mess with them, that's fine -- which makes a lot of

12    sense for the *In re Beef* and the requirement because that's

13    what they had before them, which is one of Judge Kocoras' many

14    points, is he struggled with this.

15              Let's say I buy what you said.  And that sounded way

16    more confrontational and accusatory than it was meant to be.

17    But the first cite is *Fontana Aviation*, which is a Seventh

18    Circuit case, and I think we can all agree that in *Fontana*

19    *Aviation*, it was one of the earlier cases where the Seventh

20    Circuit tackled the co-conspirator "exception," and they let

21    the case go forward without naming and joining the

22    co-conspirator.  So there is a big struggle in my head.

23              If you are a judge, and you think that it's

24    required -- and you are right, "requiring" and "requirement"

25    both are in there.  If you are a judge, and you think that's a

1    requirement, and you cite *Fontana Aviation*, the preeminent

2    case at that point in the Seventh Circuit -- I'm going to be a

3    betting man, and I'm going to say somebody read it -- it seems

4    odd that you would say it's required, citing this Fifth

5    Circuit case.  Now, it's not odd in the sense that that's the

6    facts that were presented to them, but in doing so, you are

7    essentially -- you are not technically overruling *Fontana*

8    *Aviation*, but you are certainly putting a broadside on it,

9    right?  And then do you just don't say anything about it?  And

10   then you leave it to poor Judge Kocoras to pull his -- he has

11   got a lot of hair.  He has got a full set of hair to this day.

12   It just seems odd to me.

13          So go ahead.

14          MR. MAJORAS:  Well, the posture of *Fontana Aviation*

15   was a very different type of case where there were allegations

16   of hub-and-spoke, there were allegations of -- I forget; I

17   don't know what it is called -- monopolist conduct, basically

18   individual conduct of the manufacturer in that case that that

19   court allowed to go forward, and in reading that case it

20   seemed as though the court has significant skepticism about

21   the other parts of the case.  So what it said, the Seventh

22   Circuit said, in analyzing it, that that particular dynamic

23   needed to be taken as a whole and was thus outside the mold of

24   *Illinois Brick* entirely.

25          So we have now taken it outside of *Illinois Brick*,

1    and whatever *Fontana* says about the requirement or not, as

2    that case came to the Seventh Circuit and the Seventh Circuit

3    analyzed it, and was before the Seventh Circuit decided, prior

4    to *In re Brand Name*, the issue had not been squarely

5    addressed.

6         THE COURT:  Okay.  And I don't want to mess with your

7    outline too much, and I know this was the summary, but the

8    Seventh Circuit in *Loeb* and I don't know which *Marion*, if it

9    was *Marion 1* or *Marion 2* -- I think Judge St. Eve wrote one or

10   both of those -- they talk about this co-conspirator

11   circumstance, factual situation, not as an exception but as a

12   reading, the proper reading, of *Illinois Brick*.  It is not an

13   exception.  It's *Illinois Brick* just says you have got to buy

14   from somebody in the conspiracy.

15        So -- and this is my thinking -- it's a direct

16   purchaser into the conspiracy, wherever that may be.  It is a

17   direct into the conspiracy, not direct to the manufacturer.

18   Some cases are a little clumsy with that language.

19        So that's why I think -- and I think Judge Wood in, I

20   think it is, *Loeb* says -- it is not really an exception, and

21   we are not looking to -- and it is an issue in the

22   briefing -- privity.  We are looking into when did you buy,

23   when did you hit, when did that contact point come in, and

24   that's what I'm struggling with because I don't think

25   *Fontana* -- the consequences of *Fontana* and what happened

1    happened, but they don't tackle it head on.  There is not a

2    specific, "We now say you don't need to name."  And *Name Brand*

3    *Prescription Drugs* is in a different setting in that they were

4    named.  So that's what I'm really, really struggling with.

5            MR. MAJORAS:  So as Judge Posner said, the

6    requirement was met in *Brand Name*.

7            THE COURT:  Right.

8            MR. MAJORAS:  No reason to go any further into it.

9    The question, then, is whether or not the conspiracy as

10   alleged was appropriate to be decided.

11           In *Marion 1* -- really, I think let's start with

12   *Utilicorp*.  It is a relatively recent Supreme Court case.  One

13   thing that is abundantly clear out of *Utilicorp* is that courts

14   should not be looking to find exceptions to *Illinois Brick*.

15   *Illinois Brick* is pretty clearly stated.  There are a couple

16   of exceptions.

17           THE COURT:  Oh, come on.  *Illinois Brick* was clearly

18   stated.

19           Okay.  Go ahead.

20           MR. MAJORAS:  I like the way *Brand Name* came out

21   going back to my earlier days.

22           What *Utilicorp* said was, in its view, *Illinois Brick*

23   and the indirect purchaser rule is stated precisely in a way

24   so that you are looking to see where was the purchase made and

25   was it, in, perhaps, an ordinary case, directly from the

1   manufacturer you are suing or from someone else down the

2   distribution chain.  The so-called conspiracy exception, the

3   Seventh Circuit has really kind of shied away from that

4   terminology, but regardless of what you call it, on the

5   conspiracy issue, the question then becomes did the plaintiff

6   in the case purchase -- it was the initial purchase from a

7   member of the conspiracy as alleged.

8           THE COURT:  Right.

9           MR. MAJORAS:  So I think I can form --

10          THE COURT:  I'm with you.  That's a very fair

11   characterization.

12          MR. MAJORAS:  That's at least the reasoning I have.

13          But we still go back to the question of, then,

14   joinder.  As you heard, our view is that it is a requirement

15   in the Seventh Circuit as stated in the case law.  We have

16   cited a number of cases in our briefing indicating that in

17   circuits throughout the country, it is well-recognized as a --

18          THE COURT:  No doubt, no doubt.

19          MR. MAJORAS:  -- as a requirement, and the reason for

20   the requirement is very striking, I think, if you look at the

21   facts of this case.  So here, going back to what I said

22   earlier, if you don't know who the conspirators are, and you

23   have a hub-and-spoke conspiracy, who are the spokes?  Leave

24   aside where I think you can't get to is forming the rim of

25   that conspiracy.  Who are the spokes?  What does the wheel

1    look like?  We don't know that here because we do know that it

2    appears, at least in the plaintiffs' minds, some dealers are

3    part of a conspiracy and other dealers are not or maybe it

4    changed over time.  We don't know that either.

5         So the reason for joinder is, in this case, not only

6    the case law that exists but also in terms of general pleading

7    standards.  How are we to go forward with this case not

8    knowing who the conspirators are not?  You will be asked at

9    one point to look at class certification if we get there.  How

10   is that going to be decided?  Are you going to have some

11   people in or out?  And it's not the purpose of discovery to

12   fill out those points of plaintiffs' allegations, and we think

13   that's where they are going because they don't have anything

14   in the complaint.  They had many opportunities to have placed

15   that in there.

16        With that, Your Honor -- oh, one other issue in terms

17   of joinder.  It also goes, as you know, in the case law

18   dealing with indirect purchaser, starting with *Illinois Brick*.

19   Part of the concern is how does one trace down potential

20   overcharges that are alleged in the case, but also there is a

21   question of, kind of more fundamentally, how does one identify

22   the appropriate parties so there is not the risk of double

23   recovery.

24        THE COURT:  Double recovery, right.  Damages, double

25   recovery, right.

1          MR. MAJORAS:  And here, again, we think the courts

2    are very clear that analyzing any individual case to say, "Is

3    this the one there might be double recovery, is that the one

4    that could be double recovery" is not the appropriate way to

5    handle *Illinois Brick*.  *Illinois Brick* is very clear.

6    *Utilicorp* we think even made that point further because in

7    *Utilicorp* they were trying to use the cost-plus exception,

8    which is actually one of the recognized exceptions to *Illinois*

9    *Brick*, and the court was presented with a case involving

10   utilities, and the feeling was utilities simply pass along

11   costs.  That's what utilities do.

12          THE COURT:  Right.

13          MR. MAJORAS:  But the court said even there, "We are

14   not going to chase that.  There are things that could change

15   over time.  We are not going to look into it.  The key is we

16   have *Illinois Brick*.  It's there for a reason.  There are

17   limited exceptions to it.  And it's not critical that in any

18   individual case you determine whether or not potential double

19   recovery exists."

20          We think in this case it does.  If you were to not

21   name the alleged co-conspirators and had a trial only with

22   Deere, and if there were any kind of a finding that a

23   conspiracy existed, that finding is not going to be bound on

24   those unnamed parties.  Those parties can turn around and sue

25   Deere.  So we think it does exist here, but we don't think

1   that analysis is necessary to get you to the appropriate

2   decision that joinder is, in fact, a requirement.

3           THE COURT:  What do you think -- I'm going to ask

4   them, but what do you think they're saying is being passed on?

5           MR. MAJORAS:  We don't know --

6           THE COURT:  Okay.

7           MR. MAJORAS:  -- because, again, we are not making

8   sales of repair services to individuals.  So we are not

9   pricing repair services that they then purchase.  So we don't

10  know what the pass-on is.

11          THE COURT:  If there is no pass-on, does *Illinois*

12  *Brick* even apply?

13          MR. MAJORAS:  *Illinois Brick* applies because the

14  point was not to have to analyze pass-on.

15          THE COURT:  Right.

16          MR. MAJORAS:  So we would certainly argue -- I mean,

17  if you ever got to the point in this case, and you get to a

18  damages analysis, they would still have to say fundamentally

19  there was an overcharge at the manufacturer level.

20          THE COURT:  Okay.

21          MR. MAJORAS:  What we would not be able to do would

22  be to argue what got passed down or through, down the chain

23  beyond us, but you still have to assert what the overcharge is

24  at the outset.  So whether that overcharge was passed on or

25  not, *Illinois Brick* solves that problem, but we do think -- we

1   have not seen what the alleged overcharge is that Deere has
2   supposedly imposed.

3   THE COURT:  Okay.  All right.

4   MR. MAJORAS:  Your Honor, with that, actually, I
5   think I have covered your first question which is on the
6   joinder.  I would be happy to continue on, or do you want to
7   turn some time over at this point?

8   THE COURT:  You kind of touched on it, and I know
9   what your answer is going to be, but what I'm interested in,
10  your rationale and your thinking on it, is what is truer to
11  the rationale of *Illinois Brick*, requiring co-conspirators to
12  be named and joined or not requiring?  Again, I know what you
13  are going to say, and I know what he is going to say, but I
14  want to know what your thinking is on it.

15  MR. MAJORAS:  I think, yes, it is required.  That's
16  truer to *Illinois Brick* than not, and it's for this reason we
17  just talked about in terms of the potential double recovery.
18  Without identifying the members of the conspiracy that you are
19  trying, especially in a hub-and-spoke conspiracy, the
20  potential for double recovery is going to exist because there
21  is not going to be effects on the parties who did not
22  participate in the first case.

23  THE COURT:  Okay.  All right.  I appreciate that.

24  All right.  That seems like a good sort of transition
25  point.

1          So hold on one second.

2          Tell me what you want to tell me.

3          MR. ZAPALA:  Thank you, Your Honor.  Adam Zapala for

4   the plaintiffs.

5          Your Honor -- and I don't say this lightly; I have

6   great respect for Deere's counsel -- I think what you just

7   heard is really a caricature, frankly, of and an intentional

8   misreading of the plaintiffs' complaint.

9          Let me start out with the observation that you have

10  seen in many cases, both at the district court level and the

11  circuit court level, the general rule of law that complex

12  antitrust cases are typically not amenable to resolution on a

13  Rule 12 motion because of the highly fact-intensive nature of

14  analyzing markets and the issues that are at stake in this

15  case.  So that's kind of the first issue.

16         I'm going to start off talking about *Kodak* and its

17  progeny, in particular the *DMS* case in the Northern District

18  of Illinois which applies *Kodak*.  I'm going to start there

19  just because Deere counsel started there.

20         THE COURT:  Is *DMS* -- in my head, I have it as

21  *Authenticom*.

22         MR. ZAPALA:  *Authenticom*, correct.

23         THE COURT:  Okay.  Same case.  Okay.

24         MR. ZAPALA:  Correct.

25         THE COURT:  That's how I refer to it.

1      MR. ZAPALA:  The case started with a competitor,

2   Authenticom, suing, and then Dealer sued as well, and it is

3   now *In re Dealer Antitrust Litigation* -- excuse me -- *Dealer*

4   *Management System Antitrust Litigation*.

5      With respect to *Kodak*, as the *DMS* court held and as

6   the *Kodak* court held, the bait and switch that you heard from

7   Deere is not required.  A policy change is not required.  The

8   issues that are required and which we have alleged extensively

9   in our complaint are whether significant information costs

10  exist that make life cycle costing difficult, and the

11  complaint is replete with allegations about that issue.

12      In this case, we have tractors and other agricultural

13  equipment that Deere doesn't really contest are highly

14  complex, highly sophisticated durable goods that's alleged

15  throughout our complaint, paragraph 3.  No price lists are

16  provided.  There is no transparency into the cost of

17  replacement parts or, for example, how long service will take

18  given the restraints that are at issue in this case.

19      THE COURT:  Can I pause you right there?

20      And I don't know if this is the phraseology in the

21  antitrust world.  "Bait and switch" has its context in

22  consumer fraud --

23      MR. ZAPALA:  Right.

24      THE COURT:  -- in taxation.  In my head, it's a

25  taxation issue.  There is a Supreme Court case on it.

1          Does your complaint allege both what I'm going to

2    refer to as the "bait-and-switch concept" as well as the lack

3    of information, or are you focused more -- are you doing both,

4    but you are really focused on the lack of information?

5          MR. ZAPALA:  I think both from the following

6    perspective:  I think what Mr. Majoras was referring to is

7    there has been no policy change here except for back in 2000

8    or so, 20 years ago, when tractors moved from basic mechanical

9    equipment to ECUs and things like that.

10          THE COURT:  But that's not really a policy change.

11   That's just technology.

12          MR. ZAPALA:  Correct, correct.  But there is no

13   requirement for a policy change, as the *DMS* court held.  In

14   that case, Reynolds, like Deere, was open and honest about its

15   closed system.  The court nevertheless permitted the claim to

16   proceed against Reynolds because of the high information

17   costs, high switching costs, and the resulting lock-in that

18   comes out of that.

19          What we have alleged, which I think is in addition,

20   is that Deere and their industry proxies have misrepresented

21   the degree to which these repair restrictions are imposed, and

22   because of that, that makes life cycle costing very, very

23   difficult and, as the court said in *Kodak*, if not impossible.

24          So, again, we have alleged significantly high

25   information costs.  We have alleged massive switching costs.

 1   The initial capital outlay for the agricultural equipment is

 2   very high, so just switching by itself is very difficult, but

 3   in addition to that -- that's, by the way, at paragraph

 4   99 -- we have alleged what are called "network effects" at

 5   paragraph 100.  Most farms are really sort of single-brand

 6   farms.  They tend to buy their equipment from the same

 7   manufacturer because of the integrated services that are

 8   provided; the data services, for example.  So it's very

 9   difficult.  I mean, a farmer, if they are going to change and

10   start buying capital equipment from someone else, they are

11   going to have to change their entire fleet.  That's another

12   factor that influences lock-in.

13          THE COURT:  Right.  You don't see a farm where there

14   is Deere and Kubota.

15          MR. ZAPALA:  Correct.

16          THE COURT:  You see Kubota.  You see Deere.

17          MR. ZAPALA:  And Deere understands that.

18          THE COURT:  So it is Coke and Pepsi.

19          MR. ZAPALA:  Exactly.  And so that makes switching

20   costs very high, just as in *DMS*.

21          In addition to that, as we have alleged -- and this

22   is one of your questions that we can address later

23   on -- Deere's competitors engage in similar conduct.  So it's

24   not clear what switching would do, right?  They would go to

25   another competitor and find that they are also locked in in

1  the aftermarket.  We will talk more about that.

2          THE COURT:  Okay.

3          MR. ZAPALA:  So the last thing I would mention that I

4  think makes this case slightly different from *Kodak* is we have

5  alleged that Deere has market power in the primary market.

6          THE COURT:  Right, right.

7          MR. ZAPALA:  Okay.  And that's significant for the

8  following reason:  because what courts have said is you have

9  to do something to sever the connection between the

10 aftermarket and the primary market with the idea being that

11 why wouldn't the primary market adjust to take into account

12 the aftermarket restraints.  Well, they wouldn't here because

13 Deere has market power in the primary market.  I think the

14 implicit understanding of that concept is the price for the

15 equipment would be lower to take into account the restraints

16 in the aftermarket, but where you have market power in the

17 primary market, that's not true.  So that's an additional

18 factor, by the way, that was not existent in *Kodak* that,

19 again, militates in favor of the plaintiffs' position here.

20         THE COURT:  The question asked in the first paragraph

21 of *Kodak*, it basically says they don't have market power.

22         MR. ZAPALA:  That's exactly right.

23         THE COURT:  And you have alleged they do have market

24 power.

