**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| IN RE: DEERE & COMPANY REPAIR SERVICE ANTITRUST LITIGATION | Case No. 3:22-cv-50188<br>MDL No. 3030<br><br>Honorable Iain D. Johnston |

**MEMORANDUM OPINION AND ORDER**

**Table of Contents**

INTRODUCTION ................................................................................. 3

ALLEGATIONS ................................................................................. 3

STANDARD ON A RULE 12(c) MOTION .................................. 8

ANALYSIS ......................................................................................... 9

  Plaintiffs Possess Article III Standing Under the Allegations ............................ 10

  *Illinois Brick*'s Direct Purchaser Rule Doesn't Bar Plaintiffs' Antitrust Standing 13

    *Illinois Brick* Is Inapplicable under the Complaint's Allegations ...................... 16

    If *Illinois Brick* Were Applicable, the Co-Conspirator Exception Would Apply . 23

    Under These Allegations, Co-Conspirators Need Not Be Joined ........................ 26

  Plaintiffs Plausibly Allege Relevant Markets ........................................... 39

    Plaintiffs Have Plausibly Alleged a Primary Market .......................... 40

    Plaintiffs Have Plausibly Alleged an Aftermarket .......................... 43

    Policy Change ......................................................................... 49

    Lack of Knowledge Because of Unavailability of Information ........................ 53

      The Importance of Market Power in the Primary Market ........................ 55

      Case Law Has Not Eliminated Lack of Information as a Basis for *Kodak*-type Claims ............................................................................................. 58

  The Individual Counts are Plausibly Pleaded ........................................... 61

    Counts I – III ......................................................................... 64

      Count I ............................................................................. 66

      Count II ............................................................................ 78

      Count III ............................................................................ 79

    Counts IV – VII ......................................................................... 84

CONCLUSION ................................................................................. 89

**INTRODUCTION**

Less than an hour's drive from the Stanley J. Roszkowski U.S. Courthouse down Illinois Route 2 between Oregon and Dixon, Illinois is the John Deere Historic Site. Free of charge, visitors can learn much about John Deere, the man. The takeaway from a visit to this historic site is that John Deere was an innovative farmer and blacksmith who—*with his own hands*—fundamentally changed the agricultural industry.

This multi-district litigation concerns allegations of non-competitive behavior by Deere & Co., a multi-billion-dollar international corporation. If—and that's a big if—the claims against Deere & Co. are meritorious, then the Court assumes the man lionized at the historic site would be deeply disappointed in his namesake corporation.

The ultimate determination of the claims will likely be a long and expensive process, despite this Court's goal of bringing this litigation to a just, speedy, and inexpensive resolution. This order is the first major step on that journey.

**ALLEGATIONS**[1]

Deere's Tractors[2] have come a long way from their humble origins. *See* Dkt. 85, at 3. Today's Tractors are "complex" amalgamations of computers, sensors, firmware, and, of course, machinery. *Id.* at 20-22. This technology is "intertwined" with the "basic operations" of the Tractors. *Id.* Each Tractor has as many as 40

---

[1] The allegations are taken from the consolidated complaint, which for purposes of this motion the Court accepts as true if plausible and not conclusory.

[2] "Tractors" are Deere brand agricultural equipment, such as tractors, combines, and other large agricultural machinery that have ECUs. Dkt. 85, at 3.

computer-like devices known as electronic control units ("ECUs") onboard. *Id.* at 20. The ECUs "determine how—and if—the Tractor functions." *Id.* The ECUs constantly monitor "numerous sensors" throughout the Tractor and communicate to one another via the "Controller Area Network" bus electrical system ("CAN bus"). *Id.* at 21-22. The Tractors also run "firmware," or "software code," which is "as vital a part of a Tractor as a steering wheel or an engine." *Id.* at 20. The code is "effectively part of the machine." *Id.*

Despite—or maybe because of—these marked technological advancements, Deere's Tractors occasionally malfunction. *See id.* at 3-4. "A Tractor requires a substantial amount of maintenance and repair work over the course of its useful life." *Id.* Historically, farmers could repair their own equipment or, if needed, bring the equipment to a local mechanic to perform the necessary repairs. *Id.* For Deere Tractors, however, these options are no longer available. *Id.*

According to Plaintiffs, a group of agricultural crop farms and farmers, Deere "deliberately designed its Tractors so that both the diagnosis and the completion of a repair frequently requires" software tools and resources ("Repair Tools") that Deere keeps under tight lock. *Id.* at 22-23. Plaintiffs allege that Deere restricts access to the Repair Tools to preserve "supracompetitive monopoly profits." *See id.* at 49. Repair parts and services are "far more profitable than sales of the original equipment." *Id.* at 55. The repair parts and services segments of Deere's business have been "growing far faster than original equipment sales." *Id.* So, Plaintiffs

allege, if Deere and its affiliated dealerships ("Dealerships") lose their control over Repair Tools, their profitability will suffer. *See id.* at 55-58.

Deere relies on its Dealerships to provide repair and maintenance services ("Repair Services") for its Tractors. *See id.* at 4-5. Deere, itself, does not repair the Tractors. Dealerships are "independently-owned businesses that work in close collaboration with Deere." *Id.* Despite their independent status, Deere "maintains significant and active oversight, support, and direction for the Dealerships' operation." *Id.* Critically, Deere provides the Dealerships and the Dealerships' authorized technicians with the Repair Tools that are needed to perform "certain maintenance and repairs" of the Tractors. *Id.* at 4. Only Deere and Dealer-authorized technicians have access to the Repair Tools, and Deere withholds these resources from farmers and independent repair shops. *Id.* at 4, 52. Dealerships themselves have stated that they do not sell and are "not allowed to sell" the Repair Tools. *Id.* at 8. Deere, "in concert and agreement with its Dealerships, withholds repair software and other informational repair resources" from "any person or entity that is a competitor of Deere or a Dealership." *Id.* at 5-6.

For example, troubleshooting malfunctions "frequently requires informational resources that Deere refuses to make available to farmers or independent mechanics." *Id.* 24. One such resource is the Dealer Service ADVISOR computer program, which allows the Dealerships' technicians to connect to the Tractor's "electrical system to read the communications between the ECUs to determine where the problem is located and how it can be fixed." *Id.* at 21 (cleaned

up). Dealer Service Advisor allows technicians to "view data related to past performance of the Tractor, clear error codes, communicate and pair newly-installed parts so that the Tractor recognizes them, and program ECUs." *Id.* at 6. Even if a farmer can independently find and replace a faulty part, the farmer still needs a "Dealer to come out and use Dealer Service Advisor to authorize the part." *See id.* at 22, 24-25.

Dealerships also have access to the Dealer Technical Assistance Center ("DTAC"), a "central service with informational resources controlled and operated by Deere," that provides a "searchable troubleshooting database, with a library of information" that is "not otherwise available in any format to non-Dealers." *Id.* at 6. If technicians need assistance while in the field, they can review the resources on DTAC and, if they are still unable to determine how to complete the repair, they can email or call DTAC for live assistance. *Id.* Deere has never provided access to Dealer Service Advisor or DTAC to anyone "but its authorized Dealerships." *Id.* at 7.

Similarly, Dealerships have access to Product Improvement Programs ("PIPs"), which provide "instructions on how to troubleshoot and repair more complex problems that impact large numbers of Deere Tractors." *Id.* at 6-7. Although some PIPs are public, Deere and its Dealerships also have "secret" PIPs that are "known only to Deere and the Dealerships." *Id.* What's more, "[e]ven when a PIP is 'public', the troubleshooting steps and repair information are not independently accessible." *Id.*

6

Deere does make its "Customer Service Advisor" program available to farmers and independent mechanics, but it is a "stripped-down" and "inferior" version of Dealer Service Advisor. *See id.* at 46-48. Customer Service Advisor cannot connect to DTAC, provides "ambiguously described 'diagnostics and readings,'" and cannot be used to "replace a sensor and perform all necessary calibrations a Tractor requires." *Id.* at 48. It also costs thousands of dollars per year to use. *See id.* at 47-48.

So, when a Tractor malfunctions, the farmer is effectively left to the "mercy" of Deere and the Dealerships. *See id.* at 22-23, 29, 38. Farmers are "prevented from using trusted, less expensive, and more conveniently-located skilled mechanics who are not affiliated with Deere." *Id.* at 30. Independent mechanics "cannot effectively work on modern equipment due to [the] lack of access to the Repair Tools." *Id.* at 29.

To make matters worse, Repair Services are both untimely and expensive. *See id.* at 28-29, 37. Dealerships could be "far away" and are frequently "understaffed." *Id.* Farmers "may have equipment sitting at the Dealership for months untouched by any technicians or may be waiting for days or weeks to have a technician travel to their farm." *Id.* at 37.[3] Farmers are also responsible for not only the cost of new parts and Repair Services, but also for the cost of the technician's

---

[3] The Court is not entirely sure if it can take judicial notice that equipment downtime can be devastating for a farmer. But, at the very least, the Court can draw this reasonable inference from the pleadings. Dkt. 85, at 43-44. Just imagine farmers desperately waiting for their equipment to be repaired while precious days or weeks pass and winter inevitably arrives.

travel. *Id.* at 28-29. As of 2022, the cost of Repair Services was $150-$180 per hour. *Id.*

Although securing Repair Services is an untimely and expensive endeavor, farmers are still reluctant to leave Deere for a competitor. *See id.* at 30. A Tractor can cost nearly a million dollars, making it difficult for farmers to simply walk away from their sizeable investments. *See id.* What's more, Deere's "main competitors" similarly restrict access to their repair services, so farmers "cannot simply purchase new equipment from another manufacturer to avoid these issues." *Id.* at 11. Not surprisingly, Deere's equipment is not interchangeable with its competitors. *Id.* at 18-19.

## STANDARD ON A RULE 12(c) MOTION

Although some courts believe the answer is the most inconsequential pleading in a case, this Court begs to differ—at least to some extent. *See* The Hon. Amy St. Eve & Michael A. Zuckerman, *The Forgotten Pleading*, 7 Fed. Cts. L. Rev. 149 (2014). So, the Court cajoled Deere into filing an answer and a motion for judgment on the pleadings under Rule 12(c), rather than a Rule 12(b)(6) motion. Dkt. 78, at 8. Deere humored the Court and complied, which the Court appreciates.

A major difference between a Rule 12(b)(6) and Rule 12(c) motion is timing. *Federated Mut. Ins. Co. v. Coyle Mech. Supply Inc.*, 983 F.3d 307, 313 (7th Cir. 2020). A Rule 12(c) motion is filed after the answer and affirmative defenses are filed. *Id.* So, it is the preferred procedure for contesting a complaint based on an affirmative defense, which is another important difference. *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 n.1 (7th Cir. 2012). But when challenging the

8

sufficiency of the complaint, the standard is the same. *Federated Mut. Ins. Co.*, 983 F.3d at 313. A Rule 12(c) motion is granted only when it appears beyond doubt that the nonmovant cannot prove facts sufficient to support its position. *Id*. The moving party must demonstrate that there are no material issues of fact to be resolved. *Id*. In determining the Rule 12(c) motion, the court views the allegations and reasonable inference in favor of the nonmovant. *Id*. When a Rule 12(c) motion is filed, the court determines whether the complaint states a claim that is plausible on its face. *Vinson v. Vermilion County*, 776 F.3d 924, 928 (7th Cir. 2015). In determining plausibility, the court looks to the requirements of Rule 8; namely, that the complaint contains a short and plain statement of the claim showing that the pleader is entitled to relief. *Id*. Specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests. *Id*. Because the standard for Rule 12(b)(6) and 12(c) motions are the same, *see R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Local Union 150*, 335 F.3d 643, 647 (7th Cir. 2003), the defendant bears the burden to establish that the motion should be granted. *Marcure v. Lynn*, 992 F.3d 625, 631 (7th Cir. 2021).

## ANALYSIS

In its motion for judgment on the pleadings,[4] Deere argues that Plaintiffs lack Article III standing and antitrust standing. Deere also contends that Plaintiffs

---

[4] The Court's general practice is not to hold argument on dispositive motions. The parties and the Department of Justice requested argument in this case. The Court granted the request. And the Court is glad it did. The presentations were stellar in form and substance

fail to plausibly allege relevant markets and that every single count in the Complaint is defective. Of course, Plaintiffs disagree. As discussed in the following 80 pages, the Court finds that Plaintiffs possess Article III standing, that *Illinois Brick*'s direct-purchaser rule doesn't bar Plaintiffs' claims, and that Plaintiffs have plausibly alleged the relevant markets. As to the Complaint's individual counts, the Court finds that they all survive the motion.

### Plaintiffs Possess Article III Standing Under the Allegations

From the jump, Deere asserts that Plaintiffs lack Article III standing to sue under the allegations of the Complaint. Raising Constitutional standing early makes sense and is best practices, which the Court appreciates. Not only are federal courts duty bound to address Article III standing at the outset of any case (and anytime thereafter), *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998), but counsel also have an ethical duty to ensure that federal jurisdiction exists, *BEM I, LLC v. Anthropologie, Inc.* 301 F.3d 548, 551 (7th Cir. 2002); *First Nat'l Bank v. A.M. Castle & Co Emple. Trust*, 180 F.3d 814, 819 (7th Cir. 1999).[5]

Three requirements for Article III standing exist: first, the plaintiff must have an injury in fact—an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; second, there must be a causal connection between the injury and the conduct

---

and extremely helpful. All counsel were outstanding advocates for their clients. The Court commends them for their presentations and responses to the Court's admittedly sometimes oddball questions. Additionally, all the filings relating to the motion were excellent.
[5] Technically, Deere has made a facial—not factual—challenge to jurisdiction. Regardless of the rule that is applied to a *facial* challenge, the Seventh Circuit has held that the standard in *Twombly-Iqbal* applies. *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015).

complained of—the injury must be fairly *traceable* to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Deere focuses on the "traceability" requirement. Dkt. 105, at 5.[6] For Article III standing purposes, Deere argues that Plaintiffs have failed to explicitly allege that they "purchased Repair Services from a Deere dealership involved in the alleged conspiracy." *Id.*

But for each named Plaintiff, the Complaint alleges that it "owns at least one Deere Tractor with an ECU and purchased Deere Repair Services from at least one Deere-affiliated Dealership during the Class Period." Dkt. 85, at 13-16. Plaintiffs also allege that the co-conspirators include *all* the Dealerships. Dkt. 85, at 16.[7] Deere argues that these allegations are insufficient to meet the pleading requirements for showing Article III standing. The Court disagrees.

Indubitably, the party asserting jurisdiction has the burden to establish jurisdiction. *Lujan*, 504 U.S. at 561. But the weight of the burden varies depending on when the issue is raised in the life cycle of the case. *Id.* So, at the pleading stage,

---

[6] The identified page numbers are the actual page numbers of the filings, not the CM/ECF numbers.

[7] The Court was unsure whether the Complaint meant to include *all* the Dealerships as co-conspirators. But Plaintiffs' counsel judicially admitted that their Complaint should be interpreted to mean that all of the Dealerships are co-conspirators. *See Moran v. Calumet City*, 54 F.4th 483, 494 (7th Cir. 2022); *United States v. One Heckler-Koch Rifle*, 629 F.2d 1250, 1253 (7th Cir. 1980) (concessions in brief are judicial admissions).

a plaintiff need only allege, not prove, facts establishing standing. *Id*. Indeed, general allegations of injury resulting from defendants' conduct may suffice because on a Rule 12 motion—assuming a *factual* challenge under Rule 12(b)(1) is *not* made—the court presumes the general allegations embrace the specific facts that are necessary to support the claim. *Id*. The Second Circuit has gone so far as to hold that the pleading standard for standing is lower than the standard for pleading a claim. *Harry v. Total Gas & Power N. Am. Inc.*, 889 F.3d 104, 110-11 (2d Cir. 2018).

Plaintiffs' allegations overcome this pleading hurdle by alleging that (1) they own a Tractor and purchased Deere Repair Services from a Dealership and (2) the co-conspirators "include independently-owned Dealerships with agreements with Deere giving them the right to sell new Deere Tractors, parts, and Deere Repair Services," Dkt. 85, at 16, and (3) *all* the Dealerships are co-conspirators.

Deere's Article III standing argument relies on *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337 (7th Cir. 2022) (*Marion II*), which addresses, among other things, the traceability element under Article III. Dkt. 123, at 2-4. In that antitrust case, the Seventh Circuit held that the plaintiff medical care providers did *not* have Article III standing as to one of the defendant distributors because none of the plaintiffs purchased products from that particular defendant distributor. So, the injury was not traceable to that defendant distributor's conduct. *Marion II*, 29 F.4th at 346. But here's the critical distinction. In *Marion II*, it was *undisputed* that the plaintiffs did *not* purchase products from that defendant distributor. *Id*. at 341 ("The Providers also concede that they do not

12

purchase BD products from Cardinal."). No such concession or admission exists in this case.

In this motion, the Court must construe the allegations in the light most favorable to the nonmovant—not the movant. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015); *Hodges v. CIT Group*, 350 B.R. 796, 797 n.1 (Bankr. N.D. Ill. 2006). The critical distinction at this stage of the case is that there is no concession that Plaintiffs did not purchase from one of the conspirators. Instead, the allegations are that Plaintiffs purchased Repair Services from Dealerships and that the co-conspirators include all Dealerships. So, it is not undisputed that Plaintiffs did not purchase Repair Services from a conspirator, as were the facts in *Marion II*. To interpret the Complaint otherwise would violate the fundamental principle of construing the allegations and drawing all reasonable inferences in light most favorable to the nonmovant. *See Bennett v. Spear*, 520 U.S. 154, 168 (1997).

Construing the allegations in the light most favorable to Plaintiffs and drawing all *reasonable*[8] inferences in Plaintiffs' favor, the Court finds that Plaintiffs have adequately pleaded standing to meet Article III requirements.

