```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            WESTERN DIVISION

 3   IN RE:  DEERE & COMPANY REPAIR    )  Docket No. 22 CV 50188
     SERVICES ANTITRUST LITIGATION     )
 4                                      )  Rockford, Illinois
                                        )  Thursday, June 13, 2024
 5                                      )  9:30 o'clock a.m.
                                        )
 6                           TRANSCRIPT OF PROCEEDINGS
                     BEFORE THE HONORABLE IAIN D. JOHNSTON
 7
     APPEARANCES:
 8
     For the Plaintiffs:         FOOTE MIELKE CHAVEZ & O'NEIL LLC
 9                               (1541 East Fabyan Parkway,
                                  Suite 101,
10                                Geneva, IL  60134) by
                                 MS. KATHLEEN CURRIE CHAVEZ
11                               MR. ROBERT M. FOOTE

12                               GUSTAFSON GLUEK PLLC
                                 (120 South Sixth Street,
13                                Suite 2600,
                                  Minneapolis, MN  55402) by
14                               MR. DANIEL C. HEDLUND

15                               WEXLER BOLEY & ELGERSMA LLP
                                 (311 South Wacker Drive,
16                                Suite 5450,
                                  Chicago, IL  60606) by
17                               MR. KENNETH A. WEXLER

18                               WILLIAMS MCCARTHY LLP
                                 (120 West State Street,
19                                Rockford, IL  61105) by
                                 MR. JOHN J. HOLEVAS
20
     For the Defendant:          JONES DAY
21                               (901 Lakeside Avenue East,
                                  Cleveland, OH  44114) by
22                               MR. COREY A. LEE
                                 (51 Louisiana Avenue N.W.,
23                                Washington, DC  20001) by
                                 MR. JOHN M. MAJORAS
24

25
```

```
 1    Court Reporter:              Heather M. Perkins-Reiva
                                   327 South Church Street
 2                                 Rockford, IL  61101
                                   (779)772-8309
 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  22 CV 50188, *In re Deere & Company Repair*
2  *Antitrust Litigation*.
3          THE COURT:  Good morning, counsel.
4          Let's get appearances for the record.  I'm going to
5  try to do this in an orderly fashion.
6          Do we have counsel for Forest River Farms?
7  Mr. Wexler?
8          MR. FOOTE:  Robert Foote, Judge.  And for all of the
9  plaintiffs -- it's the same group for all of the plaintiffs,
10  Judge.
11          THE COURT:  Okay.
12          MS. CHAVEZ:  Kathleen Chavez as well.
13          MR. HEDLUND:  Dan Hedlund, Gustafson Gluek.
14          MR. WEXLER:  Ken Wexler from Wexler Boley & Elgersma.
15  Good morning.
16          MR. HOLEVAS:  Good morning, Your Honor.  John Holevas
17  from Williams McCarthy for the plaintiffs.
18          THE COURT:  Anybody else for the plaintiffs?
19    (No response.)
20          THE COURT:  All right.  That worked out.
21          All right.  And for the defendant?
22          MR. MAJORAS:  Good morning, Your Honor.  John Majoras
23  of Jones Day.  I'm appearing along with my partner, Corey Lee,
24  for defendant, John Deere.
25          THE COURT:  All right.  Good morning.

1          All right.  I know where we left off last time, and I

2   blocked off some days just in case you needed them, and it

3   turns out you didn't need them or you didn't tell me you

4   needed them.  So I filled those with time spent on an 86-page

5   sanctions motion.

6          So let me hear on the plaintiffs' side.  Talk to me

7   about the status.

8          MR. FOOTE:  Thank you, Judge.  Robert Foote.  Also,

9   Dan Hedlund will speak this morning and Ken Wexler, but let me

10  start.

11         First, Judge, we are not at impasse on anything.

12  There has been a lot of meet and confers.  We do have some

13  concerns about timing.  Nothing was brought to you because we

14  continue to have -- although there is timing issues, we

15  continue to have cooperation from the defendants.  We haven't

16  heard a "no" from them on anything important.

17         So we could address a few issues for you this

18  morning, and let me start with, first of all, all of the

19  plaintiffs' 30(b)(6)s have been presented and taken, as we

20  promised would be done by the end of June.

21         THE COURT:  Great.

22         MR. FOOTE:  Dan will talk a little bit more about

23  where we are going on that discovery and depositions.

24         I wanted to raise one issue with you, which you might

25  deem important, the privilege log issue.  The plaintiffs had

1    one document on our privilege log.  The defendants have 4500

2    documents on their privilege log.  They promised us some more

3    information so we could examine that privilege log, which we

4    got this morning at 8:40 a.m.  We have a concern about the

5    common-interest privilege that comes up in many of those

6    documents, and as of this morning, I hope we have the right

7    information to be able to examine that, and that may be an

8    issue that we may need to bring before you in the next

9    30 days.

10           Other than that, I'm going to turn it over to

11   Mr. Hedlund.  In general terms, Judge, although we're behind,

12   defendants have promised that we will have all documents by

13   July 12th, 2024.

14           And I will turn it over to Mr. Hedlund to talk about

15   some document issues that we have.

16           THE COURT:  All right.  Go ahead, Mr. Hedlund.

17           MR. HEDLUND:  Good morning, Judge.

18           Thanks, Bob.

19           So I concur with everything Mr. Foote said.  I just

20   wanted to sort of put a little bit more detail on kind of the

21   things that we are waiting for.  It is largely data that we

22   need for our experts.  One piece of that is John Deere's own

23   transactional data in response to a second set of requests for

24   production.  There has been, as Mr. Foote noted, numerous back

25   and forth and letters, but it's -- I would concur that it has

1    all been productive and in good faith.  It has just taken a

2    long time.

