1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

IN RE:  DEERE & COMPANY REPAIR        )  Docket No. 22 CV 50188
SERVICES ANTITRUST LITIGATION         )
                                      )  Rockford, Illinois
                                      )  Thursday,
                                      )  September 19, 2024
                                      )  9:00 o'clock a.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE IAIN D. JOHNSTON

APPEARANCES:

For the Plaintiffs:          FOOTE MIELKE CHAVEZ & O'NEIL LLC
                             (1541 East Fabyan Parkway,
                              Suite 101,
                              Geneva, IL  60134) by
                             MS. KATHLEEN CURRIE CHAVEZ
                             MR. ROBERT M. FOOTE

                             GUSTAFSON GLUEK PLLC
                             (120 South Sixth Street,
                              Suite 2600,
                              Minneapolis, MN  55402) by
                             MR. DANIEL E. GUSTAFSON
                             MR. DANIEL C. HEDLUND

                             LEVIN PAPANTONIO RAFFERTY PROCTOR
                             BUCHANAN O'BRIEN BARR
                             (316 South Baylen Street,
                              Suite 600,
                              Pensacola, FL  32502) by
                             MS. VIRGINIA M. BUCHANAN

                             WEXLER BOLEY & ELGERSMA LLP
                             (311 South Wacker Drive,
                              Suite 5450,
                              Chicago, IL  60606) by
                             MR. KENNETH A. WEXLER

                             WILLIAMS MCCARTHY LLP
                             (120 West State Street,
                              Rockford, IL  61105) by
                             MR. MARC C. GRAVINO

For the Defendants:            JONES DAY
                               (901 Lakeside Avenue East,
                                Cleveland, OH  44114) by
                               MR. COREY A. LEE
                               (325 John H. McConnell Boulevard,
                                Suite 600,
                                Columbus, OH  43215) by
                               MS. TIFFANY D. LIPSCOMB-JACKSON
                               (51 Louisiana Avenue N.W.,
                                Washington, DC  20001) by
                               MR. JOHN M. MAJORAS

Court Reporter:                Heather M. Perkins-Reiva
                               327 South Church Street
                               Rockford, IL  61101
                               (779)772-8309

THE CLERK: Calling 22 CV 50188, *In re Deere & Company Repair Services Antitrust Litigation*.

THE COURT: Good morning, everybody.

Let's get appearances for the record. As much as I try to do this in an organized way, it never seems to work, so I have given up.

So I will start with the plaintiffs. Tell us who is on the phone. I assume Mr. Foote and Ms. Chavez because you are always on the phone.

Are you there?

MS. CHAVEZ: Yes, Your Honor.

MR. FOOTE: We are here. And I can add Dan Gustafson, Dan Hedlund, Ken Wexler, Marc Gravino for all plaintiffs. There may be some others on for the plaintiffs, but that should help.

THE COURT: Okay. That does help. I appreciate that.

All right. Anybody else for the plaintiff?

I have got -- is it -- Virginia Buchanan?

MS. BUCHANAN: Yes, sir.

THE COURT: Okay. Who else for the plaintiff?

MS. BUCHANAN: I'm for the plaintiff.

THE COURT: Anybody else for the plaintiffs?

(No response.)

THE COURT: All right. And for John Deere?

MS. LIPSCOMB-JACKSON: Good morning, Your Honor. Tiffany Lipscomb-Jackson. I'm joined with my partners John Majoras and Corey Lee on behalf of Deere.

THE COURT: Good morning.

All right. There are some things we talked about last time. You guys can tell me whatever you want to tell me. But on my list of things I was curious about is there were a couple depositions, two plaintiff individuals because they weren't corporations, so they weren't 30(b)(6)s. There were some privilege log issues that we were talking about involving the common-interest privilege. There were documents that were referred to as "transactional data," which seems like a good description of them, a good moniker. And there was the dealer data, the EQUIP system. And those are the things on my list.

But let's hear from plaintiff, and then I will hear from John Deere.

MR. FOOTE: Judge, let me assure you we have been working very hard and cooperating every day. There are a few issues, and Dan Hedlund, with your permission, is going to talk to you about them.

THE COURT: All right. Go ahead, Mr. Hedlund.

MR. HEDLUND: Good morning, Your Honor.

Yes, you have a good recall of sort of the issues that we have been dealing with. I think we can report some progress.

Depositions have been ongoing. You mentioned the two individual plaintiff depositions. One of those was taken, and as you saw, we did drop one of the other plaintiffs. So Deere -- you know, I'm not going to speak for them in terms of what other depositions they want to take of different plaintiffs' personnel, but they have had a deposition, at least, of a 30(b)(6) of the corporate designees and one of the one remaining noncorporate plaintiff.

THE COURT: Okay.

