```
1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
2                            WESTERN DIVISION

3   IN RE:  DEERE & COMPANY REPAIR    )  Docket No. 22 CV 50188
    SERVICES ANTITRUST LITIGATION     )
4                                      )  Rockford, Illinois
                                       )  Thursday,
5                                      )  December 19, 2024
                                       )  9:00 o'clock a.m.
6
                         TRANSCRIPT OF PROCEEDINGS
7              BEFORE THE HONORABLE IAIN D. JOHNSTON

8   APPEARANCES:

9   For the Plaintiffs:          FOOTE MIELKE CHAVEZ & O'NEIL LLC
                                 (1541 East Fabyan Parkway,
10                                Suite 101,
                                  Geneva, IL  60134) by
11                               MR. ROBERT M. FOOTE

12                               GUSTAFSON GLUEK PLLC
                                 (120 South Sixth Street,
13                                Suite 2600,
                                  Minneapolis, MN  55402) by
14                               MR. DANIEL C. HEDLUND

15                               WEXLER BOLEY & ELGERSMA LLP
                                 (311 South Wacker Drive,
16                                Suite 5450,
                                  Chicago, IL  60606) by
17                               MR. KENNETH A. WEXLER

18                               WILLIAMS MCCARTHY LLP
                                 (120 West State Street,
19                                Rockford, IL  61105) by
                                 MR. MARC C. GRAVINO
20
    For the Defendants:          JONES DAY
21                               (901 Lakeside Avenue East,
                                  Cleveland, OH  44114) by
22                               MR. COREY A. LEE
                                 (325 John H. McConnell Boulevard,
23                                Suite 600,
                                  Columbus, OH  43215) by
24                               MS. TIFFANY D. LIPSCOMB-JACKSON

25
```

```
 1    Court Reporter:              Heather M. Perkins-Reiva
                                   327 South Church Street
 2                                 Rockford, IL  61101
                                   (779)772-8309
 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            THE CLERK:  Calling 22 CV 50188, In re Deere and
 2   Company Repair Services Antitrust Litigation.
 3            THE COURT:  Good morning, everybody.
 4            Let's try to do this in the easiest way for the court
 5   reporter.  Let's get appearances for the record starting on
 6   the plaintiffs' side, and then we will go to John Deere.
 7            MR. FOOTE:  Good morning, Judge.  Robert Foote.  I
 8   know also Dan Hedlund, Ken Wexler, and Marc Gravino are on.
 9   I'm not sure who else is on from the plaintiffs' group.
10            THE COURT:  Okay.  Other than those four, anybody
11   else on for the plaintiffs?
12            MR. FOOTE:  I think that's it, Your Honor.
13            THE COURT:  Okay.  Fine.  That's good.
14            And for John Deere?
15            MS. LIPSCOMB-JACKSON:  Good morning, Your Honor.
16   Tiffany Lipscomb-Jackson, Jones Day, on behalf of John Deere.
17   I'm also here with my colleague Corey Lee.
18            THE COURT:  Good morning.
19            Okay.  Let's start from the plaintiff, and then I
20   will hear from John Deere.
21            MR. FOOTE:  Thanks, Judge.
22            THE COURT:  So, Mr. Foote or Mr. Hedlund, do you want
23   to start?
24            MR. FOOTE:  Yes, I will start, Your Honor.  Bob
25   Foote.
```

1           First, Judge, it appears we are on schedule.

2           Second, we have three topics to bring up with the

3     Court today.  Most of them are short.  Mr. Hedlund is going to

4     handle them, but just so you know the topics:  One, we want to

5     file on common interest, on the issue of privilege, a motion.

6     We have met and conferred, and we are sort of stuck on it, and

7     we need to bring it to the Court.  Second, we are going to

8     give you an update on the EQUIP data, which I know is

9     important to you; and, third, what's happening with

10    depositions.

11          And with those three topics, I will turn it over to

12    Mr. Hedlund.

13          THE COURT:  Okay.  Good morning, Mr. Hedlund.

14          MR. HEDLUND:  Good morning, Judge.  I hope your

15    vacation plans still held and that you are on Kauai.  I don't

16    want to pry into your personal whereabouts, but I hope you are

17    getting some time away.

