IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

IN RE:  DEERE & COMPANY REPAIR    )  Case No. 22 CV 50188
SERVICES ANTITRUST LITIGATION     )
                                  )
_____    )
FEDERAL TRADE COMMISSION,         )  Case No. 25 CV 50017
et al.,                           )
                    Plaintiffs,   )
        v.                        )
                                  )  Rockford, Illinois
DEERE & COMPANY,                  )  February 27, 2025
                    Defendant.    )  9:07 a.m.

TRANSCRIPT OF PROCEEDINGS - TELEPHONIC STATUS HEARING
BEFORE THE HONORABLE IAIN D. JOHNSTON

APPEARANCES:

For the MDL Plaintiffs:    FOOTE, MIELKE, CHAVEZ & O'NEIL LLC
                           BY:  MR. ROBERT M. FOOTE
                           1541 E. Fabyan Parkway, Suite 101
                           Geneva, IL  60134

                           GUSTAFSON GLUEK PLLC
                           BY:  MR. DANIEL C. HEDLUND
                           120 S. Sixth Street, Suite 2600
                           Minneapolis, MN  55402

                           WEXLER BOLEY & ELGERSMA LLP
                           BY:  MR. KENNETH A. WEXLER
                           311 S. Wacker Drive, Suite 5450
                           Chicago, IL  60606

                           WILLIAMS MCCARTHY LLP
                           BY:  MR. MARC C. GRAVINO
                           120 West State Street
                           Rockford, IL  61105

For the FTC and            FEDERAL TRADE COMMISSION
Attorneys General          BY:  MS. LAURA R. HALL
Plaintiffs:                     MS. SOPHIA QASIR
                                MS. MELISSA WESTMAN-CHERRY
                           600 Pennsylvania Avenue NW
                           Washington, DC  20580

OFFICE OF THE ARIZONA
ATTORNEY GENERAL
BY:  MR. ROBERT A. BERNHEIM
     MS. SARAH PELTON
2005 N. Central Avenue
Phoenix, AZ  85004

ILLINOIS ATTORNEY GENERAL'S OFFICE
BY:  MS. JENNIFER M. CORONEL
115 S. LaSalle Street, 35th Floor
Chicago, IL  60603

MICHIGAN DEPARTMENT OF
ATTORNEY GENERAL
BY:  MS. LEANN D. SCOTT
P.O. Box 30736
Lansing, MI  48909

OFFICE OF THE MINNESOTA
ATTORNEY GENERAL
BY:  MS. KATHERINE A. MOERKE
     MS. ELIZABETH R. ODETTE
445 Minnesota Street
Saint Paul, MN  55101

WISCONSIN DEPARTMENT OF JUSTICE
BY:  MS. CAITLIN M. MADDEN
P.O. Box 7857
Madison, WI  53707

For the Defendant:        JONES DAY
                          BY:  MS. LIN W. KAHN
                          555 California Street, 26th Floor
                          San Francisco, CA  94104

                          BY:  MR. COREY A. LEE
                          901 Lakeside Avenue East
                          Cleveland, OH  44114

                          BY:  MS. TIFFANY D. LIPSCOMB-JACKSON
                          325 John H. McConnell Boulevard
                          Suite 600
                          Columbus, OH  43215

Also Present:
For Case New Holland:     MAYER BROWN
                          BY:  MR. WILLIAM H. STALLINGS
                          1999 K Street NW
                          Washington, DC  20006

For AGCO Corporation:      NELSON MULLINS
                           BY:  MR. STEVEN J. CARROLL
                           201 17th Street NW
                           Atlanta, GA  30363

Court Reporter:            Heather Perkins-Reiva, RDR, CRR
                           327 S. Church Street, Room 5406
                           Rockford, IL  61101
                           (779)772-8309

                        *   *   *   *   *
                  PROCEEDINGS REPORTED BY STENOTYPE
       TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE CLERK: Calling cases 22 CV 50188, *In re Deere & Company Repair Services Antitrust Litigation*, and 25 CV 50017, *Federal Trade Commission, et al. v. Deere & Company*.

THE COURT: Good morning, everybody. Sorry for the delay. I had some computer problems.

So you know, there is -- by last count, I think there is 30 folks on the line. I don't know if it is all counsel, if there is other people on the line.

Oh, geez. Okay. I don't know if you heard any of that. All right. Let's start over.

MR. FOOTE: We did, Judge.

THE COURT: Okay. So we are going to -- we have called both cases. We are going to start by getting appearances for plaintiffs' counsel in the MDL and because we have so many people on the line, when you are not talking, make sure you mute, all right?

So let's start with the plaintiffs' counsel in the MDL. I assume Mr. Foote is going to lead it off?

MR. FOOTE: Thank you, Judge. Yes, Robert Foote. We have myself, Marc Gravino, Dan Hedlund, Ken Wexler, and Adam Zapala on. At least those are the folks who may talk, Judge.

THE COURT: Okay. Thank you.

All right. And remember to state your name before you -- or when you first start talking so that we keep a clean

All right. And who do we have on the line for Deere in the MDL?

MS. LIPSCOMB-JACKSON: Good morning, Your Honor. You have Tiffany Lipscomb-Jackson and Corey Lee on behalf of John Deere in the MDL.

THE COURT: Okay. Thank you.

All right. And then let's go to plaintiffs' counsel in the FTC -- I will think of a better name for it. We are just going to call it "the FTC case" for now. So let's get plaintiffs' counsel for that case.

MS. HALL: Thank you, Your Honor. Laura Hall, Melissa Westman-Cherry, and Sophia Qasir for the Federal Trade Commission. And for our co-plaintiffs, we have Jenny Coronel for Illinois; Sarah Pelton and Robert Bernheim for Arizona; LeAnn Scott for Michigan; Elizabeth Odette and Katherine Moerke for Minnesota; and Caitlin Madden for Wisconsin.

THE COURT: All right. So we have a bunch of new states -- well, they are not new, but new states in joining the case. Okay. That is something else --

MS. KAHN: Good morning, Your Honor. This is --

THE COURT: Hold on.

MS. KAHN: My apology. This is Lin Kahn with Jones Day on behalf of Deere.

THE COURT: Did you get that, Heather?

THE REPORTER:  Yes.  Thanks, Judge.

THE COURT:  I didn't.  There we go.  Jones Day.

All right.  Did I cut anybody else off for John Deere in the FTC case?

MS. KAHN:  Yes, Your Honor.  This is Lin Kahn with Jones Day on behalf of John Deere.

THE COURT:  Okay.  We got that.  I just didn't know if there was anybody else.

MS. KAHN:  That's it.

THE COURT:  All right.  So is the door shut on new states entering this litigation?

MS. HALL:  Yes, Your Honor.

MR. FOOTE:  May I interrupt?  Robert Foote.

THE COURT:  Go ahead, Mr. Foote.

MR. FOOTE:  There may be counsel -- there may be third-party counsel on also, Your Honor.

THE COURT:  Yes.  Thank you very much.  I appreciate that.

Yes, the third parties, let's get appearances for the third parties.

