# EXHIBIT B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| IN RE: DEERE & COMPANY REPAIR SERVICES ANTITRUST LITIGATION | Case No.: 3:22-cv-50188<br>MDL No. 3030<br><br>Hon. Iain D. Johnston |

## PLAINTIFFS' NOTICE OF DEPOSITION OF DEFENDANT

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiffs will take deposition of Defendant Deere & Company on the matters listed in the attached Schedule "A." The deposition will be conducted at a location and time to be agreed upon by the Parties.

The deposition will be taken upon oral examination before a notary public or other person authorized by law to administer oaths. The deposition shall be recorded by stenographic and videotape methods. The deposition may be used for discovery, at the trial of this action, or for any other purposes permitted by the Federal Rules of Civil Procedure.

Dated: July 25, 2023

By: */s/ Daniel C. Hedlund*
Daniel E. Gustafson
Daniel C. Hedlund
Michelle J. Looby
Kaitlyn L. Dennis
**GUSTAFSON GLUEK PLLC**
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
kdennis@gustafsongluek.com

Dennis J. Stewart
**GUSTAFSON GLUEK PLLC**
600 W. Broadway, Suite 3300
San Diego, CA 92101
dstewart@gustafsongluek.com

By: /s/ *Adam J. Zapala*
Adam J. Zapala
Elizabeth T. Castillo
James G. Dallal
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com
jdallal@cpmlegal.com

Alexander E. Barnett
**COTCHETT, PITRE & McCARTHY, LLP**
40 Worth Street, Suite 602
New York, NY 10013
Telephone: (212) 201-6820
Facsimile: (917) 398-7753
abarnett@cpmlegal.com

By: */s/ Kenneth A. Wexler*
Kenneth A. Wexler
Justin N. Boley
Tyler J. Story
**WEXLER BOLEY & ELGERSMA LLP**
311 S. Wacker Dr., Suite 5450
Chicago, IL 60606
Telephone: (312) 346-2222
kaw@wbe-llp.com
jnb@wbe-llp.com
tjs@wbe-llp.com

*Interim Co-Lead Counsel for Plaintiffs*

2

## SCHEDULE A
## DEFINITIONS

Notwithstanding any definition set forth below, each word, term, or phrase used in this Schedule is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure. As used in this Schedule, the following terms are to be interpreted in accordance with these definitions:

1. The "Relevant Period" means the time period of January 1, 2015 to the present unless otherwise indicated.

2. The "Consolidated Class Action Complaint" or "CAC" refers to the operative complaint in In re: Deere & Company Repair Services Antitrust Litigation, Case No. 3:22-cv-50188 (Northern District of Illinois).

3. "And" and "or" shall be construed conjunctively or disjunctively as necessary to make the requests inclusive rather than exclusive.

4. "Associated with," "related to," "relating to," "referring to", and "concerning" mean pertain to, refer to, contain, describe, embody, mention, constitute, support, corroborate, demonstrate, prove, evidence, show, refute, dispute, rebut, controvert, summarize, or contradict, or in any way factually or logically relevant to the matter described in the request.

5. "Communication" includes every manner of transmitting or receiving facts, information, opinions, or thoughts from one person to another person, whether orally or through documents, writing, e-mail, message or copy thereof. Communication also includes words transmitted by telephone, radio, or any method of voice recording. This includes non-duplicate drafts, versions not sent, and copies that differ only in margin notes or annotations, or other correspondence sent or received by You to or from any Person, including files maintained or exchanged internally within Your business or between Your employees.

3

6. "Dealers" or "Dealerships" means businesses with agreements with Deere giving them the right to sell new Deere Tractors, parts, and Deere Repair Services in the United States, including all employees of any such Dealership.

7. "Document" shall be understood to have the broadest meaning recognized under Fed. R. Civ. P. Rule 34, and shall include data retrievable from electronic storage media (see Fed. R. Civ. P. Rule 34(a) and 1970 Committee Notes), and any written, typed, printed, transcribed, taped, recorded, filmed, videotaped, magnetic, electronic, photographed, punched or graphic matter of any kind, type or nature whatsoever, however produced or reproduced, including, but not limited to, a receipt, an invoice, a statement, an email, a note, a letter or other correspondence, a telefax, a telegram, a press release, a written Communication, a contract, an agreement, a transcript, a study, a survey, an annual report, an expense report, a financial statement, a drawing, a diary, a calendar, a memorandum, a report, an expert's report, a photograph, an audio tape, a video tape, all data files contained on a hard disc drive, a floppy disc, a compact disc, or any other data storage medium, a mark sheet, a draft, a diagram, a data compilation (transcribed into reasonable, usable form), electronic Communication however transmitted and any other tangible thing in your possession, custody, or control. A draft or non-identical copy is a separate Document within the meaning of this term. Any and all attachments or enclosures which accompany requested Documents shall be produced in response to these demands.

8. "Including" shall be construed to mean "without limitation."

