Case: 3:22-cv-50188 Document #: 255-7 Filed: 05/07/25 Page 1 of 20 PageID #:3391

Lee v. City of Chicago, Not Reported in Fed. Supp. (2021)

2021 WL 2399999
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Martesa LEE, Plaintiff,
v.
CITY OF CHICAGO, a municipal corporation, Chicago Police Officer Raymond J. Haran, and Chicago Police Sergeant William J. Spyker, Defendants.

No. 20 CV 1508
|
Signed 06/11/2021

**Attorneys and Law Firms**

Jordan Marsh, Law Office of Jordan Marsh LLC, Skokie, IL, for Plaintiff.

Mark David Winistorfer, Brian Wilson, Gregory M. Beck, City of Chicago, Department of Law, Federal Civil Rights Litigation Division, Chicago, IL, for Defendants Raymond Haran, William J. Spyker.

Raoul Vertick Mowatt, Christopher A. Wallace, Stephanie Amanda Sotomayor, City of Chicago Department of Law, Federal Civil Rights Litigation Division, Chicago, IL, for Defendant City of Chicago.

### MEMORANDUM OPINION AND ORDER

Jeffrey Cummings, United States Magistrate Judge

\*1 Defendant City of Chicago has filed a motion for entry of a protective order to bar the deposition of Sydney Roberts, then Chief Administrator of the City's Civilian Office of Police Accountability ("COPA"). (Dckt. #35). After Roberts resigned from COPA on May 5, 2021, plaintiff Martesa Lee filed a motion to summarily deny the City's motion for a protective order and to re-open fact discovery for the limited purpose of deposing Roberts. (Dckt. #50). For the reasons stated below, the Court grants the City's motion for a protective order and denies plaintiff's motion.

### I. BACKGROUND

Plaintiff alleges that defendants Chicago police officer Raymond Haran and sergeant William Spyker arrested her without probable cause and in retaliation for the fact that she threatened to complain about the misconduct of Haran. In particular, plaintiff alleges that defendant officers responded to a stabbing incident on the subway platform at the Chicago Transit Authority's ("CTA") red line Jackson Station on February 4, 2020. (Dckt. #12 at 3). Plaintiff was the supervisor on duty at the Jackson Station that day. (*Id.*) While plaintiff was standing on the station platform, Haran approached her and instructed that she leave the crime scene. (*Id.*) Haran then grabbed plaintiff and led her away. (*Id.* at 4). Shortly after, plaintiff approached Spyker, reported that Haran had grabbed and pushed her, and stated that she wanted something to be done about it. (*Id.* at 5). Spyker responded by telling plaintiff that if Haran told him that plaintiff "w[as] obstructing the crime scene, we're gonna arrest you." (*Id.*) After plaintiff expressed disbelief that she could be arrested for doing her job and stated that she was not willing to let the situation go, Spyker ordered Haran to place her under arrest. (*Id.* at 5-6). Defendants detained plaintiff for a total of eight minutes on the station platform and eventually released her. (*Id.*) Both Haran and Spyker were wearing body-worn cameras that recorded their interactions with plaintiff. (Dckt. #35 at 2).

On February 10, 2020, plaintiff filed a complaint with COPA against Haran and Spyker. COPA thereafter initiated an on-going investigation into the incident. On June 16, 2020, Roberts signed and sent a five-paragraph memorandum (the "Memo") to Superintendent David Brown. (*See* Dckt. #35-1). In the Memo, Roberts: (1) informed Brown of the on-going COPA investigation; (2) recounted plaintiff's allegations and cited to the footage from defendants' body-worn cameras – with citations to specific times – that documented the actions of which plaintiff complained; (3) indicated that Spyker's handling of plaintiff's complaint regarding Haran "may have been in violation of Department policy regarding the treatment of complaints of misconduct;" (4) recommended that the Department evaluate the current assignment of Spyker and consider relieving him of police powers in consideration of the "video evidence;" and (5) requested that Brown contact COPA Deputy Chief Investigator Andrea Kersten if he wanted "to discuss the matter or ha[d] any questions." (*Id.*)

\*2 Plaintiff issued a notice of deposition for Roberts and sought her testimony because she sent the Memo and she could provide "helpful context" about the problem with officers arresting civilians who complain about them. (Dckt. #35-4 at 3.) The City refused to produce Roberts for a deposition pursuant to the "apex doctrine" and the limitations on discovery imposed by Rule 26(b). Instead, the City offered

Case: 3:22-cv-50188 Document #: 255-7 Filed: 05/07/25 Page 2 of 20 PageID #:3392

Lee v. City of Chicago, Not Reported in Fed. Supp. (2021)

to provide plaintiff with alternative means of discovery to explore these issues.[1] After plaintiff rejected the City's alternatives, the City filed the instant motion for a protective order. After Roberts resigned from her position as COPA's Chief Administrator, plaintiff filed a motion urging the Court to summarily refuse to issue a protective order based on the theory that Robert's resignation mooted the issues raised by the City's motion. The parties' motions are ripe for disposition.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 26(c) provides that protective orders may address "matters relating to a deposition" and that a court "may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed.R.Civ.P. 26(c)(1); *Olivieri v. Rodriguez*, 122 F.3d 406, 409 (7th Cir. 1997), *cert. denied*, 522 U.S. 1110 (1998). The party seeking a protective order bears the burden of demonstrating why the order should be entered. *Global Material Techs., Inc. v. Dazheng Metal Fibre Co., Ltd.*, 133 F.Supp.3d 1079, 1084 (N.D. Ill. 2015).

The City asserts that the deposition of former COPA Chief Administrator Roberts should be precluded by the "apex doctrine" under the circumstances present here. When such "apex" depositions are sought, courts may protect high-level executives from being deposed when *any* of four circumstances exist: (1) the official has "no unique personal knowledge of the matter in dispute;" (2) the information can be garnered from other witnesses or (3) other discovery methods; and (4) sitting for the deposition would impose a hardship in light of the officer's other duties. *See, e.g., Little v. JB Pritzker for Governor,* No. 18 C 6954, 2020 WL 868528, at *1 (N.D. Ill. Feb. 21, 2020) (citing multiple cases).[2] " 'As such, the apex doctrine ... is not an ironclad rule, but bespeaks sensitivity to the risk that very valuable executive time would be wasted where the officer has no real information.' " *Id.*, quoting *Dyson, Inc. v. Sharkninja Operating LLC*, No. 14 C 779, 2016 WL 1613489, at *1 (N.D. Ill. Apr. 22, 2016) (internal quotes and citation omitted).

**\*3** Furthermore, contrary to the theory underlying plaintiff's motion, the fact that Roberts has resigned from COPA does not automatically defeat the application of the apex doctrine. To the contrary, it is well-settled that "[t]he apex doctrine is no less applicable to former officials than to current officials." *Fed. Deposit Ins. Corp. v. Galan-Alvarez,* No. 1:15-MC-00752 (CRC), 2015 WL 5602342, at *4 (D.D.C. Sept. 4, 2015); *Thomas v. Cate,* 715 F.Supp.2d 1012, 1049-50 (E.D. Cal. 2010); *United States v. Wal-Mart Stores, Inc.*, No. CIV.A. PJM-01-1521, 2002 WL 562301, at *3-4 (D. Md. Mar. 29, 2002).

## III. DISCUSSION

The City offers several arguments in support of its position that Roberts should not be subjected to a protective order, including that: (1) Roberts does not possess any unique or specific knowledge regarding the February 4, 2020 incident that underlies plaintiff's claims or the COPA investigation; (2) the relevant information that plaintiff seeks from Roberts could be obtained from less intrusive means; (3) information that plaintiff seeks from Roberts regarding COPA's decision-making process is arguably privileged and not relevant to the parties' claims and defenses; and (4) ordering Roberts to sit for a deposition would set an untenable precedent.[3] The Court agrees with each of these points.

### A. Roberts lacks unique or specific knowledge of the incident or of the COPA investigation

The record establishes the following. Roberts was not present during the February 4 incident and therefore has no first-hand knowledge of what occurred in the Jackson Station on that day. (Dckt. #35 at 5-6). Nor is there any evidence that she interviewed any participant or witness to the incident or took an active role in COPA's investigation. Instead, as the Memo reflects, it appears that Roberts' knowledge of the incident is based on her review of the footage from the officers' body-worn cameras. (*Id.*; Dckt. #35-1). Plaintiff has offered no evidence to support her assertion that Roberts has "specific knowledge of the facts of the case" over and above what she gleaned from the body-worn camera footage. The Court also finds it significant that Roberts closes the Memo with the statement that Superintendent Brown should contact Deputy Chief Investigator Andrea Kersten – and not her – if he wanted to discuss the matter or had any questions. This clearly implies that she had nothing further to add to what had been written in the Memo.

Courts have not hesitated to block efforts to depose high-ranking officials where – as here – the officials do not have unique personal knowledge of the facts underlying the events that lead to the lawsuit in question. *See, e.g., Little,* 2020 WL 868528, at *2 (holding that the governor should not be deposed where he lacked unique or specialized knowledge relevant to the litigation), at *3 (holding that the lieutenant governor should not be deposed regarding

Lee v. City of Chicago, Not Reported in Fed. Supp. (2021)

Case: 3:22-cv-50188 Document #: 255-7 Filed: 05/07/25 Page 3 of 20 PageID #:3393

plaintiffs' discrimination claims where she lacked "unique personal knowledge" of them); *Murillo v. Kohl's Corp.,* No. 16-CV-196-JPS, 2016 WL 6090862, at *3 (E.D. Wis. Oct. 18, 2016) (holding that defendant's chief merchandising and customer officer should not be deposed where she lacked "any 'specialized' or 'unique' knowledge about the manner in which the defendants price[d] their merchandise"); *Hudkins v. City of Indianapolis,* No. 1:13-CV-01179-SEB, 2015 WL 4664592, at *7 (S.D. Ind. Aug. 6, 2015) (blocking deposition of police chief where plaintiffs "utterly failed to demonstrate that he has any personal knowledge of the events of September 6, 2012 – indeed any personal knowledge of [defendant] Officer Wilson.").

 *4  Without a showing that Roberts has some unique personal knowledge, the fact that she was made aware of plaintiff's allegations or that she viewed the video of the incident and voiced support for COPA's investigation in a letter to Superintendent Brown is insufficient to warrant her deposition. *See Little*, 2020 WL 868528, at *2 (blocking the governor's deposition despite the fact that he was made aware of plaintiffs' allegations); *Hudkins*, 2015 WL 4664592, at *7 (blocking deposition of police chief despite the fact that he viewed the video of the underlying incident and ordered an investigation).

