# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, STATE OF ILLINOIS, STATE OF ARIZONA, ATTORNEY GENERAL DANA NESSEL on behalf of THE PEOPLE OF MICHIGAN, STATE OF MINNESOTA, and STATE OF WISCONSIN,<br><br>     *Plaintiffs*,<br><br>  v.<br><br>DEERE & COMPANY,<br><br>     *Defendant*. | Case No. 3:25-cv-50017<br><br>Hon. Iain D. Johnston |
| IN RE: DEERE & COMPANY REPAIR SERVICES ANTITRUST LITIGATION | Case No.: 3:22-cv-50188<br>MDL No. 3030<br>Hon. Iain D. Johnston |

## GOVERNMENT PLAINTIFFS' AND MDL PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTIONS TO COMPEL DEFENDANT DEERE & COMPANY'S PRODUCTION OF DOCUMENTS RESPONSIVE TO GOVERNMENT PLAINTIFFS' REQUEST FOR PRODUCTION NO. 13 AND MDL PLAINTIFFS' REQUEST FOR PRODUCTION NO. 64

# **TABLE OF CONTENTS**

**Page(s)**

I.  BACKGROUND ................................................................................................ 2

    A.  The Dealer Financial Analysis ("DFA") Database .................................................. 2

    B.  Government Plaintiffs' Request for Production No. 13 ........................................ 4

    C.  MDL Plaintiffs' Request for Production No. 64 .................................................. 5

II.  ARGUMENT ................................................................................................... 6

    A.  Legal Standard.................................................................................................. 6

    B.  The DFA Data Is Relevant ............................................................................... 8

        1.  The DFA Data Is Relevant in the Government Action ................................. 8

        2.  The DFA Data Is Relevant in the MDL Action ......................................... 9

    C.  Deere Cannot Meet its Burden to Establish with Specificity that Production of DFA Data Would Be Unduly Burdensome or Cumulative ................................... 10

        1.  Deere Relies on Ipse Dixit to Support its Claim of Undue Burden ............. 11

        2.  The Requested Discovery Is Not Duplicative or Cumulative ...................... 13

III.  CONCLUSION ............................................................................................... 15

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Baxter Int'l Inc. v. AXA Versicherung,*
    320 F.R.D. 158 (N.D. Ill. 2017)..........................................................................6

*Bd. of Educ. Of Evanston Twp. High Sch. Dist. No. 202 v. Admiral Heating &*
    *Ventilating, Inc.,*
    104 F.R.D. 23 (N.D. Ill. 1984)...........................................................................7

*In re eBay Seller Antitrust Litig.,*
    No. C 07-1882, JF (RS), 2009 U.S. Dist. 2009 U.S. Dist. LEXIS 132817 (N.D.
    Cal. Oct. 28, 2009).........................................................................................12

*Epps v. Dart,*
    No. 22 C 2393, 2022 U.S. Dist. LEXIS 213505 (N.D. Ill. Nov. 28, 2022)......................12

*FireBlok IP Holdings, LLC v. Hilti, Inc.,*
    No. 19 C 50122, 2021 U.S. Dist. LEXIS 221224 (N.D. Ill. Aug. 10, 2021)......................8

*In re Folding Carton Antitrust Litig.,*
    76 F.R.D. 420 (N.D. Ill. 1977)...........................................................................8

*In re Folding Carton Antitrust Litig.,*
    83 F.R.D. 251 (N.D. Ill. 1978).......................................................................6, 8

*Kellam Energy Inc. v. Duncan,*
    616 F. Supp. 215 (D. Del. 1985)........................................................................7

*Mervyn v. Atlas Van Lines, Inc.,*
    No: 13 C 3587, 2015 U.S. Dist. LEXIS 144376 (N.D. Ill. Oct. 23, 2015)......................12

*Papst Licensing GmbH & Co. KG v. Apple, Inc.,*
    No. 6:15-cv-1095, 2017 U.S. Dist. LEXIS 51274 (N.D. Ill. Apr. 4, 2017)......................11

*Parkdale Am., LLC v. Travelers Casualty & Surety Co. of Am., Inc.,*
    No. 3:06CV78-R, 2007 U.S. Dist. LEXIS 88820 (W.D.N.C. Nov. 19, 2007).................12

*In re Ranbaxy Generic Drug Application Antitrust Litig.,*
    No. 19-md-02878-NMG, 2020 U.S. Dist. LEXIS 163292 (D. Mass. Sept. 8, 2020).........8

*Rayome v. ABT Elecs.,*
    No. 21 C 2639, 2024 U.S. Dist. LEXIS 161476 (N.D. Ill. Sept. 9, 2024).........................7

