UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Federal Trade Commission, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 25 CV 50017 |
| ) | Judge Iain D. Johnston |
| Deere & Co., ) | |
| ) | |
| Defendant. ) | |
| _____) | |
| ) | |
| In re: Deere & Co. Repair Services Antitrust ) | |
| Litigation ) | No. 22 CV 50188 |
| ) | Judge Iain D. Johnston |

**MEMORANDUM OPINION AND ORDER**

As the subject of the instant motion to compel discovery, Deere's Dealer Financial Analysis ("DFA") is its most comprehensive record of dealer profitability: a consolidated spreadsheet marrying total revenues on parts sales and repair services, customer end pricing, operating returns on each revenue stream, market share, cost absorption, incentives received directly from Deere, and other key financial metrics. *See generally* E.C.F. 22-cv-50188, Dkt. 273. Once the data aggregates in Deere's DFA, it can't be sorted by relevant product lines. *Id.* at 2. But it can be further processed. *Id.* at 2–3. With a data dictionary and the right series of keystrokes, rows of backwards Navajo morph into recognizable words; income statements, comparative performance analyses, and profitability models spring from the application in a matter of minutes. Dkt. 264 at 3. The takeaway,

1

for those lost already, is that the DFA can automate many of the same analyses the Plaintiffs' opinion witnesses will likely generate in litigation.

Not surprisingly, then, the DFA is a sore point for all Parties. Deere freely produced transaction-level data on dealer financial performance and aftermarket incentives while refusing to produce any portion of the DFA. Dkt. 273 at 3. After several requests for production and good-faith negotiations, both sets of Plaintiffs filed identical memoranda and motions to compel the full raw DFA data sets and any ancillary data dictionaries. *Id.* at 3; Dkt. 264 at 4. Even if the Court assumes the DFA data falls within the scope of both RFPs, those motions are denied for the following reasons.

## I. Analysis

Although the party seeking to compel discovery generally has the burden of showing relevance, *DR Distributors, LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 978 (N.D. Ill. 2021) (collecting cases), motions to compel under Federal Rule of Civil Procedure 37 require a two-step analysis: Once the movant adequately shows relevance, the burden shifts to the objecting party to explain why the requested discovery is otherwise improper. *Gingerich v. City of Elkhart Prob. Dep't*, 273 F.R.D. 532, 536 (N.D. Ind. 2011) (collecting cases). Under the now nearly decade-old amendments to the Federal Rules of Civil Procedure, if privilege isn't at issue—and it isn't in this motion—then the district court must focus on relevance and proportionality.

2

a. Relevance

The inquiry begins with Rule 26, which allows parties to obtain discovery regarding "any nonprivileged matter that is relevant to any party's claim or defense . . . ." Fed. R. Civ. P. 26(b)(1). Although the federal rules don't define relevance for discovery purposes, courts have derived a few common themes. First, trial "courts have broad discretion to adjudicate discovery disputes and determine the underlying relevancy." *Daniels v. Jeffreys*, 683 F. Supp. 3d 854, 858 (C.D. Ill. 2023). Second, "courts should err on the side of permissive discovery" for close questions of relevance. *Coleman v. Illinois*, No. 19C 3789, 2020 U.S. Dist. LEXIS 177020, at *9 (N.D. Ill. Sep. 25, 2020) (quoting *Wiginton v. CB Richard Ellis, Inc.*, 229 F.R.D. 568, 577 (N.D. Ill. 2004)). Third, and most importantly for this decision, relevance is "necessarily broader" under Rule 26(b)(1) than under Federal Rule of Evidence 401. *Martinez v. Cook Cty.*, No. 11 C 1794, 2012 U.S. Dist. LEXIS 175793, at *6 (N.D. Ill. Dec. 12, 2012) (collecting cases); *Laudicina v. City of Crystal Lake*, 328 F.R.D. 510, 520 (N.D. Ill. 2018) (diagramming the concepts); *EEOC v. Jewel Food Stores, Inc.*, 231 F.R.D. 343, 349-50 (N.D. Ill. 2005).