25         MR. ZAPALA:  Yes.

1  THE COURT:  This is probably a question more for

2  discovery down the road, if things go down the road, is the

3  access to information in 1992 versus access to information in

4  2023.  It seems like there is a lot more access to information

5  these days.  Maybe that's not a pleading issue, but it seems

6  like something that might come up at some point.

7  MR. ZAPALA:  It certainly will come up.  Let me give

8  you the exact quote:  "Primary issue here is whether a

9  defendant's lack of market power in the primary market

10  precludes as a matter of law the possibility of market power

11  in the derivative aftermarket."  We are alleging market power

12  in primary market.

13  THE COURT:  Right, yes.

14  MR. ZAPALA:  I agree with you it's not a pleading

15  issue because I think that the pleadings set forth extensive

16  reasons why there are significant informational costs on this

17  issue.

18  The last thing I want to say about *Kodak* is really

19  what appears to be Deere's contradictory position in this

20  case.  On the one hand, Deere says, "We can't provide these

21  repair tools to farmers because these pieces of equipment are

22  so sophisticated and so complex and so proprietary that we

23  can't possibly let farmers repair their own equipment or we

24  can't let independent dealers do the repairs."  That's what

25  they say on the one hand.  On the other hand, "Oh, it is

1   completely easy to life cycle cost.  Everybody can do it."

2   Those are very contradictory positions.

3        So that's *Kodak*.  We think we have, obviously,

4   satisfied *Kodak* in our pleadings.

5        The second issue I want to move on to, which is

6   obviously foremost in the Court's mind, is the issue of

7   standing and joinder.

8        THE COURT:  Okay.  Before you move on from *Kodak* --

9        MR. ZAPALA:  Sure.

10       THE COURT:  Go ahead.  Go to joinder.  I would derail

11  things too much if I went down that rabbit hole.

12       MR. ZAPALA:  I think in Deere's opening statement,

13  Deere stated that we don't seriously dispute that we are

14  indirect purchasers.  I just want to be very clear we do

15  seriously dispute that we are indirect purchasers.  The

16  allegations in this case -- and this goes to your question

17  about the pass-on.  I think that's exactly the question, what

18  is being passed on here.  Nothing.  We haven't

19  alleged -- those words don't appear in our complaint.

20       The allegations that we have made in this case is

21  that Deere has constructed an ecosystem, along with its

22  authorized dealers, that raise the price of Deere repair

23  services.  Deere doesn't provide repair services; the dealers

24  do.  That's the inflated price that farmers are paying.

25  That's implemented by the dealers in the first instance.  This

1    is not a price-fixing case where there is some fix on a

2    commodity product that's being passed down the chain to us

3    where we have to trace an overcharge. The overcharge is on a

4    service provided by the dealerships. So there is no need to

5    do traceability or pass-on. That was the primary issue as

6    this court stated in *Illinois Brick* and in a number of cases

7    that follow which I can discuss.

8           So the first issue is we don't believe that we are

9    indirect purchasers at all that have to take advantage of the

10    vertical conspiracy exception. We satisfy that as well, and I

11    will talk about that, but there is nothing being passed on by

12    Deere. What Deere has done is created a monopolist situation

13    where their dealers can inflate dealer repair services, and I

14    think there is a couple cases that are really instructive on

15    these points. The first is *Loeb* v. *Sumitomo* authored by --

16           THE COURT: Judge Wood.

17           MR. ZAPALA: -- Judge Wood, and here is what she

18    says: "*Illinois Brick* does not stand for the proposition, as

19    defendants would seem to have it, that a defendant cannot be

20    sued under the antitrust laws by any plaintiff to whom it does

21    not sell."

22           The fact that the farmers are not in privity with

23    Deere does not make them indirect purchasers and the facts of

24    *Loeb* show that. There was manipulation of the market by

25    Sumitomo. The copper purchasers did not buy from Sumitomo.

1    Sumitomo claimed indirect purchasers, got to just apply

2    *Illinois Brick*, and that was rejected by the Seventh Circuit.

3    Those fact circumstances are very analogous to this case.

4          She goes on to say:  "Other suits demonstrate that

5    the Supreme Court has been willing to entertain suits between

6    plaintiffs and defendants not in privity with each other," and

7    the reason plaintiffs' suit in *Illinois Brick* failed was not

8    because defendant didn't sell to them, rather it was because

9    the defendant did sell to a third party who could recover all

10    of the overcharges.  We are not alleging that Deere sells

11    anything to the dealerships in terms of the repair services

12    that are inflated.  So, again, there is no pass-on.  I think

13    that question by Your Honor frames that issue.

14          So as a result, in the *Loeb* case, Judge Wood found:

15    "Here, in contrast, the plaintiffs are not indirect purchasers

16    along a supply chain," and that's similar to this case.  There

17    are a number of out-of-district cases that also support that

18    concept.  I'm happy to go through them if Your Honor would

19    find that helpful.

20          THE COURT:  I think the Seventh Circuit has been

21    pretty clear on what their thinking, their view of what

22    *Illinois Brick* is.

23          MR. ZAPALA:  So if you would like for me to address

24    the joinder issue?

25          THE COURT:  Yes, do that.  I mean, look, on the

1   Article III standing issue in *Marion,* I think it's

2   *Marion 2* -- again, I have got stuff upstairs; I didn't bring

3   it down -- the specific -- I don't know if it was a

4   concession, admission; it didn't say allegation, but it was a

5   word like concession or admission, that there was not a sale

6   to the intermediary, for lack of a better term, and it is not

7   a good term.  So there was a specific concession, it didn't

8   happen, which, okay, to me that's an easy Article III.  It

9   just didn't happen.

10          I didn't read that in the complaint, and I don't

11   think you are making that concession, are you?

12          MR. ZAPALA:  No.

13          THE COURT:  Okay.  All right.  So, yes, start talking

14   about naming and joining co-conspirators, and you did

15   say -- and the concept of that starts, if you trace all the

16   case law back, it starts in a vertical conspiracy concept, and

17   there is some cases that say a co-conspirator exception in a

18   vertical conspiracy, and then they kind of move beyond that.

19          Well, I'm all over the road today.  I apologize.

20          Are you alleging a hub and spoke, or are you alleging

21   a vertical?  And when I say, "vertical," I don't mean

22   dealership to *Deere* in the hub and spoke, if you understand

23   the question.  If you don't understand the question --

24          MR. ZAPALA:  I understand the question.

25          THE COURT:  Okay.  Go ahead.

 1          MR. ZAPALA:  We have alleged both, Your Honor, and

 2     it's very clear.  I mean, Deere claims to not understand this.

 3     The relationship between Deere and its dealerships is

 4     vertical.  You don't have to say "vertical" in your complaint.

 5     The relationship between Deere and its dealerships is

 6     vertical.

 7          THE COURT:  Okay.

 8          MR. ZAPALA:  As your question rightly understood, by

 9     its nature, a hub and spoke is also vertical.  Now, there is

10     this issue of the rims, but we have alleged both, okay?  And

11     it doesn't matter for standing purposes, right?

12          THE COURT:  For Article III or antitrust?

13          MR. ZAPALA:  For both.

14          THE COURT:  Okay.

15          MR. ZAPALA:  Again, if you are relying on the

16     *Illinois Brick* -- we will call it the exception.  I get that

17     there is --

18          THE COURT:  We will call it the exception.

19          MR. ZAPALA:  -- we will call it the exception, the

20     co-conspirator exception, we satisfy that.

21          THE COURT:  Okay.

22          MR. ZAPALA:  But, again, I want to convince you,

23     because I know that you are struggling with this joinder

24     issue, that you don't even have to get to that issue because

25     we are direct purchasers.  We are direct purchasers of

1    inflated repair services that is not passed through a chain.

2    In all of the co-conspirator cases that Deere cites, you are

3    talking about an overcharge that is imposed at the Deere

4    level, that's then passed on to a dealer -- excuse

5    me -- that's imposed on a dealer, that is passed on to a

6    farmer.  That's not what this case alleges at all because,

7    again, the product or service that we are alleging is inflated

8    is Deere repair services.

9           Okay.  So in *Illinois Brick*, for example, you had

10   price fixing on the concrete blocks, and the contractors

11   purchased them in the first instance and the home builders

12   tried to sue.  They were clearly indirect because the

13   overcharge needed to be passed down through multiple chains of

14   the distribution level.  That's not at all what we are talking

15   about here.  Deere doesn't sell repair services to Deere

16   dealerships that then Deere dealerships turn around and pass

17   on to the plaintiffs.

18          So the indirect purchaser rule doesn't even come into

19   play here.  You don't need to worry about 1292(b).  You don't

20   need to worry about joinder because we are direct purchasers

21   in the first instance.

22          THE COURT:  Do you have a case that says any of that?

23          MR. ZAPALA:  I think *Loeb* says it.

24          THE COURT:  Okay.

25          MR. ZAPALA:  I will give you another case.

```
 1              THE COURT:  Okay.

 2              MR. ZAPALA:  The contact lens cases out of the

 3    Eleventh Circuit, very, very similar.  What you have in those

 4    cases -- again, that didn't involve joinder, but actually

 5    there was no joinder there.

 6              THE COURT:  Yeah, I remember that.

 7              MR. ZAPALA:  The contact lens cases, the

 8    manufacturers of disposable contact lenses imposed --

 9              THE COURT:  I'm a class member.

10              MR. ZAPALA:  Okay.  There you go.  So you know the

11    facts, Your Honor.

12              THE COURT:  I put in my claim, and I talked to the

13    judge.

14              MR. ZAPALA:  Excellent.

15              And in that case, the court said the same thing.  Let

16    me read to you some of the quotes.

17              THE COURT:  Can you give me the cite to that?

18              MR. ZAPALA:  Sure.

19              2018 -- I have the Lexis site, unfortunately.

20              THE COURT:  Don't say, "unfortunately."  That's what

21    I use.  It's a great -- it's a great struggle in chambers.

22    They use Westlaw.

23              MR. ZAPALA:  2018 U.S. Dist. LEXIS 212329.

24              THE COURT:  Okay.

25              MR. ZAPALA:  There is actually multiple decisions in
```

1    that case that address this issue, both motion to dismiss,

2    class certification, and summary judgment.

3            THE COURT:  Okay.

4            MR. ZAPALA:  But here is what the court said:  "The

5    court reasoned that the rationale for the direct purchase rule

6    does not apply to the very different case of vertical

7    conspiracy with no allegations of pass-on."  That's what Your

8    Honor's question was about.  That's the situation here.  The

9    manufacturers of disposable contact lenses in that case

10   imposed uniform price policies on their wholesalers and on eye

11   care professionals.  They implemented it in the first

12   instance.  They were determined to be direct purchasers there.

13   By the way, no joinder, incidentally, of the intermediaries in

14   that case.  So that's another case that stands for the

15   proposition that you don't have to join.

16           THE COURT:  But did the issue come up?  Was it raised

17   you have to join?

18           MR. ZAPALA:  That case was litigated up and down, and

19   it was settled on the eve of trial, Your Honor.  I would be

20   very surprised if it wasn't.  A number of my colleagues were

21   counsel in that case.

22           THE COURT:  But I didn't see any opinion on that from

23   that judge saying you need -- you don't need to.

24           MR. ZAPALA:  Because they are direct purchasers.  You

25   don't need -- there are no intermediaries to name, right?  I

 1    mean, they were direct purchasers in that case.  They

 2    purchased the contact lenses from the wholesaler and from eye

 3    care professionals.  They sued the manufacturers, right?  And

 4    the court didn't need to reach the issue because, again, they

 5    were direct purchasers in that case.

 6         THE COURT:  And I get that, and that's the issue with

 7    *Fontana Aviation*, is reaching the issue.

 8         I don't know if I have got it here.  I cited it off

 9    the top of my head Thursday.  I think it's *United States v.*

10    *L.A. Tucker Truck Lines*, and it talks about -- it's an old

11    case, a Supreme Court case -- and it talks about what happens

12    when courts do things sort of sub silentio.  It just kind of

13    happens in a case, and then we read the cases years later, and

14    we go, "What about this?"

15         But a case is its own organic thing, and it takes on

16    a life of its own, and issues are raised or they were decided

17    not to be raised, and courts blow through them or the court

18    just doesn't address it because it thinks it's stupid or a

19    party gives a concession, and then years later we are trying

20    to dissect and go back historically to figure out why

21    something happened, and that in my mind is kind of where we

22    are at with *Fontana Aviation*, and the contact lens case seems

23    to be in that world.  I'm trying to figure out, just because

24    it happened, is it the holding of the case.

25         MR. ZAPALA:  Understood.  Well, let me talk -- I know

1   your question asked is there controlling Seventh Circuit

2   authority on that, and, if anything, I think we have the

3   better of the arguments in the Seventh Circuit given what

4   occurred in *Brand Name Drugs* and *Fontana*.  I

5   understand -- well, what I would say to you is -- this is our

6   first time; I don't want to lose credibility -- it's not

7   controlling, right?  It is not controlling for either side.

8           THE COURT:  When you say *In re Brand*, you mean Judge

9   Kocoras' ultimate decision?

10          MR. ZAPALA:  Well, that is not controlling.

11          THE COURT:  Right.

12          MR. ZAPALA:  But, obviously, if the Seventh Circuit

13  spoke clearly on this issue, it would be controlling.

14          THE COURT:  We wouldn't be doing this.

15          MR. ZAPALA:  Right.

16          I'm not going to try to convince you that Judge

17  Posner held that you don't have to have joinder or that Judge

18  Posner said you have to have joinder.  I think the

19  parenthetical that Deere is citing, "but that requirement is

20  satisfied," it is in a parenthetical for a reason.  It is

21  talking about that case, that the requirement was satisfied in

22  *Beef*.

23          THE COURT:  It is talking about *Beef*.

24          MR. ZAPALA:  That's what you do with parentheticals.

25  You don't put facts in your own case in a parenthetical.  It

1   is talking about --

2           THE COURT:  But he does though.

3           MR. ZAPALA:  He says, "but that requirement is

4   satisfied."

5           THE COURT:  He says, "here the wholesalers."  So he

6   does mix in both the facts of *In re Brand Name Prescription*

7   *Drugs* with *In re Beef*, and he makes his stew that we can't

8   figure out.

9           MR. ZAPALA:  Right.  But I was referring to counsel's

10  argument about the parenthetical in particular.

11          THE COURT:  Okay.

12          MR. ZAPALA:  I don't think that states anything of

13  the kind.  And of course the district court judge interpreted

14  it in our favor.  And as Your Honor has pointed out, why cite

15  *Fontana* and *Shamrock*, two cases where the fact scenario was

16  presented and no joinder was required.

17          So, again, the first thing I want to convince you of,

18  Your Honor, is that you don't have to reach this very

19  difficult issue of joinder because that only arises in the

20  context where there is an admitted indirect purchaser who is

21  attempting to avoid that rule through the co-conspirator

22  exception.  We satisfy that secondarily.

23          But as first principles, you have *Loeb*, you have

24  *McCready*, you have *Marion*, you have the *NCAA* case, a number of

25  cases where there is a monopolist who has set up a

1  monopolistic scheme, a plaintiff who has not purchased from

2  that monopolist where they can sue as a direct purchaser

3  because they are the first entity in the chain to pay the

4  inflated price.

5        I want to talk a little bit about the policy reasons

6  for this joinder rule that counsel touched on.

7        THE COURT:  All right.

8        MR. ZAPALA:  I don't think they are satisfied here at

9  all and part of that has to do with the nature of the

10  dealerships.

11        THE COURT:  I think they give three policy reasons,

12  and one is, obviously, double recovery damages.

13        MR. ZAPALA:  Duplicative recovery, a concern that the

14  co-conspirator upstream would also have a claim against Deere

15  in this case.  That doesn't exist here.

16        We are alleging, again, that the repair services are

17  inflated by the joint restrictions implemented by Deere and

18  its dealerships.  Its dealerships can't sue Deere for an

19  inflated repair cost.  They don't pay Deere for inflated

20  repair costs.  So there is no chance of duplicative recovery.

21        Is it possible that Deere's dealers have some other

22  antitrust cause of action against Deere?

23        Of course.  That doesn't create duplicative recovery.

24  Of course what Judge Wood said in the *Marion* case is

25  instructive.  What she said is that multiple plaintiffs can be

1    harmed by an antitrust violation.  So if the dealerships -- I

2    don't know why they would because they benefit from this

3    practice, as alleged in our complaint -- if they want to sue

4    Deere for lost profits, they can do that.  That's not the same

5    duplicative claim as a farmer suing for elevated prices in the

6    Deere repair services market.

7             THE COURT:  Hold on one second.

8             If all the dealerships benefit from this scheme, why

9    aren't all of them in it?

10            MR. ZAPALA:  They are, and, again, I would --

11            THE COURT:  Does the complaint say they all are?

12            MR. ZAPALA:  I think fairly read, our complaint does;

13   if not, we are happy to amend to make that clear.  There is

14   no --

15            THE COURT:  I will be really, really honest -- I'm

16   not smart enough to be tricky -- the way I read the complaint

17   is some are in, some are not.  There is this sort of

18   undercurrent of, well, the ones who aren't in the scheme are

19   ticked at the ones who are, and they got the big boys pushing

20   out the little ones, and there is this internal struggle.