### *Illinois Brick*'s Direct Purchaser Rule Doesn't Bar Plaintiffs' Antitrust Standing

Deere argues that the Complaint fails under the general rubric of "antitrust standing."[9] Under this category, Deere raises three interrelated but distinct issues.

---

[8] *See* Iain Johnston, *The Case for Drawing Reasonable—and Only Reasonable—Factual Inferences in Analyzing Rule 12(b)(6) Motions to Dismiss*, The Circuit Rider 14 (May 2022).
[9] The concepts of "antitrust standing," Article III standing, and "antitrust injury" are related but distinct. *Marion II*, 29 F.4th 345 n.7; *Loeb Indus. v. Sumitomo Corp.*, 306 F.3d

Deere argues that the Complaint's allegations "run headlong into antitrust's direct purchaser rule." Dkt. 105, at 6. From there, Deere branches into two separate sub-arguments. First, according to Deere, the Complaint fails to plausibly plead a conspiracy based on the direct purchaser rule under *Illinois Brick*. Dkt. 105, at 7-11. Second, in the alternative, even if the direct purchaser rule doesn't bar the claim and the Complaint plausibly pleaded a proper conspiracy (whether vertical or hub-and-spoke), the Complaint fails because Plaintiffs failed to join the co-conspirator Dealerships as party defendants. Dkt. 105, at 11-14. The Court disagrees with Deere on both fronts. The Court has no trouble rejecting the first argument for two related reasons: first, *Illinois Brick*'s direct purchaser rule does not apply under the circumstances alleged here, in which there is no pass on and Plaintiffs are the type of party best suited to bring the claims; and second, *Illinois Brick*'s direct purchaser rule does not apply when, as here, the plaintiffs are the first purchasers into the conspiracy when they purchased from co-conspirators. But, assuming the direct-purchaser rule of *Illinois Brick* applied, Deere's contention that co-conspirators—the Dealerships—must be joined as defendants is booth review close.

As to Deere's contention that Plaintiffs have failed to plausibly plead a conspiracy, there are (1) explicit allegations, (2) a lack of other allegations, and (3)

---

469, 480 (7th Cir. 2002); *see also Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 542 (8th Cir. 2015). The Court understands why Deere used this moniker. Although the Court wishes it had more time to delve into the nuance (a word the Court is not comfortable with), it will simply tackle Deere's arguments as labeled.

reasonable inferences the Court can and should draw.[10] First, the Complaint specifically alleges that Plaintiffs purchased Repair Services from the Dealerships. Second, the Complaint fails to allege that there are any agreements between the various Dealerships, that Plaintiffs purchased Repair Services from Deere, or that Deere even provides Repair Services. Third, the reasonable inference is that Deere is running the show. Indeed, that is the only reasonable way to read the 73-page Complaint. *See also* Dkt. 113, at 21 n.23. From these, Deere goes on to argue Plaintiffs' hub-and-spoke conspiracy fails because no agreement is alleged between the Dealerships (the rim)—after all, Deere is running the show through independent vertical agreements—and because Plaintiffs purchased the Repair Services from the Dealerships—not Deere—Plaintiffs are not direct purchasers, resulting in a fatally flawed antitrust damages claim. Dkt. 105, at 7-11.

To some extent, Plaintiffs' response to these arguments is "Ah yeah, so what?" Instead, Plaintiffs address an underlying principle of the direct purchaser rule. Dkt. 113, at 9-11. Plaintiffs respond on two fronts. First, *Illinois Brick* is not applicable. Second, even if it were, their claims fall into "an exception." In a mashup of these two arguments, according to Plaintiffs, the "direct purchaser rule" does not require privity with Deere because Plaintiffs alleged that they purchased from the Dealerships, which are in a conspiracy with Deere, so they purchased Repair

---

[10] Consistent with Deere's Article III standing argument, Deere reads at least one allegation in the light most favorable to *it*, not Plaintiffs. Namely, Deere asserts that the Complaint alleges that Deere provides "Repair Tools to only certain dealerships." Dkt. 105, at 8, 9. The Court understands why Deere takes this position. But the Court rejects it for the same reasons. This inference benefits Deere, not Plaintiffs. Moreover, at oral argument, Plaintiffs' counsel judicially admitted that all Dealerships were co-conspirators.

15

Services directly from a conspirator, not an entity simply passing on. *See Paper Sys. v. Nippon Paper Co.*, 281 F.3d 629, 632 (7th Cir. 2002).

Although, from Plaintiffs' point of view, both of their arguments may lead to Rome, the distinction is important. If *Illinois Brick* does not apply, the thorny questions concerning its "exceptions" are moot—or at least much less important. The inverse is also true. If *Illinois Brick* is applicable, then the Court must determine if Plaintiffs' claims fall under an "exception."

### *Illinois Brick* **Is Inapplicable under the Complaint's Allegations**

Both the paradigmatic strictures and the rationale behind *Illinois Brick* show that it is not applicable to this case.

"The facts of *Illinois Brick* illustrate the rule." *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019). Illinois Brick Company manufactured concrete blocks and sold the blocks to masonry contractors. *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 726 (1977). The masonry contractors, in turn, sold masonry structures to general contractors. *Id.* Then, those general contractors incorporated the structures into "entire buildings" and sold the buildings to the State of Illinois. *Id.*

The State sued Illinois Brick Co., alleging that it had engaged in a conspiracy to fix the price of its concrete blocks. *Id.* at 726-27. As a result, according to the State, it had paid more than it would have absent the conspiracy. *Id.* "The monopoly overcharge allegedly flowed all the way down the distribution chain to the ultimate consumer"—the State. *Apple Inc.*, 139 S. Ct. at 1521.

But the Supreme Court put the State's claim on ice. *See Illinois Brick Co.*, 431 U.S. at 745-47. Because the State had not purchased the concrete blocks

directly from Illinois Brick, the antitrust violator, the State could not bring an antitrust action for damages against it. *Id.* The proper plaintiff to bring such an action would be an entity that purchased the blocks directly from Illinois Brick. *See id.* Simply put, indirect purchasers "who are two or more steps removed" from the antitrust violator "in a distribution chain may not sue." *Apple Inc.*, 139 S. Ct. at 1520.

The limitations espoused in *Illinois Brick* address three concerns. *See Apple Inc.*, 139 S. Ct. at 1524. First and foremost, the Supreme Court was not willing to tolerate "the risk of duplicative recovery engendered by allowing every person along a chain of distribution to claim damages arising from a single transaction that violated the antitrust laws." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 474-75 (1982). Second, the Supreme Court wanted to avoid the "evidentiary complexities and uncertainties" associated with a downstream purchaser proving its damages. *See Illinois Brick Co.*, 431 U.S. at 732-33. "The demonstration of how much of the overcharge was passed on by the first purchaser must be repeated at each point at which the price-fixed goods changed hands before they reached the plaintiff." *Id.* And third, the Supreme Court reasoned that antitrust laws will be more "effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it." *Id.*; *see Apple Inc.*, 139 S. Ct. at 1524. In other words, the Court wanted to avoid the death-by-a-thousand-papercuts approach to antitrust litigation. *See id.*

Without the chain of distribution paradigm where some charge is being passed on from a direct purchaser to an indirect purchaser, the rationales underpinning *Illinois Brick*—especially the concern over duplicative recoveries— lose their bite. *See, e.g., McCready*, 457 U.S. at 474-76. For example, in *McCready*, Carol McCready had a Blue Cross of Virginia health plan purchased by her employer. *Id.* at 467-68. The plan provided partial reimbursements for psychotherapy treatment provided by psychiatrists. *Id.* at 468. It did not, however, provide the same benefit for psychotherapy treatment provided by psychologists, unless a physician supervised and billed the psychotherapy. *Id.* Ms. McCready, who was treated by a clinical psychologist, submitted claims to Blue Cross of Virginia, but her claims were denied because they were not billed by a physician. *Id.* So, Ms. McCready sued Blue Cross of Virginia, alleging that it and the Neuropsychiatric Society of Virginia, Inc., conspired "to exclude and boycott clinical psychologists from receiving compensation under the Blue Shield plans." *Id.* at 468-69 (cleaned up).

Evidently, these facts are a far cry from the paradigm presented in *Illinois Brick*, where there was a manufacturer, multiple middlemen, and an ultimate consumer. *See Illinois Brick Co.*, 431 U.S. at 726. So, it is unsurprising that the Court rebuffed the defendant's argument that only the employer had standing to sue under the direct purchaser rule. *McCready*, 457 U.S. at 474-75. There was no risk of duplicative recovery because Ms. McCready's psychologist had already been paid for his services. *Id.* Ms. McCready's psychologist could "link no claim of injury

18

arising from his treatment of McCready." *Id.* at 475. What's more, "it is not the employer as purchaser, but its employees as subscribers, who are out of pocket as a consequence of the plan's failure to pay benefits." *Id.* Therefore, there was no risk of duplicative recovery and *Illinois Brick* offered "no support." *Id.* at 474.

Twenty years after *McCready*, the Seventh Circuit considered how *Illinois Brick* applied to an alleged conspiracy to fix copper futures at "artificially high levels in the international exchange markets." *Loeb Indus. Inc. v. Sumitomo Corp.* 306 F.3d 469, 474 (7th Cir. 2002). The plaintiffs were large companies that occupied "various positions along the copper production chain." *Id.* at 475. They alleged that the defendants conspired "to fix and maintain the price of copper at artificially high levels" in the related copper futures market. *Id.* at 477. Because future traders must take or deliver physical copper depending on their position, the price of physical copper is "directly linked" to the exchange prices for copper futures. *Id.* at 476. In determining that the plaintiffs were not *in*direct purchasers barred by *Illinois Brick*, the Seventh Circuit explained the decision's rationale:

> The reason the plaintiffs' suit in *Illinois Brick* failed was not because the defendants did not sell to them. Rather, it was because the defendants did sell to a third party who . . . could recover for any injury they claimed. The same paradigm applies in all of the cases cited by the defendants: Party A, the antitrust violator, sells to Party B, and then Party C, a down-stream purchaser from B, seeks to recover the implicit overcharges that B passed on to C.

*Id.* at 482. The defendants "did not sell cathode to integrated producers who in turn sold to any of the plaintiffs." *Id.* Rather, "the alleged conspiracy operated in the separate but related futures market, through which it sought directly to manipulate

the price of copper the plaintiffs were buying." *Id.* That's a long way around the barn of saying that this type of paradigm—one where there is no pass on—is less likely to raise *Illinois Brick* concerns. *See id.*

Take, for example, *In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336 (M.D. Fla. 2018). The plaintiffs, purchasers of disposable contact lenses, alleged that the contact lens manufacturer defendants conspired with their wholesalers, independent eye care professionals, and their trade association to "impose minimum resale prices on certain contact lens lines" by requiring them to abide by a Unilateral Pricing Policy ("UPP"). *Id.* at 350. The conspiracy prevented "big box stores, buying clubs, and internet-based retailers" from discounting those products. *Id.* (cleaned up). Critically, the plaintiffs' claims focused on their paying higher retail prices from the distributors because of the UPP. *Id.* at 402. They did not allege a "pass on" of higher prices from the manufacturer to the distributors to the plaintiffs. *See id.* at 401-02. Because their claim was limited to the retail prices, there was no risk of duplicative recovery by the intermediate distributors. *Id.* at 402. The distributors' claims would "involve damages caused by wholesale prices and restrictions on the price they could set to sell UPP-restricted lenses, which are not duplicative of Plaintiffs' alleged injury of paying higher retail prices as a result of the Defendants' alleged horizontal and vertical conspiracies to enact and enforce the UPPs." *Id.*

And that's exactly what we have here. Under the Complaint's allegations, Deere is not passing on price increases—or anything really—downstream. Deere

itself does not provide Repair Services. Dkt. 85, at 5. Those are only provided by the Dealerships. *Id.*[11] Rather, as Plaintiffs' counsel explained during oral argument, Deere and its Dealerships created an "ecosystem" that raised the price for Repair Services. Dkt. 144, at 36; *see* Dkt. 85, at 11, 30, 56-57, 60-61. The Dealerships then implement the inflated price for Repair Services in the "first instance." Dkt. 144, at 36; *see* Dkt. 85, at 5, 23. Thus, the "overcharge," or, the inflated price of Repair Services, starts with the Dealerships and ends with Plaintiffs. *Id.* In short, a "direct purchase" was made.

Paradigmatically, this case is distinguishable from *Illinois Brick* in that there is no middleman. *See Illinois Brick Co.*, 431 U.S. at 726. Rather, it falls more in line with *McCready*, *Loeb*, and *In re Disposable Contact Lens Antitrust*. The Supreme Court in *McCready* recognized that Ms. McCready was in essence a direct purchaser from Blue Shield of Virginia even though her employer purchased the actual plan at issue. *See* 457 U.S. at 475; *In re Wyo. Tight Sands Antitrust Cases*, 866 F.2d 1286, 1294 (10th Cir. 1989) (discussing *McCready*). Ms. McCready, rather than her employer, was the one who was shortchanged in the first instance by the alleged conspiracy. 457 U.S. at 475. Likewise, in this case, Plaintiffs—rather than the Dealerships—are the both the first and only ones to have allegedly had to pay an overcharge for Repair Services. Dkt. 144, at 36; *see* Dkt. 85, at 5, 11, 23, 30, 56-57, 60-61. Again, a "direct purchase" was made.

---

[11] And, for what it's worth, the Dealerships certainly do not provide Repair Tools to Plaintiffs. *See id.* at 9, 23.

Similarly, the plaintiffs in *Loeb* were not "indirect purchasers along a supply chain." 306 F.3d at 482. Instead, the conspiracy occurred in the "separate but related futures market, through which" the defendants "sought directly to manipulate the price of copper the plaintiffs were buying." *Id.* Again, there was no allegation of an overcharge being passed on to the plaintiffs. *See id.* at 481-82. Plaintiffs here, too, were not indirect purchasers along a supply chain, but rather, paid for the inflated cost of the Repair Services because of the alleged conspiracy; the inflated cost of the Repair Services did not originate with Deere and did not pass from Deere to the Dealerships. Dkt. 144, at 36; *see* Dkt. 85, at 5, 11, 23, 30, 56-57, 60-61. And, just like the plaintiffs in *In re Disposable Contact Lens Antitrust*, Plaintiffs were the first to face the inflated price because of the alleged conspiracy; there was no overcharge being passed on through the chain of distribution. 329 F.R.D. at 400-02; Dkt. 144, at 36; *see* Dkt. 85, at 5, 11, 23, 30, 56-57, 60-61.

So, Plaintiffs are in a wholly different position than those that are barred by *Illinois Brick*. *See Loeb*, 306 F.3d at 482. With that, the rationales underpinning *Illinois Brick* are of less concern. First, there is no risk of duplicative recovery. Indeed, any injury that the Dealerships may have suffered would be separate and distinct from the injury Plaintiffs suffered. *See In re Disposable Contact Lens Antitrust*, 329 F.R.D. at 402. After all, Plaintiffs were the first entities to purchase Repair Services. Dkt. 144, at 36; *see* Dkt. 85, at 5, 11, 23, 30, 56-57, 60-61. Second, Plaintiffs' damages calculation will not be needlessly complex. *See Apple Inc.*, 139 S. Ct. at 1524. Rather, like most antitrust cases, there will likely be the usual expert

22

testimony surrounding what Plaintiffs would have paid for Repair Services in a competitive market. *Id.* This is far from exceptional. *See id.* Third, allowing Plaintiffs to proceed against Deere would not result in under-enforcement of the antitrust statutes. *See Illinois Brick Co.*, 431 U.S. at 732-33. As the entity first injured by the inflated cost of Repair Services, they are in the best position to enforce the antitrust law. *See id.*

> **If *Illinois Brick* Were Applicable, the Co-Conspirator Exception Would Apply**

The Court could stop the analysis here. But the Court will consider an "exception" to *Illinois Brick* for two reasons. First, a higher court may disagree with the previous analysis, which has been known to happen. Second, the parties have rightfully devoted substantial energy to addressing this *Illinois Brick* exception.

If, however, the facts of this case were considered to fall under the *Illinois Brick* paradigm, Plaintiffs contend that because they purchased from Dealerships—all of which are allegedly conspiring with Deere—*Illinois Brick* doesn't apply. Some courts refer to this concept as the "conspiracy exception." *Marion II*, 29 F.4th at 342.[12] Plaintiffs' argument rests on solid footing. Multiple cases, including several

---

[12] This is probably not really an "exception" to *Illinois Brick*. Instead, the concept behind the "conspiracy exception" is simply an accurate understanding of the rationale and holding of *Illinois Brick*. *Marion I*, 952 F.3d at 839 ("This is what we mean when we speak of a conspiracy 'exception' to the *Illinois Brick* rule. It is not so much a real exception as it is a way of determining which firm, or group of firms collectively, should be considered to be the relevant seller (and from that identifying which one is the direct purchaser) for purposes of the rule."); *Paper Sys.*, 281 F.3d at 632. This argument is related to Plaintiffs' argument that *Illinois Brick*'s direct purchaser rule is not applicable to this case. Basically, the issue focuses on the proper interpretation of *Illinois Brick*. But the label "conspiracy exception" works well for purposes of this case, so the Court will use that moniker.