3              But when we came to Your Honor and asked for an

4    extension of six months back in March, we were under the

5    impression and the hope that that data would be coming out by

6    mid-May and giving our experts the six months that they wanted

7    to be able to review the data, but so far, you know, not here,

8    although, as Mr. Foote said, we had a meet and confer

9    yesterday, and it sounds like in the next 30 days we should

10   get that.

11             The other piece to that is there is data in a system

12   called EQUIP, which is the dealer data, who, as Your Honor

13   will recall, the dealers are not named in the complaint, but

14   we have subpoenaed about 30 of them.  Deere can explain the

15   finer details of it, but essentially it's the dealers' data,

16   but it is maintained at Deere.  So it has been a little bit of

17   back and forth with subpoenaing the dealers, and then talking

18   to Deere, and they have been talking to the dealers.  Anyway,

19   that data fits alongside the Deere transactional data, which,

20   as I said, if we get in 30 days, and it all seems good, then I

21   think we will be in good shape, but we will have to sort of

22   examine that when it comes in.

23             It's all to say that I think it is premature right

24   now to raise or to ask the Court for any sort of extension

25   because we want to stick to what we can do, but I just wanted

1   to flag that since it is probably going to be a couple months

2   late, that it's possible that we may come back to Your Honor,

3   which I hope would be for the final time, with regard to any

4   schedule issues.  But I want to see it, once we get the data,

5   and take a look at it before we can make that assessment.

6          THE COURT:  Okay.

7          MR. HEDLUND:  And depositions, just a note on that,

8   the 30(b)(6)s have been done.  We have two plaintiffs who are

9   not corporations, so we have received 30(b)(1) notices from

10  Deere, and we are checking on dates for those.  And we have

11  served some notices on Deere for their witnesses.  So far, we

12  have done 30(b)(6)s, but we have sent out some 30(b)(1)s, and

13  we have been negotiating dates with John Deere to take those.

14         So I think that gets you up to speed on sort of a

15  high level of where we are at on the important sort of issues

16  that are kind of outstanding.  So unless Bob or Ken have

17  anything to add to that, then I would turn it over to Ken.

18         MR. WEXLER:  Thank you, Dan.

19         Good morning, Your Honor.  Ken Wexler for the

20  plaintiff.

21         Because of the length of time that has gone by, and

22  like Dan said, we had an expectation that we would have -- our

23  experts would be able to have the data for six months, and we

24  would file our motion for class certification on November 18th

25  as scheduled, that really is no longer realistic.

1      But what we would like to do, given the passage of

2  time, is we would like to propose filing our motion for class

3  certification under (b)(2) for injunctive relief in 45 days,

4  and I have a proposed briefing scheduling which I gave to John

5  Deere yesterday.  We want to do this.  You know, another

6  planting and harvesting season will have come and gone.  It

7  has been two years.  We want to take some action to get some

8  relief to the farmers that they really want, which is the

9  right to repair their own equipment, and we think that (b)(2)

10  is the vehicle through which to do it.  We can proceed with

11  discovery, and collect the data, and worry about our damages

12  class down the line, but this is a more immediate concern, and

13  we would like to take it on.

14      What we would propose is 45 days to file our motion,

15  which would bring us to July 29th.  Forty-five days is

16  actually the 28th, and that's a Sunday, so it would be the

17  29th.  Deere would have 60 days to respond.  That's

18  September 27th.  And we would have 60 days for a reply.  That

19  brings us to November 26th, which is before Thanksgiving.

20      Again, we would leave it to the Court to set a

21  hearing at the appropriate time, if you want it, or rule on

22  the papers, however the Court wants to address it, the point

23  being we want to get the farmers what they want, what they

24  really want, and this would be -- we would like to make this

25  motion, and we are asking leave to do so in 45 days.

 1           THE COURT:  All right.  Before I hear from Deere, I

 2  have got some questions.

 3           But before I start rifling questions off at you,

 4  Mr. Wexler, anything else?

 5           MR. WEXLER:  No, nothing else, Your Honor.

 6           THE COURT:  Okay.  How about Mr. Foote or

 7  Mr. Hedlund?  Anything else before I start asking questions?

 8           MR. FOOTE:  No from Mr. Foote.

 9           MR. HEDLUND:  No, Your Honor.

10           THE COURT:  Maybe I will start with a simple one.

11           What is John Deere transactional data?

12           MR. LEE:  Your Honor, this is Corey Lee from Jones.

13           Was that a question addressed to the plaintiffs or

14  addressed to John Deere?

15           THE COURT:  That was to the plaintiffs because they

16  used the phrase "John Deere transactional data" a few times,

17  and I don't know what that means.  In my head, it could be

18  something extremely broad, or it could be something much

19  narrower.  So I'm just curious as to when the term "John Deere

20  transactional data" is being used, what are we talking about?

21           MR. HEDLUND:  At a high level, Your Honor, there is a

22  set of our request for production, 62 to 68, which are focused

23  on Deere's transactional data that deals with sales of

24  tractors, sales of services.  Essentially, it gets down to the

25  information that our experts are seeking to analyze in support

1  of the damages model that they would put together with regard

2  to their class certification report.

3          THE COURT:  All right.  So "transactional" meaning

4  sales and "data" meaning information regarding sales of

5  tractors and services?