MR. HEDLUND: The plaintiffs have been continuing to take depositions. In fact, there was one just yesterday of a Deere person. There has been a fair amount of third-party subpoenas, mostly been documents, although next week there is going to be actually a third-party deposition taking place in Washington, D.C. So things have been proceeding I think well in terms of depositions from the plaintiffs' perspectives.

You mentioned the data, and, yeah, there is two main areas of data that we have been working to obtain, in part, from Deere, and then, in part, from the dealers/Deere, and I will explain that briefly in a minute. But there is some dealer -- or there is some John Deere data that we have requested, and I have been working with Mr. Lee, Deere's counsel, to get that produced, and I believe we are getting close. In the last email I got from Mr. Lee, my understanding, and I will let him comment when he speaks, it

sounds like Deere's data production of their transactional data will be complete by next week.

The dealer data, we served about 29 subpoenas on Deere dealers, I think 21 of them who have the EQUIP data, which, as a reminder, is this situation where the data belongs to the dealers but John Deere maintains it. So when we served the subpoenas on the dealers, they reached out to John Deere to ask them to pull it, and of the 22 that have EQUIP, 21 have agreed to Deere's proposal, which, in essence, was to reimburse them for the task of pulling the data and preparing it. All but one have agreed to that. So we are continuing to meet and confer with that dealer. It's possible that may lead to us asking for the Court's assistance --

THE COURT: Okay.

MR. HEDLUND: -- depending on how that goes.

THE COURT: Can I pause you just briefly --

MR. HEDLUND: Yes, of course.

THE COURT: -- for a second on that issue?

MR. HEDLUND: Yes.

THE COURT: Is that dealer represented by, I assume, different counsel?

MR. HEDLUND: Yes, that is correct.

THE COURT: Okay.

MR. HEDLUND: They are represented, yes, by different counsel. And just to be clear on their position, they are

fine with Deere producing the data, their data, which Deere holds, but Deere, as I mentioned, had asked for reimbursement for the cost of pulling that data.

THE COURT: Okay.

MR. HEDLUND: And the other 21 agreed, but this one doesn't seem to want to. So we are continuing to talk to them.

But bottom line, the good news is that, I understand from Mr. Lee, at this point all the data has been now turned over to the dealers, so it is in their hands to produce to the plaintiffs, and I think they are doing some quality checking, sort of spot-checking of the data, to make sure it's accurate. So the good news is that we are expecting that to start to kind of roll to us so that we can get it to our experts.

THE COURT: Okay.

MR. HEDLUND: So that's the sort of data issue.

Then kind of a related issue that we have spoken with Your Honor about before is the issue of the schedule. You know, we did come before Your Honor earlier with a request for a six-month extension, in part, to allow time for production of this data. It, as I mentioned, has taken longer than we had all hoped. But as I just stated, I believe we are now at the point where it feels pretty solid that the data is going to all be in and will give our experts the time they need subject to the Court granting an additional six-month

extension, which I really believe will be the last one because we have got the pieces in place.

So we sent over a proposed schedule to Deere. Deere has agreed to it. And we are preparing some papers to put it before Your Honor for Your Honor's consideration. But, essentially, with maybe a few sort of minor variances, it is essentially a six-month extension of the existing deadlines. So that's sort of where we are at on this schedule.

THE COURT: Okay. Where would those six months be? Are they all going to be front-end loaded in the production/deposition component, or are they coming in later at experts, or is it kind of evenly distributed across the schedule? What does it look like?

MR. HEDLUND: Yeah. So it kind of picks up on, I think -- I think we are through a lot of the original deadlines. So the first one that's impacted is the close of fact discovery, and then it rolls into the deadlines for the plaintiffs to serve the expert reports in support of class certification, and then everything else after that, defendant's response to that, plaintiffs' reply, close of expert discovery, Daubert motions, and then I think a lot is the deadlines at the end in terms of, like, when we actually file our motion for class cert is tied to when the Court rules on the Daubert motions. So there is a lot of --

THE COURT: Yes.

MR. HEDLUND: Yes.

THE COURT: Yes, at the end, there is a lot of moving things that all interact with each other.

All right. Thank you, Mr. Hedlund.

MR. HEDLUND: Yeah, correct.

THE COURT: Anything else on the privilege logs you wanted to update me on?

MR. HEDLUND: Yes, yes. What I would say on that is we have been -- we have a log from John Deere, which is about 5300 entries, and we have been reviewing those and are getting prepared to go through all the documents and getting ready to challenge and meet and confer with John Deere on those, and I expect that to happen soon, probably in the next week or so. And then there has also been some documents that I just wanted to flag that were produced by a third party called AEM, which is the Association of Equipment Manufacturers.

THE COURT: Yes.