18          THE COURT:  Well, thanks.

19          MR. HEDLUND:  And as always, we appreciate your time.

20          THE COURT:  No problem.

21          MR. HEDLUND:  Excellent.

22          So, yes, I think I will take those topics kind of in

23    reverse order as to how Mr. Foote laid them out.

24          In terms of discovery and depositions, everything has

25    been sort of proceeding at pace.  We have been taking some

1    Deere depositions.  We have noticed our first third-party

2    dealer deposition for January 7th to be held in Decatur, and

3    we are planning a few additional dealer depositions.  Deere

4    has also noticed some third-party repair shop depositions.

5    But that process, I believe, at least from plaintiffs'

6    standpoint, has been working well, and the parties are working

7    cooperatively.

8            The parties have been cooperating for sure on ELIPS

9    and EQUIP data.  So, first, the ELIPS data is the data that

10   was produced by John Deere, and it's transactional data that

11   we need for our expert.  They have produced it.  Our experts

12   have done an initial analysis of it, and we sent them a pretty

13   lengthy letter with a lot of questions and data tables on

14   October 21st.  Deere yesterday provided us with a very lengthy

15   response, which I have forwarded to our experts and am waiting

16   for their sort of review and analysis of it, and we are

17   certainly hopeful that with the long response Deere provided

18   to us that we can kind of check ELIPS off, but we still need

19   to consult with the experts.

20           THE COURT:  Okay.

21           MR. HEDLUND:  The EQUIP data, which Your Honor

22   probably recalls, is the data that the dealers own but that

23   Deere maintains.  So we have been in a situation where Deere

24   has been pulling that data and then providing it to the

25   dealers for their review and reproduction.

1          We spoke at our conference, which I guess was just

2    about three months ago, and at the time -- I went back and

3    looked at the transcript -- I was pretty optimistic that

4    everything was on its way.  In fact, EQUIP data was produced

5    around that time.  However, when our experts reviewed it, they

6    discovered certain issues that we raised with Deere, and they

7    have since told us, just Tuesday this week, that they are

8    working on it.  But it seems like there is an issue, and they

9    are going to produce corrected datasets to the dealers as

10   quickly as possible, and then at which point the dealers will

11   review it again and produce it to us.

12          So, once again, I am hopeful that this is going to

13   wrap this up, but, again, we need to get the corrected data,

14   and we need it soon because all along with our schedule, we

15   have been looking at sort of a six-month cushion for our

16   experts to work with the data from Deere, and under the

17   current schedule our reports are due on May 30th.  So we are

18   starting to creep into that.  But at this point, we are

19   waiting to see what the corrected data is and then get it to

20   our experts to analyze.

21          So I will pause in case you have any questions on any

22   of that, and then I can talk about the common-interest issue.

23          THE COURT:  Yes, maybe this is a question for Deere.

24   My notes are reflecting there was one dealer holdout who was

25   not agreeing to reimburse Deere, but maybe that's a question

1    for Deere, not for you.

2         MR. HEDLUND:  Well, yes, I'm happy to speak to it,

3    and then Deere may have something to add.

4         THE COURT:  Okay.  Sure.

5         MR. HEDLUND:  There is still that party out there,

6    but we sort of held off on moving forward until we are sort

7    of -- until we have got what we understand to be the correct

8    data.  So that issue is still there, but, like I said, we want

9    to make sure that we get correct data from the ones who are

10   cooperating, and then we would pick that up.

11        THE COURT:  And then you know what to jump on that

12   dealer for.  Okay.  That makes some sense.

13        MR. HEDLUND:  Yes.

14        THE COURT:  All right.  Okay.  Go ahead, and let's

15   talk about common interest.

16        MR. HEDLUND:  Yes.  Okay.  As with most cases, I

17   still remember our initial status conference when I think you

18   indicated that you were going to be spending the weekend

19   reviewing privileged documents to rule on their assertions.

20   We, not surprisingly, have privileged documents that are at

21   play here.