MR. STALLINGS:  Yes, Your Honor.  This is William Stallings on behalf of Case New Holland.

MR. CARROLL:  And, Your Honor, this is Jake Carroll on behalf of AGCO Corporation.

THE COURT:  I thought there was a third person that

was kind of hanging around.  Is that it?

MR. CARROLL:  So there is Gilbert Keteltas from Baker Hostetler, but he is not joining us this morning.

THE COURT:  Okay.  All right.

MR. CARROLL:  We are just going to --

THE COURT:  Thank you, Mr. Foote.  I appreciate that.

Let's go back to my initial plan.  I want to talk about the MDL first and then talk about the FTC case again.  I will use that moniker for today, before I come up with a better term.

So I saw the proposed case management order.  I didn't have many issues with the proposed changes; I was okay with them, but I tried to explain my concern about combining the briefing of *Daubert* motions with class cert.  So I don't know if I articulated myself any better, worse, or made any more sense, but that's my concern.  I did the best way I could to articulate my concerns.  I do, again, recognize that the idea was to try to have parallel tracks and consistency with the FTC case and the MDL, and that may have been some of the thinking and rationale behind the proposal.  Over the weekend -- it wasn't this weekend; it was last weekend -- I came to the clear conclusion that keeping these things on the same tracks is a complete fool's errand.

So let me start with the plaintiffs' counsel in the MDL.  Talk to me about your thoughts on having briefing on

*Daubert* and class cert at the same time. Maybe I changed your mind; maybe I didn't. Let's just talk about that. I'm open. I have not foreclosed anything. I would like to hear from counsel on both sides.

MR. FOOTE: Thank you, Judge. Robert Foote.

I think we have just agreed to conform to your minute order in terms of the scheduling, and we are working with Deere on a new proposal for you that includes bifurcation, and we hope to have that to you by next Wednesday, the 5th of March.

THE COURT: Okay. So the new proposal, it will be bifurcated?

MR. FOOTE: Yes, Judge.

THE COURT: Okay.

MR. FOOTE: We also are working with the FTC folks to try to make, as close as we can, efficiencies in terms of the two separate cases, but I will let the FTC talk to that. But we have all been talking, Judge.

THE COURT: Okay. I appreciate that. So you said next Wednesday, you think?

MR. FOOTE: Yes, Judge.

THE COURT: Okay. All right. Next Wednesday for revised proposed CMO.

And I think that will address the main issue that we had in the MDL case, other than I know I wanted to briefly talk about this: There were -- I don't think it was ever labeled a

motion, and it is not showing up with a little gavel on our system, so it is not labeled as a motion on our system, but I had position papers on the common-interest doctrine. I have read those. We have looked at the filings, looked at everything that was provided in camera. I have got some thoughts. I haven't gotten any -- I don't have a draft order yet. But before I finalize that, I wanted to give the parties the opportunity to tell me anything else they wanted to tell me on the common-interest doctrine issue.

I will start with the MDL plaintiffs. If there is anything else you want to tell me, I will be glad to hear it.

MR. HEDLUND: Good morning, Judge. Dan Hedlund.

Can you hear me okay?

THE COURT: Yes.

MR. HEDLUND: Yes. Okay. Sorry. Dan Hedlund, Gustafson Gluek, for the MDL plaintiffs.

I felt that when we appeared before Your Honor in court, we addressed what we needed to. You know, sort of the parting thought that I just always like to bring up is sort of the narrow scope of this privilege. You know, we just would like to see it remain narrowly construed. But I'm sure Your Honor is aware of all the case law sort of dealing with that issue. So other than that, I don't have anything to add.

THE COURT: Okay. I just like to give counsel the opportunity. You know, sometimes after sentencing,

2:00 o'clock in the morning, 2:00 o'clock in the next day, I wake up in a cold sweat and say, "Oh, my God, I should have said this at the sentencing," and it's too late. So I'm just giving you folks the opportunity.

MR. HEDLUND: I appreciate it, Judge.

THE COURT: Okay. And then, Mr. Lee, anything else to add on the common-interest doctrine issue?

MR. LEE: Your Honor, I think we, for the most part, covered what we needed to, both in our papers and before the Court. I recall the Court had some skepticism about the common interest applying when there are communications between trade associations. I would just like to remind the Court, if you factually look at the situations and circumstances under which those trade associations were sharing documents, you really will see an identical legal interest between those trade associations, so that we think the common interest should apply. But otherwise, unless Your Honor has any questions, I think we have given Your Honor enough information to make a decision.

THE COURT: All right. Thank you, Mr. Lee.

Okay. We will get something to you on that ASAP. I appreciate that.

All right. I'm going to shift over to the FTC case.

MS. LIPSCOMB-JACKSON: Your Honor --

THE COURT: Who is talking?

MS. LIPSCOMB-JACKSON: Sorry. Tiffany Lipscomb-Jackson, Jones Day.

THE COURT: Go ahead.

MS. LIPSCOMB-JACKSON: Tiffany Lipscomb-Jackson, Your Honor.

Yes, just one issue that we saw with your order on the case schedule. You had set a deadline for June 1st for the 26(a)(2)(C) disclosures. That is actually a Sunday. So when we submit the new schedule next week with the bifurcated *Daubert* and class cert briefing, we would propose to set that deadline for June 2nd, which is the Monday following the deadline the Court had entered.

THE COURT: That's fine. That's fine. I apologize for that. I was trying to avoid that, but clearly I didn't. So, yes, June 2nd is fine.

MS. LIPSCOMB-JACKSON: Okay. Great. Thank you, Your Honor.

THE COURT: All right. Thank you. I appreciate that.

Anything else on the MDL that you want to talk about before I shift over to the FTC case? I'm probably going to bounce back to the MDL case, but I'm going to shift over to the FTC case for now. But anything else to talk about?

MR. FOOTE: Nothing else, Judge. Robert Foote.

THE COURT: Okay.

MS. LIPSCOMB-JACKSON: Tiffany Lipscomb-Jackson.

Nothing for Deere, Your Honor.

THE COURT: All right. Thank you.

Okay. I don't even know what to start with, other than that I think it is the fairly obvious view that if we tried to marry the schedules, we can do it close, but we are not going to be able to have something that is going to go hand-in-hand. And, look, there is no way that this case is not going to slow down the MDL. I would hope that after everybody left court, and then everybody filed their filings, and they all looked at them -- maybe you all didn't look at them collectively because you don't have to, but I do because it all comes to me -- that's the first thing that came to mind is there is no way that these are going to -- that the FTC case is not going to interfere with the timing of the MDL.

So I'm going to back up a little bit on the FTC case. I didn't read the transcript. I think --

Heather, did people order the transcript?

THE REPORTER: Yes.

THE COURT: Okay. So people ordered the transcript. Great. I didn't read it. But I have a very distinct recollection -- people can correct me if I'm wrong -- I have a very distinct recollection that there were allusions to, references to, statements that the FTC and John Deere were talking settlement and maybe even close to reaching a settlement in the enforcement action.

Did I just make that up? Or was that told to me? And if it was told to me, is that really accurate?

I will start with the FTC.