9. "Meeting" means the contemporaneous presence of natural Persons, whether in person or by teleconferencing, video conferencing, or otherwise, whether or not such presence

was by chance or prearranged and whether or not the Meeting was formal or informal or occurred in connection with some other activity.

10. The word "Person" shall mean any legal entity, including, without limitation, natural persons, public or private corporations, companies, firms, joint ventures, proprietorships, partnerships, governmental bodies or agencies, associates, organizations, groups, trusts, and estates. Any reference herein to any "Person," whether or not a party herein, that is a corporation, partnership, or any entity other than an individual, shall be construed as including, without limitation, all past and present owners, directors, officers, employees, agents, representatives, partners, and/or attorneys of the aforementioned entities.

11. "Repair Tools" means software, Documents, physical tools or implements, and other informational resources created, maintained, distributed, provided, or sold by Deere, that are used by any Person for purposes of assisting with, performing, or completing Repair Services, including but not limited to: Service ADVISOR, Customer Service ADVISOR, Parts Advisor, information contained in or accessed through Deere's Dealer Technical Assistance Center ("DTAC"), mobile applications, computer programs, error code readers, service bulletins, Product Improvement Programs, manuals, schematics, and parts lists.

12. "Tractor" or "Tractors" means equipment manufactured by John Deere that: (A) has a primary purpose for use in the production of agricultural products, including: large, medium, and utility tractors; tractor loaders; combines, cotton pickers, cotton strippers, and sugarcane harvesters; harvesting front-end equipment; sugarcane loaders and pull-behind scrapers; tillage, seeding and application equipment, including sprayers, nutrient management and soil preparation machinery; hay and forage equipment, including self-propelled forage harvesters and attachments, balers and mowers; and (B) depends for its functioning, in whole or

in part, on digital electronics embedded in or attached to the product. This definition does not include equipment manufactured, assembled, or sold by John Deere as Lawn & Garden, Construction, Roadbuilding, Landscaping & Grounds Care, Golf & Sports Turf, and Forestry equipment.

13. "You" or "Your" and "Deere" refers to Deere, together with its Dealers, agents, representatives, divisions, departments, affiliates, parents, subsidiaries, predecessors; and any entity in which Deere has a controlling interest; including its present and former directors, officers, employees, representatives, personnel, agents, attorneys, partners, and members.

## INSTRUCTIONS

In addition to the requirements set forth in the Federal Rules of Civil Procedure, the following instructions apply to each of the deposition topics set forth herein:

1. Any noun used in the singular form shall be construed and applied so as to include the plural form also, and vice versa.

2. Each topic shall be construed independently, and no topic shall be viewed as limiting the scope of any other topic.

3. The terms defined above and in each individual topic should be construed broadly to the fullest extent of their meaning to comply with the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

4. If You object to a portion or aspect of a deposition topic, state the grounds for Your objection with specificity.

## AREAS OF DESIGNATION AND INQUIRY

You are required pursuant to Rule 30(b)(6) to produce one or more officers, directors, or managing agents, or other Person(s) who consent to testify on Your company's

behalf, to testify to all facts known or reasonably available to Your company concerning the matters identified below.

1. The negotiation of and agreement to the Memorandum of Understanding with the American Farm Bureau (AFB) dated January 8, 2023 ("MOU"), including the identity of all Persons involved in drafting it, in internal deliberations about it, in analysis of it, in discussions with the AFB about it, and the identification of all internal and external meetings and Communications (including with the AFB, trade organizations, and other farm equipment manufacturers) about it.

2. For the entirety of the Relevant Period the identity and principal terms of all agreements between John Deere and its authorized Dealers, which govern all aspects of the relationship between the Dealers and John Deere including but not limited to cashflows between Dealers and John Deere, from parts sold, repairs made, other services related to parts and repair, or the use of Repair Tools made available to authorized Dealers by John Deere.

3. For the entirety of the Relevant Period, John Deere's development of DTAC, including but not limited to employee training for DTAC, the identification of all Persons involved in creating, overseeing, designing, and controlling DTAC, and the means, manner, and purpose for the creation and implementation of DTAC.

4. For the entirety of the Relevant Period, John Deere's policies and practices with respect to Dealership consolidation and acquisitions, including but not limited to the identification of all Persons involved in decision-making, strategizing, supervising, or participating in the consolidation of Dealerships, the means and manner of enforcing the consolidation of Dealerships, Communications about the consolidation and acquisition of

Dealerships, the chronology of the consolidation of Dealerships, and the reasons and/or motivations behind the efforts to consolidate and enforce the consolidation of Dealerships.

5. For the entirety of the Relevant Period, the nature and sources of cashflows from the Dealers to John Deere, and the mechanisms by which any amounts paid by the customers of authorized Dealerships for repairs generate or affect any revenues to John Deere.

6. For the entirety of the Relevant Period the nature, extent, terms and means by which Dealers are afforded access to Dealer Service Advisor, Parts Advisor, Dealer Technical Assistance Center and Product Improvement Programs, including the terms of any licensing or permissions relating to such access.