Plaintiff's assertion that "courts have ... repeatedly ordered high-ranking City officials to sit for deposition or testify for trial, even when the official in question did not have unique firsthand knowledge about the underlying issues in the case" is not supported by the cases she cites. The first decision, where the magistrate judge ordered that Mayor Richard M. Daley sit for a deposition, was reversed by the district judge after the City objected. *Hobley v. Burge,* No. 03 C 3678, 2007 WL 551569 (N.D. Ill. Feb. 22, 2007), *rev'd,* No. 03 C 3678, Order (N.D. Ill. Dec. 7, 2007) ("The objections of the defendant City of Chicago to the February 27, 2007 Order ... granting plaintiff's motion to compel the deposition of Mayor Richard M. Daley are sustained."). In the second case, plaintiffs were allowed to call Mayor Emanuel as a trial witness regarding an issue related to their *Monell* claim (namely, his comments regarding the existence of a "code of silence") and not regarding the underlying incident. *Spalding v. City of Chicago,* No. 1:12-CV-8777, Order (N.D. Ill. May 18, 2016). *Spalding* is distinguishable because plaintiff does not have a *Monell* claim here. In the third case, Superintendent McCarthy was ordered to sit for a deposition for reasons "stated in open court." *Whitaker v. City of Chicago,* No. 11-CV-7362, Order (N.D. Ill. Feb. 16, 2012). Plaintiff's exhibit suggests that Superintendent McCarthy was to be deposed about his knowledge of the defendant officer's two prior shootings and his opinion that the officer should have been on desk duty prior to the third shooting, which led to the lawsuit in question. Those circumstances are different from this case. [4]

### B. The relevant information that plaintiff seeks to obtain from Roberts can be obtained by less intrusive means

The City asserts that much of the information that plaintiff seeks to obtain from Roberts at her deposition has already been – or can be – obtained by less intrusive means. In particular, the City asserts – and the Court agrees – that the best evidence about the underlying incident is provided by plaintiff's own testimony and the depositions and body worn camera footage of Haran and Spyker. With respect to the COPA investigation, to the extent that it is relevant to the parties' claims or defenses, the City has agreed to stipulate to the authenticity of the Memo. (Dckt. #35 at 7). The City also asserts – without contradiction by plaintiff – that a deposition from the COPA investigator who actually conducted the investigation and concluded that rules violations had occurred and that discipline would be appropriate would be a more knowledgeable witness on these topics than Roberts. Plaintiff could have served requests for admission to confirm the findings. Furthermore, as noted above (*supra,* at note 2), the City made an offer – which plaintiff eschewed – to provide plaintiff with a Rule 30(b)(6) witness, a limited deposition on written questions, and interrogatory answers.

 *5  Plaintiff does not dispute the above propositions. Instead, she insists that Roberts' testimony is needed to support her claims for compensatory and punitive damages. (Dckt. #37 at 4-5). It is difficult to understand how Roberts' testimony could shed any light on "the uniquely harmful effect Defendant Spyker's conduct had on [plaintiff]," as plaintiff asserts. (Dckt. #37 at 5). Roberts, to the Court's knowledge, does not know plaintiff. How a person would react to Spyker's allegedly illegal conduct depends upon the person. Some folks would be deeply traumatized by being threatened with arrest and detained in custody for eight minutes simply for trying to do their job. Other folks might shrug off such an encounter and consider themselves fortunate that the situation did not escalate further. Plaintiff is unquestionably the best source of evidence about how this event affected her. Roberts' proposed testimony on this subject would be nothing more than speculation.

Case: 3:22-cv-50188 Document #: 255-7 Filed: 05/07/25 Page 4 of 20 PageID #:3394

Lee v. City of Chicago, Not Reported in Fed. Supp. (2021)

Similarly, the Court does not agree with plaintiff's assertion that Roberts' testimony is necessary to "assist the jury in understanding not only that [plaintiff] was arrested without probable cause, but *why* she was arrested, why it matters, and why it is important that Defendant Spyker's conduct not be repeated by him or other officers in the future." (Dckt. #37 at 5 (emphasis in original)). To reiterate, as explained above, there are less intrusive means of obtaining probative evidence that will assist the jury in determining why plaintiff was arrested and whether she was, in fact, arrested without probable cause. Furthermore, there is no indication that the City is going to disagree with the proposition that persons should not be arrested by Chicago police officers unless there is probable cause to support the arrest. Finally, the Memo itself explains why the alleged conduct of Spyker (namely, threatening a civilian with arrest for reporting police misconduct) damages "the Department's efforts to rebuild trust with the community," "demonstrates a profound lack of judgment," and "brings significant discredit to the Department." (Dckt. #35-1 at 1-2). Since the City has agreed to stipulate to authenticity of the Memo (Dckt. #35 at 7), Roberts' testimony is not necessary to establish these points.

### C. Information that plaintiff seeks to obtain from Roberts regarding COPA's decision-making process is arguably privileged and irrelevant

Plaintiff also seeks to have Roberts testify "why she and/or COPA took the unusual step of determining that the allegations and the evidence warranted relieving Defendant Spyker of his police powers pending the investigation, and whether it is related to Chief Roberts' strong opinions about the gravity of Spyker's apparent conduct and the threat it poses to policy community relations." (Dckt. #37 at 6). However, as the City asserts, any deposition testimony by Roberts regarding COPA's decision-making process that culminated in the issuance of the Memo is arguably protected by the deliberative-process and investigative privileges. *See United States v. Farley,* 11 F.3d 1385, 1389 (7th Cir. 1993) ("The deliberative process privilege protects communications that are part of the decision-making process of a governmental agency.... Since frank discussion of legal and policy matters is essential to the decisionmaking process of a governmental agency, communications made prior to and as part of an agency determination are protected from disclosure") (citations omitted); *Santiago v. City of Chicago,* No. 09 C 3137, 2010 WL 1257780, at *4 (N.D. Ill. Mar. 26, 2010) ("The City ... has a legitimate interest in preserving the confidentiality of an ongoing IPRA investigation"). [5] Even plaintiff acknowledges that the question of whether Roberts would be allowed to testify regarding these matters would be "the subject of future motion practice." (Dckt. #37 at 6).

**\*6** The Court also agrees that Roberts' knowledge of why COPA wrote and sent the Memo to Superintendent Brown is not relevant to the parties' claims or defenses within the meaning of Federal Rule of Evidence 401. The material issues in this case do not concern COPA's investigative process. Furthermore, evidence concerning this process does not have a tendency to make it more or less probable that plaintiff was arrested without probable cause and/or in retaliation for plaintiff's statement that she wanted to file a complaint about the alleged misconduct of Haran.

### D. Ordering Roberts to sit for a deposition under the circumstances of this case would set an adverse precedent

In her motion, plaintiff asserts that Roberts' resignation as COPA's Chief Administrator moots the City's motion for a protective order. Although plaintiff is correct in the limited sense that one rationale for the City's motion (namely, that forcing Roberts to sit for a deposition would interfere with her official duties) has been eliminated by virtue of Roberts' resignation (*supra,* at note 3), other important rationales for the apex doctrine remain "appl[icable] to former officials and current officials with equal force." *Galan-Alvarez,* 2015 WL 5602342, at *4. In particular,

> [t]he integrity of administrative proceedings and the underlying decisionmaking process of agency officials are just as important where the official to be questioned no longer serves in the same position. And 'indiscriminate depositions of high-ranking government officials would ... likely discourage' people 'from accepting positions as public servants' irrespective of whether those deposed were current or former officials.

*Id.*, quoting *Wal-Mart Stores,* 2002 WL 562301, at *3. Furthermore, Roberts' resignation does not change the fact that she has no unique personal knowledge of the underlying incident or the COPA investigation. Given the circumstances discussed above, the Court finds that the concerns expressed by the *Galan-Alvarez* and *Wal-Mart Stores* decisions are fully warranted here.

Lee v. City of Chicago, Not Reported in Fed. Supp. (2021)

Case: 3:22-cv-50188 Document #: 255-7 Filed: 05/07/25 Page 5 of 20 PageID #:3395

**CONCLUSION**

For all of the above reasons, defendant City of Chicago's motion for entry of a protective order to bar the deposition of Sydney Roberts (Dckt. #35) is granted and plaintiff's motion for denial of the City's motion for a protective order and to re-open fact discovery for a limited purpose (Dckt. #50) is denied.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 2399999

---

**Footnotes**

1  In particular, the City offered to provide plaintiff with a Rule 30(b)(6) witness, a limited deposition on written questions, and interrogatory answers. (Dckt. #35 at 7).

2  Plaintiff asserts that the Seventh Circuit has not adopted the apex doctrine. *See* Dckt. #37 at 2 (citing to *Nucap Indus. Inc. v. Robert Bosch LLC*, No. 15 CV 2207, 2017 WL 6059770, at *3 (N.D. Ill. Dec. 7, 2017)). However, *Nucap* itself applied the apex doctrine with reliance on the Seventh Circuit's prior decision in *Patterson v. Avery Dennison Corp.,* 281 F.3d 676 (7th Cir. 2002), where the Court of Appeals affirmed the district court's decision to block the deposition of a high-level executive because there was "serious doubt" as to whether the executive had information that was more than marginally relevant to plaintiff's claim and plaintiff had failed to take advantage of a more inexpensive and convenient method of discovery (namely, the use of interrogatories). *Nucap,* 2017 WL 6059770, at *2 (citing to *Patterson,* 281 F.3d at 681-82). The *Nucap* court issued a protective order barring the high level executive's deposition after finding that he was not involved in the actions giving rise to plaintiffs' claims, plaintiffs had less burdensome avenues for obtaining the information that they sought from him, and that the deposition would be unduly burdensome and would significantly disrupt defendant's business. *Nucap,* 2017 WL 6059770, at *2-4.

3  The City also asserts that allowing a deposition of Roberts would impose an unwarranted hardship on the City and the public because it would interfere with her official duties. (Dckt. #35 at 8-9). Now that Roberts has resigned, this concern is no longer present. *See Thomas*, 715 F.Supp.2d at 1049-50 (noting that the concern about interference with official duties falls by the wayside with respect to former officials).