*Sailsbery v. Vill. of Sauk Village,*
    No. 15-cv-10564, 2020 U.S. Dist. LEXIS 170439 (N.D. Ill. Sept. 17, 2020)...................7

*Scott v. Edinburg*,
    101 F. Supp. 2d 1017 (N.D. Ill. 2000) ...............................................................6

*Sols. Team v. Oak St. Health*,
    No. 17 CV 1879, 2021 U.S. Dist. LEXIS 132847 (N.D. Ill. July 16, 2021) ......................8

*Soto v. City of Concord*,
    162 F.R.D. 603 (N.D. Cal. 1995*)* ......................................................................7

*In re Sulfuric Acid Antitrust Litig.*,
    231 F.R.D. 351 (N.D. Ill. 2005) ......................................................................11

*In re Urethane Antitrust Litig.*,
    261 F.R.D. 570 (D. Kan. 2009), 261 F.R.D. 570 .............................................................7

**Rules**

Federal Rules of Civil Procedure
    26(b)(1) ...................................................................................6, 7, 12
    30(b)(6) ....................................................................................5, 6

**Other Authorities**

6 MOORE'S FEDERAL PRACTICE – CIVIL
    § 26.42 ..................................................................................7

Government Plaintiffs[1] submit this memorandum of law in support of their motion to compel the production of data from Deere & Company ("Deere") in the Government Action. MDL Plaintiffs[2] submit this memorandum of law in support of their motion to compel the production of the very same data from Deere in the MDL Action. For the convenience of the court and the parties, Government Plaintiffs and MDL Plaintiffs are filing a single, identical memorandum in support of their respective motions to compel.

Government Plaintiffs and MDL Plaintiffs (together, "Plaintiffs") seek to compel Deere to produce data from its Dealer Financial Analysis ("DFA") database in response to Government Plaintiffs' Request for Production No. 13 ("RFP No. 13") served on Deere on February 14, 2025, and MDL Plaintiffs' Request for Production No. 64 ("RFP No. 64") served on Deere on September 29, 2023. Deere uses the DFA database to analyze financial information submitted by dealers monthly.

Like all of Government Plaintiffs' initial requests for production to Deere, RFP No. 13 seeks information previously requested during the Federal Trade Commission's ("FTC") pre-complaint investigation. During that proceeding Deere neither produced the DFA data nor substantiated its reason for not doing so, despite months of negotiations. Deere now has again dragged its feet through months of discussions, repeatedly asking for explanations of the information's relevance and invoking generic burden arguments, before surfacing a definitive refusal to produce the DFA data. Deere has not responded to Government Plaintiffs' requests that it substantiate its claims by producing a data sample.

---

[1] "Government Plaintiffs" refers to plaintiffs in *Federal Trade Commission et al. v. Deere & Company*, Case No. 3:25-cv-50017 (the "Government Action").

[2] "MDL Plaintiffs" refers to plaintiffs in *In re Deere & Company Repair Services Antitrust Litigation*, Case No. 3:22-cv-50188 (the "MDL Action").

Independently, MDL Plaintiffs have been seeking the DFA data since September 2023. Deere has similarly resisted disclosure of DFA data in the MDL Action, refusing to identify even the fields of information available in the DFA database and arguing that the data is irrelevant or too burdensome to produce.

The DFA database contains the most complete financial records of Deere dealers' revenue and profitability, capturing financial information such as dealer costs and volume-based incentive payments that is not reflected in the other databases from which Deere is producing. Even if other data sources overlap with the DFA data, these other sources do not embody the holistic picture of dealer profitability contained in the DFA data.

Because the requested data is relevant to Plaintiffs' claims and because there is no undue burden associated with its production, the Court should order Deere to produce the DFA data in both the Government Action and the MDL Action.

## I.    BACKGROUND

### A.    The Dealer Financial Analysis ("DFA") Database

Plaintiffs in both actions allege that Deere monopolizes repair services markets. Government Plaintiffs allege that by monopolizing the repair services market, Deere enables its dealers to maintain a 100% market share and charge supracompetitive prices for restricted repairs and enables itself to reap additional profits through sales of replacement parts. Government Action, ECF No. 60 ("Am. Compl.") ¶¶ 11-13, 65-87, 110-117. MDL Plaintiffs similarly allege that Deere's restrictive practices prevent equipment owners and independent repair providers from competing in the repair services market, thereby enabling Deere and its dealers to charge supracompetitive prices for parts and repair services. *See* MDL Action, ECF No. 85 ("CCAC") ¶¶ 5-14, 27, 30, 34, 96, 102-105, 187 & n.90.