Under Rule 401's low threshold and, by extension, the less onerous standard for discovery purposes, the DFA contains relevant information on Deere's alleged economic interest in monopolizing repair markets. DFA data minimally supports the MDL conspiracy claim (Count I) by suggesting that Deere tracks and analyzes dealer profitability to formulate financial strategies. More directly to the Governments'

theory, Deere allegedly monopolizes the aftermarket by restricting repair services to authorized dealers who, in turn, regularly use Deere parts. Dkt. 282 at 10–11. Even if parts sales and repair services are distinct revenue streams as Deere argues, both flow to the same ocean, surging aftermarket profits *in general*.

    b. Proportionality

Despite its relevance, the DFA data isn't proportional under Rule 26(b)(1), which instructs courts to consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Though a party may rightly incur heavy burdens when producing highly relevant information, even minimal burdens are undue if the sought-after material adds little value to the litigation. *Gremillion v. Grayco Communs., L.P.*, No. 16-9849, 2017 U.S. Dist. LEXIS 212307, at *5 (E.D. La. Dec. 28, 2017).

Although Deere couches its argument in the context of proportionality, dkt. 275, at 10, its more specific argument is that it has already produced the information, dkt. 275, at 7-10. So, Deere argues that producing the DFA would be cumulative and duplicative. Dkt. 275, at 7, 10. The Federal Rules of Civil Procedure specifically protect against cumulative and duplicative discovery in Rule 26(b)(2)(C)(i) ("On motion or on its own, the court must limit the frequency or extent of discovery

4

otherwise allowed by these rules . . . if it determines that . . . the discovery sought is unreasonably cumulative or duplicative . . . ."). Deere doesn't cite Rule 26(b)(2)(C)(i) in its opposition; instead, it leans on Rule 26(b)(1)'s proportionality provision. But the concept of proportionality is embodied in Rule 26(b)(2)(C). *Chen-Oster v. Goldman, Sach & Co.*, 285 F.R.D. 294, 3030 (S.D.N.Y. 2012). Courts often consider proportionality in the context of Rule 26(b)(2)C). *See Maxtena, Inc. v. Marks*, 289 F.R.D. 427, 434 (D. Md. 2012). And this process works in reverse: Rule 26(b)(2)(C)(i)'s protections against duplicative or cumulative discovery are part of proportionality. Discovery that is duplicative or cumulative are not proportional. *See Hurd v. W. World Ins. Co.*, Civil No. 13-540, 2013 U.S. Dist. LEXIS 191362, at *2 (D. N.M. Dec. 10, 2013) (citing Rule 26(b)(2)(C)(i)-(iii) and stating, "This is, in essence, the meaning of 'proportionality.'").

Consistent with Rule 26(b)(1)'s sliding scale and the protections offered by Rule 26(b)(2)(C)(i), the Court won't subject Deere to even the minimal burden of producing DFA data that adds no real value when Deere has essentially already produced the information. Between the 30(b)(6) deposition, pre-existing productions, and dealer

5

subpoenas,[1] the Plaintiffs have already received the relevant dealer financial performance and incentive metrics. Collectively more than the sum of their parts, these pre-existing productions allow the Plaintiffs to manually conduct dealer financial analyses. Some data sets sweep broadly where others are discrete. *Compare* Dealer Scorecards (producing dealer-level aftermarket sales metrics, including total labor sales, total net sales, net parts, operating return on sales, market share, and cost absorption in the parts and service departments) *with* EQUIP data (a service data set showing parts used, parts quantity, and labor hours for just nineteen dealers). But in any event, the Plaintiffs have essentially received extracted DFA data concerning Deere's agricultural equipment, which is the equipment at issue in these actions. And providing information is the goal of discovery. *Spencer v. Church of Prismatic Light*, 22-cv-257, 2024 U.S. Dist. LEXIS 159574, at *14 (W.D. Wis. Sept. 4, 2024); *Triteq Lock & Sec. LLC v. Innovative Secured Solutions, LLC*,