21   That was my read of the complaint, is there are some in and

22   there are some not, and that's the way I read it.

23            MR. ZAPALA:  That is true from the following

24   standpoint --

25            THE COURT:  Okay.

```
 1              MR. ZAPALA:  -- independent repair shops are out.
 2              THE COURT:  I'm talking pure dealerships.
 3              MR. ZAPALA:  All Deere dealerships are in, and here's
 4    why --
 5              THE COURT:  Okay.
 6              MR. ZAPALA:  -- Deere has a common contract that it
 7    uses with its Deere dealerships.  That's the spoke.
 8    Mr. Majoras said he doesn't understand what the spoke is.  The
 9    spoke is the agreement between Deere and its dealerships.
10    They have agreements.  And as we have alleged throughout the
11    complaint, those agreements prohibit dealerships from
12    providing repair tools to farmers.
13              THE COURT:  I didn't take his argument that way.  I
14    thought the spoke on my bike is dealership to Deere, and I
15    don't want to mis -- maybe I misunderstood your argument.
16              What I heard you say and what I read, and hopefully I
17    have got this right, is your concern is dealership to
18    dealership to dealership to dealership around that --
19              MR. ZAPALA:  What he said was, "We don't even know
20    who the spokes are."
21              MR. MAJORAS:  I did say that, and I think that's
22    correct.
23              THE COURT:  Right.
24              And then he is saying that because he says you have
25    got to name the dealerships, because I think his view -- and I
```

1    don't want to interrupt here too much.

2            Was your view that some dealerships were in and some

3    dealerships were out?

4            MR. MAJORAS:  It certainly read that way to us, Your

5    Honor, and we detailed that in our papers.

6            THE COURT:  Okay.  So if his reading and my reading

7    tracks, that makes some sense because then now you -- what

8    is -- you are right, the vertical and the hub and spokes

9    there, it is Deere & Company to dealership.  But the

10   connection between dealership to dealership to dealership to

11   dealership, all the way around the wheel, if the reading is

12   some are in or some are out, well, a spoke ain't attached to

13   my rim, and my wheel is going to not do so well.

14           MR. ZAPALA:  All Deere affiliated dealerships are

15   part of the vertical agreement because that's what --

16           THE COURT:  Okay.

17           MR. ZAPALA:  I mean, there is no way to make a Deere

18   dealership a Deere dealership without an agreement with Deere,

19   right?

20           THE COURT:  Right.

21           MR. ZAPALA:  As part of that dealership agreement,

22   they agree to impose these restraints which we say ought to be

23   available to farmers and independent repair shops.

24           THE COURT:  And then by the very existence -- again,

25   if I'm wrong on this, you tell me -- the very existence of

1     every dealership being in, which is getting my verticals

2     everywhere, that in itself makes the horizontal?

3            MR. ZAPALA:  I wasn't addressing the rim, but if you

4     would like for me to address the rim?

5            THE COURT:  Yes, I would like to address the rim.

6            MR. ZAPALA:  I'm happy to do so.

7            THE COURT:  Because I understand the vertical within

8     the hub and spoke.  It's the rim.

9            MR. ZAPALA:  Yes.  So, obviously, it's appropriate

10    for us to plead in the alternative.  We have pled multiple

11    vertical conspiracies with each Deere dealership and a

12    hub and spoke.

13            In terms of the rim, as the Supreme Court held in

14    *Monsanto*, it's a conscious commitment to a common scheme, Your

15    Honor, and *In re Disposable Contact Lenses* has a hub-and-spoke

16    conspiracy aspect to it as well, and what both courts held,

17    the Supreme Court in *Monsanto* and the district court in the

18    disposable lens cases, what you have are form policies, right?

19    Same thing here.  Deere has, essentially, a common contract

20    that it imposes on all Deere dealerships.  They all agree to

21    that.  They are aware -- of course they are aware that the

22    other dealers are entering into those contracts.  It's a

23    condition of being a Deere dealership.

24            So all of them are entering into these restraints

25    that are imposed on the farmers knowingly.  That's all it

1    takes to allege a hub-and-spoke conspiracy under *Monsanto* and

2    the contact lens cases.  So we do have that, and that is

3    alleged in the complaint.

4          If Your Honor is -- it sounds like the Court was

5    slightly confused about who is in.  We are happy to clear that

6    up on amendment under Rule 15.  That would be appropriate in

7    this case.  But we do think the complaint, fairly read,

8    alleges that.  So there is no confusion about who is in and

9    who is not in terms of the dealers.

10         THE COURT:  So say I don't buy into this -- I'm going

11   to call it -- the contact lens, where I think you said

12   *McCready* or *Loeb* -- let's go with *Loeb* --

13         MR. ZAPALA:  Sure.

14         THE COURT:  -- this *Loeb* concept.  I'm not so sure I

15   agree with you, but I will go back and read *Loeb* again.

16         MR. ZAPALA:  Sure.

17         THE COURT:  Let's say I don't buy into that, and I

18   think you do need -- the co-conspirator exception applies.  If

19   I think that I need to use the co-conspirator exception, talk

20   to me about whether or not you need to name and join the

21   conspirators rationale under *Illinois Brick* and would a 1292

22   speed things up.  Because in my head, if we are early in this

23   game, and I make a blunder that monumental, and it goes up,

24   well, there is obviously consequences to you that you would be

25   a little concerned about.  I just get a black mark on my

1    record.  Okay.  So it's big deal, but I don't lose any money.

2    And you have clients and I don't.  My client is the

3    constitution.

4            It might make some sense to ask the Seventh Circuit,

5    and maybe it's two questions:  one, does this apply, does the

6    "exception" apply in this circumstance, look at *Loeb* and

7    *McCready* or the contact lens cases; if not, do we need to do

8    this.

9            So that was a lot of questions at you.  Pick one you

10   want to answer and go with it.

11           MR. ZAPALA:  I will endeavor to answer them all, Your

12   Honor.  Thank you.

13           There is no case in the Seventh Circuit that holds

14   you have to join the co-conspirators.  It doesn't exist.  The

15   *Brand Name Drugs* district court case has been around for

16   25 years.  There is no contrary authority in that intervening

17   time.  I think that's a pretty good indication that the

18   position that Deere is taking in this case is not the law in

19   the Seventh Circuit.  So that would be the first argument as

20   to why --

21           THE COURT:  Well, that is sub silentio and all that,

22   right?

23           MR. ZAPALA:  But again, I mean, 25 years, Your Honor,

24   where this could have been corrected.  Judge Posner writes on

25   antitrust extensively.  He could have corrected it, said the

1    district court got it wrong in *Brand Name Drugs*, that you do

2    need to join a conspirator.  It never happened.  So I think

3    that's pretty good -- so, number one, there is no

4    inter-circuit split that should require an interlocutory

5    appeal.  There is no contrary authority.

6         THE COURT:  Well, you have -- there is no -- assuming

7    that you tracked it, you have got Judge Kocoras and *In re*

8    *Brand Name Drug Prescriptions*, and we hold what his ultimate

9    holding is despite his mental machinations, and him not only

10   internally but externally struggling with the concept, he ends

11   up where he ends up, and then I think your position is there

12   is no controlling Seventh Circuit.  But you have got

13   Judge Kocoras.  Smart, great judge, former Chief Judge of the

14   Northern District of Illinois.  And there is no other district

15   court cases in the Seventh Circuit that contradicts

16   Judge Kocoras.  I'm trying to remember the one that went up

17   from Judge Gordon in Milwaukee a long time ago, but that

18   didn't really contradict Judge Kocoras on this.

19        So you have got that.  And, again, yes, there is no

20   conflict within the Seventh Circuit.  But you have got Charles

21   Kocoras, Judge Kocoras, former Chief Judge Kocoras, and then

22   you have got all this stuff on the other side, right?  And you

23   have got to admit there is the Third Circuit and there is the

24   Fifth Circuit.  There is a lot of circuit cases that say it is

25   a requirement.  That seems like a split that somebody might

1    want to help us on because I don't want to go through whatever

2    we go through, assuming the case proceeds, and then it goes up

3    and they say, "Judge Johnston is a fool.  What was he

4    thinking?  It's clear it's a requirement.  Why was he

5    struggling?  This is not a difficult issue.  Judge Kocoras got

6    it all wrong too.  Judge Johnston is a fool.  It's right

7    here."  And then, whoa, you are in a pickle, right?

8            MR. ZAPALA:  Well, I mean, certainly amendment would

9    be appropriate.  We can name.  I mean, that's not difficult.

10   But I find it slightly ironic that Deere is encouraging us to

11   sue their dealerships -- I wonder if the dealers are aware of

12   that -- because they are not making this argument for

13   substantive law reasons.  They want a get-out-of-jail-free

14   card from this litigation, right?  But the idea that --

15           THE COURT:  Well, to be fair to them, they are

16   concerned about double recovery, assuming they don't buy into

17   your whole --

18           MR. ZAPALA:  But there is no double -- again, your

19   question hit the nail on the head.  There is no pass-on here.

20   So dealers cannot sue Deere for a charge that the dealership

21   imposed in the first instance.  I mean, again, we go back to

22   Judge Wood's decision in *Marion*.

23           Is there some other cause of action that the

24   dealerships could take against Deere?  I don't know, that's up

25   to them and their attorneys, but it wouldn't be based on the

1    facts of our case.

2         THE COURT:  So is Deere making money in this scheme?

3         MR. ZAPALA:  That's what we have alleged, Your Honor.

4    We have alleged --

5         THE COURT:  Okay.  But the first instance is the

6    dealership, right?

7         MR. ZAPALA:  Yes, correct.

8         THE COURT:  That's where the contact point is for the

9    services.

10        MR. ZAPALA:  And the dealerships --

11        THE COURT:  How about the tools?  Who makes the

12   tools?

13        MR. ZAPALA:  The repair tools?

14        THE COURT:  Yes -- I'm sorry -- the repair tools.

15        MR. ZAPALA:  That's Deere participating in the repair

16   services market.  They provide tools, the diagnostic codes for

17   the repairs, but we are not arguing that the charge of the

18   repair tools is passed on.

19        THE COURT:  Okay.

20        MR. ZAPALA:  That's not our case.

21        THE COURT:  Well, because they don't sell the repair

22   tools --

23        MR. ZAPALA:  Correct.

24        THE COURT:  -- which is your whole point, is, "Hey,

25   if you would have given us these tools, we could have done it

1  on our own."

2          MR. ZAPALA:  Exactly.  And, yes, we have alleged

3  throughout our complaint that Deere financially benefits from

4  this arrangement, as does its dealerships, because what Deere

5  has done is eliminated competition for repair and service in

6  the Deere repair service market.  The only people who can

7  perform those services are Deere affiliated dealerships.  So

8  they have eliminated competition from both independent repair

9  shops and, candidly, from the farmers themselves who could

10 engage in self-repair.

11         That restraint causes an overcharge at the repair

12 level, not at the OEM level.  It's at the repair level.  There

13 is no pass-on.  *Illinois Brick* isn't even implicated.  So,

14 again, that's construct number one.  We think that's correct

15 under *Loeb*, under *Contact Lenses*, under *McCready*, under

16 *Sanner*, all of those cases.

17         But if Your Honor needs to reach, obviously, the

18 indirect purchaser issue and feels that we are indirect

19 purchasers or indirect purchasers suing a

20 co-conspirator -- and I understand the question about joinder,

21 but I think we have addressed it.  I know you asked me about

22 the policy reasons.  I think I have addressed the policy

23 reasons in terms of duplicative recovery, which aren't

24 implicated here, which is exactly why the *Contact Lens* court

25 said the indirect purchaser rule doesn't apply.  There is no

1    duplicative recovery here.

2          So for those reasons, we believe that joinder is not

3    appropriate.  We believe that we do have standing and that the

4    complaint states multiple claims against Deere.

5          I'm happy to answer questions, go through your

6    questions, however you would like to proceed.

7          THE COURT:  Well, I would like to hear -- you have

8    got a lot coming at you.  It started with *Kodak*.  Why don't

9    you talk about *Kodak.*  And, you know, I should have asked you

10   this, and I think I thought -- I don't know if I got the

11   question out in time to you folks.  There is the dispute

12   between -- well, not a dispute -- primary market, aftermarket.

13   The cases I read and saw and the ones I researched -- again,

14   this isn't a big area; there is not a lot of cases on

15   it -- they focus on that aftermarket component.  They don't

16   really talk about the primary market.  They just kind of blast

17   right past it, and they kind of do that in *Kodak*, and maybe

18   they did because *Kodak* says it didn't have market power.  But

19   I didn't see a lot of cases that talked about the primary

20   market.  It has to exist because you can't have an aftermarket

21   unless you have a primary market.  So it has got to exist.

22         What is the pleading requirement?  I didn't find a

23   case that talked about the pleading requirement for the

24   primary market.

25         So, again, I'm launching a bunch of issues at you,

1    but why don't we start with the *Kodak* issue, primary market,

2    aftermarket, and then I will hear from -- that seems like a

3    good place for the Department of Justice to jump in.

4          So we will do that.  I'm not limiting you.  We will

5    come back to what else you have got scribbled on the right

6    side of your paper.  But let's talk about that.

7          MR. MAJORAS:  Sure.

8          THE COURT:  And then, you know, one other thing is

9    the whole idea of we don't even get into this game because

10    there is nothing being passed on.  So pick whatever you want

11    to talk about and go ahead.

12          MR. MAJORAS:  Thank you, Your Honor.

13          My partner Ms. Lipscomb-Jackson will address the

14    market *Kodak* issues.  I would certainly like to come back at

15    some point and talk about your question on 1292 certification,

16    the multiple conspiracies that now apparently exist, and a

17    couple of the additional questions you had asked.

18          THE COURT:  Okay.  That's fine.

19          MS. LIPSCOMB-JACKSON:  Good morning, Your Honor.

20          THE COURT:  Good morning.

21          MS. LIPSCOMB-JACKSON:  So picking up on the question

22    you just asked about, what is the standard for the primary

23    market, I believe counsel for plaintiff said earlier, you

24    know, the reason we look at primary markets when we are

25    talking about aftermarkets is you only get to the aftermarket

1   if there is some sort of a disconnect between the primary

2   market and the aftermarket such that the primary market can't

3   discipline the aftermarket.

4           THE COURT:  Right, right.

5           MS. LIPSCOMB-JACKSON:  So when you are asking what's

6   the standard for the relevant market and the primary market,

7   it is the same standard we apply to any relevant market in

8   antitrust and that's the standard of interchangeability.

9   That's the *Sharif* case in the Seventh Circuit.  There are

10  cases across the country that talk about the

11  interchangeability standard when we are talking about relevant

12  market, and that is really the issue with plaintiffs'

13  complaint when you look at their deemed tractor market, which

14  they --

15          THE COURT:  I don't want to interrupt you right from

16  jump.  I'm with you.  I understand the whole

17  interchangeability and a cherry-picker versus a combine, two

18  very different machines, tools, and what they accomplish.

19          Do you have a case that talks about that there needs

20  to be interchangeability in a circumstance which we have here,

21  is single-brand aftermarket?  That's what I'm looking for, and

22  I didn't find anything.  Do you have anything on that?

23          Because you do a bang-up job and full-on discussion

24  of the need for interchangeability generally in the antitrust

25  world, and I'm with you on that.  But specifically to this

1    type of circumstance, do you have a case on that?

2              MS. LIPSCOMB-JACKSON:  So as you pointed out earlier,

3    Your Honor, this is not something that courts tend to talk

4    about a lot when you are talking about the single-brand

5    market, I think because, logically, sort of everyone assumes

6    there must be a primary market.  So I don't have a specific

7    case where they have talked about it in this context, but we

8    haven't seen a case yet where they have allowed a complaint to

9    go forward where there wasn't a primary market that would meet

10   the interchangeability test.

11             THE COURT:  Okay.  All right.  That's helpful.

12             Go ahead.

13             MS. LIPSCOMB-JACKSON:  And on the primary market,

14   while we are there, counsel earlier mentioned that their

15   complaint alleged that Deere had market power in their primary

16   market, and that is just not what the complaint says.  As we

17   talked about just a moment ago, their definition of tractor

18   includes combines, air seeders, sugarcane harvesters, a whole

19   plethora of different equipment that you can find on a farm.

20   The only statistics that they provide about Deere's purported

21   share of that market, Deere's purported market power, is a

22   statistic related to combines and a statistic related to

23   tractors, not the full definition of tractors as they define

24   in the complaint but just tractors I think as you and I would

25   commonly think of tractors.

1       They are not talking about what Deere's market power,

2  what Deere's market share is in their deemed primary market,

3  and it's essentially they are making the argument that, well,

4  if Deere had market share in apples and Deere had market share

5  in grapes, Deere must have market share in the entire U.S.

6  produce market, and that's simply not how this works.