Seventh Circuit cases, recognize this "exception." *Id.* at 342 n.5 (citing *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 542 (8th Cir. 2015)); *Lowell v. Am. Cyanamid Co.*, 177 F.3d 1228, 1229 (11th Cir. 1999); *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1211-13 (9th Cir. 1984).[13] Under this theory, a plaintiff is not barred by the "direct purchaser rule" "so long as the plaintiff is a direct purchaser from at least one member of the conspiracy." *Marion II*, 29 F.4th at 347; *Paper Sys.*, 281 F.3d at 631-32. The consequence of this "exception" is that the "direct purchaser rule" does not mandate privity between a plaintiff and an upstream entity engaged in anticompetitive behavior. *Loeb*, 306 F.3d at 481-82 *Paper Sys.*, 281 F.3d at 34 ("That the plaintiffs did not buy from Nippon Paper directly, or at all, does not matter."). In crude terms, *Illinois Brick* could be described as barring damage claims by a "remote customer." *See In re Midwest Milk Monopolization Litig.*, 730 F.2d 528, 529 (8th Cir. 1984). But, to the extent that description is precise—and, as already shown, it really isn't—"[m]atters are different, however, when a monopolist enters a conspiracy with its distributors." *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 836 (7th Cir. 2020) (*Marion I*); *see also Loeb*, 306 F.3d at 482 ("The reason the plaintiffs' suit in

---

[13] Whether other circuits recognize this exception and if so, to what extent, is irrelevant to this Court. *See, e.g., Dickson v. Microsoft Corp.*, 309 F.3d 193, 215 (4th Cir. 2002) (identifying but not deciding the issue); *Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 481 (S.D.N.Y. 2012) (recognizing that Second Circuit had not endorsed the exception). The Seventh Circuit has long recognized the exception. *Paper Sys.*, 281 F.3d at 632; *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 604 (7th Cir. 1997); *Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 617 F.2d 478, 481 (7th Cir. 1980); *see Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l. Inc.*, 424 F.3d 363, 379 n.13 (3d Cir. 2005) ("The Seventh Circuit is the only Court of Appeals to engage head-on the general co-conspirator exception, and it has adopted it."). And that's the Court's focus.

*Illinois Brick* failed was not because the defendants did *not* sell to them. Rather, it was because the defendants *did* sell to a third party who . . . could recover for any injury they claimed."). So, in the Seventh Circuit, as far as the *Illinois Brick* direct purchaser rule is concerned, once Plaintiffs alleged the Distributors were co-conspirators, everything changed. *Marion I*, 952 F.3d at 839 ("The only point here is that *Illinois Brick* is not a barrier to suit on behalf of a purchaser who dealt with a member of the conspiracy.").

In reply, Deere takes issue with this well-recognized principle, going so far as to question the validity of the Seventh Circuit's decision in *Loeb Indus. v. Sumitomo Corp.*, holding that privity is not required. Dkt. 123, at 5 (arguing that "what matters is who paid whom"), 6-7 ("Of course, to the extent *Loeb* is inconsistent with *Apple*, the former must give way.").[14] In doing so, Deere relies on *Apple*. But the cases don't conflict, as previously shown. Indeed, if the Supreme Court's decision in *Apple* up-ended the "conspiracy exception," then post-*Apple* cases such as *Marion I* and *Marion II*—cases Deere relies upon, Dkt. 123; Dkt. 105, at 4-6—got it all wrong. Instead, the conspiracy exception cases and *Apple* can be easily reconciled without this Court questioning the validity of *Loeb* and the host of other Seventh Circuit cases. First, in *Apple*, the plaintiff was admittedly a direct purchaser from Apple. *Apple Inc.*, 139 S. Ct. at 1521 ("There is no intermediary in the distribution chain

---

[14] This district court is duty bound to follow the appellate court. *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005). To the extent this Court can still refuse to follow the Seventh Circuit, *compare Hohn v. United States*, 524 U.S. 236, 252-53 (1998), *with Ind. Airport v. American Airlines*, 733 F.2d 1262, 1272 (7th Cir. 1984), Deere's counsel is requesting this Court to play with fire. The Court declines that invitation.

between Apple and the consumer."). Instead, the issue Apple unsuccessfully argued was that *Illinois Brick*'s direct purchaser rule must consider which entity set the retail price. *Id.* at 1521-22. So, the conspiracy exception was not even an issue. Second, *Apple* cited *Loeb* with approval in explaining the direct purchaser rule. *Id.* at 1521. It would be most peculiar for the Supreme Court to favorably cite a case that erroneously interpreted *Illinois Brick* when the Supreme Court itself was addressing *Illinois Brick*. Third, in *Marion I*, the Seventh Circuit explained that *Apple*'s holding confirmed that direct purchasers—including those downstream who are the first direct purchaser of the conspiracy, *Marion II*, 29 F.4th at 347—are allowed to sue. *Marion I*, 952 F.3d at 840.

Because Plaintiffs have adequately alleged a conspiracy by alleging that the Dealerships conspired with Deere and that Plaintiffs could only purchase Repair Services from the Dealerships, the "direct purchaser rule" does not bar Plaintiffs' damage claims.

### Under These Allegations, Co-Conspirators Need Not Be Joined

As a fallback, Deere argues that if the conspiracy exception applies, then Plaintiffs must name and join the Dealerships as defendants. Deere's argument has much merit, particularly outside of the Seventh Circuit. As discussed in detail, the critical issue is whether the Seventh Circuit "requires" co-conspirators to be named and joined as defendants.

As Deere correctly notes, the Complaint fails to name and join the alleged co-conspirators—the Dealerships—as defendants. And multiple cases require that when a plaintiff invokes the "conspiracy exception" to *Illinois Brick*, the plaintiff

must name and join as defendants the alleged co-conspirators. *See, e.g.*, *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l.*, 424 F.3d 363, 376-78 (3d Cir. 2005); *Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 931-32 (3d Cir. 1986); *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1163 (5th Cir. 1979); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 307 F. Supp. 2d 136, 141 (D. Me. 2004). At least one old, out-of-circuit district court held that co-conspirators need not be named and joined, *Reiter v. Sonotone Corp.*, 486 F. Supp. 115, 118-19 n.3 (D. Minn. 1980), which seems to have been overruled, *see Insulate SB*, 797 F.3d at 542; *In re Midwest Milk Monopolization Litig.*, 730 F.2d at 532. But, frankly, this Court is concerned with the Seventh Circuit's view and considers other decisions only in the absence of controlling precedent. And the Seventh Circuit's treatment of this issue is difficult to track. Understandably, Plaintiffs rely on *Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 617 F.2d 478 (7th Cir. 1980). Just as understandably, Deere relies on *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599 (7th Cir. 1999). But the Court does not believe either decision squarely answers the question.

Plaintiffs rely on *Fontana Aviation* to argue that they need *not* name and join the Dealerships as defendants. The Department of Justice agrees with Plaintiffs on this point. *Fontana Aviation* was the Seventh Circuit's early entry into the conspiracy exception to *Illinois Brick*. Critically, in *Fontana Aviation*, the co-conspirators were *not* joined as defendants. *Fontana Aviation*, 617 F.2d at 479. And just as critically for this issue, the Seventh Circuit found that if plaintiffs purchased

directly from co-conspirators, they met the direct purchaser rule of *Illinois Brick*. *Id.* at 481. But here's the rub: The *Fontana Aviation* decision did *not* connect these two critical aspects of the case. The Seventh Circuit never addressed the issue, let alone held that conspirators need not be joined as defendants. *See* Jerome Musheno, Case Note, *Antitrust Law—Should Standing Be an Issue for the Indirect Purchaser in a Vertical Conspiracy?—In re* Brand Name Prescription Drugs Antitrust Litigation*, 123 F.3d 599 (7th Cir. 1997)*, 72 Temp. L. Rev. 251, 267 n.140 (1999) ("Other courts have simply recognized an exception in an indirect purchaser suit where there were co-conspirator middlemen, without deciding whether the middlemen co-conspirators must be joined." (citing *Fontana Aviation*, 617 F.2d at 481)). Instead, it was merely the result of the case that the co-conspirators were not joined and the Seventh Circuit adopted the conspiracy exception. The *Fontana Aviation* opinion is silent on the precise issue of whether co-conspirators must be named and joined as co-defendants when using the conspiracy exception to establish the direct purchaser rule of *Illinois Brick*.[15]

This phenomenon occasionally happens and it can be vexing to attorneys and courts alike. Fortunately, the Supreme Court has given direction under these circumstances. Specifically, in *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952), the Supreme Court held that if an issue is not raised in the briefs or arguments nor discussed in a court's opinion, the result of a decision—as opposed

---

[15] Foreshadowing the upcoming analysis, Judge Kocoras described the result of *Fontana Aviation* as "*seemingly* set[ting] forth" no requirement that co-conspirators need be named and joined. *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897, 1998 U.S. Dist. LEXIS 12534, at *46 (N.D. Ill. Aug. 6, 1998) (emphasis added).

to the holding—is not binding precedent. So, an issue that is not questioned and passes *sub silentio* is not binding. *Id*. The Seventh Circuit consistently follows this rule. *See, e.g, Hughes v. United Air Lines, Inc.*, 634 F.3d 391, 394 (7th Cir. 2011) ("Yet the absence of a discussion is just silence. Even when the issue concerns subject matter jurisdiction, a topic passed over without discussion has not been resolved."); *Ind. Prot. & Advocacy Servs. v. Ind. Family & Soc. Servs. Admin.*, 573 F.3d 548, 552 n.† (7th Cir. 2009) ("Moreover, even if these subjects were jurisdictional, the fact that they were overlooked does not establish a holding on the subject."); *Petrov v. Gonzales*, 464 F.3d 800, 802 (7th Cir. 2006). As a result, *Fontana Aviation* is not controlling.

Deere relies on *In re Brand Name Prescription Drugs Antitrust Litigation*. In this Court's view, however, that Seventh Circuit decision does not *require* co-conspirators to be named and joined as defendants. To reach this conclusion, a fulsome analysis of *In re Brand Name Prescription Drugs Antitrust Litigation* is required.

In that multidistrict litigation, Judge Charles Kocoras thoroughly wrestled with the issue of whether co-conspirators must be named and joined as defendants so as to avoid the direct purchaser rule of *Illinois Brick*. In that litigation, two sets of pharmacy plaintiffs and two sets of defendants existed: the class plaintiffs, the individual plaintiffs, the wholesaler defendants, and the manufacturer defendants. The class plaintiffs named and joined the wholesalers as defendants as well as the manufacturers. But the individual plaintiffs initially did not name the wholesalers

as defendants; instead, the individual plaintiffs only named the manufacturers as defendants.

In *In re Brand Name Prescription Drugs*, Judge Kocoras initially tackled the issue of the conspiracy exception. Because he lacked a time machine, when he ruled, Judge Kocoras did not have the benefit of the cornucopia of Seventh Circuit authority on the topic. *See, e.g.*, *Marion II*, 29 F.4th at 342; *Paper Sys.*, 281 F.3d at 632. The only Seventh Circuit authority Judge Kocoras had to use on both the general topic of the conspiracy exception and the specific topic of naming and joining co-conspirators as defendants was *Fontana Aviation*. In retrospect, *Fontana Aviation* can be viewed as the Seventh Circuit's grounding on the conspiracy exception. But, as discussed previously, even in retrospect, whether *Fontana Aviation* excuses any requirement to name and join co-conspirators as defendants is less than clear.

Judge Kocoras' journey began on October 24, 1994, when he first determined (correctly, as we now know) that the Seventh Circuit recognized the conspiracy exception. *In re Brand Name Prescription Drugs Antitrust Litig.*, 867 F. Supp. 1338, 1346 (N.D. Ill. 1994). He then went on to analyze the issue of whether co-conspirators must be named and joined as defendants. Judge Kocoras side-stepped the issue because *some* of the co-conspirators were named and joined as defendants:

> The court recognizes that at least two circuits have expressly rejected the vertical conspiracy theory. . . In each of these cases, the plaintiffs' allegations of vertical conspiracy succumbed to *Illinois Brick* because the plaintiffs had failed to join all of the intermediate co-conspirators, thereby increasing the risk of multiple liability. We refrain, however, from granting the Manufacturer Defendants' motion on these grounds.

> In the present case, the plaintiffs have named a large percentage of all possible Wholesaler Defendants. In light of that, we do not believe the plaintiffs should be so severely penalized for the failure to join every single Wholesaler Defendant. We conclude that *Illinois Brick* does not apply to the situation as alleged by the plaintiffs. As such, the Manufacturer Defendants' motion is denied.

*Id.* at 1346 (internal citations omitted).

But, like a stray cat that has been fed, the issue repeatedly returned. *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897, 1998 U.S. Dist. LEXIS 18133, at *14 (N.D. Ill. Nov. 17, 1998).

Only a few months later, on January 1, 1995, again relying on *Fontana Aviation*, Judge Kocoras reaffirmed that the conspiracy exception existed in the Seventh Circuit and denied the manufacturer defendants' motion to certify an interlocutory appeal. *In re Brand Name Prescription Drugs Antitrust Litig.*, 878 F. Supp. 1078, 1082 (N.D. Ill. 1995).

Nevertheless, by August 15, 1997, the Seventh Circuit issued a decision on the appeal from rulings on dispositive motions as well as a certified question. *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599. In this appeal, the Seventh Circuit weighed in on *Illinois Brick*'s direct purchaser rule. The decision is clear that the conspiracy exception exists in this circuit. *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 790 (7th Cir. 1999). But the decision is less than clear as to whether all of the conspirators must be named and joined as defendants. Here's the relevant portion of the opinion, with the citations included because they end up being critical in the analysis:

The indirect-purchaser issue . . . is separate from the issue of the wholesalers' participation in the manufacturers' alleged conspiracy. It is true that if we reversed the judge's ruling on the latter issue and so reinstated the wholesalers as defendants, and if the plaintiff went on to obtain a judgment against the wholesalers and manufacturers, any indirect-purchaser defense would go by the board, since the pharmacies would then be direct purchasers from the conspirators. *Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 617 F.2d 478, 481 (7th Cir. 1980); *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1212-13 (9th Cir. 1984); *see also In re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1163 (5th Cir. 1979) (requiring that the direct sellers, here the wholesalers, be joined as defendants—but that requirement is satisfied). But even if we do reinstate the wholesalers as defendants . . . the plaintiffs may fail at trial to establish their liability, in which event the indirect-purchaser issue will be decisive.

*In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d at 604-05.

What this paragraph means is subject to reasonable debate. The lack of clarity has troubled more than one district judge in the Seventh Circuit. *See, e.g.*, *Paper Sys. Inc. v. Mitsubishi Corp.*, Nos. 96-C-959, 97-C-412, 97-C-508, 2000 U.S. Dist. LEXIS 4535, at *13 (E.D. Wis. Mar. 30, 2000), *rev'd* 281 F.3d 629 (7th Cir. 2002); *In re Brand Name Prescription Drugs Antitrust Litig.*, 1998 U.S. Dist. LEXIS 12534, at *46. The undersigned can be added to that team.

This passage is confusing for several reasons, including but not limited to, these. First, it is important to remember the context of the ruling. Remember that at this point in the litigation the class plaintiffs had named the wholesalers as defendants (but the individual plaintiffs had not). So, the Seventh Circuit was analyzing the issues based on those facts. Second, because of the context, it is important to note what the Seventh Circuit did *not* state. The Seventh Circuit never stated that if it were to affirm Judge Kocoras, without the wholesalers, the class plaintiffs could not prevail against the manufacturers. Third, this discussion focuses

on "direct purchases from the *conspirators*"—not "from the defendants." Fourth, the citation to *In re Beef Industry Antitrust Litigation*—signaled with a "see also" followed with a parenthetical that raises more questions than provides answers, including whether "here" meant *In re Beef* or *In re Brand Name Prescription Drug Antitrust Litigation*—is very odd. Critically, the holding of *In re Beef* is inconsistent with the result of *Fontana Aviation*. And if the Seventh Circuit intended to hold contrary to the result in *Fontana Aviation*, one would expect the Seventh Circuit to explicitly say so, particularly when *Fontana Aviation* was the first case cited.[16]

On remand, whether *all* of the co-conspirators must be named and joined as defendants arose yet again. Because of the Seventh Circuit's decision, the individual plaintiffs sought to amend their complaint to now add the wholesalers as defendants in their case. Obviously, they felt as though they were now required to do so. Once again, relying on *Fontana Aviation*, Judge Kocoras reaffirmed that the conspiracy exception existed in the Seventh Circuit. *In re Brand Name Prescription Drugs Antitrust Litig.*, 177 F.R.D. 414, 418 (N.D. Ill. 1997). Judge Kocoras then recognized that he had previously allowed the individual plaintiffs to proceed against the manufacturing defendants despite not joining the wholesaler

---

[16] This Court is not saying the Seventh Circuit never issues inconsistent opinions. Even the Seventh Circuit has commendably recognized that it has done so in the past. *See, e.g.*, *Runkel v. City of Springfield*, 51 F.4th 736, 745 n.3 (7th Cir. 2022) (noting other decisions seemingly requiring plaintiffs to show two aspects of pretext); *Ill. Republican Party v. Prtizker*, 973 F.3d 860, 763-64 (7th Cir. 2020) (noting that Seventh Circuit, itself, had applied the incorrect standard for preliminary injunctions). Inconsistencies like this are very rare, but not impossible. It's like the chances of photographing a coelacanth compared to photographing a sasquatch.

defendants, which was contrary to the law in other circuits. *Id.* But he was

concerned that the Seventh Circuit's decision may have required a different result.

> The recent decision by Seventh Circuit in this case, however, has cast new light on the importance of formally naming the Wholesalers as defendants in Plaintiffs' Sherman Act claims. First, the Seventh Circuit explicitly rejected the notion that *Illinois Brick* is inapplicable to the conspiracy alleged in this case; overruling our analysis on this issue, the Court expressly held that the Plaintiffs' indirect purchaser claims against the Manufacturer Defendants were "just the kind of complaint that *Illinois Brick* bars." *In re Brand Name Prescription Drugs Antitrust Litigation*, 123 F.3d 599, 606 (7th Cir. 1997). Furthermore, the Seventh Circuit also cited with approval case law from other jurisdictions which required that alleged vertical co-conspirators be named as defendants in order to avoid an *Illinois Brick* bar to recovery. *Id.* at 605. Thus, it would seem that the Seventh Circuit now adheres to the legal position that, to qualify for the co-conspirator exception to *Illinois Brick*, intermediaries in an alleged vertical conspiracy must be formally joined as defendants and not merely named as co-conspirators.

*In re Brand Name Prescription Drugs Antitrust Litig.*, 177 F.R.D. at 418.