6          MR. HEDLUND:  Yeah.

7          THE COURT:  All right.  I know I have got plenty of

8  cases with some, probably, overly harsh and snippy language

9  about in camera inspection of documents, but if you get to an

10 impasse on documents on the privilege log, and it's

11 common-interest privilege, I'm unlikely to look at 4,500

12 documents, but I could start with a relevant random sample,

13 put my eyes on it and give you my thoughts, but I'm

14 disinclined to spend weekends reviewing 4,500 documents on

15 privilege issues.

16         In the past, what I have done when parties have told

17 me that documents were privileged, and it looked like they

18 weren't privileged after I got through, I don't know, a few

19 hundred, I would enter an order saying, "I have gotten through

20 a few hundred.  This is the best you got.  There is a real

21 problem.  And I'm going to start charging you.  I'm going to

22 bill you."

23         Likewise, when somebody was grumbling about a

24 privilege, and I got the -- I was doing an in camera

25 inspection, and I looked through a hundred documents, and,

1   yeah, they are privileged, and there is no real doubt about

2   it, I entered a similar order saying, "I'm eyeballing these

3   things, and they look privileged to me.  So if you want to

4   keep doing this, I could put my meter on."

5          So I'm just throwing that out for you.  Work through

6   it.  Common-interest privilege, you know, it's got some

7   nuances to it.  So I'm okay with that.  So if you need me to

8   look at those, I'm okay.  I'm not traveling anywhere, so I

9   can't look at them on a plane ride, which would be a

10  convenient way to do it.  But if you get to an impasse on that

11  issue, you let me know.

12         On the class cert issue, hold on one second.

13         So I think Mr. Wexler was talking about the class

14  cert issue, and you were very specific in referencing

15  23(b)(2), an injunctive class.  Is that the only class that

16  the plaintiffs would be seeking to certify, or would it be

17  other classes, or maybe even subclasses?

18         MR. WEXLER:  No, they are slightly different.  Under

19  Section 16 of the Clayton Act, the threat of antitrust harm is

20  sufficient to warrant an injunction.

21         THE COURT:  Okay.

22         MR. WEXLER:  And those farmers who cannot fix their

23  tractors because they are precluded from the repair tools that

24  enable them to do so would benefit from injunctive relief

25  requiring John Deere to give them the repair tools that are

1   necessary.  Those that have had the problems in the past are

2   entitled to damages for their downtime or whatever it was.

3   They are different approaches, but this is not a situation

4   where there is a conflict because there is a settlement

5   context or anything like that.  They are just different kinds

6   of relief that are afforded by the statute.

7           THE COURT:  Sure.

8           Would there be overlap between a damage class and an

9   injunctive relief class, overlap on issues, facts, legal

10  issues?

11          MR. WEXLER:  I can't imagine that there wouldn't be

12  some, yes.

13          THE COURT:  Okay.  All right.  So you --

14          MR. WEXLER:  But --

15          THE COURT:  -- know where this is going.

16          MR. WEXLER:  I do.  But this is not a damages case in

17  the traditional sense.  This is not just predominately a

18  damages case.  It is predominately -- I mean, those that are

19  facing the threat of injury and the threat of downtime are

20  facing a specific antitrust harm that cannot be remedied by

21  damages today.  It hasn't been incurred yet.  And the legal

22  standards, there is a lesser burden on having a (b)(2)

23  certification.

24          Having an injunction trial would be after (b)(2), and

25  there might be issues the Court wants to address at that time,

1    but there is no reason to delay certifying the (b)(2) class

2    for these purposes, at least that's our view.

3           THE COURT:  Okay.  Well, maybe I should have got the

4    question out before you started answering my thought.

5           My concern, obviously, is having two separate

6    briefing schedules on similar issues for class certification,

7    one under (b)(2) for injunctive relief and then another class

8    cert motion with a whole new raft of papers and documents and

9    issues on damages, and to bifurcate class cert on that.  I

10   understand what your clients want, but from a case management

11   perspective, I have some concerns, and that's what I would

12   like to flesh out on the plaintiffs' side.

13          MR. WEXLER:  I understand, yes.

14          THE COURT:  I'm sure Deere has their view, but I

15   would like to hear your views.

16          MR. WEXLER:  Well, our view is this:  You know, the

17   standards are different for class certification, so in that

18   sense the overlap would be numerosity --

19          THE COURT:  Common questions of law and fact.

20          MR. WEXLER:  -- adequacy, common questions.  Yes,

21   that's where the overlap would be.  But the issue on a (b)(2)

22   class is whether the defendant has acted or refused to act in

23   a manner applicable to the class as a whole.

24          In the (b)(3) area, which is what we need the data

25   for when we are developing our models, as Your Honor well

 1    knows from your recent decision, we have to show predominance

 2    of common questions over individual ones.  It is just a

 3    different focus by the Court.  You are not doing the same

 4    thing twice in that instance.

 5         I doubt Deere would contest numerosity, although they

 6    have a right to do so, and we will put on evidence of it, and

 7    the existence of common questions and whatnot are more -- we

 8    can put on evidence of that, and I believe it is much more

 9    direct, and it would not require a redo because I don't think

10    the issues are that controversial on the 23(a) front.

11         But the fight on 23(b)(2) is the fundamental question

12    for which we have sufficient discovery and sufficient

13    admissions by Deere that they have acted and are refusing to

14    act in a manner applicable to the class as a whole, and then

15    the predominance issue will just have to come later because of

16    waiting on the data and getting our experts enough time to

17    sift through it.  I don't think the Court would be duplicating

18    work.  That's our view.