MR. HEDLUND: They produced the documents without any privilege assertion. When John Deere reviewed the documents, they are seeking to assert privilege protections on those, and AEM still seems sort of indifferent. I don't know if they still want to sort of be involved. But anyway, we did receive a privilege log with respect to those documents -- I believe it was yesterday -- from Mr. Lee. So we are reviewing that.

So, anyway, we have made progress on that as it has

been a lot of documents to go through, but I suspect -- well, I know we will be meeting and conferring with Deere, and depending on how those go, maybe bringing those to the Court for some assistance and some rulings on that.

THE COURT: Okay.

MR. HEDLUND: So that's what I have for Your Honor.

THE COURT: All right. I appreciate that.

MR. FOOTE: Judge, Robert Foote. I have one thing to add to that.

When we got the documents from the association, we didn't realize they were privileged. Just for transparency, a couple of those documents by people on our team were looked at before we got the information from Deere that it was privileged. So we have separated those out. No one but the person who has looked at them has looked at them. We are not going to look at them anymore. Just so you know that we haven't crossed the line in any way, Judge.

THE COURT: I appreciate that. Thank you. That's helpful information.

MR. HEDLUND: Thanks, Bob.

THE COURT: All right. Anything else from the plaintiffs' side?

MR. HEDLUND: No.

Thanks, Bob, for bringing that up. I had that on my list, and I forgot about it.

MR. FOOTE: Sure.

MR. HEDLUND: Nothing here, Your Honor.

THE COURT: Okay. All right. Ms. Lipscomb-Jackson? Mr. Lee?

MR. LEE: Your Honor, this is Corey Lee for John Deere. I think largely the report from the plaintiffs is accurate. I just wanted to give you a little bit more color on a few issues.

Around depositions on the individual side, Mr. Hedlund correctly noted that we have taken one individual deposition and another individual chose to drop. There is an issue, which hopefully we believe the parties should be able to work out, where there is an individual who is a co-owner of one of the corporations, who we are seeking to take his deposition, and apparently has some health issues we are trying to accommodate in order to get the unique and relevant information to be able to testify to. So we hope the parties are able to work through that, but I just wanted to let you know that might be an issue.

THE COURT: Okay.

MR. LEE: Turning next to the John Deere data, I just want to give you a sense of the scope of data we have been dealing with here. So to date, John Deere, just in structure data, which, as you know, is a lot of information -- it's very big; it's in gigabytes -- we've produced almost 200 gigabytes

of structure data, made up of 274 files with over 305 million records. So this is a huge amount of data that we have been producing, and that is the reason why this is taking a bit of time here because this is just a huge amount of data that has been at issue here.

THE COURT: Okay.

MR. LEE: Mr. Hedlund, I think, also correctly noted that we have provided all the EQUIP data to the dealers. They are going through that data, and they have been asking some questions to us which we have been answering for them. So we believe that process to be going smoothly, but to the extent that dealers have questions around their EQUIP data, John Deere is working with them to answer those questions.

It is a bit of a difficult situation where John Deere cannot do the QC before sending it to the dealers, and it does not have the underlying invoice information to make sure the structure data is matching what the invoices themselves show. So it is a little bit of an odd process here, but we are working cooperatively with the dealers to move that process along.

THE COURT: So the dealers have additional information that they have got to match up with the things that you have produced to them to make sure there is quality control?

MR. LEE: That's correct. That's right, Your Honor.

So a dealer can look at an invoice data and see, "Oh, this is what we are showing the sale price for here. Does this match what the structure data is showing versus some other sales information?" So we are just going through that process of make sure the data is both complete and accurate as we provide it to the dealers, so that they can then provide it on to the plaintiffs, because, unfortunately, this is not data which Deere actually works with on a regular basis. It is the dealers' sales information with pricing that Deere does not use in the ordinary course of business. So we don't have a whole lot of insight into how some of the fields are used and have been working with the dealers to make sure that they are getting the information that is responsive to comply with their subpoenas.

THE COURT: All right. Well, that makes a lot of sense, instead of having the dealers just produce it to the plaintiffs and then the plaintiffs seeing the disconnect later. So if you work it out, address that issue now, that makes a lot of sense.

MR. LEE: Your Honor, also, I just wanted to note we have also, in addition to the discovery we have with the plaintiffs, we have also had some third-party discovery which we have served upon some of the independent repair shops that have done work on the plaintiffs' machines. We have also served some subpoenas, both for testimony and documents, to

some of the other manufacturers of tractors. So, like, the discovery in that area has been moving forward. So I just wanted to make Your Honor aware that we have been moving this case along even while we have been having some of the delays on some of the data issues.

THE COURT: Okay.