22        I think the current log, which is Deere's

23   third-amended privilege log, which we received earlier this

24   month, has 5300 entries or assertions of privilege.  961 of

25   those deal with the common-interest exception.  So that's a

1    large sort of portion of them.  So that's what we have been

2    focusing our efforts on initially, and specifically we have

3    been focused on the documents that we mentioned on the last

4    conference that were produced by a third party, AEM, the

5    Association of Equipment Manufacturers.

6            THE COURT:  Right.

7            MR. HEDLUND:  Those documents, we subpoenaed them in

8    October '23.  They produced the majority of their documents

9    by the end of '23 and some additional documents in April of

10   '24.  When they produced those documents, they did not assert

11   privilege over any of those.  Then in September of this year,

12   Deere advised plaintiffs and AEM that they claimed certain

13   documents were protected under common interest.  AEM took,

14   essentially, no position, but Deere clawed back the documents,

15   and plaintiff complied with all the requirements of the 502(d)

16   order in terms of not looking at the documents.

17           So in a nutshell, the parties have been meeting and

18   conferring about the privilege log entries for these

19   common-interest documents.  We have been seeking more

20   information that would help us better assess those documents,

21   which include things like headers from the emails -- or, in

22   essence, the non-privileged portion -- and more detailed

23   descriptions about the nature of the asserted common-interest

24   privilege.  It is plaintiffs' position that Deere has

25   essentially asserted somewhat boilerplate descriptions, and we

 1   would like more specificity, and we seem to be at an impasse

 2   in terms of providing additional information.  They did

 3   provide some additional information, but I think we would like

 4   more.

 5           But the more I think about this, I think we may be to

 6   a point where we understand the common-interest privilege to

 7   be a somewhat narrow privilege.  It is kind of an exception to

 8   the rule that no privilege attaches to communications between

 9   a client and an attorney in the presence of a third person.

10   I'm not going to argue, but there is a case in the Northern

11   District of Illinois, the *Dealer Management Systems* case,

12   which sort of addresses these issues and the fact that the

13   burden is on the defendant, and if they are asserting such a

14   privilege, that it has got to be kind of a legal interest as

15   opposed to a business or rooting interest.

16           But I think at this point it probably makes sense for

17   us to get a motion on file, lay out the history for the Court,

18   and then if the Court is willing to undertake some in-camera

19   review of the documents and make a call on sort of a smaller

20   subsection of the common-interest documents, I think that

21   would assist the parties in kind of going forward with regard

22   to the larger group of the common-interest documents.

23           So I'm happy to talk about timing for a motion, but

24   that's where we are at from plaintiffs' perspective.

25           THE COURT:  Okay.  And, again, these might be

1    questions better suited for Deere, but I was scribbling on my

2    notes over here, and it says, "Sample, selected versus

3    random."  You haven't seen the documents -- well, maybe

4    somebody saw the documents somewhere in the process, but I'm

5    just curious -- and, again, maybe it's a better question for

6    Deere -- whether there is some consistency, whether there is

7    certain tos and froms that are consistent, there is patterns

8    that I think that I can make a call in looking at less than

9    961 documents.  But, again, maybe that's a better question for

10   Deere than for you.

11            And then I don't want to do this backwards, but I'm

12   trying to save time and money.  It might -- and I can't

13   believe I'm saying this.  It might be more efficient to do an

14   in-camera review before you file stuff.  I look at it, I have

15   a good sense, and then we can have an argument hearing.  You

16   can file briefs if you want, that's fine, but I can at least

17   look at the documents and tell you what my initial thoughts

18   are, instead of you just filing sort of a blunderbuss, entire

19   waterfront -- I know I'm mixing metaphors here -- motion to

20   compel, and then you are responding, and then me finally

21   looking at the documents, and then I'm able to focus and drill

22   down on what specifically seems to be at issue.

23            But if you want to file a motion to compel and fill

24   up 15 pages, that's fine with me too.  I'm just trying to

25   figure out something that is quicker and cheaper for you.