MS. KAHN: Your Honor, Lin Kahn on behalf of Deere. I'm happy to start first and then hand the floor over to FTC counsel.

There was, in fact -- you are correct. There was some discussion about settlement discussions at the tail end of the investigation. FTC had approached Deere with a request to send them something to consider along the lines of what the company has been planning, in any event, with respect to repairability. Those discussions obviously did not lead anywhere as the FTC filed a lawsuit before they sent over a counterproposal hours after filing the lawsuit. We are, you know, open to continue discussions, but at this point, you know, also focused on moving the litigation forward.

THE COURT: Okay. All right. Thank you. I appreciate that.

All right. Let's hear from the FTC.

MS. HALL: Thank you, Your Honor. Laura Hall for the FTC.

I would say Ms. Kahn's description sounds about right to us. We are open to continuing to talk, but we don't think that we are particularly close at this moment, and so we are focused on progressing the litigation.

THE COURT: Well, are you not close now? Are you further apart than you were before the case was filed here?

MS. HALL: I don't think we have had sufficient -- I don't think our back-and-forth has really moved us from where we were when the case was filed at this point.

THE COURT: Okay. Maybe I didn't ask the question well enough.

All right. So fair to say there was some discussion about settlement before the litigation was filed in this court, right?

MS. HALL: Deere made a proposal prior to the filing of this litigation, yes.

THE COURT: Okay. All right. So there was some discussion. It sounded like there -- to me, again, that's why I'm asking the question -- it sounded like there was at least some back-and-forth, and maybe -- I'm not saying it was a done deal -- maybe there was some optimism, maybe more on Deere's part and less so on FTC's part.

So let me hear from the FTC. Is what Deere proposed, was it just a dead letter to you? Or did you go, "Ah, there is something in here that we might be able to work with"?

MS. HALL: I would characterize -- Laura Hall for the FTC, Your Honor.

I would characterize our response as starting from a very different philosophical place than Deere's proposal. So

we didn't read it and say we refused to engage, but we proposed a very different paradigm for a settlement.

THE COURT: Okay. I will be brutally honest with you on my theory of settlements. I don't care where people come from philosophically. I don't care at all. It doesn't matter to me one bit. What I care about is reaching a resolution where the parties agree on the ultimate determination, and whether one comes from left field and the other comes from a soccer field, I don't care.

So as far as what you were hoping to get out of a settlement, was there something there to work with?

MS. HALL: Like I said -- again, Laura Hall for the FTC, Your Honor -- like I said, we are continuing to discuss with Deere. If a starting place is they propose something, we propose something, we will go back to them in response to their latest communication. I just wouldn't characterize us as in the same ballpark, to borrow your metaphor, Your Honor.

THE COURT: Okay. All right. Not in the same ballpark.

Are you in the same state?

MS. HALL: That I hope we are, Your Honor.

THE COURT: Okay. How about the same county? How about the same county?

MS. HALL: That might be challenging. I think we have some -- we have a big gap in a lot of the details that would be

required.

THE COURT: Okay. All right. Here is what I'm getting at: Once you put on your litigation armor, it is hard to then -- I'm mixing all kinds of metaphors here -- restart settlement discussions until people spend a lot of time and money and energy, and, likewise, I have done it.

I'm hoping settlement discussions between Deere and the FTC and the states is more akin to a dimmer switch on lights than throwing a bucket of water on a bonfire. How is that for a metaphor for you? Because the first one is pretty easy. The second one is game over, and we are going to be -- you are not going to talk settlement until two years from now. So I'm hoping it is the former, not so much the latter. And if it is the former, now would be the time to talk. But, look, if the parties don't want to talk, they don't want to talk.

MS. KAHN: Your Honor, Lin Kahn --

THE COURT: That's fine.

MS. KAHN: Apologies, Your Honor. Lin Kahn for John Deere.

I just wanted to add to that. We did, in fact, send a proposal that was at FTC staff's request. Their counterproposal, however, was very far from where we started the discussions. In fact, their proposal essentially attempts to regulate innovation and pricing for a long time going forward. And those discussions are continuing. And while we

are certainly open to continuing those discussions, we haven't seen a counterproposal that is close to something that is workable.

THE COURT: Okay. All right. I got it now. Thank you. You know, I was coming at this, based upon my recollection of the conversation previously, with a substantial level of hope which has now been shattered. So I'm not going to waste time on that. You can do it if you want, but I'm not going to do that. That's just a -- that's a waste of the Court's resources.

Okay. So I want to talk about the confidentiality order, protective order with the third parties, because I saw the draft back and forth. I understood the concern about, you know, in-house counsel at Deere having access to it. I got where that was coming from, but I just wanted to make sure, and there was some language in the proposal. So I shot off the order, and then I got a response that gave me some hope. Maybe that hope is shattered too.

So where do we stand on the confidentiality order in the FTC case as it relates to the third-parties' concerns about Deere getting the documents that were produced to the FTC? Wow, that was a lot.

MS. KAHN: Your Honor, Lin Kahn for John Deere.

We have heard the nonparty OEMs' concerns about competitively sensitive information. We are adding an

outside-counsel-eyes-only provision to the protective order. In fact, they raised some issues, and we are accepting those as well, with respect to the outside counsel eyes only. So that will certainly be worked out in short order and should address those confidentiality concerns in full.

THE COURT: Okay. All right. Outside counsel, you agree?

MS. STALLINGS: This is William Stallings for Case New Holland.

That sounds accurate to us, Your Honor, and we look forward to an agreement.

MR. CARROLL: And Jake Carroll for AGCO. That's the same.

THE COURT: Okay. How much time do you think you need to work out the remainder of any issues outstanding with that confidentiality order?

MS. KAHN: I will let Corey -- apologies -- I will let Corey Lee speak up as well. One of the last remaining things, I think we are also communicating with MDL plaintiffs about it and wanted to work something out more broadly. So from our perspective, we are very close, but just waiting for some final sign-offs.

THE COURT: Yes.

MR. LEE: Yes, Your Honor. Corey Lee for John Deere. So basically the --

19

THE REPORTER:  I can't hear him, Judge.

THE COURT:  Hold on a second, Mr. Lee.  We didn't hear you.  Hold on.  We didn't hear you.  Back that up.  Start again.

MR. LEE:  I'm sorry.  Can you hear me?

Okay.  So, Your Honor, the same language that the OEMs have shared in the FTC matter, we have also shared with the MDL plaintiffs in the hopes that they will agree to it as well so that we can have a common set of -- basically, common principles that govern the protective order in both matters since the OEMs are likely to give testimony, if not share documents, in both of those matters.  So I believe Mr. Hedlund for the MDL plaintiffs said they were close to getting back to us as to the language that has been proposed and whether or not it is acceptable to the MDL plaintiffs so that we can have a global resolution of this protective order issue.

THE COURT:  Okay.  Fantastic, because that was the next issue I wanted to talk about, because I was assuming that the MDL plaintiffs' counsel probably wanted to see what was produced by the third parties to the FTC, and they wanted to see how that helps their case, and so they might be interested in getting them at some point.