7. For the entirety of the period during which Customer Service Advisor, Dealer Service Advisor, Parts Advisor, Dealer Technical Assistance Center, Product Improvement Programs and any other "manufacturers tools," "specialty tools," "software," "part authorization," or Documents relevant to repair (as those terms are used in the MOU) have been in existence and access to them has been afforded to authorized Deere Dealers: the nature, functionality, cost, price, and history of availability from Deere authorized Dealers and Deere to parties other than Deere and its authorized Dealers (including but not limited to owners of Deere equipment, third party repair firms, or state or local government entities) of those resources.

8. With respect to the statement referenced in footnote 1 below from Your Form 10-K for the fiscal year ended October 30, 2022,[1] the identity and source of the referenced "software

---

[1] "[S]o-called 'right to repair' legislation proposals in certain states and at the federal level in the U.S. could require John Deere to provide access to the software code embedded in its products, which, among other harmful consequences, could result in product safety issues, compromise engine emissions and performance controls, adversely affect the protection of John Deere's intellectual property rights, and discourage innovation and investments in research and development. Legislative and regulatory changes and other actions that could potentially affect

8

code embedded in its products" and the manner and extent to which You assert that proposed right to repair legislation "could" require access to such code.

9. With respect to the same statement referenced in the footnote 1 below, the nature and identity of, evidence supporting, and Deere employee witnesses' knowledgeable about the alleged harmful consequence of right to repair laws, including "product safety issues," "compromise [of] engine emissions and performance controls," the "[adverse] [e]ffect on the protection of John Deere's intellectual property rights, and the "discourage[ment] [of] innovation and investments in research and development" referenced therein, as well as any other adverse effect You contend right to repair legislation might have on Deere.

10. The nature and identity of non-self-healing software codes on Your Tractors.

11. The factual basis for Your denial of the allegations in Paragraphs 80, 83 and 89 of the Consolidated Class Action Complaint (set out in footnote 2 below), Persons knowledgeable regarding the factual basis for Your denials, and the identity of Documents or other evidence which You consider relevant to the factual basis of those denials.[2]

---

John Deere's business may be announced with little or no advance notice and John Deere may not be able to effectively mitigate all adverse effects from such measures."

[2] Consolidated Class Action Complaint ¶80: First, Dealer-level software and other informational resources are frequently needed to figure out what the error code means and what repair is required. Then, for at least some repairs, once the repair is made, Dealer-level software is needed to authorize the repair, in order to "pair" the new part to the machine within the CAN bus system. For certain parts that are replaced, the Tractor will not function with a new part installed until the Tractor is given a code that will clear error messages and allow the Tractor to function again.

*Id.* at ¶83: Tractors' emission systems are a common source of an error code that can result in the Tractor going into limp mode (also known as "de-rating"). The Tractor cannot get out of "limp mode" until the code is cleared. De-rating can happen even when the only reason the error code occurred is a software glitch or an electronic sensor malfunctioning, rather than a true mechanical problem with the emissions system. If a farmer is fortunate, a Dealership nearby may be able to send a technician relatively quickly. But during a busy harvest season, farmers can wait days for a

12. The identity of repairs which You contend comprise the (approximately) "98%" of repairs which You have stated can be accomplished without Dealer involvement and the (approximately) 2% which cannot, and as to all repairs which cannot be accomplished without Dealer involvement, the nature of the dealer involvement which is necessary to accomplish those repairs, and the reasons why such repairs require Deere involvement.

13. Projections and predictions of the economic impact of "right to repair" legislation and other expanded "right to repair" outcomes on Deere's or its authorized Dealers' revenues and profits.

14. Deere's policies and practices regarding the availability of Repair Tools to farmers and independent repair organizations in countries outside the United States.

---

technician with Dealer Service Advisor to plug into their Tractor and do something as simple as reset an ECU or replace a sensor. In the meantime, they watch their crops rot.

*Id.* at ¶89: Deere notably does not allow farmers or independent repair shops to access its DTAC database, or access any of the information controlled by DTAC, which includes PIPs and the ability to request payload files.

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2023, a copy of the foregoing was served via email on the following counsel of record:

| | |
|---|---|
| John M. Majoras<br>jmmajoras@jonesday.com<br>**JONES DAY**<br>51 Louisiana Avenue, N.W.<br>Washington, DC 20001 | Tiffany Lipscomb-Jackson<br>tdlipscombjackson@jonesday.com<br>**JONES DAY**<br>325 John H. McConnell Boulevard, Suite 600<br>Columbus, OH 43215-2673 |
| Corey A. Lee<br>calee@jonesday.com<br>**JONES DAY**<br>North Point<br>901 Lakeside Avenue<br>Cleveland, Ohio 44114 | Amanda B. Maslar<br>amaslar@jonesday.com<br>**JONES DAY**<br>110 North Wacker, Suite 4800<br>Chicago, IL 60606 |

*Counsel for Defendant Deere & Company*

Dated: July 25, 2023

*/s/ Daniel C. Hedlund*
Daniel C. Hedlund

11