4  Finally, plaintiff cites to an Illinois state court case where Mayor Emanuel and Superintendent Johnson were ordered to sit for their depositions under Illinois procedural rules. *Legrier v. City of Chicago,* No. 15 L 12964 (Ill.Cir.Ct.). Plaintiff has not provided the state court's rationale for its order and this Court is thus unable to determine whether the circumstances in *Legrier* are analogous to this case. Nonetheless, Plaintiff's exhibit suggests that Mayor Emanuel would be questioned about policy-related issues (*i.e.,* "use of force policies," the "code of silence" among officers, and "the aggressive legal gambits the city's lawyers ha[d] pursued") and not the facts of the underlying incident (Dckt. #37-2 at 3, 4).

5  COPA's investigation of the underlying incident remains on-going. (Dckt. #52 at 6).

---

**End of Document**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case: 3:22-cv-50188 Document #: 255-7 Filed: 05/07/25 Page 6 of 20 PageID #:3396

Little v. JB Pritzker for Governor, Not Reported in Fed. Supp. (2020)

2020 WL 868528
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Maxwell LITTLE, et al., Plaintiffs,
v.
JB PRITZKER FOR GOVERNOR, et al., Defendants.

No. 18 C 6954
|
Signed 02/21/2020

**Attorneys and Law Firms**

Jeanette Samuels, Samuels & Associates, Ltd., Chicago, IL, Shay T. Allen, The Law Office of Shay T. Allen, Flossmoor, IL, for Plaintiffs Maxwell Little, Jelani Coleman, Kasmine Calhoun, Celia Colon, Erica Kimble, Nathaniel Madison, Tiffany Madison, James B. Tinsley, Mark Walker, Jason Benton.

Jeanette Samuels, Samuels & Associates, Ltd., Chicago, IL, for Plaintiffs Kayla Hogan, Eric Chaney.

William B. Stafford, Mallory Anne Gitt Webster, Perkins Coie LLP, Seattle, WA, Christopher Lepore, Perkins Coie LLP, Chicago, IL, Marc Elias, Pro Hac Vice, Perkins Coie LLP, Washington, DC, for Defendant JB Pritzker for Governor.

William B. Stafford, Perkins Coie LLP, Seattle, WA, for Defendants Jay Robert Pritzker, Anna Capara, Quentin Fulks.

William B. Stafford, Mallory Anne Gitt Webster, Perkins Coie LLP, Seattle, WA, for Defendants Juliana Stratton, Caitlin Pharo.

**ORDER**

Hon. Jeffrey Cummings, United States Magistrate Judge

**\*1** Defendant's motion for protective order [64] is granted.

**STATEMENT**

Defendant Juliana Stratton ("Stratton") and non-party JB Pritzker ("Pritzker") have brought this motion for a protective order to limit plaintiffs' proposed depositions of both individuals. Plaintiffs brought this action against the JB Pritzker for Governor campaign and various individuals associated with the campaign for three counts of harassment, discrimination, and retaliation pursuant to 42 U.S.C. § 1981. [28]. Plaintiffs have also brought a defamation claim against Stratton. Ms. Stratton is the Lieutenant Governor of Illinois; Mr. Pritzker is the state's Governor. On April 5, 2019, the District Court dismissed the retaliation claim in its entirety and also dismissed the remaining § 1981 claims against both Stratton and Pritzker. Accordingly, the Governor is no longer a party to this case, while the Lieutenant Governor remains a defendant only for the defamation claim.

In her motion for protective order, Stratton does not object to being deposed by plaintiffs. She asks, however, that the deposition be limited to three hours and be restricted to questions related to the defamation claim. Pritzker asks the Court to prohibit plaintiffs from deposing him altogether. In the alternative, both individuals request that the Court (1) defer ruling on whether their depositions should go forward until plaintiffs have completed their depositions of other witnesses, or (2) permit them to be deposed by written questions with no more than seven written deposition questions.

**LEGAL STANDARD**

Rule 26(c) provides that protective orders may address "matters relating to a deposition" and that a court "may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed.R.Civ.P. 26(c)(1). The party seeking a protective order bears the burden of demonstrating why the order should be entered. *Global Material Techs., Inc. v. Dazheng Metal Fibre Co., Ltd.*, 133 F.Supp.3d 1079, 1084 (N.D. Ill. 2015).

Here, plaintiffs seek depositions from Governor Pritzker and Lieutenant Governor Stratton, the two highest ranking officials in Illinois' state government. When such "apex" depositions are sought, courts may protect high-level executives from being deposed when any of four circumstances exist: (1) the official has "no unique personal knowledge of the matter in dispute"; (2) the information can be garnered from other witnesses or (3) other discovery methods; and (4) sitting for the deposition would impose a hardship in light of the officer's other duties. *Murillo v. Kohl's Corp.*, No. 16-CV-196, 2016 WL 6090862, at \*2 (E.D. Wis. Oct. 18, 2016); *In re Yasmin and Yaz,* No. 3:09-md-02100, 2011 WL 3759699, at \*2 (S.D. Ill. Aug. 18, 2011); *see also Coleman v. Schwarzenegger,* No. CIV S-90-520, 2008 WL

Case: 3:22-cv-50188 Document #: 255-7 Filed: 05/07/25 Page 7 of 20 PageID #:3397

Little v. JB Pritzker for Governor, Not Reported in Fed. Supp. (2020)

4300437, at *2 (N.D. Cal. Sept. 15, 2008) (finding that the apex doctrine applies to a state Governor). "As such, the apex doctrine ... is not an ironclad rule, but bespeaks sensitivity to the risk that very valuable executive time would be wasted where the officer has no real information." *Dyson, Inc. v. Sharkninja Operating LLC*, No. 14 C 779, 2016 WL 1613489, at *1 (N.D. Ill. April 22, 2016) (internal quotes and citation omitted).

**DISCUSSION**

**Governor Pritzker's Deposition**

 **\*2**  The factors that govern whether a high-level official should be deposed show that Governor Pritzker should not be required to sit for an oral deposition. The record strongly suggests that Pritzker – who is no longer a party to this case – does not have unique personal knowledge of the events that plaintiffs allege. The campaign employed approximately 200 individuals across 34 offices in Illinois. The campaign's manager Quentin Fulks states in his declaration that an email address was created to which employees could send their employment-related concerns. The address forwarded these emails to "certain" campaign employees whom Fulks does not identify but not to Pritzker or Stratton. (Dckt. # 69 at ¶ 6). Pritzker and Stratton also lacked daily supervisory responsibilities; instead, five non-senior campaign employees supervised the campaign's field organizers. (*Id.* at ¶ 7).

Plaintiffs have made no showing of why Pritzker should be deposed given these facts. Plaintiffs claim that plaintiff Eric Chaney "attempted" to talk to Pritzker about his employment complaints at an unidentified point in the campaign but Pritzker "immediately walked off." (Dckt. # 75 at 4). Pritzker's responsiveness, however, is not relevant to the apex analysis; rather, the issue is whether he had unique knowledge of the matter in question. Plaintiffs' claim that Pritzker "walked off" instead of listening to Chaney's complaint suggests that he does not.

Plaintiffs have also provided an unauthenticated news article reporting that unnamed campaign staff members voiced some discrimination complaints to Pritzker and Stratton when the candidates reached out at some point to African-American campaign workers. However, not only does this article fail to identify the persons involved, the content of their communication, or the length or conditions under which the communication took place, it actually undermines plaintiffs' argument through its incorporation of denials by both Pritzker and Stratton that anyone ever voiced to them concerns regarding racism and harassment. (Dckt. # 75-1, at 2). Furthermore, Pritzker states in his sworn declaration that he "was rarely made aware" of any personnel matters in the campaign; had no direct role in human resource issues; and was not responsible for receiving or investigating workplace complaints. (Dckt. # 67 at ¶¶ 15-16). In any event, even if Pritzker was made aware of some of plaintiffs' allegations, mere knowledge of events is not sufficient to require a deposition: the officer must have "unique" personal knowledge. *See, e.g., In re Yasmin and Yaz,* 2011 WL 3759699, at *2 ("district courts may preclude the depositions of high-ranking executives if the witness does not possess unique or specialized knowledge relevant to the litigation") (citing cases). No evidence indicates that Pritzker has such information.

The second and third factors also support exempting the Governor from an oral deposition. The motion for protective order states that plaintiffs will depose former campaign employees and a Rule 30(b)(6) witness who have more detailed information about the allegations that plaintiffs make in their complaint. These deponents presumably have greater knowledge about the campaign's day-to-day operations, and plaintiffs do not address why they will not be able to obtain the information they seek from these witnesses. Stratton and Pritzker also note that they have produced extensive documents to plaintiffs that cover much of the ground that their own depositions would address. Although the Court has no information on what those documents contain, plaintiffs have not shown why they would be insufficient.

Fourth, sitting for an oral deposition would clearly impose a hardship on the Governor. Pritzker was preparing for his State of the State address at the time of his sworn declaration. (*Id.* at ¶ 3). That date has now passed, but Pritzker further states that his official duties require his full-time attention even when he spends personal time with his family. (*Id.*).

 **\*3**  These factors persuade the Court that Governor Pritzker should not be required to sit for an oral deposition because "there is insufficient reason to expect the deposition[ ] to yield relevant evidence unobtainable through other means." *Bless v. Cook County Sheriff's Office,* No. 13 C 4271, 2017 WL 1344522, at *2 (N.D. Ill. Apr. 12, 2017). The Court further finds that a deposition by written questions is no more likely to result in relevant evidence than an oral deposition would. Pritzker's sworn declaration makes clear that he had no substantive knowledge of employment conditions – much less a unique understanding of events. Plaintiffs' claims to the

contrary and their news clipping are simply too thin of a reed on which to require the State's chief executive to divert time from his demanding duties to comply with the requirements under Rule 31 for a deposition by written questions. *See Stagman v. Ryan,* 176 F.3d 986, 995 (7th Cir. 1999) (affirming the district court's decision to deny request to depose the Illinois Attorney General where the court concluded that the deposition "would have served little purpose other than to disrupt a busy official who should not be taken away from his work to spend hours or days answering lawyers' questions.") (internal quotation marks omitted).