The financial performance of Deere dealers is integral to these allegations and is reflected in the DFA database. Deere dealers promote and sell Deere equipment and parts and provide repair services to farmers who own Deere equipment. Government Action, ECF No. 99, Answer ¶ 3. Deere uses DFA data in the ordinary course of its operations to monitor and assess the profitability and financial performance of its dealers. *E.g.*, Hall Decl.[3] Ex. O at -587; *id.* Ex. J at 212:5-19. Through DFA, Deere collects dealers' profits and losses, balance sheet information, and related financial information. Hall Decl. Ex. M at 56:16-57:8 (█████████████████████ ████████████████████████████████████████████████████████████); *id.* Ex. N at 28:2-29:2 (████████████████████████ █████████████████████████████████████████████████████████ ████████████████████████); *id.* Ex. P (report generated from DFA). The DFA data can be used to generate a range of financial reports, including comparative reports, profitability models, and trend analyses. *See* Hall Decl. Ex. Q at -716-27 (identifying reports available through DFA). Although Deere also maintains transaction-level data, the DFA data contains a more complete record of dealers' total revenues, including from sales of parts, repair services, and integrated solutions, as well as from Deere's various incentive programs, including incentives based on sales volumes and dealer performance. *E.g.*, Castillo Decl.[4] ¶¶ 8, 10-11; *id.* Ex. 3 (at tab 3), Ex. 4 at -144-45.

---

[3] References to "Hall Decl." refer to the Declaration of Laura R. Hall in Support of Government Plaintiffs' Motion to Compel Defendant Deere & Company's Production of Documents Responsive to Request No. 13 filed in the Government Action.

[4] References to "Castillo Decl." refer to the Declaration of Elizabeth T. Castillo in Support of MDL Plaintiffs' Motion to Compel Defendant Deere & Company's Production of Documents Responsive to Request for Production No. 64 filed in the MDL Action.

**B.    Government Plaintiffs' Request for Production No. 13**

On February 14, 2025, Government Plaintiffs served Deere with RFP No. 13 seeking

"Data Sets sufficient to show, on a monthly and dealer-specific basis, the financial performance

of Deere dealers as reflected in Deere's Dealer Financial Analysis ('DFA') system" for all Deere

dealers located in the United States for the relevant period (January 1, 2015 to present). Hall

Decl. ¶ 3; *id.* Ex. A at 12. RFP No. 13, like all other Requests in Government Plaintiffs' First Set

of Requests for the Production of Documents, was directed at material that the FTC requested

during its pre-complaint investigation but was not yet produced at the time the Complaint was

filed. Hall Decl. ¶ 4.[5]

On March 11, 2025, Government Plaintiffs sent Deere a letter providing additional

clarification on the RFPs and documenting certain agreements reached by the parties. Hall Decl.

¶ 7; *id.* Ex. B. Over the ensuing six weeks, Government Plaintiffs and Deere met and conferred

by videoconference on multiple occasions and exchanged multiple letters and emails in an effort

to resolve their disputes. Hall Decl. ¶¶ 9-14; *id.* Ex. D at 6, Ex. E at 6, Ex. F at 3-4, Ex. G at 5-6,

Ex. H at 5. As a result of significant discussion and compromise, the parties in the Government

Action have reached agreement as to nearly all RFPs. Hall Decl. ¶ 17.

In negotiations, Deere asserted that DFA data is irrelevant and that its production would

be cumulative and unduly burdensome. Hall Decl. ¶ 18. On March 28, April 2, April 10, and

again on April 24, 2025, Government Plaintiffs proposed a compromise for RFP No. 13. *Id.* ¶ 15.

Government Plaintiffs proposed that Deere provide a sample of the data so that Plaintiffs can

evaluate for themselves whether the DFA data is duplicative, as Deere claims. *Id.*; *id.* Ex. E at 6,

---

[5] The FTC and Deere were still conferring over the production of DFA data when the Complaint was filed, with the FTC seeking an explanation of the overlap between DFA data and other data that Deere had produced. Hall Decl. ¶ 5. Deere has not provided the requested explanation. *Id.*

F at 3-4, H at 5. On April 28, 2025, Deere rejected Government Plaintiffs' proposed compromise and confirmed that the parties are at impasse as to RFP. No. 13. Hall Decl. ¶ 16; *id.* Ex. I.