---

[1] The Plaintiffs have received dealer transactional data on whole goods, parts sales, and repair services, taken a 30(b)(6) deposition on the Dealer Scorecards and DFA data surrounding tractor repair services, and received the following data sets:

- Aftermarket Volume & P4P Program Scorecards from 2019-2024 on Deere's Aftermarket Volume & Pay for Performance Program;
- Pay for Performance Data containing volume and performance based incentive data each dealer has earned from 2015-2022;
- Incentives transactional data from 2015-2023 which shows the incentive amounts paid to dealers by product;
- Dealer Development Progress Reports for each year from 2015-2022;
- Dealer Scorecards from 2015-2020;
- Monthly Performance Data showing dealer-level data from 2016-2021;
- Transaction level data from 2015-2022 containing information on individual dealer pricing of parts and repair services; and
- Transaction level data for Deere equipment and parts sold to Deere dealers.

6

10C1304, 2011 U.S. Dist. LEXIS 82245, at *6 (N.D. Ill. Jul. 21, 2011); *Kelly v. McGraw-Hill Cos.*, 270 F.R.D. 470, 472 (N.D. Ill. 2012); *Jones v. City of Indianapolis*, 02-cv-1152, 2004 U.S. Dist. LEXIS 5635, at *11 (S.D. Ind. Mar. 31, 2004).

At the Plaintiffs' request, Deere identified these overlapping productions by Bates number and organized them by categories—effectively handing over a box of small puzzle pieces. Dkt. 282 at 5, n. 14. Rather than assemble the puzzle, the Plaintiffs criticize each individual production.[2] The EQUIP data lacks information about parts and labor rates, the Dealer Scorecards aren't readily comparable, and the Incentives Scorecard Data is annual, not monthly. That may all be true. But the Court aggregates the data across Deere's pre-existing productions to understand what, if anything, is missing. And, after a detailed review of the filings, the information sought from the DFA has been previously produced. For example, the Dealer Scorecards fill EQUIP gaps about part sales and repair service rates, the EQUIP data is readily comparable where the Dealer Scorecards aren't, and the Monthly Performance Data breaks down the Dealer Scorecards in more detail. At best, the Plaintiffs speculate that the DFA "may" contain "more reliable and comprehensive" information. *Id.* at 5. But the question for the Court, more concretely, is *what's missing?*

---

[2] At times, the Plaintiffs even drop pieces on the floor and then complain they're missing. *See* Dkts. 264 and 282 (never acknowledging the detailed incentive metrics in the P4P data or Incentives Scorecards).

7

On the Court's review, the primary difference between the pre-existing productions and DFA data is that the DFA aggregates agricultural equipment with unrelated business lines; whereas, Deere's prior productions typically isolate agricultural products. To the extent the DFA contains something more than the pre-existing productions, its addition decreases its importance to the litigation. Perhaps the Plaintiffs' opinion witnesses would disagree with that conclusion. But scouring the record and finding nothing new, the Court won't delegate its discretion to opinion witnesses. *See Herbert v. Lando*, 441 U.S. 153, 177 (1979) ("[D]istrict courts should not neglect their power to restrict discovery where justice requires protection for a party or person from . . . undue burden or expense . . . .") (cleaned up). Even if there were unique information in the DFA not in prior productions, compelling production would still be disproportionate. As a consolidated data set across all business lines, from what has been presented to the Court, the DFA can't connect dealer parts specifically with agricultural repair services. *See* Dkt. 273 at 2, 5–6.

8

## II.  Conclusion

In its discretion and for the reasons already given, the Court denies all Plaintiffs' motions to compel Deere's production of documents allegedly responsive to Government Plaintiffs' Request for Production No. 13 and MDL Plaintiffs' Request for Production No. 64.

Entered: July 7, 2025                     By:_____

                                                         Iain D. Johnston
                                                         U.S. District Judge