7       So it is not true that the complaint says that Deere

8  has market power in the primary market, nor could the

9  complaint make that allegation because plaintiffs have alleged

10  a primary market that is indefinite.  So they list 12

11  different items:  air seeders, planters, the like, but they

12  have defined the market to use the term "including."  So it is

13  not limited to just the items listed there.  There are other

14  items that are not specified that they are trying to pull into

15  their primary market definition.

16       So with an indefinite market like that, part of the

17  reason why courts reject those types of markets is because you

18  can't look at that and determine what is the market power of

19  the party at issue because we don't know what the full scope

20  of products are.

21       THE COURT:  Again, I should have brought everything

22  down with me.  I apologize.

23       My recollection is that the specific allegation in

24  the complaint was that Deere's -- I don't know if they said

25  gross sales or whatever -- is more than double both Case New

1    Holland and Kubota.  I thought that was the allegation.

2              MR. ZAPALA:  That's one of them, Your Honor.  I'm

3    happy to go through others.

4              THE COURT:  I don't want to interrupt her too much.

5              MR. ZAPALA:  Yes.

6              THE COURT:  And that's what jumped out at me.  I'm

7    thinking, "Well, that seems like market power."  But I think

8    you are arguing more specifically.

9              Does it got to be to each product that's used on a

10   farm?  It has got to be -- you have got to look at combines or

11   you look at tractors, but you don't look at cherry pickers or

12   seed pickers?  Is that the level of specificity that you think

13   that they need to have?

14             MS. LIPSCOMB-JACKSON:  The level of specificity is

15   dictated by how they have defined their market.

16             THE COURT:  Okay.

17             MS. LIPSCOMB-JACKSON:  So if they were defining a

18   market that was just tractors, they could talk about market

19   power with respect to just tractors or just combines.  They

20   have chosen to define a market that includes a dozen different

21   products.  So they have to put forth factual allegations, not

22   conclusory allegations, factual allegations to show that Deere

23   has market power in that market.

24             THE COURT:  And all those things they said?

25             MS. LIPSCOMB-JACKSON:  Correct, combined together,

1   assuming, Your Honor, that that is actually a valid market to

2   begin with because, again, we go back to interchangeability,

3   and that's part of the issue with the complaint.  As you said,

4   a tractor is not a sugarcane harvester.  They are different

5   things.  They are not interchangeable.  And part of the issue

6   when you don't have interchangeability is this problem we are

7   talking about right here, is, well, how do you determine if

8   you have market power when you are talking about different

9   disparate pieces.

10          THE COURT:  Is the coding different?  I don't think

11  there is anything in the complaint on this.  But just off the

12  top of my head, are what we are calling the computers,

13  EDUs -- what's the acronym?

14          MR. ZAPALA:  ECUs.

15          MS. LIPSCOMB-JACKSON:  ECUs.

16          THE COURT:  ECUs.  I'm sorry.  I'm off by a letter.

17          Are the ECUs different in, say, a tractor and a

18  combine, or are they the same?

19          MS. LIPSCOMB-JACKSON:  Certainly, there are

20  differences across the products that have to do with

21  functionality, emission standards, things of that nature.

22          THE COURT:  Okay.  Go ahead.  Sorry for interrupting.

23          MS. LIPSCOMB-JACKSON:  So I think when we are talking

24  about relevant markets and taking a step back, it is two

25  pieces:  It is the primary market, which we were just

1    discussing, and then the aftermarket.  And the parties agree

2    that they have to have pled a plausible primary market.  They

3    haven't done that.  But even if they had, their aftermarket

4    fails because they have not alleged lock-in.  And counsel for

5    plaintiffs earlier said Deere's position is that for lock-in,

6    you must have either concealment or some sort of policy

7    change, and certainly Deere agrees with that, but that's not

8    Deere's position.  That's the Seventh Circuit's position in

9    two cases that have been around since shortly after *Kodak*.

10          THE COURT:  Yes, well, one has, and then like

11   20 years later, Judge Easterbrook decided to sort of

12   sua sponte say it again.

13          MS. LIPSCOMB-JACKSON:  He wanted to make sure that

14   everyone was very clear on this point.

15          THE COURT:  Right.  And it wasn't -- correct me if

16   I'm wrong.  Neither one of those cases where Judge Easterbrook

17   talks about this was a single-market repair case, right?

18          MS. LIPSCOMB-JACKSON:  They weren't single-market

19   repair cases, but in both cases the discussion of *Kodak* was

20   integral to the court's analysis of why the plaintiff's claim

21   fails.

22          So the first case, the *Digital Equipment* case, the

23   plaintiff in that case was trying to allege some sort of tying

24   agreement and argued that *Jefferson Parish v. Hyde*, a prior

25   Supreme Court decision on tie-in, had somehow been modified by

1    *Kodak* and that allowed his claims to go forward, and Judge

2    Easterbrook went through a detailed discussion about why that

3    wasn't the case, and what did *Kodak Eastman* actually do, and

4    what did that mean in terms of a tie-in case.  So even though

5    it wasn't a single-brand aftermarket repair case, it was a

6    case where it was necessary for Judge Easterbrook to discuss

7    what did *Kodak* mean.

8              THE COURT:  Okay.

9              MS. LIPSCOMB-JACKSON:  A similar thing happened in

10   the *Schor* case.  There the plaintiff was alleging

11   monopoly -- oh, excuse me -- a leveraging case, let me just

12   put it out there, and, again, the point that the judge was

13   making was, under *Kodak,* this case doesn't make sense because

14   that is what plaintiff was asserting, right, "*Kodak* gives me

15   the ability to do this."  Judge Easterbrook said, "No, it

16   doesn't, and here's why."

17             So these are cases -- this is not dicta.  This is

18   what Judge Easterbrook and the Seventh Circuit has said about

19   what *Kodak* means, and it is what the majority of the circuit

20   courts around the country have said *Kodak* means.  You do not

21   have a lock-in unless you have concealment, active

22   concealment, by the defendant on the front end or a policy

23   change on the back end, and plaintiffs have not alleged either

24   here.  I believe plaintiff said earlier that they are not

25   arguing that there is a policy change, that they are arguing

1    that there is information cost issues and a lack of

2    transparency, but a lack of transparency is not active

3    concealment.  There isn't a standard --

4           THE COURT:  How about -- sorry -- how about

5    conflicting information?  "Yes, you guys, knock yourselves

6    out.  Repair this.  We will give you some stuff."  Then "Okay.

7    Where do we get it?"  And it's radio silence.

8           How about that?  Where would that fall in?  And I

9    think that's their -- I think -- I don't know if they used the

10    term but certainly "inconsistent positions" on that.

11           MS. LIPSCOMB-JACKSON:  Yes, I think if they were

12    making allegations about inconsistent positions, we could have

13    a debate about that, but that's not really what the complaint

14    says because when they are pointing to supposed inconsistent

15    positions, they are pointing to things that people other than

16    Deere have said.

17           THE COURT:  Through their agents, though.  I think

18    they talk about it's the trade group and the

19    government -- they are not lobbyists anymore.  Not government

20    affairs.  They are government relations.  That's a fancy term.

21    So I think that was their allegation, is, yes, it's their

22    lackeys doing it acting as agents.  But I agree.  I don't

23    think there was anything specific from Deere, but it was folks

24    working in their stead.

25           MS. LIPSCOMB-JACKSON:  Yes, and I mean there are

1    certainly allegations about a dealer trade association that

2    they allege is related to Deere, very conclusory.  The fact of

3    the matter is it is a dealer organization that represents

4    dealerships from all sorts of different ag manufacturers, and

5    Deere dealers don't have to be a member of it, and they are

6    trying to make that Deere's agent.

7           But stepping back, I think you hit the nail on the

8    head when you said it is not really clear, right?

9           So we have got some discussion in the complaint where

10   somebody says repair tools are available.  Well, some repair

11   tools are available.  They make an assertion that they have

12   some -- that the 98 versus 2 percent of repairs that can be

13   done, that there is some confusion about that, but they don't

14   say that that's wrong.  And it's not that Deere has a

15   responsibility under *Kodak* to make sure everything is

16   perfectly clear to every single person who could hear it.

17          What *Kodak* requires is that Deere not actively

18   conceal or change its policies, that it not do something that

19   is going to exploit its customers in the aftermarket.  That's

20   really the key to *Kodak* and that's why *Kodak* is not a good fit

21   in a case where what plaintiffs are seeking is a policy goal.

22   They want to be able to do more repairs, but that policy goal

23   is not a substitute for actual law, and the Seventh Circuit

24   has been very clear on what the law is here.  You have to show

25   active concealment or you have to show that there was an

1   after-the-fact policy change.

2          THE COURT:  Okay.  I'm tracking you.

3          In my head, on the copy of *Authenticom* or -con that I

4   printed out off of Lexis, in the left-hand column on the

5   bottom is Judge St. Eve, and she says, "But that's not all

6   what *Kodak* says," and then she talks about lack of

7   information, and I swear that's in there.

8          I can go up and get it, but I'm pretty sure that's

9   how I remember things, is it is on this page.  It is in the

10  bottom left-hand corner.  I said "right."  It is in the bottom

11  left-hand corner off of the printout that I have from Lexis

12  where she says it is not just that.  It is information as

13  well.  I thought she said that.

14         MS. LIPSCOMB-JACKSON:  So there is some discussion

15  about information there, but in that case there were two

16  different defendants.  One defendant had a policy change that

17  was very clear.

18         THE COURT:  Game over.  Easy.  That was an easy one.

19         MS. LIPSCOMB-JACKSON:  There was another defendant

20  who did not have a policy change, but they did have an active

21  practice of concealing the costs that vendors were being

22  charged for the dealer management software.  So in her

23  decision to allow those claims to go forward, she focused in

24  on their active decision to keep that information away from

25  their dealer customers, and there is some discussion, then,

1    about life cycle management planning.

2            So I don't disagree with you that you see some of

3    that discussion in these cases, but that is not what is

4    turning the cases.  It is not the case that just because

5    information is hard to get or that products are complicated or

6    complex that somehow a defendant has run afoul of *Kodak*.

7    There has to be something that the defendant is actively doing

8    to make the burden on consumers harder with information than

9    it otherwise would be.

10           THE COURT:  Okay.  In my notes, I have "hide."

11   That's what you are talking about, active concealment.  That's

12   hiding.

13           MS. LIPSCOMB-JACKSON:  Yes.

14           THE COURT:  And then I have got question marks,

15   usually three.

16           So there is a difference between hiding, active

17   concealment, and there is just a lack of information out

18   there.  And you are saying it's got to be hiding.  There has

19   almost got to be like that intent of "We are not going to give

20   you this."  And I think once I turn to him, he is going to go

21   "It has just got to be a lack of info or conflicting."

22           But your point is it has got to be that concealment

23   component to it, right?

24           MS. LIPSCOMB-JACKSON:  Because if that were not the

25   case, then you would turn any market with a complex,

1    complicated product into a potential antitrust violation.  If

2    it was just that it's hard to do it or that the information is

3    complicated or hard to gather, and therefore that is a lock-in

4    *Kodak* problem, you would have many more *Kodak*-type cases than

5    what you see.

6         THE COURT:  But doesn't *Kodak* talk about that?

7    Doesn't *Kodak* talk about the lack of information?  Right?

8         MS. LIPSCOMB-JACKSON:  *Kodak* does talk about the lack

9    of information, but, again, Judge Easterbrook has interpreted

10   *Kodak* in two cases to say -- to talk about information but

11   really to home in on this active concealment of information.

12   That is really the key piece.  The defendant must do something

13   to make the burden on the consumer higher to get information

14   than it otherwise would be.

15        They are just in the nature of --

16        THE COURT:  Hold on for a second.  I want to write

17   that down.  Well, I have got it right here.

18        Go ahead.

19        MS. LIPSCOMB-JACKSON:  I just wanted to say that in

20   the nature of the economy that we live in is you have

21   information asymmetry.  It happens all over the place.  It has

22   happened for a long period of time.  They are increasing as

23   products get more complicated.  The defendant must do

24   something more than just be the beneficiary of general

25   information asymmetries that happen every day in the economy.

1    They must make a choice.  They must have an action.  That is

2    what the courts are concerned about.  That's the antitrust

3    violation, to actively try to exploit their customers, and

4    there are no allegations in this complaint to that effect.

5              THE COURT:  Okay.  I know you disagree.

6              I don't want to cut you off.  Go ahead.

7              MS. LIPSCOMB-JACKSON:  No, Your Honor.  I think that

8    covers all of the questions that you had about *Kodak*, but I'm

9    happy to walk through them one by one.

10             THE COURT:  No, you have got most of them covered.

11             MS. LIPSCOMB-JACKSON:  Okay.

12             THE COURT:  I'm called "pedantic" more than I need to

13   be.  So I think you have highlighted the critical issues.

14             MR. ZAPALA:  If I may, Your Honor?

15             THE COURT:  Yes.

16             Hold on one second.

17             MR. ZAPALA:  Sure.

18             THE COURT:  Okay.  You used the word "concealment."

19   That's just a different word for "hide."  Okay.

20             MS. LIPSCOMB-JACKSON:  Deere is happy for you to use

21   whichever word you prefer, Your Honor.

22             THE COURT:  That's fine.  That's fine.

23             Anything else?  I don't want to cut you off.

24             MS. LIPSCOMB-JACKSON:  I did look.  There is one

25   other question you had, and I'm happy to save this for after

1    the DOJ speaks or not, but you had asked about what weight, if

2    any, to give to the DOJ's statement of interest in this case

3    with respect to the *Kodak* issue.

4            THE COURT:  Okay.

5            MS. LIPSCOMB-JACKSON:  And just briefly, as Your

6    Honor pointed out, as we pointed out in our briefing, the

7    Department of Justice has been on both sides of this issue

8    depending on which administration is making decisions about

9    policy, so there is no reason to give the DOJ's statement of

10   interest any special dispensation just because it's coming

11   from the government.  And if you look at it just on the face

12   of the brief, as you would maybe an amicus brief, it should

13   get no weight because it is simply an incorrect recitation of

14   the law.  And we go through this in our statement of interest,

15   and we have talked about it a little bit here.  The DOJ's

16   position essentially tries to rewrite the 30 years of history

17   that's happened after *Kodak*, much of which is traced back to

18   Judge Easterbrook here in the Seventh Circuit.  So our

19   position and our response to that question is simply that

20   there is no weight to be given to that.

21           THE COURT:  Okay.  I appreciate that.  I struggle

22   with -- and I will deny it even though Heather is typing it,

23   that I said this -- I suppose there could be conspiracy

24   theorists that would say *Kodak* goes completely contrary to the

25   Chicago School of Economics, and then somebody took the

1    opportunity to take a swipe back.  I just throw that out

2    there.

3              MR. ZAPALA:  In dicta, no less.

4              THE COURT:  We will figure that out.

5              Is there anything else?  I didn't want to cut you

6    off.

7              MS. LIPSCOMB-JACKSON:  I guess all kidding aside,

8    even if there is some conspiracy theory, the Seventh Circuit

9    has spoken on this, and they have spoken on it past *Kodak*, and

10   so this Court is bound to take what the Seventh Circuit has

11   said and apply it.

12             THE COURT:  Or I have to follow the Supreme Court.

13             MS. LIPSCOMB-JACKSON:  Yes.  Well --

14             THE COURT:  That's another thing I will throw out.  I

15   have two bosses, other than my wife, my daughter, and my cat.

16             Okay.  All right.  I will hear from you, and then I

17   want to hear from the Department of Justice.

18             How much do you have?

19             MR. ZAPALA:  There is a lot there because I think we

20   started out with interchangeability in the aftermarket.  So

21   let me just -- I will try to be brief.  I do think it is

22   important that I respond to a couple things.  I'm going to try

23   to address all of the issues, and I'm going to try to do them

24   in order, but I want to come at -- start, perhaps, where

25   counsel for Deere ended about *Kodak*, and I know you have read

1    the case, and you have probably read it multiple times.  I'm

2    sure your clerks have read it.

3         There is nowhere in Justice Blackmun's decision where

4    he says the OEM has to actively conceal the life cycle costs.

5    That is nowhere to be found in *Kodak*.  In fact, there was no

6    such concealment by *Kodak*.

7         Here's what Justice Blackmun says -- I will try to

8    speak slowly for the court reporter -- "For the service-market

9    price to affect equipment demand, consumers must inform

10   themselves of the total cost of the package - equipment,

11   service, and parts - at the time of purchase; that is

12   consumers must engage in accurate life cycle pricing.

13   Life cycle pricing in complex, durable equipment is difficult

14   and costly.  In order to arrive at an accurate price, a

15   consumer must acquire substantial information which would

16   include data on price, quality, availability of products

17   needed to operate, upgrade, or enhance the initial equipment,

18   as well as service and repair costs, including estimates of

19   breakdown frequency, nature of repairs, price of service and

20   parts, and length of downtime and losses incurred in downtime.