As noted, this uncertainty caused the individual plaintiffs to seek to amend

the complaint to name and join all the wholesalers as defendants in their case. *Id.*

at 418-19. After stating that he previously found that there was no requirement to

name and join co-conspirators as defendants, Judge Kocoras indicated that the

Seventh Circuit's decision "seriously undermine[d]" his previous interpretation. *Id.*

at 420. In particular, Judge Kocoras noted the Seventh Circuit's citation to *In re*

*Beef* and the parenthetical that co-conspirators must be named and joined "cast[]

serious doubt" on his previous decision. *Id.* So, after addressing Rule 15 and the

*Foman* factors, Judge Kocoras granted the individual plaintiffs' motion to amend

the complaint to add the wholesalers as defendants in the individual plaintiffs' case.

*Id.* at 424.

Less than a year later, on August 6, 1998, Judge Kocoras again addressed the issue—apparently this time with a cheerier outlook and a fresh set of eyes. *In re Brand Name Prescription Drugs Antitrust Litig.*, 1998 U.S. Dist. LEXIS 12534. This time the issue arose in the context of the tolling of the statute of limitations for damages after the wholesalers were made defendants in the individual plaintiffs' case. *Id.* at *15. As Judge Kocoras framed the issue, "The big question, however, is whether the Wholesalers must be formally named as defendants, or if identifying the Wholesalers as co-conspirators is enough to overcome the rule of *Illinois Brick*." *Id.* at *34. Judge Kocoras noted that the Seventh Circuit's decision had viewed the case from the class plaintiffs' perspective, in which the wholesalers were defendants during the entirety of the case. So, because of this context, "it was unnecessary for the [Seventh Circuit] to decide whether the Wholesalers' involvement must be as named defendants, or merely as co-conspirators not joined in the case." *Id.* at *37.[17] This then framed the issue: "It is necessary to determine, therefore, whether the Seventh Circuit now subscribes to the holding of *In re Beef*, or whether it continues to recognize a co-conspirator exception as seemingly set forth in *Fontana*." *Id.* at *46. After conducting an exacting analysis of the Seventh Circuit's decision, Judge Kocoras ultimately found that plaintiffs can "proceed with indirect purchaser claims where the intermediary in the distribution chain is identified as a co-conspirator."

---

[17] Because the class plaintiffs had always joined the co-conspirators, it was not necessary for the Seventh Circuit to address the issue of *requiring* co-conspirators to be joined. And because the issue was not before the Seventh Circuit, then it can reasonably be argued that the Seventh Circuit did not rule on the issue. *L.A. Tucker*, 344 U.S. at 38.

35

*Id.* at *50. Ultimately, backtracking from his previous concern, Judge Kocoras concluded that the Seventh Circuit approved of his earlier analysis:

> [T]his Court believes that the Seventh Circuit has endorsed, and continues to recognize, a co-conspirator exception to *Illinois Brick*. The effect of this ruling is to allow the indirect purchaser claims against the Manufacturer Defendants to go forward, without regard to whether a specific purchase was made from a Wholesaler who is a defendant or not. Nothing the Court of Appeals has said would indicate that this position is in error . . . .

*Id.* at *50-51.

Only three months later, on November 17, 1998, Judge Kocoras addressed the manufacturer defendants' motion to certify the issue for interlocutory appeal. The proposed question was "must the plaintiffs join the Wholesalers as defendants and obtain judgments against them to avoid the bar of *Illinois Brick*." *In re Brand Name Prescription Drugs Antitrust Litig.*, 1998 U.S. Dist. LEXIS 18133, at *16-17. In granting the motion, Judge Kocoras confirmed his latest view but found that a substantial ground for a difference of opinion existed: "Because several federal Circuits reject a co-conspirator exception to *Illinois Brick* and at least one other District Court within our Circuit has likewise rejected a co-conspirator exception, we think the Manufacturer Defendants' proposed question satisfies 28 U.S.C. § 1292(b)'s requirement of a substantial ground for difference of opinion." *Id.* at *25.

Unfortunately for this Court, the Seventh Circuit refused to certify the question. *See Paper Sys. Inc.*, 2000 U.S. Dist. LEXIS 4535, at *13-14. And subsequent Seventh Circuit decisions in the *In re Brand Name Prescription Drugs Antitrust Litigation* case never resolved the issue, other than reaffirming the

general concept of the conspiracy exception. *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d at 790.

"Having reached the end of what seems like a long front walk," *Steel Co.*, 523 U.S. at 102, where does this lengthy discussion leave this Court? On one side of the ledger are several circuit courts requiring that co-conspirators be named and joined as defendants. *See In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 307 F. Supp. 2d at 141 (collecting cases). On the other side of the ledger is (1) a likely overruled out-of-circuit district court opinion holding that co-conspirators need not be joined, *Reiter*, 486 F. Supp. at 118-19; (2) older out-of-circuit court decisions to the same effect, *see In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 307 F. Supp. 2d at 141 n.6 (collecting pre-*Kansas v. Utilicorp. United, Inc.*, 497 U.S. 199 (1990) cases); (3) an in-circuit district court judge—the former Chief Judge of the Northern District of Illinois whom the undersigned deeply respects and greatly admires—who has found that the Seventh Circuit does *not* require that co-conspirators be named and joined as defendants, *In re Brand Name Prescription Drugs Antitrust Litig.*, 1998 U.S. Dist. LEXIS 12534, at *50-51; and (4) a Seventh Circuit opinion that indicates—but does not hold—likewise, *Fontana Aviation*, 617 F.2d at 481. The jurisprudence of precedent is not much help in this quandary. Neither side of the ledger controls or binds this Court, which must give substantial weight to the other circuit decisions (assuming the absence of Seventh Circuit precedent) and persuasive weight to Judge Kocoras' opinion. *Cortright v. Thompson*, 812 F. Supp. 772, 776 (N.D. Ill. 1992); *see also TMF Tool Co. v. Muller*, 913 F.2d

37

1185, 1191 (7th Cir. 1990) ("For a variety of quite valid reasons, including consistency of result, it is an entirely proper practice for district judges to give deference to persuasive opinions of their colleagues on the same court.").

The Court believes it is writing on a clean slate. It is not bound by any controlling authority under these circumstances. So, to the extent the Court needs to determine this issue, it will.

Under the allegations of the Complaint, the Court finds that the Dealerships need not be joined as defendants. The Court recognizes that Deere has correctly cited numerous circuit court cases requiring that co-conspirators be joined as defendants.[18] But all of those cases involved claims in which a charge was being passed on.[19] Unsurprisingly, in cases where no pass on is alleged and *Illinois Brick* is inapplicable, the concerns of *Illinois Brick* are dramatically less compelling—if they exist at all.

None of the three rationales of *Illinois Brick* apply under the allegations and claims in the Complaint. First, there's no risk of double recovery. *McCready*, 457 U.S. at 474-75. Any injury—to the extent there is any—to Dealerships would be separate and distinct from the injury to Plaintiffs. Second, the Dealerships' absence as parties does not complicate damage calculations. *Illinois Brick*, 431 U.S. at 732-33. Third, requiring the Dealerships to be joined as defendants would not increase

---

[18] The Court takes no position as to how it would rule in cases involving the pass on of a charge through the distribution chain of co-conspirators.

[19] At the argument, Deere's counsel understandably expressed Deere's frustration that Plaintiffs' claim was outside the norm. Like patients who hear their doctors say "Hmmm" during an examination, defendants don't want to be a party in an unusual case.

enforcement of the antitrust statutes. *Id.*; *see Apple Inc.*, 139 S. Ct. at 1524. No benefit exists to join the Dealerships as defendants under these circumstances. Indeed, requiring the Dealerships to be named would vastly increase costs and complicate the litigation, likely leading to under-enforcement.

*        *        *

The Court finds that Plaintiffs possess Article III standing and antitrust standing. Plaintiffs have sufficiently pleaded a traceable injury to Deere. And *Illinois Brick*'s direct-purchaser rule is no bar to Plaintiffs' antitrust standing.

### Plaintiffs Plausibly Allege Relevant Markets

Deere argues that Plaintiffs' Complaint fails to plausibly plead both a relevant primary market and a relevant aftermarket. Dkt. 105, at 16-21. Deere's main argument focuses on the aftermarket. This is also the focus of the Statement of Interest of the United States. Dkt. 120. Like the parties, the Court will focus on the aftermarket but also addresses the primary market.[20]

Initially, it is important to note that resolution of Deere's motion is difficult because—as both sides recognize—claims based on single brand aftermarket repair

---

[20] Deere also contends that, assuming Plaintiffs' Complaint plausibly alleges both markets, its motion should be granted because the markets conflict with the current proposed class definition. Dkt. 105, at 21. On the merits, this argument is colorable. But this argument is best suited for resolution during class certification, when class definitions can be modified as the case proceeds, even on the court's own initiative. *In re Disposable Contact Lens Antitrust*, 329 F.R.D. at 401; *see In re Motorola Sec. Litig.*, 644 F.3d 511, 518 (7th Cir. 2011) ("[A] district court has authority to modify a class definition at different stages in litigation."); *Schorsch v. Hewlett-Packard Co.*, 417 F.3d 748, 750 (7th Cir. 2005); *Buycks-Roberson v. Citibank Fed. Sav. Bank*, 162 F.R.D. 322, 328-29 (N.D. Ill. 1995). Although the Court recognizes that standing concerns, statute of limitations issues, and Rule 23 factors will need to be resolved, now is not the time. *See Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557, 563 (7th Cir.2011); *Chapman v. First Index, Inc.*, 796 F.3d 783, 785 (7th Cir. 2015); *Advanced Dermatology v. Fieldwork, Inc.*, 550 F. Supp. 3d 555, 569 (N.D. Ill. 2021)

restrictions are rare. *See Authenticom, Inc. v. CDK Global, LLC*, 313 F. Supp. 3d 931, 961 (N.D. Ill. 2018) (*citing PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010)). So, Deere's reliance on cases addressing primary market allegations don't mesh well with the Complaint's allegations, claims, and theories of the case. Dkt. 105, at 16-17. The cases also don't involve single brand aftermarket repair claims. *Id.* (citing *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911 (7th Cir. 2020); *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963 (W.D. Tenn. 2004)). And, more fundamentally, many of Deere's cases are decided at later stages of the litigation, such as at summary judgment, not the pleadings stage. *Id.* at 15-16 (citing *SMS Sys. Maint. Servs., Inc. v. Digit. Equip. Corp.*, 188 F.3d 11 (1st Cir. 1999); *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811 (6th Cir. 1997); *EPIC Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898 (N.D. Cal. 2021)). District courts skate on wafer-thin ice when they rely upon summary judgment cases in deciding motions attacking the pleadings. *See, e.g., Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 777 (7th Cir. 2022); *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014). Even—or especially—after *Twombly*, courts must respect the differences between Rule 12 motions and Rule 56 motions. *See Authenticom*, 313 F. Supp. 3d at 952-53.

### Plaintiffs Have Plausibly Alleged a Primary Market

In the Court's view, the parties talk past each other on the "primary market" issue. Deere argues that there must be an adequately defined primary market for there to be an aftermarket. Dkt. 105, at 16. Plaintiffs don't squarely address this issue. In fact, finding Plaintiffs' response was a challenge. Plaintiffs seem to

contend that this Court need only consider the primary market in relation (a) to their tying claim, and (b) to establish "the viability of the derivative single-brand aftermarket for Deere Repair Services." Dkt. 113, at 36.

At this juncture, the Court will focus on the primary market in the context of Plaintiffs' aftermarket claim. The Court will address the primary market in the context of the tying claim later in this opinion.

Plaintiffs' Complaint alleges that the primary market is the Tractor Market. The Complaint defines the Tractor Market as the product market for agricultural equipment in the United States. Dkt. 113, at 36. This definition is broad, indeed.

Understandably, Deere argues that Plaintiffs' reliance on the Tractor Market is too broad and indefinite. Deere raises the valid concern that the Complaint's description of "Tractors" includes all manner of agricultural machinery. But Deere has not cited to a case holding that a primary market must be properly defined when a claim is based on a single-brand aftermarket. For example, Deere relies on *Sharif Pharmacy*. But, as explained previously, that case is not a single-brand aftermarket case. Indeed, Deere does not reply to Plaintiffs' point that "[n]one of the cases cited by Deere discusses the adequacy of a primary market's definition in the context of an antitrust claim alleging competitive harm in a relevant single-brand aftermarket." Dkt. 113, at 37. (And remember that Deere bears the burden of proof on its motion. *Marcure*, 992 F.3d at 631; *R.J. Corman*, 335 F.3d at 647.) Nevertheless, the Court understands Deere's point, which is a valid concern. Even *Kodak* assumed there was a primary equipment market. And the Court

understands why Deere may have been unable to locate a case. The Court was unable to find one either.

In a case cited by Plaintiffs but not addressed in Deere's reply, the Seventh Circuit stated, "if plaintiff can show the rough contours of a relevant market, and show that the defendant commands a substantial share of the market, then direct evidence of anticompetitive effects can establish the defendant's market power—in lieu of the usual showing of a precisely defined relevant market and a monopoly market share." *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 738 (7th Cir. 2004). Absent controlling Seventh Circuit law or even any persuasive authority from any other court, the Court believes this type of standard is appropriate for a claim based on a single-brand aftermarket.[21] This standard provides defendants with notice of the claim and the general contours of the market upon which the single-brand aftermarket claim is based and leaves a more precisely defined aftermarket to carry most of the weight.

Applying this standard, to the extent a primary market needs to be plausibly pleaded for a single-brand aftermarket claim, the Complaint adequately and plausibly does so. Just as the rough contours of the primary equipment market were provided in *Kodak*, the Complaint provides the rough contours of the Tractor Market, which, according to the Complaint, is consistent with the agricultural industry's and Deere's own definitions. The Complaint also shows that Deere commands a substantial share of the Tractor Market. Dkt. 85, at 18-19. According

---

[21] The Department of Justice advocated for a similar standard at oral argument. Dkt. 144, at 93-94.

to the Complaint, "Deere is indisputably the biggest player in the market for Tractors in the United States. Deere wields significant economic power in the market for Tractors in North America . . . and . . . has a larger market share than that of its next two largest competitors, Case New Holland and Kubota Corp., combined." *Id.* at 19. In contrast, in *Kodak*, Kodak lacked market power in the primary equipment market; after all, that was the premise of the question presented to the Supreme Court. *Kodak*, 504 U.S. at 454. So, this Court's standard is higher than what concerned the Supreme Court in *Kodak*.

### Plaintiffs Have Plausibly Alleged an Aftermarket

Because Plaintiffs' case is based on a single brand aftermarket repair claim, the Court must start its analysis with *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451 (1992). *See Authenticom*, 313 F. Supp. 3d at 961 ("*Eastman Kodak* is the principal authority addressing such circumstances."). Like many Supreme Court decisions, *Kodak* is deceptively both simple and complicated.

Factually, the allegations in *Kodak* are similar and helpful to the analysis in this case. In that case, Kodak sold photocopiers as well as service and replacement parts for its equipment. *Kodak*, 504 U.S. at 454. Photocopiers are expensive, large pieces of equipment, resulting in substantial up-front costs. *Id.* 456-57. In addition to Kodak, independent service organizations (ISO) also repaired Kodak copiers. *Id.* at 457. The ISO also sold parts and reconditioned and sold used Kodak copiers. *Id.* The ISO's repair services were cheaper than Kodak's and sometimes were better quality. *Id.* Along with ISO, another set of players was involved in repairs to Kodak machines: original equipment manufacturers (OEMs). The OEMs manufactured

parts that could be used to repair Kodak copiers. *Id.* After a few years, Kodak implemented a policy by which it would only sell replacement parts "to buyers of Kodak equipment who use Kodak service or repair their own machines." *Id.* at 458. What's more, "Kodak sought to limit ISO access to other sources of Kodak parts," so "Kodak and the OEM's agreed that the OEM's would not sell parts that fit Kodak equipment to anyone other than Kodak." *Id.* Furthermore, Kodak pressured Kodak equipment owners and independent parts distributors not to sell Kodak parts to ISO and took steps to restrict the availability of used machines. *Id.* Kodak took these actions to make it more difficult for ISO to sell repair services for Kodak machines. The upshot was that ISO were unable to obtain parts, were forced out of business, and customers were forced to switch to Kodak repair service despite preferring the ISO repair service. *Id.*

Legally, the issue presented to the Supreme Court was "whether a defendant's *lack of market power* in the primary equipment market precludes—as a matter of law—the possibility of market power in derivative aftermarkets." *Id.* at 454 (emphasis added). In the process of deciding that issue, Kodak pitched the idea that as a matter of law "competition in the equipment market necessarily prevent[ed] market power in the aftermarkets." *Id.* at 470. Kodak had no evidence to support this proposition. *Id.* at 466. Instead, Kodak relied upon a presumption derived from its economic theory that competition in the primary market

"preclude[d] any finding of monopoly power in derivative markets." *Id.*[22] Despite being "intuitively appealing"—even to this Court—the Supreme Court wasn't buying the argument, stating, "Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law." *Kodak*, 504 U.S. at 466-67.[23] The Supreme Court noted that the economic realities might allow an alleged monopolist to find "a middle optimum price at which the increased revenues from the higher priced sales of service and parts would more than compensate for the lower revenues from lost equipment sales." *Kodak*, 504 U.S. at 471.[24]

In rejecting Kodak's argument, importantly for purposes of this case, the Supreme Court focused on three points. First, the Supreme Court found that many customers had been "locked in" to their purchases of the large and expensive copiers before Kodak changed its policy, allowing it to dominate the parts and service aftermarkets. *Id.* at 475. Next, the Supreme Court also found that the relevant antitrust market was determined by the choices that were available to Kodak customers, and because Kodak's parts were not interchangeable with other manufacturers', it determined that the relevant market was composed of only those

---

[22] In its motion, Deere asserts that, "The presumption is thus that 'competition in the [Tractor Market will] suffice[] to discipline anticompetitive practices in the aftermarkets.'" Dkt. 105, at 18. In keeping with the Supreme Court's admonishment, this Court rejects finding this presumption, particularly when—unlike Kodak—Deere has substantial market power in the primary market.