19         THE COURT:  So are you telling me that you have all

20    the facts you need right now to file a motion for class

21    certification under 23(b)(2)?  There is no additional

22    discovery you need?

23         MR. WEXLER:  Yes.

24         THE COURT:  You are good?

25         MR. WEXLER:  That's correct.

1          THE COURT:  And are you --

2          MR. WEXLER:  And since -- I'm sorry.  Go ahead.  I

3    didn't mean to interrupt.

4          THE COURT:  Are you going to be using an opinion

5    witness or opinion witnesses to support that motion?

6          MR. WEXLER:  We haven't made a final decision, but I

7    personally don't think it's necessary.

8          THE COURT:  Okay.  Again, I'm not treading new ground

9    here.  If you are going to have an opinion witness, then I

10   assume Deere is going to come back, as soon as I give them a

11   chance to talk, and they are going to say, "Oh, we don't know

12   who that person is.  We need to see the report.  We want to

13   depose that person."  Then, of course, everybody has to file a

14   Daubert motion.  And then you respond to that, and they say,

15   "Well, now we need an expert."  And the briefing schedule gets

16   blown up.  So that's my concern.  But if you are telling me

17   you don't think you need an opinion witness, well, that solves

18   that concern.

19         MR. WEXLER:  Yeah.  Again, Your Honor, I'm not going

20   to speak for my co-counsel.  We haven't reached a final

21   decision.  But I happen to agree with you.  I want to avoid

22   all that stuff.

23         THE COURT:  Okay.

24         MR. WEXLER:  And I don't think we need it.

25         THE COURT:  Okay.  Well, I'm not going to enter a

1   briefing schedule if you don't know whether you are going to

2   need -- when there hasn't been a resolution in the plaintiffs'

3   camp on whether you are going to have an opinion witness.  If

4   I enter a briefing schedule today, and then the plaintiffs'

5   group talks, and, Mr. Wexler, unfortunately, you lose that

6   battle, and other folks say they want an expert, well, we know

7   the briefing schedule is not going to hold, right?

8           So I will give you plenty of time to talk about that

9   among yourselves, and I understand that's litigation tactics

10  and strategy that you and your co-counsel need to noodle

11  through and think through, and I'm not going to prevent you

12  from doing that, but I'm not going to enter a briefing

13  schedule until that decision has been made.

14          MR. WEXLER:  I think that's wise, Your Honor, but I

15  would just like a week to let you know.

16          THE COURT:  Well, I will give you a week.  No

17  problem.

18          MR. WEXLER:  Okay.  All right.

19          THE COURT:  All right.  Hold on one second.

20          I'm not going to waste your time with my other

21  questions.  Okay.  Thank you very much.

22          All right.  Let's hear from Deere.  You can respond

23  to anything and you can tell me whatever you want to tell me.

24          MR. MAJORAS:  Thank you, Your Honor.  John Majoras

25  for Deere.

1        I think, first of all, I will turn this over to

2    Mr. Lee to see if he has any responses with respect to some of

3    the discovery issues.  I think generally in terms of what we

4    heard between the parties cooperating and doing meet and

5    confers in the process, that has gone well, but I will turn it

6    over to Mr. Lee with any other specifics.

7        THE COURT:  Okay.

8        MR. LEE:  Sure.

9        Your Honor, just to give you a bit more flavor, I

10    will just run through the issues that were raised by

11    plaintiffs in order, first starting with challenges to the

12    common-interest privilege.

13        Unlike other instances where there might be, I think,

14    challenges to specific documents, I think here it will be much

15    more of a categorical knowledge.  So I think we are probably

16    looking for some guidance from the Court, potentially, on what

17    the limits of the privilege are, and then when we can apply

18    that to the documents, versus having a more

19    document-by-document inclusive challenging of particular

20    documents or the privilege that applies.  So hopefully we will

21    avoid instances where we are asking for any sort of

22    large-scale in camera review.  We understand the Court's time

23    is very valuable, and I think we can probably resolve any

24    issues there on more of a categorical basis versus a

25    document-by-document basis.

1          THE COURT:  Okay.  Any idea how many categories we

2   are talking about?

3          MR. LEE:  I think, honestly, when we look at the

4   common-interest privilege and where it has been applied here,

5   I think it is basically one instance where you have issues

6   where Deere is part of trade associations where legal advice

7   is being shared amongst those trade associations and whether

8   or not the common-interest privilege can apply in those

9   instances.

10         THE COURT:  Got you.  Okay.  All right.

11         And so that would cover many of the 4,500 documents.

12  However I rule on that, it would be applicable to most of

13  those?  Is that what you are telling me?

14         MR. LEE:  I wouldn't say -- I honestly don't know the

15  breakdown of the privilege log between where common interest

16  is being claimed versus a more routine attorney-client or work

17  product privilege, but at least to date the largest area where

18  plaintiffs have stated they intend to challenge is around

19  common interest.  So I think a ruling on that issue would take

20  care of or release one issue they have raised with the

21  defendant so far.

22         THE COURT:  Okay.

23         MR. LEE:  So if Your Honor has no more questions on

24  that matter, I will turn next to issues around data just to

25  give you a bit more flavor as to where we are and where we

1    hope to be.

2            THE COURT:  All right.  Hold on a second.  You can't

3    see this.  I'm scribbling notes down.