MR. LEE: The last thing I want to note from the privilege log is I think Mr. Hedlund's characterization of AEM's position is fairly accurate. I think, you know, we frequently see third parties just not want to get involved in doing more work and doing more disputes. So the general counsel of AEM has represented to me they did not intend to waive any privileges in their documents, and just to the extent they produced documents, they just missed the documents, and I think are, unfortunately, looking to John Deere to carry the water on this privilege issue just so they don't have to put more money into responding to the subpoena.

THE COURT: Well, that's nice of them. Okay. All right. I appreciate that.

MR. LEE: I think those are the things we need to cover. If you have any questions about the subpoena -- not the subpoena -- the schedule, I would turn that over to Ms. Lipscomb-Jackson, but I think Mr. Hedlund covered that pretty well.

THE COURT: All right. Let's see. I am going

through my notes.

I was just looking at a 2019 case, which seems both not too long ago as well as being in the distant past, by Magistrate Judge Katharine Parker, and in a footnote that she dropped, she cited some Exterro article, and it says the average case involved 100 gigabytes, and I thought that was nuts. And you are at 200. Well, that's only a hundred percent more. It is more than an average case. So I understand that the volume is astronomical. I get it. I understand it.

MR. LEE: Yeah.

MR. FOOTE: Judge, Robert Foote.

I was just before Magistrate Parker, and she is very smart and very on top of things.

THE COURT: She is. No doubt. No doubt.

All right. Okay. So, Ms. Lipscomb-Jackson, you are going to talk to me about the schedule? Was that on your list?

MS. LIPSCOMB-JACKSON: It is, Your Honor, but, again, I think plaintiffs' counsel did a good job of summarizing where we are, and the attorneys are in agreement that given the unfortunate amount of time it has taken to get this astronomical amount of data out the door, that a six-month extension of the schedule, primarily focused on extending the fact discovery deadline to allow for the data to come in and

related depositions to take place, makes sense so that the parties can be well-positioned for expert discovery.

THE COURT: Okay. Just for what it is worth, here is my view -- and just submit the proposed extension in the schedule through the proposed order portal on the website, and I will get it, and I will take a look at it.

For what it is worth, my view is it makes -- in my experience, it makes some sense to front-end load the extension into the fact part because if you get the fact part wrong, everything after that goes sideways, because if the fact discovery isn't complete and done properly, then you give your experts, your opinion witnesses, information, and then something pops up, and now they have to adjust their opinions, and then you have a bigger problem. So I will be glad to take a look at it. You know the case better than I do. But making sure you get the fact discovery component done right is critical because the rest of the process depends on it. Okay. All right. So, yes, just submit it through the proposed order portal, and I will take a look at it.

As to any issues on a privilege log and the common interest, if you are going to file something -- you folks have worked well. I'm sure you will have a proper -- you've probably already had many proper meet and confers. If you need me to make a decision, get the motion to me.

I will tell you we have a lot of trials coming up.

So the good thing is I will work on it on weekends when I'm not in trial, so I won't need your help. I will just need the documents -- the motion, the response, and the reply -- but it is going to take me a while to get to.

I'm looking at my calendar right now. We have got trials through October, whereas November I know we have got -- we have got back-to-back trials, I think? Yes. Most of November is taken up with trials except for Thanksgiving week. December, we have one that starts on the 2nd. And then what's the next trial? And then we have got one starting -- yeah, and a trial after that. So we have got lots of trials jamming up. And then if we go into 2025, I know the entire month of May is scheduled for a trial -- the entire month -- except for Memorial Day.

So if you have issues, get it to me sooner rather than later so I can find time to address any issues you need to address, okay?

All right. Mr. Majoras, I don't want to keep you out of the conversation. Anything to add?

MR. MAJORAS: No, Your Honor. I appreciate that, but everything was handled quite well by everyone else.

THE COURT: Okay. All right. So I think we have another status that is set for December 19th. I will not be on trial that day. So we have got -- it's 9:00 o'clock Central Time, December 19th. Let me get there. It is not a

18

problem for me. I can hold it. I will tell you during that telephonic conference you will likely hear geckos, and I guarantee you, you will hear chickens. You will hear that. I'm just letting you know that will occur. I guarantee it. I guarantee the chickens.

So we can keep that. No problem. And then if anything pops up between now and December 19th, you just let me know, okay?

MS. CHAVEZ: Judge -- I'm sorry -- you piqued our curiosity now.

THE COURT: We will see how it goes, but I will be on the Island of Kauai.

MS. CHAVEZ: Oh, enjoy. I have heard it is fantastic.

THE COURT: There is a lot of chickens.

MS. CHAVEZ: I have heard that too. I should have been a better guesser, I guess.

THE COURT: Okay. All right. Thanks, everybody. I appreciate it. Have a great day.

(Which were all the proceedings heard.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/Heather M. Perkins-Reiva*          *September 30, 2024*
_____          _____
Heather M. Perkins-Reiva                              Date
Official Court Reporter