1          MR. HEDLUND:  Yeah, sure, Your Honor.  I mean,

2    obviously, we are happy to proceed however the Court would

3    like.  I mean, I think any motion we would file would be

4    mostly just sort of laying out kind of the history of things,

5    although I think I have sort of done that on the call, and

6    then sort of just probably citing to a few cases that address

7    the common-interest privilege, although I suspect, Your Honor,

8    with your background as a magistrate judge, and now as an

9    Article III, it is probably not anything new to you.

10          So I would have to talk with Mr. Wexler and Mr. Foote

11   and Mr. Zapala, but I would be open to doing something like

12   that.  I think it is probably possible that we could come up

13   with sort of a sampling of documents that you could look at,

14   unless Your Honor is so inclined and wants to go through 961.

15   But I do think there will be some similar patterns or

16   assertions that Deere has made which if you decide in their

17   favor that this is a privilege properly asserted, then it will

18   help us sort of move forward with thinking about the others

19   and vice versa.  If you rule that maybe it has been asserted

20   too broadly, then maybe that would lead to --

21         THE COURT:  You are breaking up a little bit.  I

22   don't know if you are breaking up just on my call.

23         Can you hear?

24         MR. HEDLUND:  Sorry.  Yes, I can.

25         THE COURT:  I got the general gist.  That's helpful.

1           I'm going to bounce over to Deere now.

2           MR. HEDLUND:  Perfect.

3           THE COURT:  If you don't mind, let's do it on what we

4    just talked about on the common interest.  So, again, you have

5    seen the documents.  I haven't.  Is there categories?  Have

6    you put them in certain buckets?  Are they all just random and

7    there is no common thread to them?  Just talk to me about

8    that, and we'll figure out a way to get an answer to it.

9           MR. LEE:  Your Honor, this is Corey Lee with Jones

10   Day for John Deere.  I'm happy to address this question for

11   you.

12          So at least from my point of view, I think there is

13   probably two large buckets where you can put the documents in.

14   One is is there a common interest amongst members of the same

15   trade association when sharing legal advice related to certain

16   issues, and then probably a second bucket would be --

17          THE COURT:  I have got like every third word, I

18   think, you are saying.

19          MR. LEE:  Am I breaking up for others?

20          MS. LIPSCOMB-JACKSON:  You are not breaking up.

21          Your Honor, you are breaking up on our end.

22          THE COURT:  I'm breaking up on your end?

23          MR. LEE:  Yes.

24          MS. LIPSCOMB-JACKSON:  Yes, Your Honor.

25          MR. LEE:  Hopefully, we will get a strong connection

1    here, and you will be able to hear me going forward.

2

3              THE COURT:  Okay.

4              MR. HEDLUND:  And maybe if I could just suggest -- I

5    don't know if this will help -- that anyone who is not

6    speaking, so maybe other than Mr. Lee and the Court, and the

7    court reporter or the staff, maybe if everybody would just

8    mute, maybe that will help.  I don't know.

9              THE COURT:  That's what I'm doing.

10             MR. LEE:  Hopefully we will be successful here in try

11   number two.

12             Your Honor, at least from John Deere's perspective, I

13   think there are largely two buckets where at least we can

14   group the documents.  One is is there a common interest where

15   legal advice is being shared among organizations that are

16   members of the same trade association, and then probably a

17   second bucket is is there a common interest when various trade

18   associations are sharing legal advice between themselves.  So

19   that is probably the largest two buckets I see.

20             I don't know if plaintiffs also intend to challenge

21   whether legal advice itself is being shared versus business

22   advice or lobbying strategy, but if that is the case, then

23   there will be three buckets; is there business advice or lobby

24   advice versus legal advice and what is the scope of the common

25   interest.  Is it limited to members of one trade association?

1   Can it be shared amongst various trade associations?  Or does

2   it not exist at all?  But that's, I think, high level, how I

3   see it.

4        And we are happy to do some early sharing if the

5   Court would like us to do so before going into full briefing,

6   but we do think some sort of short letter brief or position

7   statements will be helpful to give the Court context around

8   what it might see in the documents because many times it is

9   not apparent on the face of the document who the various

10   players are who are participants in the communication.