So, Mr. Hedlund, do you want to weigh in on that?

MR. HEDLUND:  Thank you, Your Honor.  Dan Hedlund for the MDL plaintiffs.

Yes, we have received the proposed changes to the MDL protective order to get it to align with the proposals that are going into the FTC order. I think you are correct, we would like to see the investigative file that the FTC has gathered with respect to its investigation, and we are discussing the terms of it, although, as I'm sure Your Honor has seen, the OEMs, the third parties, are taking the position that we should not see any of what they produced, which to some extent begs the question of what we are agreeing to treat as outside attorneys' eyes only if their position is that we are not going to see anything that they produce. So that is sort of where we are at, but we are considering their changes. But we are, to Your Honor's point, very interested in seeing the entire investigative file or whatever Deere ends up receiving.

THE COURT: Yes. Okay.

MR. STALLINGS: Your Honor, this is --

THE COURT: Go ahead.

MR. STALLINGS: This is William Stallings for Case New Holland.

If I could address that?

THE COURT: Sure.

MR. STALLINGS: We see two distinct issues here. One is that there is discovery that is taking place in what I will call the '22 action, the MDL action. And right now, just so you know, there is discussion about the nonparty OEMs sitting

for depositions. We understand that discovery. We are going to be providing that. The plaintiffs' attorneys in the MDL action will be at those depositions. And for that type of situation, we want an outside-counsel-only provision for deposition and any documents produced in the 2022 action. That's why we are interested in having a confidentiality order in the plaintiffs' action as well.

I think that is totally a distinct issue from discovery in the FTC matter. You know, as you know from the prior status hearing and I know the many papers that we have filed, we consider a lot of the information that the FTC got from us to be, frankly, irrelevant, and we want a process to be able to make those objections.

THE COURT: Yes.

MR. STALLINGS: But that's for the FTC action. The MDL, if the plaintiffs wanted documents from us, they could have -- they subpoenaed us. All right. They did issue a subpoena very early on in their case. We responded. They didn't pursue anything further. And I see the two cases as separate. Just the mere fact that we produced materials for the FTC doesn't mean that plaintiffs would get them.

And just to be frank, Your Honor, of why I raised that, because it did --

THE COURT: Well, let me pause you there. Let me pause you right there. Let me pause you right there because

this goes back to the view that this case isn't going to interfere with the MDL case just doesn't hold water.

I know you want to keep the peas and carrots separate, but if the FTC has these documents, John Deere wants to see them, and I certainly understand why John Deere wants to see these documents because they form the basis of the complaint. They go to John Deere. Plaintiffs in the MDL case want to see the documents. It's a roundabout way. It is not through a subpoena. But I don't know what would prevent the plaintiffs' counsel in the MDL case from simply serving a discovery request on John Deere to say, "Give us those documents." What would stop them from doing that?

MR. STALLINGS: I think, Your Honor --

THE COURT: What Federal Rule of Civil Procedure would stop them from doing that?

MR. STALLINGS: There is no federal rule that would stop them from making the request. I think the protective order that has been -- the ones that have been filed so far and I think the one that is going to be proposed to be filed state that the materials will be used only for this action. We have a protective order in the 2025, the FTC litigation, that says that materials will be used only for that action. So it would then take an order of the court, and obviously Your Honor could order it, to then amend that to give the -- to have John Deere give those materials to the plaintiffs.

But there should be some showing of need, some showing of relevance, proportionality, all the types of issues that are going to come up in the question about whether or not John Deere gets the FTC file, its entire --

THE COURT: That would be for John Deere to squawk about. That's John Deere's fight. That's John Deere's fight. And I can't imagine John Deere coming with a really great argument to me telling me that they can't give those documents that they got from the FTC, in a nice bundle, and just make a copy, and give it to the plaintiffs' counsel in the MDL case. I can't imagine a proportionality argument that they are going to make because they didn't have to rummage around to get them, and they are not privileged, and I think they are relevant. So that would be John Deere's argument to make, and I'm telling you right now I doubt they will ever make it; and, two, if they make it, they are going to lose.

MR. STALLINGS: Well, Your Honor, I think from the nonparty OEM perspective, this is -- it is simply an end run that the private plaintiffs will be using to get documents that they did not request in their litigation. And, yes, obviously, I'm sure the plaintiffs are interested in the documents. They are interested in getting whatever they can from our files. But they never made the request to us. They never let us object. They never let us bring the arguments to you about relevance, proportionality. So then, yes, I totally agree with

you. John Deere won't make any arguments to protect our documents. It is not in John Deere's interest. But, once again, we don't get the chance, then, to make the arguments as to why the documents should not be produced at all.

THE COURT: Couldn't you have made the arguments when the FTC asked for them?

MR. STALLINGS: Your Honor, the FTC has broad investigatory subpoena power.

THE COURT: Sure.

MR. STALLINGS: And the FTC subpoenas, the CIDs that were sent to us, said that they were investigating a wide range of activity. They were investigating John Deere or "any other person" and under a whole range of statutes. And when you are making -- when you are trying to respond to a government investigatory demand, you really cannot make relevance objections. You can make burden objections, but there is not a forum within which to make a relevance objection because the FTC basically gets to decide, you know, what they deem relevant to their investigation, and they don't need to tell the party they are sending an investigative demand to the entire scope of their investigation. So we actually cannot make a meaningful or effective relevancy objection.

THE COURT: What's the FTC's view on that? If the FTC asks for something, are the people -- or the entities that are regulated by the FTC powerless to say, "This is not relevant"?

They can't do anything?

MS. HALL: Your Honor, this is Laura Hall for the FTC.

Actually, in our investigation leading to this case, a motion to quash one of our CIDs was filed in federal district court, after which we withdrew that CID to that party. I would say in general, there is a lot of negotiation about the scope of CID responses. But I would say we have proposed, alongside Deere, a mechanism for dealing with the claims of relevance in this case. In our joint status report, we said we thought they should identify what information they think isn't relevant since there is sort of a known scope of what we have, which of that is not relevant, and then we would meet and confer, and they would have a deadline to file a motion to quash our response to Deere's request for production. And I think that is the correct move under the Federal Rules of Civil Procedure. We have given them notice, as we are required to do, that we would produce the information to Deere. Their response can be to move to quash the RFP from Deere to us as it relates to certain information.

THE COURT: Okay. I'm less concerned about that right now than -- "concern" is not the right word. I'm less interested about that right now because I think that is an easier one than the plaintiffs' counsel in the MDL getting the documents. That's where I see the hang-up.

MR. CARROLL: Your Honor --

MR. STALLINGS: So --

MR. CARROLL: Bill, you can go ahead and address that.

MR. STALLINGS: William Stallings on behalf of Case.

It comes down to us that they are separate actions, and the plaintiffs in their 2022 case could have issued subpoenas to us calling for materials that were produced to the FTC. We could have objected. We could have had a developed briefing in front of Your Honor to address this. What we are being -- we are being ambushed by an end run around that process for the plaintiffs to get the documents from us.