**Lieutenant Governor Stratton's Deposition**

Like Pritzker, Stratton has also submitted a sworn declaration stating that she had no formal responsibility for receiving information about workplace conditions and did not supervise the campaign's employees. (Dckt. # 68 at ¶¶ 10, 13, and 16). Plaintiffs claim that Stratton was present at an event where staff members raised discrimination concerns to her. Plaintiffs also include in their response brief a social media post from Stratton stating that she stopped at the Burr Ridge, Illinois campaign center on September 12, 2018. (Dckt. # 75 at 6). However, plaintiffs admit that they "cannot prove that Lt. Governor Stratton ever actually received the complaints of which [they] are aware." (Dckt. # 75 at 5). Moreover, as with Pritzker, no evidence shows what Stratton was told or why she would have more knowledge than the campaign's field managers have of the day-to-day conditions that the campaign's employees faced. Plaintiffs have therefore failed to demonstrate why Stratton has any "unique personal knowledge" of their discrimination claims.

That fact – combined with Stratton's high-level duties as Lieutenant Governor – persuades the Court in consideration of the authority cited above that she should not be deposed concerning plaintiffs' discrimination claims.

Stratton does not ask the Court to exempt her from being deposed on the defamation claim. Instead, she asks that the deposition be limited to three hours and to questions only related to the defamation issue. Plaintiffs do not address the length of Stratton's deposition or discuss the defamation topic in their response brief. In consideration of the circumstances, the Court grants the motion on this issue. *See, e.g., Greater Birmingham Ministries v. Merrill,* 321 F.R.D. 406, 414 (N.D. Ala. 2017) (imposing time and subject matter limitations on the deposition of a public official to allow plaintiffs to probe his "unique personal knowledge about which [they] have not already received substantial discovery"). Plaintiffs may depose Lieutenant Governor for three hours. They may address background issues that are relevant to carrying forward with a meaningful deposition but are otherwise restricted to questioning Stratton to matters concerning the defamation claim pending against her.

The Court notes that the District Court has set fact discovery to close on February 28, 2020. [74]. Plaintiffs should therefore quickly notice Stratton's deposition and defendants' counsel should take all reasonable steps to make her available for the deposition she has agreed to before the cutoff date.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 868528

---

End of Document     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case: 3:22-cv-50188 Document #: 255-7 Filed: 05/07/25 Page 9 of 20 PageID #:3399

Kove IO, Inc. v. Amazon Web Services, Inc., Not Reported in Fed. Supp. (2021)

2021 WL 12094206
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

KOVE IO, INC., Plaintiff,
v.
AMAZON WEB SERVICES, INC., Defendant.

No. 18 C 8175
|
Signed October 15, 2021
|
Filed: October 26, 2021

**Attorneys and Law Firms**

Courtland Reichman, Pro Hac Vice, Gina Cremona, Pro Hac Vice, Jennifer Estremera, Pro Hac Vice, Savannah Carnes, Pro Hac Vice, Reichman Jorgensen Lehman & Feldberg LLP, Redwood Shores, CA, Michael Matulewicz-Crowley, Pro Hac Vice, Jaime Francisco Cardenas-Navia, Pro Hac Vice, Khue Hoang, Pro Hac Vice, Reichman Jorgensen Lehman & Feldberg LLP, New York, NY, Wesley White, Pro Hac Vice, Orrick Herrington & Sutcliffe LLP, New York, NY, Navid Bayar, Pro Hac Vice, Karlanna Lewis, Pro Hac Vice, Shawna L. Ballard, Reichman Jorgensen Lehman & Feldberg LLP, Redwood City, CA, Renato Thomas Mariotti, Bryan Cave Leighton Paisner LLP, Chicago, IL, Holly Hannah Campbell, Bryan Cave Leighton Paisner, Chicago, IL, Adam Adler, Pro Hac Vice, Aisha Mahmood Haley, Pro Hac Vice, Ariane Mann, Pro Hac Vice, Christine E. Lehman, Naveed S. Hasan, Pro Hac Vice, Philip Eklem, Pro Hac Vice, Reichman Jorgensen Lehman & Feldberg LLP, Washington, DC, Bahrad Sokhansanj, Pro Hac Vice, The Law Office of Bahrad Sokhansanj, Los Angeles, CA, Ian Washburn, Pro Hac Vice, Irell & Manella LLP, Los Angeles, CA, Mateo Fowler, Pro Hac Vice, MZF Law Firm, PLLC, Austin, TX, Taylor Mauze, Pro Hac Vice, Reichman Jorgensen Lehman & Feldberg LLP, Austin, TX, Michael G. Flanigan, Crowell & Moring LLP, San Francisco, CA, Sarah Jorgensen, Pro Hac Vice, Reichman Jorgensen Lehman & Feldberg LLP, Atlanta, GA, for Plaintiff.

Alan M. Fisch, Jeffrey M. Saltman, Pro Hac Vice, Lisa Noelle Phillips, Pro Hac Vice, R. William Sigler, Fisch Sigler LLP, Washington, DC, Ken Fung, Pro Hac Vice, Fisch Sigler LLP, San Mateo, CA, for Defendant.

**ORDER**

SHEILA FINNEGAN, United States Magistrate Judge

 *1 Plaintiff Kove IO, Inc., filed suit against Defendant Amazon Web Services, Inc. ("AWS"), alleging infringement of three patents disclosing "a data storage network architecture that permits cloud-based storage of information on a large scale." *Kove IO, Inc. v. Amazon Web Servs., Inc.*, 448 F. Supp. 3d 849, 851 (N.D. Ill. 2020). Currently before the Court is Plaintiff's motion to compel discovery of Andrew Jassy, CEO of Amazon.com, Inc. ("Amazon") [351, 352]. For reasons set forth here, the motion is granted in part and denied without prejudice in part.

**BACKGROUND**

Plaintiff holds three patents related to a distributed data storage technology that can be utilized in cloud computing. (Doc. 1, Compl., ¶¶ 1-2). The patented distributed network system allows storage systems to grow to a significant size by "not only storing data files in different locations but storing location information across multiple servers, as well." *Kove IO*, 448 F. Supp. 3d at 852. This system "enabled hyper-scalable cloud storage and improved upon the scalability limitations of conventional storage systems." (Doc. 1, Compl., ¶ 18). Plaintiff alleges that two of Defendant's products infringe the three patents: Amazon Simple Storage ("Amazon S3") and DynamoDB. (*Id.* ¶ 26). Defendant launched Amazon S3 in 2006, stating that it "allows users to store data in the cloud" in a "highly scalable, reliable, and low-latency data storage infrastructure." *Kove IO*, 448 F. Supp. 3d at 854 (quoting Press Release, Ex. 7 to Compl., [1-1] at 1). DynamoDB is "a database service that Defendant says permits users to 'create database tables that can store and retrieve any amount of data, and serve any level of request traffic.' " *Id.* (quoting DynamoDB Developer Guide, Ex. 11 to Compl., [1-11] at 1).

In this motion, Plaintiff seeks to compel discovery of Andrew Jassy. Jassy was a principal founder of AWS and a member of the "S-Team" that helped review and develop the design of the accused Amazon S3 product. (Doc. 351, at 7). He served as Senior Vice President of AWS until 2016 when he became CEO. On July 5, 2021, Jassy took over as CEO of Amazon. Plaintiff seeks to compel production of Jassy's

**Kove IO, Inc. v. Amazon Web Services, Inc., Not Reported in Fed. Supp. (2021)**

Case: 3:22-cv-50188 Document #: 255-7 Filed: 05/07/25 Page 10 of 20 PageID #:3400

emails and a copy of the six-page AWS vision document Jassy authored in 2003. Plaintiff has also issued a Rule 30(b)(1) notice for Jassy's deposition testimony. Defendant objects that Plaintiff's proposed email search terms are not narrowly tailored to particular issues as required in this patent case, and that the vision document is irrelevant. As for the deposition, Defendant declines to produce Jassy pursuant to the apex doctrine.

### DISCUSSION

**I. Jassy's Emails**

Plaintiff first seeks to compel the production of Jassy's emails. For purposes of ESI discovery, the parties have agreed to follow both the Federal Circuit Model Order Regarding E-Discovery in Patent Cases ("Model Order") and the Northern District of Illinois Local Patent Rules for Electronically Stored Information ("LPR ESI"). (Doc. 52, Jt. Motion for Entry of Report of Parties' Planning Meeting and Agreed Case Schedule, at 4; Doc. 54). As discussed in more detail below, discovery of emails is subject to specific limitations that must be applied here based on the parties' agreement.

**A. Email Production Requests**

**\*2** LPR ESI 2.6(a) provides that "[g]eneral ESI production requests ... shall not include email," and "to obtain emails parties must propound specific email production requests." The Model Order similarly states that email production requests "shall only be propounded for specific issues, rather than general discovery of a product or business." (Doc. 361-5, Model Order, at 7 ¶ 7).

In this case, Plaintiff seeks emails from Jassy (and four other email custodians) related to the following topics:

• Marketing, advertising, and customer support related to speed, scalability, and availability for Amazon S3 and DynamoDB.

• Telemetry, usage data, and metrics regarding speed, scalability, and availability, including any customer testing (such as A/B testing), of Amazon S3 and DynamoDB.

• Surveys, studies, analyses or purchase journey mapping relating to pricing, sales, and customer procurement and retention for Amazon S3 and DynamoDB, including any studies commissioned by AWS.

(Doc. 361, at 8; Doc. 361-6). Defendant has not argued that these email production requests fail to comply with the local patent rules and Model Order. Nor does Defendant dispute that to the extent Jassy has emails relating to the above topics, they may be relevant to the case. Instead Defendant takes issue with the search terms that Plaintiff proposes Defendant use to identify the universe of emails that would be reviewed for responsiveness under these topics. The Court turns to that issue.

**B. Search Terms**

Under LPR ESI 2.6(d) and (e), each party "shall limit its email production requests to a total of five custodians" and "a total of five search terms per custodian per party" unless the parties "jointly agree to modify this limit." In addition, LPR ESI 2.6(e) requires that search terms be "narrowly tailored to particular issues. Indiscriminate terms, such as the producing company's name or its product name, are inappropriate unless combined with narrowing search criteria that sufficiently reduce the risk of overproduction."

Defendant argues that Plaintiff's proposed search terms for Jassy's emails are not "narrowly tailored to particular issues" as required by LPR ESI 2.6(e). By letter dated April 14, 2021, Plaintiff requested that Defendant run the following search terms:

> S3 AND (price OR pricing OR (rate w/5 charge) OR fee OR tier OR scale OR scalability OR speed OR availability OR durability OR durable OR throughput OR "bucket size" OR "bytes uploaded" OR (first-byte w/5 latency) OR (total-request w/5 latency) OR "total time" OR (elapsed w/4 time) OR downstream OR "A/B" OR survey! OR (conjoint w/2 study) OR (conjoint w/2 analysis) OR "focus group" OR telemetry OR "journey map" OR "journey mapping" OR [Redacted]).