### C. MDL Plaintiffs' Request for Production No. 64

MDL Plaintiffs' RFP No. 64 seeks, "All financial or other performance reports that Deere regularly receives from dealers from January 12, 2016 through October 24, 2022." Castillo Decl. ¶ 4; *id.* Ex.1. In response to RFP No. 64, Deere produced "dealer scorecards," which are created using information from the DFA database, and are used by Deere to evaluate dealers' performance against a set of key metrics. *Id.* ¶ 6. There is, notably, material variation from one dealer scorecard to the next, and the information contained in the dealer scorecards represents only a subset of the information in the DFA database. *Id.* ████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████. *Id.* ¶¶ 6, 10; *id.* Ex. 3

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████

MDL Plaintiffs requested a list of fields and descriptions in July 2024, proposed targeted deposition questions to identify relevant metrics in March 2025, and followed up in May 2025 to confirm Deere's continued refusal to produce even a partial extract or sample dataset. Castillo Decl. ¶ 9. Deere continued to resist disclosure, refusing to produce even the fields of information available in the DFA database, while simultaneously arguing that the data is irrelevant or too burdensome to produce. *Id.*

MDL Plaintiffs are continuing to pursue avenues of discovery relating to this issue, including by serving a Rule 30(b)(6) deposition on DFA and dealer scorecards on March 31,

2025,[6] aimed at understanding what information Deere collects from its authorized dealers and how Deere uses that information to monitor, manage, and incentivize its dealers. *Id.* ¶ 13.

## II.     ARGUMENT

In its separate discussions with Plaintiffs, Deere has asserted—without support—that DFA data is irrelevant, cumulative, and unduly burdensome. Because Deere has offered no facts or data samples confirming its position that the DFA data is irrelevant or cumulative, and because Deere cannot meet its burden of establishing undue burden, the Court should order Deere to produce the DFA data sought by Government Plaintiffs' RFP No. 13 and MDL Plaintiffs' RFP No. 64.

### A.     Legal Standard

Plaintiffs are entitled to discovery of information relevant to their antitrust claims. *See* Fed. R. Civ. P. 26(b)(1). Federal Rule of Civil Procedure ("Rule") 37(a) permits parties to move to compel the production of discovery sought. Once the party seeking discovery demonstrates that the information sought is relevant, the party objecting to discovery "bears the burden to show the requested discovery is improper." *Baxter Int'l Inc. v. AXA Versicherung*, 320 F.R.D. 158, 161 (N.D. Ill. 2017).

The scope of relevant discovery under the Federal Rules of Civil Procedure is extremely broad. *In re Folding Carton Antitrust Litig.*, 83 F.R.D. 251, 254 (N.D. Ill. 1978). This is necessary to "allow the parties essentially equal access to the operative facts." *Scott v. Edinburg*, 101 F. Supp. 2d 1017, 1021 (N.D. Ill. 2000) (citation omitted). Discovery may be obtained

---

[6] This Rule 30(b)(6) deposition is confirmed for May 28, 2025; however, Deere has agreed to prepare a witness to provide testimony only to the extent the topic relates to Repair Services for Tractors. Castillo Decl. ¶ 13 n.1. Repair Services for Tractors are, of course, only one facet of dealer profitability and do not provide the whole picture of profitability captured by the DFA data. *Id.*

"regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1).

To be relevant, all that is required is that the information at issue "might bear on a claim raised in a Complaint." *Rayome v. ABT Elecs.*, No. 21 C 2639, 2024 U.S. Dist. LEXIS 161476, at *7 (N.D. Ill. Sept. 9, 2024) ("If that question can be answered in the affirmative, the challenged information is relevant and thus discoverable."); *see also* 6 MOORE'S FEDERAL PRACTICE - CIVIL § 26.42 (all that is required for materials to be discoverable "is that the fact must be germane to a claim or defense alleged in the pleading"). Questions of relevance should be construed "liberally and with common sense" and discovery should be permitted unless it has "no conceivable bearing on the case." *Soto v. City of Concord*, 162 F.R.D. 603, 610 (N.D. Cal. 1995*)*; *see also Sailsbery v. Vill. of Sauk Village*, No. 15-cv-10564, 2020 U.S. Dist. LEXIS 170439, at *4 (N.D. Ill. Sept. 17, 2020) ("[T]he [c]ourt should be permissive when considering relevance objections."). Furthermore, because any violation of antitrust laws is a blow to the free enterprise system, "there is a general policy of allowing liberal discovery in antitrust cases." *Kellam Energy Inc. v. Duncan*, 616 F. Supp. 215, 217 (D. Del. 1985) (citations omitted).