21   Much of this information is difficult, some impossible to

22   acquire at the time of purchase.  It makes little sense to

23   assume in the absence of any evidentiary support that

24   equipment purchasing decisions are based on an accurate

25   assessment of the total cost of equipment, service, and parts

1   over the lifetime of the machine."

2           There was no deception by *Kodak* in that case, none

3   whatsoever, and that cannot be the holding of *Kodak*.  That

4   cannot be the teaching of *Kodak*.  There was a policy change,

5   but as many courts have noted, the vast majority of people

6   purchased after those policy changes.  So as the *DMS* court and

7   other circuit courts, including the Third Circuit, has held, a

8   policy change is not the sine qua non of a *Kodak* claim.  So

9   that's the first thing, just putting *Kodak* in its proper

10  context.

11          THE COURT:  While we are talking about that, putting

12  it into proper context, was Justice Blackmun saying that

13  because the context of *Kodak* was there is no evidence of this,

14  it was just this presumption based upon a school of economic

15  thought, that of course consumers can figure out what -- there

16  is no ultimate harm because in the primary market, we go

17  through this, and there was no evidence of it?  It was just

18  that was the economic thought, so Justice Blackmun is going,

19  "We are not going to let you play that game in this context."

20          MR. ZAPALA:  Yes.

21          THE COURT:  But it is just rebutting this view of

22  economic thought, not facts.

23          MR. ZAPALA:  Well, I mean, I think the posture of

24  that case was that *Kodak* was sort of raising that almost like

25  an affirmative defense.

1          THE COURT:  Yes.

2          MR. ZAPALA:  And the court said there is no reason to

3     buy into that theory because of these issues:  switching,

4     lock-in, information costs.

5          THE COURT:  Okay.

6          MR. ZAPALA:  And I think you are right in the sense

7     that Justice Blackmun almost created a presumption in the

8     other direction, almost saying it's really the defendant that

9     has got to come forward and demonstrate rather than the

10    plaintiff.  Now, we understand we have the burden in this

11    case, and we believe our complaint alleges significant

12    information costs, and I will go into it.  And we do allege,

13    we do allege, that Deere conceals information from farmers,

14    and I will go into that.

15         But taking a step back from *Kodak*, your first

16    question to start out this exchange was about the primary

17    market, I believe.

18         THE COURT:  Right.

19         MR. ZAPALA:  Right.  And I think really the critical

20    issue in aftermarket cases is really about interchangeability

21    in the aftermarket, and that's the *International Equipment*

22    *Trading v. AB Sciex* case -- I'm not sure how to pronounce

23    that -- again, a Lexis site, 2013 U.S. Dist. LEXIS 123109, and

24    what court said there is:  "There is no dispute that a

25    relevant market can be limited to a single brand; rather, the

1    question is whether the plaintiff adequately alleged that

2    there are no interchangeable substitutes to that single

3    brand."

4              So in that case there was still competition in the

5    aftermarket for services.  Here we have alleged there is no

6    competition whatsoever because that has been completely

7    eliminated by the repair restrictions.  So when you are

8    looking at a *Kodak* claim, the question is do they actually

9    have monopoly power in the aftermarket, and here we have

10   clearly alleged that.  That's the *International Equipment*

11   *Trading* case and others.

12             In terms of market power, I won't go through it

13   again --

14             THE COURT:  I'm going to pause you right there while

15   we are still talking about interchangeability because counsel

16   said today, and I know it's in their brief, that you agree

17   there needs to be an adequate definition of the primary

18   market.  If you do agree with that, what do we look to to

19   determine whether you have plausibly pled the primary market?

20             MR. ZAPALA:  Two things.

21             Number one, I'm not sure I do agree with that.  I

22   have not found a case that says that you need to do that.

23   What I found was the case that I just quoted to you, which is

24   really about interchangeability in the aftermarket.

25             But let's assume for the sake of argument that that

1    is a component of a *Kodak* claim.  We have alleged that.  They

2    say it's hopelessly overbroad.  Well, the first thing I would

3    point to is *Kodak*.  Kodak has a number of different copiers.

4    There was no discussion in *Kodak* about interchangeability or

5    the different SKUs that were at issue.  Kodak does not create

6    one copier.  They have a number of different products, and

7    this tie-in restraint applied to all of them, all of Kodak's

8    products, and that was what the ISOs, the independent service

9    organizations, were complaining about.

10          The second thing I would say is this is exactly why

11   courts don't delve into this issue traditionally at motions to

12   dismiss.  When you are talking about interchangeability, it is

13   a highly fact-intensive inquiry because interchangeability

14   really depends on cross elasticity of demand, and it is really

15   why courts are loathe to dive into this issue at the

16   motion-to-dismiss stage.

17          So I don't think that's -- now, typically -- I have

18   been doing this a long time.  My co-counsel have been doing

19   this a long time.  Counsel for Deere has been doing this a

20   long time.  I can tell you right now defendants typically want

21   to say, "The market goes down to the SKU level, all the way

22   down to the SKU level."  So there is always a debate about,

23   even in trial, how broad the market should be, what the

24   cross elasticities of demand show.  That's not appropriate for

25   resolution on our motion to dismiss.

1    What we can say is that Deere talks, itself, about

2   the equipment market as a market in its own filings.  So,

3   again, we don't think that that's appropriate for resolution

4   on a motion to dismiss.

5    Again, counsel talked about concealment and

6   misrepresentations being necessary to a *Kodak* claim.  I talked

7   about why that's not so in terms of what *Kodak* actually held

8   and the language used in *Kodak* and the facts of *Kodak*.  But,

9   again, we have alleged that.  The complaint is, frankly,

10   replete with allegations of their misrepresentations and

11   obfuscation regarding repair services.

12    I mean, here's an example.  We have allegations in

13   the complaint about Deere saying, "You can do like 98 percent

14   of the repairs," right?  You know from this case there was a

15   development where they entered into an MOU with the farm

16   bureau.  They issued press releases after that saying, "It's a

17   watershed moment.  This is a huge deal."  Well, if 98 percent

18   of the repairs were already available to farmers, what's such

19   a big deal about the agreement with the farm bureau?  Nothing,

20   according to what you had said before, should have changed.

21   They are all still available.

22    So in the complaint, I can go through the

23   allegations.  I know you and your clerks have read it closely.

24   It's at paragraph 15, 16, footnote 4, paragraph 18, 19, 23,

25   125, 129 through 140, 141 through 154.  And, by the way, these

 1     are statements from Deere itself, not just from industry

 2     proxies.  But I would actually like to address that for a

 3     moment too.

 4          This is not a fraud case.  We are not talking -- I

 5     mean, the question is whether consumers can accurately

 6     life cycle cost.  It shouldn't matter who utters it.  It

 7     doesn't, right?  I mean, the question is does the market

 8     itself contain accurate information that would permit a farmer

 9     to accurately life cycle.  The complaint alleges absolutely

10     not.  Now, Deere is involved in those representations, but it

11     doesn't matter who utters them.  No one has ever said that.

12     The question is whether information in the market is available

13     to accurately life cycle price.  We say no.

14          And in terms of concealment, again, it's replete in

15     the complaint.  Paragraph 8:  "Only authorized dealerships are

16     permitted to sell Deere tractors and parts, subject to

17     dealership agreements that control how the dealership conducts

18     its business and maintains its records."  Paragraph 14:

19     "Deere does not provide and has never provided access to

20     Dealer Service Advisor or DTAC to anyone but its authorized

21     dealerships."  I don't know what to call that other than

22     concealment, right?

23          I mean, in order to accurately life cycle price, you

24     need to understand what repairs are subject to the restraints

25     and what aren't.  Farmers don't get that information.  They

1   are denied entirely that information according to this

2   complaint.  Now, maybe Deere will be able to convince the

3   Court when facts are contested "That's not true at all, and

4   it's actually true that 98 percent of the repairs have been

5   available."  That's not what's alleged in this complaint.

6   That's Deere's defense.  That's a disputed issue of fact that

7   cannot be resolved on a Rule 12 motion.  But again,

8   respectfully, I think the complaint fairly read alleges a

9   great deal of concealment by Deere, a great deal of

10  misrepresentations by Deere and their industry proxies, and a

11  significant amount of informational cost to farmers in terms

12  of accurate life cycle pricing.

13          In terms of *DMS*, again, I can read the quote.  It's

14  true that one of the entities had a policy change.  Reynolds

15  did not.  There was no policy change.  There was no

16  concealment by Reynolds, right?  I mean, Reynolds, like Deere,

17  points out that the complaint affirmatively pleads its

18  longstanding opposition to third-party integration services

19  and that its contracts have expressly banned it.  The

20  complaint therefore pleads that Reynolds' closed architecture

21  was generally known -- the same thing that Deere is saying,

22  the farmers know that they don't have a right to repair, that

23  there are these restraints that exist -- and nonetheless the

24  *DMS* court let the claim go through; rather, as explained, the

25  court expressed more general concerns about consumers' ability

1  to accurately life cycle cost.  The complaint pleads that

2  Reynolds employs contracts that make life cycle costing

3  difficult.  The complaint does the same thing.

4          I will stop there because I know you want to hear

5  from the DOJ, Your Honor.

6          THE COURT:  Okay.  All right.  I will hear from DOJ,

7  and then I want to hear back from you guys because it is your

8  motion.  So you get the first and the last word.

9          So come on up.

10          MR. CHOU:  Good morning, Your Honor.  May it please

11  the Court, Matt Chou for the United States.

12          THE COURT:  Okay.  Give me one second.

13          All right.  Whenever you are ready.

14          MR. CHOU:  So thank you, Your Honor, for the chance

15  to speak today.

16          I would like to start with a brief discussion of the

17  government's interest in this case, which we appreciate your

18  considering in resolving this Rule 12 motion.

19          The government is concerned about the arbitrary rule

20  that Deere proposes here that risks harming not only farmers

21  and their equipment repairs but also other aftermarkets in

22  context too.  *Kodak* makes clear that to protect competition,

23  we should look to the particular facts disclosed by the

24  record, not arbitrary legal rules.  This holds especially true

25  for market definition.  We use market definition as a tool to

1   suss out market power, such as the ability to raise prices or

2   exclude competition, but Deere would blunt this tool.  Deere

3   threatens to create quandaries, situations in which

4   market -- or the facts show that market power exists, but a

5   court isn't able to offer remedy because it cannot define the

6   relevant market.

7          Take, for example, durable equipment and life cycle

8   pricing.  There are situations in which life cycle pricing is

9   difficult, if not impossible, as *Kodak* explained.  In those

10  situations, a consumer may be locked in even if the

11  restriction at issue was disclosed in a lengthy operator

12  manual, licensing agreement, or elsewhere, yet Deere would

13  have this Court presume without any basis in the record that

14  deception or surprise is always required to define a repair

15  aftermarket.  That would ignore the careful fact-specific

16  analysis that our complex markets demand.

17         With that, I would like to turn to the threshold

18  question the Court had about the weight to give the statement

19  of interest.

20         THE COURT:  Yes.

21         MR. CHOU:  So on that question, Your Honor, in

22  response to the Court's inquiry, we have looked carefully at

23  the statement of interest, the 1991 *Kodak* amicus brief and the

24  more recent OECD paper, and we have identified a through line.

25  In every case, consistently, the government has looked to the

1    facts at issue and not applied arbitrary rules.  Take the OECD

2    paper.  In that paper, we flatly concluded that aftermarkets

3    "require fact-intensive analysis grounded in protection of the

4    competitive process."  In the *Kodak* amicus brief, we applied

5    that same rule.  We looked to the facts of that case after

6    discovery, at summary judgment, and on that record we faulted

7    plaintiffs for failing to "point out any specific market

8    imperfection in their equipment market or explain how such an

9    imperfection could result in market power in aftermarkets in

10   that case."

11        So given that case-specific analysis, we also left

12   open the possibility that a different case could lead to a

13   different result.  Expressly, in footnote 13 of the amicus

14   brief, we failed to rule out or we expressly did not rule out

15   that there could be market imperfections that would allow an

16   equipment manufacturer to exploit his aftermarkets without

17   giving back those profits in the equipment foremarket.

18        There is the same sort of factual question in this

19   case.  There is a question of whether Deere has market power

20   in the aftermarkets such that it could exploit those markets

21   without giving back those profits to future equipment buyers

22   who wouldn't buy Deere products or current Deere owners who

23   would switch away from Deere products.

24        So as in *Kodak*, we would ask the Court to

25   specifically consider the facts in this case and not rely on

1    arbitrary rules.  That's not to say, though, that we request

2    any sort of special deference here.  We merely ask that the

3    Court consider the government's interest in this case, our

4    arguments, and accord them whatever persuasive weight you

5    believe they are worth.

6              THE COURT:  Okay.

7              MR. CHOU:  On that, Your Honor, I would like to turn

8    to some of the questions that have been raised.

9              THE COURT:  Sure.

10             MR. CHOU:  And I could also, perhaps, start with the

11   *Fontana Aviation* question, which I know is not raised in our

12   statement.

13             THE COURT:  If you have got a view, I'm all ears.

14             MR. CHOU:  Sure.

15             So in our view, Your Honor, *Fontana Aviation*

16   controls, and the reason for that is that court in *Fontana*

17   *Aviation* expressly considered the fact that the intermediary,

18   the independent distributor, was not named as a defendant; and

19   despite noting that allegation specifically, it rejected

20   defendant Cessna's argument that the *Illinois Brick* rule

21   applied, and it went on to hold expressly that any sort of

22   situation in which the co-conspirator was alleged was a

23   situation in which *Illinois Brick* did not apply, and I don't

24   think *Brand Name Drugs* either held differently or could have

25   overruled *Fontana Aviation*.

1          So on the merits, the Court may view this

2   differently, but, if anything, Judge Posner was simply

3   contrasting the Fifth Circuit's rule with the Seventh Circuit.

4   But leaving that aside, Circuit Rule 40(e) provides that the

5   prior precedent rule provides in this circuit, and in this

6   circuit, you cannot overrule prior precedent unless you go

7   through the 40(e) process which requires circulation to the

8   full court, followed by what is, essentially, an Irons

9   footnote where the footnote will state, "We followed 40(e) and

10  this is what has been overruled."

11          So that's the government's view on *Fontana Aviation*,

12  but I'm happy to either stay on that or turn back to *Kodak*.

13          THE COURT:  I researched the guts out of *Fontana*

14  *Aviation* to try to drill down as best I could.  I will say I'm

15  not the only one who holds the view that *Fontana Aviation* left

16  the issue unresolved, but my company is a student from like

17  Temple Law School in his case note where he says they don't

18  address it.  Take it for what it's worth.

19          But I'm having real difficulty saying that *Fontana*

20  *Aviation* held that you don't need to name and join

21  co-conspirators under the exception, the co-conspirator

22  exception.  That would be a big deal, and I would think they

23  would tell us.  It looks more to me like an oversight.  And

24  it's an old case.  It is like 1980.  So I don't know if the

25  briefs are down over by Richard J. Daley Community College on

1    Kedzie.  Right?  Isn't that Kedzie or something like that?  By

2    Midway.  I don't know where I could find them.  So I don't

3    know if it was raised.  But it's very hard for me to say that

4    they resolved it.  It is very difficult having read it

5    multiple times.  I can understand why somebody would say it

6    does.  I'm just struggling with it.  So I'm okay with that.  I

7    understand your position.  I'm not saying it's unreasonable.

8          But if you want to start focusing on *Kodak*?  And you

9    guys do a very good job explaining *Kodak* and the history of

10   *Kodak* and sort of the policy reasons.  But there is a lot that

11   comes after *Kodak*, including what the Seventh Circuit has

12   said, and then the other circuits essentially following the

13   Seventh Circuit's -- what the Seventh Circuit has said.

14         So go ahead and tell me what you want to tell me.

15         MR. CHOU:  Sure.

16         So on the issue of the Seventh Circuit precedents,

17   namely *Schor* and *Digital Equipment*, Your Honor, we agree with

18   the Court's question as filed on the docket that neither those

19   cases address bona fide aftermarkets; rather, as the Court

20   rightly noted, both cases address concurrent complements,

21   goods that consumers must buy at the same time to have a good

22   functioning product.

23         So if you look at *Digital Equipment Corporation*, you

24   are dealing with computer hardware on the one hand and

25   operating systems on the other hand, and as Judge Easterbrook

1    noted, if you don't have both, you don't have a functioning

2    computer.  You have no compute.

3          Similarly, in *Schor v. Abbott Laboratories*, you were

4    dealing with a drug cocktail sold by Abbott Laboratories as

5    well as a component of that cocktail sold by Abbott, Norvir.

6    Similarly there, you take a drug cocktail at the same -- you

7    take the drugs and the drug cocktail at the same time.

8          Neither of those cases dealt with the sort of

9    life cycle pricing issues that we see in *Kodak* and in this

10   case where you have an up-front purchase of long-life durable

11   equipment followed by an uncertain stream of future repair

12   costs and aftermarket costs.