[23] The belief that the argument is "intuitively appealing" has legs. *See Xerox Corp. v. Media Scis., Inc.*, 660 F. Supp. 2d 535, 544 (S.D.N.Y. 2009) ("As a theory, Kodak's argument was not without persuasive force.").

[24] Aware that economists seem to like "Goldilocks and the Three Bears" analogies, this Court views this as a "Goldilocks just right price."

companies that serviced Kodak machines. *Id.* at 482. Finally, the Supreme Court highlighted that the customers could not calculate the machines' life-cycle costs because of a lack of information. *Id.* at 473-74. As a result, the customers had unknowingly and involuntarily signed on to Kodak's aftermarket power. *Id.* at 473-75.

So, at first blush, Plaintiffs' claim fits neatly within the *Kodak* framework. As in *Kodak*, Plaintiffs purchased large, expensive pieces of equipment. During the purchasing process, Plaintiffs lacked knowledge as to the life-cycle cost of the Tractors not only because information was difficult to obtain but also because Deere inconsistently represented the availability of self- and independent repairs. As farmers, Plaintiffs often repair their own equipment themselves or use "independent repair shops," both of which are allegedly cheaper, quicker, and better than repairs performed by the Dealerships.[25] But, like Kodak, Deere restricts repairs to only authorized Dealerships. And, not surprisingly, Deere's Tractors and Repair Tools are not interchangeable with its competitors' tractors and repair tools.

---

[25] Deere understandably notes a disconnect here. Allegedly, Plaintiffs were repairing their equipment or believed they would be allowed to repair their equipment. And if they and the independent repair shops did so quicker and cheaper, then they must have been able to do so to allow for the comparison when Deere put the kibosh on this practice and forced Plaintiffs to the Dealerships. So, the timing of purchases and the alleged representations will be critical as the case proceeds. *See Digital Equip. Corp. v. Uniq Digital Technologies*, 73 F.3d 756, 762 (7th Cir. 1996) ("Thus Kodak had some ability to extract additional money by raising prices. *It could not do so again; once the new policy was known, consumers could shop with full information*; but there was a material dispute about the effect of its change of policy." (emphasis added)); *see also Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3f 354, 405 (3d Cir. 2016); *DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1346 (Fed. Cir. 2014); *supra* note 20. This Court is extremely confident that Deere will remind the Court of this issue, presumably during class certification and summary judgment briefing.

But the Supreme Court's decision in *Kodak* is not the last word on these types of claims. "The Seventh Circuit has since elucidated *Eastman Kodak*'s holding." *Authenticom*, 331 F. Supp. 3d at 962. In fact, some might say that the Seventh Circuit—and nearly every other circuit—has limited *Kodak*. Rudolph J.R. Peritz, *What Should Antitrust Learn from the Business Schools?: Toward a Dynamic Antitrust Analysis of Strategic Market Behavior*, 47 N.Y.L. Sch. L. Rev. 101, 113 (2003) ("In particular, most federal courts have limited the *Kodak* decision to refusals to sell which change prior policy, changes that harm locked-in customers."); *see also* Jonathan I. Glecklen, *The ISO Litigation Legacy of* Eastman Kodak Co. v. Image Technical Services*: Twenty Years and Not Much to Show for It*, 27 Antitrust ABA 56, 58 (2012).[26] In two cases—neither of which involved single brand aftermarket claims—*Digital Equipment Corp. v. Uniq Digital Technologies, Inc.*, 73 F.3d 756 (7th Cir. 1996), and *Schor v. Abbott Labs.*, 457 F.3d 608 (7th Cir. 2006), the Seventh Circuit took the opportunity to state what it believed *Kodak* held. In *Digital Equipment*, the Seventh Circuit found that the critical fact in *Kodak* was "the change in policy [that] enable[d] Kodak to extract supra-competitive prices from customers who had already purchased its machines." *Digit. Equip.*, 73 F.3d at 763. And then a decade later, in *Schor*, the Seventh Circuit framed *Kodak*'s holding this way: "What the Supreme Court held . . . is not that firms with market power are forbidden to deal in complementary products, but that they can't do this in ways

---

[26] This Court is bound by *Digital Equipment* and *Schor* because these cases don't "directly conflict" with *Kodak*. Instead, the Seventh Circuit explained its view of *Kodak*'s holding in these cases. *Alvarez v. City of Brownsville*, 904 F.3d 382, 398 (5th Cir. 2018).

that take advantage of customers' sunk costs." *Schor*, 457 F.3d at 614.[27] The

Seventh Circuit is not alone in viewing *Kodak* this way. The best summary—which

is more accurately a summary of a summary—is found in *Authenticom*:

> The Ninth Circuit aptly summarized the post-*Eastman Kodak* world
> this way: '[T]he law permits an antitrust claimant to restrict the
> relevant market to a single brand of the product at issue (as in *Eastman
> Kodak*),' but 'the law prohibits an antitrust claimant from resting on
> market *power* that arises solely from contractual rights that consumers
> *knowingly and voluntarily* gave to the defendant.'

*Authenticom*, 331 F. Supp. 3d at 963 (first emphasis in *Newcal Indus., Inc. v. Ikon

Off. Sol.*, 513 F.3d 1038, 1048 (9th Cir. 2008); second emphasis in *Authenticom*).

This Court's takeaway is that the focus in aftermarket repair cases should be

on two interrelated circumstances. The first involves a change in policy after the

consumer has made a significant expenditure in the product. But that doesn't mean

a lack of knowledge and availability of information regarding repairs after the

consumer has made a significant expenditure in the product is irrelevant. Indeed,

this is the second circumstance that a court should consider. *See Authenticom*, 313

F. Supp. 3d at 964 (denying motion to dismiss). The first is similar to a bait-and-

switch; whereas, the second involves the inability of the customer to determine "all

in cost" or "life-cycle cost" for the product. This focus makes sense because as the

Supreme Court noted in *Kodak*, "The relevant market for antitrust purposes is

determined by the *choices* available to Kodak equipment owners." *Kodak*, 504 U.S.

at 481-82 (emphasis added). Because the Kodak equipment was not interchangeable

---

[27] At the argument, the Department of Justice attempted to distinguish both *Digital Equipment* and *Schor* based on the existence of complimentary goods, among other things. Dkt. 144, at 90-93.

with its competitors—just as Deere's equipment is not interchangeable with its competitors, Dkt. 85, at 18-19—a change in policy or lack of knowledge as to repairs limits Plaintiffs' choices. The Court addresses these two circumstances in the context of this case in order.

### Policy Change

As to the change in policy, the Court believes the parties, the United States, and it agree on the fundamental legal principle. Deere contends that a claim for a single brand aftermarket requires that the consumer be "locked-in" in one of two ways. One of the ways that Deere properly concedes is when a company "changes its post-sale policies on the back-end." Dkt. 105, at 15; Dkt. 123, at 18. This characterization is fair and tracks the Court's analysis of the case law. Instead, the issue is whether Plaintiffs' Complaint plausibly alleges facts sufficient to meet this requirement.

Plaintiffs' Complaint contains almost eight pages of allegations related to the relevant aftermarket, setting forth Deere's alleged history of making various representations that purchasers could repair their own Tractors but in reality thwarting the purchasers' efforts. Dkt. 85, at 38-46. According to the Complaint, for years, Deere insisted that Repair Tools and information needed to perform repairs were readily available, "despite all evidence to the contrary, while emphatically paying lip service to farmers' right to repair their own equipment." *Id.* at 42. The allegations are supported by purported examples of this behavior. Here are a few. In an effort to stave off "right to repair" legislation, Deere—through a trade association and lobbying group—"committed to make *comprehensive* repair tools, Software, and

49

diagnostics available to the public by January 1, 2021." *Id.* at 40 (emphasis in original). These representations came in the form of a "Statement of Principles," web sites, and press releases. After those representations, however, "farmers were struggling to get what was promised." *Id.* at 41. Indeed, the inability to obtain Repair Tools was evidenced by journalists who attempted to obtain the promised software but were informed that it was not available. After a representation "that comprehensive repair and diagnostic equipment was available," when questioned where and how these were available, no response was provided. *Id.* at 44. And allegedly even when farmers could make their own repairs to Tractors, they still needed diagnostic equipment to complete the process, but the equipment was unavailable. A telling example of this included a farmer who was able to replace exhaust filters and particulate traps for his Tractor after the code was thrown, only to still need the "Dealer-level software" to clear the code for the Tractor to operate. *Id.* So, Deere's representations that it "supports a customer's right to safely maintain, diagnose and repair their own equipment" were not true in the field. *Compare id.* at 45, *with id.* at 46 (describing the need for a dealer to come to the farm with a laptop to "push[] some buttons on the console" to get the machine operating).

The Complaint also contains four pages of allegations that, to the extent Deere has made Repair Tools available, those particular Repair Tools are ineffective and insufficient to allow purchasers to either repair their own Tractors or have "independent repair shops" fix the Tractors. *Id.* at 46-50. For example, the

Customer Service ADVISOR—an allegedly inferior diagnostic product—was allegedly available. But, when farmers attempted to obtain the Customer Service ADVISOR, they were told it didn't exist and were rebuffed or told that farmers were not allowed to possess it. *Id.* at 47. Then, after facing backlash for not living up to its representations to make Repair Tools available, Deere created a website. But access to the website was expensive and the website had limited capabilities. *Id.* One particularly important bug was that the Customer Service ADVISOR possessed no ability to connect to a Tractor to run diagnostics or clear codes.

Based on these allegations, Plaintiffs contend that "[o]bstructing the availability of repair tools to farmers and independent repair shops" "is about preserving supracompetitive monopoly profits." *Id.* at 49.

The reasonable inference from these allegations is that Deere—by itself or through its agents—repeatedly made public statements that purchasers could make repairs to their own Tractors but the reality was that they couldn't. The Complaint contains sufficient allegations to support Plaintiffs' claim under *Kodak* and even the subsequent circuit court decisions that elucidate it. The Complaint contains plenty of allegations of "market imperfections" that would prohibit farmers from knowing that their ability to repair their own Tractors or to use "independent repair shops" was illusory. The Complaint's allegations outline Deere's representations that farmers could repair their own Tractors or use "independent repair shops" to induce farmers to purchase a Tractor costing upwards of $1 million—the bait—but then a

real-world practice that prohibits them from doing so and forcing them to use Dealerships after the significant financial outlay—the switch.

Deere's contention that "everybody knew" repairs were limited is flawed for three reasons. Dkt. 105, at 18-19. First, the contention is premised on construing inferences in its favor, which this Court cannot do on a Rule 12(c) motion. *See TL of Fla., Inc. v. Terex Corp.*, 54 F. Supp. 3d 320, 329 (D. Del. 2014) (Rule 12 motion "is not the proper procedural vehicle to resolve conflicting inferences of fact"); *see also Kubiak v. City of Chicago*, 810 F.3d 476, 480-81 (7th Cir. 2016) (reasonable inferences drawn in favor of plaintiff). Second, the contention ignores all the specific allegations described above. Defendants cannot ignore harmful allegations when seeking judgment under Rule 12(c). *Elena v. Municipality of San Juan*, 677 F.3d 1, 8 (1st Cir. 2012) ("But this argument fails because it presents a fact bound question and ignores the complaint's contrary allegations, which we must honor in the context of Rule 12(c) motions."). Third, the contention requires the Court to take both of these actions that it cannot do—credit inferences in Deere's favor and ignore the well-pleaded allegations in Plaintiffs' favor. *See Authenticom*, 313 F. Supp. 3d at 952. Whether Plaintiffs knew of the repair policy and the extent of that knowledge is a factual dispute better resolved later in this case, rather than in a Rule 12 motion. *In re Apple & AT&TM Antitrust Litig.*, 596 F. Supp. 2d 1288, 1305-06 (N.D. Cal. 2008). A defendant's lack of consistent candor—essentially, not being "forthcoming"—about its policies is critical in the *Kodak* analysis. *Alcatel USA, Inc. v. DGI Techs.*, 166 F.3d 772, 783 (5th Cir. 1999); *PSI Repair Servs.*, 104 F.3d at 820.

### Lack of Knowledge Because of Unavailability of Information

Plaintiffs also contend that the Complaint meets the second circumstance allowing for a *Kodak*-style claim. According to Plaintiffs, they have adequately alleged a single brand aftermarket repair claim based on a lack of knowledge because of the unavailability of information. Deere disagrees.

Unlike a consumer being locked in because of a policy change after the purchase—which the parties, the United States, and the Court agree is sufficient—Deere disagrees with Plaintiffs' and the Court's view as to whether a single brand aftermarket claim can be based on a lack of knowledge because of the unavailability of information to determine a product's life cycle costs. In Deere's view, besides a policy change, a claim can only occur when the consumer is locked in because "a company *hides* its post-sale policies on the front-end." Dkt. 105, at 15 (emphasis added); *see also* Dkt. 123, at 18.[28] Deere's position excludes—or at least substantially minimizes—information costs to the consumer. Note Deere's position is that it must "hide" its policies. Dkt. 105, at 15; Dkt. 123, at 18. "Hide" requires intent and motive. Under Deere's position, a claimant can't prevail under this method to establish a *Kodak*-like claim if the consumer merely doesn't know about

---

[28] Unstated in Deere's position as to the two ways in which a consumer can be locked in are other *Kodak* considerations, including the significant financial outlay for the product and the lack of interchangeability of the aftermarket product and service. *See Kodak*, 504 U.S. at 475, 482. The Court is unsure whether Deere really means to assert those considerations are irrelevant or, alternatively, whether they are implicit in the concept of "locked in." To the extent Deere's position is the former, the Court disagrees. But if it is the latter, the Court agrees. Not only were these factors important to the Supreme Court in *Kodak* but other courts also focus on them, too. *Kodak*, 504 U.S. at 473-74; *Harrison Aire, Inc. v. Aerostar Int'l., Inc.*, 423 F.3d 374, 384 (3d Cir. 2005); *Authenticom*, 313 F. Supp. 3d at 964. The United States is keen on them as well. Dkt. 120, at 17.

the life cycle costs of a product because of its lack of sophistication and access to information. Instead, there must be an affirmative effort by the company to prevent the consumer from obtaining the information. Dkt. 120, at 70-72.

This contention may be an understandable reading of *Kodak*, particularly for Deere. And, to be fair to Deere, support for this position exists. *E.g.*, *PSI Repair Servs.*, 104 F.3d at 820. But the Court questions whether this reading of *Kodak* is the most complete and whether it is the most accurate under the particular allegations of this case. As explained further, the Court believes this assertion goes too far based on the Complaint's allegations. Notably, in *Kodak*, there was an absence of market power but in this case the Complaint alleges that Deere possesses substantial market share in the Tractor Market. *Compare Kodak*, 504 U.S. at 454 (uncontested that Kodak lacked market power in the primary equipment market), *with* Dkt. 85, at 16-19 ("Deere is indisputably the biggest player in the market for Tractors in the United States. Deere wields significant economic power in the market for Tractors in North America [and] has a larger market share that that of its next two largest competitors . . . combined. . . Deere has appreciable economic power in the U.S. Tractor Markets, controlling approximately 55% and 63% of the large tractor and combine markets, respectively.").[29]

---

[29] The Court recognizes that "market share" and "market power" are not synonymous. *Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989). Although market share often evidences market power, it is only one factor in showing the ability to exclude competition or control price. *Id.*

54

The Court has already found the Plaintiffs have stated a single brand aftermarket repair claim under the change of policy/bait-and-switch theory. But even if Plaintiffs had not, the Court believes that Plaintiff's allegations taken in totality and in conjunction with the lack of knowledge based on unavailability of information sufficiently states a *Kodak*-like claim.

### The Importance of Market Power in the Primary Market

The concern about using the lack of knowledge as a basis to state a single brand aftermarket claim rises from the interplay between *Kodak* and *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984). The theory is that although *Kodak* identifies information costs as a consideration, in *Jefferson Parish*, the Supreme Court rejected the view that this type of "market imperfection" generated the type of market power that antitrust law addressed. *PSI Repair Servs.*, 104 F.3d at 820. And because *Kodak* did not overrule *Jefferson Parish*, courts have minimized or eliminated the lack of knowledge as a basis for *Kodak*-type claims. *Id.*; *Digit. Equip.*, 73 F.3d at 763 ("*Kodak* did not undercut *Hyde*."); *but see Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*, 63 F. Supp. 2d 1218, 1230 n. 11 (E.D. Cal. 1999) (asserting that the concern about *Kodak* avoided overruling *Jefferson Parish* is a non-issue).[30]

---

[30] The policy concern about allowing a *Kodak*-type single brand aftermarket claim to be based on a lack of information to determine life cycle costs of a product is that a deluge of litigation would result. *See PSI Repair Servs.*, 104 F.3d at 820. Indeed, this was Justice Scalia's worry. *Kodak*, 504 U.S. at 489 ("[T]he Court's opinion threatens to release a torrent of litigation and a flood of commercial intimidation that will do more harm than good to enforcement of the antitrust laws and to genuine competition.") (Scalia, J. dissenting). But that worry was never realized. Gleklen, *supra*, at 56 ("[T]he feared torrent never

But in both *Kodak* and *Jefferson Parish* no market power in the primary market existed. In *Kodak*, it was agreed Kodak had no market power in the primary market. *Kodak*, 504 U.S. at 454, 466. Kodak's lack of market power in the primary market was the focus of Justice Scalia's dissent. *Id.* at 490 ("We must assume, for purposes of deciding this case, that petitioner is without market, much less monopoly, power in the interbrand market for its micrographic and photocopying equipment."). Indeed, Justice Scalia identifies Kodak's lack of market power no less than ten times. *Id.* at 486-504. And Justice Scalia characterized Kodak as lacking "any power whatsoever in the interbrand market." *Id.* at 497. The premise of Justice Scalia's dissent is summed up nicely in this one sentence: "In my view, if the interbrand market is vibrant, it is simply not necessary to enlist § 2's machinery to police a seller's intrabrand restraints." *Id.* at 503.