4            So a trade association meeting, attorneys giving

5    legal advice, essentially, across the board and how it applies

6    in that type of setting.  Okay.  I got that.

7            Okay.  Talk to me about John Deere transactional

8    data.  I think that's what you are talking about next; is that

9    right?

10           MR. LEE:  That's correct, Your Honor.  And as

11   counsel, I think, correctly stated, there are basically four

12   categories of John Deere data:  warranty data, sales data,

13   parts data, and repair data.

14           Warranty data has already been provided to

15   plaintiffs.  They raised an issue with that data when we were

16   looking back to see if there is an additional field of

17   information we can provide.  But at least in the first

18   instance, that data has been provided, and if we can

19   supplement that data with some additional information, we will

20   do so as quickly as we can.

21           Repair data we plan to provide to the plaintiffs this

22   week, and it is, I believe, being transferred to our vendor as

23   we speak, and we hope to have that information going out

24   fairly quickly.

25           We also mentioned sales data will be going out fairly

1   soon.  It's being QC'd to make sure there are no issues in the

2   queries that were run.  We expect that data to be ready

3   fairly soon.

4          And then parts data is still being collected by the

5   client.

6          As you can imagine, when you ask for six years or

7   more of transactional data, from everything from screws to

8   transmissions, there is a whole lot there.  So that collection

9   is ongoing, and we will get that out to plaintiffs as quickly

10  as possible.

11         But that's, in a snapshot, where we are with the

12  Deere data.

13         THE COURT:  Okay.

14         MR. LEE:  When it comes to -- I'm sorry, Your Honor.

15  Do you have a question?

16         THE COURT:  No.  I said, "Okay."

17         MR. LEE:  Okay.  So the other category of data is the

18  EQUIP data, and that's data where I would almost say like John

19  Deere acts as kind of a sales force or another software

20  provider where they provide a tool for usage by dealers to

21  manage their own data.  So John Deere has been assisting these

22  dealers using some back-end tools to try to collect data for

23  dealers to produce in response to subpoenas.  It is

24  about -- at the end of May, it provided sample data to dealers

25  to ensure that the reports that it had collected have no

1    issues with them and are responsive to plaintiffs' subpoenas.

2    We are waiting for sign-off from the dealers to ensure that we

3    have their authority to move forward with a large-scale

4    collection.  So we will be prepared to move forward with

5    large-scale collections as soon as the dealers give their

6    sign-off.

7            THE COURT:  Okay.

8            MR. LEE:  And I think the subpoenas -- I'm

9    sorry -- the depositions, I don't think I have much to add.  I

10   think the plaintiffs are accurate that the 30(b)(6)s for the

11   plaintiffs have taken place.  Both sides have some 30(b)(1)s

12   out there, which we will need to schedule, but all of these

13   30(b)(1)s which plaintiffs have asked for, Deere has provided

14   dates in the first instance.  There is some negotiation going

15   back and forth as to getting those dates, securing them, with

16   competing schedules between lawyers and witnesses, but I think

17   we are moving along in that direction.

18           So I think that covers everything we need to discuss

19   on discovery.  If you have questions, I'm happy to take them;

20   but if not, I will hand things over to Mr. Majoras to speak on

21   the class certification issues.

22           THE COURT:  All right.  Hold on a second, Mr. Lee.

23   That's helpful.  I was trying to write quickly.  Let me see if

24   I have any questions for you on the discovery issues.

25           So for this -- I'm using air quotes here -- "EQUIP"

1    data that is being collected from the dealerships, how many

2    dealerships are we talking about that are kind of culling,

3    pulling all that different type of information into this

4    process?

5           MR. LEE:  Your Honor, I believe it is about 19

6    dealers of the ones that have been subpoenaed by the

7    plaintiffs where those dealers have asked for Deere's

8    assistance in collecting their information.

9           THE COURT:  Okay.  All right.  So the dealerships get

10   the subpoenas.  They see them.  They go, "Yikes.  We have got

11   a lot of stuff here, a lot of information.  We are not exactly

12   sure how we are supposed to respond, but we know we have a

13   lot.  We know we can't figure out how to pull it."  Then they

14   contact Deere and say, "Hey, we have got these subpoenas.

15   Plaintiffs want the information.  We don't know how to pull

16   all this data, separate it, and then aggregate it."  Then they

17   reach out to Deere, and then Deere helps them with,

18   essentially -- and we talked about this the last time -- a

19   process by which the information can be collected.  Is that

20   what we are talking about?

21          MR. LEE:  Your Honor, that's fairly accurate.  Deere

22   is providing this service to the dealers at a fee so that,

23   hopefully, it can be done more efficiently and get the case

24   moving along.

25          THE COURT:  Okay.

1          MR. LEE:  So Deere is basically acting as a service

2     provider to the dealers, charging them a fee to assist them in

3     the data collection.

4          THE COURT:  Okay.  I don't want to use "vendor"

5     because that has its own connotations and stuff.

6          Okay.  That's helpful.  I appreciate it, Mr. Lee.

7     All right.  Thank you, Mr. Lee.

8          Does somebody want to talk to me about views on class

9     cert?