11        THE COURT:  Okay.  So I have got the three buckets.

12   How many documents do you think are going to be encompassed in

13   those of the 961, or does this describe all the 961?

14        MR. LEE:  So I think we have been working -- when

15   plaintiffs had mentioned there have been various privilege

16   logs served, that, in large part, is because plaintiffs have

17   asked for additional information, and John Deere has been

18   willing to provide it in an attempt to try to resolve this

19   issue without Court intervention.  In their last ask, they

20   asked for some very detailed information for a set of, I

21   believe, about 15 documents.  I think that is probably a large

22   enough set to give a lot of context to the issues being seen,

23   but of course if plaintiffs think they need more than that set

24   of documents, I'm open to it.  But it seems like they have

25   been using a set of about 15 documents as exemplars or

1    illustrative of a larger set.

2         THE COURT:  Okay.  That is helpful.

3         Mr. Hedlund, is that kind of what you are looking at,

4    or was that your initial attempt, but there is more?

5         MR. HEDLUND:  I mean, we have been focused on 15,

6    although I would just like to sort of have some follow-up

7    conversations with some of my co-counsel on whether or not

8    they think there would be some additional ones that we would

9    like to add.  But certainly it is not our view that you should

10   look at 961.  So whether it would be 15 or perhaps a slightly

11   larger number, we are happy to look into that and discuss with

12   John Deere and make a proposal.

13        THE COURT:  All right.  Let me ask you this, knowing

14   full well that you haven't seen the documents:  My concern is,

15   say, I say some or all of them need to be produced.  Is that

16   going to cause additional fact discovery, which is then going

17   to delay expert discovery?  Again, you haven't seen the

18   documents, but tell me what your thoughts are.

19        MR. HEDLUND:  That's a fair question, Your Honor, and

20   a bit difficult to answer.  I mean, I could imagine the

21   scenario where certain documents which we haven't seen are

22   reproduced and they implicate a 30(b)(1) witness who we have

23   already deposed, in which case we would maybe want to ask some

24   additional questions related to those documents, but I can't

25   say for sure.  I mean, if that were to happen, I think the

1   parties would work cooperatively if it was going to be a very

2   sort of limited additional deposition, that we could do it

3   remotely and have the time be focused on those documents.

4   But, again, since we don't have the documents to look at, I

5   can't say for sure.

6          MR. LEE:  Your Honor, this is Corey Lee for John

7   Deere.  Having seen the documents, I wouldn't say it is never,

8   but I would be very surprised if plaintiffs find themselves

9   wanting to take additional, going back to previous witnesses

10  and take large amounts of discovery based upon what is in

11  them.  That is to say I just don't think there is that much

12  new in the material that is being withheld that they would

13  find themselves in the position of needing to take a large

14  amount of additional discovery.

15         THE COURT:  Okay.  That's helpful.

16         Today is the 19th, Thursday.  We're right in

17  everybody's holidays here.  If the parties just want to get

18  together and propose -- I mean, I don't want to go through a

19  whole formal briefing schedule with two weeks, two weeks, one

20  week, and all that.  Obviously, folks have given a lot of

21  thought to this.  But, again, it is the 19th.  We can do,

22  again, I think -- I'm going to look at the documents.  I will

23  be glad to read what you submit.  But I think my inclination

24  of how it is going to shake out is I will read what you send,

25  I will look at the documents, and I'm going to have some

1    special-type questions that I'm going to have to get more

2    answers to to make the ultimate legal determination.

3          So having said that, and it's your guys' schedule,

4    when can you get me some filings so I can start the process?

5          And just so you know, because I have made the mistake

6    of going on vacation, my month of January is jammed solid, and

7    then I don't want to go much further than that.  But I will

8    find some time to get you in in January if needed.

9          Let's see here.  Hold on.

10         MR. LEE:  So, Your Honor, just to make sure I'm

11   understanding --

12         THE COURT:  Go ahead.

13         MR. LEE:  -- are you thinking we will provide a

14   limited set of documents with simultaneously provided position

15   statements, something like that?