And I will be very frank with you, Your Honor. What triggered this is in a prior court hearing before Your Honor just a year or two ago, one of the plaintiffs' lawyers said that they are going to be suing us next, after they get done with John Deere. And for us to have had responded to the government in an investigatory demand for a wide-ranging investigation, and then have those materials be indirectly given to a potential adversary in a case that we are not even a party to, it seemed to us as an end run around maybe not the letter of the federal rule, but definitely the spirit.

THE COURT: Okay. All right. So I'm going to say this because I don't know if we are talking about the same hearing. At the hearing on the motion, the arguments, I heard arguments from, I think it was, Mr. Hedlund -- I'm pretty sure it was Mr. Hedlund -- and then from Deere, and then the counsel

from the Department of Justice chimed in on the issue that the Department of Justice was interested in. And I have a very vivid recollection of asking Mr. Hedlund a question about future lawsuits, and Mr. Hedlund didn't answer it directly, but he answered it, I think -- and I understand why he answered it this way. I was hinting at, "Am I going to see more lawsuits? Are there going to be more lawsuits?" And I know there is a transcript. I haven't read it in a while. But my recollection what Mr. Hedlund said is, "Look, this is an antitrust case, and it depends on market share." And the plaintiffs' counsel in the MDL, their whole theory is that John Deere has the market share and is a monopolist. And he didn't say it, but what I heard him say is your clients don't have the kind of market share that John Deere has and so he couldn't bring an antitrust case against your client. Now, maybe there is something else they think your client has done terribly wrong. I don't know. But that was my takeaway.

So I don't know if that's the give-and-take that you have some heartburn about or your client is concerned about or there is something else that I can't remember, but that's my very vivid recollection, and I will go back and read the transcript.

Mr. Hedlund, do you want to tell me if my recollection of that is totally off or somewhat accurate?

MR. HEDLUND: Hi, Your Honor. This is Dan Hedlund.

That was actually my colleague, Mr. Zapala.

THE COURT: Okay.

MR. HEDLUND: I'm not sure if he is on. I don't know if he was able to make the call today.

THE COURT: Okay.

MR. HEDLUND: So I don't hear him. But, yes, that was not me.

But, look, I would just say that to characterize what we are doing here as an "end run" around something seems a little bit of a stretch. I mean, we did serve subpoenas on them for various things and got a very sort of stiff pushback on things. But now that the FTC has been involved, and they have acquired documents from them, we have done what Your Honor had indicated, which we understand is the correct way to proceed, which is we have served a single RFP on Deere that asked for whatever they get from the FTC in terms of an investigative file. I know in the filings in the FTC case there is a lot of back-and-forth about the OEMs wanted to make an objection to relevance and wanting subpoenas to be issued and all of that. You know, frankly, that is happening in the FTC, and whatever course that takes it will take. But at the end of the day, whatever John Deere receives from the FTC in terms of the investigative file, that's what we want to see.

So what goes on with the FTC in terms of objections or relevance or anything like that, that's not for us to decide.

That is the other case. But, you know, these cases are clearly closely related, and relevance is construed broadly, and we completely agree with your assessment of what burden would be involved once Deere receives whatever they receive from the FTC. It should be no burden to produce. So that's where we are at.

THE COURT: Okay. Let me just confirm my thinking with Deere.

Do you have a dog in this fight, Deere?

MS. KAHN: Your Honor, Lin Kahn for John Deere.

THE COURT: Go ahead.

MS. KAHN: If the question is with respect to whether we would turn over documents to the MDL? Was that the question?

THE COURT: Yes. It sounds like -- I think Mr. Hedlund just said they sent a request to produce over to Deere saying, "Give us whatever the FTC is going to give you." I don't know if you have received it yet, and if you have, are you going to come in with a motion to quash, a motion for a protective order, or are you going to go, "Oh, here they are."

MS. LIPSCOMB-JACKSON: Hi, Your Honor. This is Tiffany Lipscomb-Jackson. I will address that.

Yes, we did receive a request from plaintiff, their RFP for production of whatever we receive from the FTC once we receive those files. And I think, as was laid out by counsel

for the FTC, the process that's in place in the FTC case takes care of the issue that's being raised by the OEMs, because our intention is that we would respond to that RFP and provide the documents that we have, that we receive from the FTC, to the MDL plaintiffs. It would not be our intention to quash that because we don't, frankly, think we would have a basis to do so.

And to the extent that documents are produced to Deere from the FTC, those will be documents that are in our possession, custody, and control. Once they are, we will not have a basis to object to that. And to the extent there needs to be some decision about what that scope is, that right is something to be had in the FTC matter through the processes that I will let my colleague Ms. Kahn discuss and the FTC to discuss.

THE COURT: Okay.

MR. STALLINGS: Your Honor, this is William Stallings. Can I respond to that?

THE COURT: Sure. Sure. Go ahead.

MR. STALLINGS: We had no knowledge whatsoever that -- we had no knowledge whatsoever, "we" being the nonparty OEMs, that plaintiffs' lawyers had even served that request on Deere. So I stand by my characterization of end run. In other words, so what it sounds like is going to happen, these documents are going to go from the FTC to Deere, and then the

nonparty OEMs have no idea what happens to them next. And to hear counsel for Deere say it, they wouldn't even have to give us notice that they are about to produce these things even though they are going to be under a court order in the 2025, in the FTC action, stating that the documents can only be used for that action. So it frankly is an end run around any type of semblance of us knowing where our most confidential and most competitively sensitive documents are going.

MS. LIPSCOMB-JACKSON: Your Honor --

MS. HALL: If I may, Your Honor --

THE COURT: Hold on a second. I think Ms. Hall chimed in.

Was that Ms. Hall?

MS. HALL: Yes. Thank you, Your Honor. Laura Hall for the FTC.

I do want to clarify our understanding of the protective order that we are discussing in the FTC case would require notice to all third parties before Deere produces the documents, but I also understand Your Honor's view on the likelihood of success on a relevancy challenge should they come in at that stage to challenge, responding to that RFP.

THE COURT: Right. There is a notice provision in the draft order.

MS. LIPSCOMB-JACKSON: I'm sorry, Your Honor. This is -- yes, Your Honor. This is Tiffany Lipscomb-Jackson, Jones

Day.

And that was what I also wanted to chime in and say. The difference -- relevance and notice are two different issues. My last response was focusing on the relevance, if we would have a relevance basis in order to object to the RFP. But certainly the notice provision is in play in the PO, and that would be provided.

THE COURT: Okay. I'm going to kick myself for even asking this question.

How many documents are we talking about?

MR. STALLINGS: Your Honor, this is William Stallings, again, on behalf of Case.

In terms of the actual number of specific documents, I gave you the characterization before of two Bankers Boxes, and that's about right. A large -- at least for Case New Holland, a large portion of that is our extensive data files that the FTC requested going into our most granular sales and tracking of tractors and parts over the past -- I think it was -- four or five years, and that is the most granular of our competitive information in terms of profit margins, prices, costs, things like that, which is one of the main issues that I think is totally irrelevant to the FTC case against John Deere, and that's what we want to protect against.

Once we get past that, I think from Case New Holland's perspective --

THE REPORTER: I can't hear him, Judge.