> (DB OR DynamoDB) AND (price OR pricing OR (rate w/5 charge) OR fee OR tier OR scale OR scalability OR speed OR availability OR durability OR durable OR (replicat! w/5 latency) OR (successful-request w/5 latency) OR (write w/5 latency) OR (elapsed w/4 time) OR downstream OR "samplecount" OR (sample w/2 count) OR "A/B" OR survey! OR (conjoint w/2 study) OR (conjoint w/2 analysis) OR "focus group" OR telemetry OR "journey map" OR [Redacted]).

(Doc. 351-7, 4/14/2021 Letter from J. Cardenas-Navia to J. Saltman, at 3-4). Plaintiff had proposed similar search

Case: 3:22-cv-50188 Document #: 255-7 Filed: 05/07/25 Page 11 of 20 PageID #:3401

Kove IO, Inc. v. Amazon Web Services, Inc., Not Reported in Fed. Supp. (2021)

terms for other custodians (e.g., Werner Vogels, current Chief Technology Officer ("CTO") of Amazon, and Allan Vermeulen, former CTO of Amazon), which had already prompted an objection from Defendant that they produced too many hits (more than 57,000 combined even after replacing "AND" with "W/100"). (Doc. 361, at 9 n.19, 11). In response, Plaintiff agreed to replace "AND" with "W/65," but Defendant said this still yielded too many hits (13,123 emails), as did "W/30" (over 10,000 hits). (*Id.* at 9 and n.20).

**\*3** Defendant ultimately agreed to review the email hits for Vogels and Vermeulen, though it says it did so only to break the impasse and without waiving its objections. (*Id.* at 9). Defendant completed production of responsive documents on March 12, 2021. [1] (*Id.*; Doc. 351-6, 3/12/2021 Letter from E. Bernard to J. Cardenas-Navia). Around that same time (March 8, 2021), Plaintiff indicated for the first time that it might request emails from Jassy, and the following month (on April 14, 2021) it tentatively identified him as one of the five allotted email custodians. (Doc. 361, at 10). This time the parties were unable to reach agreement on the search terms. Defendant was unwilling to use the same search terms it had used for the Vogels and Vermeulen emails, insisting it would not run any search terms until Plaintiff "revise[s] the terms to comply with the LPR ESI and Model Order requirements." (*Id.* at 11). Aside from arguing generally that the search terms must be "narrowly tailored," however, Defendant provided no guidance as to what acceptable terms would look like. Defendant rejected Plaintiff's latest proposal adding the delimiter "W/50" and reducing the temporal scope from 2006-2020 to 2006-2018, without proposing any alternative suggestions. (Doc. 351, at 12; Doc. 361, at 11 n.33; Doc. 369, at 14, objecting that Defendant effectively "insisted Kove bargain against itself.").

### C. Ruling on Jassy Emails

Based on the current record, the Court is not persuaded that Plaintiff's proposed search terms are "narrowly tailored to particular issues" as required by LPR ESI 2.6(e). Important information bearing on this disputed issue has not been provided and should have been. The fault lies with both parties. Plaintiff argues that the emails it seeks are relevant to "the origin of AWS and the development of the accused S3 product," and are "expected to yield information relevant to issues relating to damages, including commercial success, pricing, profitability, and convoyed sales." (Doc. 351, at 10). Yet it says nothing in its briefing about the effectiveness of the very same search terms when used to identify responsive emails of other custodians, namely, Vogels and Vermeulen. It is possible the search terms led to the production of many helpful emails that were probative of disputed issues in this case. Conversely, it is also possible the emails, while related to the S3 or DynamoDB products, were generally unhelpful. In determining whether these very same search terms should be used again, and are "narrowly tailored to particular issues" so as to "sufficiently reduce the risk of overproduction[,]" the Court requires this information.

Fault also lies with Defendant. It ran the searches for at least some other custodians using the search terms now at issue, yet it has provided no information regarding the volume of "false positives," that is, the volume of emails containing the search terms that were not responsive. Nor has Defendant indicated whether, based on its review of the responsive emails that *were* produced, these emails appeared to be relevant to specific issues in the case or instead seemed largely duplicative or otherwise unhelpful. Finally, Defendant anticipates that "running the terms for Jassy would be a very time-consuming and costly process that would yield at best cumulative information" given that the same search terms with the delimiter "W/65" produced more than 15,000 emails for Vermeulen and Vogels. (Doc. 361, at 11, 17 n.64). But Defendant reportedly refused Plaintiff's request to run the proposed search terms against Jassy's emails and provide a "hit" count. (Doc. 351, at 7). As a result, this Court has no idea of the volume of Jassy's emails that would be flagged for review using those terms, or the number if those terms were used with the narrower delimiter "W/50" for the years 2006-2018. In this Court's experience, it is relatively common (and not unduly burdensome) for a party to preliminarily run the searches to at least identify the number of "hits." And this is helpful information for the parties and the Court to consider in evaluating not only the burden of reviewing the emails but also whether the search terms are sufficiently narrowly tailored.

**\*4** For all of these reasons, Plaintiff's motion to compel Jassy's emails is denied but without prejudice. Given the missing information described above, the Court is not able to determine that the proposed search terms comply with the requirement in LPR ESI 2.6(e) that they be "narrowly tailored to particular issues[,]" and that "[i]ndiscriminate terms, such as the ... product name" be "combined with narrowing search criteria that sufficiently reduce the risk of overproduction." The parties are directed to confer in an effort to reach agreement on suitable search terms. To that end, Defendant must run the search terms to determine the

Case: 3:22-cv-50188 Document #: 255-7 Filed: 05/07/25 Page 12 of 20 PageID #:3402

Kove IO, Inc. v. Amazon Web Services, Inc., Not Reported in Fed. Supp. (2021)

number of hits, and provide this to Plaintiff. Depending on the results, the parties should discuss possible techniques to improve on the terms and capture a more reasonable subset of documents. For example, the parties may wish to consider further limiting the time period (Plaintiff has indicated it is "particularly interested in ESI during the early years of the accused products" (Doc. 351-7, 4/14/2021 Letter from J. Cardenas-Navia to J. Saltman, at 3)), using a smaller delimiter (e.g., W/30), or trying a sampling protocol. In the event the motion is re-filed, the parties should provide the missing information described in this order about the results of the other custodian searches that were done using the same terms, and Defendant must more specifically address the burden issue.

**II. The "Six-Pager"**
Plaintiff next seeks a copy of Jassy's six-page AWS vision document (the "six-pager"). In 2003, Jassy and others were part of a one-day brainstorming session at Jeff Bezos' house to come up with a list of project ideas. (Doc. 351-20, 11/11/2019 Blog Post, at 3). This list served as "a starting point" for "a narrative to define the AWS business." (*Id.*). Allan Vermeulen, former Amazon CTO and early S-Team member who helped develop and design the Amazon S3 product, testified at his June 4, 2021 deposition that Jassy ultimately "wrote the original six-page document that describes ... the AWS vision and laid out kind of the strategy for how the business would grow." (Doc. 351-2, at 6, Vermeulen Dep., at 37). Jassy later presented the "six-pager" to the Amazon Board of Directors and "spearheaded Amazon's move into a new field: cloud computing." (Doc. 351-3, 2/3/2021 New York Times article, at 2).

Though the "six-pager" likely lays out Jassy's earliest vision for AWS, Defendant refuses to produce a copy of it to Plaintiff. As Defendant explains, Plaintiff has consistently limited its email search terms for Jassy (and other email custodians) to 2006 forward. (Doc. 361, at 19). Since the "six-pager" was drafted years earlier in 2003, it would not be captured by Plaintiff's proposed search terms. The flaw in this argument is that Defendant concedes Plaintiff specifically asked for the document in its Sixth Set of Requests for Production in February 2021. (*Id.*). In such circumstances, the 2003 date of creation is not a basis to deny production of the document. [2]

Defendant also argues the "six-pager" has no relevance to the case because it is a "non-technical document" written "before AWS or any of the accused products existed, before the asserted patents issued, and before the time period for which Kove is claiming damages." (*Id.*). To begin, Defendant cites no authority for the suggestion that only "technical" documents are discoverable in this case. Moreover, Plaintiff has alleged that the "six-pager" is "relevant to the value of infringing features and the hypothetical negotiation." [3] It reasons that the document "describes the vision for the architecture and significance of S3 – the very accused feature that infringes Kove's patents – and is contemporaneous with the hypothetical negotiation" occurring at the time infringement began. (Doc. 369, at 16). The Court is persuaded that the "six-pager" meets the bar for relevance. *See* FED. R. EVID. 401 (relevant evidence is that which "has any tendency to make a fact more or less probable" and "is of consequence in determining the action."). Moreover, AWS does not claim it would be burdensome or difficult to produce this small document that already is in hand. This portion of the motion to compel is granted.

**III. Jassy Deposition**

**A. The Apex Doctrine**
**\*5** The parties' primary dispute concerns whether Jassy, who is now serving as Amazon's CEO, should have to sit for a deposition. Courts may protect high-level executives from being deposed pursuant to the "apex doctrine" if any of four circumstances exist: "(1) the official has no unique personal knowledge of the matter in dispute; (2) the information can be garnered from other witnesses; (3) the information can be garnered from other discovery methods; or (4) sitting for the deposition would impose a hardship in light of the officer's other duties." *DeLeon-Reyes v. Guevara*, Nos. 18 C 1028, 18 C 2312, 2021 WL 3109662, at \*3 (N.D. Ill. July 22, 2021). *See also Lee v. City of Chicago*, No. 20 C 1508, 2021 WL 2399999, at \*2 (N.D. Ill. June 11, 2021); *Little v. JB Pritzker for Governor*, No. 18 C 6954, 2020 WL 868528, at \*1 (N.D. Ill. Feb. 21, 2020). Though "the apex doctrine ... is not an ironclad rule, [it] bespeaks sensitivity to the risk that very valuable executive time would be wasted where the officer has no real information." *Id.* (quoting *Dyson, Inc. v. Sharkninja Operating LLC*, No. 14 C 779, 2016 WL 1613489, at \*1 (N.D. Ill. Apr. 22, 2016)).