A party resisting discovery on the basis of relevance must establish that the requested materials are irrelevant by demonstrating that the information requested either "(1) does not come within the broad scope of relevance as defined under Fed. R. Civ. P 26(b)(1), or (2) is of such marginal relevance that the potential burden occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure." *In re Urethane Antitrust Litig.*, 261 F.R.D. 570 (D. Kan. 2009), 261 F.R.D. 570, 573; *see also Bd. of Educ. Of Evanston Twp. High Sch. Dist. No. 202 v. Admiral Heating & Ventilating, Inc.*, 104 F.R.D. 23, 29 n.10 (N.D. Ill. 1984)

("[T]he burden is on the objecting parties to show why release of the requested information would be improper.") (citing *In re Folding Carton Antitrust Litig.*, 83 F.R.D. at 254).

A party resisting discovery on the basis of undue burden or duplicative production must make a specific showing to justify withholding materials. *See Sols. Team v. Oak St. Health*, No. 17 CV 1879, 2021 U.S. Dist. LEXIS 132847, at *10-11 (N.D. Ill. July 16, 2021) ("[A] party resisting discovery on the basis of undue burden must show with specificity that the discovery requests [at] issue are objectionable."); *FireBlok IP Holdings, LLC v. Hilti, Inc.*, No. 19 C 50122, 2021 U.S. Dist. LEXIS 221224, at *15 (N.D. Ill. Aug. 10, 2021) ("The party opposing discovery has the burden of showing the discovery is overly broad, unduly burdensome, or not relevant. To meet this burden, the objecting party must specifically detail the reasons why each [request] is [overly broad or unduly burdensome].") (citations omitted).

## B. The DFA Data Is Relevant

The DFA data is relevant to the claims in both the Government Action and the MDL Action.

### 1. The DFA Data Is Relevant in the Government Action

The operations and financial performance of Deere dealers are relevant to the allegations in Government Plaintiffs' Complaint that Deere's conduct enables its dealers to maintain a 100% market share and to charge supracompetitive prices for restricted repairs. Am. Compl. ¶¶ 11-13, 65-87, 110-117. The DFA data may be used to show competitive conditions in repair services and parts markets and to assess the nature and magnitude of the effects of Deere's conduct on dealers' financial performance. *See In re Folding Carton Antitrust Litig.*, 76 F.R.D. 420, 426-27 (N.D. Ill. 1977) (permitting discovery of financial information that would "help plaintiffs determine whether or not [alleged monopolist] enjoyed unreasonably high or excessive profits, facts which are relevant to the issues here involved"); *see also In re Ranbaxy Generic Drug*

*Application Antitrust Litig.*, No. 19-md-02878-NMG, 2020 U.S. Dist. LEXIS 163292, at *11 (D. Mass. Sept. 8, 2020) (recognizing that profit margin data is often relevant to determining "whether a company had the ability to charge supra-competitive prices.").

In particular, the DFA data that Government Plaintiffs request bears on the following matters: the incentives that cause dealers to source parts almost exclusively from Deere (*see* Am. Compl. ¶¶ 84, 87); whether, as the Complaint alleges, Deere's conduct allows it and its dealers to reap supracompetitive profits on parts and service while causing equipment owners to pay more than they would otherwise pay for repairs (*see* Am. Compl. ¶¶ 11, 13, 72, 79, 81, 100); and the relationship between service revenues and parts revenues (*see* Am. Compl. ¶¶ 82, 97-100). At bottom, Government Plaintiffs seek to understand the incentives and the impact of those incentives—both on Deere's customers and on Deere's and its dealers' profitability—of Deere's use of repair restrictions to steer customers to dealers for repairs that would otherwise be performed elsewhere. *See* Am. Compl. ¶¶ 11, 72, 79, 81-84, 87, 97-100.

### 2.     The DFA Data Is Relevant in the MDL Action

Like Government Plaintiffs, MDL Plaintiffs allege that Deere has monopolized the Repair Services market through its exclusive control over repair tools, and that this prevents equipment owners and independent repair providers from performing repairs, thereby enabling Deere and its dealers to charge supracompetitive prices for parts and repair services. *See* CCAC ¶¶ 5-14, 30, 34, 96, 102-105, 187 & n.90. MDL Plaintiffs also allege that Deere tightly controls a shrinking, consolidated network of authorized dealers, and that this control and consolidation of the repair services market is driven by the pursuit of monopoly profits from repair, associated parts, and financing revenues. *See* CCAC ¶ 187 & n.90 (showing that parts and repair services reportedly accounted for approximately a fifth of Deere's total sales in 2020).