13         THE COURT:  Okay.  And --

14         MR. CHOU:  As I think plaintiffs' counsel has noted,

15   *Dealer Management Systems*, which is *Authenticom* or basically

16   the MDL in this district, from Judge St. Eve applies *Digital*

17   *Equipment Corporation* in the exact correct way where, serving

18   the Seventh Circuit case law as well as out-of-circuit case

19   law, Judge St. Eve noted that aftermarket policy changes or

20   deception or surprise are not the only issue at issue in *Kodak*

21   cases, rather we have to look to things like information

22   costs, switching costs, supracompetitive pricing, and the

23   defendant's market share in the aftermarket to determine

24   whether there is an aftermarket at issue.

25         You have also asked whether, if there is a conflict

1    with *Kodak*, whether *Kodak* applies or Seventh Circuit precedent

2    applies.  I would first argue that there is no conflict

3    between the cases, Your Honor, given the factual distinction

4    you have pointed out; but to the extent there is a direct

5    conflict, *Kodak* controls, as the Seventh Circuit has noted in

6    the *Bay v. Peters* 1991 case, in situations where, perhaps,

7    there would be a conflict between Supreme Court precedent and

8    the Seventh Circuit.  District courts and courts are obliged

9    to follow the Supreme Court.  But again, I'm happy to discuss

10   more --

11          THE COURT:  Which case is that?

12          MR. CHOU:  That was *Bay v. Peters*.  That's a 1991

13   Seventh Circuit case.  I admit I don't have the reporter

14   citation handy.

15          But in any event, Your Honor, I'm happy to talk more

16   about either *Digital Equipment* specifically or *Schor v. Abbott*

17   *Laboratories.*  But based on the tenor of the Court's

18   questions, it seems to me that we are on the same page about

19   those cases being -- not addressing repair aftermarkets but

20   instead talking about complementary goods and pointing to

21   *Kodak* simply to explain that *Kodak* was wholly inapposite both

22   in terms of life cycle pricing as well as the facts at issue.

23          THE COURT:  Okay.  I have no position.  I don't know.

24   That's why I'm asking you folks.

25          MR. CHOU:  So I guess I'm happy, then, to maybe touch

 1   briefly on *Digital Equipment* and *Schor* specifically.

 2           THE COURT:  Sure, yes.

 3           MR. CHOU:  So in *Digital Equipment*, Judge Easterbrook

 4   analogized the claims in that case to a claim against General

 5   Motors for including an electrical system in each vehicle, the

 6   reason again being that you had the simultaneous purchase of

 7   two complementary goods, hardware and an operating system.  So

 8   given that analogy, he held that there could not be possibly a

 9   weaker case for *Kodak*.

10           If you were to tie that analogy to today's case, it

11   would be as if plaintiffs were going after Deere for including

12   an electrical system in each tractor.  Well, that's clearly

13   not the claim that plaintiffs are bringing; instead, it is a

14   claim about an equipment purchase at time zero followed by an

15   uncertain stream of aftermarket purchases throughout the

16   useful life of a tractor, and those are the sort of purchases

17   that lead to the uncertain life cycle pricing issues that

18   *Kodak* focuses on.

19           THE COURT:  Okay.

20           MR. CHOU:  On *Schor v. Abbott Laboratories*, that case

21   too involved a similar fact pattern where you had the drugs

22   and the drug cocktail used to treat HIV.  You had Norvir, and

23   then you had a drug cocktail sold by Abbott Laboratories, and

24   then elsewhere in the market competing drug cocktails sold by

25   other drug manufacturers, some of which contained Norvir and

 1    others that didn't, and the plaintiff in that case said,

 2    "Well, Abbott Laboratories really should sell Norvir at a

 3    cheaper price because then, possibly, drug cocktails could be

 4    cheaper."  But as Judge Easterbrook pointed out, Abbott

 5    Laboratories had no duty to sell Norvir at a cheaper price.

 6    There was no claim of either predatory pricing or monopolistic

 7    pricing.  So it was more just a, basically, unreasonable

 8    pricing type claim.

 9         And, thirdly, as Judge Easterbrook pointed out, the

10    life cycle pricing issues raised in *Kodak* could not possibly

11    be at issue in *Abbott v.* -- or *Schor v. Abbott Laboratories*

12    because there was no some costs up front followed by a stream

13    of payments.  It was, instead, the question, at every, I

14    guess, treatment opportunity, about whether to take a drug

15    cocktail.

16         In terms of what sort of guidance to look to when it

17    comes to defining a foremarket --

18         THE COURT:  I'm going to pause you right there so I

19    can think about that for a moment.

20         All right.  So you are getting a shot.  You are

21    trying to forestall -- you're HIV positive, but you want to

22    forestall AIDS.  So you get the shot.  What are the up-front

23    costs, right?  Well, it is you got the shot.  It is not some

24    giant huge investment that then is going to change down the

25    road.  It is "I'm going to get another shot" and that kind of

1    thing.

2         Okay.  I'm with you.  Go ahead.

3         MR. CHOU:  So a question that the Court asked was

4    whether the plaintiffs need to affirmatively plead, with

5    hollow definition, the foremarket or the equipment market in

6    order to bring an --

7         THE COURT:  Yes, talk to me about that.

8         MR. CHOU:  -- aftermarket claim.

9         And I think, Your Honor, that *Kodak* provides the best

10   sort of guidance here where you have to have a sense of the

11   rough contours of the foremarket just to suss out whether

12   there is market power and a correct market definition, but

13   there doesn't need to be a full-blown inquiry into what

14   exactly the foremarket is.

15        THE COURT:  And you say *Kodak* gives me that

16   authority?

17        MR. CHOU:  *Kodak* is one case, but I think to be even

18   more specific, Your Honor, *Harrison Aire* from the Third

19   Circuit offers very instructive guidance.

20        So in that case, which was a repair aftermarket case,

21   the Third Circuit enumerated four factors that determine

22   whether there is an aftermarket at issue, and the Third

23   Circuit looked to the presence of supracompetitive pricing in

24   the aftermarket, high information costs --

25        THE COURT:  So you look at the aftermarket in your

1    analysis of the primary market?

2         MR. CHOU:  Because the question is whether, when

3    dealing with --

4         THE COURT:  And, again, that's way too accusatory,

5    but I'm confused.  Is that really what they were doing?

6         Now, that seems worse.

7         I mean, you get my point is are they looking at the

8    primary market in sort of a "Yeah, notice pleadings, you get

9    the point"?  I think you said "rough context," and I know -- I

10   will tell you I got a draft on this, the area I'm trying

11   to -- I think I use the term "rough context," and maybe there

12   is a Seventh Circuit that kind of uses the rough context.

13        So *Kodak* and this Harris case?

14        MR. CHOU:  *Harrison Aire*, yes.

15        THE COURT:  What is it?

16        MR. CHOU:  H-a-r-r-i-s-o-n  A-i-r-e from the Third

17   Circuit.

18        THE COURT:  Got you.  Okay.

19        And they say you are not held to this, which is a

20   fairly high pleadings standard, even though it's notice

21   pleadings of the interchangeability, that I can look to those

22   and say I can use sort of a rough ballpark?  I don't need that

23   nearly as specific pleadings as in the aftermarket?  Is that

24   what you are telling me?

25        MR. CHOU:  That's right, Your Honor, because the

1   question is whether competition in a foremarket or some sort

2   of equipment market would discipline anticompetitive conduct

3   in the aftermarket.  So to the extent that is possible,

4   plaintiff has the burden of showing that that's not going to

5   be the case, and that's why the *Kodak* court focused on that

6   question.

7        But there are many situations in which there is no

8   such disciplining that occurs given, as *Kodak* and *Harrison*

9   *Aire* point out, things like information costs or switching

10  costs or price discrimination or the defendant's very high

11  market share in the aftermarket.  So when those situations are

12  at play, then you lose the linkage between the aftermarket and

13  the equipment foremarket.

14       So I think to draw an analogy maybe to other places

15  in antitrust law, we have something called quick-look analysis

16  where we basically just require rough contours, and I think

17  that is probably closest to what the courts do here in *Kodak*

18  cases.

19       THE COURT:  Quick look.  Okay.

20       So the analogy is to a quick-look analysis?

21       MR. CHOU:  Yes, I think that is one way of thinking

22  about it, but ultimately, of course, courts don't use the term

23  "quick look" in the context of *Kodak* aftermarket.  So I think

24  the best fit is really looking at the *Harrison Aire* case where

25  you have things like information costs and switching costs

1    ultimately referring back to, "Well, what are you switching

2    away from, or what is the information at issue that you are

3    losing," and that inquiry points to an equipment market where

4    if with your equipment purchase, right below the price tag,

5    Deere and the other company said, "Here is exactly how much

6    you have to pay in the aftermarket," akin to basically

7    bundling a lifetime warranty, then you don't really have the

8    equipment -- you don't really have the information costs or

9    switching costs at issue because the consumer at that point in

10   time could switch.

11           THE COURT:  You know it.  You know it.  Okay.

12           MR. CHOU:  So that's the extent to which --

13           THE COURT:  And you look at the price, and you go,

14   "Oh, that's what it is."  You have got this warranty.  That's

15   what Deere charges.  "I'm going to go over to Case New

16   Holland, see what they have got, look for the information, and

17   I will be able to figure out what this machine is going to

18   cost me for the next 20 years, and I will compare, and then

19   with that knowledge I will make the choice."

20           MR. CHOU:  Right.

21           THE COURT:  Okay.  Sorry for interrupting.

22           Anything else?

23           MR. CHOU:  No problem at all.

24           And that ties in, I think, to the Court's later

25   question about if every other competitor is allegedly engaged

1    in the same sort of anticompetitive conduct in the

2    aftermarkets, do we still have an issue with the defendant

3    here, and the answer, I believe, would be likely yes.  If we

4    look to *Kodak* footnote 21, I believe the court contemplated a

5    very similar fact pattern where the court discussed a

6    situation in which all the different equipment manufacturers

7    engaged in high information cost, high switching cost type

8    aftermarket behaviors, and the court discussed how in that

9    situation every manufacturer might be incentivized to exploit

10   and gain supracompetitive profits rather than defect from the

11   oligopoly, as it were, and therefore gain market share over

12   their competitors.

13            THE COURT:  Okay.

14            MR. CHOU:  So one last point I wanted to just note,

15   Your Honor, is earlier in Deere's argument, Deere pointed out

16   that with our increasingly complex products, we are dealing

17   with increasingly high information costs, and I think that

18   ultimately gets to why the government is interested in this

19   case.  So therefore, in conclusion, we would urge the Court to

20   carefully examine the facts at issue in this case and to

21   reject Deere's categorical argument that in every case

22   deception or surprise is always needed to delineate a repair

23   aftermarket.

24            THE COURT:  Okay.  Thanks.

25            MR. CHOU:  Thank you, Your Honor.

1      THE COURT:  I don't know how fast you were writing.

2  There were a couple things I would love to hear your views on.

3          As to *Schor* and *Digital Equipment* -- again, hopefully

4  I'm articulating this well -- is that those were complementary

5  good type cases, whereas this isn't.  So in those cases where

6  you have got a complementary good -- operating systems and

7  hardware, obviously, complementary goods -- you don't have

8  that here.  So you probably scribbled that down too.  That

9  would be one thing I would like to hear your views on, as well

10  as the reference to *Harrison Aire* and *Kodak* and I'm going to

11  use the term you just need a "rough context" for the primary

12  market.  And then anything else you want to tell me about.

13  But those are a couple of things that I put red stars on.

14          MS. LIPSCOMB-JACKSON:  Great.  I will start with

15  those two, Your Honor.

16          I do have a couple of other points I want to make,

17  and then I want to turn things back over to my colleague

18  Mr. Majoras to address some things that we discussed earlier.

19          THE COURT:  Does anybody need a break?

20          How much more time do you have?  How much more time

21  do you have?  We started at 9:30, and it is noon, and I didn't

22  know it was noon.  I apologize.  So we could take a break for

23  lunch and come back in the afternoon.  I don't think we have

24  got anything scheduled this afternoon.  I tried to keep the

25  day open.  What do you want to do?

```
 1           MR. ZAPALA:  We are at your pleasure, Your Honor.

 2           THE COURT:  Do you need a break, Heather?

 3           THE REPORTER:  I could use a break.

 4           THE COURT:  We are going to take a break because

 5   Heather needs a break.  We will come back when we are all

 6   ready, and we will figure out where we go from there.

 7           MS. LIPSCOMB-JACKSON:  How long, Your Honor?

 8           THE COURT:  Let's come back in ten minutes, and we

 9   will figure out where we go from there.

10     (Recess taken.)

11           THE COURT:  All right.  We will show the same

12   appearances.

13           A couple minor things.

14           More proof that I like Judge Kocoras.  I read his

15   book In the Name of My Father.  It's a good read.  I highly

16   recommend it.  It is like his dad is the microcosm of the

17   country.

18           I went and took a look at the complaint just to

19   clarify some stuff.

20           And then in Authenticom, bottom left-hand corner,

21   "But a change in aftermarket practices is not the sole worry

22   of Eastman Kodak and its progeny."  So it was there.

23           One of the things on the complaint where we were

24   struggling with we didn't think that it included all the

25   dealerships, in part -- it was a couple things.
```

1          One, I want to say you used the word "include," like

2     the co-conspirators include.  In my head, if you include some,

3     you exclude others.  That's just maybe I'm exclusionary that

4     way.

5          Then there was the whole concept of the "big

6     dealers," and in my head, I'm thinking, "Well, the big dealers

7     are getting bigger, and they are getting a deal out of this,

8     and then the non-big dealers are not doing so well."  So

9     that's why my interpretation, and clearly what Deere &

10    Company's interpretation was, is that it was select

11    dealerships.  Yes, "co-conspirators include," which I had

12    circled, "include independent dealerships with agreements with

13    Deere giving them the right to sell new Deere tractors."

14         So I'm going to come back to you.  I promise.

15         I'm still stuck on this hub-and-spoke issue.  I know

16    you cited *Monsanto.*

17         And, Mr. Holevas, weren't you involved in Monsanto

18    cases?  Why do I have that in my head?

19         MR. HOLEVAS:  Yes, Your Honor.

20         THE COURT:  You were?

21         MR. ZAPALA:  I think it is a different Monsanto case,

22    though.

23         THE COURT:  But I know you had a lot of Monsanto

24    cases at one point.  Okay.  Yes, I assume Monsanto gets sued

25    on occasion.

1           So I'm going to come back to you.

2           But before I let this go, I'm still trying to figure

3   out, on this hub and spoke, we have got the vertical, Deere

4   and the dealerships, and then you used the phrase -- and then

5   you said *Monsanto* -- hold on.

6           You don't need to sit there and watch me read my

7   notes.  It doesn't help anybody.  It is tough to explain to

8   the client why you billed "Watched judge read notes."

9           But my point being I'm still working, trying to

10  figure out the agreement between the dealerships as I'm going

11  around the hub.  Even if it's all, even if Deere has what

12  essentially would be vertical agreements with all the

13  dealerships, on a hub and spoke, I still need agreements

14  between the dealerships or with the dealerships.

15         So where do I get that?

16         MR. ZAPALA:  You need what's called a conscious

17  commitment to a common scheme.  So what Deere wants the Court

18  to believe is that the rim requires evidence of like a

19  price-fixing conspiracy where dealerships are meeting in smoky

20  rooms and agreeing on price lists and things like that.

21  That's not at all --

22         THE COURT:  That's not the way I took them.  I took

23  them as they needed -- they want you -- and they will tell me

24  if I'm wrong -- they want you to plead and show that every

25  dealership in the country agrees with each other that they are

1   not going to let any farmer or any independent repair shop

2   into this market.

3          Once you have understood that it is now all

4   dealerships, is it your position they have got to plead

5   agreements between all those, that "We are keeping the rest of

6   you folks out.  Farmers, you can't do it; and independent

7   repairers, you can't do it"?

8          MS. LIPSCOMB-JACKSON:  Yes.  My colleague Mr. Majoras

9   will have more to say, but in general, yes, Your Honor.  They

10  have to plead some sort of agreement between the dealers.  It

11  is not enough that each dealer independently entered a

12  dealership agreement with Deere.  There must be an agreement

13  between the dealers, there must be a rim, and that's what

14  their complaint is lacking.

15         THE COURT:  Okay.  So go ahead.  That's what I'm

16  taking their argument to be.

17         MR. ZAPALA:  And on that, Your Honor, *Monsanto*,

18  *Disposable Contact Lenses* are instructive.  It's not so much a

19  formal agreement amongst the dealers or the rim in any

20  hub-and-spoke case where, you know, there is a written

21  agreement or some communication.  What those courts have held

22  in the context of hub-and-spoke conspiracies is are there

23  firmly established vertical agreements.

24         THE COURT:  Okay.  Got to have that.

25         MR. ZAPALA:  Does the rim know, right.  Does the rim

1    know that all of the vertical agreements are being entered

2    into by their fellow dealerships such that there is a

3    conscious commitment to a common plan, and that is what we

4    have alleged here.  We have alleged that Deere enters into a

5    variety of vertical relationships with the dealers that's

6    well-known in the industry.  In fact, Deere says, "Everybody

7    knows that.  That's why *Kodak* applies, right?  That's why you

8    have to dismiss this case."