In *Jefferson Parish*, the Supreme Court likewise focused on the market share in the primary market. In that case, one exclusive contract at one hospital was at issue but more than 20 hospitals existed in the metropolitan area and about 70% of patients in the particular parish went to hospitals other than the one with the exclusive contract. *Jefferson Parish*, 466 U.S. at 7. The Supreme Court highlighted the importance of market share in the primary market being the initial concern:

---

materialized."). This result proves—once again—the genius of Tom Petty, who repeatedly counseled against worrying. As he famously sang in *Crawling Back to You*, "Most things I worry 'bout never happen anyway." Similar wisdom can be found in *Century City* ("Sometimes I get so worried: But I don't know what about: It works out in the long run: Always goes away: And I've come now to accept it: As a reoccurring phase") and *Here Comes My Girl* ("Yeah, I just catch myself wondering, and waiting, and worrying: About some silly little thing that don't add up to nothing"). These sentiments were also captured in *It'll All Work Out* ("It'll all work out eventually").

The same strict rule is appropriate in other situations in which the existence of market power is probable. When the seller's share of the market is high or when the seller offers a unique product that competitors are not able to offer, the Court has held that the likelihood that market power exists and is being used to restrain competition in a separate market is sufficient to make *per se* condemnation appropriate.

*Id.* at 17 (cleaned up).[31]

It was this lack of market power in the primary market that caused the Supreme Court to reject the "market imperfections"—including, "the lack of adequate information"—approach. *Jefferson Parish*, 466 U.S. at 27.

In contrast, in this case, the Complaint details Deere's significant market share in the primary market. Deere is the "biggest player." Dkt, 85, at 19. Deere's market power in the primary market combined with significant financial outlays, lack of interchangeability, and lack of information make this case different from the Supreme Court's concerns in *Jefferson Parish* about market imperfections providing market power in the tied market. *Jefferson Parish*, 466 U.S. at 27. Deere already

---

[31] The Supreme Court highlighted this issue more than once. Previously, in the opinion, the Supreme Court elaborated on the importance of market share in the primary market. *Jefferson Parish*, 466 U.S. at 13 ("Thus, the law draws a distinction between the exploitation of market power by merely enhancing the price of the tying product, on the one hand, and by attempting to impose restraints on competition in the market for a tied product, on the other. When the seller's power is just used to maximize its return in the tying product market, where presumably its product enjoys some justifiable advantage over its competitors, the competitive ideal of the Sherman Act is not necessarily compromised. But if that power is used to impair competition on the merits in another market, a potentially inferior product may be insulated from competitive pressures. This impairment could either harm existing competitors or create barriers to entry of new competitors in the market for the tied product and can increase the social costs of market power by facilitating price discrimination, thereby increasing monopoly profits over what they would be absent the tie. And from the standpoint of the consumer—whose interests the statute was especially intended to serve—the freedom to select the best bargain in the second market is impaired by his need to purchase the tying product, and perhaps by an inability to evaluate the true cost of either product when they are available only as a package.").

has market power in the primary market. The lack of information is not providing Deere with market power in the primary market, where it already possesses market power. *Id.*; *see Red Lion*, 63 F. Supp. 2d at 1230 n.11 ("It is doubtful that [*Kodak*'s holding] is inconsistent with *Jefferson Parish*, in which the Court found that a hospital—the 'single brand'—did not have market power because consumers could easily travel to other hospitals.").

### Case Law Has Not Eliminated Lack of Information as a Basis for *Kodak*-type Claims

Although there is certainly support for Deere's position, the complete rejection of a *Kodak*-type claim based on a lack of information is not uniformly followed. Case law exists focusing on the lack of information, among other considerations, to support a *Kodak*-type claim. For example, in this district, then-District Court Judge St. Eve explained that a change in aftermarket practices was just one concern in *Kodak* and lack of information was another:

> But a change in aftermarket practices is not the sole worry of *Eastman Kodak* and its progeny. Rather . . . the Supreme Court expressed more general concerns about customers that unknowingly and involuntarily sign on for the defendant's aftermarket power. Included in that group, according to the Supreme Court, are those unable to undertake lifecycle-cost analyses (at least at some, reasonable level) before purchasing the primary product because the requisite "information is difficult—some of it impossible—to acquire at the time of purchase." Indeed, the Seventh Circuit recognized as much in explaining that "[c]ompetition among manufacturers fully protects buyers who *accurately* calculate life-cycle costs," but where customers cannot do so, a supplier-defendant . . . can charge supracompetitive prices in the aftermarket.

*Authenticom*, 313 F. Supp. 3d at 964.

Judge St. Eve is not alone and she even found support in the Seventh Circuit. *Id.* at 965 (citing *Digit. Equip.*, 73 F.3d at 762). Indeed, *Digital Equipment* assumes

that the decision in *Kodak* would have been different had Kodak "informed customers about its policies before they bought its machines." 73 F.3d at 763. Moreover, the Third Circuit noted "that an 'aftermarket policy change' is not the *sine qua non* of a *Kodak* claim. An aftermarket policy change is an important consideration, but only one of several relevant factors." *Harrison Aire, Inc. v. Aerostar Int'l., Inc.*, 423 F.3d 374, 384 (3d Cir. 2005); *see also Avaya Inc. v. Telecom Labs, Inc.*, 838 F.3d 354, 404 (3d Cir. 2016) ("We have not read *Kodak* quite so narrowly. . . . Showing exploitation of locked-in customers . . . is one way to satisfy that burden, but our own case law prevents us from concluding in the abstract that it is the only way to do so."). One of the factors the Third Circuit identified was "significant information costs that prevented lifecycle pricing." *Harrison Aire*, 423 F.3d at 384. In fact, recently, the Ninth Circuit echoed the Third Circuit's rejection of exclusively relying upon a change in policy. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 979 (9th Cir. 2023)) ("Had the district court actually imposed such an absolute change-in-policy requirement, it would have erred. As explained above, *Kodak* and *Newcal* require a showing of a lack of consumer awareness regarding aftermarket restrictions. *Newcal*, 513 F.3d at 1050. A change in policy is of course *one way* of doing so; a consumer cannot knowingly agree to a restriction that did not exist at the time of the foremarket transaction. But it is not the *exclusive* means of doing so.") (emphasis in original); *see also Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 987 (N.D. Cal. 2010) ("[T]o establish a single-brand aftermarket under *Kodak* and *Newcal*, the restriction in the aftermarket must not

have been sufficiently disclosed to consumers in advance to enable them to bind themselves to the restriction knowingly and voluntarily."); *Red Lion*, 63 F. Supp. 2d at 1232.[32]

In this case, the Complaint's allegations are sufficient to show that there was an absence of information that would allow a farmer to know of Deere's monopolistic repair policies. *See Authenticom*, 313 F. Supp. 3d at 964 (denying motion to dismiss). For example, the Complaint alleges that Deere's insistence that information was readily available was untrue. Dkt. 85, at 42. Moreover, the Complaint alleges that Deere's explanation of a communication breakdown—to paraphrase Led Zeppelin—was absurd. *Id*. And the Complaint alleges that Deere's "obfuscation is one of the key factors which render it impossible for farmers to even approximate the lifecycle cost of repairs on Deere Tractors." *Id*. The Complaint goes on to provide specific examples to support these contentions, including occurrences in which when pressed for information as to how to repair Tractors, information was not provided. *Id*. at 44-46. The absence of information, combined with not only

---

[32] Even an academic who thinks that *Kodak* was wrongly decided has stated that a *Kodak* claim can be based upon the lack of information that affected the purchaser's ability to know the life-cycle cost. Herbert Hovenkamp, *Book Review: The Rationalization of Antitrust*, 116 Harv. L. Rev. 917, 933-34 (2003) (reviewing Richard A. Posner, *Antitrust Law* (2d ed. 2001)). ("In its *Kodak* decision, the Supreme Court held that a nonmonopolist producer of a durable good – such as a photocopier – with unique replacement parts could be held to have significant market power in those aftermarket parts if (1) customers who already owned the product were 'locked-in' by this previous commitment to purchase the parts; and (2) this lock-in permitted these customers to be exploited because *either (a) some limitation on information undermined their ability to know, at the time they purchased the copier, that the aftermarket parts were being sold at high prices, or* (b) the defendant changed its part prices after the lock-in occurred.") (emphasis added); *see also Xerox Corp.*, 660 F. Supp. 2d at 547 (citing same test).

market power but also with the other *Kodak* concerns—such as significant financial outlays and lack of interchangeability—is sufficient to state a claim. *See Authenticom*, 313 F. Supp. 3d at 964 (denying motion to dismiss).

Again, the Court finds that Plaintiffs have adequately pleaded a *Kodak*-type of single brand aftermarket claim based on a bait-and-switch theory. To the extent such a claim can be based on the lack of information preventing the consumer from determining the life cycle cost of the product, based on the Complaint's allegations—particularly Deere's market power—the Court finds Plaintiffs have stated a claim under this theory as well.

*    *    *

Plaintiffs have plausibly, sufficiently pleaded both the primary market and aftermarket to support *Kodak*-type claims.

### The Individual Counts are Plausibly Pleaded

The Complaint seemingly contains seven counts: three are based on Section 1 of the Sherman Act; four are based on Section 2 of the Sherman Act; and one unlabeled count seeks declaratory and injunctive relief under both Section 1 and Section 2 of the Sherman Act. Counts I through III are based on Section 1 of the Sherman Act. Count I alleges a conspiracy in restraint of trade as a *per se* violation or in the alternative under a quick look. Dkt. 85, at 60-62. Count II alleges a group boycott as a *per se* violation. *Id.* at 62-63. Count III alleges unlawful tying as a *per se* violation or in the alternative as a rule of reason. *Id.* at 63-64. Counts IV through VII are based on Section 2 of the Sherman Act. Count IV alleges monopolization. *Id.* at 64-65. Count V alleges monopoly leveraging. *Id.* at 65-66. Count VI alleges

61

attempted monopolization in the alternative. *Id.* at 67. Count VII alleges conspiracy to monopolize. *Id.* at 67-68.

Deere moves to dismiss each count, which Plaintiffs obviously oppose. The Court will address each count in turn.[33] But before launching into the analyses of each count, the Court must take a relatively brief detour to discuss the pleading standard for antitrust claims after *Twombly*.

The federal pleading world changed after *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *See Ponder v. County of Winnebago*, No. 20-cv-50041, 2021 U.S. Dist. LEXIS 142558, at *5-6 (N.D. Ill. July 20, 2021); *Thorsen v. Cmty. Unit Sch. Dist. 300*, No. 20-cv-50132, 2021 U.S. Dist. LEXIS 85530, at *7 (N.D. Ill. May 5, 2021). But as any student of the federal rules of civil procedure knows, in *Twombly*, the Supreme Court disavowed that it was creating a heightened pleading standard. *Twombly*, 550 U.S. at 569 n.14. Nevertheless, the Supreme Court's own language in *Twombly* and the subsequent circuit courts' treatment of *Twombly* cast at least some doubt on that contention. *See, e.g.*, *Twombly*, 550 U.S. at 563 (retiring the *Conley* standard after 50 years, which would not have been necessary if *Twombly* changed nothing); *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 589 (7th Cir. 2016) (referring to "the heightened pleading requirements of *Iqbal* and *Twombly*"). Undoubtedly, even after

---

[33] Again, the parties' briefs are excellent and very well written. Clearly, counsel know their stuff. And the Court recognizes and appreciates that parties can frame their arguments as they deem most persuasive. But the Court counsels counsel that one of the first rules of writing is to make it easy on the reader. In this regard, as to the challenges to the individual claims, the briefs talk past each other. The process was not easy on the Court. The Court sincerely hopes that it has fully addressed all of the parties' various arguments.

*Twombly*, some types of claims are still easy to plead, particularly employment discrimination cases. *See Crawford v. Dekalb Cmty. Unit Sch. Dist. No. 428*, No. 22-cv-50256, 2023 U.S. Dist. LEXIS 39612, *13-14 (N.D. Ill. Mar. 9, 2023) (collecting cases); *see also Freeman v. Metro. Water Reclamation Dist.*, 927 F.3d 961, 965 (7th Cir. 2019); *Chapman v. Yellow Cab Coop.*, 875 F.3d 846, 848-49 (7th Cir. 2017). Perhaps the ease with which an employment discrimination claim can be pleaded is just evidence that the plausibility standard is context specific. *See Iqbal*, 556 U.S. at 679.

But, in addressing a § 1 Sherman Act claim, in *Twombly*, the Supreme Court found that allegations showing parallel conduct were insufficient. *Twombly*, 550 U.S. at 557. According to the Supreme Court, allegations of parallel conduct merely showed that illegality through an agreement may have occurred but other innocent explanations were just as likely. *Id.* There needed to be more. There needed to be "further factual enhancement." *Id.* This factual enhancement was required to meet the plausibility standard. *Id.* And, according to the Seventh Circuit, "plausibility" exists as a probability somewhere south of probable but north of conceivable or negligible. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) (defining plausibility as "a nonnegligible probability"). This standard doesn't allow the district court to weigh what is more likely, and district courts must be careful not to import a summary judgment standard into the Rule 12 context because of *Twombly. SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 425 (4th Cir. 2015).

63

So, at this point, the question becomes this: Have Plaintiffs plausibly pleaded an agreement sufficient to support their § 1 Sherman Act claims based upon a *per se* theory?

### Counts I – III

Deere moves to dismiss Counts I – III—all of which are based, at least in part, on *per se* violations. Deere contends Plaintiffs have not plausibly pleaded horizontal restraints. Dkt. 105, at 9, 23; Dkt. 123, at 10. Throughout Deere's filings, it contends that not only have Plaintiffs failed to allege an agreement between the Dealerships, but also that Plaintiffs' allegations don't allow a reasonable inference that there are agreements between the Dealerships. *See, e.g.*, Dkt. 105, at 9. Deere's argument is straightforward: If there are no horizontal agreements, then there are no *per se* violations, so Counts I – III must be dismissed.[34]

In opposition to this straightforward argument, Plaintiffs make a bold move by not responding directly. Instead, citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984),[35] Plaintiffs' thesis is this:

> The plausibility of the alleged conspiracy does not hinge on whether Plaintiffs allege facts relating to specific, express, and communicated agreements between each of the Dealership "spokes." The necessary agreement, or common commitment to a mutual objective, between the

---

[34] The Court sets aside the issue that Plaintiffs need not have pleaded theories, and even if they pleaded the wrong theories, that would not be fatal if they simply pleaded a claim. *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011); *Rabe v. United Air Lines, Inc.*, 636 F.3d 866, 872 (7th Cir. 2011). Indeed, Plaintiffs probably did not even need to plead separate counts as no claim is "founded on a separate transaction or occurrence." Fed. R. Civ. P. 10(b). Because none of the counts are being dismissed, the Court sees no benefit of tumbling down this particular rabbit hole.

[35] The *Monsanto* standard applies to both vertical and horizontal conspiracies. *Wilk v. Am. Med. Ass'n.*, 895 F.2d 352, 375 (7th Cir. 1990); *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 660 n.5 (7th Cir. 1987).

> Dealers is created by the facts plead in the Complaint, which are fairly
> read at this preliminary pleading stage as demonstrating a shared
> understanding *between and among* the Dealerships and Deere to keep
> the Repair Services market to itself.

Dkt. 113, at 15 (emphasis added).

Plaintiffs then spend twelve pages explaining several reasons—each containing supporting allegations—why a common commitment to a mutual objective exists between and among Deere and the Dealerships. Dkt. 113, at 15-27.[36]

The Court will address these reasons in determining whether Plaintiffs have plausibly alleged *per se* violations in Counts I – III.

---

[36] Deere contends that the Complaint fails to plead plus factors. Dkt. 105, at 10. Plus factors are a big deal. *See Anderson News LLC v. Am. Media, Inc.*, 899 F.3d 87, 104 (2d Cir. 2018) (discussing plus factors). The requirement of plus factors helps ensure that courts are punishing a conspiracy, not punishing independent conduct. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 (3d Cir. 2010). But the concept has not been clearly defined. Phillip Areeda, Louis Kaplow & Aaron Edlin, *Antitrust Analysis* 229-230 (7th ed. 2013). For example, here's a definition the Ninth Circuit teased out of *Twombly*: plus factors are economic actions that are largely inconsistent with unilateral action but largely consistent with explicit coordinated action. *In re Musical Instruments*, 798 F.3d at 1194. What's more, no exhaustive list exists. *E.I. du Pont de Nemours & Co.*, 673 F.3d 185, 193 (3d Cir. 2017). Basically, plus factors are facts—in addition to parallelism—from which a conspiracy can be inferred, including evidence that is traditionally used to establish a conspiracy. *Mish Int'l Monetary Inc. v. Veg Cap. London, Ltd.*, 596 F. Supp. 3d 1076, 1094 (N.D. Ill. 2022); *see also Petruzzis IGA Supermarkets v. Darling-Del. Co.*, 998 F.2d 1224, 1244 (3d Cir. 1993). Deere contends that the Complaint fails to plead plus factors, and nowhere in their response brief do Plaintiffs use the term "plus factors" or even state that these reasons are plus factors. Despite Plaintiffs' failure to assert it has pleaded plus factors, the Court will apply the "duck test." *GE Betz, Inc. v. Zee Co.*, 718 F.3d 615, 630 (7th Cir. 2013); *Lake v. Neal*, 585 F.3d 1059, 1059 (7th Cir. 2009); *see also Wudi Indus. (Shanghai) Co. v. Wai L. Wong*, 70 F.4th 183, 191 (4th Cir. 2023). Although not labeled "plus factors," Plaintiffs' allegations meet the definition.

### Count I

As to Count I, Deere argues that no horizontal agreement between the Dealerships has been sufficiently alleged to support a *per se* violation. Dkt. 105, at 7-11, 23. The horizontal agreements between the Dealerships would be the rim on a hub-and-spoke conspiracy. *Id.* at 23; *see In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191-92 (9th Cir. 2015); *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435-36 (6th Cir. 2008). There are two parts to this argument: (1) whether Plaintiffs alleged that *all* the Dealerships are part of the conspiracy, and (2) assuming *all* the Dealerships are part of the conspiracy, whether Plaintiffs have sufficiently pleaded allegations to support a horizontal agreement between the Dealerships.