10          MR. MAJORAS:  Yes, Your Honor.  Thank you.  John

11     Majoras again.

12          A number of reactions, one of which, and probably the

13     principal one, at least at the moment, is, as counsel

14     indicated, they raised this with us yesterday in a

15     meet-and-confer call that I personally was not on, and sort of

16     dealing with it, trying to process it myself, although I have

17     not had a chance to talk to my client, I would ask that we

18     have some additional time to come back with a formal response,

19     and I will even throw out there at least the prospect of it

20     might make sense to have a motion from the plaintiffs seeking

21     leave to file the class cert that we can then respond to.  I'm

22     aware that there is some case law, at least in other circuits,

23     possibly in the Seventh Circuit, about injunctive classes

24     masquerading --or damages classes masquerading as injunctive

25     classes that we probably want to bring to your attention.

1              But even beyond that, some reactions similar to, I

2    think, the ones that you have raised.  So the first question

3    is are we just going to have duplicate steps here?  And I

4    think not only is this set up to be a two-step process, it is

5    two steps squared because if I understood Mr. Wexler

6    correctly, they want to seek the certification of the

7    injunctive class, and then presumably have a trial on the

8    injunction itself before a damages class, before a damages

9    class motion.  I'm not sure exactly how it would be sequenced,

10   but it seems to imply that we would have two motions for class

11   certification, which there would be some overlap, and there

12   would be some disconnect.

13             So, for example, on a damages class, they are

14   representing individuals who may no longer own Deere

15   equipment.  Those people, of course, would not have standing

16   to bring an injunctive class into the future.  You have got

17   standing issues that would have to go forward.  But you still

18   would have the overlap, ultimately, when you get the second

19   motion for class certification on the damages, and I'm sure we

20   would hear, "Oh, you have already got an injunctive class,"

21   seeking really to avoid the more difficult process of getting

22   a damages class certified under (b)(3).  Then it sounds like,

23   again, you have multiple trial process here, and of course

24   there would be great overlap with that.  So that's my first

25   reaction.

1           The second one, in experts, is also an interesting

2    point.  So I'm a little surprised, but I certainly take them

3    at their word that they may not have an opinion expert in a

4    (b)(2) motion, but it doesn't preclude me from bringing one

5    in, and I haven't even thought about it.  Until I see their

6    motion, it is hard to say for certain whether I would do that.

7    The types of issues that that expert may raise would, again,

8    likely have some overlap with the work that they are going to

9    be doing with respect to a (b)(3) class.

10          So overall my reaction is I think there is a huge

11   amount of inefficiency that would be built into this.  I think

12   there is also this issue about the injunctive class

13   masquerading as a damages class, which of course we are still

14   going to have to deal with in this case, and I will go back to

15   fundamentally where I started, though, is that I would request

16   some additional time to formally respond to that, and I think

17   perhaps doing that in a motion and response may be an

18   appropriate way for the Court to see all the issues.

19          THE COURT:  All right.  Hold on one second here.

20          I want to clarify some things with Mr. Wexler, but I

21   will tell you, off the top of my head, filing motions to file

22   motions really doesn't sit well with me.

23          But hold on one second.

24          So I told Mr. Wexler I would give him at least seven

25   days for the plaintiffs' side to talk about whether they are

 1    going to be even using an opinion witness.  So that hasn't

 2    been --

 3              MR. WEXLER:  Can I address --

 4              THE COURT:  Hold on.

 5              MR. WEXLER:  Can I address -- I'm sorry, Your Honor.

 6    Can I address that?  Because I had a moment to reflect while

 7    Mr. Lee was talking.

 8              What I would propose -- because the briefing schedule

 9    was thought out so that we would finish before Thanksgiving,

10    and I still want to try to do that -- I would propose that you

11    allow us to file a motion in 45 days as requested.  You don't

12    have to set the rest of the briefing schedule.  If we file it

13    without an opinion -- which I, again, don't think we need to

14    do, and will argue against -- then the rest of the briefing

15    schedule would follow.  If we do, then it creates a different

16    situation.  We understand that.  But if defendant wants to

17    raise that this is an injunctive -- or damages class

18    masquerading as an injunctive class, they can do that in their

19    response.  We don't need a separate motion to address that.

20              Beyond that, I don't know what to say.  We think this

21    is an efficient way to proceed.  We have a complaint that

22    seeks two classes, and there is no reason why a motion for

23    class certification can't be decided, and then trial issues

24    and case management from a trial standpoint can be addressed

25    at some point and doesn't have to be decided today.  All we

1   want to do is file our motion.

2          THE COURT:  Okay.  All right.  Let me get a thought

3   out there before you start jumping in, okay?

4          MR. WEXLER:  Yes.

5          THE COURT:  All right.  So I said I would give you

6   some time to talk because I don't know what you are going to

7   be doing or not, but it's going to affect what my thinking is.

8   But I wanted to -- before that information was provided to me,

9   one of my questions that I wrote down quickly was, "Is

10  plaintiff seeking an injunction trial," what would essentially

11  be not a preliminary injunction -- well, maybe a preliminary

12  injunction -- but a final permanent injunction somewhere

13  before we're addressing the damages.

14         MR. WEXLER:  We haven't thought that through at this

15  point, Your Honor.

16         THE COURT:  Okay.

17         MR. WEXLER:  But we are not -- I mean, as of now, we

18  are not going to seek a preliminary injunction, but we will

19  seek a permanent injunction.  That's what we want.

20         But the timing of it, I mean, there are case

21  management issues involved.  We are aware of that.  So I think

22  it is just premature.  It is a good question, but it is just

23  premature.