16         THE COURT:  Yes, yes, and then I will look at -- I

17   will read everything, I will look at everything, and then we

18   will talk before.  Before I make any decisions, we will talk

19   again.

20         MR. FOOTE:  Judge, from the plaintiffs' position, I

21   would think the first week of January, if Corey

22   agrees -- this is Bob Foote for the reporter -- we could get

23   together for the protocol in terms of documents, not too many

24   exceeding 15 on the three buckets, and from the plaintiffs'

25   perspective, get you our summary of what we think the law is.

 1   If that works for Corey or Deere, we could do that the first

 2   week of January.

 3          MR. LEE:  I'm open to doing that.  I think

 4   probably -- in all honesty, our client is basically closed

 5   from the 20th until about the 6th, but we are happy to do what

 6   we can here on the lawyers' side and even the plaintiffs.  But

 7   we're probably looking at something the week of the 6th as far

 8   as submitting things, is reasonable or doable.  It depends on

 9   how, Bob, the documents are and just knowing that we are not

10   going to have access to our client until, basically,

11   January 6th.  But we are happy to work with plaintiffs here in

12   the new year and get this process moving as quickly as we can.

13          THE COURT:  Okay.  That works.  Let me do this --

14          MR. FOOTE:  Your Honor --

15          THE COURT:  Go ahead, Mr. Foote.

16          MR. FOOTE:  I'm sorry, Judge.  I was just trying to

17   pick a date with Corey now.

18          But how about the 10th, if that works for the Court

19   and you, Corey?  That's a Friday.

20          MR. LEE:  The 10th as far as filing, or having

21   position statements on the 10th?

22          MR. FOOTE:  Yes.  We are getting our joint agreement

23   on how many documents, and then everybody filing their short

24   little memos on what they believe is important, to do that all

25   on the 10th.

1      MR. LEE:  Yes, that seems fine as long as we build in

2  some time to make sure we know what the buckets are.  But that

3  seems reasonable.

4      THE COURT:  Okay.  All right.  Let's do this:  How

5  about we schedule it for a telephonic on the 24th at 1:30 in

6  the afternoon Central Time, and if it needs to be in person, I

7  will let you know as soon as possible.

8      MR. FOOTE:  That's fine with us, Your Honor, for

9  plaintiffs.

10      MR. LEE:  January 24th, that works, Your Honor.

11      THE COURT:  All right.  We will put it for a

12  telephonic currently, but if it is going to be a full-blown

13  argument, those don't work telephonically.  But I will let you

14  know as soon as possible.

15      MR. FOOTE:  That sounds good.

16      THE COURT:  All right.  That will take care of the

17  common-interest privilege issue.

18      Mr. Lee, I didn't want to cut you off.  We were

19  talking also about the EQUIP data/ELIPS data and any

20  depositions.  Or Ms. Lipscomb-Jackson?  Or anything else you

21  want to talk about, we can do that.

22      MR. LEE:  Your Honor, I can just give you a little

23  bit more background on the EQUIP data.

24      So as we discussed before, EQUIP is kind of a system

25  that is a competitor to, like, a CDK, which is used for other

1   dealers, and, in fact, some John Deere dealers actually choose

2   to use CDK instead of using EQUIP.  So that's the kind of

3   system we were talking about here.

4        To date, there are three buckets of data that

5   plaintiffs will be getting from EQUIP:  There is data relating

6   to whole goods being finished parts, data related to parts for

7   repair, and data related to services.  As far as I know, the

8   datasets for whole goods and parts have been completed and

9   provided to the dealers, so John Deere has nothing left to do

10  there, and that is fully within the domain of the dealers as

11  far as that data produced.

12       As it comes to the services data, plaintiffs did

13  raise an issue where a second set of data was not being

14  collected by queries, but also asked for some additional

15  fields of data to be provided.  We have been working with the

16  dealers and they have agreed to provide those additional

17  fields.  So what we are really talking about is one of the

18  three buckets of data where we are working to finalize them,

19  and I can tell the Court that we have run three samples of

20  that data this week.  I think we have it to the place where it

21  is going to be good, but the dealers right now are choosing

22  sample data before we run a wholesale collection to be

23  provided to all the dealers at issue.