THE COURT: You are breaking up on us.

MR. STALLINGS: I think there is really about -- oh, no, I'm sorry.

THE COURT: That's all right.

MR. STALLINGS: There is about two Redwelds of good old-fashioned documents, you know, emails, things like that, which probably is -- and a portion of those I'm not going to try to protect. I can see how they would be relevant to the claims. There are, though, you know, a good handful that I think are irrelevant to the claims at issue in the 2025 case. But not many, maybe, is the best way to answer your question.

THE COURT: Okay. Yes, I was going to ask you what a good handful is, if you could give me a good number on that.

MR. STALLINGS: Of the ones that -- I'm sorry.

For Case New Holland, I would say it is probably going to be about 30.

THE COURT: Okay. 30 pages or 30 documents?

MR. STALLINGS: 30 documents. So, let's say, about 100 pages.

THE COURT: Okay.

MS. HALL: Your Honor, Laura Hall for the FTC. I can --

MR. STALLINGS: I want to stress the data --

THE COURT: Hold on a second. We have got way too

many people talking over each other.

I thought another third party wanted to chime in, and then I will hear from Ms. Hall.

MR. CARROLL: Yes, Your Honor. This is Jake Carroll for AGCO Corporation.

Specifically, we have 22 Excel spreadsheets that we are going to be objecting to any kind of production, and it is exactly the kind of information -- the granular pricing, profit, sales -- for all of our equipment and all of our parts nationwide.

THE COURT: Okay. Is that what you guys care about? Because there is no sense that -- what time is it? It is almost 10:00 o'clock. At your folks' billing rate, if we are arguing about 30 documents, that money is gone. But if it is these Excel spreadsheets and pricing and that kind of thing, we can talk about that. But for the others -- and I think this process was incorporated into a proposed draft order, protective order -- none of us should be wasting our time on 30 documents that either are marginally relevant, or if they don't matter, why do we fight over them. But if there is others, these granular pricing documents, that kind of thing, tell me about that. We can fight over that if we need to fight at all.

But is that what is really causing the concern to the third parties? Just tell me what is really causing your clients to be very uncomfortable.

MR. STALLINGS: Yes, sir. Yes. The data files are the most sensitive and most -- what is most at issue here, and the proposal that we put forth is we put forth a proposal where we would actually log. We would give the equivalent of like a privilege log for the specific documents that we believe were most at issue and most irrelevant. That was our proposal. We would come forward with a document-by-document log to justify why we think the documents should be withheld, and we would give that log to the FTC and to Deere and let them come back to us. We would have meet-and-confers and then go back to Your Honor with anything where we are left with a dispute.

THE COURT: Okay. Highly unlikely that's going to happen.

But let me do this. Let me bounce back to Mr. Foote, Mr. Hedlund, and whoever else wants to chime in on this. Do you want to see these Excel spreadsheet documents with the pricing from Case New Holland? Do you care about that in your MDL case?

MR. FOOTE: Dan?

MR. HEDLUND: Your Honor, Dan Hedlund, Gustafson Gluek, for the MDL plaintiffs.

I mean, you know, here today, I guess it would -- I would probably like to see sort of a more fulsome description of exactly what's included and be able to sort of run it by our experts to see if it's relevant, and of course some of it

depends, on the other hand, also, if Deere considers it relevant. And of course anything that Deere is going to get and might potentially use in their defense is something that we would want to see as we prosecute the case.

Bob, I don't know if you have anything to add?

MR. FOOTE: Yes. I think our basic position, Judge, is if Deere gets it, we should get it, as you kind of indicated before. This is Robert Foote. But we are willing to, obviously, talk about it if it doesn't waste a whole bunch of time, and obviously we don't want documents that are something that Deere is not going to use in their defense.

THE COURT: Exactly. Okay. And you are not going to want to waste your time.

MS. KAHN: Your Honor --

THE COURT: So I want to hear John Deere's view on those. I know it is a high-level description of the documents. Let me hear from Deere on do you think you would be able to use those in the defense somehow?

MS. KAHN: Your Honor, Lin Kahn with Jones Day.

So we have not seen the documents. It is difficult to say how we potentially may put it to use. But just based on the nonparty OEMs' own description, they are describing this as sales and financial information regarding parts and tractors. Those are the products at issue here. Also, the nonparty OEMs have described in their own filings that this information goes

directly to the heart of competition between the OEMs and Deere.

This is a case alleging a harm to competition.

THE COURT:  Yes.

MS. KAHN:  The FTC's complaint specifically alleges that Deere was a price leader in the ag equipment market.  It alleges that the OEMs, including Case New Holland and AGCO, followed Deere in raising prices.  So from that high-level description, it is definitely beyond a doubt relevant to the claims as specifically alleged in the complaint.

THE COURT:  The FTC complaint?

MS. KAHN:  Yes, and also in the MDL complaint.

I will let my colleague jump in on that.

MS. LIPSCOMB-JACKSON:  Yes, Your Honor, Tiffany Lipscomb-Jackson.

Yes, it is also an issue in the MDL that antitrust claims are competition claims, and so competitive information, we would think, without seeing the documents themselves, would be potentially relevant.

THE COURT:  Yes.  Okay.

MR. STALLINGS:  Your Honor, William Stallings.

The MDL has been around since 2022.  Neither plaintiffs nor Deere ever requested this type of granular data, and to now claim that it is super relevant and necessary for the defense seems far afield when discovery in that case has

been close to over.

THE COURT: But it's open. The door is not shut.

MR. STALLINGS: The door is not shut, no.

THE COURT: Yes. Okay. And I'm going to keep it open longer.

MS. LIPSCOMB-JACKSON: Your Honor, Tiffany Lipscomb-Jackson.

THE COURT: Go ahead.

MS. LIPSCOMB-JACKSON: Yes, just one other point on that. We are also in a different context because we now know that this information had been pulled and provided to the FTC, which takes care of burden arguments which are often the issue with subpoenas.

THE COURT: I'm with you.

MS. LIPSCOMB-JACKSON: So the burden argument is no more.

THE COURT: I'm with you. I'm with you on that. I'm with you.

MR. CARROLL: And, Your Honor, this is Jake Carroll, again, for AGCO.

I just want to say it is very frustrating this is coming out today, but we are prepared to talk about it. We have been preparing in substantive discussions with the FTC, who have told us on calls that their position is the MDL plaintiffs should not get this information. And if I'm

mischaracterizing that, the FTC can join in, but that is what I believe has been told to us on calls and represented in the calls. And I think, too, the nonparties are -- this issue needs to be briefed. And we are asking for the procedure that we filed in our objector response, that we would like a notice, an opportunity to brief the Court on this, to present testimony as to why this information is so competitively sensitive. And as Your Honor recognized, this is an impossible way to do business if your primary competitor is getting your most sensitive pricing data. It's very difficult.

THE COURT: Okay. Well, I thought --

MS. HALL: Laura Hall for the FTC.

THE COURT: Go ahead.

MS. HALL: Apologies, Your Honor.

THE COURT: Go ahead.