Under the apex doctrine, the party seeking to avoid discovery "bears the burden of 'showing that good cause exists to prevent' the discovery." *Dyson*, 2016 WL 1613489, at \*1 (quoting *Powertech Tech., Inc. v. Tessera, Inc.*, No. C 11-6121 CW, 2013 WL 3884254, at \*1 (N.D. Cal. July 26, 2013)).

Case: 3:22-cv-50188 Document #: 255-7 Filed: 05/07/25 Page 13 of 20 PageID #:3403

Kove IO, Inc. v. Amazon Web Services, Inc., Not Reported in Fed. Supp. (2021)

"This makes sense, as the logical underpinnings of the apex doctrine seeks to prevent a high-ranking corporate executive from being run through the wringer of civil discovery, when they do not have personal knowledge of the relevant facts; in other words, to protect apex employees 'from annoyance, embarrassment, oppression, or undue burden or expense' " as contemplated by Rule 26(c)(1). *Id.* at *1. Moreover, "[a] strong showing is required before a party will be denied entirely the right to take a deposition." *City of Rockford v. Mallinckrodt ARD, Inc.*, No. 17 C 50107, 20 C 50056, 2020 WL 1675593, at *1 (N.D. Ill. Apr. 6, 2020) (citing *Nucap Indus. Inc. v. Robert Bosch LLC*, No. 15 C 2207, 2017 WL 6059770, at *4 (N.D. Ill. Dec. 7, 2017)).

### B. Unique Personal Knowledge Unavailable from Other Sources

"Courts have not hesitated to block efforts to depose high-ranking officials where ... the officials do not have unique personal knowledge of the facts underlying the events that lead to the lawsuit in question." *Lee*, 2021 WL 2399999, at *3 (citing *Little*, 2020 WL 868528, at *2) (holding that the governor should not be deposed where he lacked unique or specialized knowledge relevant to the litigation); *Murillo v. Kohl's Corp.*, No. 16-CV-196-JPS, 2016 WL 6090862, at *3 (E.D. Wis. Oct. 18, 2016) (holding that defendant's chief merchandising and customer officer should not be deposed where she lacked "any 'specialized' or 'unique' knowledge about the manner in which the defendants price[d] their merchandise").

There can be little doubt that Jassy has personal knowledge related to the accused products in this case. As noted, he is a founding member of AWS and he was an original member of the S-Team that created the Amazon S3 product. In addition, Vermeulen testified that Jassy was "responsible for" AWS and "managed the teams." (Doc. 351-2, at 6, Vermeulen Dep., at 37). The question is whether Jassy's knowledge is unique, or whether Plaintiff can obtain the same information from other sources. [4]

**\*6** Defendant argues that Jassy does not have any unique knowledge that cannot be obtained from Vermeulen, Sr. Principal Engineer of DynamoDB James Sorenson, AWS Chief Evangelist Jeff Barr, and others. As a preliminary matter, Defendant finds it suspect that Plaintiff did not identify Jassy as a knowledgeable witness in its Rule 26(a) disclosures or throughout 25 months of discovery despite knowing his significant role within the company. In fact, Plaintiff waited until March 8, 2021, just one month after Amazon made an announcement that Jassy would be taking over as CEO, before mentioning for the first time that it "may" request emails from him. (Doc. 351-5). Plaintiff then noticed Jassy's deposition on May 26, 2021, less than two months before he became Amazon CEO. (Doc. 361, at 6). Defendant also notes that even before his promotion to CEO of Amazon, Jassy was AWS's highest-ranking executive so oversaw the entire company, including its "more than 200 different products, only two of which are relevant here" (Amazon S3 and DynamoDB). (*Id.* at 12).

In addition, in emails spanning a 10-year period that Defendant produced for Vogels and Vermeulen, Jassy is listed in the To: or CC: line in less than 4%, "with most of his responses spanning one word." (*Id.*). For example, though Plaintiff finds it significant that Jassy was copied on two email threads discussing "S3 Daily Metrics" in August and October 2007, Jassy merely responded to one with "I love the beginning of the month! congrats [Redacted]," and to another with "Nice!!" (Doc. 351, at 10; Doc. 351-18; Doc. 351-19). Defendant says even the more substantive emails reflect that Jassy was involved at a very high level. (*See* Doc. 351-22, at 4, 9/21/2007 Email from A. Jassy to D. Grismore, et al.) ([Redacted]); (Doc. 351-23, 1/18/2012 Email from A. Jassy to S. Sivasubramanian et al.) (congratulating team members about the launch of DynamoDB and describing it as [Redacted].").

Plaintiff denies that it can reasonably get the information it needs from anyone but Jassy, who it says has unique knowledge about the early days of AWS, including "how the company was structured, how and what drove the early product development (including S3), projects, pricing, and metrics at the outset." (Doc. 351, at 14). Of course, this begs the question why Plaintiff waited more than two years to identify Jassy as a potential witness and email custodian. Plaintiff is correct that one proffered alternative witness, James Sorenson, was not an original S-Team member (Doc. 351, at 17), and another (Jeff Barr) testified at his recent deposition that he did not know how Jassy made decisions in the early days or how he built teams within AWS. (Doc. 379-2, at 10, 13, Barr Dep., at 96, 147). Nor was Barr involved in the design and development of Amazon S3 or DynamoDB. (*Id.* at 11-12, 15, Barr Dep., at 107-08, 278). But Vermeulen was present during the 2003 brainstorming session at Bezos's house that led to the creation of AWS and was part of the original S-Team, so he has knowledge of the company's origins along with Jassy. (Doc. 351-20, Barr Blog, at 3).

Case: 3:22-cv-50188 Document #: 255-7 Filed: 05/07/25 Page 14 of 20 PageID #:3404

Kove IO, Inc. v. Amazon Web Services, Inc., Not Reported in Fed. Supp. (2021)

Plaintiff disagrees, citing Vermeulen's testimony that he and Jassy "came from very different directions with very different backgrounds." (Doc. 351-2, at 7, Vermeulen Dep., at 38). As Vermeulen testified, he is a "very technical person" while Jassy is a "business-oriented person." (*Id.*). Nevertheless, Vermeulen made clear that "the entire team [had] full responsibility for the entire product." (*Id.*). Though Jassy had "more responsibility for overall thinking about what market segments we were going to approach" and "how we would position our products, what our pricing strategy would be" (*id.*), these are not topics Plaintiff attributed to Jassy in its Third Amended Initial Disclosures served on July 6, 2021. (Doc. 361-4, at 9) (stating that Jassy has knowledge about the "[h]istory of AWS and the development and launching of Amazon S3; benefits of speed, performance, scalability, and availability of S3."). And in those same disclosures, Plaintiff identified 12 other individuals as having knowledge about marketing, pricing, and pricing strategy, as well as speed, performance, scalability, and availability of S3. (*Id.* at 4-10).

**\*7** Significantly, Plaintiff has served eight Rule 30(b)(6) deposition notices covering 90 topics, many of which Plaintiff now claims are uniquely within Jassy's knowledge. (Doc. 361, at 15; Doc. 384, at 2). For example, Topic 6 addresses "[t]he history of the development of the Accused Products, including Your decisions to develop [them] and ... implement the Relevant Features." (Doc. 361-16, at 10). And Topic 28 addresses "[t]he pricing of the Accused Products, including the manner in which You derive or establish Your pricing and any analyses or studies associated with Your pricing." (*Id.* at 13). If Plaintiff can obtain the information it needs from Rule 30(b)(6) witnesses (as yet to be determined), then it cannot establish that Jassy has "unique" personal knowledge that is unavailable from other sources. *See, e.g.,* Hallmark Licensing LLC v. Dickens Inc., No. 17 C 2149, 2018 WL 6573435, at \*5 (E.D.N.Y. Dec. 13, 2018) (denying motion to compel apex deposition where at least "some of the information sought will be addressed during the 30(b)(6) deposition, with a deponent who has the best knowledge.").

Plaintiff argues that Jassy is still "uniquely positioned to testify as to how and why" Amazon S3 became "critical to other services offered by AWS." (Doc. 351, at 14) (citing Doc. 351-2, 13-14, Vermeulen Dep., at 83-84). But the cited testimony from Vermeulen in no way establishes that Amazon S3 was critical to other AWS services, or that Jassy would have unique information in that regard. Vermeulen testified only that Amazon S3 is "valuable" and "useful" [Redacted] (Doc. 351-2, at 13, Vermeulen Dep., at 83).

Also unavailing is Plaintiff's theory that Jassy should be deposed simply because he "may have different facts or perspectives" than other witnesses. (Doc. 351, at 17) (citing Mendez v. City of Chicago, No. 18 C 5560, 2020 WL 3510692 (N.D. Ill. June 29, 2020)). If all a party needed to show under the apex doctrine was that a high-level executive has a different perspective from other witnesses, then such executives could routinely be deposed. But the caselaw does not support such a rule. Indeed the *Mendez* court did not address the apex doctrine at all; it merely allowed the defendants to depose a child who personally witnessed an encounter between the plaintiffs (the child's parents) and the defendant officers while they were executing a search warrant. 2020 WL 3510692, at \*2. The plaintiffs objected that the child's testimony was unnecessary in light of an interview he gave about the incident to CBS News, but the court found it significant that the child had offered "contradictory statements regarding the subject encounter" which the defendants were "entitled to explore." *Id.* Nothing in *Mendez* supports Plaintiff's request to depose Jassy.

Even if much of Jassy's knowledge about AWS is not entirely unique, there is at least one topic about which it appears he may have unique knowledge: his creation of the "six-pager" setting forth the vision for AWS. *See* In re Pradaxa (Dabigatran Etexilate) Prods. Liab. Litig., No. 3:12-MD-02385-DRH-SCW, 2014 WL 257566, at \*2-3 (S.D. Ill. Jan. 23, 20014) (denying motion for protective order where apex deponent had "first-hand, nonrepetitive knowledge of facts at issue in th[e] case."). As noted earlier, Defendant insists the document is irrelevant because it predates the 2006 launch date of Amazon S3 – and the existence of the accused products – by some three years. (Doc. 361, at 19). This Court already has overruled that objection and ordered Defendant to produce this document that reportedly lays out the foundation of the company that led to the development of the accused Amazon S3 product. Whether the document contains any specific information about the accused products that will be helpful to Plaintiff remains to be seen.