The DFA data is relevant to proving these claims and to understanding how Deere monitors, incentivizes, and profits from dealers' repair operations. Castillo Decl. ¶ 8. The DFA database contains structured, dealer-specific profitability and performance metrics that Deere uses to evaluate dealer operations, including sales of parts, sales of repair services, sales of integrated solutions, volume incentives, and other incentive programs. *Id.* ¶¶ 8, 10-11; *id.* Ex. 3 (at tab 3), Ex. 4 at -144-45. This data will also enable MDL Plaintiffs to assess the extent to which Deere's practices have generated supracompetitive profits, the financial role of parts and service in Deere's dealer strategy, and the bottom-line impact of Deere's exclusionary conduct on pricing and market structure. *See* CCAC ¶¶ 30, 34. Moreover, aggregate profitability and performance values will allow Plaintiffs to evaluate the relationships between equipment sales, parts and service revenue, volume and performance incentives, and overall dealer performance. That full picture of dealer economics is uniquely captured in the DFA data. *Id.* ¶ 8.

## C.     Deere Cannot Meet its Burden to Establish with Specificity that Production of DFA Data Would Be Unduly Burdensome or Cumulative

Deere's assertions to date that the DFA data is "cumulative, duplicative, and unduly burdensome" (Hall Decl. Ex. G at 6) lack the specificity mandated by the Federal Rules and controlling precedent. Deere has not identified what burden is associated with additional production (e.g., time, cost, technical barriers). Deere has rejected an offer from Government Plaintiffs to accept a sampling of the data in the first instance to facilitate negotiations relating to the request. *See* Hall Decl. ¶¶ 14-15; *id.* Ex. F at 3-4, Ex. H at 5, Ex. I, Deere has also rejected MDL Plaintiffs request for a list of relevant data fields. Castillo Decl. ¶ 9. Similarly, Deere claims—in conclusory fashion—that Plaintiffs' request for DFA data is duplicative of other data that has been produced. *See* Hall Decl. Ex. D at 6, Ex. G at 5-6, Ex. H at 5.

### 1. Deere Relies on Ipse Dixit to Support its Claim of Undue Burden

In support of its burden claim, Deere has offered only the generalized statement that Plaintiffs' request is "overbroad, unduly burdensome and disproportional to the needs of the case on the grounds that it seeks information for 120 separate months' worth of data for hundreds of Deere dealers, including dealers that are no longer in operation." *See* Hall Decl. Ex. C at 14-15 (Response to Request No. 13). Deere has not subsequently attempted to quantify this statement in terms of time, effort, or costs in any way. Instead, Deere simply repeats the phrase "120 individual months' worth of data multiplied hundreds of times over." *See* Hall Decl. Ex. D at 6, Ex. G at 6.

Deere's generalized assertion, without further detail about the time, costs, or technical barriers associated with production, falls far short of establishing undue burden. Without more specific representations, Deere's objections are tantamount to boilerplate objections. Mere recitation that a discovery request is overly broad, burdensome, or oppressive is not adequate to defeat discovery of relevant materials. *Papst Licensing GmbH & Co. KG v. Apple, Inc.*, No. 6:15-cv-1095, 2017 U.S. Dist. LEXIS 51274, at *10 (N.D. Ill. Apr. 4, 2017) (finding that "one claiming undue burden must do more than intone the phrase" and that "[u]ndue burden or expense, actual or potential, must be shown by 'a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements'") (citations omitted). Deere has not provided information from a knowledgeable person explaining the claimed burden or duplicative nature of the request. Such evidentiary support is required to justify noncompliance. *In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 351, 360 (N.D. Ill. 2005) ("In order to demonstrate undue burden, the plaintiffs must provide affirmative proof in the form of affidavits or record evidence . . . . Nothing of the sort have been offered by [defendants]. There is only the *ipse dixit*

of counsel, and that is not sufficient."); *Epps v. Dart*, No. 22 C 2393, 2022 U.S. Dist. LEXIS 213505, at *22 (N.D. Ill. Nov. 28, 2022) (assertion that compliance would take "hours or days" is "insufficient to establish an undue burden," without evidence or supporting declaration).

Deere's assertion of undue burden is predicated on the claim that Plaintiffs' respective requests implicate a large volume of data. However, production of large data sets is common in antitrust matters and is generally addressed by running an automated script across the database. *See, e.g.*, *Mervyn v. Atlas Van Lines, Inc.*, No: 13 C 3587, 2015 U.S. Dist. LEXIS 144376, at *21-23 (N.D. Ill. Oct. 23, 2015) (finding that "requiring the creation of new code does not necessarily create an undue technical burden" and compelling production of data); *see also In re eBay Seller Antitrust Litig.*, No. C 07-1882, JF (RS), 2009 U.S. Dist. LEXIS 132817, at *6-7 (N.D. Cal. Oct. 28, 2009) (upholding magistrate judge decision to compel production of new dataset records from existing database, and noting that "[t]he Federal Rules of Civil Procedure clearly contemplate the production of information from dynamic databases."). Deere has not demonstrated or explained the burden associated with the production of data from the DFA system.