9         And not only is there a conscious commitment to a

10   common plan, there has to be -- this monopolist scheme does

11   not work unless the dealerships all implement the dealership

12   agreements and keep the repair tools from the public.  That's

13   what they are required to do, and they all do it.  They all

14   engage in parallel conduct that is depriving the public of the

15   repair tools.  That's the parallel conduct.

16        Now, Deere says, "Well, yeah, but you can't show that

17   it is not in their self-interest because, as you have

18   admitted, they have to enter into that agreement in order to

19   become a Deere dealership," but that's not the way that I'm

20   looking at actions against self-interest work in the antitrust

21   context.  The question is would it be in their unilateral

22   self-interest to engage in that conduct in the absence of an

23   agreement, right?  And of course it wouldn't.  If a dealership

24   here in Rockford couldn't be assured that all other

25   dealerships were engaged in the same conduct, they would be at

1    a competitive disadvantage.

2           So that's the hub-and-spoke conspiracy, and that's

3    been articulated, as I said, in a number of cases,

4    including -- let me get you the cites -- *Wallach and Others*,

5    *Contact Lenses*, *Monsanto*.

6           THE COURT:  Okay.  All right.  That's helpful.

7           All right.  Whoever wants to talk on any issues you

8    want to talk on, go ahead.

9           MR. MAJORAS:  If I could just respond on that last

10   point, Your Honor?

11          THE COURT:  Sure.

12          MR. MAJORAS:  Yes, we certainly do make the point

13   that you have to allege what the conspiracy is among the

14   spokes; in this case now, apparently all of the dealers.

15   Having dealership agreements that in their unilateral interest

16   a dealership may want to sign and that Deere may want to sign

17   with a dealership does not connect everyone into a conspiracy

18   to violate the antitrust laws; otherwise, any type of a

19   franchise arrangement would be some type of a conspiracy from

20   which you might be able to allege there is some conduct that

21   you don't like.

22          "For a conspiracy to exist, the people that form the

23   wheel spokes must have been aware of each other and must do

24   something in furtherance of some illegal enterprise."  That's

25   a quote from -- this is on page 8 of our reply brief, a quote

1    from the *Conrad v. Jimmy John's Franchise* case which was a

2    Southern District of Illinois case in 2021, and likewise we

3    refer to *United States v. Townsend*, a Seventh Circuit case

4    holding "knowledge alone of a hub's parallel activities with

5    other spokes is not enough to create a tacit agreement across

6    the spokes."  The agreement can't simply be -- or the

7    conspiracy agreement can't be "I know a bunch of other people

8    signed a Deere dealership agreement."  There has got to be

9    something alleged that the ends of the spokes all had an

10    agreement with each other to further that conspiracy.  We

11    think that's lacking here.

12          And now we have heard that it's been pled in the

13    alternative that there are -- as a hub-and-spoke conspiracy,

14    and then there is a vertical conspiracy, and we would point

15    you to *Marion 1* and *2*.  *Marion 1* dealt with the hub-and-spoke

16    conspiracy, we think on the same grounds that this should be

17    dealt with here.  *Marion 2* was then the vertical conspiracy

18    that followed on that allegation and likewise that has not

19    been pled adequately here.

20          THE COURT:  Okay.

21          MR. ZAPALA:  Your Honor, if I could just respond --

22          THE COURT:  Yes.

23          MR. ZAPALA:  -- refer you to a few cases that I think

24    might be helpful:  I have already talked about *Monsanto*.  Just

25    for the record again and for your review once this is under

1  submission, there is the *City of Miami v. Eli Lilly & Co.*

2  that's -- sorry, I have got a Westlaw cite for this

3  one -- 2022 WL 198028.  As I said, there is also the

4  *Disposable Contact Lens Antitrust Litigation* case,

5  329 F.R.D. 336.  If you think about the hub-and-spoke

6  conspiracy there, you had the contact lens manufacturers, the

7  wholesalers, and also the alleged -- the eye care

8  professionals.  There was no allegation in that case that the

9  eye care professionals were going around and agreeing with

10  each other that they would enter into this.  It is the exact

11  same allegations as in this case; again, form contracts, form

12  policy, all adhere to it, all are knowledgeable that the

13  others are doing it, and then they engage in parallel conduct.

14  They enforce the policy.  That's exactly what *Contact Lens* is.

15  The case I just mentioned before in the previous colloquy,

16  *Wallach v. Eaton Corp.*, which is 814 F.Supp.2d 428.  I think

17  those cases are instructive on hub and spoke in addition to

18  the Supreme Court's case in *Monsanto*.

19              THE COURT:  All right.  Thanks.

20              I have interrupted you like three times now.  So tell

21  me what you want to tell me.

22              MS. LIPSCOMB-JACKSON:  One more point I want to make

23  about what Mr. Zapala just said in terms of whether it is in a

24  dealer's unilateral interest to not sell its repair parts, I

25  believe earlier in the argument today he made mention that

1    other OEMs have similar policies, and Your Honor asked a

2    question about whether if others in the industry are doing the

3    same thing, is it anticompetitive.  I point that out simply to

4    say it would seem that it would be in one's unilateral

5    self-interest to not make repair tools available if we have

6    allegations of collusion in this case but not allegations of

7    collusion in other instances where folks in the same industry

8    are performing the same task.

9           But going back to the two questions Your Honor asked

10   before the break, I will start with the *Harrison Aire* case and

11   I think your larger question of how the heck do we look at

12   primary market when we are talking about these cases, and I

13   think the better analogy is to look at a traditional tie-in

14   case.  *Kodak* and its prodigy are sort of a speciality type of

15   tie-in case, and plaintiffs here have alleged a tie-in case.

16   It's one of their claims.

17          So to look at, well, what do you have to show to show

18   that you have a relevant primary market, well, look at what

19   you have to show to show that the tie-in product market

20   is -- you have articulated it appropriately and that you have

21   a demonstrated market power.  I think that's the best analogy

22   here, and we submit that, again, that gets you back to issues

23   of interchangeability because you have to have a way to

24   understand whether or not competition -- how competition in

25   that market is impacting the tied product or here the

1    single-brand aftermarket product.

2          The second question you asked had to do with whether

3    or not the Seventh Circuit precedent on *Kodak* applies here

4    because in those cases they weren't single-brand aftermarkets.

5          THE COURT:  Right.  And then the government mentioned

6    complementary.

7          MS. LIPSCOMB-JACKSON:  Right, complementary versus

8    what we are dealing with here.

9          THE COURT:  Right.

10         MS. LIPSCOMB-JACKSON:  Certainly, those cases on

11   their face do not limit the analysis to just complementary

12   product markets.  They talk about *Kodak* in a holistic way, but

13   what did the case mean, what was the impact of that case on

14   antitrust analysis because, again, they were using that as a

15   way to reject arguments that plaintiffs were making about why

16   their claim could move forward, and that's certainly how those

17   discussions have been interpreted by other courts, both in

18   this circuit and in other circuits, and I will point to

19   plaintiffs' favorite case, the *DMS*, the *Dealer Management*

20   case, and in that case Judge St. Eve starts by saying that,

21   "The Seventh Circuit has elucidated *Eastman Kodak*'s holding."

22         THE COURT:  You know, I looked up the word

23   "elucidated," and I know I have it circled.  I will show you

24   my work product.

25         MS. LIPSCOMB-JACKSON:  There you are.

1        THE COURT:  Elucidated.

2        Do you know what the word "elucidated" is?

3        MS. LIPSCOMB-JACKSON:  My guess would be elaborate

4   on.

5        THE COURT:  Fair enough.  Fair enough.

6        MS. LIPSCOMB-JACKSON:  But the point is that even in

7   that case there is a recognition both in the circuit and

8   outside the circuit that what happened in *Digital Equipment*

9   and what happened in *Schor* was the Seventh Circuit

10  interpreting *Kodak* and pronouncing what *Kodak* meant.  So there

11  has been some discussion today about whether there is a

12  conflict between those cases and *Kodak* and the fact of the

13  matter is there can't be a conflict.  *Kodak* came out first.

14  The Seventh Circuit interpreted that case in two different

15  opinions.  So those opinions articulate the Seventh Circuit's

16  view of what *Kodak* said and what *Kodak* did.

17        And I will close, again, by going back to Judge

18  St. Eve in the *Dealer Management* case and stressing that, yes,

19  there was some discussion about information in the case, but

20  she specifically said, after talking about how the Seventh

21  Circuit had elucidated on *Kodak* and noting that other circuits

22  had echoed --

23        THE COURT:  Yes.

24        MS. LIPSCOMB-JACKSON:  -- that language, that a claim

25  depends on the consumer's unawareness of the supplier's

1   aftermarket power and its terms when it purchased the primary

2   market product.  It's all about what did Deere put out there

3   to the public, and throughout their complaint, throughout

4   their papers, plaintiffs have not pointed to statements or

5   allegations showing that Deere made any misrepresentations

6   that actively concealed.  They may take issue with what the

7   policy is, but they haven't articulated active concealment or

8   a lock-in, a change in policy.

9         And unless the Court has any other questions about

10   *Kodak*, I will turn things back over to my partner Mr. Majoras.

11         THE COURT:  Okay.  Give me one second.

12         MR. ZAPALA:  May I respond to a few of those points,

13   Your Honor?

14         THE COURT:  Hold on one second.

15         MR. ZAPALA:  Sure.

16         THE COURT:  Paragraph 142 goes through a whole -- it

17   is one, two, three, four allegations.  It concludes with:

18   "All of these claims are untrue or extremely misleading."

19   That's why in my head I'm thinking bait and switch.  Then

20   there is the reference to the 98 percent and then there is a

21   bunch of footnotes.

22         Okay.  "Such obfuscation is one of the key factors

23   which renders it impossible for farmers to approximate the

24   life cycle cost of repairs of dealer tractors."  You are going

25   to say, "That's conclusory."  He is going to say, "Yes, but

1    look at everything before it."  So I'm with you.  So I follow

2    you.

3           All right.  Go ahead.

4           MR. ZAPALA:  Just to start where we began on the

5    question of whether it matters that competitors are engaged in

6    the same practice or not, I mean, the simple answer is it

7    doesn't at all, and I will say why in a second, but I think

8    counsel's argument on that was, well, if there was something

9    anticompetitive that one of the competitors was doing, they

10   would have been sued too, and all I would say to that is we

11   are attacking one cartel at a time.  They may be next.

12           But aside from that --

13           THE COURT:  Elsewhere?

14           MR. ZAPALA:  Elsewhere.

15           This is one of the -- I feel like one of the hardest

16   things that took me a long time to understand about antitrust

17   law when I started practicing in this area, and that is there

18   is exclusionary practices that companies engage in that are

19   not illegal unless, for example, they are a monopolist, right?

20   So Google, who is a monopolist, may engage in various

21   exclusionary practices that are illegal that their competitors

22   can engage in because they are not a monopolist.  That's the

23   nature of antitrust.  And one of the hard things to understand

24   that about that, at least from a lawyer's perspective, is a

25   lot of times statutes are a general application.  They apply

1    to everybody.  They define conduct that's illegal for

2    everybody.  But that's not the way antitrust law works.  It

3    looks at the particulars of a market to determine whether

4    there is a violation and whether exclusionary conduct affects

5    that market from that entity.

6          On *Digital Equipment*, I think DOJ really summed it up

7    well, but there couldn't be almost a weaker antitrust case

8    than the one brought in *Digital Equipment*.  I mean, this was

9    really about vertical integration, right?  The entity there

10    was making an operating system for their computer.  Again, the

11    analogue in our case would be for plaintiffs to be claiming

12    that Deere can't manufacture any of its own parts to put into

13    its tractor.  That's not what we are alleging, right?  Of

14    course Deere has the right to manufacture its own parts.  The

15    allegation in that case was, "Hey, you know, there is a market

16    for operating systems, and you can't bundle those two

17    together."  We are not saying that at all.  So *Digital*

18    *Equipment* really doesn't carry the day.

19          I will stop there.

20          THE COURT:  Okay.  It's your motion.

21          MR. MAJORAS:  And I will use the most abused phrase

22    from lawyers:  "I will be brief, Your Honor."

23          THE COURT:  Sure.

24          How long was "brief" on Thursday night?  "Brief"

25    was -- Heather would know better than anybody.  "Brief" went

1    on for like an hour and a half.

2         So go ahead.

3         MR. MAJORAS:  I really want to respond to a couple

4    things that Mr. Zapala raised way back in our early arguments

5    that I think he touched on from your questions.  And I did

6    have a chance at counsel table to go through, and I think we

7    have largely covered the questions that you have asked us in

8    advance.

9         I would like to go to one you raised about potential

10   1292 certification.

11        THE COURT:  Yes.

12        MR. MAJORAS:  Our understanding -- actually, my

13   understanding -- and I always hesitate -- my understanding of

14   what is your job behind the bench is that to certify the

15   question, first, there has to be an order.  There is an order

16   that you did.  So I assume your question is once an order is

17   in on this motion, whether the question should be certified.

18   The flippant answer is I want to see what the order says.

19        But the other is we believe the arguments that we

20   have raised, and we have got a number of arguments, some of

21   which we have talked today, really deal with the entire case,

22   and that the joinder issue is not one that the Court

23   necessarily has to resolve in our favor for Deere to be

24   successful on a motion to dismiss.  But certainly, depending

25   on what the Court's ruling is, if that makes sense to --

1    THE COURT:  You want to see things in the full
2    context before you take a position on 1292.
3    MR. MAJORAS:  We would.  And frankly, when we were
4    talking about this issue, I was surprised to see that there
5    was an argument anywhere that it was at issue.  I understand
6    the point, and we would look at that on a potential
7    certification.
8    THE COURT:  Sure.  Right.
9    Now, remember, even though Judge Kocoras ended up
10   where he ended up eventually in the process, and this is
11   before the Seventh Circuit decisions in his case, he said it
12   should be certified.  It seems like --
13   MR. MAJORAS:  I recall that.
14   THE COURT:  Okay.  Go ahead.
15   MR. MAJORAS:  And, Your Honor, the other statement
16   that counsel made -- or he asked a question, I suppose, does
17   Deere want to see its dealers get sued, and of course the
18   answer to that is no.  Our point to being here right now is we
19   think this case should be resolved altogether, but,
20   nonetheless, the plaintiffs have to answer that question as
21   well.  We firmly believe that the Deere dealers offer great
22   value to their customers.  We do what we can to help them in
23   that regard.  And whether the plaintiffs make a decision that
24   those are the dealers they want to sue, they can make that,
25   but it's something that they have to do under the applicable

1    cases in this jurisdiction.

2           And with that, Your Honor, we would put the motion in

3    front of you based on our papers and the argument unless you

4    have further questions.

5           THE COURT:  No.  I'm good.  I'm good.

6           All right.  That's helpful.

7           Go ahead.

8           MR. MAJORAS:  The only -- we are prepared -- I know

9    there is a discovery motion too.  I didn't know if that was

10   something you wanted to address, but if you do, Mr. Lee is

11   here for that.

12          THE COURT:  You know, you are here.  I have read it.

13   I have got my views, but my views can be wrong.

14          So I will be glad to hear if it's a motion to compel

15   or a protective order.  So I thought it was a motion to

16   compel.  So, obviously, plaintiff will go first; we will hear

17   from defense; and then we will go from there.

18          MR. ZAPALA:  Thank you, Your Honor.  I am not,

19   thankfully, arguing also the motion to compel.  So I will turn

20   that over to my colleague.  Thanks again to the Court and its

21   staff for attention to these very interesting issues.

22          Thank you.

23          THE COURT:  You're welcome.

24          MR. HEDLUND:  Good afternoon, Your Honor.  Dan

25   Hedlund, Gustafson Gluek, for the plaintiffs.

1    So as was pointed out in our motion papers, we did

2    engage in a lot of good faith meet-and-confers, and we were

3    able to narrow the issues on the motions down to three out of

4    61 RFPs, which are put forth in our motion.  So it's,

5    essentially, Request 8, 36, and 49.

6    I think throughout, looking at all the different

7    requests, there is a fair amount of discussion in the briefs

8    about the amendments to Rule 26(b)(1) in 2015, which I know

9    Your Honor is well aware of in terms of talking about

10   relevance and proportionality.  We think that if the Court

11   looks at all of the proportionality issues in terms of the

12   importance of the issues at stake with regard to these

13   requests, we think that they are all extremely important

14   issues and all relate to -- have national implications.

15   We think the amount of controversy is large.  We

16   don't know the amount of damages at this point, but it's very

17   significant in terms of the parties' relative access to the

18   information.  Deere has access to this information; the

19   plaintiffs don't.  In terms of the parties' resources, Deere

20   is a large company; the plaintiffs are farmers.  And in terms

21   of the importance of the discovery in resolving the issues, we

22   think that all of these are really at the core of the

23   allegations in plaintiffs' complaint so therefore are very

24   important in that regard.