As to the first part, Deere reads Plaintiffs' Complaint so that *all* the Dealerships are *not* alleged to be part of the conspiracy. Dkt. 105, at 8-9, 23. To be fair to Deere, as previously mentioned, this is not an unreasonable reading of the Complaint. The Complaint's main allegation is not entirely clear: "Co-conspirators include independently-owned Dealerships with agreements with Deere giving them the right to sell new Deere Tractors, parts, and Deere Repair Services . . . ." Dkt. 85, at 16. Note the word "includes" as well as the absence of the word "all" or any synonym for that word. But, although Deere's interpretation of the Complaint may be reasonable, it is not an interpretation most favorable to Plaintiffs, which is how this Court must interpret the Complaint. *Silha*, 807 F.3d at 173. What's more, Plaintiffs' counsel explicitly stated during argument that Plaintiffs *were* alleging that *all* Dealerships were part of the conspiracy. *See Steven v. Umsted*, 131 F.3d

697, 705 (7th Cir. 1997) (nonmovant can add consistent allegations in response to a Rule 12 motion even on appeal for the first time); *see also supra* n.6. Therefore, the Court interprets the Complaint and draws all reasonable inferences from it in the light most favorable to Plaintiffs so that the Complaint alleges *all* Dealerships are part of the conspiracy.

The more difficult issue is whether the Complaint sufficiently and plausibly pleads horizontal agreements between the Dealerships. There could be vertical agreements between Deere and all Dealerships but no horizontal agreements between the Dealerships so that the vertical agreements alone may not be illegal. *See Collins v. Associated Pathologists*, 844 F.2d 473, 478 (7th Cir. 1988) ("Not all exclusive contracts violate the Sherman Act."); *Rutman Wine Co. v. E&J Gallo Winery*, 829 F.2d 729, 735 (7th Cir. 1987) ("An agreement between a manufacturer and a distributor to establish exclusive distributorship is not, standing alone, a violation of the antitrust laws.").[37] So, Deere focuses on the lack of a specific allegation of horizontal agreements between the Dealerships.

Deere's position is not without merit, but conflicts with two interrelated concepts. First, labels and antitrust law don't mix. *See, e.g.*, *Jefferson Parish*, 460 U.S. at 21 n.34 ("The legality of petitioner's conduct depends on its competitive consequences, not on whether it can be labeled 'tying.' If the competitive

---

[37] To the extent a rimless hub-and-spoke conspiracy is viable, *see Dickson v. Microsoft Corp.*, 309 F.3d 193, 203-04 (4th Cir. 2002), the Court does not believe that Plaintiffs are using that theory. That theory uses the rule of reason. *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 n.3 (9th Cir. 2015). But Plaintiffs specifically assert that these Counts are based on a *per se* theory. Dkt. 85, at 60-64.

consequences of the arrangement are not those to which the *per se* rule is addressed, then it should not be condemned irrespective of its label."). "In antitrust law, 'easy labels do not always supply ready answers.'" *Siva v. Am. Bd. of Radiology*, 38 F.4th 569, 572 (7th Cir. 2022) (citing *Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 8 (1979).) Courts should look at substance over labels. *Siva*, 38 F.4th at 572; Daniel A. Hanley, *Per Se Illegality of Exclusive Deals and Tyings with Fair Competition*, 37 Berkeley Tech. L.J. 1057, 1067 n.47 (2022) ("Indeed, looking at substance over form is a consistent theme in antitrust and prevents the broad prohibitions imposed by the antitrust laws from being circumvented."); *but cf. Miles Distribs., Inc. v. Specialty Const. Brands, Inc.*, 476 F.3d 442, 448-49 (7th Cir. 2007) (at summary judgment, labels can be important because they determine type and amount of evidence needed to survive the motion). This is unsurprising because the line between vertical and horizontal restraints, for example, can blur. *Musical Instruments*, 798 F.3d at 1192. Homespun metaphors of complex economic activities go only so far. *Id*. For example, "a facially vertical restraint imposed by a manufacturer only because it has been coerced by a 'horizontal cartel' agreement among his distributors is in reality a horizontal restraint." *Bus. Elect. Corp. v. Sharp Elect. Corp.*, 485 U.S. 717, 730 n.4 (1988). So, the actual label placed on a conspiracy is a pedantic distinction—a court must determine whether *Monsanto*'s "common commitment to a common scheme designed to achieve an unlawful purpose" standard applies. *Wilk v. Am. Med. Ass'n.*, 895 F.2d 352, 375 (7th Cir.

1990) (citing *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 660 n.5 (7th Cir. 1987)).

Relatedly, because labels only go so far, the alleged anticompetitive behavior must be considered as a whole. *SD3*, 801 F.3d at 425 ("Actions that might seem otherwise neutral in isolation can take on a different shape when considered in conjunction with other surrounding circumstances."); *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003). And because courts must look at the course of conduct of the alleged conspiracy as a whole, the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts. *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). Parsing the complaint to argue that each separate allegation doesn't support a conspiracy is the wrong way to determine if a conspiracy has been plausibly pleaded. *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 902 (N.D. Ill. 2009). Indeed, this type of divide-and-conquer analysis is disfavored across the law. In several areas, including sentencing, employment discrimination, and search and seizure, the Seventh Circuit counsels in favor of analyzing legal issues in the aggregate, rather than disassembling facts. *See United States v. Vaughn*, 62 F.4th 1071, 1072-73 (7th Cir. 2023) ("One persistent error in legal analysis is to ask whether a piece of evidence 'by itself' passes some threshold—to put evidence in compartments and ask whether each compartment suffices.").

To show a conspiracy generally involving *all* the Dealerships and Deere as well as specifically Dealership agreements establishing the rim of the hub-and-

69

spoke conspiracy, Plaintiffs rely on several indicia. Together, Plaintiffs contend that the allegations supporting these indicia establish that the Dealerships made a conscious commitment to a common scheme. Deere does an excellent job of picking off each of these individually. But the Court needs to analyze the Complaint's allegations as a whole. At this time and stage, Plaintiffs have alleged enough circumstantial evidence[38] for the Court to find a "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co.*, 465 U.S. at 768.

Plaintiffs focus on the several indicia of a conspiracy between and among Deere and the Dealerships. First, Plaintiffs note that they have alleged that the dealership agreements prohibit the disclosure of manuals, service bulletins, catalogs, and service manuals. Dkt. 113, at 15; Dkt. 85, at 5, 8. And importantly, Plaintiffs allege that each Dealership was aware the other Dealerships joined "in covenants" to withhold repair tools from farmers and independent repair shops. *Id.*; *see LePage's*, 324 F.3d at 157-58 (discussing exclusive contracts). Second, Plaintiffs allege that the same trade groups and lobbying firms spoke on behalf of both Deere and the Dealerships on the right-to-repair issue. Dkt. 113, at 15-16; Dkt. 85, at 25,

---

[38] *Per se* violations can be shown through circumstantial evidence. *Toys "R" Us v. FTC*, 221 F.3d 928, 934 (7th Cir. 2000); *Text Messaging*, 630 F.3d at 629. Circumstantial evidence consists of facts from which the existence of an agreement can be inferred. *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002). "[C]ircumstantial evidence is the lifeblood of antitrust law." *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 749 (N.D. Ill. 2019). And there's nothing wrong with using circumstantial evidence. *Hollis v. Ceva Logistics U.S., Inc.*, 603 F. Supp. 3d 611, 623 (N.D. Ill. 2022). In fact, courts repeatedly instruct jurors that circumstantial evidence is considered the same way as direct evidence. Seventh Circuit Pattern Civil Jury Instruction 1.12.

39-40; *cf. Text Messaging*, 630 F.3d at 628 (defendants were part of the same trade association and worked in concert).

Deere contests each. Obviously, Deere does not contest the truthfulness of the allegations—because it can't with a Rule 12 motion—but it contests the legal significance of the allegations. First, as to engaging in exclusive contracts, Deere notes exclusive agreements are presumptively legal, citing *Republic Tobacco Co.*, 381 F.3d at 736. Dkt. 105, at 23-24. Moreover, as to the fact that other Dealerships were aware of the others' actions, that alone is insufficient. *See Okavage Grp., LLC v. United Wholesale Mortg., LLC*, No. 21-cv-448, 2022 U.S. Dist. LEXIS 133516, at *39 (M.D. Fla. Jul. 27, 2022) ("Nor is it sufficient that the brokers knew they were all accepting UWM's ultimatum."). Second, communicating through the same public relations entity alone likewise is not sufficient. *See Washington Cnty. HealthCare Auth. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 843 (N.D. Ill. 2018).

Plaintiffs' two other indicia of an overarching conspiracy that includes horizontal conspiracies between the Dealerships overlap. These are the multiple vertical agreements between Deere and the individual Dealerships, Dkt. 113, at 23-25, and the parallel anti-competitive conduct by which Deere and the Dealerships profited—especially when the Dealerships' concerted conduct is profitable only if all the Dealerships agree to the conduct. *Id.* at 19. There is no doubt that vertical agreements exist between Deere and the Dealerships. Dkt. 85, at 5; *Miles Distribs.*, 476 F.3d at 448 (defining vertical agreements). Deere does not contest this allegation. Instead, Deere contests the legal import of this allegation. Generally,

vertical agreements are not anticompetitive. *Miles Distribs.*, 476 F.3d at 450. This is true. "However, courts have found in some cases that a collection of individual vertical exclusive distributorship agreements can be viewed as a horizontal agreement. Specifically, when a respondent who competes at one level of product distribution makes vertical exclusive distributorship agreements with competitors at a different level of product distribution, the 'collection' of the vertical agreements together may comprise a *per se* unlawful horizontal forced group boycott, with the respondent 'in the center as the ringmaster.'" *Acuity Optical Labs., LLC v. Davis Vision, Inc.*, No. 14-cv-03231, 2016 U.S. Dist. LEXIS 112423, at *30 (C.D. Ill. Aug. 23, 2016). Vertical and horizontal agreements can intersect. *In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d 1272, 1291 (M.D. Fla. 2016). "[V]ertical agreements, lawful in the abstract, can in context 'be useful evidence for a plaintiff attempting to prove the existence of a 'horizontal cartel,' . . . particularly where multiple competitors sign vertical agreements that would be against their own interests were they acting independently." *United States v. Apple, Inc.*, 791 F.3d 290, 319-20 (2d Cir. 2015). So, sometimes, a collection of vertical agreements can become essentially horizontal agreements that are anticompetitive. *King Drug Co. of Florence v. Cephalon, Inc.*, No. 2:06-cv-1797, 2014 U.S. Dist. LEXIS 84818, at *51 n.11 (E.D. Pa. Jun. 23, 2014). When these types of vertical agreements dovetail with allegations that standing alone the behavior is against a party's self-interest but collectively all the parties profit, antitrust laws may be implicated. *Id.* at *50-51 ("The economic self-interest inquiry seems to be especially useful in cases like this

one, where the antitrust plaintiff attempts to infer a horizontal agreement among signatories to separate agreements with a common participant.").

As to each set of allegations Plaintiffs assert as evidence of an overall conspiracy as defined by *Monsanto*—that would include horizontal agreements between the Dealerships—Deere offers an innocent interpretation supported by case law. However, this series of "yeah, but"s conflict with both the prohibition against crediting alternative, innocent interpretations of allegations at the motion to dismiss stage, *Authenticom*, 313 F. Supp. at 952; *Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1079 (N.D. Ill. 2011), as well as the requirement that the Court interpret the Complaint's allegations holistically, *Cont'l Ore Co.*, 370 U.S. at 699.

Deere additionally argues that Plaintiffs' alleged conspiracy doesn't make much economic sense. Dkt. 105, at 13-14 ("[T]he Complaint's economic story involving Deere makes little sense."). In support of this argument, Deere relies on *Matsushita Elec. Indus. Co. v. Zenith Corp.*, 475 U.S. 574 (1986) and *Miles Distributors, Inc. v. Specialty Construction Brands, Inc.* But both of those cases are decisions based on summary judgment motions, not Rule 12 motions. Again, it bears repeating: the circuit courts of appeal have counseled district courts not to engraft summary judgment requirements on plaintiffs when responding to Rule 12 motions. *SD3*, 801 F.3d at 425; *Authenticom*, 313 F. Supp. 3d at 953 ("Courts, however, have correctly held that the bars described in *Matsushita* are not set at the pleadings stage."). The Court was able to find a district court opinion relied upon by other

district courts in the Ninth Circuit that states, "Where the facts alleged in the complaint demonstrate that an alleged conspiracy makes no economic sense, the claim must be dismissed." *Cascades Comput. Innovation LLC v. TPX Corp.*, No. 12-CV-01143, 2013 U.S. Dist. LEXIS 10526, at *38 (N.D. Cal. Jan. 24, 2013). The Court has some concerns with this proposition, in part because the cases cited do not stand for the specific legal proposition. *Id.* If this assertion stands for the proposition that the conspiracy is simply not plausible on its face, so that the complaint must be dismissed under *Twombly*, the Court is fine with that. This reading—with its emphasis on the "no economic sense"—is in line with controlling Seventh Circuit authority. *Text Messaging*, 630 F.3d at 628 (describing nationwide children's lemonade stands hypothetical). But if this proposition is used to allow district courts at the motion to dismiss stage to choose between competing economic views, then the Court is not on board, especially if some rational motive behind the conspiracy exists. *Dexon Comput., Inc. v. Cisco Sys., Inc.*, No. 22-cv-53, 2023 U.S. Dist. LEXIS 58541, at (*104 (E.D. Tex. Feb. 7, 2023); *In re Packaged Seafood Prods. Antitrust Litig.*, 338 F. Supp. 3d 118, 1178-79 (S.D. Cal. 2018). Again, at the summary judgment stage, district courts are dealing with a different situation in which a court must consider the economic sense of a claim. *Avaya*, 838 F.3d at 403; *see, e.g.*, *Anderson News L.L.C. v. Am. Media Inc.*, 899 F.3d 87, 99-100 (2d Cir. 2018); *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1085-86 (10th Cir. 2006); *Advo, Inc. v. Phila. Newspapers*, 51 F.3d 1191, 1197 (3d Cir. 1995). Indeed, outside of completely implausible conspiracies, at the pleading stage, the

Seventh Circuit seems reluctant to rely upon assertions that conspiracies allegedly make "no economic sense." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 462 (7th Cir. 2020). Plaintiffs' theory is this: "The Complaint alleges throughout that Deere makes common cause with its dealers in keeping Repair Tools out of the hands of farmers and independent repair providers as a means of preserving that lucrative repair revenue to its Dealers and which, in the form of parts and repair financing (at the very least) inures directly to Deere's economic benefit." Dkt. 113, at 26. This theory is not in a category of implausibility that the Court can factually or legally reject it at the pleading stage.

Plaintiffs' *per se* § 1 Sherman Act claims are consistent with many cases, including a Seventh Circuit case. For example, in *Wallach v. Easton Corp.*, 814 F. Supp. 2d 428 (D. Del. 2011), a transmission manufacturer was competing with another transmission manufacturer. The first manufacturer entered into exclusive vertical agreements with class 8 truck manufacturers that contained rebates that pushed the second manufacturer out of business. The court found an "overarching conspiracy" including an inference that horizontal agreements existed between the class 8 truck manufacturers in part because the truck manufacturers' parallel action was contrary to their self-interest unless they all agreed to participate. *Wallach*, 814 F. Supp. 2d at 440-41. Relying in large part on *United States v. Apple, Inc.*, the court in *In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d at 1291-1300, likewise found that an inference of horizontal agreements existed. In that case, vertical agreements existed between the eye care professionals, the

disposable contact wholesaler, and the disposable contact manufacturers. The court was able to infer horizontal agreements between the manufacturers to complete the rim of a hub-and-spoke conspiracy, in part, because it was against the manufacturers' self-interest unless all the manufacturers agreed. *In re Disposable Contact Lens*, 215 F. Supp. 3d at 1297.

The Seventh Circuit has weighed in on this scenario, too. Indeed, *Toys "R" Us v. FTC*, 221 F.3d 928 (7th Cir. 2000), is a good analog for this case. And the opinion starts with a helpful description:

> The antitrust laws, which aim to preserve and protect competition in economically sensible markets, have long drawn a sharp distinction between contractual restrictions that occur up and down a distribution chain—so-called vertical restraints—and restrictions that come about as a result of agreements among competitors, or horizontal restraints. Sometimes, however, it can be hard as a matter of fact to be sure what kind of agreement is at issue.

*Id.* at 930.

In *Toys "R" Us*, as in this case, there was no dispute that a series of vertical agreements existed. In that case, Toys "R" Us entered into numerous vertical agreements with toy manufacturers/suppliers. These vertical agreements prevented Toys "R" Us' main competitor—wholesale clubs—from selling the same types of toys at the same time as Toys "R" Us, "forcing the clubs' customers to buy products they did not want, and frustrating customers' ability to make direct price comparisons of club prices and [Toys "R" Us] prices." *Id.* at 932. Key to this scheme was Toys "R" Us' role in monitoring the vertical agreements with the manufacturers/suppliers. Toys "R" Us acted as a "ringmaster" to ensure that all the manufacturers/suppliers

remained true to their vertical agreements. *Id.* at 934. This "ringmaster" function was critical because it gave assurances to the manufacturers/suppliers that they were all participating because if one "broke ranks" that manufacturer/supplier would gain sales at the others' expense. *Id.* at 932.