24         MR. MAJORAS:  Your Honor, John Majoras.

25         It again strikes me that if we are going to do the

 1    two-step process on the class, in the class certification

 2    issue, and what we heard initially was there is this timing

 3    concern that the plaintiffs' counsel had for their farmers for

 4    the next planting season, if we are going to have a single

 5    trial, then we should have a single series of -- or a single

 6    grouping of class certification motions, and then try the

 7    case, because I don't think the trial is going to look that

 8    much different, although there is the prospective damages

 9    issue or the prospective harm issue.  I think you still are

10    going to have to go through the fundamental liability issues

11    on the antitrust claims, regardless of whether it is an

12    injunctive class or damages class, if either one is even

13    certified.

14          I'm back to where I think we are setting up something

15    with a number of inefficiencies here, multiple motions that

16    are going to certainly have some overlap, and I'm not seeing

17    what the value is.  That, again, is my initial reaction after

18    really less than 24 hours to think about it.

19          THE COURT:  Okay.  So I'm going to bounce back to the

20    plaintiffs on this.  Obviously, we are talking about

21    certifying a class for injunctive relief.  But you win that;

22    hurray, great.  Just because I have certified a class for

23    injunctive relief doesn't mean I'm giving you the injunction.

24    And from what you have told me this morning, the injunction is

25    what you want.  So say I certify a class, a 23(b)(2) class,

1    for injunctive relief.  Hurray, congratulations.  You have got

2    that.  You have overcome that issue.  And you are worried

3    about the next planting season.  What does this --

4               MR. WEXLER:  Well --

5               THE COURT:  You have got to let me finish the

6    question, Mr. Wexler.

7               MR. WEXLER:  You are absolutely right.  I apologize.

8    It is a problem of mine.  I apologize.

9               THE COURT:  Okay.  So you have the class certified.

10   That's great for your side.  But you still don't have the

11   relief that you are seeking unless there is either a

12   preliminary injunction or a permanent injunction that gives

13   you that relief for that class.

14              So if you don't have that part, what good is really

15   pushing the class cert quickly?  That's what I'm struggling

16   with.  That's one of the many things I'm struggling with.  So

17   go ahead and address that.

18              MR. WEXLER:  Sure, sure.

19              It may very well affect our strategic thinking, and I

20   think it will.  It's one step, and we may make some decisions

21   regarding (b)(3) that we wouldn't otherwise make if this is

22   certified.  You know, it's kind of like asking Your Honor to

23   give an advisory opinion on something.  We have to take it one

24   step at a time.  We think this is a good path.  We want to act

25   on it, and how it -- you know, obviously, we would prefer to

 1    go right to trial if we have it class certified, but we have

 2    to, obviously, balance that with where we are on (b)(3), and

 3    it is just taking too long.  So that just may affect our

 4    decision making and likely will.

 5            THE COURT:  Okay.  Helpful information.  Not sure it

 6    answers my concern.

 7            My concern is I understand you want to get this

 8    injunctive relief, and as part of that, before you do that,

 9    you want to get your class certified for that relief, and I'm

10    hearing about and we have talked a long time about the class

11    cert component to it.  Mr. Majoras jumps in and says he's

12    concerned about -- and it was a fair question because I was

13    scribbling it down as well -- bifurcation and having two

14    trials, a trial on equitable injunctive relief and a trial on

15    damages, which is a concern I think for everybody.

16            So what I'm driving at, and I'm going to try to

17    articulate this better, is what's the hurry with the class

18    cert motion, unless you think you are going to jump in and

19    say, "Now we got the class cert.  We want a trial ASAP on

20    injunctive relief."  And that would be fine.  You could do

21    that.

22            MR. WEXLER:  We might --

23            THE COURT:  We could fight over that, and I'm sure

24    Mr. Majoras is going to have issues on that.  But we could

25    have that discussion.

```
 1              But why push this class cert if you are not going to
 2    get that relief that you are seeking?
 3              Go ahead.
 4              MR. WEXLER:  Okay.  Your Honor, I'm glad you asked it
 5    that way because I thought you wanted -- I thought I was in
 6    the fight today.  But, yes, we would want to go and have a
 7    trial for permanent injunctive relief.
 8              THE COURT:  Separate and distinct from a trial on
 9    damages?
10              MR. WEXLER:  Right.
11              THE COURT:  Okay.  All right.  Then we are getting
12    somewhere.  Now I get it.  So now I know where that is.  Okay.
13              MR. WEXLER:  I'm just concerned -- obviously, I don't
14    want to waive anything.  I don't want to be misinterpreted
15    down the line.  But, yes, what we want is injunctive relief.
16    That's the whole purpose of this.
17              THE COURT:  Okay.  All right.  Hold on everybody.
18              Okay.  I will throw this out for you to consider.
19    Today is the 13th.  Again, this is just a proposal at this
20    point.  The proposal is give plaintiffs' side a week to think
21    and talk about it among themselves.  They file a status report
22    with me on June 20th saying, "We want to proceed on a motion
23    for class cert under 23(b)(2), seek an injunctive relief.  We
24    will be using a retained opinion witness or we won't."  I
25    don't know.  But you just tell me what you envision.
```

1          You get that on file on the 20th.  I eyeball it.

2    Deere eyeballs it.  And then Deere files something a week

3    later on June 27th and says, "Yeah, we are okay with that.  We

4    think we can beat back the class cert," and that would be a

5    major victory for them; or they say, "No, we don't like this

6    procedure," and they can tell me, and then we talk about it.

7          And then I eyeball it on the 27th.  And then we talk

8    on the 28th, sometime in the afternoon, for a telephonic.  And

9    then that gives both sides the opportunity to talk among

10   themselves.  We can clarify where this is all going, and I can

11   make a more reasoned decision after everybody has had the

12   opportunity to think about it, and giving me the opportunity

13   to think about it as well as seeing what both sides envision.