24       So I feel pretty good that we are moving in the right

25  direction there.  This is not an instance where we are

1  thinking about what we are going to do, but we actually have a

2  solution that is being implemented as far as the EQUIP data

3  goes.

4         THE COURT:  Okay.  Well, that's good.  You have moved

5  beyond the idea of a plan or plan of an idea.  So that's

6  great.

7         MR. LEE:  Yes, Your Honor.

8         THE COURT:  Okay.  Go ahead.

9         MR. LEE:  Tiffany, do you want to speak to dealer

10 depositions or would you like me to?

11        MS. LIPSCOMB-JACKSON:  You can go ahead, Corey.

12        MR. LEE:  Your Honor, I think the plaintiffs have,

13 for the most part, covered most of what we have there on

14 depositions.  There are a couple of wrinkles that might be

15 coming up.  We issued some subpoenas to other manufacturers of

16 tractors.  We have been in a meet-and-confer process there.

17 We are very hopeful that we will be able to resolve that

18 without the Court having to intervene, but I just wanted to

19 let you know that is a bucket of depositions that also we are

20 trying to work through the proper scope and timing of those

21 depositions.

22        Also in this case, one of the owners of one of the

23 plaintiffs' companies has some health issues, so the parties

24 have agreed to a Rule 31 deposition by written questions

25 there.  So that's something a little unusual that the parties

1   have been able to work out to deal with some issues there as

2   well.

3          THE COURT:  Okay.  No one has ever done a Rule 31

4   deposition in any cases I have had.

5          MR. LEE:  I can honestly say this will be my first

6   one.

7          THE COURT:  It happens.  I did it as an attorney a

8   long time ago, only one time.  But, you know, if someone has

9   health issues, and that's the solution, that's fine.

10         Okay.  All right.  Anything else on Deere's side you

11  want to talk about?

12         MS. LIPSCOMB-JACKSON:  Nothing else from Deere, Your

13  Honor.

14         THE COURT:  Okay.  Any follow-up on the plaintiffs'

15  side?  Mr. Hedlund?  Mr. Foote?

16         MR. FOOTE:  No, Your Honor.  Bob Foote.

17         MR. HEDLUND:  Nothing.  Yes, Dan Hedlund.  Nothing

18  for me either.

19         THE COURT:  Okay.  All right.  I will take a look at

20  the filings when they come in, and then we will talk on the

21  24th at 1:30.  Like I said, I will keep it for a telephonic.

22  If I need to have you in person, I will let you know as soon

23  as possible, okay?

24         MR. FOOTE:  Thank you, Judge.

25         MR. HEDLUND:  Judge, that's good.

1       MS. LIPSCOMB-JACKSON:  Thank you, Your Honor.

2       MR. HEDLUND:  I wanted to raise -- Dan Hedlund

3   again -- one question as we go through this process of

4   submitting the documents, and I just haven't thought of sort

5   of how this will play out.  But will plaintiffs essentially be

6   able to see the challenged documents or just Deere and the

7   Court?  I just want to be clear on how it will work.

8       THE COURT:  I think Deere is going to provide them to

9   me, and then I will eyeball them.

10      MR. HEDLUND:  Perfect.  I just wanted to get that

11  straight.  Thank you.

12      THE COURT:  All right.  Thanks, everybody.  Happy

13  holidays.  I will see you soon.

14      MR. FOOTE:  Thank you, Judge.

15      MS. LIPSCOMB-JACKSON:  Thank you, Your Honor.

16      MR. LEE:  Thank you, Your Honor.

17      MR. HEDLUND:  Thank you, Your Honor.  Happy holidays.

18    (Which were all the proceedings heard.)

19                      CERTIFICATE

20    I certify that the foregoing is a correct transcript from

21  the record of proceedings in the above-entitled matter.

22  */s/Heather M. Perkins-Reiva*          *December 19, 2024*

23  _____        _____

    Heather M. Perkins-Reiva                    Date
24  Official Court Reporter

25