MS. HALL: I am frankly stunned by counsel's statement that we said that it is not relevant in the MDL. I wouldn't purport to know what is relevant to the MDL or tell anyone what is or is not. All I can think is he is misunderstanding us saying that resolution of the production of the information in the MDL is, in our view, separate from the question of whether we should produce it to Deere in our case, and that those can proceed on separate tracks, and we should get a move on with dealing with whether we can produce it to Deere.

THE COURT: Okay.

MS. TIFFANY LIPSCOMB-JACKSON: And, Your Honor -- sorry -- one more point. Tiffany Lipscomb-Jackson from Jones Day.

The concern, again, I'm hearing from counsel for the OEMs is one that is being addressed by the protective order with the outside attorneys' eyes only.

THE COURT: I was just going to say that, yes.

MS. LIPSCOMB-JACKSON: I want to be clear that we are not conflating the two.

Thank you, Your Honor.

THE COURT: Yes. Okay.

So was there something more --

MR. STALLINGS: Your Honor --

THE COURT: Can I get a question in?

So was there something more that the third parties wanted to tell me, other than what they put in their position papers?

MR. STALLINGS: Your Honor, this is William Stallings.

I think, Judge, to address that last point on the protective order, it still does not mean that they get irrelevant information, you know, regardless of whether there is a protective order in place. And then from what we are hearing now, yes, maybe there is a protective order, but we are talking about distribution of literally our most sensitive information to law firms.

If you look at the list in the confidentiality order, the types of people who get this information, multiplied potentially now by the many law firms that are representing plaintiffs, it becomes a morass where we are not -- we, the nonparty OEMs, are, by definition, not parties to this litigation. We can't keep an eye on what's happening to our information, we lose control over it, and for what, you know, we believe is irrelevant information to the actual claims at issue in the case.

THE COURT: When you say, "the case," do you mean the MDL case?

MR. STALLINGS: Both. Both, Your Honor. The MDL and the FTC case. Our granular pricing information on product-by-product basis, it is -- maybe it's interesting to the parties. It's not relevant to deciding whether John Deere's practices violated the antitrust law.

THE COURT: How are pricing documents not relevant to an antitrust case?

MR. STALLINGS: Because the antitrust case, Your Honor, is about John Deere's specific aftermarket practices. The only way that our pricing could even conceivably come up is to ask whether or not to do some type of conjecture about John Deere's market power in the foremarket, in the tractor market. And that, you know, there is plenty of information apparently in the record from what references I have seen of market shares

from plenty of different sources, that the actual pricing and profit margins of Case New Holland, you know, every single product we offer in the space, it just is not -- it's not -- it's not meaningful to any type of analysis and when there is plenty of other evidence about market shares.

THE COURT: Well, wait. It doesn't matter if there is other -- now you are totally mixing apples and auto parts. Whether there is other information, that means it's relevant. We were talking relevance.

MR. STALLINGS: Well, yes, sir, relevant to -- if the question here is whether or not John Deere has -- well, it is an alleged monopoly power in the tractor market. So the FTC probably will have evidence of claims that they have monopoly power. I have seen nothing that indicates why CNH's profit margin on tractors, parts, and things like that is in any way, frankly, relevant to that question.

And I go back to, Your Honor, that if it was relevant, if it was important to the analysis here, you think it would have come up in the 2022 litigation over the past three years, and it didn't. And I don't know why the FTC wanted the information from us. Once again, Your Honor, effectively, there is no meaningful way to push back on the government when they ask for information. You can negotiate burden, but at the end of the day, you can't negotiate relevance because you don't know what the FTC is investigating.

THE COURT: Well, wasn't there --

MR. STALLINGS: But now we know --

THE COURT: Hold on. Stop, stop, stop. We are at 10:00 o'clock already.

I will tell you my mornings, I get here early, and I read *Law 360* and a bunch of other things. When I saw some article about a motion to quash a subpoena that was filed by one of the third-party OEMs -- and I forget; I want to say it is the Eastern District of New York, the Southern District of New York -- I saw it and went, "Oh, fantastic. The FTC is investigating John Deere and third parties are involved. That means they are going to kick in my door, and my MDL is going to go sideways." I think my view at that point was probably pretty accurate as I'm sitting here today.

And my understanding is -- and Ms. Hall can correct me if I'm wrong -- wasn't that motion to quash granted?

MS. HALL: Laura Hall for the FTC.

My understanding is it was the Association of Equipment Manufacturers --

THE COURT: Yes.

MS. HALL: -- who we had issued a CID to for data. We withdrew the CID. We didn't respond to the motion to quash --

THE COURT: Okay. All right.

MS. HALL: -- is my recollection.

THE COURT: So the association that was concerned,

they ran to court, and you withdrew. So their concerns were resolved in their favor?

MS. HALL: Correct, Your Honor.

THE COURT: Okay. It seems like there is a procedure.

All right. So I'm going to go back to the question I think I asked ten minutes ago. Is there something else that the third parties want to brief, that they want to provide to me that they didn't have in their position papers? I just need to know that.

MR. STALLINGS: Yes, sir. This is William Stallings.

We would like to have an opportunity to explain why these documents are not relevant and in a way that provides you more information about the types of documents so that we can -- so that you can see. And, of course, we are more than happy to provide the documents in camera to you.

THE COURT: Well, what am I going to do with --

MR. STALLINGS: We would like --

THE COURT: -- Excel spreadsheets?

Stop, stop.

What am I going to do with Excel spreadsheets showing your pricing information? What am I going to make heads or tails of that for? I mean, I'm good at reviewing privileged things, but relevance you can tell me. Maybe give me an affidavit. If you want to file something, and everybody else wants to file, okay, we can have a briefing schedule on this,

and things can be delayed. That's fine. We can do that.

How much time do you need to file -- and what would it be called? What would the filing be called? Motion to what?

MR. STALLINGS: Well, what we had proposed, Your Honor, in our papers is that just to be able to have, for lack of a better phrase, it captioned like at issue here, is the FTC or Deere would issue a subpoena document calling for the documents that we produced to --

THE COURT: I will tell you right now we are not doing that. We are not doing that. We are not doing that. I'm telling you right now. If you want to brief it, you can. But I have read the filings. That is a procedure we are not doing.

MR. STALLINGS: Okay. Then in terms of what to call it, I think our motion for a protective order on documents produced to the FTC.

THE COURT: Okay. How much time --

MS. KAHN: Your Honor --

THE COURT: Is this Ms. Lipscomb-Jackson?

MS. KAHN: This is Lin Kahn with Jones Day for John Deere, if I may.

THE COURT: Go ahead.

MS. KAHN: The nonparty OEM already submitted two separate statements on these issues, and I just wanted to discuss, again quickly, if Your Honor is willing to listen, on the relevance that there really is no question here. These are

documents that the FTC obtained to investigate Deere on whether it violated the antitrust laws by restricting repairs. I quoted the paragraphs from the FTC complaint, and also the Court's 12(c) ruling in the MDL action discussed the relevance of competition in the primary market. What counsel for nonparty OEMs are describing today are all relevant. That's the standard. Relevance is the standard, and what they are describing meets that standard.