Without that information, Plaintiff's rationale for needing to depose Jassy about the content or creation of the "six-pager" is speculative. Plaintiff says it wants to question Jassy about "what prompted the drafting of the document, who was involved in it, when and to whom the document was presented, who was involved in executing the items therein,

Case: 3:22-cv-50188 Document #: 255-7 Filed: 05/07/25 Page 15 of 20 PageID #:3405

Kove IO, Inc. v. Amazon Web Services, Inc., Not Reported in Fed. Supp. (2021)

and whether and how the ideas manifested themselves in the development of AWS and the accused S3 product." (Doc. 351, at 14). But without knowing the specific content of the document, Plaintiff is hard-pressed to persuasively argue (and this Court to find) that Jassy's testimony about the six-pager would be probative of matters at issue in this lawsuit, and that the information sought could not be obtained from other witnesses. Plaintiff also says "[t]he creation and promulgation of this document are relevant to understanding the business incentives, profits and design decisions, corporate genesis, and corporate structure of the Defendant." (Doc. 351, at 14). This broad statement is equally unhelpful. Plaintiff fails to explain, for example, what it is seeking to learn about Defendant's "corporate structure," how that information bears on the issues in dispute in the lawsuit, and why the information cannot be obtained through other witnesses.

*8 For these reasons, Plaintiff's motion to compel Jassy to sit for a deposition is denied. But that denial is without prejudice. If, after reviewing the "six-pager" and completing the Rule 30(b)(6) and other depositions, Plaintiff is able to demonstrate that it has been unable to obtain information on specific topics that bear on the elements of the claims or the alleged damages, and that Jassy has unique knowledge of this information, the motion may be renewed. If that happens, "the Court will consider 'the totality of the circumstances, weighing the value of the material sought against the burden of providing it, and taking into account society's interest in furthering the truthseeking function in the particular case before the court.' " *In re Pradaxa*, 2014 WL 257566, at *2 (quoting *Patterson v. Amery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002)). See also *Nucap Indus. Inc.*, 2017 WL 6059770, at *4 (quoting *Serrano v. Cintas Corp.*, 699 F.3d 884, 901 (6th Cir. 2012)) (the key consideration is "the executive's knowledge of relevant information. Discovery has limits which 'grow more formidable as the showing of need decreases.' "). [5]

## CONCLUSION

For the reasons stated above, Plaintiff's Motion to Compel Discovery of Andrew Jassy [351, 352] is granted in part and denied without prejudice in part.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 12094206

---

## Footnotes

1. It is not entirely clear which delimiter Defendant used for this production. Defendant stated that the delimiter "W/65" captured 13,123 emails (Doc. 361, at 9), but that it reviewed "more than 15,000 emails" from Vogels and Vermeulen. (*Id.* at 17 n.64).

2. Defendant also argues that the motion to compel production of the "six-pager" is not properly before the Court because the parties did not meet and confer about it. (Doc. 361, at 19). Plaintiff disputes this (Doc. 369, at 17), and it is apparent from the briefing that further conference would be futile in any event.

3. The "hypothetical negotiation" "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Sloan Valve Co. v. Zurn Indus., Inc.*, 33 F. Supp. 3d 984, 990 (N.D. Ill. 2014) (quoting *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009)).

4. Plaintiff cites *Johnson v. Jung*, 242 F.R.D. 481 (N.D. Ill. 2007), for the proposition that an apex deponent's knowledge need not be "unique." (Doc. 369, at 6 n.7). That case is inapposite because it did not address the apex doctrine. Rather, the court allowed the deposition of the defendant's CEO because she had information considered "relevant" "as that term is expansively defined in Rule 26." *Johnson*, 242 F.R.D. at 485.

Kove IO, Inc. v. Amazon Web Services, Inc., Not Reported in Fed. Supp. (2021)

Case: 3:22-cv-50188 Document #: 255-7 Filed: 05/07/25 Page 16 of 20 PageID #:3406

5   In light of this ruling, the Court need not address Defendant's argument that requiring Jassy to sit for a deposition would impose a hardship in light of his other duties. *DeLeon-Reyes,* 2021 WL 3109662, at *3. If the motion is re-filed, Defendant will be required to address this issue with specificity.

**End of Document**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case: 3:22-cv-50188 Document #: 255-7 Filed: 05/07/25 Page 17 of 20 PageID #:3407

Nucap Industries Inc. v. Robert Bosch LLC, Not Reported in Fed. Supp. (2017)

2017 WL 6059770
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

NUCAP INDUSTRIES INC.
and Nucap US Inc., Plaintiffs,
v.
ROBERT BOSCH LLC, Bosch Brake Components
LLC, and Robert Bosch GmbH, Defendants.

No. 15 CV 2207
|
Filed 12/07/2017

**Attorneys and Law Firms**

Michael A. Jacobs, Morrison & Foerster LLP, San Francisco, CA, Todd H. Flaming, Kenneth E. Kraus, Krausflaming LLC, Chicago, IL, Chanwoo Park, Kyle W.K. Mooney, Sarah L. Prutzman, Morrison & Foerster LLP, New York, NY, Joshua Alan Hartman, Michelle Yang, Morrison & Foerster LLP, Washington, DC, Kenneth A. Kuwayti, Morrison & Foerster LLP, Palo Alto, CA, for Plaintiffs.

Alan Norris Salpeter, Robert W. Unikel, Dina Marie Hayes, Emily Newhouse Dillingham, Michelle Kristina Marek, Arnold & Porter Kaye Scholer LLP, Chicago, IL, Philip A. Giordano, Kaye Scholer LLP, Washington, DC, Stephen Christopher Holmes, Kaye Scholer LLP, Palo Alto, CA, for Defendants.

### MEMORANDUM OPINION and ORDER

Young B. Kim, United States Magistrate Judge

*1 Before the court is Defendants' motion for a protective order barring the deposition of Volkmar Denner, Chairman of the Board of Management of Defendant Robert Bosch GmbH ("Bosch GmbH"). For the following reasons, the motion is granted without prejudice to Plaintiffs seeking leave to re-notice Denner's deposition if and when they can demonstrate a need for it:

### Background

The facts in this case are set forth in previous orders resolving the parties' motions for summary judgment and motions to dismiss, so the court need not repeat them at length here. See Nucap Indus., Inc. v. Robert Bosch LLC, No. 15 CV 2207, 2017 WL 1197104, at *2-6 (N.D. Ill. Mar. 31, 2017); see also Nucap Indus., Inc. v. Robert Bosch LLC, No. 15 CV 2207, 2017 WL 3581174, at *1-5 (N.D. Ill. Aug. 18, 2017). Briefly, Plaintiffs sold brake components to Defendants from 2008 until their business relationship soured and came to an end in November 2014. See Nucap Indus., 2017 WL 1197104, at *2-3. The parties have differing views on what led Bosch GmbH, a German limited liability company and indirect parent of Robert Bosch, LLC ("Bosch") and Bosch Brake Components, LLC ("Bosch Brake"), to terminate their relationship. (See R. 961, Pls.' Opp. at 2.) According to Plaintiffs, Defendants' decision to end the parties' business dealings in 2014 "is central to the claims, counterclaims, and defenses in this case[,]" and Plaintiffs argue that Denner is likely to have knowledge on this topic. (Id. at 4.) Defendants contend that Denner has no relevant and unique personal knowledge relating to Plaintiffs' claims and that any such information can be obtained through less burdensome means. (R. 914, Defs.' Mot. at 1-2; R. 978, Defs.' Reply at 2.)

### Analysis

Federal Rule of Civil Procedure 26(b)(1) allows parties to "obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense," and public policy favors disclosure of relevant materials. See Patterson v. Avery Dennison Corp., 281 F.3d 676, 681 (7th Cir. 2002). Rule 26(c)(1) also allows district courts to issue a protective order limiting discovery to protect a party from oppression, undue burden, or expense for good cause. Before doing so, the court must consider the totality of the circumstances and weigh the value of the material sought against the burden of providing it. Patterson, 281 F.3d at 681 (citations omitted).

When it comes to determining who bears the burden of showing good cause in the case of deposing high-level executives, federal courts have adopted varying approaches. See Iain D. Johnston, *Apex Witnesses Claim They Are Too Big to Depose*, Litigation, American Bar Association, Vol. 41, No. 1 (Fall 2014), available at https://www.ilnd.uscourts.gov/_assets/_documents/_forms/_judges/johnston/apexwitnessdepose.pdf ("*Apex Witnesses*") (collecting cases). Bosch GmbH asserts that Plaintiffs bear the burden of showing both that Denner is likely to possess relevant, unique personal knowledge and that less intrusive avenues

Case: 3:22-cv-50188 Document #: 255-7 Filed: 05/07/25 Page 18 of 20 PageID #:3408

Nucap Industries Inc. v. Robert Bosch LLC, Not Reported in Fed. Supp. (2017)

of discovery have been exhausted. (R. 914, Defs.' Mot. at 3-5.) Meanwhile Plaintiffs argue that Bosch GmbH has the burden of demonstrating that "extraordinary circumstances" justify granting a protective order. (R. 961, Pls.' Opp. at 2 (internal quotation marks omitted).) Both parties seek to apply the "apex doctrine," a framework used by some courts to analyze whether to allow the depositions of high-ranking senior executives or officials. *See, e.g., Finisar Corp v. Nistica, Inc.*, No. 13-3345, 2015 WL 3988132, at *1 (N.D. Cal. June 30, 2015); *Powertech Tech., Inc. v. Tessera, Inc.*, No. 11-6121, 2013 WL 3884254, at *1 (N.D. Cal. July 26, 2013).