Even were Deere to demonstrate its burden with sufficient (or any) specificity, to be considered "undue" the burden associated with production must be disproportionate to the relevance of the materials and the claims at stake in the litigation. *See* Fed. R. Civ. P. 26(b)(1) (directing courts to consider, *inter alia*, the issues at stake in the action, the amount in controversy, and the importance of the discovery). Courts frequently weigh defendants' cost of production against the value of the claims at stake and find that even significant costs of production do not excuse a party's obligation to produce responsive documents. *See, e.g.*, *Parkdale Am., LLC v. Travelers Casualty & Surety Co. of Am., Inc.*, No. 3:06CV78-R, 2007 U.S.

Dist. LEXIS 88820, at *35-36 (W.D.N.C. Nov. 19, 2007) (finding cost of $20,000 was not sufficient burden to excuse production in a case involving a $3,000,000 insurance policy).

Plaintiffs' respective complaints outline actions Deere took to illegally restrict the ability of farmers and independent repair providers to repair Deere equipment and allege that Deere's repair restrictions have driven up repair costs for farmers while also depriving them of choice and the ability to make timely repair on critical equipment. Am. Compl. ¶ 6, 72, 115; CCAC ¶ 26, 34, 71, 102. Plaintiffs also allege that Deere's unfair steering practice has boosted Deere's and its dealers' multi-billion dollar profits on repair service and parts, growing their repair business while burdening farmers with higher repair costs. Am. Compl. ¶ 1, 99, 116; CCAC ¶ 30, 100, 186-189. Deere has not provided Plaintiffs or the Court with *any* quantification of its claimed burden, much less one that outweighs the relevance of the requested data to this important case.

### 2.     The Requested Discovery Is Not Duplicative or Cumulative

Deere claims that production of DFA data would be disproportionate to the needs of the case because it is duplicative or cumulative of other data that Deere has produced, including transaction-level data, incentive data, and certain reports generated from the DFA data. These data sources, even if they contain overlapping information, are not themselves adequate.

Deere argues that the DFA data is not necessary because Deere has provided transactional data from its Equipment Lifecycle Integration of Parts and Service ("ELIPS") database and, via its dealers, from a program called "EQUIP." Some Deere dealers use EQUIP to track sales data related to equipment, parts, and service. Hall Decl. Ex. L at 104:15-105:20.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████ *E.g.,*

Hall Decl. Ex. R; *see also id.* Ex. S (identifying ELIPS data fields). These data sources, together, provide transaction-level data regarding dealers' equipment, parts, and service sales, but do not show the overall profitability of these business lines, which may depend upon undisclosed external costs and revenue streams such as incentives, rebates, returns, and financing costs. In addition, not all dealers provide data to Deere through ELIPS, and Deere has not provided EQUIP data for all dealers,[7] rendering the data sets incomplete.

Deere also argues that it has separately produced data relating to the incentives it provides to dealers for both equipment sales and parts sales. Hall Decl. Ex. G at 6. However, this data, without the DFA data, lacks context, including as to the size or significance of the incentive payments relative to dealer profitability.

Finally, Deere also argues that the DFA data is duplicative of "dealer scorecards" that Deere has produced. However, Deere's own witnesses have admitted that DFA contains significantly more data than is reflected in the dealer scorecards. Hall Decl. Ex. K at 149:13-17



*id.* Ex. J at 100:7-11

. In addition, internal Deere documents

Hall Decl. Ex. T. The dealer scorecard is

---

[7] Deere has provided EQUIP data for only a subset of around 19 dealers who were subpoenaed for that information in the MDL Action. Castillo Decl. ¶ 12. Because the EQUIP data does not encompass all dealers, an expert's ability to draw conclusions based on the data may be limited. *Id.*

███████████████████████████████████████████████████ *Id.* Further, the

data provided in the dealer scorecards is inconsistent across dealers and does not reflect the total

financial and performance data that Deere collects from its dealers. Castillo Decl. ¶ 6. With

dealer scorecards, Plaintiffs cannot perform their own analyses and assessments based on the

underlying data. *See id.* ¶ 7. Plaintiffs are limited to data fields that Deere selected for its own,

separate purposes. *Id.* Thus, dealer scorecards are not a substitute for the underlying DFA data.

*Id.*

## III.     CONCLUSION

Government Plaintiffs respectfully request that the Court grant their motion and order

Deere to produce in the Government Action complete data responsive to RFP No. 13, including

the DFA data, within 10 calendar days of the Court's Order. MDL Plaintiffs respectfully request

that the Court grant their motion and order Deere to produce in the Government Action the DFA

data underlying the dealer scorecards produced in response to RFP No. 64 within 10 calendar

days of the Court's Order.