25   Now, whether the -- the other one is whether the

1    burden or expense of the proposed discovery outweighs its

2    likely benefit.  Plaintiffs recognize that Deere has put forth

3    a couple different affidavits or declarations about the

4    burden, and we recognize that what they put forward is not

5    insignificant; however, we feel that given the importance of

6    these issues, we believe that the motion to compel should be

7    granted.

8          You know, I think in terms of what the amendments to

9    the rule did, it was definitely a change, but I think if you

10   look at Judge Gilbert's opinion in the *Ye* case that was cited

11   by Deere, you know, I think Judge Gilbert said the amendment

12   subtlety narrowed the concept of relevance for purposes of

13   discovery, and then essentially looked at kind of the new rule

14   and the old rule and basically concluded that under either

15   rule he would, you know, decide it the same way, and we think

16   in this instance the same should hold true.

17         So just briefly -- and if the Court has questions it

18   wants to interject, that's fine.

19         THE COURT:  What about sampling?

20         MR. HEDLUND:  Yes.

21         MR. LEE:  And, Your Honor, we proposed sampling, and

22   the plaintiffs have agreed to sampling on a number of issues.

23   For example, in Request Nos. 1, 5, 7, 10, 43 and 45, they have

24   agreed to sampling in order to solve some of these problems,

25   and that's, in fact, what Deere has proposed frequently in

 1    response to some of these issues, that we look at a sample of

 2    the data to see how we might be able to move forward.

 3              THE COURT:  Right.

 4              So what's your view on that for 8, 36, and 49?  So

 5    there were -- obviously, you folks worked it out, and you came

 6    to an agreement on these others.

 7              But why wouldn't sampling, as an initial step, be

 8    appropriate under 8, 36, and 49, which is going to address one

 9    of their major concerns as to the cost?

10              MR. HEDLUND:  I think with regard to 8 in particular,

11    which deals with the error codes, that really is sort of at

12    the core of all of our allegations.  We did agree to sampling

13    for some of the other requests, but for that one it's

14    just -- it's too much in terms of the offer is, I think, 25

15    models out of 850, which is less than 3 percent of the sample.

16    I think if we were to talk about sampling as sort of --

17              THE COURT:  Statistically, why would that be

18    improper?

19              MR. HEDLUND:  Sorry?

20              THE COURT:  Statistically, why would that be

21    improper --

22              MR. HEDLUND:  I mean, just --

23              THE COURT:  -- taking your sample sizes in all kinds

24    of other contexts?

25              MR. HEDLUND:  Yes.  I mean, I have read a lot of

1     things indicating that, like, 50 percent is a good way to sort

2     of get a sample that you can rely on.  The other thing is that

3     Deere says that there is a lot of differences between the

4     different models and so knowing whether or not a sample would

5     work.

6           But I think if we were to go down the road of some

7     sampling, so long as we weren't waiving the ability to

8     continue to meet and confer and pursue expanding that once we

9     saw what the samples looked like, I think we could do that.

10          THE COURT:  And that's one of the benefits of

11     sampling, is you take the sample and you look at it.  Well,

12     50 percent, that's not a sample.  That's a half.

13          All right.  When you go to the ice cream store, and

14     you want a sample, they give you that little wooden spoon --

15          MR. HEDLUND:  And I hate being behind those people.

16          THE COURT:  -- and they don't give you the tub.

17          MR. HEDLUND:  I hear you.  I hear you.

18          THE COURT:  So then you look at the sample, and then

19     you go, "Well, there might be something here," and you have

20     the opportunity because now you have seen it, we haven't

21     engaged in the full cost; or you go, "Yes, you know what?

22     That's a dry well."  You don't want to go down a dry well

23     either, right?  No benefit to you.

24          So that's one of the benefits of sampling, and it is

25     not the end of the discussion.  It is the beginning of the

1    discussion of do we continue on.  And then we still look at

2    the factors under Rule 26.  So when I saw that, I'm thinking

3    that makes some sense.  That's why I wanted to know the

4    distinction between these other ones where sampling was okay,

5    but 8, 36, and 49 stuck out as to why sampling wasn't a step

6    to engage in.

7            MR. HEDLUND:  Yes.  I mean, I think as Your Honor has

8    described it, and it sounds like Deere is in agreement, if

9    this is sort of, as you say, not necessarily the end of the

10   road but an attempt to sort of see what's there, plaintiffs

11   could agree to that.

12           THE COURT:  Okay.  All right.  Do you want to talk

13   about sampling on those 8, 36, and 49?

14           MR. LEE:  Your Honor, I think we proposed some

15   sampling both in meet-and-confers and in opposition to the

16   motion, but if the Court would like us to go and conduct

17   further meet-and-confers along the path, we are happy to do

18   so.

19           On 8, especially, I think there is one thing I would

20   like to clarify.  It is the amount of time that Deere has

21   already agreed to in --

22           THE COURT:  The frame.

23           MR. LEE:  It is not a light lift.  If you look at the

24   amount of time putting the sample will take, it is fairly

25   extensive, and I think plaintiffs may have a misconception as

1      to what they are asking for.  They think they are asking for,

2      basically, a list of codes, which is just one very small part

3      and step in the process.  Where the real time is incurred is

4      the analysis as to what the codes mean and what they can do,

5      which is, honestly, teetering on the edge of an improper

6      request for production, almost asking for the production and

7      creation of new documents.  Deere has not objected on that

8      basis, but it really is getting very close to that line and

9      another reason why we think sampling that we have proposed is

10     sufficient and will be reasonable under the circumstances.

11             THE COURT:  So like ESI is -- discovery is discovery.

12     So it's the traditional -- it is not necessarily the

13     production.  It's the review.  Now you go through the sample,

14     and it's like now you have to kind of go through and go,

15     "What's in here?  And now we are going to give to them."  And

16     there is your additional significant cost.

17             MR. LEE:  And this is more than just the review,

18     especially looking for the DTCs.  One would have to both,

19     first, pull the codes, make sure you have an accurate list,

20     but there is no master, is it self-healing, is it not.  That

21     is the part where I'm talking about almost the creation of a

22     new document.  We are talking about subject matter experts

23     going through and providing that analysis, which the

24     plaintiffs have asked for and Deere agreed to provide for the

25     25 models in the sampling.

1          THE COURT:  I appreciate that.

2          MR. HEDLUND:  So one other thing that was mentioned

3    in Courtenay Cramer's declaration was that there is apparently

4    an underlying database, this VNSM database, where the error

5    codes reside.  So one of the things we suggested in our reply

6    is that they could produce those and then we could run

7    searches and meet and confer because we heard what they said

8    about having to create things.

9          THE COURT:  Run searches on what you already have or

10   what's being produced?

11         MR. HEDLUND:  Sorry?

12         THE COURT:  To run searches on what you either

13   already have or what will be produced?

14         MR. HEDLUND:  Yes, yes, and to include additional

15   meet-and-confers.  I don't know if that would help with the

16   burden issue of Deere or not.

17         THE COURT:  Okay.  What's your thought on that one?

18         MR. LEE:  Your Honor, if you look back at the

19   declaration of Courtenay Cramer, as we mentioned, we have

20   about 8500 products at issue, and she estimated it would take

21   about an hour per product just to pull the list of codes.  We

22   are still talking about 8500 hours just to pull the list of

23   the VNSM codes.

24         MR. HEDLUND:  One point of clarification, which maybe

25   we could reach, would be do you know whether that involves

1    human time or whether it is just running the --

2         MR. LEE:  It is a combination of human time and

3    machine time.

4         THE COURT:  Any idea of what the breakout is, human

5    time versus machine time?

6         MR. LEE:  I don't want to misrepresent that.  I would

7    rely on the declaration of Ms. Kramer.

8         THE COURT:  That's fine.

9         Look, I would go back and take a look at a sampling.

10   I think that would be a good solution or a good step before we

11   go further.  Again, you guys are good lawyers.  You don't want

12   to go down dry wells.  It doesn't help you to sit there and

13   look at irrelevant stuff.  And of course they don't want to

14   produce irrelevant stuff because it costs them money to

15   produce irrelevant stuff.  So nobody wins.

16        So, wow, that's a weasel way out of this thing.

17        So try your samples, the sample process first.  See

18   what it produces.  And then we will talk not next week, but I

19   think we have one scheduled in September, right, or did we

20   bounce to October?

21        Hold on.

22        Yvonne, I just hit "month," and CEO just disappeared.

23   Do you have -- okay, yours is alive.

24        Can you check to see if we have something?  I thought

25   we had like a Thursday in September.  Do we have something on

1    a Thursday in September?

2            THE CLERK:  I'm checking, Your Honor.

3            THE COURT:  We may have bounced to October.

4            Why don't we do this:  Do the sampling, and just give

5    me a status report in about 45 days, because it is going to

6    take you a while to get the sample and take a while to eyeball

7    it to see where it makes sense.  Give me a status on where

8    things are, and I will take a look at it, and if it needs to

9    be further addressed, you can file motions after that.  But

10   at least let me know what the status is, okay?

11           MR. LEE:  Yes, Your Honor.

12           THE COURT:  So here is what we will do:  I will enter

13   and continue the motion to see how the sampling goes, okay,

14   without prejudice.

15           MR. HEDLUND:  The only other point I would make is

16   that I think 36 and 49 are slightly different in that it's

17   not -- I mean, perhaps sampling would work, but I think

18   qualitatively they are a little bit different in terms of the

19   communications that they are looking for.  36, John Deere has

20   wanted to sort of limit the scope of those to be documents

21   that deal with recalibrating the ECUs, which was a limitation

22   that we didn't have in our request.  So we believe that by

23   limiting it that way that there are certain documents that we

24   would not get.

25           THE COURT:  Well, that's what happens when you limit,

1    right?

2              MR. HEDLUND:  Right, exactly.

3              THE COURT:  Then why would it be improper?

4              MR. LEE:  So, Your Honor, the request as written is a

5    little bit different.  So the plaintiffs asked for RP 36 to

6    be -- for us to be required to comply with it, but they don't

7    really mention the full scope of RP 36 in their papers, which

8    is all communications relating to repair tools and repair

9    services for tractors.  So basically any repair anywhere is

10   what they are requesting documents for.  What Deere came back

11   and tried to limit it to was the repairs at issue, those that

12   are not intended to be resolved by independent repair persons

13   or the owners of the tractors.

14             THE COURT:  Basically, the claims.

15             MR. LEE:  Yes.

16             THE COURT:  Right?

17             MR. HEDLUND:  But we could see, I think, instances

18   where there would be communications to, for example, a dealer

19   about how they are dealing with repair tools that wouldn't

20   necessarily involve recalibration of the ECU or disagreements

21   over the dealership agreement, things that are in our

22   complaint.

23             THE COURT:  But we were talking about the amendments

24   to 26, right?  And then we focused on claims and defenses,

25   right?

1          MR. HEDLUND:  Yes.

2          THE COURT:  Whereas people were looking at

3    *Oppenheimer* before that -- the other *Oppenheimer* -- and it

4    wasn't limited to the claims and defenses.  So I understand

5    Deere's point on that.

6          MR. HEDLUND:  Yes.  I mean, they do have an

7    affirmative defense which essentially talks about limiting

8    access to proprietary software and other repair tools in light

9    of concerns about customer safety, security, and the

10   environment.  So we think given that affirmative defense that

11   we want the ability to get documents that relate to that, even

12   if they are not dealing with ECUs.

13         Now, I guess if they tell us that there are

14   absolutely none that exist that would fit into that

15   category --

16         THE COURT:  And that was going to be my next

17   question.  I didn't know if you had a request on that, and it

18   might catch everything or it might catch nothing, right?

19         MR. HEDLUND:  Right.

20         THE COURT:  So I don't know.

21         MR. LEE:  And I think that's where the parties might

22   be talking a little bit past each other.  Deere offered to

23   produce documents that related to the programming,

24   reprogramming, and recalibration of ECUs, one, due to safety

25   and security issues; two, to emissions; and, three, to

1   proprietary and IP issues.

2          So I think we have agreed to produce what the

3   plaintiffs have truly stated they want in this motion.  For

4   example, they gave some examples of a latch tractor being

5   something they want.  Those are the types of documents we are

6   willing to give them.  That would fall into documents where

7   you would either need to program, reprogram, or recalibrate

8   the ECU in order to get the tractor out of latch mode.

9          THE COURT:  Is "latch mode" what was referred to as

10  "limp mode"?  I just want to make sure we have the same

11  nomenclature.

12         MR. LEE:  Yes.

13         MR. HEDLUND:  In paragraph 87 of our complaint, we

14  talk about sometimes it's required that Deere authorize a part

15  once it is put in.  We don't understand that to involve an

16  ECU, and we think that would be relevant here.

17         MR. LEE:  And there that would fall within the

18  calibration mode, for the part to be calibrated to work with

19  the machine.

20         THE COURT:  Okay.  That seems like it's catching what

21  you are looking for.  Okay.

22         MR. HEDLUND:  So then I think the last one is 49 --

23         THE COURT:  49.

24         MR. HEDLUND:  -- which deals with software and

25  subscriptions, which go to the switching costs under *Kodak*.

1    Our understanding, as it is alleged in our complaint, I think

2    at paragraph 100 and some other places, is that there are

3    several pieces of software, some of which is sold to farmers,

4    some of which is provided to them as part of when the farmer

5    buys the tractor, but this is sort of this agronomic tracking

6    of what the farmer does with the crop and things of that

7    nature.

8              Now, if that isn't allowed to be transitioned over to

9    another brand of tractor, which we understand that some of it

10   isn't -- and that's the affidavit of Liz Castillo at

11   paragraph 4, and there is some attachments regarding

12   AgriSync -- that adds to switching costs under *Kodak* because

13   if you have a Deere tractor, and you have obtained this

14   information, and you want to use it in next year's harvest, if

15   you get a new tractor, and if you can't transfer that

16   information over, then that's, obviously, a switching cost and

17   is relevant to the claims that we make under *Kodak*.

18             So we have asked for all of that, and they have

19   offered to provide information regarding three different

20   services and subscriptions.

21             THE COURT:  And why did you offer the three?

22             MR. LEE:  So, Your Honor, the three we offered was

23   the Customer Service ADVISOR, one of the core tools at issue

24   in this case; JDLink, which allows for the data to be

25   transferred and shared amongst the fleet; and the John Deere

1    Operations Center, which is an online farm management system.

2    So we believe those to be the core systems and software issued

3    in this case.

4         While the counsel for the plaintiffs mentioned

5    several that might be relevant, there are several thousand of

6    tools and things that fall within this category.  If

7    plaintiffs had several they were interested in, that is

8    something we could have a discussion about, but several

9    thousand is not proportional to the needs of this case.

10        THE COURT:  Yes.  I mean, the Customer Service

11   ADVISOR -- sometimes it is capitalized, sometimes it isn't,

12   but I assume it's the same thing -- that's clearly at play,

13   and you don't have an issue about producing that --

14        MR. LEE:  No.

15        THE COURT:  -- as well as those other two categories.

16   I think at this point that that is sufficient.  Now, I don't

17   know what shows up later, and you can come back, okay?

18        MR. HEDLUND:  And DTAC we have covered, right?

19        MR. LEE:  DTAC I don't believe is an issue.  We have

20   an agreement among the parties to do searching for things --

21        MR. HEDLUND:  Right, yes.  We have agreed to the

22   search terms.

23        So I think if we could agree to essentially treat

24   this similar to a sample, and that we can take a look at this

25   and then get back to the Court on whether or not --

1     THE COURT:  With a status report?

2     MR. HEDLUND:  -- yes -- whether or not there should

3 be others.

4     The only thing that we want to be careful with, I

5 think, with regard to sampling is we don't want to end up in

6 the situation where we get certain information from Deere, but

7 then Deere uses information that they haven't provided to us

8 against us.

9     MR. LEE:  Well, under Rule 26, anything we are going

10 to use we have to provide.

11     THE COURT:  I think Mr. Holevas and Mr. Gravino will

12 tell you that if something wasn't produced in discovery, it

13 ain't going to be used.  I mean, look at Rule 37 on that,

14 whether there is substantial justification or harmlessness,

15 and it's their burden to show that, and I think those are

16 pretty high burdens to have to establish.  So, yes, that's the

17 whole reason we don't have trial by ambush.  If they are going

18 to use it, it has got to be produced.  So you can rest assured

19 that I apply that rule pretty stringently.

20     MR. HEDLUND:  All right.

21     THE COURT:  All right.  Thank you for your time

22 today.  I appreciate it.

23     MR. HEDLUND:  Thank you, Your Honor.

24     MR. LEE:  Thank you, Your Honor.

25     THE COURT:  Have a good day.

1    (Which were all the proceedings heard.)

2                          CERTIFICATE

3    I certify that the foregoing is a correct transcript from

4    the record of proceedings in the above-entitled matter.

5    */s/Heather M. Perkins-Reiva*          *August 15, 2023*

6    _____        _____
     Heather M. Perkins-Reiva                      Date
7    Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25