As in this case, one of the issues in *Toys "R" Us* was whether the Federal Trade Commission's finding that a horizontal conspiracy—agreements between the manufacturers/suppliers—existed was "contrary to the facts and impermissibly confuse[d] the law of vertical restraints with the law of horizontal restraints." *Id.* at 934. The Seventh Circuit upheld the finding that a horizontal conspiracy existed between the manufacturers/suppliers, resulting in a *per se* violation. *Id.* at 935-36. Relying on *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (193), the Seventh Circuit found that a horizontal conspiracy could be inferred. *Id.*

Under the Complaint's allegations in this case, Deere would be Toys "R" Us— acting as ringmaster—and the Dealerships would be the manufacturers/suppliers. Deere could plausibly benefit from this arrangement. Dkt. 85, at 9-10. For example, first, Deere could inflate the prices of Repair Parts that the Dealerships could then charge the farmers. Second, Deere could serve as the only practical option for repair financing. Third, Deere could hide latent defects—and thus help avoid liability under the warranty—by tightly controlling information learned during the repair process. By engaging in these activities, which are facilitated by horizontal agreements among the Dealerships, Deere benefits. And, importantly, the inference that a horizontal "agreement"—a shared understanding of a common goal—exists

among and between the Dealerships is supported by the fact that going it alone is against their individual self-interest. Just as "[n]o single reasonable manufacturer would drastically increase its prices and restrict its available sales without assurances that others would follow suit," *In re Disposable Contact Lenses Antitrust Litig.*, 215 F. Supp. 3d at 1297, no single reasonable Deere Dealership[39] would sell Deere Tractors that had to be repaired only by it. Farmers would just purchase from dealerships that allowed them to repair tractors themselves or use an independent repair shop. That single Dealership would be economically disadvantaged—particularly when, as the Complaint alleges, farmers and independent repair shops could fix Deere Tractors quicker, better, and cheaper.

Plaintiffs' Complaint sufficiently and plausibly pleads allegations to support this type of "overall" or "overarching" conspiracy by which horizontal agreements can be inferred, which could lead to a finding of a *per se* violation of § 1 of the Sherman Act, based on a conspiracy in restraint of trade. Deere's motion is denied as to Count I.

### Count II

Deere's basis for dismissal of Count II is that the Complaint fails to plausibly plead a *per se* violation of 1 of the Sherman Act. Because the Court has found that

---

[39] This assumes the single Dealership isn't a "cheater." The economic incentives to cheat in a cartel are great, so an enforcer or enforcement mechanism, such as a ringmaster, must exist. *Petruzzi's IGA Supermarket v. Darling-Delaware Co.*, 998 F.2 1224, 1233 (3d Cir. 1993). Members can't go rogue or the whole scheme falls apart. Members who breach the agreement are, thus, "cheating." *Blomkest Fertilizer, Inc. v. Potash Corp.*, 203 F.3d 1028, 1050 (3d Cir. 2000). Apparently, there's no honor among conspirators because cheating is common. *United States v. Beaver*, 525 F.3d 730, 739 (7th Cir. 2008).

the Complaint sufficiently and plausibly pleads a *per se* violation based on an inference of a horizontal conspiracy, Deere's motion is denied as to Count II.

## Count III

Count III is Plaintiffs' tying claim under § 1 of the Sherman Act, which seems to be the heart of the case—at least in the Court's view. In addition to arguing that a *per se* claim cannot exist, Deere also argues that Count III fails to sufficiently allege appreciable/sufficient economic power in an appropriately defined market. Dkt. 105, at 25-26. Again, Plaintiffs don't address this argument head on in a cohesive manner. Dkt. 113 at 27, 35-39. But Deere bears the burden to establish it is entitled to judgment on this count and the issue is a matter of law for this Court to independently address. *Marcure*, 992 F.3d at 631; *Moss v. HealthCare Compare Corp.*, 75 F.3d 276, 279 (7th Cir. 1996).

A § 1 tying claim has four elements: (1) the tying arrangement is between two distinct products or services; (2) the defendant has sufficient economic power in the tying market to appreciably restrain free competition in the market for the tied product; (3) a not insubstantial amount of interstate commerce is affected; and (4) the tying seller has an economic interest in the sales of the tied product or service. *Siva*, 34 F.4th at 574 (citing *Reifert v. S. Cent. Wis. MILS Corp.*, 450 F.3d 312 316-17 (7th Cir. 2006)). The parties are fighting about the second element—the requirement that the defendant have sufficient or appreciable economic power in the tying market. *Id.*; *see also Kodak*, 504 U.S. at 464 ("appreciable economic power"); *Paladin Associates, Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003) ("appreciable economic power"). Specifically, Deere contends that the

79

Complaint fails to sufficiently and plausibly plead Deere's power in a sufficiently defined tying market. Dkt. 105, at 16-17, 24-26.

So what's "sufficient/appreciable economic power"? The Supreme Court has stated what it isn't: "The standard of 'sufficient economic power' does not . . . require that the defendant have a monopoly or even a dominant position throughout the market for the tying product. Our tie-in cases have made unmistakably clear that the economic power over the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only with respect to some of the buyers in the market." *Fortner Enter., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 502-03 (1969). After *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28 (2006), it appears "sufficient/appreciable economic power" was shorthanded to "market power." ABA Section of Antitrust L., *Antitrust Law Developments* 189-93 (8th ed. 2017). This is true in the Seventh Circuit, too. *Sheridan v. Marathon Petroleum Co.*, 530 F.3d 590, 594 (7th Cir. 2008) ("So, 'market power' is key. . ."). But, again, in this context "market power" doesn't need to reach the level of monopoly power. *Id.* at 594-95. And, in an effort to define this type of power, courts look to market share. *See In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 416-17 (S.D.N.Y. 2005); *see also Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1215 (9th Cir. 1977) ("Appellants are not required to prove a monopoly or dominant economic power, although proof that the seller occupies a dominant position in the market for the typing [sic] item satisfies the test.") (cleaned up)). Although no precise percentage of market share has been established as a

80

threshold, the share apparently can't be south of 30%. *Antitrust Law Developments*, *supra*, at 189. Indeed, in the Seventh Circuit, it appears that market share north of 30% allows courts to infer market power. *See Hardy v. City Optical Inc.*, 39 F.3d 765, 767 (7th Cir. 1994). This type of power has also been said to include "the power to raise prices or impose other burdensome terms such as a tie-in." *Fortner Enters.*, 394 U.S. at 503.

Plaintiffs' Complaint contains the following allegations about the tying market, which is the same as the previously discussed "primary market." Dkt. 85, at 19. "The 'Tractor Market' includes the United States product market for agricultural equipment (described as 'Tractors' in this Complaint), which include "tractors, application equipment, tillage, planters, air seeders, self-propelled forage harvesters, balers, windrowers, combines, cotton harvesters, and sugar cane harvesters." Dkt. 85, at 19. In other words, the market is the durable farm equipment market. The Complaint goes on to allege that, "Deere is indisputably the biggest player in the market for Tractors in the United States. Deere wields significant economic power in the market for Tractors in North America." *Id.* The Complaint then references an article in a trade publication conveniently called *Farm Equipment*, which states that Deere has "become the world's largest producer and seller of farm and industrial tractors and equipment." Jennifer Reibel, *Manufacturer Consolidation Reshaping the Farm Equipment Marketplace*, Farm Equip. (August 29, 2018). According to this referenced article, Deere possesses 53% of the large farm tractor market and "Deere's lead is even more commanding in the

combine market, with 60% of the market." *Id.* Under Count III, Plaintiffs incorporate and re-allege these allegations and further contend, among other things, that "Defendant has appreciable economic power in the relevant Tractor Markets, i.e. the 'tying' markets." Dkt. 85, at 64. The Complaint further alleges that Deere "has a larger market share than that of its next two largest competitors, Case New Holland and Kubota Corp., combined." *Id.* at 19. Like the representations in the referenced article, the Complaint alleges that "Deere has appreciable economic power in the U.S. Tractor Markets, controlling approximately 55% and 63% of the large tractor and combine markets, respectively." *Id.* What's more, according to the Complaint, "Deere's share of its US sales in the Tractor markets are high, but even that may understate its true market power." *Id.* And another article from 2020 referenced in the Complaint states, "Deere's metallic-green-and-yellow farm vehicles dominate the world's $68 billion market for agricultural equipment, accounting for more than half of all farm machinery sales in the U.S." Peter Waldman & Lydia Mulvany, *Farmers Fight John Deere Over Who Gets to Fix an $800,000 Tractor*, Bloomberg Businessweek (March 5, 2020).

Plaintiffs' Complaint sufficiently alleges that Deere has sufficient/appreciable economic power by its market share well above 30% in the Tractor Market, which is essentially the farm equipment market. And the Complaint's allegations that Deere has been able to tie the Repair Services, despite its customers' desire not to purchase the Repair Services, and restrict competition in the aftermarket likewise

allow the Court to infer sufficient/appreciable economic power. The Complaint's allegations are sufficiently pleaded and state a plausible tying claim.

Two other points inform the Court's decision in this regard. First, thankfully, the Court is not required to throw out common sense and judicial experience when determining whether a complaint has plausibly stated a claim. *Iqbal*, 556 U.S. at 679. Deere's argument that it does not possess appreciable economic power in the Tractor Market—which is basically the farm equipment market described in the articles—tests this Court's common sense and judicial experience. It would blink reality to find that Deere does not possess appreciable power in the farm equipment market. Second, even after *Iqbal* and *Twombly*, the purpose of a complaint is to put the defendant on notice of the claims against it, not to prove its case. *Bausch v. Stryker Corp.*, 630 F.3d 546, 559 (7th Cir. 2010). Plaintiffs have sufficiently put Deere on notice that they and apparently others—including business and farm equipment journalists—assert that Deere has market power in the Tractor Market and Plaintiffs have put Deere on notice that they are alleging that Deere abused that power by tying the Repair Services to the purchase of Deere's Tractors. If Deere wants to dispute that with evidence, it certainly can. But Deere's apparent factual contention that it does not have sufficient/appreciable economic power is not a basis to grant the motion.

As to Deere's argument that the tying market is not appropriately defined, the Court has previously addressed that issue. Again, the cases Deere cites for the specificity of the primary market are not single-brand aftermarket cases. Moreover,

the specificity of the market definition is a highly fact-intensive analysis. *See, e.g.*, *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997); *Kaiser Aluminum & Chem. Corp. v. FTC*, 652 F.2d 1324, 1329 (7th Cir. 1981).

Deere's motion with respect to Count III is denied.

### Counts IV – VII

Deere argues that the Complaint fails to state any claim under § 2 of the Sherman Act. Dkt. 105, at 26-28. Deere makes four assertions to support its argument. First, Deere asserts that the Complaint fails to allege it has monopoly power in the Repair Services Market because the Dealerships—not it—perform the repairs to the Tractors. Second, Deere further asserts that the Complaint fails to plausibly allege any anticompetitive conduct. Third, Deere asserts that its conduct promotes competition. Fourth, Deere perfunctorily asserts that no other § 2 claim exists, presumably meaning the attempted monopolization claim and leveraging claim. Plaintiffs disagree. Dkt. 113, at 28-29. The parties blast through these arguments in less than two pages each. The Court will address the arguments as framed but will further elaborate on these issues in the interest of completeness.

As to the first contention, the issue is not whether Deere is a seller of Repair Services. Instead, the issue is whether Deere has monopoly power in the relevant market. This is determined by showing that Deere could control prices or exclude competition. *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966). The Complaint easily meets any requirement to allege that Deere excludes competition in the Repair Services Market. Only Deere's own authorized Dealerships are provided with the Repair Tools necessary to perform Repair Services. According to

84

the Complaint's allegations, Deere has the ultimate control of the Repair Services Market. These allegations are not mere legal conclusions. The Complaint is chock-full of factual allegations to support this conclusion.

Deere's second argument is based upon a reasonable interpretation of the Complaint, but not an interpretation that is most favorable to Plaintiffs. Dkt. 105, at 27. Again, Deere reads the complaint in a way that *some* Dealerships are provided with Repair Tools and others are not, which coincides with its view that the Complaint alleges only *some* Dealerships are part of the conspiracy. But, again, that interpretation is inconsistent with a reasonable interpretation of the Complaint in the light most favorable to Plaintiffs; specifically, *all* Dealerships are part of the conspiracy among and between themselves and Deere. This Court must construe the allegations and all reasonable inferences drawn from those allegations and interpret the Complaint in the light most favorable to Plaintiffs. *Bennett*, 520 U.S. at 168; *Silha*, 807 F.3d at 17. The reasonable interpretation most favorable to Plaintiffs—that all Dealerships are co-conspirators—defeats Deere's argument that Deere is promoting competition. The Complaint's allegations plausibly establish that Deere is excluding competition; specifically, competition from independent repair shops and Deere's very own customers. In fact, Deere never identifies *any* competitors to its Dealerships in the Repair Services Market.

Deere's remaining perfunctory arguments, including those raised in a footnote, are waived. *Evergreen Square v. Wis. Hous. & Econ. Dev. Auth.*, 848 F.3d

822, 829 (7th Cir. 2017); *330 W. Hubbard Restaurant Corp. v. United States*, 203

F.3d 990, 997 (7th Cir. 2000).

For purposes of completeness, the Court will further explain why the

Complaint's allegations sufficiently plead a § 2 Sherman Act claim. At the outset, it

is important to remember that Plaintiffs' Complaint is a *Kodak*-type single brand

aftermarket claim. And the Complaint's allegations fit squarely within many of the

issues the Court addressed in *Kodak*. Indeed, like this case, *Kodak* was both a tying

claim brought under § 1 and a monopolization claim under § 2 of the Sherman Act.

*Kodak*, 504 at 459, 480-86 (addressing § 2 claim). This is not surprising: "Tying

arrangements are more frequently challenged under Section 1 of the Sherman Act,

but unlawful tying also can satisfy the exclusionary conduct requirements of Section

2." *Antitrust Law Developments*, *supra*, at 255; *see also Avaya*, 838 F.3d at 397; *In re

Google Digit. Adver. Antitrust Litig.*, 627 F. Supp. 3d 346, 402 (S.D.N.Y. 2022). So,

"a Section 2 plaintiff might show . . . that the defendant is using the tie to attempt

to monopolize the tied product market." *Antitrust Law Developments*, *supra*, at 255.

Moreover, the allegations in *Kodak* are like the allegations in this case. Like

Kodak's copiers, Deere's Tractors are large, durable, expensive pieces of equipment,

which are not interchangeable with competitors' equipment. Like Kodak, Deere

allegedly has been less than forthright with its customers as to whether customers

and independent repair shops can perform Repair Services. And like the facts in

*Kodak,* Plaintiffs allege that after they purchased the large, expensive, non-

interchangeable equipment without being able to calculate the life-cycle costs,

86

Deere refuses to allow customers and independent repair shops to perform Repair Services. To the extent the allegations are different, those differences inure to Plaintiffs' benefit. In particular, as explained repeatedly, the major factual difference between *Kodak* and the allegations in this case is that Kodak did *not* possess market power in the primary market; whereas, Deere does allegedly possess market power in the primary market. The cases the Court found all involved a competitive primary market. *Kodak*, 504 U.S. at 454; *Avaya*, 838 F.3d at 398; *Xerox Corp.*, 660 F. Supp. 2d at 547. The Court does not believe the parties cited a case like this in which the defendant had market power in the primary market. If the parties did, then the Court missed it. (The Court addresses Deere's supplemental citation to *Lambrix v. Tesla, Inc.* in a separate order. Dkt. 155.)

A § 2 claim requires monopoly power and anticompetitive conduct. *Kodak*, 504 U.S. 481-83. Monopoly power in this context means the ability to fix prices or exclude competition. *Grinnell*, 384 U.S. at 571. "Monopoly" in this context is not the colloquial understanding; it is not complete control of the market. *Sheridan*, 530 F.3d at 594 ("The word 'monopoly' in the expression 'monopoly power' was never understood literally, to mean a market with only one seller . . . ."). The monopoly power must exist in a relevant market. *Grinnell*, 384 U.S. at 570-71. In a *Kodak*-type single brand aftermarket case, determining the relevant market focuses on the aftermarket. *See Xerox Corp.*, 660 F. Supp. 2d at 547 (defining relevant market "as the market for replacement ink sticks for Xerox's color workgroup printers"). This relevant market looks to the product or service choices that are later available to

87

the durable equipment owner—the consumer who already purchased the equipment in the primary market. *Kodak*, 504 U.S. at 482, *Avaya*, 838 F.3d at 400; *Harrison Aire*, 423 F.3d at 383-84 (for monopolization requirement, relevant market was balloon replacement fabric); *Alcatel*, 166 F.3d at 779 (for monopolization purposes, relevant market was products compatible with product purchased in the primary market). Anticompetitive conduct is the use of monopoly power to foreclose competition, to gain competitive advantage, or to destroy a competitor. *Kodak*, 504 U.S. at 482-83. Anticompetitive conduct is conduct without a legitimate business purpose that makes sense only because it eliminates competition. *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014).

The Complaint's allegations adequately plead a § 2 claim for a *Kodak*-type single brand after-market claim, particularly because it sufficiently and plausibly alleges Deere has market power in the primary market. The Complaint contains allegations showing that Deere has monopoly power—which exists because of Deere's lack of forthrightness and/or the lack of consumer information to calculate life-cycle costs—in the relevant aftermarket. No other competitors exist, which is monopoly power. And Deere's alleged conduct excludes competitors at the cost of Deere's customers' choices to perform their own repairs or have a local repair shop perform the repairs, even when they could perform the repairs faster, better, and cheaper, which is anticompetitive conduct. So, the Complaint alleges a monopoly and anticompetitive conduct, which is what § 2 requires even when the defendant

does *not* possess market power in the primary market. *Xerox*, 660 F. Supp. 2d at 546.

## CONCLUSION

Plaintiffs have sufficiently and plausibly alleged claims based on § 1 and § 2 of the Sherman Act under *Kodak*. Plaintiffs' Complaint alleges both constitutional and antitrust standing, relevant markets, and all the necessary requirements for each count in the Complaint. Deere's motion for judgment on the pleadings is denied.

Entered: November 27, 2023                    By: _____
                                               Iain D. Johnston
                                               U.S. District Judge