14   And that puts it for the 28th, and that's a relatively short

15   turnaround time for this.  But I don't want to have a motion

16   to file a motion.

17         MR. WEXLER:  Your Honor --

18         THE COURT:  That's my proposal.

19         What does the plaintiffs' side think about that?

20         MR. WEXLER:  Your Honor, Ken Wexler.  I think that is

21   a good proposal, and, obviously, we will comply with it.  My

22   only request is that if the Court then gives us leave, that it

23   institutes the briefing schedule we asked for.  We are far

24   enough along, so we can file our motion on July 29th,

25   regardless, and then proceed with the briefing schedule we

1    proposed of 60 days and 60 days.

2          THE COURT:  Okay.  Well, I can't give you that answer

3    now because I don't have the information to make that

4    decision.  I'm searching to get the information to make that

5    decision.  So I understand your position.

6          MR. WEXLER:  All right.

7          THE COURT:  So, Mr. Majoras, what do you think about

8    my proposal?

9          MR. MAJORAS:  Your Honor, I think the proposal is a

10   good one.  It's very similar, without the actual motion that I

11   had requested.  So that timing sounds fine to us.

12         The only thing, given that I have raised the issue as

13   to whether we might very well have an opinion expert in

14   response, that's something, obviously, I could not in any way

15   detail prior to seeing the motion, the actual motion.

16         THE COURT:  Right.  But you will have the

17   opportunity -- you will have at least a week to see what the

18   plaintiffs are envisioning, and then I will give you some time

19   to think about it, and your decision will be maybe not

20   finalized, but certainly more informed, right?

21         MR. MAJORAS:  Yes, sir.  Yes, sir.

22         THE COURT:  Okay.  So how about 1:30 p.m. on Friday,

23   June 28th, for a telephonic?  Does that work for everybody?

24         MR. WEXLER:  It does for me, Your Honor.

25         MR. FOOTE:  Yes for the plaintiffs, Your Honor.

1      MR. MAJORAS:  Yes, yes.  It does for Deere as well,

2  Your Honor.

3      THE COURT:  Okay.  All right.  We will do it the same

4  way as with all the other telephonic statuses.  So we will set

5  it for 1:30, Friday, June 28th.  We will talk then.

6      I think I have addressed everything that has been

7  raised.  If I haven't, let me know, before I start asking

8  things I wanted to talk about.

9      Have I covered everything on that?

10     MR. WEXLER:  I believe so.

11     THE COURT:  Okay.  All right.  Now, don't read too

12 much into this because I had this written down even before we

13 started talking today, and, again, don't read too much into

14 this because, look, I studied under the Honorable P. Michael

15 Mahoney, and he raised the issue of settlement at every single

16 status, and I think Mr. Gravino and Mr. Holevas will confirm

17 that for you if you don't believe me.

18     So I don't think I -- I can't remember the last time

19 I raised it, so I'm raising it now.  Again, don't read too

20 much into it.  But if the parties want to have a settlement

21 conference, I would not do it, especially if there is going to

22 be a whole -- on the injunctive relief, I would be concerned

23 about doing that.

24     Mr. Foote, Mr. Gravino, Mr. Holevas I think were at

25 the last attempts where I was involved -- it was the last time

1    I was involved in an attempted settlement conference.  I think

2    you folks have settled it, but certainly not because of me,

3    but probably in spite of me.

4            MR. FOOTE:  Well, you were very helpful -- this is

5    Mr. Foote.  You were very helpful to set the parameters,

6    Judge, and it was a successful settlement.

7            THE COURT:  So if you would like a settlement

8    conference with one of -- oh, wait, there is no magistrate

9    judge.  I would find a magistrate judge, because I don't know

10   who is assigned to it, but if they don't have the background.

11   If you want a mediator, that's fine.  If you want to find your

12   own mediator, that's fine.  Again, I'm not pushing anybody for

13   this.  It is just something that I traditionally raise, in

14   part because Judge Mahoney did it, and he told me I should do

15   it.  So I'm doing it.

16           I will tell you, in a way, this case is like watching

17   friends go through a nasty divorce.  Yeah, maybe they

18   shouldn't be married anymore, but it is pretty ugly to watch.

19   You have got American farmers versus an iconic company and an

20   iconic brand, and it is just -- to the outsider, it is kind of

21   painful.  I'm sure it is not all beer and Skittles for you

22   folks either.

23           So if you need the Court's assistance, if you want to

24   go that route at any point, you just let me know, and we can

25   do that, all right?

1      So having said that, we will talk on the 28th at

2   1:30.  Anything else to talk about from the plaintiffs'

3   perspective?

4          MR. FOOTE:  Nothing else, Your Honor.  Robert Foote.

5          THE COURT:  Okay.  How about from Deere?

6          MR. MAJORAS:  John Majoras.  Nothing from us either,

7   Your Honor.

8          THE COURT:  All right.  We will talk to you in a

9   couple weeks.  Thanks, everybody.

10    (Which were all the proceedings heard.)

11                     CERTIFICATE

12   I certify that the foregoing is a correct transcript from

13   the record of proceedings in the above-entitled matter.

14   */s/Heather M. Perkins-Reiva*          *June 17, 2024*

15   _____          _____
    Heather M. Perkins-Reiva                     Date
16   Official Court Reporter

17

18

19

20

21

22

23

24

25