THE COURT: It sounds like it goes to the primary market, and the primary market is at issue in the MDL unless someone is going to tell me otherwise.

But how much time are you going to need to get this protective order on file with any other information, whether it's facts or law, that you didn't provide previously? How much time do you need to get that on file?

And whoever wants to chime in or respond, whether it is in the FTC case or in the MDL, how much time would you need to respond?

So let me start with the third parties to get this protective order on file. How much time would you need?

MR. STALLINGS: Two weeks, Your Honor.

THE COURT: Okay. Hold on one second here.

All right. March 13th.

Now, Ms. Kahn, you said it is pretty cut and dried. Do you need a couple days? Do you need any more? How much

more time do you want?

MS. KAHN: Your Honor, I was going to propose two weeks to match what the OEMs are -- the nonparty OEMs are getting, Your Honor.

THE COURT: That's fine.

MS. KAHN: In addition, if I may?

THE COURT: Go ahead.

MS. KAHN: If I may, with respect to -- you know, aside from the Excel spreadsheets, because it does sound like counsel is admitting to the relevance of the remaining documents, if we can, in the interim, get those documents and not have those subjected to this process, that would help move the case along.

THE COURT: I agree.

MR. STALLINGS: Your Honor, this is William Stallings.

What I said was that there were many of those documents that I had thought would be relevant and we would be producing, but there would still be some that we would deem irrelevant. The most important part of the question I was answering was with respect to the data.

THE COURT: Okay.

MR. STALLINGS: There is still some -- a very, very small number -- documents, our strategic material, we don't think is relevant.

THE COURT: I like to fight about important stuff.

MR. STALLINGS: Yes, sir, and believe me, I'm not going to fight about anything that is not important. I understand that.

THE COURT: Litigation is way too expensive.

So two weeks is March 27th. Anybody can respond.

Michigan, didn't we get Michigan? Arizona is in here now. Whoever wants to respond, knock yourself out.

All right. That will give you folks time to brief that issue, see where it goes, talk about the things. It sounds like you are working some things out. Keep doing that.

MS. LIPSCOMB-JACKSON: Your Honor?

THE COURT: Go ahead.

MS. LIPSCOMB-JACKSON: Sorry, Your Honor. Tiffany Lipscomb-Jackson for Jones Day.

And just to echo what Ms. Kahn said, I hear that Mr. Stallings said there may be a couple additional documents in addition to the data, but it does sound like there are a group of documents that can be produced to Deere to move forward in the FTC case, and we would just reiterate that while this briefing process is taking place that could happen. So whether Mr. Stallings needs to inform the FTC of what documents he will be seeking to get a protective order over and which ones he won't, maybe that's the way to handle this, but Deere sees no reason why the documents that aren't going to be at issue for the briefing shouldn't be turned over so we can keep

the cases moving.

THE COURT: Yes, by the 13th, the third parties can tell the FTC what documents they don't have concerns about being produced to John Deere. Okay.

MR. STALLINGS: Your Honor, William Stallings.

That's, of course, fine with me, but I ask, though, that since Deere has been saying that they are going to be filing the protective order with the outside-counsel-only provision, that we would like to make sure that is in place before any documents are turned over.

THE COURT: Okay. Well, it sounds like everybody agrees on that, right?

MR. STALLINGS: Well, we still haven't seen the final, but yes.

MR. HEDLUND: Judge, Dan Hedlund.

The MDL plaintiffs are reviewing the drafts, and we will get back to Deere shortly on that.

THE COURT: Hold on one second here.

Yes, I don't think we had another -- I think this is our last scheduled status that we had kind of scheduled throughout previously. So we are going to have to -- we are going to meet in person.

Let's see here. Hold on one second. Let me find a day to get you in here.

We are going to put it for in person on April 8th,

10:00 o'clock -- let's make it 9:30. I will block off the whole day for you folks.

And then we are going to get things. You talk among yourselves. You get agreements on what you can get agreements on. I will take a look at the briefings. I will get you a ruling on the common-interest doctrine issue. I will get that to you relatively soon or quickly.

And, again, I'm looking forward to seeing the revised case management order in the MDL case. And if everybody reaches agreement on protective orders, get those to me. If there is still issues -- and I sure hope there aren't -- let me know, and I will take those up. And we are going to move forward with everything, and we are going to spend a lot of time on April 8th getting these things in the proper procedural posture so that they can move forward.

Okay. And I know there is -- I already entered a briefing schedule on the 12(c) motion. I can't remember what the reply date is on that. I think it was a fairly lengthy briefing schedule.

Anybody know what the reply date is?

MS. HALL: Yes, Your Honor. I believe it is April 28th for the FTC.

THE COURT: All right. Well, I won't have a clue by then. By April 8th, I won't know. I won't have any ideas on that issue, so we can't talk about that.

All right. I'm going to, again, kick myself for asking this question. I'm going to bounce back to the MDL case. Anything else to talk about?

MR. FOOTE: Judge, Robert Foote.

Just real quick, and for the aid of the Court, the FTC and Deere are close to working out a schedule for their case, and we, obviously, all three of us, have been talking so that there is, hopefully, some overlap. I don't want to speak for them, but I think the FTC can tell you that sometime next week you will also get a scheduling order for the FTC case.

THE COURT: Okay. All right. Thank you.

MS. HALL: This is Laura Hall for the FTC.

Just to clarify, we actually submitted slightly different proposed orders with our February 7th status report. We are continuing to talk in the context of our 26(f) conference, but I do think we will still have a handful of dates that are different, as set out in the February 7th status report.

THE COURT: Okay. On that point, can somebody get me some document that shows me the discrepancies between the two? Somebody did -- there was a nice -- I forgot who provided it. Maybe it was in the joint documents. It tracked the dates on both parties. It was very helpful visually to keep track of who is doing what when. That was very helpful. Give me that again. I appreciate that.

MS. KAHN:  Yes, Your Honor, we will do that.

THE COURT:  Okay.  All right.  So for Deere in the MDL, anything else you want to talk about?

MS. LIPSCOMB-JACKSON:  Tiffany Lipscomb-Jackson, Your Honor.

No, nothing else.  Thank you.

THE COURT:  Okay.  In the FTC case, for the plaintiffs, anything else you want to talk about?

MS. HALL:  Laura Hall for the FTC.  No, Your Honor.

THE COURT:  Okay.  How about for Deere in the FTC case?

MS. KAHN:  Lin Kahn with Jones Day.

No, as well.

THE COURT:  Okay.  How about third parties in the FTC case?  Anything else to talk about?

(No response.)

THE COURT:  I'm going to take that as a no.

MR. CARROLL:  No, Your Honor.

THE COURT:  All right.  I will take a look at the filings, and we are going to talk on April 8th, and you will get something from us on the common-interest doctrine.

Okay.  Thank you, everybody.  Have a good day.

(Proceedings concluded at 10:21 a.m.)

                    *   *   *   *   *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/Heather Perkins-Reiva*                    *March 4, 2025*

_____          _____
Heather Perkins-Reiva                          Date
Official Court Reporter