**\*2** Although the Seventh Circuit has not formally adopted the apex doctrine, both parties cite to *Patterson* in support of their position. In *Patterson*, the Seventh Circuit noted that deposing "a high-ranking executive in a multinational corporation ... would have been a quite costly and burdensome means" for determining whether he had information bearing on the claims in the case. 281 F.3d at 681. The *Patterson* court also observed in that case that the plaintiff seeking to depose the executive failed to take advantage of an "inexpensive, convenient method of discovery, i.e., interrogatories," which casted "serious doubt" over her claim that the executive had information "that was more than marginally relevant to her civil action." *Id.* at 682 (citations omitted). After considering these factors and the relatively small amount in controversy, the *Patterson* court affirmed the district court's decision not to permit the deposition. *Id.*

According to Bosch GmbH, *Patterson* mandates that Denner, an "apex employee," must be protected from having to sit for a deposition unless Plaintiffs can first prove he has unique, non-cumulative, first-hand relevant knowledge that cannot be obtained by other less intrusive means. (See R. 914, Defs.' Mot. at 3-4.) But this view misreads *Patterson* and contradicts the well-established principle that the party seeking protection from discovery bears the burden of presenting "a particular and specific demonstration of fact" as to the need for that protection. *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n.16 (1981) (citations omitted); *see also Hodgdon v. Northwestern Univ.*, 245 F.R.D. 337, 341 (N.D. Ill. 2007) ("[Rule 26] puts the burden on the party seeking the protective order to show some plainly adequate reason for its issuance."); *Johnson v. Jung*, 242 F.R.D. 481, 483 (N.D. Ill. 2007) ("The burden to show good cause is on the party seeking the protective order." (citation omitted)). Rather than shifting the burden to the party seeking discovery, *Patterson* merely acknowledged that when weighing the value of the material sought against the burden of providing it, courts may consider an employee's "apex" position and whether less burdensome alternatives are available. *See Patterson*, 281 F.3d at 681-82. As such, rather than establishing hard and fast requirements, *Patterson* confirmed the idea that a court should be sensitive to the risk of abuse where an executive has no real information, and as with any other protective order, "should look for guidance to a balance of the likelihood of oppression or harassment compared to the value of the inquiry in generating important information." *See Dyson, Inc. v. Sharkninja Operating LLC*, No. 14 CV 779, 2016 WL 1613489, at *1 (N.D. Ill. April 22, 2016) (citation omitted).

Bearing this in mind, the court considers the specific reasons Bosch GmbH provides for why there is good cause for a protective order. First, according to Bosch GmbH, Denner had no involvement in the actions giving rise to Plaintiffs' claims. (R. 914, Defs.' Mot. at 1.) Bosch GmbH further contends that less burdensome avenues, such as issuing written discovery and deposing other witnesses, are available to Plaintiffs for obtaining the information they seek from Denner. (Id. at 9-13.) Finally, Bosch GmbH argues that sitting for a deposition would be unduly burdensome and would significantly disrupt Denner's company obligations. (Id. at 13.) The court addresses each of these reasons in turn.

**A. Denner's Lack of Involvement**

The court finds Bosch GmbH's evidence that Denner was not involved in the events at issue persuasive. First, Bosch GmbH asserts, and Plaintiffs do not dispute, that Denner "is not identified as an author, sender or recipient of even a single pre-litigation document ... of the nearly 3 million pages of documents exchanged thus far[.]" (R. 914, Defs.' Mot. at 1.) Plaintiffs also do not dispute that no other witnesses have suggested that Denner was involved with, or has knowledge regarding, the central issues in the case. To support its argument, Bosch GmbH attaches deposition transcript excerpts from key employees of Defendants Bosch and Bosch Brake who testified to their lack of contact with Denner. (Id., Exs. E & F.) Bosch GmbH also includes affidavits from Lutz Marschall, President of Bosch Brake, and Eckhard Lichtenthaler, Senior Vice President of the Automotive Aftermarket Brake Components ("AA-BC") business unit of Bosch GmbH, attesting to the fact that Denner was not involved in decisions regarding Defendants' business relationship with Plaintiffs, and that they had no conversations with Denner prior to the lawsuit about that relationship or Defendants' efforts to purchase brake components from another group of companies. (See id., Exs. I & J.) Rather than making "stereotyped and conclusory

Case: 3:22-cv-50188 Document #: 255-7 Filed: 05/07/25 Page 19 of 20 PageID #:3409

Nucap Industries Inc. v. Robert Bosch LLC, Not Reported in Fed. Supp. (2017)

statements" regarding Denner's limited involvement, Bosch GmbH has provided specific support for its assertion that Denner does not have relevant information.

**\*3** Plaintiffs attempt to counter Bosch GmbH's showing by citing to an email from Marschall regarding the parties' deteriorating relationship, a letter from Lichtenthaler with Denner's name in the footer, Denner's online bio, a press release issued after this suit was filed, and Defendants' counterclaims alleging that Plaintiffs ceased product shipments "without justification" and "in order to cause Bosch financial and reputational distress." (R. 961, Pls.' Opp. at 5-6.) However, the court is unconvinced that this evidence shows Denner has more than a remote relationship to the claims in this case. As an initial matter, it is unclear why Defendants' reasoning for ending their business relationship with Plaintiffs is "central to the claims, counterclaims, and defenses in this case" as Plaintiffs allege. (See R. 961, Pls.' Opp. at 4.) The court recently held that at this stage in the proceedings, information regarding the safety of certain brake components and their alleged role in the dissolution of contractual relations between the parties is irrelevant. (See R. 951.) But even if the court ultimately determines that such information is in fact relevant as Plaintiffs urge in their objection to the court's order, (R. 956), the evidence Plaintiffs rely on does little to show that Denner has that information. Plaintiffs cite an email from Marschall to Ray Arbesman, Chairman and Owner of Nucap Industries, stating that the parties' endangered relationship was a topic that "ha[d] reached board level in Germany." (R. 961, Pls.' Opp. at 5.) However, this vague language does not implicate Denner's direct involvement in the matter, nor does it identify which board Marschall is referring to and what is meant by "reached." (See R. 978, Defs.' Reply at 8.)

As for Denner's name appearing in the company stationery's footer and "Corporate Strategy" being listed as one of his responsibilities on Defendants' web site, Plaintiffs are grasping at straws. This is unlike other cases where the executive is portrayed in marketing materials as being "uniquely 'hands-on,' " *see In re Pradaxa (Dabigatran Etexilate) Prods. Liab. Litig.*, MDL No. 2385, 2014 WL 257566, at \*2 (S.D. Ill. Jan. 23, 2014), or where evidence shows the executive had a substantial role in the specific decisions at issue, *see id.*; *Jung*, 242 F.R.D. at 485. Here, the mere appearance of Denner's name in a letterhead (alongside several other names, presumably board members) and the generic description of his role as board chairman of a large corporation are insufficient to justify taking his deposition.

*See Bombardier Recreational Prods., Inc. v. Arctic Cat, Inc.*, No. 12-CV-2706 MJD/LIB, 2014 WL 5685463, at \*3 (D. Minn. Sept. 24, 2014) (finding marketing brochure statements "generalized and vague, akin to statements attributable to any company's president and/or CEO regardless of his or her level of involvement").

Plaintiffs' argument based on the October 2015 press release also falls short. As discussed above, the court is not convinced that brake component safety is relevant to the issues in this case. (See R. 951.) Even if it were, it is unclear how Bosch GmbH's public statements on the topic several months after Plaintiffs filed this lawsuit are relevant, and the court is not persuaded that Plaintiffs' evidence regarding the press release justifies Denner's deposition. For all these reasons, the court agrees with Bosch GmbH that Denner's involvement with the issues in this case is minimal, if any, which favors granting a protective order.

**B. Less Intrusive Means**
In support of its contention that Plaintiffs can obtain the information they seek using less intrusive means, Bosch GmbH points to the fact that Plaintiffs did not seek written discovery regarding Denner's alleged involvement in, or knowledge of, the acts giving rise to their claims. (See id. at 10; R. 978, Defs.' Reply at 13.) Bosch GmbH also names several of Defendants' current and former employees whose depositions are pending, who it contends were actually involved in the events at issue and can provide the information Plaintiffs seek. (See R. 914, Defs.' Mot. at 10-11; R. 978, Defs.' Reply at 13-14.) Plaintiffs argue in response that other deponents are not on the Bosch GmbH board and cannot provide the same high-level information that Denner can. (See R. 961, Pls.' Opp. at 11-12.) But for reasons already discussed, Plaintiffs have not adequately explained why board-level testimony is relevant. At any rate, Plaintiffs themselves concede that completing depositions of lower-ranking Bosch GmbH employees first could result in more efficient depositions of higher-level witnesses later, if permitted. (See id. at 13.) The court thus agrees with Bosch GmbH that Plaintiffs should first seek testimony from other accessible deponents who are more likely to have relevant information than Denner.

**C. Burden on Denner**
**\*4** Finally, Bosch GmbH argues that a deposition would be unduly burdensome for Denner given his busy schedule and would be "extremely disruptive" to his company obligations.

Case: 3:22-cv-50188 Document #: 255-7 Filed: 05/07/25 Page 20 of 20 PageID #:3410

Nucap Industries Inc. v. Robert Bosch LLC, Not Reported in Fed. Supp. (2017)

(See R. 914, Defs.' Mot. at 13.) This is Bosch GmbH's weakest argument, betrayed in part by the fact that it occupies only one paragraph in Bosch GmbH's opening brief. (See id.) Indeed, many courts have given short shrift to arguments based on a high-ranking executive's self-described busyness. *See, e.g., Jung*, 242 F.R.D. at 486 ("As with the President of the United States ... scheduling, not prohibition, accommodates and harmonizes the inevitably competing interests involved in discovery matters."); Johnston, *Apex Witnesses*, *supra*, at 4-5 (collecting cases). As hectic as an executive's schedule might be, "the hypothetical single parent could make a compelling argument that he is busier than the hypothetical chief executive officer[.]" Johnston, *Apex Witnesses*, *supra*, at 5.

The more important consideration, as discussed above, is the executive's knowledge of relevant information. Discovery has limits which " 'grow more formidable as the showing of need decreases.' " See *Serrano v. Cintas Corp.*, 699 F.3d 884, 901 (6th Cir. 2012) (quoting 8A Charles A. Wright & Arthur R. Miller et al., *Federal Practice and Procedure* § 2036 (3d ed. 2012)). "[E]ven very slight inconvenience may be unreasonable if there is no occasion for the inquiry and it cannot benefit the party making it." *Id.* (internal quotations and citation omitted). Here, given Plaintiffs' inability to show that they need to depose Denner, the court finds that requiring him to provide testimony at this time would impose an undue burden. That being said, completely prohibiting a deposition is an extraordinary measure. *See* 8A Wright & Miller, at § 2037 n.5 (collecting cases). Should Plaintiffs develop additional evidence showing Denner's involvement with the relevant facts and issues in this case, the court will reconsider the need for this protective order.

### Conclusion

For the foregoing reasons, Defendants' motion for a protective order is granted without prejudice to Plaintiffs seeking leave to re-notice Denner's deposition if and when they can demonstrate a need for his deposition.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 6059770

---

End of Document     © 2025 Thomson Reuters. No claim to original U.S. Government Works.