Dated: May 16, 2025

*/s/ Laura R. Hall*
Laura R. Hall
Joseph R. Baker
Sophia Qasir
Melissa Westman-Cherry
**FEDERAL TRADE COMMISSION**
600 Pennsylvania Ave NW
Washington, DC 20580
Telephone: (202) 326-3282
Email: lhall1@ftc.gov
        jbaker1@ftc.gov
        sqasir@ftc.gov
        mwestman@ftc.gov

Rachel F. Sifuentes
**FEDERAL TRADE COMMISSION**
230 S. Dearborn St.,
Suite 3030
Chicago, IL 60604
Telephone: (312) 960-5617
Email:
rsifuentes@ftc.gov

*Attorneys for Plaintiff Federal Trade Commission*

**FOR PLAINTIFF STATE OF ILLINOIS**

KWAME RAOUL
Attorney General

*/s/ Briam M. Yost*
BRIAN M. YOST
Assistant Attorney General, Antitrust
JENNIFER M. CORONEL
Assistant Attorney General, Antitrust
ELIZABETH L. MAXEINER
Bureau Chief, Antitrust
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, IL 60603
Telephone: (872) 276-3598
Email: Brian.yost@ilag.gov
        Jennifer.coronel@ilag.gov

Respectfully submitted,

*/s/ Adam J. Zapala*
Adam J. Zapala
Elizabeth T. Castillo
Christian S. Ruano
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
azapala@cpmlegal.com
ecastillo@cpmlegal.com
cruano@cpmlegal.com

*/s/ Daniel C. Hedlund*
Daniel C. Hedlund
Daniel E. Gustafson
Michelle J. Looby
Kaitlyn L. Dennis
**GUSTAFSON GLUEK PLLC**
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dhedlund@gustafsongluek.com
dgustafson@gustafsongluek.com
mlooby@gustafsongluek.com
kdennis@gustafsongluek.com

Dennis J. Stewart
**GUSTAFSON GLUEK PLLC**
600 W. Broadway, Suite 3300
San Diego, CA 92101
dstewart@gustafsongluek.com

*/s/ Kenneth A. Wexler*
Kenneth A. Wexler
Justin N. Boley
Tyler J. Story
Margaret L. Shadid
**WEXLER BOLEY & ELGERSMA LLP**
311 S. Wacker Drive, Suite 5450
Chicago, IL 60606

Elizabeth.maxeiner@ilag.gov

*Attorneys for Plaintiff State of Illinois*

**FOR PLAINTIFF STATE OF ARIZONA**

KRISTIN K. MAYES
Attorney General

*/s/ Sarah Pelton*
SARAH PELTON
ROBERT A. BERNHEIM
Office of the Arizona Attorney General
Consumer Protection & Advocacy Section
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Email: Sarah.Pelton@azag.gov
        Robert.Bernheim@azag.gov

*Attorneys for Plaintiff State of Arizona*

**FOR PLAINTIFF DANA NESSEL**

DANA NESSEL
Attorney General

*/s/ LeAnn D. Scott*
LEANN D. SCOTT
Assistant Attorney General
Corporate Oversight Division
Michigan Department of Attorney General
P.O. Box 30736
Lansing, MI 48909
Telephone: (517) 335-7632
Email: ScottL21@michigan.gov

*Attorney for the People of Michigan*

**FOR PLAINTIFF STATE OF MINNESOTA**

KEITH ELLISON
Attorney General

Telephone: (312) 346-2222
F: (312) 346-0022
kaw@wbe-llp.com
jnb@wbe-llp.com
tjs@wbe-llp.com
ms@wbe-llp.com

*Interim Co-Lead Counsel for Plaintiffs*

17

JAMES CANADAY
Deputy Attorney General

*/s/ Elizabeth Odette*
KATHERINE A. MOERKE
Assistant Attorney General, Antitrust Division
ELIZABETH ODETTE
Manager, Assistant Attorney General, Antitrust
Division
Office of the Minnesota Attorney General
Suite 1400
445 Minnesota Street
St. Paul, MN 55101
Telephone: (651) 757-1257
Email: katherine.moerke@ag.state.mn.us
        elizabeth.odette@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*


**FOR PLAINTIFF STATE OF WISCONSIN**

JOSHUA KAUL
Attorney General

*/s/ Caitlin M. Madden .*
CAITLIN M. MADDEN
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 267-1311
Email: caitlin.madden@wisdoj.gov

*Attorney for Plaintiff State of Wisconsin*

18