# Attachment

## TABLE OF UNPUBLISHED AUTHORITIES

**CASES** **PAGE(S)**

*Brookins v. Coldwell Banker*,
No. 02 C 3425, 2003 WL 1720028 (N.D. Ill. Mar. 31, 2003) ....2

*In re Midwest Video Games, Inc.*,
No. 98 C 3836, 1998 WL 395152 (N.D. Ill. July 9, 1998) ....5

*United States v. Aetna Inc.*,
No. 1:16-cv-1494 (JDB), 2016 WL 8738421 (D.D.C. Sep. 14, 2016) ....8

*Suu v. Siemens Indus., Inc.*,
No. 12-cv-03743, 2014 WL 4775163 (N.D. Cal. Sep. 22, 2014) ....17

*Media Matters for Am. v. FTC*,
No. 25-cv-1959 (SLS), 2025 WL 2378009 (D.D.C. Aug. 15, 2025) ....22

*In re Broiler Chicken Antitrust Litig.*,
No. 16-cv-8637, 2017 WL 4417447 (N.D. Ill. Sep. 28, 2017) ....43

*In re Graphics Processing Units Antitrust Litig.*,
No. C 06-7417, 2007 WL 2127577 (N.D. Cal. July 24, 2007) ....50

*Midwest Gas Servs. Inc. v. Ind. Gas Co.*,
No. IP99-0690, 2000 WL 760700 (S.D. Ind. Mar. 7, 2000) ....55

*In re Demert & Doughtery, Inc.*,
No. 01CV7289, 2001 WL 1539063 (N.D. Ill. Nov. 30, 2001) ....57

2003 WL 1720028
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

# Howard BROOKINS, Jr., Appellant,
v.
COLDWELL BANKER, Appellee.

No. 02 C 3425.
|
March 31, 2003.

*MEMORANDUM AND ORDER*

MANNING, J.

***1** Howard Brookins brings this appeal pursuant to 28 U.S.C. § 158(a) and seeks review of a bankruptcy court order requiring him to produce, with certain limitations, his file relating to his representation of a former client. For the following reasons, this appeal is dismissed for lack of jurisdiction.

## I. Background

Brookins, an attorney, represented Janquenatta Anderson at the closing of the sale of her home. Subsequently, Anderson filed suit in the United States Bankruptcy Court, Northern District of Illinois, against both the sellers and broker involved in the sale. (Bankr.Case Nos. 98 B 13975; 99 A 00016.)

During the course of the bankruptcy court litigation, Coldwell Banker issued a subpoena to Brookins for a deposition scheduled on October 1, 2000. The subpoena also requested that Brookins bring documents related to the closing on Anderson's home. At the deposition, Brookins asserted that the contents of his file on the Anderson closing were subject to the attorney-client privilege. After an adjournment of the deposition, and unsuccessful correspondence, Coldwell Banker filed a motion to compel requesting production of the Anderson file. In his response to Coldwell Banker's motion, Brookins asserted, in addition to his privilege claim, that he had an unsatisfied retaining lien over the Anderson file, and thus would not produce its contents. The bankruptcy court granted Coldwell Banker's motion and ordered Brookins to make the file available for inspection, subject to certain conditions. Brookins seeks appellate review of this production order.

## II. Discussion

Bankruptcy appeals as of right are limited to "final judgments, orders and decrees ... of bankruptcy judges." 28 U.S.C. §

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

158(a). Alternatively, § 158(a)(3) permits district courts, in their discretion, to hear appeals "from other interlocutory orders and decrees." There is no doubt that the order from which Brookins now appeals is not a final order; rather, it is an interlocutory discovery order. Thus, jurisdiction here is proper only if the Court, sitting in its appellate jurisdiction, grants leave for the appeal to proceed.

Neither the Bankruptcy Code nor the Bankruptcy Rules provide any criteria to guide the exercise of this Court's discretion. Therefore, courts interpreting § 158(a)(3) turn to the familiar standards set forth at 28 U.S.C. § 1292(b) which govern when courts of appeal will grant leave to appeal a district court's interlocutory order. *See In re. Midwest Video Games, Inc.,* 1998 WL 395152, at *2 (N.D.Ill. July 9, 1998); *Carlson v. Brandt,* 1997 WL 534500, at *6 (N.D.Ill. Aug. 22, 1997); *S.N.A. Nut Co. v. Nat'l Union Fire Ins. Co.,* 1996 WL 411290, at *4 (N.D.Ill. July 19, 1996). Section 1292(b) authorizes appellate review of a nonfinal order when (i) the order involves a controlling question of law, (ii) as to which there is substantial ground for difference of opinion, (iii) and an immediate appeal will materially advance the ultimate termination of the litigation. *See* 28 U.S.C. § 1292(b). The backdrop to this analysis is the Seventh Circuit's admonition that "[t]he general and very salutary rule is that discovery orders are not appealable until the end of the case." *Union Carbide Corp. v. U.S. Cutting Service, Inc.,* 782 F.2d 710, 712 (7th Cir.1986).

***2** The Court need not tarry long in concluding that resolution of the present discovery dispute fails to present a controlling question of law. *See Santa Fe Industries, Inc. v. Yorke,* 1991 WL 18483, at *1 (N.D.Ill. Feb. 11, 1991) ("It is difficult to decipher how a discovery order could be a controlling question of law.") Even if disclosure of the information contained in the Anderson file ultimately impacts the course of the underlying action, the bankruptcy court's order, standing alone, is not dispositive of any controlling legal issue.

Second, to establish a "substantial ground for a difference of opinion," Brookins had to, at least, set forth a sufficient number of conflicting decisions regarding the claimed controlling issue of law. *See Carlson,* 1997 WL 534500, at *6. Brookins has not done so and his objections to the bankruptcy court's order, though multiple and vociferous, do not demonstrate a substantial ground for a difference of opinion which requires this Court's immediate intervention. *See id.* ("[G]eneralized opposition to an adverse ruling is insufficient to demonstrate substantial ground for difference of opinion.") Nor do the nature of Brookins' privilege and retaining lien objections relax the general rule that interlocutory discovery orders are not appealable. *See E.H. Reise v. Board of Regents of the Univ. of Wisconsin,* 957 F.2d 293, 295 (7th Cir.1992) ("[E]ven orders to produce information over strong objections based on privilege are not appealable, despite the claim that once the cat is out of the bag the privilege is gone.")

Finally, although a colorable argument could be made that this Court's resolution of the production dispute would expedite *that* issue, it is far from clear that its resolution would advance the ultimate determination of the litigation. Moreover, the Court is reluctant to permit piecemeal appeals of discovery questions best left to the discretion of the bankruptcy judge. *See Jartran v. Fruehauf,* 886 F.2d 859, 863 (7th Cir.1989) ("To routinely permit separate appeals as to each distinct claim or issue raised ... would obviously undermine the finality rule entirely.").

To the extent that the bankruptcy judge did commit an error, and this Court makes no findings, express or implied, that she did, there remains ample opportunity for Brookins to air his objections before the bankruptcy judge. In addition, Brookins is not denied meaningful appellate review merely because he must await a final disposition in the bankruptcy court. *See In re. Lifschultz Fast Freight Corp.,* 127 B.R. 418, 419 (N.D.Ill.1991). In sum, the bankruptcy court's garden variety discovery order does not present the unique circumstances that warrant immediate appellate review.

III. Conclusion

Accordingly, the Court, in its discretion under 28 U.S.C. § 158(a), declines to grant Brookins leave to appeal from the bankruptcy judge's interlocutory order. This appeal is, therefore, dismissed for lack of jurisdiction.

**All Citations**

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Not Reported in F.Supp.2d, 2003 WL 1720028

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

1998 WL 395152
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois.

# In re: MIDWEST VIDEO GAMES, INC., Debtor.

No. 98 C 3836.
|
July 9, 1998.

MEMORANDUM AND ORDER

MANNING, District Court J.

***1** Appellants Bernice Ackerman, Melvin Ackerman, John O'Brien, and Lisa O'Brien seek to stay a bankruptcy court order setting dates for examinations pursuant to Bankruptcy Rule 2004 pending resolution of the merits of their appeal. For the following reasons, this appeal is dismissed for lack of jurisdiction, the appellants' stay motion is denied as moot, and counsel for the appellants and the Creditors' Committee are directed to show cause why they should not be sanctioned for failure to comply with the briefing schedule set by the court.

*Background*

The appellants seek to stay discovery pursuant to Bankruptcy Rule 2004 that is scheduled to commence later this week. According to the appellants, the Official Committee of Unsecured Creditors filed an adversary complaint against them which alleges that, through their transactions and dealings with Midwest Video Games, they "engaged in 'fraudulent' transfers, obtained 'preferences' and treated the Debtor as their 'alter ego." ' (Motion at 1). The appellants claim that the bankruptcy court erred in allowing discovery under Bankruptcy Rule 2004 in light of the pending adversary proceeding against them. Specifically, they argue that, because an adversary proceeding against them is pending, discovery must occur under Bankruptcy Rule 7026, *et seq.,* rather than Bankruptcy Rule 2004.

*Jurisdiction*

The court's consideration of the appellants' stay motion begins and ends with its consideration of its jurisdiction to consider this appeal in the first instance. Bankruptcy appeals as of right are limited to "final judgments, orders, and decrees ... of bankruptcy judges." 28 U.S.C. § 158(a). Here, the appealed-from order relates to discovery. The appellants nevertheless

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

contend that this order is final, citing *In re Blinder, Robinson & Co., Inc.,* 127 B.R. 267 (D.Colo.1991). In *Blinder,* the court held that an order compelling discovery under Rule 2004 was interlocutory, but stated that:

> [t]his is not to say that all appeals from Rule 2004 orders are non-final. This question should be resolved on a case-by-case basis. Where the dispute has been narrowed and there is no indication that further action by the bankruptcy court will be forthcoming, an order concerning Rule 2004 examinations should properly be considered final.

*Id.* at 272–73.

Notably, the *Blinder* court explained why the discovery order appealed in that case was interlocutory. It did not, however, explain why a discovery order would become appealable simply because the bankruptcy judge definitively resolved that motion. The court declines to accept the appellants' invitation to find that the bankruptcy judge's discovery order is final because the bankruptcy judge has indicated that he does not intend to revisit his ruling, as the order is clearly interlocutory, even under the more relaxed standards of finality applicable to bankruptcy cases. *See, e.g., In re Jartran, Inc.,* 886 F.2d 859, 861–64 (7th Cir.1989) (discussing parameters of finality in bankruptcy cases); *Sante Fe Industries, Inc. v. Yorke,* No. 90 C 5359, 1991 WL 18483 *1 (N.D.Ill. Feb.11, 1991), *citing Union Carbide Corp. v. U.S. Cutting Service, Inc.,* 782 F.2d 710, 712 (7th Cir.1986) ("The general and very salutary rule is that discovery orders are not appealable until the end of the case"); *In re S.N.A. Nut Co.,* No. 96 C 181, 1996 WL 411290 *4 (N.D.Ill. Jul.19, 1991) (collecting cases regarding the non-appealability of discovery orders in bankruptcy cases); *In re Towers Financial Corp.,* 164 B.R. 719, (S.D.N.Y.1994) (criticizes *Blinder* rule and collects cases regarding the non-appealability of discovery orders in bankruptcy cases).

***2** The court also notes that the holding of *Blinder* requires a case-by-case determination as to the finality of a Rule 2004 order. It thus is susceptible to a variety of interpretations and, therefore, is at odds with the Seventh Circuit's recent admonition that jurisdictional rules in bankruptcy cases should be "simple and precise so that judges and lawyers are spared having to litigate over not the merits of a legal dispute but where and when those merits shall be litigated." *In re Lopez,* 116 F.3d 1191, 1194 (7th Cir.), *cert. denied,* 522 U.S. 1014, 118 S.Ct. 599, 139 L.Ed.2d 488 (1997). In addition, the appellants have failed to present a convincing reason why allowing an appeal as of right from a discovery order would not completely eviscerate the finality requirement, even when viewing finality from the more liberal bankruptcy perspective. For these reasons, the court finds that the bankruptcy court's Rule 2004 order is not final.

Thus, jurisdiction over this appeal is proper only if the court grants leave for the appeal to proceed. *In re Jartran,* Inc., 886 F.2d at 866; *In re Lifschultz Fast Freight Corp.,* 127 B.R. 418 (N.D.Ill.1991). Consideration of this question is governed by the familiar § 1292(b) factors, which authorize an appeal if: (1) the interlocutory order involves a controlling question of law; (2) as to which there is a substantial ground for difference of opinion; (3) and an immediate appeal will materially advance the ultimate termination of the litigation. 28 U.S.C. § 1292(b); *In re Lifschultz Fast Freight Corp.,* 127 B.R. at 418; *Sante Fe Industries, Inc.,* 1991 WL 18483 at *1.

The court finds that resolution of the parties' dispute concerning the scope of discovery fails to present a controlling question of law, as resolution of this "discovery matter is not likely to be dispositive of any of the material issues in this case." *Sante Fe Industries, Inc.,* 1991 WL 18483 at *1; *In re S.N.A. Nut Co.,* 1996 WL 411290 at *4 (bankruptcy court order regarding discovery was not controlling); *In re Lifschultz Fast Freight Corp.,* 127 B.R. at 419 (same). In addition, the appellants' disagreement with orders entered by the bankruptcy court with respect to discovery directed at them does not demonstrate that there is a substantial ground for difference of opinion. *See Sante Fe Industries, Inc.,* 1991 WL 18483 at *1. Finally, resolution of this discovery matter will multiply, as opposed to streamline, the proceedings.

Accordingly, the court exercises its discretion and declines to grant leave to file an interlocutory appeal. This appeal is, therefore, dismissed for lack of jurisdiction, and the appellants' stay motion is denied as moot. The court notes that, by declining jurisdiction, the court does not express an opinion as to the propriety of the bankruptcy court's order. *See Sante Fe Industries, Inc.,* 1991 WL 18483 at *2.

*Counsel's Failure to Comply With the Briefing Schedule Set by the Court*

***3** On July 1, 1998, when the appellants presented their stay motion, the court ordered the Creditors' Committee to file their response by July 6, 1998 at 12:00 p.m. and ordered the appellants to file their reply by July 7, 1998 at 12:00 p.m. The court, however, received its courtesy copy of the response on the morning of July 7, 1998, and received its copy of the reply at approximately 2:30 p.m. on July 7, 1998. Neither side explained the reason for the delay or sought leave to file their pleading instanter. Adherence to filing deadlines set by the court is not discretionary. Accordingly, counsel for the appellants and the Creditors' Committee are directed to show cause why they should not be sanctioned for failure to comply with the briefing schedule set by the court.

*Conclusion*

This appeal is dismissed for lack of jurisdiction, and the appellants' stay motion [2–1 and 2–2] is denied as moot. Counsel for the appellants and the Creditors' Committee are each directed to file a brief memorandum by no later than July 15, 1998, addressing why they should not be sanctioned for failure to comply with the briefing schedule set by the court.

**All Citations**

Not Reported in F.Supp., 1998 WL 395152

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 8738421
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.

UNITED STATES of America, et al., Plaintiffs,
v.
AETNA INC. and Humana Inc., Defendants.

Case No. 1:16-cv-01494 (JDB)
|
Signed 09/14/2016

**Attorneys and Law Firms**

Craig William Conrath, Dylan Matthew Carson, Eric J. Mahr, Eyitayo Oritsematosan St. Matthew-Daniel, Miriam Rose Vishio, Peter Joseph Mucchetti, Ryan M. Kantor, Barry James Joyce, Bennett Jorg Matelson, Eric Damian Welsh, Justin T. Heipp, Matthew David Siegel, Patricia Leigh Sindel, Samer Makram Musallam, Sanford Marshall Adler, Yvette F. Tarlov, U.S. Department of Justice, Catherine Anne Jackson, Elizabeth Sarah Gere, Office of the Attorney General for the District of Columbia, Washington, DC, Michael Andrew Undorf, Department of Justice, Wilmington, DE, Christopher R. Hunt, Rachel Michelle Steinman, Timothy Michael Fraser, Lizabeth A. Brady, Office of the Attorney General, Tallahassee, FL, Daniel Stephen Walsh, Monica Anne Sullivan, Office of Attorney General, Atlanta, GA, Robert W. Pratt, Elizabeth Louise Maxeiner, Office of the Attorney General, Chicago, IL, Layne M. Lindebak, Attorney General's Office for the State of Iowa, Des Moines, IA, Beth Ann Finnerty, Brian Francesco Jordan, Thomas Nathaniel Anger, Office of the Attorney General, Columbus, OH, Aaron L. Schwartz, James A. Donahue, III, Tracy Wright Wertz, Commonwealth of Pennsylvania Office of Attorney General, Jennifer Ann Thomson, Office of Attorney General/PA Litigation Section, Harrisburg, PA, Sarah Oxenham Allen, Tyler Timothy Henry, Office of the Attorney General, Richmond, VA, for Plaintiffs.

Christopher Nathan Thatch, John M. Majoras, Michael S. Fried, Geoffrey S. Irwin, Michael R. Shumaker, Jones Day, Arthur Norman Lerner, Astor Henry Lloyd Heaven, III, Kent Alan Gardiner, Shari Ross Lahlou, Shawn R. Johnson, Christie L. Stahlke, David Martin Schnorrenberg, Joseph M. Miller, Crowell & Moring LLP, Edward D. Hassi, Katrina M. Robson, Richard G. Parker, O'Melveny & Myers LLP, Washington, DC, Aaron M. Healey, Jones Day, Columbus, OH, Alex P. Middleton, Paula W. Render, Jeremy J. Gray, Jones Day, Chicago, IL, Erin L. Shencopp, Frederick P. Santarelli, Thomas B. Helbig, Elliot Greenleaf, P.C., Blue Bell, PA, Thomas Demitrack, Jones Day, Cleveland, OH, Connor T. Lynch, Cynthia A. Merrill, Jeffrey J. Fowler, Kenneth R. O'Rourke, O'Melveny & Myers LLP, Los Angeles, CA, for Defendants.

**SPECIAL MASTER REPORT AND RECOMMENDATION NO. 2**

Hon. Richard A. Levie (Ret.), Special Master

***1** Pending before the Special Master is non-party UnitedHealth Group Inc.'s ("United" or "UnitedHealth") Motion to Amend the Protective Order and non-party Aon PLC's ("Aon") Motion for Additional Relief Under the Protective Order. For the reasons that follow, the Special Master recommends that the Court deny both Motions.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

I. **Background**

The Motions at issue concern documents which Aon and UnitedHealth separately provided to the Department of Justice (DOJ) in response to civil investigative demands (CIDs) issued during the DOJ investigation into the proposed mergers between Aetna, Inc. and Humana Inc., and between Anthem Inc. and Cigna Corp. (*See* Aon Mot. at 1-2; United Mot. at 2). Aon and United describe the information at issue as "confidential and competitively sensitive" (Aon Mot. at 2) and "highly confidential documents and data" (United Mot. at 2).

Following the filing of the complaint in both *United States et al. v. Aetna Inc. et al.*, Case No. 1:16-cv-1494(JDB) and *United States et al. v. Anthem Inc. et al.*, Case No. 1:16-cv-1493(ABJ), Aon and United separately informed Plaintiffs that they objected to the production of these documents and/or data to the Defendants in these matters under the current terms of the Protective Orders applicable to each case.

The Order Appointing the Special Master to this case grants the Special Master authority over, *inter alia*, scheduling matters and "motions for protective order." (Dkt. No. 53 at ¶ 2). On September 2, 2016, the Special Master issued Special Master Order No. 2, which directed United and Aon to submit formal motions regarding any concerns with the Protective Order by September 8, 2016. (Dkt. No. 92 at ¶ 1). United and Aon timely filed such Motions. Plaintiffs and Defendants in this case submitted responses, and United and Aon each submitted reply briefs. The Special Master has reviewed all of the arguments presented in these papers. This Opinion follows.[1]

II. **Legal Standard**

Although "protective orders are not permanent or immutable and may be modified to serve important efficiency or fairness goals," the party or, in this case, non-party, which seeks to modify a protective order bears the burden of showing that good cause exists to justify the desired change. [*U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*, 2004 WL 2009414 at *2 (D.D.C. May 17, 2004)( citations omitted); *Infineon Tech. A.G. v. Green Power Tech Ltd.*, 247 F.R.D. 1, 2 (D.D.C. 2005)(Bates, J.)(citations omitted) ]. " 'Good cause' implies changed circumstances or new situations; a continuing objection to the terms of an order does not constitute good cause to modify or withdraw a protective order." [*Infineon Tech.*, 247 F.R.D. at 2 (citing *Bayer AG & Miles, Inc. v. Barr Labs., Inc.*, 162 F.R.D. 456, 464 (S.D.N.Y. 1995)) ].

***2** To show good cause, the party seeking to modify the protective order must provide specific facts showing the particular harm that is likely to occur in the absence of such an order and that this harm outweighs the opposing side's interests in preparing for trial. As one court has put it,

> Good cause exists under Rule 26(c) when justice requires the protection of a party or a person from any annoyance, embarrassment, oppression, or undue burden or expense, but the party requesting a protective order must make a specific demonstration of facts in support of the request as opposed to conclusory or speculative statements about the need for a protective order and the harm which will be suffered without one. Accordingly, courts apply a balancing test, weighing the movant's proffer of harm against the adversary's 'significant interest' in preparing for trial.

[*Huthance v. District of Columbia*, 255 F.R.D. 285, 296 (D.D.C. 2008) (quoting *Fonville v. District of Columbia*, 230 F.R.D. 38, 40 (D.D.C. 2005) and *Doe v. District of Columbia*, 230 F.R.D. 47, 50 (D.D.C. 2005)) ].

III. **UnitedHealth Motion**

a. **Arguments**

UnitedHealth seeks three modifications to the Protective Order.

First, it asks that paragraph C (5) of the Protective Order, regarding the production of investigation materials, be modified to permit the non-party which produced such materials to designate as "beyond the scope of permissible discovery," and therefore as non-producible to Defendants, any documents submitted by that non-party to Plaintiffs during the investigation stage of this case. [United Mot. at 2-6 and Exh. 2 (Proposed Amended Protective Order) at ¶ C(5) ].

United contends that this limitation is appropriate in this case because it produced to DOJ "extensive" information from "multiple distinct business lines encompassing virtually all of United's products and covering much of the United States," even though DOJ has elected to challenge the Aetna-Humana merger based only on particular geographic areas and products. (*Id.* at 2). According to United, disclosure of what it describes as "irrelevant confidential information" to Defendants "increases the risk of significant and irreversible competitive harm." (*Id.* at 3).

Plaintiffs object to this request as likely to delay and "further burden[ ] an already rushed discovery process," noting that United "cites no precedent for this unusual and unnecessary request." (Pl. Resp. at 2). According to Plaintiffs, the current protective order adequately "safeguards confidential information from unauthorized disclosure—particularly in this case, where in-house counsel will not receive confidential information." (*Id.*)

Defendants likewise object to United's request, arguing that permitting a non-party to designate information as irrelevant, and therefore not producible, would grant Plaintiffs the benefit of a potentially "significant amount of information ... that would be off-limits to defendants." (Def. Resp. at 2). Defendants note that "the extent of this disadvantage [to Defendants] would largely be determined by third parties who may very well oppose the merger at issue here." (*Id.*) In addition, Defendants contend that granting United's request would inject "needless delay ... into this litigation." (*Id.* at 2).

Second, United asks that paragraphs E(1)(c-f), concerning permitted disclosure of confidential information, be modified to expressly preclude disclosure to any outside counsel and/or outside professionals involved in Defendants' competitive decision making.[2] (*Id.* at 7). In addition, United asks that a new paragraph be added to the Protective Order which would prohibit any outside counsel or professional having access to a non-party's confidential information from participating in any Defendant's competitive decision-making for a period of two years after receipt of that information. [United Mot. Exh. 2 (Proposed Amended Protective Order) at ¶ E(5) ]. United argues that such protective measures are appropriate because "the law firms and other outside professionals involved in these cases frequently represent one or more of the health insurers in litigation and non-litigation matters." (*Id.* at 7).

***3** Plaintiffs object to the inclusion of the two-year moratorium because it "threatens to burden the service providers in this case by limiting the future engagements they can undertake, irrespective of the risk of misuse of Confidential Information." (Pl. Resp. at 3). Plaintiffs note that the Protective Order already requires that Confidential Information be used "solely for the prosecution and defense of this Action and not for any business, commercial, [or] competitive purpose." [*Id.* (citing Protective Order at ¶ E(4)) ].

Defendants object to requiring that any individual who accesses or uses confidential information certify that he or she is not involved in Defendants' competitive decision making, and to imposing a two-year moratorium on such use. (Def. Resp. at 4-5). Defendants argue that United has presented no evidence suggesting that any outside professionals are or might be involved in Defendants' competitive decision making, contending instead that United "merely speculates that there might be some unspecified confidential information that *might* be useful to Defendants in future, undefined decision-making that *might* involve the advice of outside counsel or outside professionals." [*Id.* at 5 (emphasis in original) ]. In addition, Defendants contend that United's proposed modifications would impose a "substantial burden" on Defendants' relationship with outside counsel and professionals, and may "force Defendants to develop new relationships [with new outside counsel or professionals] at this late stage, placing them at a serious litigation disadvantage." (*Id.* at 6).

Finally, United asks that the Protective Orders be modified to require the parties to provide non-parties who provided confidential information with a list of all individuals who accessed that information during these proceedings and to certify that such information was destroyed at the conclusion of the case. (*Id.* at 8). United argues that "these are reasonable safeguards and are designed to encourage the parties to limit the disclosure of Confidential Information in the first place to the minimum amount necessary and to the minimum number of individuals necessary to prosecute and defend the cases." (*Id.*).

Plaintiffs object to this request in its entirety. (Pl. Resp. at 4). Plaintiffs represent that "complying with such a provision ... would create an enormous administrative burden, given the large number of Protected Persons and individuals working on this matter." (*Id.*). According to Plaintiffs, United "has made no showing" which would "justify this unnecessary burden." (*Id.*)

Defendants do not object to certifying that all confidential information has been destroyed following the close of litigation. (Def. Resp. at 7). Defendants do object to providing non-parties with a list of all individuals who accessed the non-party's confidential information. (*Id.* at 8). Defendants argue that this requirement would impose a "significant" burden on them because it would require the parties to "record 'all persons'—including every associate, paralegal, secretary, expert or vendor support staff, etc.—who accessed confidential information, and the particular third party whose confidential information that person accessed. And the parties would have to maintain this information in separate lists to be eventually produced to each third party." (*Id.*). Defendants represent that, to date, "well over one hundred" individuals have accessed non-party confidential information. (*Id.*)

**b. Discussion**

United has not shown "good cause" to modify the protective order to accommodate any of its requests because it has failed to show specific facts to support its broad allegations that it will suffer harm under the Protective Order currently in effect.

***4** United's first request asks that DOJ be forced to limit its production of United investigation materials to only the documents and information relevant to this case, arguing that such a provision is necessary in order to protect United's confidential information. United alleges that what it describes as its "irrelevant Confidential Information" comprises "some of United's most competitively-sensitive information that in the hands of a direct competitor would expose United to severe and irreversible competitive harm," (United Reply at 1). United, however, has not provided any specific facts suggesting, let alone demonstrating, that its information may in fact be given to any its direct competitors.

It is significant that the current Protective Order expressly limits disclosure to Defendants' outside counsel, retained experts, outside vendors, and outside trial consultants. [Amended Protective Order (Dkt. 108) at ¶ E (1)(c-f) ]. It does not permit disclosure to Defendants' in-house counsel or to any direct employee of either of the Defendant companies. Moreover, the Order clearly limits recipients of confidential information to use of that information "solely for the prosecution and defense of this Action and not for any business, commercial, or competitive purpose, or in any other litigation proceeding." [*Id.* at ¶ E(4) ].

The current Protective Order therefore limits both *who* may use United's confidential information (outside counsel, experts, and vendors only) and *how* they may use it (exclusively for purposes of this litigation). It is not evident, therefore, how information such as "United's business plans detailing how and where it intends to compete in the near future, pricing and product strategy, member and customer information, product design information, profit and loss data and projections and provider rate information" (United Mot. at 4) may be provided to any individual who may be in the position to use this information to Defendants' advantage or to United's disadvantage, and United has provided no "specific demonstration of facts" showing how this may be the case. [*Huthnance*, 255 F.R.D. at 296 (citations omitted) ].

Likewise, even assuming, *arguendo*, that some individual who might be in a position to advise Aetna or Humana regarding competitive decision making was to come into possession of the confidential information at issue, United has not put forth any concrete evidence suggesting that such individual might use that information improperly. Indeed, such improper use would defy both the Protective Order's requirement that the information be used solely for purposes of this litigation, and the attestation that each recipient of confidential information has signed or will sign in which he or she agrees to be bound by the terms of the Protective Order. Finally, while United alleges that disclosure of its information "puts United at risk of severe and irreparable competitive harm," it has failed to describe precisely *what* harm it believes it might incur.

United's justification for its need for entry of this provision is, therefore, speculative at best. "[T]he moving party has a heavy burden of showing 'extraordinary circumstances' based on 'specific facts' that would justify" entry of a protective order.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

[*Alexander v. F.B.I.*, 186 F.R.D. 71, 75 (D.D.C. 1998) (quoting *Prozina Shipping Co., Ltd. v. Thirty–Four Automobiles,* 179 F.R.D. 41, (D. Mass. 1988)) ]. United's abstract assertions fall far short of satisfying this "heavy burden."[3]

***5** By contrast, United's proposal is likely to significantly delay to these proceedings. Fact discovery began in these proceedings nearly one month ago, and is due to be complete by October 19, 2016. [*See* Case Management Order (Dkt. No. 55) at 1-2]. Putting aside the fact that many non-party documents have already been produced to opposing counsel, permitting non-parties now to reconsider and potentially re-designate as "irrelevant" material that they have provided to the government will severely impair this schedule. Indeed, even permitting only one party—United, let alone possibly multiple parties—to re-designate its material will result in significant interruption to these proceedings because the parties would have the right to challenge any designation by United [or others], resulting in continued litigation and delay. Given United's failure to show any specific need for re-designation of documents, such delay is not justifiable here and its general assertions of potential harm are not persuasive.

United's second request—to require outside Counsel and other outside professionals who access Confidential Information to verify that they are not involved in Defendants' competitive decision making and will not be for two years—should also be denied because United has not shown a specific need for such restrictions to be expressly included in the Protective Order. In Special Master Report and Recommendation No. 1, the Special Master recommended against permitting particular in-house counsel to access non-party confidential information in part because "[w]here in-house counsel are involved in competitive decision making ... the risk of inadvertent disclosure is obviously higher than for retained counsel.' " [R&R No. 1 (Dkt. No. 93) at 9 (quoting *F.T.C. v. Advocate Health Care Network*, ––– F. Supp. 3d ––––, 2016 WL 770099 at *3 (N.D. Ill. Feb. 29, 2016)) ].

The concerns relevant to in-house counsel are not applicable to those of outside counsel, however. A company's in-house counsel, and in particular the in-house counsel identified by Aetna and Humana who were at issue in Report & Recommendation No. 1, have many duties and obligations to their clients, including providing advice regarding competitively sensitive matters such as litigation with healthcare providers and/or contract negotiations regarding reimbursement rates.

By contrast, the outside counsel and outside professionals who Defendants have retained for purposes of this case have one primary obligation: to represent Defendants during the pendency of this litigation and, possibly, throughout the merger process. United has not presented any specific examples showing that any outside counsel or outside professional has had or is likely to have any involvement in Defendants' competitive decision making beyond these duties. The risk of inadvertent disclosure is also much lower with such individuals because the entire scope of their duties pertains to this litigation. There is no reason to believe—and United has not come forth with any specific facts—that they will be in a position to disclose accidentally competitively sensitive information, and particularly not in any manner that may harm United, which is a non-party to this litigation.

Moreover, here again by way of existing protection, the current Protective Order expressly restricts any individual who obtains confidential information through this litigation to using that information solely for purposes of this litigation. United has not shown that this limitation will be insufficient to prevent any intentional or inadvertent disclosure of confidential information.

For these same reasons, the Special Master recommends against amending the Protective Order to ban any person who received confidential information from participating in Defendants' competitive decision-making or from providing consulting services in the health insurance industry to any competitor of a non-party for a period of two years after conclusion of this litigation. United has not provided any specific facts showing that it is likely to incur harm if this provision is not included, or that the current Order's limitation on use of confidential information is somehow inadequate. In these circumstances, to apply the constraints sought on possible future work without any evidence and only speculation is not warranted.

***6** Indeed, in support of its allegations that additional protections are warranted in this case, United relies only upon a single case from 1986 in which the Seventh Circuit concluded that a district court did not err when it imposed a protective order limiting information that could be disclosed to particular trial counsel for a hospital. [*See Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins.*, 784 F.2d 1325, 1345-46 (7th Cir. 1986) ]. In that case, however, the Seventh Circuit specifically noted that "Counsel for the Hospitals [plaintiffs] regularly represented [the plaintiffs] in price negotiations with [particular insurance

companies].” (*Id.* at 1346). There is no evidence here that Defendants’ outside counsel or any outside experts, vendors, or other professionals represent Defendants on any matter other than the instant antitrust litigation. *Ball Memorial* therefore is not applicable to this case.

Finally, United has failed to show good cause to amend the Protective Order to require the parties to provide all non-parties who produced confidential information with a list detailing the name, employer, and title of all persons who accessed the non-party’s confidential information, and to certify that all confidential material has been destroyed. United argues that these are “reasonable safeguard and are designed to encourage the parties to limit the disclosure of Confidential Information in the first place to the minimum amount necessary and to the minimum number of individual necessary to prosecute and defend the cases.” (United Mot. at 8).

The standard for amending a protective order, however, is not whether a proffered change is “reasonable,” but, rather, whether it is necessary in order to avert a particular harm. United has not shown what harm it believes it will incur if its desired provision is not included, nor has it provided any specific facts in support of that request. As noted above, the current Protective Order limits the distribution and use of the confidential information in this case, and United has not shown why it does not currently provide adequate safeguards.

By contrast, Plaintiffs and Defendants have shown that providing the type of information that United seeks is likely to place a significant burden upon them. Plaintiffs represent that “teams of people at [DOJ], Defendants’ outside counsel, 17 states and the District of Columbia, and multiple vendors and consultants” have already accessed confidential information. (Pl. Resp. at 4). Defendants indicate that “surely ... well over one hundred” individuals have accessed the confidential information of at approximately seventy-five third parties. (Def. Resp. at 8). Requiring the parties to detail each individual who has accessed or will access confidential information would place a burden on the parties that would far outweigh the benefit that doing so may afford United.

For all of these reasons, the Special Master concludes that United has not shown good cause in the form of demonstrating specific facts justifying amending the Protective Order in the way that it seeks.

## IV. Aon’s Motion to Amend the Protective Order

### a. Arguments

In contrast to UnitedHealth, Aon seeks only one modification to the Protective Order. Aon asks that the Protective Order be amended to create two tiers of confidentiality: “Confidential Information” and “Highly Confidential Information.” (Aon Mot. at 1). Aon’s proposal would permit non-parties to designate as “highly confidential” “information that a Protected Person reasonably believes to be so competitively sensitive that it would cause competitive harm if such information were disclosed to the Defendants or their competitors.” (*Id.*) The parties would be permitted to disclose this information only to the Court and its employees; Plaintiffs’ attorneys and employees; Defendants’ outside counsel and employees; and to experts, providing that the parties provide non-parties with three days’ notice before disclosing the information to experts. (*Id.* at 2).[4] Finally, the parties would only be permitted to transmit such information “by secure transmission which means any encryption or password protection.” (*Id.* at 2).

***7** Aon is a professional services firm which, among other services, advises clients regarding the selection of insurance products. (*Id.* at 2). As part of this service, it produces what it labels “Confidential Reports” containing “pricing information for both sets of merging companies (Aetna / Humana and Anthem / Cigna) *and their competitors.*” [*Id.* (emphasis in original) ]. Aon’s request that the Protective Order be amended to establish two tiers of confidentiality is primarily designed to protect these reports, which it has already produced to the Plaintiffs in this matter. According to Aon, “keeping this information confidential is critical to the success of Aon’s business model.” (*Id.* at 3). It explains that it “only provided the Aon Confidential Reports to DOJ in response to a CID and by secure transmission, and only following several consultations with DOJ regarding, and in reliance on, the strict confidentiality laws and regulations governing it.” (*Id.*).

Aon argues that the current Protective Order is not sufficient to safeguard Aon's interest in protecting these documents because "the list of persons / entities to which Confidential Information may be disclosed is overbroad." (*Id.* at 4). According to Aon, "[s]uch broad distribution does not appropriately balance Aon's interest in 'avoiding the inadvertent use or disclosure of' the Aon Confidential Reports with the parties' need to litigate their cases." [*Id.* at 5 (citing *FTC v. Sysco*, 83 F. Supp. 3d 1, 8 (D.D.C. 2015)) ].

Plaintiffs object to Aon's request, arguing that the proposed modifications are "unnecessary and unworkable." (Pl. Resp. at 2). Plaintiffs note that the Court has previously rejected a two-tiered approach to confidentiality. (*See* Pl. Resp. at 2 and Exh. B). They argue that altering the Protective Order to adopt such a system now will untenably delay discovery by permitting all non-parties to re-designate materials already provided. (*Id.* at 3). In addition, Plaintiffs oppose Aon's proposals because they would "prevent the parties from using outside vendors, trial consultants, or taking effective depositions of Protected Parties," thereby "hamstring[ing] the parties and mak[ing] litigating these cases unmanageable." (*Id.*)

Defendants also oppose Aon's requests. Defendants argue that Aon has not met its burden of "establishing that the existing Protective Order is inadequate." (Def. Resp. at 10). Defendants note that Aon does not "identify even a single reason that any particular category of individuals should not be include on the list of eligible recipients of confidential information." (*Id.*). According to Defendants, Aon's proposal ignores the safeguards already established in the current Protective Order. (*Id.* at 10-11). Defendants further contend that the proposed modifications would be burdensome and inefficient, noting that permitting non-parties to re-designate already produced materials and requiring a three-day delay, and possible additional litigation, before materials can be disclosed to experts, will delay the discovery process. (*Id.* at 11). Likewise, Defendants argue that prohibiting disclosure to trial consultants and outside vendors will "impede the efficient litigation of this matter." Finally, Defendants argue that "Aon's request that all confidential information be transmitted securely is unnecessary" because "all confidential information is already adequately protected under the terms of the Protective Order." (*Id.* at 13).

**b. Discussion**

Aon has not met its burden to show good cause justifying amending the Protective Order because as it has not shown that it is likely to suffer any particular harm if the Order is not amended. Aon has, to be sure, shown that the material it produced to the government is confidential and competitively sensitive. It has not provided any "specific demonstration of facts" showing the harm that it is likely to suffer in the absence of its desired modifications, however.

***8** Rather, Aon argues, broadly, that "in any litigation there is always a risk of inadvertent disclosure," noting that it has "committed to its health insurer partners that it will do everything possible to safeguard the information, and to competition more generally." (Aon Reply at 3). Any risk of inadvertent disclosure of competitive information, however, is minimal here because none of the insurance companies involved will actually view the documents at issue. Thus, for example, Aon's concern that "Aetna ... could see Anthem's reports, and Cigna could see Humana's reports" (Aon Reply at 3) is without merit because neither Aetna nor Cigna employees will actually see these reports. To the contrary, the Protective Order limits disclosure to only outside counsel and outside professionals, and restricts the use of that material solely to purposes related to this litigation. Any risk of inadvertent disclosure is far lower with respect to these outside counsel and professionals than it would be with respect to in-house employees.

Moreover, each individual who has reviewed or had access to material has been or will be required to sign the "Agreement Concerning Confidentiality," confirming that he or she has read the Protective Order and agrees to be bound by its terms. This Agreement likewise serves to provide an additional safeguard against improper disclosure of Aon's reports, as every individual who signs it avers that he or she "understands that ... failure to abide by the terms of the Stipulated Protective Order ... will subject me, without limitation to civil and criminal penalties for contempt of Court." [Amended Protective Order (Dkt. 108) Appendix A at ¶ 3].

Finally, Aon has not shown "good cause" for its request that its information be transmitted by "secure transmission," meaning "any encryption or password protection." First, this request is predicated on Aon's earlier request that it be permitted to designate the reports at issue as "highly confidential." For the reasons just stated, it is not appropriate to establish

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

two tiers of confidentiality in this case. Second, Aon has not provided specific examples of the harm that it theoretically believes may flow from failure to require such secured transmission. There is no allegation, for example, that any party is being careless with confidential information, or that any party is unusually vulnerable to electronic hacking or similar threats. Rather, Aon states only that its request is not unduly burdensome. Relative degree of burdensomeness, however, is not the sole element of the "good cause" standard; rather, an entity must provide specific examples of the feared harm in order to obtain additional protection. Aon has failed to make this showing.

The cases that Aon presents do not compel an alternate conclusion. In *State of New York v. Microsoft Corp.*, the court determined that a protective order did not sufficiently safeguard materials to the extent that it permitted Microsoft's *in-house* counsel to view non-party documents. [2002 WL 31628220 at *2 (D.D.C. Nov. 18, 2002) ]. In *F.T.C. v. OSF Healthcare System*, the court concluded that, because particular commercial information qualified as competitively sensitive, it should be sealed from public view. The court, however, did not limit counsel involved in litigating that case from accessing the material at issue. [2012 WL 1144620 at *3 (N.D. Ill. 2012) ]. Likewise, while the court in *FTC v. Sysco Corporation* concluded it "must strike a balance between Sysco's ability to prepare and present its defense and the interest of third parties in avoiding the inadvertent use or disclosure of their confidential information," it actually concluded that permitting three of the four suggested in-house counsel to access confidential information adequately resolved this concern. [83 F. Supp. 3d 1, 4 (D.D.C. 2015) ]. In this case, the operative Protective Order does not permit any in-house counsel to access confidential information, and Aon has not shown that permitting access to the individuals listed in section E of the Order poses any cognizable risk of harm to Aon.

***9** By contrast, creating the two-tiered system that Aon seeks significantly risks delaying the discovery process in this case, thereby hindering the parties' ability to prepare for trial. This case is proceeding on an exceptionally expedited timeline, with fact discovery scheduled to conclude in just over a month and expert discovery set to begin before that. Given this schedule, it is virtually unthinkable that the parties can effectively prepare for litigation without reliance on outside vendors and trial consultants. Segregating the material that Aon alone has produced will likewise impose a substantial time burden and obligate the parties expend time devising alternate methods of processing this material.

Likewise, even assuming that Aon had shown some reason that establishing a three-day delay before production to experts might avoid some specific harm to Aon's interest, a three-day period in this case is much more impactful than it might be to a case with a longer discovery period.[5] For the same reason, permitting all non-parties to re-designate material already produced is unrealistic.

### V. Conclusion

For the foregoing reasons, the Special Master recommends that the Court deny non-party UnitedHealth's Motion to Amend the Protective Order and further recommends that the Court deny non-party Aon's Motion for Additional Relief Under the Protective Orders.

### VI. Certification

Because this recommendation involves a provision in the Protective Order entered by the Court, the Special Master, pursuant to paragraph 5 of the appointment order (Dkt. No. 53) certifies this Report and Recommendation for appeal to the Court. UnitedHealth, Aon. Pursuant to paragraph 5, UnitedHealth and Aon have 48 hours from the entry of this Report and Recommendation in ECF to file a brief. If one or both of the non-parties elects not to appeal to the Court, they are requested to notify the Court and the parties as soon as possible.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 8738421

Footnotes

1 The currently applicable Amended Protective Order in this case was signed and docketed on September 12, 2016 [Dkt. 108]. This Amended Order includes certain protections designed to afford greater protection to non-parties. After Aon and United filed their respective Motions, the parties to this case informed both Aon and United of the pending amendments to the Protective Order and both Aon and United confirmed that the pending changes did not resolve their concerns.

2 Disclosure of any confidential material to in-house counsel is prohibited pursuant to Special Master Report & Recommendation No. 1 (Dkt. No. 93).

3 Moreover, United provides no precedent for its proposal that it—a non-party which is not directly involved in this matter—be permitted to unilaterally determine what material is and is not relevant in this case. Rule 26 of the Federal Rules of Civil Procedure limits production of materials to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Even following the December 2015 revisions to this rule, numerous Courts in this District and in others have concluded that "relevance is still to be 'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on" any party's claim or defense.' " [United States ex rel. Shamesh v. CA, Inc., 314 F.R.D. 1, 8 (D.D.C. 2016) (quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)); see Green v. Cosby, 314 F.R.D. 164, 171 (E.D. Pa. 2016); Henry v. Morgan's Hotel Group, Inc., 2016 WL 303114 at *3 (S.D.N. Y Jan. 25, 2016) ]. Likewise, the rule provides that "Information within this scope of discovery need not be admissible in evidence to be discoverable." [Fed. R. Civ. P. 26 (b)(1) ].

As a non-party to this matter, United is not privy to all of the details regarding the claims and defenses at issue here. Its proposal would remove from the parties and potentially the Court and Special Master the authority to determine what is relevant for purposes of discovery, and grant it the unilateral right to deny Defendants certain materials. This proposal risks permitting United to run roughshod over Rule 26, thereby severely hampering Defendants' ability to litigate this case.

4 The Amended Protective Order currently permits confidential information to be disclosed to these four groups, as well as to outside vendors or service providers retained by any Party; outside trial consultants; any mediator or arbitrator engaged by the parties or appointed by the Court; individuals who have previously had lawful access to the confidential information; and "persons who counsel for Plaintiffs or Defendants believe in good faith previously received or had access to the document." [Protective Order (Dkt. 108) at ¶¶ E (1) (a-i) ].

5 Aon cites to three cases which have required non-party notification prior to disclosure of confidential documents to experts. Those cases are not on point here. In *Gerffert Co. v. Dean*, advance notice of disclosure to experts was required because "problems in [the] case [had] already occurred with respect to confidences and secrets." [2012 WL 2054243 at *5 (E.D.N.Y. June 6, 2012) ]. As stated above, there have been no allegations that any party to this case has been careless with or has misused any confidential information. In *Genentech Inc. v. Bowen*, the court concluded that the party seeking entry of a protective order had provided specific examples of the harm that it was likely to suffer were a protective order not entered. [1987 WL 10500 at *2 (D.D.C. Apr. 21, 1987) ]. Aon has not provided any such specific examples here, nor has it shown that the existing Order is insufficient to protect its interests. Finally, in *Bank of New York v. Meridien BIAO Bank Tanzania Limited*, the court concluded that "exceptional circumstances" justified requiring one party to inform its opponent before disclosing materials to non-testifying experts. [171 F.R.D. 135, 145 (S.D.N.Y. 1997) ]. No such "exceptional circumstances" are present here.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4775163
United States District Court, N.D. California.

Julie SU, Plaintiff,
v.
SIEMENS INDUSTRY, INC., Defendant.

Case No. 12–cv–03743–JST
|
Signed 09/22/2014

**Attorneys and Law Firms**

Michael Lee Smith, State of California, Department of Industrial Relations, Oakland, CA, Doris Y. Ng, State of California, Department of Industrial Relations, San Francisco, CA, for Plaintiff.

Gregory G. Iskander, Alexa L. Woerner, Johanna Rene Carney, Littler Mendelson, P.C., Walnut Creek, CA, for Defendant.

**ORDER GRANTING SECOND APPLICATION FOR LEAVE TO BRING AN INTERLOCUTORY APPEAL; CONTINUING STAY**

Re: ECF No. 154

JON S. TIGAR, United States District Judge

## I. INTRODUCTION

***1** Plaintiff, California State Labor Commissioner Julie Su ("Plaintiff"), has moved pursuant to 28 U.S.C. § 1292(b) to seek interlocutory appeal of two legal issues this court decided in its May 12, 2014 summary judgment order, as modified in the Court's July 22, 2014 "Order Regarding Associational Retaliation and Fringe Benefits." For the reasons set forth below, the Court will grant the motion.

## II. BACKGROUND

### A. Procedural and Factual Background

Plaintiff brings a single cause of action under California Labor Code Section 6310 ("Section 6310"), which prohibits employers from retaliating against employees for making certain protected job-related safety complaints. Complaint for Backpay and Injunctive Relief for Violation of Labor Code Section 6310 ("Complaint"), Exh. A to Notice of Removal, ECF No. 1. Plaintiff alleges that Defendant Siemens Industry, Inc. ("Defendant") violated Section 6310 in terminating Complainants Charles Anderson and Charles Pitschner ("Complainants") from their positions on a crew installing a baggage conveyor system at San Francisco International Airport. *Id.* Complainant Anderson is also an intervenor in this action. *See* Order Granting Motion to Intervene, 2013 WL 3477202, 2013 U.S. Dist. LEXIS 96505, (ECF No. 35).

The parties brought cross-motions for summary judgment on various legal issues, which the court decided on May 12, 2014. Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment; Denying Plaintiff's Motion for Partial Summary Judgment ("SJ Order"), 2014 WL 1894315, 2014 U.S. Dist. LEXIS 65184 (ECF No. 102). Plaintiff later sought, and the Court granted, a motion to seek interlocutory appeal of two legal issues decided in that order. 2014 WL 2600539, 2014 U.S. Dist. LEXIS 80349 (ECF No. 143). The Court also granted Plaintiff's request to reconsider and clarify aspects of the Summary Judgment Order, and on June 12 the Court issued an "Order Regarding Associ ational Retaliation and Fringe Benefits" ("Clarification Order"), 2014 WL 3615582, 2014 U.S. Dist. LEXIS 100240 (ECF No. 153). In the SJ Order and the Clarification Order, the Court decided two other legal issues in Defendant's favor:

1. The Court held that Section 6310 provides a cause of action only to "[a]ny employee who is ... discriminated against ... because the *employee* has' engaged in protected activity," and does not provide a cause of action to an employee who is discriminated against because *another* employee has engaged in such protected activity. Clarification Order 2:17–5:16, 2014 WL 3615582, at *2–4, 2014 U.S. Dist. LEXIS 100240, at 4–11.

2. The Court held that Plaintiff may not recover as damages any health and life insurance benefits for which the Complainants did not bear out-of-pocket expenses. SJ Order 23:7–24:4, 2014 WL 1894315, at *14–15, 2014 U.S. Dist. LEXIS 65184, at 45–47, *as modified by* Clarification Order 5:17–8:17, 2014 WL 3615582, at *4–6, 2014 U.S. Dist. LEXIS 100240, at 11–17.

Plaintiff filed this motion to seek interlocutory appeal of those two legal conclusions. Other aspects of the case are described in the Summary Judgment Order. SJ Order 1–4, 2014 WL 1894315, at *1–*2, 2014 U.S. Dist. LEXIS 65184, at 1–7.

### C. Legal Standard

***2** The final judgment rule ordinarily provides that courts of appeal shall have jurisdiction only over "final decisions of the district courts of the United States. 28 U.S.C. § 1291. However, "[w]hen a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order." 28 U.S.C. § 1292(b). "The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order." *Id.* "Certification under § 1292(b) requires the district court to expressly find in writing that all three § 1292(b) requirements are met." *Couch v. Telescope Inc.,* 611 F.3d 629, 633 (9th Cir.2010).

### D. Jurisdiction

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), since Complainants' state citizenships are diverse from Defendant's, and the amount in controversy exceeds $75,000. *See* Notice of Removal ¶¶ 7–16, ECF No. 1.

**III. ANALYSIS**
The court addresses each of the required findings in order.

**A. Controlling Question of Law**
Both of the issues decided are purely questions of law. The only question is whether they are "controlling."

"[A]ll that must be shown in order for a question to be 'controlling' is that resolution of the issue on appeal could materially affect the outcome of litigation in the district court." *In re Cement Antitrust Litig.* (MDL No. 296), 673 F.2d 1020, 1026 (9th Cir.1981) *aff'd sub nom. Arizona v. Ash Grove Cement Co.,* 459 U.S. 1190 (1983) *and cause dismissed sub nom. Arizona v. U.S. Dist. Court for the Dist. of Arizona,* 459 U.S. 961 (1982). However, "the legislative history of 1292(b) indicates that this section was to be used only in exceptional situations in which allowing an interlocutory appeal would avoid protracted and expensive litigation." *Id.* at 1026. "A steadily growing number of decisions" have found "that a question is controlling, even though its disposition might not lead to reversal on appeal, if interlocutory reversal might save time for the district court, and time and expense for the litigants." 16 Wright, Miller & Cooper, *Fed. Prac.* & Proc. (Juris.) § 3930 (3d ed.) (citing cases).

Here, both legal determinations are likely to significantly affect the outcome of the litigation. The Court's holding regarding "associational retaliation" cuts off much of Complainant Pitschner's claim. As for the decision on fringe benefits, while that issue only goes to the extent of damages, its impact on damages appears to be significant. While normally a ruling cutting off the extent of damages is not particularly appropriate for interlocutory appeal, in some cases it can be. *See, e.g., Ditullio v. Boehm,* 662 F.3d 1091, 1096 (9th Cir.2011) (considering interlocutory appeal of an order holding that a plaintiff could not seek punitive damages).

Plaintiff also objects that the Court only granted Plaintiff leave to appeal questions *newly* decided in the Clarification Order, and not any issues decided in the SJ Order. Plaintiff sought clarification of the SJ Order to clarify the extent of the Court's holding on the fringe benefits recoverable in this action. Having received such clarification in the Clarification Order, it was permissible to seek interlocutory appeal of the original holding as modified by the Clarification Order.

As it did previously, the Court also notes that the questions decided are of substantial public policy importance to the state as a whole, and that as the State Labor Commissioner, Plaintiff is well situated to seek clarity from the appellate court on the questions presented.

**B. Substantial Ground for a Difference of Opinion**
***3** "To determine if a 'substantial ground for difference of opinion' exists under § 1292(b), courts must examine to what extent the controlling law is unclear." *Couch,* 611 F.3d at 633. "Courts traditionally will find that a substantial ground for difference of opinion exists where "the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented." *Id.* (*quoting* 3 Federal Procedure, Lawyers Edition § 3:212 (2010) (footnotes omitted)). "A substantial ground for difference of opinion exists where reasonable jurists might disagree on an issue's resolution, not merely where they have already disagreed." *Reese v. BP Exploration (Alaska) Inc.,* 643 F.3d 681, 688 (9th Cir.2011).

Reasonable jurists could disagree with the Court's conclusion that Section 6310 's text does not give a cause of action to an employee who did not himself engage in protected activity. For reasons more fully explained in the Clarification Order, the Court finds that the text of the statute is not susceptible to such an interpretation, and that other decisions allowing "associational" causes of action were interpreting statutes with importantly different language. Clarification Order 2:17–5:16, 2014 WL 3615582, at *2–4, 2014 U.S. Dist. LEXIS 100240, at 4–11. But a California court has, at least once, interpreted the text of Section 6310 to extend beyond its literal scope. *Lujan v. Minagar,* 124 Cal.App. 4th 1040, 1045–46 (2004).

Reasonable jurists could also disagree with the Court's conclusion that health and life insurance benefits are not recoverable in a Section 6310 action. For reasons set forth in the SJ Order and the Clarification Order, the Court understands *EEOC v. Farmer Bros Co.* (*"Farmer Bros."*), 31 F.3d 891, 902 (9th Cir.1994), to be precedent on the question of what types of damages are available under Section 6310. SJ Order 23:7–24:4, 2014 WL 1894315, at * 14–15, 2014 U.S. Dist. LEXIS 65184, at 45–46, *as modified by* Clarification Order 6:24–28, n. 5 & 7:26–28, n.7, 2014 WL 3615582, at *4, n.5, at *5, n.7, 2014 U.S. Dist. LEXIS 100240, at 12, n. 5, at 14, n. 7. But especially since the *Farmer Bros.* court did not explain why it applied *Galindo v. Stoody,* 793 F.2d 1502, 1516–17 (9th Cir.1986), a case interpreting federal law, to apply to state law, a reasonable jurist could decide the question differently.

There are substantial grounds for a difference of opinion.

### C. Material Advancement of the Litigation

"[N]either § 1292(b)'s literal text nor controlling precedent requires that the interlocutory appeal have a final, dispositive effect on the litigation, only that it 'may materially advance' the litigation." *Reese,* 643 F.3d at 688. As one commentator has put it, "[i]deally, § 1292(b) could be used to allow interlocutory appeals whenever the district court and court of appeals agree that immediate review is a good gamble." 16 Wright, Miller & Cooper, supra, at § 3930.

Here, especially since this action will likely be stayed while Plaintiff seeks interlocutory appeal of the earlier-decided questions, interlocutory appeal is an unusually good gamble. It would not be an efficient use of judicial resources to appeal only two of the four major outstanding legal issues before trial, only to then have to return to those issues again after trial.

Interlocutory appeal of these issues would materially advance the litigation.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff's second motion to seek interlocutory appeal. In total, the Court has now certified the following questions for interlocutory appeal:

> ***4** 1. Whether Plaintiff may recover on the theory that Complainants, who were directly employed by Siemens, made protected safety complaints to Turner Construction, to whom Siemens was a subcontractor. SJ Order 6:19–13:11, 2014 WL 1894315, at *4–*8, 2014 U.S. Dist. LEXIS 65184, at 11–24.
>
> 2. Whether, to prevail on a Section 6310 claim, Plaintiff must show that "retaliatory animus ... [was] a but-for cause of the employer's adverse action." SJ Order 13:13–28, 2014 WL 1894315, at *8 and *8, n.7, 2014 U.S. Dist. LEXIS 65184, at 24–25 and 25, n.7.
>
> 3. Whether Section 6310 provides a cause of action only to "[a]ny employee who is ... discriminated against ... because the *employee* has' engaged in protected activity," and does not provide a cause of action to an employee who is discriminated against because *another* employee has engaged in such protected activity. Clarification Order 2:17–5:16, 2014 WL 3615582, at *2–4, 2014 U.S. Dist. LEXIS 100240, at 4–11.4.
>
> 4. Whether Plaintiff may recover as damages any health and life insurance benefits for which Complainants did not bear out-of-pocket expenses. SJ Order 23:7–24:4, 2014 WL 1894315, at *14–15, 2014 U.S. Dist. LEXIS 65184, at 45–47, *as modified by* Clarification Order 5:17–8:17, 2014 WL 3615582, at *4–6, 2014 U.S. Dist. LEXIS 100240, at 11–17.

Both this order, and the Court's June 10 order certifying the two earlier questions, take effect on the date of this order. Any application to the Ninth Circuit must be made "within ten days after the entry of" this order. 28 U.S.C. § 1292(b). The Court hereby CONTINUES the stay of this action for ten days from the date of this order, and stays all activity except for Plaintiff filing an application to the Ninth Circuit for interlocutory appeal. If Plaintiff files a notice of appeal within that time, the

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Court will stay this action pending appeal, vacate the trial and other dates, and terminate all pending motions and deadlines. If no appeal is filed, the stay will expire in ten days and the December trial date will remain in effect.

The parties are ORDERED to move the Court to set a case management conference immediately upon the Ninth Circuit issuing an order denying the application for interlocutory appeal or issuing an order deciding the issues certified for interlocutory appeal.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2014 WL 4775163, 2014 IER Cases 168,694

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 2378009
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.

MEDIA MATTERS FOR AMERICA, Plaintiff,
v.
FEDERAL TRADE COMMISSION, et al., Defendants.

Civil Action No. 25 - 1959 (SLS)
|
Signed August 15, 2025

**Attorneys and Law Firms**

Kuntal Virendra Cholera, Pro Hac Vice, Brenden J. Cline, Ryan K. Quillian, Pro Hac Vice, Stephen Pierce Anthony, Covington & Burling LLP, Washington, DC, Alex Foulkes Grafton, Pro Hac Vice, Justin A. Nelson, Susman Godfrey LLP, Houston, TX, Katherine Marie Peaslee, Pro Hac Vice, Susman Godfrey L.L.P., Seattle, WA, for Plaintiff.

H. Thomas Byron, III, Imad Dean Abyad, Federal Trade Commission Office of the General Counsel, Washington, DC, for Defendants.

**MEMORANDUM OPINION**

SPARKLE L. SOOKNANAN, United States District Judge

***1** Speech on matters of public concern is the heartland of the First Amendment. The principle that public issues should be debated freely has long been woven into the very fabric of who we are as a Nation. Without it, our democracy stands on shaky ground. It should alarm all Americans when the Government retaliates against individuals or organizations for engaging in constitutionally protected public debate. And that alarm should ring even louder when the Government retaliates against those engaged in newsgathering and reporting.

This case presents a straightforward First Amendment violation. Media Matters for America is a nonprofit media company that is over two decades old. In November 2023, it ran a story reporting that as a result of Elon Musk's acquisition of Twitter (now "X"), advertisements on the social media platform were appearing next to antisemitic posts and other offensive content. Mr. Musk immediately promised to file "a thermonuclear lawsuit against Media Matters." And he followed through. In the weeks and months that followed, X Corp. and its subsidiaries sued Media Matters all over the world, at least until a federal district court preliminarily enjoined this aggressive litigation strategy. Meanwhile, seemingly at the behest of Steven Miller, the current White House Deputy Chief of Staff, the Missouri and Texas Attorneys General issued civil investigative demands (CIDs) to Media Matters, both of which were preliminarily enjoined in this Court as likely being retaliatory in violation of the First Amendment.

But these court victories did not end the fight for Media Matters. Now the Federal Trade Commission (FTC) has taken up the cause. After Andrew Ferguson took on his new role as the Chairman of the FTC, the agency issued a sweeping CID to Media Matters, purportedly to investigate an advertiser boycott concerning social media platforms. That CID should have come as

no surprise. Before President Trump selected him to head the FTC, Mr. Ferguson appeared on Steve Bannon's podcast, where he said that it is "really important that the FTC take investigative steps in the new administration under President Trump" because "progressives" and others who are "fighting "disinformation" were "not going to give up just because of the election." One of his supporters, Mike Davis, who urged President Trump to nominate him to the role, made several public comments about Media Matters, including that Mr. Musk should "nuke" the media company. And after taking the reins, Chairman Ferguson brought on several senior staffers at the FTC who previously made public comments about Media Matters.

Media Matters brought this lawsuit to challenge the FTC's CID, alleging that it is retaliatory in violation of the First Amendment and that it is overbroad in violation of the Fourth and First Amendments. Before the Court is a motion seeking preliminary injunctive relief from the CID. The Court agrees that a preliminary injunction is warranted.

The FTC claims that this Court should look the other way because it lacks the authority to hear this lawsuit. It is wrong. Relying on *Thunder Basin Coal Company v. Reich*, 510 U.S. 200, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994), the FTC argues that Congress precluded federal court jurisdiction to hear challenges to the FTC's CIDs because it channeled those claims elsewhere in the Federal Trade Commission Act (FTC Act). But the FTC Act does no such thing. Although it gives the FTC the authority to bring a lawsuit in federal district court to enforce a CID if the recipient fails to comply, it says nothing about claims by recipients of CIDs wishing to challenge them. According to the FTC, a recipient of a CID that violates the First Amendment may only challenge that CID if the FTC chooses to bring suit itself. It is hard to believe that Congress intended such a result. Nothing in the FTC Act suggests that Congress meant to declare open season on journalists by allowing a retaliatory FTC to decide if and when its retaliation will be reviewed by a federal court.

***2** The FTC also argues that Media Matters may not bring constitutional claims to challenge the agency's actions. It takes the broad stance that the Administrative Procedure Act (APA) provides the exclusive remedy for judicial review of agency conduct, preventing federal courts from hearing even constitutional claims. But nothing in the APA suggests Congress meant to foreclose equitable relief for constitutional violations that have been challenged without reliance on the APA. Perhaps that is why courts in this District have routinely allowed equitable constitutional claims to proceed even when plaintiffs could not sue under the APA.

On the merits, the Court finds that Media Matters is likely to succeed on its First Amendment retaliation claim, which is all it needs at this stage. Media Matters engaged in quintessential First Amendment activity when it published an online article criticizing Mr. Musk and X. And the Court finds that the FTC's expansive CID is a retaliatory act. There can be no doubt that such a CID would deter a reporter of ordinary firmness from speaking again. Indeed, the FTC's CID has had its intended effect. Because of the CID, Media Matters has decided against pursuing certain stories about the FTC, Chairman Ferguson, and Mr. Musk. Finally, given the comments by Chairman Ferguson and his colleagues about Media Matters, the timing of the CID, and evidence of pretext, Media Matters is likely to show that retaliatory animus was the but-for cause of the FTC's CID. Because the other equitable factors also favor Media Matters, the Court grants a preliminary injunction in its favor.

## BACKGROUND

### A. Statutory Background

"Congress created the Federal Trade Commission in 1914 to regulate the use of 'unfair methods of competition in commerce.' " *Meta Platforms, Inc. v. FTC*, 723 F. Supp. 3d 64, 72 (D.D.C. 2024) (quoting *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 966 (D.C. Cir. 1985)). The FTC "administers the FTC Act, which prohibits the use of 'unfair methods of competition' and, since 1938, 'unfair or deceptive acts or practices in or affecting commerce.' " *Id.* (quoting 15 U.S.C. § 45(a)(1)). The statute gives the FTC "the ability to investigate violations of the FTC Act" using various tools, including the issuance of civil investigative demands (CIDs). *Id.* (citing 15 U.S.C. § 57b-1(b)). And when someone fails to comply with a CID, the FTC "may file ... in [a] district court of the United States ... a petition for an order of such court for the enforcement" of the CID. 15 U.S.C. § 57b-1(e).


© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**B. Factual Background**

"The following facts are alleged in the Complaint or drawn from declarations in the record that are not disputed in relevant part, except where otherwise noted." *Postal Police Officers Ass'n v. U.S. Postal Serv.*, 502 F. Supp. 3d 411, 415 (D.D.C. 2020).

Media Matters is a "not-for-profit research center and media watchdog." Compl. ¶ 22, ECF No. 1. For more than two decades, it has been "dedicated to monitoring and correcting misinformation in U.S. media." *Id.* ¶ 29. It has about eighty employees, "including [forty-five] reporters, writers, and researchers, to whom it provides a far-reaching platform from which they can reach the public." *Id.* ¶ 30. In recent years, Media Matters has helped document instances of "white nationalism, antisemitism, and neo-Nazi rhetoric" in the public square. *Id.* ¶ 4.

The events leading to this lawsuit date back to the end of 2022, when Elon Musk purchased Twitter, which he renamed "X." *Id.* ¶ 5. According to Media Matters, Mr. Musk "gutted its content moderation teams and its policies on misinformation and violent content in the name of promoting 'free speech.' " *Id.* Media Matters alleges that this resulted in a surge of "extremist and racist rhetoric" on X. *Id.* ¶ 32. Less than a month after Mr. Musk acquired X, the Brookings Institute reported that the platform saw "a nearly 500% increase in use of the N-word in the 12-hour window immediately following the shift of ownership to [Mr.] Musk," *id.* (quoting Rashawn Ray & Joy Anyanwu, *Why is Elon Musk's Twitter takeover increasing hate speech?*, Brookings (Nov. 23, 2022), https://perma.cc/KPW7-K6LC), and that "use of the word 'Jew' increased fivefold" "within the first week of his ownership," *id.*

***3** In February 2023, Media Matters began publishing articles about "the juxtaposition of advertisements alongside hateful content on X." *Id.* ¶ 37. And it published one such article by Eric Hananoki on November 16, 2023. *See id.*; *see also id.* ¶ 7 (identifying Mr. Hananoki as the author). That article went viral after stating: "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content." *Id.* ¶ 37 (quoting Compl., Ex. A., ECF No. 1-1). "The article included screenshots of six advertisements from major corporate entities appearing with at least nine posts from X users containing such content." *Id.*

Mr. Musk responded on November 18, 2023, by promising to file "a thermonuclear lawsuit against Media Matters." *Id.* ¶ 38 (quoting Elon Musk (@elonmusk), X (Nov. 18, 2023, 2:01 am), https://perma.cc/X4HN-PLJ4). He claimed that "activist groups like Media Matters ... try to use their influence to attack our revenue streams by deceiving advertisers on X." *Id.* ¶ 39 (quoting Elon Musk (@elonmusk), X (Nov. 18, 2023, 2:01 am), https://perma.cc/X4HN-PLJ4). As he saw it, Media Matters had " 'manipulate[d]' advertisers and the public by 'curat[ing]' and 'contriv[ing]' in order to 'find a rare instance of ads serving next to the content they chose to follow.' " *Id.* ¶ 39.

The next day, on November 19, 2023, Stephen Miller, the current White House Deputy Chief of Staff, in response to a post on X about the Media Matters article, stated that "[f]raud is both a civil and criminal violation" and that "[t]here are 2 dozen+ conservative state Attorneys General." *Id.* ¶ 40 (quoting Stephen Miller (@StephenM), X (May 17, 2022, 11:12 am), https://perma.cc/5X5H-5QLN). Just a few hours later, Missouri Attorney General Andrew Bailey replied to Mr. Miller's post: "My team is looking into this matter." *Id.* ¶ 41 (quoting Attorney General Andrew Bailey (@AGAndrewBailey), X (Nov. 19, 2023, 4:46pm), https://perma.cc/J463-656K). And the next day, on November 20, 2023, Texas Attorney General Ken Paxton "announced that he was launching an investigation into Media Matters, purportedly under Texas's Deceptive Trade Practices Act." *Id.* ¶ 42. That same day, Mr. Musk's X Corp. sued Media Matters and Mr. Hananoki in the United States District Court for the Northern District of Texas. *See id.* ¶ 45 (citing *X Corp. v. Media Matters for Am.*, No. 4:23-cv-1175 (N.D. Tex Nov. 20, 2023), ECF No. 1).[1] And in the "weeks and months" that followed, "X Corp., through its international subsidiaries, filed suits in Ireland and Singapore." *Id.* ¶ 46.

Media Matters also began receiving CIDs from state attorneys general. The Texas Attorney General issued a CID to Media Matters on November 21, 2023. *See id.* ¶ 43. It demanded that Media Matters "produce an array of materials in both Media Matters' and [Mr.] Hananoki's possession since January 1, 2022, including documents and communications about their research and reporting, their communications with possible sources at X and its advertisers," and other materials. *Id.* (citing

Compl., Ex. B, ECF No. 1-2). The Missouri Attorney General followed suit on March 25, 2024, issuing a CID seeking records from Media Matters. *Id.* ¶ 44 (citing Compl., Ex. C, ECF No. 1-3).

Media Matters challenged those state CIDs in this Court. It filed a complaint against the Texas Attorney General on January 17, 2024. *See Media Matters for Am. v. Paxton*, No. 24-cv-147, ECF No. 1. And the Court preliminarily enjoined the Texas CID on April 12, 2024, concluding that Media Matters was likely to succeed on the merits of its First Amendment retaliation claim. *See Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1 (D.D.C. 2024); *see also* Compl. ¶ 50. Media Matters "amended its suit" after receiving the Missouri CID to name the Missouri Attorney General as a defendant. Compl. ¶ 51. And the Court again granted a preliminary injunction on August 23, 2024, concluding that the Missouri CID likely amounted to First Amendment retaliation. *See Media Matters for Am. v. Bailey*, No. 24-cv-147, 2024 WL 3924573 (D.D.C. Aug. 23, 2024). Media Matters and the Missouri Attorney General ultimately settled their dispute in February 2025. *See* Mot. Dismiss Case, *Media Matters for Am. v. Paxton*, No. 24-7141 (D.C. Cir. Feb. 11, 2025), ECF No. 2100004; *see also* Pl.'s Unopposed Mot. Dismiss Claims Against Andrew Bailey, *Media Matters for Am. v. Paxton*, No. 24-cv-147 (D.D.C. Feb. 13, 2025), ECF No. 89. And on May 30, 2025, the D.C. Circuit affirmed the district court's preliminary injunction as to the Texas Attorney General, holding that Media Matters had "demonstrated a likelihood of success on the merits of [its] First Amendment retaliation claim." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025); *see also* Compl. ¶ 50.

***4** While the litigation about the state CIDs was ongoing, Media Matters also sued X Corp. in the United States District Court for the Northern District of California. *See* Compl., *Media Matters for Am. v. X. Corp.*, No. 25-cv-2397, ECF No. 1 (Mar. 10, 2025); *see also* Compl. ¶ 52. It challenged X Corp.'s global litigation campaign as violating the forum selection clause in its terms of service. *See* Compl. ¶ 52. And on April 10, 2025, the district court granted Media Matters' motion for a preliminary injunction in part, recognizing that "it seems almost certain that the X entities' decision to file multiple suits in multiple jurisdictions is designed more to bully Media Matters and inflict financial hardship upon it than to actually vindicate those entities' rights." *Media Matters for Am. v. X Corp.*, No. 25-cv-2397, 2025 WL 1084715, at *1 (N.D. Cal. Apr. 10, 2025); *see also* Compl. ¶ 52.

These preliminary injunctions did not end the controversy. On December 10, 2024, President-elect Trump announced that he would name Andrew Ferguson to be the next Chairman of the FTC. Compl. ¶ 65. This choice came after Mr. Musk "spent at least $288 million to help elect President Trump and other Republican candidates in the 2024 election cycle." *Id.* ¶ 54. It also followed an X post by a fellow donor, Marc Andreesen, stating that "[t]he orchestrated advertiser boycott against X and popular podcasts must end immediately" because "[c]onspiracy in restraint of trade is a prosecutable crime." *Id.* ¶ 57. Mr. Ferguson had responded to Mr. Andreesen's post with the comment that "[a]ntitrust enforcers should take this seriously." *Id.* ¶ 58. And according to a "leaked memo" that the Defendants do not seem to contest, *see* Compl. ¶ 59, when Mr. Ferguson was only a candidate for the FTC Chairman position, he also stated that he had a "track record of standing up to ... the radical left" and insisted that he would "[i]nvestigate ... advertiser boycotts," *FTC Commissioner Andrew N. Ferguson for FTC Chairman*, Punchbowl News, https://perma.cc/A56K-Q4YM. Mr. Ferguson had also appeared on Steve Bannon's podcast, where he said that " 'progressives' who are 'fighting "disinformation' " were 'not going to give up just because of the election,' so 'it's really important that the FTC take investigative steps in the new administration under President Trump.' " Compl. ¶ 61 (quoting Andrew Ferguson, *Bannon's WarRoom, Show Clip Roundup 11/30/2-24 [AM]*, Bannon's War Room (Nov. 30, 2024), https://perma.cc/ASE8-RZNJ); *see also* Notice of Tr., Ex. A at 3, ECF No. 32-1. One of Mr. Ferguson's supporters was Mike Davis, who wrote on X that "Donald Trump should nominate digital freedom fighter Andrew Ferguson to chair FTC." *Id.* ¶ 63 (Mike Davis (@mrddmia), X (Dec. 7, 2024, 2:09 pm), https://perma.cc/V9XL-J7UX).

Mr. Davis has made many comments about Media Matters throughout this controversy. On December 1, 2022, Mr. Davis posted on X that Mr. Musk "should nuke @MMFA [Media Matters' account] and all staff accounts" because "[t]hey're a cancer to free speech." *Id.* ¶ 64 (quoting Mike Davis (@mrddmia), X (Dec. 1, 2022, 11:54am), https://perma.cc/VVD5-NAR5). Later, on November 10, 2023, he solicited money to help push back against Media Matters: "If you want to help @Article3Project build our (growing) list of leftists to throw in the DC gulag with @MMFA's @ehananoki and @MattGertz, please donate here." *Id.* (quoting Mike Davis (@mrddmia), X (Nov. 10, 2023, 1:53 pm), https://perma.cc/L8E8-ZSJF). And he cheered on Mr. Musk's eventual lawsuits against Media Matters, writing that "[a]dvertiser boycotts are highly effective tactics leftists use to cow media executives to destroy free speech—and control the political narrative. @MMFA is the driving force behind conservative media getting crushed—and conservative voices silenced. Cheers to @ElonMusk." *Id.* (quoting Mike Davis (@mrddmia), X (Nov. 29, 2023, 5:42 pm), https://perma.cc/G88S-YC3U). Mr. Davis "is now an outside adviser to the Trump administration." *Id.* ¶ 71 (quoting Dave Michaels, *How Trump's FTC Chairman Is Bringing a MAGA Approach to Antitrust Enforcement*, WSJ (Mar. 12, 2025),

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

https://www.wsj.com/politics/policy/how-trumps-ftc-chairman-is-bringing-a-maga-approach-to-antitrust-enforcement-66b286d5).

***5** When Mr. Ferguson became Chairman of the FTC, he "brought in several senior staffers" who had previously made comments about Media Matters. *Id.* ¶ 70. Joe Simonson, the FTC's Director of Public Affairs, had posted on X in May 2024 that "Media Matters employed a number of stupid and resentful Democrats who went to like American University and didn't have the emotional stability to work as an assistant press aide for a House member." *Id.* ¶ 70 (quoting Joe Gabriel Simonson (@SaysSimonson), X (May 23, 2024), https://perma.cc/8CTX-HPS7). Jon Schweppe, a Senior Policy Advisor to Chairman Ferguson, had said in June 2023 that "Media Matters wants to weaponize powerful institutions to censor conservatives," *id.* (quoting Jason Cohen, *'Deeply Flawed' and 'Laughable': Experts Slam Study Finding Facebook Does Not Censor Conservatives*, Daily Caller (June 19, 2023), https://dailycaller.com/2023/06/19/deeply-flawed-laughable-experts-slam-study-finding-facebook-censor-conservatives/), before celebrating one of Mr. Musk's lawsuits against Media Matters, which he called the "scum of the earth," *id.* (quoting Jon Schweppe (@JonSchweppe), X (Nov. 20, 2023), https://perma.cc/25YT-DQ7T). And Jake Denton, the FTC's Chief Technology Officer, had stated in June 2023 that Media Matters was "an organization devoted to pressuring companies into silencing conservative voices." *Id.* (quoting Jason Cohen, *'Deeply Flawed' and 'Laughable': Experts Slam Study Finding Facebook Does Not Censor Conservatives*, Daily Caller (June 19, 2023), https://dailycaller.com/2023/06/19/deeply-flawed-laughable-experts-slam-study-finding-facebook-censor-conservatives/).

That brings us to this lawsuit. On May 20, 2025, the FTC issued a CID to Media Matters. *Id.* ¶ 73. The CID included many broad demands, including but not limited to the following:

• Provide all documents that Media Matters either produced or received in discovery in any litigation between Media Matters and X Corp. related to advertiser boycotts since 2023.

• Provide all documents relating to other entities that purport to track, categorize, monitor, analyze, evaluate, or rate news, media, sources, platforms, outlets, websites, or other content publisher entities for "brand suitability," "reliability," "misinformation," "hate speech," "false" or "deceptive" content, or similar categories.

• Provide all documents relating to advertisers working with publishers and/or platforms to address harmful, hateful, misleading, unsafe, or otherwise undesirable media environments.

• Provide all documents relating to efforts by any person to create or advance brand safety tools.

• Provide documents and data sufficient to show the methodology by which Media Matters evaluates or categorizes any news, media, sources, platforms, outlets, websites, or other content publisher entities.

• Provide all documents relating to any complaints that Media Matters received related to its activities, programs, or policies, including but not limited to complaints regarding Media Matters' decision to apply any label, rating, or categorization to any news, media, sources, outlets, platforms, websites, or other content publisher entities.

• Provide all documents, including correspondence, relating to Media Matters working with ad tech, technology, or developer companies or social media platforms to develop or advance any of Media Matters' programs, policies, or objectives, including but not limited to any agreements between Media Matters and these companies.

• Provide each financial statement, budget, profit and loss statement, cost center report, profitability report, and any other financial report regularly prepared by or for Media Matters on any periodic basis. For each such statement, budget, or report, state how often it is prepared, and identify the employees responsible for its preparation.

Compl., Ex. D at 2–4, ECF No. 1-4. The CID defined "Media Matters" to mean "Media Matters for America, together with its successors, predecessors, divisions, wholly- or partially-owned subsidiaries, committees, working groups, alliances, affiliates, and partnerships, whether domestic or foreign; and all the directors, officers, employees, consultants, agents, and representatives of the foregoing." *Id.* at 4. The field of the CID entitled "Subject of Investigation" said "See attached." *Id.* at 1. And the only attachment mentioning anything about a "Scope of Investigation" was a 2022 FTC resolution directing that "any and all compulsory processes available" to the FTC should "be used in connection with any inquiry" meant to "investigate whether any persons, partnerships, corporations, or others have engaged or are engaging in inviting, initiating, participating in, or facilitating collusion or coordination ... in violation of Section 5 of the Federal Trade Commission Act ...

or any other statutes or rules enforced by the Commission." *Id.* at 20.

***6** Over a month later, on July 7, 2025, after Media Matters had filed this lawsuit, the FTC clarified in a letter to Media Matters why it had issued the CID. *See* Pl.'s Mot. Prelim. Inj., Ex. B, ECF No. 22-4. It stated that the subject of the investigation was:

> To determine whether any natural persons, partnerships, corporations, associations, or other legal entities have engaged in or are engaging in unfair, anticompetitive, collusive, or exclusionary acts or practices—including inviting, participating in, or facilitating boycotts or other collusion or coordination—to withhold, degrade, increase the cost of, or otherwise diminish the quantity of advertising placed on news outlets, media platforms, or other publishers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, or Section 5 of the FTC Act, 15 U.S.C. § 45, as amended, or any other statutes or rules enforced by the Commission, and to determine the appropriate action or remedy.

*Id.* at 1. And the Defendants put a finer point on this in their Opposition, stating that they are "investigating whether online advertisers and/or advertising agencies have unlawfully agreed to use certain lists promulgated by other industry participants that categorize or rate content publishers as not 'brand suitable' or not 'brand safe,' to coordinate the placement of ads." Defs.' Opp'n Mot. Prelim. Inj (Defs.' Opp'n) at 28, ECF No. 27 (quoting Order Den. Pet. to Quash Civ. Investigative Demand at 2, *In the Matter of Civ. Investigative Demand to Media Matters for America Dated May 20, 2025*, FTC Dkt. No. 251-0061 (July 25, 2025)). They say that they have accordingly issued CIDs to entities "that the Commission has reason to believe possess information relating to the use of such lists to coordinate ad placement," including Media Matters. *Id.*

Media Matters claims that the FTC's CID has chilled its First Amendment activity. Compl. ¶ 84. And it has presented several declarations to support this argument. According to one declarant, "the prospect of relaxing Media Matters' posture on research and reporting about government entities" after winning legal victories against the state CIDs "was stymied by the FTC's CID." Dimiero Decl. ¶ 19, ECF No. 22-6; *see also* Padera Decl. ¶ 17 (similar), ECF No. 22-8. "For example, without the investigation, Media Matters would likely have looked into reporting about Andrew Ferguson's merger requirements for Omnicom and IPG, which placed unprecedented limitations on their speech in a transparent attempt to aid media platforms, like X, with limited content moderation efforts." Dimiero Decl. ¶ 20. The declarant also identified particular stories that Media Matters would have pursued but for the FTC CID. *See id.* ¶ 21. Another declarant stated that the FTC's CID is "driving additional costs" and that it has caused "retention challenges" for Media Matters. Padera Decl. ¶ 22. Finally, a third declarant attested that the FTC's CID resulted in Media Matters being "removed from coalition communications" "about FTC actions." Millican Decl. ¶ 13, ECF No. 22-7.

### C. Procedural Background

Media Matters filed a Complaint in this Court on June 23, 2025, bringing two claims against the FTC and some of its officers. *See* Compl. ¶¶ 95–110. First, it alleged that the Defendants "violated, and continue to violate," Media Matters' "First Amendment rights by launching an investigation and serving a burdensome CID in retaliation for [Media Matters'] speech." *Id.* ¶ 96. And second, it alleged that the Defendants' "issuance of the overbroad and retaliatory CID violates [Media Matters'] First and Fourth Amendment rights by unreasonably requiring it to turn over sensitive and privileged materials, including those that impinge upon their association with other organizations." *Id.* ¶ 107. On July 14, 2025, Media Matters filed a Motion for Preliminary Injunction. *See* Pl.'s Mot. Prelim. Inj., ECF No. 22. This motion is fully briefed and ripe for review. *See* Defs.' Opp'n; Pl.'s Reply Supp. Mot. Prelim. Inj., ECF No. 28; Pl.'s Suppl. Mem., ECF No. 31; Defs.' Mem., ECF No. 33.

## LEGAL STANDARD

***7** A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20, 129 S.Ct. 365. And a plaintiff "need only establish a likelihood of success on the merits of one claim to obtain ... injunctive relief." *A.B.-B. v. Morgan*, 548 F. Supp. 3d 209, 218 (D.D.C. 2020).

**DISCUSSION**

The Court finds that Media Matters is likely to succeed on the merits of its First Amendment retaliation claim, that it has shown irreparable injury, and that the balance of equities and the public interest favor injunctive relief. The Court therefore grants Media Matters the preliminary injunction it seeks.

**A. Likelihood of Success on the Merits**

**1. Preclusion**

The Defendants raise two threshold arguments. They first argue that the Court lacks subject matter jurisdiction because the FTC Act precludes this lawsuit. *See* Defs.' Opp'n at 11–18. "A special statutory review scheme ... may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185, 143 S.Ct. 890, 215 L.Ed.2d 151 (2023) (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994)); *see also Elec. Privacy Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019) ("The merits on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." (cleaned up)). "District courts may ordinarily hear those challenges by way of 28 U.S.C. § 1331's grant of jurisdiction for claims 'arising under' federal law." *Id.* "Congress, though, may substitute for that district court authority an alternative scheme of review." *Id.* It may do so "explicitly, providing in so many words that district court jurisdiction will yield," or "implicitly, by specifying a different method to resolve claims about agency action." *Id.* "Under *Thunder Basin*'s framework, courts determine that Congress intended that a litigant proceed exclusively through a statutory scheme of administrative and judicial review when (i) such intent is fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure." *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 498 (D.C. Cir. 2018) (cleaned up).

**a. Fairly Discernible**

Courts first ask whether it is "fairly discernible in the statutory scheme" that Congress intended to provide an exclusive channel to review. *Id.* The Defendants argue that the FTC Act reflects such an intent. *See* Defs.' Opp'n at 13. More specifically, they identify statutory language authorizing the FTC to enforce a CID in federal district court "[w]henever any person fails to comply with any civil investigative demand duly served upon him ..., or whenever satisfactory copying or reproduction of material requested pursuant to the demand cannot be accomplished and such person refuses to surrender such material." 15 U.S.C. § 57b-1(e). And they point out that the recipient of an agency CID may raise constitutional challenges during an enforcement proceeding. *See, e.g.*, *United States v. Witmer*, 835 F. Supp. 208, 224 (M.D. Penn. 1993) ("Witmer and Kelly argue that the issuance of the CIDs during the pendency of a grand jury investigation into the same conduct unduly burdens their Fifth Amendment rights and is fundamentally unfair."). They argue that "Congress thus channeled issues concerning the validity, scope, and enforceability of FTC CIDs into an enforcement action, precluding efforts ... to impede preemptively the Commission's ongoing investigations." Defs.' Opp'n at 13.

***8** The first problem with this argument is that it is highly unusual to apply *Thunder Basin* to preclude claims brought in federal court on the basis that a statute channels those claims to a later federal court proceeding. *Thunder Basin* itself

suggests it should apply only to statutes that channel claims to an administrative proceeding, which is perhaps followed by federal court review. *See, e.g.*, *Thunder Basin*, 510 U.S. at 207, 114 S.Ct. 771 ("In cases involving delayed judicial review of final agency actions, we shall find that Congress has allocated initial review to an administrative body where such intent is fairly discernible in the statutory scheme." (cleaned up)); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) ("Provisions for agency review do not restrict judicial review unless the statutory scheme displays a fairly discernible intent to limit jurisdiction[.]" (cleaned up)); *Arch Coal, Inc.*, 888 F.3d at 498 ("Under *Thunder Basin*'s framework, courts determine that Congress intended that a litigant proceed exclusively through a statutory scheme of *administrative and* judicial review when ... such intent is fairly discernible in the statutory scheme[.]" (emphasis added) (cleaned up)); *see also Elgin v. Dep't of the Treasury*, 567 U.S. 1, 8, 132 S.Ct. 2126, 183 L.Ed.2d 1 (2012) ("We begin with the appropriate standard for determining whether a statutory scheme of *administrative and* judicial review provides the exclusive means of review for constitutional claims." (emphasis added)). In describing *Thunder Basin*, the Supreme Court has even said that "Congress typically chooses" to implicitly substitute district court jurisdiction with an alternative scheme of review by providing for "review in a court of appeals following the agency's own review process." *Axon*, 598 U.S. at 185, 143 S.Ct. 890; *see also id.* ("The agency effectively fills in for the district court, with the court of appeals providing judicial review."). And the Defendants have not directed the Court to any case applying *Thunder Basin* to preclude claims because a statute channels those claims directly to a federal court.

The Court has identified a line of cases applying *Thunder Basin*'s precursor, *Block v. Community Nutrition Institute*, 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984), to find preclusion where a statute channels certain claims to enforcement actions in federal court. *See Nat'l Ass'n of Home Builders v. U.S. EPA*, 731 F. Supp. 2d 50, 54–56 (D.D.C. 2010) ("Courts have routinely held that the [Clean Water Act] precludes 'pre-enforcement review' of agency actions taken under its authority." (collecting cases)); *see also Maryland v. U.S. Dep't of Agric.*, 777 F.Supp.3d 432, 464–65 (D. Md. 2025) ("[I]n the claim-channeling line of authority, *Block* does not represent some independent analytical framework separate and apart from *Thunder Basin*, but rather is a precursor decision to *Thunder Basin*, as *Thunder Basin* itself suggests."). *Block* taught that "the presumption favoring judicial review" is overcome "whenever the congressional intent to preclude judicial review is 'fairly discernible in the statutory scheme.' " 467 U.S. at 351, 104 S.Ct. 2450 (quoting *Data Processing Serv. v. Camp*, 397 U.S. 150, 157, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)). And *Thunder Basin* then adopted that "fairly discernible" language. *See* 510 U.S. at 207, 216, 114 S.Ct. 771 (citing *Block*, 467 U.S. at 351, 104 S.Ct. 2450). So the Court will treat this line of cases as informing the first prong of *Thunder Basin*.[2]

The primary case is *Hoffman Group, Inc. v. EPA*, 902 F.2d 567 (7th Cir. 1990), which held that a federal district court lacked jurisdiction to hear a challenge to an EPA compliance order because the Clean Water Act (CWA) "impliedly precluded judicial review" of such an order "except in an enforcement proceeding" brought by the EPA. *Id.* at 569 (citing *Block*, 467 U.S. at 349, 104 S.Ct. 2450). Understanding this holding requires some background. "Congress provided [the] EPA with a choice of procedures for enforcing the [CWA]." *S. Pines Assocs. v. United States*, 912 F.2d 713, 715 (4th Cir. 1990). The first two options come from Section 309(a)(3) of the CWA, which permits the EPA to "either issue an order requiring [a] person to comply with [the Act]" or "bring a civil action" where it finds a violation of the Act. *Id.* (quoting 33 U.S.C. § 1319(a)(3)). And a third option comes from Section 309(g), which provides that the EPA "may also assess administrative penalties against those who violate the Act or a permit issued under the Act." *Id.* (citing 33 U.S.C. § 1319(g)). When the EPA takes this third route, "the violator is entitled to a hearing before the agency," *id.* (citing 33 U.S.C. § 1319(g)(2)), and the order "assessing administrative penalties [is] subject to judicial review," *id.* (citing 33 U.S.C. § 1319(g)(8)). In *Hoffman*, the Seventh Circuit largely relied on two aspects of this statutory structure to conclude that Congress intended to preclude district court challenges to EPA compliance orders, and several circuits have followed suit. *See, e.g.*, *S. Pines Assocs.*, 912 F.2d at 715; *S. Ohio Coal Co. v. Off. of Surface Mining, Reclamation & Enf't*, 20 F.3d 1418, 1427 (6th Cir. 1994); *Laguna Gatuna, Inc. v. Browner*, 58 F.3d 564, 566 (10th Cir. 1995); *see also Rueth v. EPA*, 13 F.3d 227, 230 (7th Cir. 1993). But neither of these features is present in the FTC Act. *See infra*, at 18–21, 132 S.Ct. 2126.

***9** *First*, the Seventh Circuit zeroed in on the two options presented in Section 309(a)(3). *See Hoffman*, 902 F.2d at 569. It said that the statutory language showed that the EPA could either "issue a compliance order" *or* "file suit for enforcement" when faced with a violation of the CWA. *Id.* "A compliance order is a document served on the violator, setting forth the nature of the violation and specifying a time for compliance with the Act." *S. Pines Assocs.*, 912 F.2d at 715 (citing 33 U.S.C. § 1319(a)(5)(A)). It "does not alter [the recipient's] obligations under the Act," and as should be clear from Section 309(a)(3), the "EPA can bring a suit whether or not it issues an order[.]" *Id.* at 716 n.3. Accordingly, deciding to issue a compliance order can be seen as an attempt "to negotiate a solution rather than to institute civil proceedings immediately." *Id.*; *see also Rueth*, 13 F.3d at 230 n.2 ("[F]orcing the agency into litigation before it completes its wetlands delineation and

permitting process will frustrate the statutory scheme that allows the agency to resolve violations in a flexible manner without judicial interference." (quoting *Howell v. U.S. Army Corps of Eng'rs*, 794 F. Supp. 1072, 1075 (D.N.M. 1992)). This more flexible option makes sense because "[t]he objective of the CWA is 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," *S. Pines Assocs.*, 912 F.2d at 715 (quoting 33 U.S.C. § 1251), so Congress understandably "intended to allow [the] EPA to act and address environmental problems quickly without becoming immediately entangled in litigation," *id.* at 716. As the Seventh Circuit saw it, allowing the recipient of a compliance order to immediately bring a challenge in federal court "would eliminate this choice." *Hoffman*, 902 F.2d at 569.

But the FTC Act provides no alternative option when the FTC finds someone has violated the terms of one of its CIDs. It only allows the FTC to "file ... in [a] district court of the United States ... a petition for an order of such court for the enforcement of this section." 15 U.S.C. § 57b- 1(e). Allowing the recipient of a CID to bring a pre-enforcement challenge in district court therefore removes no statutorily provided tool from the FTC's toolbox.

*Hoffman* muddies this distinction by saying that the CWA allows the EPA to "seek to enforce" its compliance orders "in a federal district court." 902 F.2d at 568 (citing 33 U.S.C. § 1319(b)). This seems to collapse the EPA's options for handling a CWA violation into a single option for responding to a compliance order violation—federal court enforcement. On this view, the FTC appears to be in the same boat, left to handle CID violations with federal court enforcement actions alone. *See* 15 U.S.C. § 57b-1(e). But *Hoffman* used materially imprecise language. 33 U.S.C. § 1319(b) does not allow the EPA to enforce its compliance orders. After all, those compliance orders do "not alter [the recipient's] obligations under the [CWA]." *S. Pines Assocs.*, 912 F.2d at 716 n.3. Instead, 33 U.S.C. § 1319(b) allows the EPA "to commence a civil action" "for any violation for which [it] is authorized to issue a compliance order." *Id.* In other words, the civil action is not enforcing the compliance order, it is enforcing the CWA. *See also id.* § 1319(a)(3) (allowing the EPA to enforce violations of the CWA by bringing "a civil action in accordance with *subsection (b)* of this section"). And the EPA has several options when faced with CWA violations. *See supra*, at 17–18. But the FTC Act permits federal court enforcement actions for violations of the CID itself. *See* 15 U.S.C. § 57b-1(e) ("Whenever any person fails to comply with any *civil investigative demand* duly served upon him under this section, ... the Commission ... may file ... a petition for an order of [a district court] for the enforcement of this section."). And it provides only one way to respond to such a violation. *See id.*

The Defendants insist that the FTC's CIDs create no legal obligations on the recipient until enforcement because they are not self-executing. *See* Defs.' Opp'n at 42 ("Commission CIDs are not self-executing, and Media Matters was under no legal obligation to comply—unless and until the Commission later sought and secured a court order enforcing the CID."); *see also* Motions Hr'g (Aug. 13, 2025), Rough Tr. at 27:14–17 ("[I]t's not self-enforcing. So the obligation doesn't arise until the enforcement action."). But whether something is self-executing is a distinct question from whether it creates legal obligations. *See, e.g.*, *Sluss v. U.S. Dep't of Just.*, 898 F.3d 1242, 1249 (D.C. Cir. 2018) ("Non-self executing treaties are much like federal statutes that do not supply a private cause of action. Although both are enactments that create legal obligations, plaintiffs cannot bring claims under either."); *Lewis v. Mich. Sec'y of State*, No. 24-cv-13249, 2024 WL 5161945, at *3, 2024 U.S. Dist. LEXIS 229172, at *7 (E.D. Mich. Dec. 18, 2024) ("[T]hat order is not a source of federal legal obligation, so it is not a basis for suit in a federal court. Nor is the state court order self-executing."); *see also In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 299 F.R.D. 502, 514 (S.D. W. Va. 2014) ("[T]he court found that the DOJ-issued CID *triggered a duty* to preserve evidence that [was owed] to the DOJ[.]" (emphasis added) (cleaned up)). Indeed, it is unclear what exactly an FTC enforcement action would be enforcing if the CID created no legal obligations. *See* Rough Tr. at 26:4–7 (responding to the Court asking, "So you think in the absence of the CID there's some authority that would have required them to provide the requested information?" with "Oh, no, Your Honor"). While *Hoffman* might have been comfortable discerning a congressional intent to preclude pre-enforcement district court challenges to EPA compliance orders creating no new obligations, this Court declines to do the same for FTC CIDs making new demands on their recipients.

***10** *Second*, the Seventh Circuit contrasted the CWA's statutory silence about judicial review of compliance orders with the language allowing for judicial review of administrative penalties. *See Hoffman*, 902 F.2d at 569. It reasoned that by expressly providing for judicial review of one enforcement option, Congress impliedly foreclosed the same for the other enforcement option. *See id.*; *see also Rueth*, 13 F.3d at 230 ("Additionally, we noted that an alleged violator can obtain judicial review if the EPA seeks to assess administrative penalties which Congress chose to make subject to judicial review."). But again, the FTC Act provides the FTC with no similar administrative enforcement option for CID violations, let alone one followed by judicial review. *See* 15 U.S.C. § 57b-1(e). It would therefore make little sense to read a preclusive intent into Section 57b-1(e)'s silence about judicial review for pre-enforcement actions.[3]

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Moving beyond the *Hoffman* line of cases, the Court sees nothing in the FTC Act's structure to suggest that Congress meant to preclude district court review of challenges to CIDs. The Defendants argue that Congress demonstrated that it knew how to provide for district court review in different parts of the statute, implying that it purposefully chose not to allow for district court review of pre-enforcement actions in 15 U.S.C. § 57b-1(e). *See* Defs.' Opp'n at 14 (citing 15 U.S.C. §§ 45(l), 45(m)). But the provisions they cite merely allow the *Government* to file an action in district court. *See* 15 U.S.C. § 45(l) ("[A] civil penalty ... may be recovered in a civil action brought by the Attorney General of the United States."); *id.* § 45(m)(1)(A) ("The Commission may commence a civil action to recover a civil penalty in a district court of the United States[.]"); *id.* § 45(m)(1)(B) ("[T]he Commission may commence a civil action to obtain a civil penalty in a district court of the United States[.]"); *see also id.* § 45(m)(2) (allowing for judicial review "[u]pon request of any party to such an action *against* such defendant[.]"). So they say nothing about Congressional intent with respect to district court lawsuits by regulated parties.

If anything, *Thunder Basin* itself suggests that the Court should *not* read 15 U.S.C. § 57b- 1(e) to impliedly preclude pre-enforcement challenges. When discussing the statutory scheme in that case, the Supreme Court highlighted that the statute expressly authorized the Secretary of Labor to enforce a violation of an order in federal district court and that the text said nothing about a recipient bringing an action in district court. *See* 510 U.S. at 209, 114 S.Ct. 771. But *Thunder Basin* read this silence to imply that Congress meant to preclude pre-enforcement actions only because the statute allowed the regulated party to "complain to the Commission and then to the court of appeals." *Id.* Media Matters has no such alternative recourse, so the Court doubts that Congress meant to close the courthouse doors to CID recipients altogether.

**b. Type of Claim**

***11** Even if the Defendants were correct about the first *Thunder Basin* prong, Media Matters' First Amendment retaliation claim is not "of the type Congress intended to be reviewed within [the] statutory structure," *Arch Coal, Inc.*, 888 F.3d at 498 (cleaned up). The Supreme Court has identified three factors to help run this analysis:

> First, could precluding district court jurisdiction foreclose all meaningful judicial review of the claim? Next, is the claim wholly collateral to the statute's review provisions? And last, is the claim outside the agency's expertise? When the answer to all three questions is yes, we presume that Congress does not intend to limit jurisdiction. But the same conclusion might follow if the factors point in different directions. The ultimate question is how best to understand what Congress has done—whether the statutory review scheme, though exclusive where it applies, reaches the claim in question. The first ... factor recognizes that Congress rarely allows claims about agency action to escape effective judicial review. The second and third reflect in related ways the point of special review provisions—to give the agency a heightened role in the matters it customarily handles, and can apply distinctive knowledge to.

*Axon*, 598 U.S. at 186, 143 S.Ct. 890 (cleaned up). It is hard to see how the second and third factors can favor the Defendants since they do not seek "to give the agency a heightened role," *id.*, and instead seek to channel claims to a later federal court proceeding. But the core problem for the Defendants comes from the first factor.[4] They even appeared to concede as much at oral argument. *See* Motions Hr'g (Aug. 13, 2025), Rough Tr. at 34:8–11 (responding to the Court saying, "What I hear you saying is there is no meaningful judicial review, but [C]ongress made that decision," with "Yes, Your Honor").

Reading the FTC Act to preclude Media Matters' claims—at least its First Amendment retaliation claim—would "foreclose all meaningful judicial review." *Id.* The D.C. Circuit has already held that Media Matters' similar First Amendment injuries caused by the Texas CID were "ongoing," such that it could not "get meaningful redress by challenging the CID later." *Media Matters for Am.*, 138 F.4th at 583; *see also Loma Linda-Inland Consortium for Healthcare Educ. v. NLRB*, No. 23-5096, 2023 WL 7294839, at *13, 2023 U.S. App. LEXIS 13064, at *40–41 (D.C. Cir. May 25, 2023) (Rao, J., dissenting) (arguing the first factor was met even where eventual review was guaranteed because "[t]he Consortium maintains the NLRB's assertion of jurisdiction violates the First Amendment, a here-and-now constitutional injury that cannot be remedied through appellate review of an ultimate order by the Board"). To be clear, the Court does not give special solicitude to First Amendment claims that are guaranteed to be heard eventually. *See LabMD, Inc. v. FTC*, 776 F.3d 1275, 1280 (11th Cir. 2015) (rejecting such an argument). It merely notes that letting the alleged retaliator decide whether a First Amendment retaliation claim will ever be heard would not provide meaningful relief to those suffering from ongoing concrete injuries because of that retaliation. Returning to the "ultimate question" presented by the three factors, *Axon*, 598 U.S. at 186, 143

S.Ct. 890, the Court doubts that Congress intended such an absurd result, and nothing in the FTC Act suggests that to be the case. Perhaps the FTC wishes to argue that Media Matters is suffering from no concrete harm. But the D.C. Circuit has already foreclosed that argument. *See Media Matters for Am.*, 138 F.4th at 580.

***12** For similar reasons, even if 15 U.S.C. § 57b- 1(e) could be read to evince a congressional intent to preclude pre-enforcement challenges to FTC CIDs, the Court would not find preclusion in this particular case. One need look no further than *Rueth v. U.S. EPA* to see why. *See* 13 F.3d at 231. There, the Seventh Circuit reaffirmed its earlier holding from *Hoffman* that the CWA impliedly precluded a pre-enforcement claim. *See Rueth*, 13 F.3d at 229–30. And it acknowledged that it was leaving the plaintiff "somewhat in limbo until such time as the EPA seeks to enforce the compliance order or assess administrative penalties." *Id.* at 230. But it warned that if "the EPA or the Corps of Engineers ... completely overextend[ed] their authority," the Court would "not hesitate to intervene in pre-enforcement activity." *Id.* at 231. Media Matters claims that the FTC has done just that, so it follows that the FTC Act should not deny Media Matters its day in court.

**2. Cause of Action**

The Defendants' second threshold argument is that "Media Matters does not invoke a cognizable cause of action for its claims." Defs.' Opp'n at 19; *see also Trudeau v. FTC*, 456 F.3d 178, 188 (D.C. Cir. 2006) ("Whether these are claims 'upon which relief can be granted' depends in part on whether there is a cause of action that permits [the plaintiff] to invoke the power of the court to redress the violations of law that he claims the FTC has committed."). But the Court is not convinced, at least not when it comes to the First Amendment retaliation claim. *See A.B.-B.*, 548 F. Supp. 3d at 218 ("Plaintiffs need only establish a likelihood of success on the merits of one claim to obtain the injunctive relief that they seek.").

The Supreme Court has suggested that plaintiffs have "an implied private right of action directly under the Constitution to challenge governmental action" when seeking equitable relief. *Free Enter. Fund*, 561 U.S. at 491 n.2, 130 S.Ct. 3138. When the Government tried to argue that certain petitioners lacked a private right of action to enforce the Appointments Clause and separation-of-powers principles, the Court demanded that it provide a reason or cite an authority for why "an Appointments Clause or separation-of-powers claim should be treated differently than every other constitutional claim." *Id.* And the Defendants have similarly provided no reason for why First Amendment claims should be treated differently.

Even absent a textual hook, "[t]he ability to sue to enjoin unconstitutional actions by ... federal officers ... reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327, 135 S.Ct. 1378, 191 L.Ed.2d 471 (2015) (citing Jaffe & Henderson, *Judicial Review and the Rule of Law: Historical Origins*, 72 L.Q. Rev. 345 (1956)); *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001) ("[I]njunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally."); *Bell v. Hood*, 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution[.]").

The Defendants invoke a series of cases to support the proposition that Media Matters "cannot rely on the First or Fourth Amendments for a viable cause of action in this case." Defs.' Opp'n at 22–24 (collecting cases). But two of those cases addressed whether a plaintiff had a *statutory* private right of action. *See Sledge v. District of Columbia*, 869 F. Supp. 2d 140, 143 (D.D.C. 2012) (evaluating "whether § 1981 as amended implies a private right of action"); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) ("The question of the existence of a statutory cause of action is, of course, one of statutory construction."). And another was a *Bivens* case that implicitly recognized the availability of injunctive relief. *See Ziglar v. Abbasi*, 582 U.S. 120, 135, 137 S.Ct. 1843, 198 L.Ed.2d 290 (2017) (saying it is not "damages or nothing" since the "detainees may seek injunctive relief").

***13** The only case they cite discussing equitable relief under an implied constitutional cause of action is *Committee on the Judiciary of the United States House of Representatives v. McGahn*, 973 F.3d 121 (2020). There, the D.C. Circuit held that a congressional committee lacked a cause of action to enforce a subpoena. *See id.* at 123. First, it imported the reasoning of *Ziglar*—a *Bivens* case—to hold that the committee lacked an implied cause of action under Article I to seek equitable relief because "Congress has *declined* to authorize lawsuits like the Committee's twice over." *McGahn*, 973 F.3d at 123. Second, it held that the court could not "exercise its 'traditional equitable powers' to grant relief," *id.* (quoting *Ziglar*, 582 U.S. at 133,

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

137 S.Ct. 1843), in part because "those equitable powers remain 'subject to express and implied statutory limitations,' " *id.* (quoting *Armstrong*, 575 U.S. at 327, 135 S.Ct. 1378). The upshot of these two holdings seems to be that Congress may expressly or impliedly displace by statute both an implied constitutional cause of action and the traditional equitable cause of action to enforce the Constitution. The Defendants argue that Congress did just that as to constitutional claims brought against agencies when it enacted the APA. *See* Defs.' Opp'n at 24. But there are a few problems with this argument.

*First*, *McGahn* is not binding on this Court. The judgment in that case was vacated pending en banc review, *see Comm. on the Judiciary of the U.S. House of Representatives*, No. 19-5331, 2020 U.S. App. LEXIS 32573 (D.C. Cir. Oct. 15, 2020) (per curiam), and the opinion was later vacated as well, *see Comm. on the Judiciary of the U.S. House of Representatives*, No. 19-5331, 2021 U.S. App. LEXIS 20759 at *1 (D.C. Cir. July 13, 2021) (per curiam), after one side filed a consent motion for vacatur "to remove any doubt that th[e] opinion is not the binding law of this Circuit," Consent Mot. Vacate Panel Op. at 3, *Comm. on the Judiciary of the U.S. House of Representatives*, No. 19-5331, 2021 U.S. App. LEXIS 20759 at *1 (D.C. Cir. July 13, 2021) (per curiam), ECF No. 1902017. The vacated opinion is therefore non-binding. *See Save Our Cumberland Mountains, Inc. v. Lujan*, 963 F.2d 1541, 1548 (D.C. Cir. 1992) ("The *Two-acres* opinion, we bear in mind, was vacated in anticipation of this court's en banc rehearing. We look to that opinion, accordingly, for the soundness of its reasoning and not as binding precedent."); *see also Comm. on the Judiciary of the U.S. House of Representatives*, No. 19-5331, 968 F.3d 755, 778 (D.C. Cir. 2020) (en banc) (saying "panel opinions ... have been vacated by the order granting the Committee's petition for rehearing *en banc*" even though those orders referred only to judgments, suggesting vacatur of an opinion may be superfluous where the judgment is vacated pending en banc review).

*Second*, *McGahn* is not persuasive. None of the cases it cited supported the proposition that Congress "should decide" whether a party may "assert an implied cause of action under the Constitution" for equitable claims. 973 F.3d at 123 (cleaned up); *see, e.g.*, *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 333–34, 140 S.Ct. 1009, 206 L.Ed.2d 356 (2020) (deciding whether there is a *statutory* cause of action); *Hernandez v. Mesa*, 589 U.S. 93, 98–103, 140 S.Ct. 735, 206 L.Ed.2d 29 (deciding whether to extend *Bivens*); *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 264–65, 138 S.Ct. 1386, 200 L.Ed.2d 612 (2018) (deciding whether to extend a private right of action under the Alien Tort Statute for international law violations); *Ziglar*, 582 U.S. at 135–37, 137 S.Ct. 1843 (deciding whether to extend *Bivens*); *Alexander v. Sandoval*, 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) ("The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy."). And it reads *Armstrong* more broadly than is required in light of its actual holding. *See McGahn*, 973 F.3d at 123. More specifically, it points to language from *Armstrong* saying that "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." *Armstrong*, 575 U.S. at 327, 135 S.Ct. 1378; *see also McGahn*, 973 F.3d at 123. But *Armstrong* cited *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), which merely held that a statutory remedial scheme to enforce a "*statutorily* created right" should not be circumvented by the traditional availability of injunctive relief, *id.* at 74, 116 S.Ct. 1114 (emphasis added). And *Armstrong* itself held only that a statute "implicitly preclude[d] private enforcement" of a *statutory* right and that the respondents could not "circumvent Congress's exclusion of private enforcement." 575 U.S. at 328, 135 S.Ct. 1378.

***14** *Third*, even if *McGahn* is right about Congress having the power to extinguish an implied constitutional cause of action and the traditional equitable cause of action, nothing in the APA suggests it meant to do this. *See Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) (saying an APA limitation on judicial review "serves only to take away what the APA has otherwise given—namely, the APA's own guarantee of judicial review"). Courts in this District routinely allow constitutional claims in equity to proceed where relief under the APA is foreclosed. *See, e.g.*, *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 372–73 (D.D.C. 2020) (rejecting the argument that the APA cause of action "forecloses any equitable cause of action" and allowing the plaintiff to "advance her claim for equitable relief directly under the First Amendment" even though her "APA claims are precluded by the CSRA"); *All. for Nat. Health, USA v. United States*, No. 24-cv-2989, 2025 WL 1938165, at *6, 2025 U.S. Dist. LEXIS 134565, at *15 (D.D.C. July 15, 2025) (holding plaintiffs "may proceed with ... an implied equitable cause of action challenging [an agency action] under the Fifth Amendment" event though they "cannot challenge the [action] under the APA because it is not final agency action"). The Court joins that chorus.

The Defendants also cite another line of cases to argue that "where Congress has supplied a specific, adequate means for challenging and remedying agency action, no other cause of action (including a constitutional one) should be judicially implied for challenging and remedying that same action." Defs.' Opp'n at 23–24 (collecting cases). The idea seems to be that the FTC Act provides an adequate means for challenging the FTC's CID. *See id.* at 24 ("Media Matters can bring the exact same claims ... as defenses to an action in district court to enforce the CID.").

They first cite *FTC v. Claire Furnace Company*, 274 U.S. 160, 47 S.Ct. 553, 71 L.Ed. 978 (1927), which held that a bill of equity challenging FTC notices demanding monthly reports as exceeding the FTC's powers "should have been dismissed for want of equity," *id.* at 174, 47 S.Ct. 553. The Court reasoned that "[u]ntil the Attorney General acts" to enforce the notices, "the defendants cannot suffer, and, when he does act, they can promptly answer and have full opportunity to contest the legality of any prejudicial proceeding against them," making this an adequate remedy at law. *Id.* They also cite *Reisman v. Caplin*, 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964), which similarly held that a complaint seeking to enjoin the enforcement of a summons issued by the Internal Revenue Service should have been dismissed "for want of equity," *id.* at 443, 84 S.Ct. 508, because "the summons was only enforceable if the [Internal Revenue Service] sought relief in federal court" and "a party only faced coercive penalties if it refused to comply with a court order or did not challenge the summons in good faith," *Media Matters for Am.*, 138 F.4th at 582–83 (citing *Reisman*, 375 U.S. at 445–47, 84 S.Ct. 508); *see also Reisman*, 375 U.S. at 449, 84 S.Ct. 508 ("It follows that with a stay order a witness would suffer no injury while testing the summons.").

But the D.C. Circuit already explained that *Reisman* does not control when it comes to retaliatory CIDs because the recipients of such CIDs "are suffering ongoing injuries due to the campaign of retaliation against them." *Media Matters for Am.*, 138 F.4th at 583; *see also Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1178 (9th Cir. 2022) ("This case is different from *Reisman* because it involves the First Amendment, under which a chilling effect on speech can itself be the harm."). And nothing in *Claire Furnace Company* suggests the result should be any different here. Just like *Reisman*, that case "did not concern First Amendment retaliation," *Media Matters for Am.*, 138 F.4th at 583, and it relied on the premise that the "defendants [could not] suffer" pending enforcement, *Claire Furnace Co.*, 274 U.S. at 174, 47 S.Ct. 553. So the D.C. Circuit's distinction as to *Reisman* applies with equal force to *Claire Furnace Company*, rendering the FTC Act's enforcement provision an inadequate remedy at law, *cf. Bailey*, 2024 WL 3924573, at *9, 2024 U.S. Dist. LEXIS 151291, at *25–26 (D.D.C. Aug. 23, 2024) (declining to apply *Reisman* specifically on the question of whether there is an adequate remedy at law in part because the case "involve[d] the First Amendment, under which a chilling effect on speech can itself be the harm" (cleaned up)). The Defendants' reliance on out-of-circuit cases applying *Reisman* outside of the First Amendment retaliation context does not change that. *See* Defs.' Opp'n at 23–24 (collecting cases).

### 3. Retaliation

***15** Turning to the merits of the claims before the Court, Media Matters first alleges that the "Defendants violated, and continue to violate, [its] First Amendment rights by launching an investigation and serving a burdensome CID in retaliation for [Media Matters'] speech, press, and associational activities." Compl. ¶ 96. "[T]he law is settled that ... the First Amendment prohibits government officials from subjecting an individual to retaliatory actions ... for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006). To prevail on a retaliation claim, a plaintiff must show: "(1) he engaged in conduct protected under the First Amendment; (2) the defendants took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (cleaned up). At this preliminary stage, Media Matters has demonstrated that it is likely to show all three elements, so the Court finds that it is likely to succeed on the merits of this claim.

#### a. Protected Activity

Media Matters engaged in protected activities under the First Amendment. "[T]he underlying incident that precipitated [its] claim involved [its] news reporting on a public figure and alleged political extremism on a popular social media platform." *Media Matters for Am.*, 138 F.4th at 584. And this "reporting on public issues [is a] quintessential First Amendment activit[y]." *Id.* (citing *Snyder v. Phelps*, 562 U.S. 443, 452, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." (cleaned up)); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) ("The general proposition that

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions."); *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) ("The protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.")). It is no surprise, then, that the Defendants concede this point. *See* Defs.' Opp'n at 25 ("[T]he FTC does not dispute that Media Matters engages in some protected First Amendment conduct.").

**b. Retaliatory Act**

Media Matters is also likely to show that the Defendants took a retaliatory action sufficient to deter a person of ordinary firmness in Media Matters' position from speaking again. This is because the FTC issued a sweeping and burdensome CID calling for sensitive materials. *See White v. Lee*, 227 F.3d 1214, 1228–29 (9th Cir. 2000) (holding an "investigation by ... HUD officials" "more than meets" the standard requiring an act that "would chill or silence a person of ordinary firmness from future First Amendment activities" where the defendants "directed the plaintiffs under threat of subpoena to produce all their publications regarding [a certain] project, minutes of relevant meetings, correspondence with other organizations, and the names, addresses, and telephone numbers of persons who were involved in or had witnessed the alleged discriminatory conduct"); *Cooksey v. Futrell*, 721 F.3d 226, 236–37 (4th Cir. 2013) (holding "[a] person of ordinary firmness would surely feel a chilling effect" where an official told the plaintiff "that he and his website were under investigation and that the State Board does have the statutory authority to seek an injunction[.]" (cleaned up)).[5]

***16** This is especially true where, as here, "[t]he CID seeks" "a reporter's resource materials." *Media Matters for Am.*, 732 F. Supp. 3d at 28 (cleaned up); *cf. United States v. Cuthbertson*, 630 F.2d 139, 147 (3d Cir. 1980) ("The compelled production of a reporter's resource materials can constitute a significant intrusion ... [that] may substantially undercut the public policy in favor of the free flow of information to the public[.]"); *Shoen v. Shoen*, 48 F.3d 412, 415–16 (9th Cir. 1995) (recognizing the compelled "disclosure of research materials poses a serious threat to the vitality of the newsgathering process"). A reporter of ordinary firmness would be wary of speaking again if she had to reveal the materials requested by this fishing expedition of a CID. *See, e.g.*, Compl., Ex. D at 2, ECF No. 1-4 ("Provide all analyses or studies that Media Matters conducted, sponsored, or commissioned relating to advertising on social media or digital advertising platforms, including but not limited to any financial analyses or studies, and all data sets and code that would be necessary to replicate the analysis."); *id.* ("Provide documents sufficient to show the methodology by which Media Matters evaluates or categorizes any news, media, sources, platforms, outlets, websites, or other content publisher entities."); *id.* at 2–3 ("Provide all communications between Media Matters and any other person regarding any request for Media Matters to label any news, media, sources, outlets, platforms, websites, or other content publisher entities for 'brand suitability,' 'reliability,' 'misinformation,' 'hate speech,' 'false' or 'deceptive' content, or similar categories, regardless of whether the request was fulfilled."); *id.* at 3 ("Provide all documents, including correspondence, relating to Media Matters working with ad tech, technology, or developer companies or social media platforms to develop or advance any of [Media Matters'] programs, policies, or objectives, including but not limited to any agreements between Media Matters and these companies."); *id.* ("Provide each financial statement ... prepared by or for Media Matters on any periodic basis."); *see also id.* at 4 (defining "Media Matters" to mean "Media Matters for America, together with its successors, predecessors, divisions, wholly- or partially-owned subsidiaries, committees, working groups, alliances, affiliates, and partnerships, whether domestic or foreign; and all the directors, officers, employees, consultants, agents, and representatives of the foregoing. Identify by name, address, and phone number, each agent or consultant.").

And the fact that the CID is enforceable in federal court, *see* 15 U.S.C. § 49, also bolsters the conclusion that someone of ordinary firmness would be deterred from speaking. *See Media Matters for Am.*, 732 F. Supp. 3d at 28 (saying "possible judicial intervention to enforce the CID" is part of what makes the "Plaintiffs' claim of chilled expression objectively reasonable"); *cf. Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963) (holding "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation" "may sufficiently inhibit the circulation of publications to warrant injunctive relief"); *Playboy Enters. Inc. v. Meese*, 639 F. Supp. 581, 585 (D.D.C. 1986) (similar).

Finally, "while a plaintiff's actual response to a defendant's conduct is not dispositive, it 'provides some evidence of the tendency of that conduct to chill First Amendment activity.' " *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 54 (D.D.C. 2013) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005)). And Media Matters

has demonstrated that the FTC's CID chilled its activity. One declarant has sworn that "the prospect of relaxing Media Matters' posture on research and reporting about government entities" after winning legal victories against the state CIDs "was stymied by the FTC's CID." Dimiero Decl. ¶ 19; *see also* Padera Decl. ¶ 17 (similar). "For example, without the investigation, Media Matters would likely have looked into reporting about Andrew Ferguson's merger requirements for Omnicom and IPG, which placed unprecedented limitations on their speech in a transparent attempt to aid media platforms, like X, with limited content moderation efforts." Dimiero Decl. ¶ 20. The declarant even identified particular stories that Media Matters would have pursued but for the FTC CID:

> Furthermore, because of the FTC CID, we have refrained from reporting on the FTC's relationship with right-wing media or Musk's relationship with the FTC, as we would have in the past. We have also refrained from publishing research related to right-wing media's long-running list of companies that they have boycotted or celebrated damaging financially in light of Ferguson's claims about advertising boycotts. We have even refrained from reporting on our own story of the FTC's investigation into Media Matters out of fear of retaliation, also turning down a number of media requests for information and appearances on various shows and outlets about a wide range of topics related to the investigation. We also turned down a high-profile interview that was unrelated to the FTC but was about right-wing content creators, deciding that the risk of engaging with the subject matter was too high in the wake of the FTC's CID. In the past, we likely would have written about a federal agency pressuring companies to adopt policies favored by the Administration or about Media Matters' experience of being subject to a government investigation because of our speech. Such fears about FTC reporting did not exist in the past. For example, during the first Trump Administration, Mr. Hananoki repeatedly wrote about subjects that were within the scope of the FTC's work. Now, any reference to the FTC or commissioners must be approved by senior staff and the legal team, burdening an already cumbersome editing process.

***17** *Id.* ¶ 21. It is therefore clear that "Media Matters has ... pointed to ... harm that it has incurred *as a result of the CID*," despite the Defendants' protests on this point. Defs.' Opp'n at 37.

The Defendants' main counterargument on the retaliatory act element is that "there is a significant question whether a retaliatory *investigation* claim is even cognizable." *Id.* at 36. And they point to out-of-circuit cases holding state and local actors were protected by qualified immunity because retaliatory criminal investigations were not clearly violative of the First Amendment. *See Archer v. Chisholm*, 870 F.3d 603, 620 (7th Cir. 2017) (holding defendants are protected by qualified immunity where they allegedly engaged in a retaliatory criminal investigation because the plaintiff's asserted right was not "clearly established" given Supreme Court precedent stated that "the first amendment does not protect statements made as part of one's job" and the plaintiff's purportedly protected "activities were part of her job as a public employee" (cleaned up)); *Rehberg v. Paulk*, 611 F.3d 828, 850–51 (11th Cir. 2010) ("But even if we assume Rehberg has stated a constitutional violation by alleging that Hodges and Paulk initiated an investigation and issued subpoenas in retaliation for Rehberg's exercise of First Amendment rights, Hodges and Paulk still receive qualified immunity because Rehberg's right to be free from a retaliatory investigation is not clearly established."); *Thompson v. Hall*, 426 F. App'x 855, 859 (11th Cir. 2011) (per curiam) ("Defendants Sheriff Hall and Deputy Utsey are entitled to qualified immunity insofar as Plaintiffs have alleged they carried out an investigation in 2005 in retaliation for Plaintiff Daniel Thompson's comments at the town hall meeting."); *J.T.H. v. Missouri Dep't of Soc. Servs. Children's Div.*, 39 F.4th 489, 493 (8th Cir. 2022) (holding "the complaint falls short of establishing that Cook violated a clearly established right" because "we have never recognized a retaliatory-investigation claim of this kind"); *see also Sivella v. Twp. Of Lyndhurst*, No. 20-2342, 2021 WL 3356934, at *3 (3d Cir. Aug. 3, 2011) ("We ... conclude that ... when [the mayor] sent a letter requesting the initiation of an investigation of no-show municipal jobs by the Township Chief of Police, allegedly in retaliation for Sivella's protected speech, it was not clearly established that such an adverse action amounted to a First Amendment violation.").

But the standard for qualified immunity is higher than what is required for preliminary injunctive relief. *Compare Hedgpeth v. Rahim*, 893 F.3d 802, 806 (D.C. Cir. 2018) ("Although the Supreme Court's decisions do not require a case directly on point for a right to be clearly established for purposes of qualified immunity, existing precedent must have placed the statutory or constitutional question beyond debate." (cleaned up)), *with Elec. Privacy Info. Ctr. v. U.S. DOC*, 928 F.3d 95, 104 (D.C. Cir. 2019) ("One showing a plaintiff must make to obtain a preliminary injunction is a substantial likelihood of success on the merits." (cleaned up)). Indeed, the Ninth Circuit simultaneously held that it is not "clearly established that a retaliatory investigation per se violates the First Amendment" *and* that "[t]he scope and manner of the investigation" in *White v. Lee*, 227 F.3d 1214 (9th Cir. 2000), "violated plaintiffs' First Amendment rights." *Moore v. Garnand*, 83 F.4th 743, 752–53 (9th Cir. 2023) (cleaned up).

***18** The Defendants also cite language from three out-of-circuit opinions unrelated to qualified immunity. *See* Defs.' Opp'n

at 37. But the first case merely held that a retaliatory investigation did not amount to an adverse employment action under the First Amendment retaliation test for public employees—a test that is not at issue here. *See Breaux v. City of Garland*, 205 F.3d 150, 158 (5th Cir. 2000) ("[I]nvestigating alleged violations of departmental policies and making purportedly false accusations are not adverse employment actions."). And it even acknowledged that such an investigation could have a chilling effect. *See id.* at 157 ("This court has declined to expand the list of actionable actions, noting that some things are not actionable even though they have the effect of chilling the exercise of free speech" "to ensure that § 1983 does not enmesh federal courts in relatively trivial matters." (cleaned up)).

It is true that the second and third cases squarely held that "a criminal investigation *in and of itself* does not implicate a federal constitutional right." *Thompson*, 426 F. App'x at 858 (emphasis added) (cleaned up); *Rehberg*, 611 F.3d at 850 n.24 (same). But that language does not foreclose the possibility that certain investigatory acts may cross the line when they come with particularly adverse consequences. *Cf. Evans v. City of Chicago*, No. 16-cv-7665, 2017 WL 1954544, at *6, 2017 U.S. Dist. LEXIS 71814, at *17 (N.D. Ill. May 11, 2017) (recognizing that the Supreme Court in *Hartman v. Moore*, 547 U.S. 250, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006), "alluded ... to the idea that the adverse consequences of a retaliatory investigation might theoretically justify recognizing a retaliatory investigation as a deprivation" (cleaned up)); *see also Rehberg*, 611 F.3d at 850 n.23 (carefully pointing out that the plaintiff "does not allege he incurred any expenses in the investigation stage"). And the FTC's CID has had plenty of knock-on effects according to Media Matters' declarants; it is "driving additional costs," Padera Decl. ¶ 22, it has caused "retention challenges," *id.*, and it has resulted in Media Matters being "removed from coalition communications" "about FTC actions," Millican Decl. ¶ 14. It is hard to imagine any media company *not* being chilled by this sweeping and sensitive CID. The Court is therefore unpersuaded that these non-binding opinions render Media Matters unlikely to succeed on the merits of their retaliation claim.

The Defendants' argument is further undercut by D.C. Circuit precedent new and old. In *Media Matters for America v. Paxton*, the Texas Attorney General had forfeited the argument that "a retaliatory investigation is not a cognizable claim," so the Court did not address it head-on. 138 F.4th at 584. But when discussing Media Matters' injury-in-fact for standing purposes, the Court quoted broad non-standing language from a prior opinion: "In distinguishing between 'good faith' and 'bad faith' investigations, this court has explained that 'all investigative techniques are subject to abuse and can conceivably be used to oppress citizens and groups,' and that bad faith use of investigative techniques can abridge journalists' First Amendment rights." *Id.* at 580 (quoting *Reps. Comm. for Freedom of the Press v. AT&T*, 593 F.2d 1030, 1064 (D.C. Cir. 1978)). It explained that "the First Amendment 'protect[s] [information-gathering] activities from official harassment,' and that 'official harassment [of the press] places a *special* burden on information-gathering, for *in such cases the ultimate, though tacit, design is to obstruct rather than to investigate, and the official action is proscriptive rather than observatory in character*.' " *Id.* (emphasis in original) (quoting *Reps. Comm. for Freedom of the Press*, 593 F.2d at 1064). The older D.C. Circuit opinion pulled no punches, stating that "there can be no doubt that, as a general proposition," the issuance of subpoenas "not in furtherance of Bona fide felony investigations, but in order to harass plaintiffs in their journalistic information-gathering activities," "would constitute an abridgement of a journalist's First Amendment rights." *Reps. Comm. for Freedom of the Press*, 593 F.2d at 1064; *see also Branzburg v. Hayes*, 408 U.S. 665, 707–08, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) ("[N]ews gathering is not without its First Amendment protections, and grand jury investigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment."); *United States v. Morton Salt Co.*, 338 U.S. 632, 642, 70 S.Ct. 357, 94 L.Ed. 401 (1950) (saying an agency's "power of inquisition" is "analogous to the Grand Jury"). So the Court sees no reason why the FTC's CID cannot amount to a sufficient retaliatory act as a matter of law.

**c. Causation**

***19** Finally, "[t]o establish causal link, it is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury." *Media Matters for Am.*, 732 F. Supp. 3d. at 28 (cleaned up). "Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* (cleaned up); *see also Hartman*, 547 U.S. at 256, 126 S.Ct. 1695 ("[W]e have held that retaliation is subject to recovery as the but-for cause of official action offending the Constitution."). "In assessing whether this causal element is met, courts have ... given weight to circumstantial evidence such as a proximity in time between the protected speech and the adverse action, the defendant's expression of opposition to the protected speech, and evidence that

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

the defendant proffered false or pretextual explanations for the adverse action." *Bailey*, 2024 WL 3924573, at *15 (quoting *Boquist v. Courtney*, 32 F.4th 764, 777 (9th Cir. 2022)). "[D]irect evidence of retaliatory animus is not required[.]" *Goodwin v. District of Columbia*, 579 F. Supp. 3d 159, 174 (D.D.C. 2022) (cleaned up). Media Matters is likely to show that retaliatory animus was the but-for cause of the FTC's CID for three reasons.

*First*, Chairman Ferguson and his colleagues have made comments characterizing Media Matters and this investigative push "in ideological terms." *Bailey*, 2024 WL 3924573, at *14. According to a "leaked memo" provided by Media Matters and uncontested by the Defendants, Compl. ¶ 59, before he was chosen as the FTC Chairman, Mr. Ferguson bolstered his candidacy by arguing that he had a "track record of standing up to ... the radical left" and insisting that he would "[i]nvestigate ... advertiser boycotts," *FTC Commissioner Andrew N. Ferguson for FTC Chairman*, Punchbowl News, https://perma.cc/A56K-Q4YM. And in a podcast appearance in November 2024, he stated that " 'progressives' who are 'fighting "disinformation' " were 'not going to give up just because of the election,' so 'it's really important that the FTC take investigative steps in the new administration under President Trump.' " Compl. ¶ 61 (quoting Andrew Ferguson, *Bannon's WarRoom, Show Clip Roundup 11/30/2-24 [AM]*, Bannon's War Room (Nov. 30, 2024), https://perma.cc/ASE8-RZNJ); *see also* Notice of Tr., Ex. A at 3. These comments indicate at a minimum that Chairman Ferguson saw the FTC's investigation as having a partisan bent.

And Chairman Ferguson's colleagues have been even more pointed when discussing Media Matters specifically. *Cf. Cones v. Shalala*, 199 F.3d 512, 519 (D.C. Cir. 2000) (considering a non-decisionmaker's "discriminatory intent" because she was not divorced from "the decisionmaking process" or "the adverse decision" (cleaned up)). For example, Mike Davis, "an outside adviser to the Trump administration," Compl. ¶ 71 (quoting Dave Michaels, *How Trump's FTC Chairman Is Bringing a MAGA Approach to Antitrust Enforcement*, WSJ (Mar. 12, 2025), https://www.wsj.com/politics/policy/how-trumps-ftc-chairman-is-bringing-a-maga-approach-to-antitrust-enforcement-66b28 6d5), and someone who advocated for Chairman Ferguson to be chosen as the FTC Commissioner, *see* Compl. ¶¶ 63–64, suggested that Mr. Musk "should nuke @MMFA [Media Matters' account] and all staff accounts," *id.* ¶ 64 (quoting Mike Davis (@mrddmia), X (Dec. 1, 2022, 11:54am), https://perma.cc/VVD5-NAR5). He also posted that "[i]f you want to help @Article3Project build our (growing) list of leftists to throw in the DC gulag with @MMFA's @ehananoki and @MattGertz, please donate here." *Id.* (quoting Mike Davis (@mrddmia), X (Nov. 10, 2023, 1:53 pm), https://perma.cc/L8E8-ZSJF). And he cheered on Mr. Musk's eventual lawsuits against Media Matters, writing that "[a]dvertiser boycotts are highly effective tactics leftists use to cow media executives to destroy free speech—and control the political narrative. @MMFA is the driving force behind conservative media getting crushed—and conservative voices silenced. Cheers to @ElonMusk." *Id.* (quoting Mike Davis (@mrddmia), X (Nov. 29, 2023, 5:42 pm), https://perma.cc/G88S-YC3U).

***20** Several of Chairman Ferguson's senior staffers at the FTC were brought on after criticizing Media Matters in ideological terms as well. Joe Simonson posted in May 2024 that "Media Matters employed a number of stupid and resentful Democrats who went to like American University and didn't have the emotional stability to work as an assistant press aide for a House member." *Id.* ¶ 70 (quoting Joe Gabriel Simonson (@SaysSimonson), X (May 23, 2024), https://perma.cc/8CTX-HPS7). Jon Schweppe said in June 2023 that "Media Matters wants to weaponize powerful institutions to censor conservatives," *id.* (quoting Jason Cohen, *'Deeply Flawed' and 'Laughable': Experts Slam Study Finding Facebook Does Not Censor Conservatives*, Daily Caller (June 19, 2023), https://dailycaller.com/2023/06/19/deeply-flawed-laughable-experts-slam-study-finding-facebook-censor-conservatives/), before celebrating one of Mr. Musk's lawsuits against Media Matters, which he called the "scum of the earth," *id.* (quoting Jon Schweppe (@JonSchweppe), X (Nov. 20, 2023), https://perma.cc/25YT-DQ7T). And Jake Denton stated in June 2023 that Media Matters was "an organization devoted to pressuring companies into silencing conservative voices." *Id.* (quoting Jason Cohen, *'Deeply Flawed' and 'Laughable': Experts Slam Study Finding Facebook Does Not Censor Conservatives*, Daily Caller (June 19, 2023), https://dailycaller.com/2023/06/19/deeply-flawed-laughable-experts-slam-study-finding-facebook-censor-conservatives/). These are precisely the sorts of comments that courts in this District have considered as evidence of retaliatory intent. *See Bailey*, 2024 WL 3924573, at *14 (cataloguing comments that Media Matters was a "political activist organization" that wants to "silence conservative voices"); *Media Matters for Am.*, 732 F. Supp. 3d at 28 (highlighting comments that Media Matters was a "radical anti-free speech" and "radical left-wing organization"). And, contrary to what the Defendants report, these individuals are not just people who Chairman Ferguson "happens to know." Defs.' Opp'n at 34. They are instead FTC staffers he "brought in" who ultimately report to him. Compl. ¶ 70.

*Second*, the timing suggests the CID was motivated by retaliatory animus for a couple reasons. The first is that it was issued

on the heels of other failed attempts to seek retribution. A court in this District preliminarily enjoined the Texas CID in April 2024, *see Media Matters for Am.*, 732 F. Supp. 3d 1, and the Missouri CID in August 2024, *see Bailey*, 2024 WL 3924573. The D.C. Circuit dismissed the appeal of the injunction against the Missouri CID in February 2025. *Media Matters for Am. v. Paxton*, No. 24-7141, ECF No. 2100627. And Mr. Musk's worldwide lawsuits were largely preliminarily enjoined in April 2025. *See X Corp.*, 2025 WL 1084715, at *1 ("[I]t seems almost certain that the X entities' decision to file multiple suits in multiple jurisdictions is designed more to bully Media Matters and inflict financial hardship upon it than to actually vindicate those entities' rights[.]"). It stands to reason that the FTC issued an additional CID while the D.C. Circuit was still considering whether to affirm the preliminary injunction of the Texas CID because it wanted to continue the years' long pressure campaign against Media Matters by Mr. Musk and his political allies. Perhaps the Defendants will establish otherwise later in these proceedings. But at this stage, the record certainly supports that inference.

There is another reason that timing indicates retaliatory animus. Chairman Ferguson wasted no time after taking office to initiate this investigation. President-elect Trump announced on December 10, 2024, that he had chosen Mr. Ferguson to be the Chairman of the FTC. Compl. ¶ 65. He became the Chairman in January 2025. Pl.'s Mot. Prelim. Inj. at 23. And he announced an investigation into "tech [platform] censorship" the very next month, in February 2025, *id.* (citing Press Release, *Federal Trade Commission Launches Inquiry on Tech Censorship*, FTC (Feb. 20, 2025), https://perma.cc/5AZB-G94M), and issued the CID to Media Matters by May 2025, Compl. ¶ 14. This fast-moving investigation—when combined with the above statements from Chairman Ferguson and his colleagues—suggests that he was chomping at the bit to "take investigative steps in the new administration under President Trump" to make "progressives" like Media Matters "give up." Compl. ¶ 61 (quoting Andrew Ferguson, *Bannon's WarRoom, Show Clip Roundup 11/30/2-24 [AM]*, Bannon's War Room (Nov. 30, 2024), https://perma.cc/ASE8-RZNJ); *see also* Notice of Tr., Ex. A at 3. The Defendants argue that timing cuts against Media Matters because the FTC CID was issued about a year and a half after the November 2023 incident with Mr. Musk. *See* Defs.' Opp'n at 31. But this misses the point. Chairman Ferguson only gained the reigns to the FTC in January 2025. *See* Pl.'s Mot. Prelim. Inj. at 23. And counting from *that* date, it becomes clear that he acted with expedition in issuing a CID to Media Matters.

***21** *Third*, "there is evidence from which a neutral factfinder likely would find" that the Defendants' "proffered nonretaliatory explanation for the investigation of Media Matters is pretext." *Bailey*, 2024 WL 3924573, at *15. The Defendants offer no declaration explaining why they have decided to investigate Media Matters. *See* Defs.' Opp'n; *see also Media Matters for Am.*, 732 F. Supp. 3d at 29 ("Notably, he has not submitted a sworn declaration that explains his reasons for opening the investigation."). Nor did the CID itself offer an explanation. *See* Compl., Ex. D. ECF No. 1-4; *see also* 15 U.S.C. § 57b-1(c)(2) ("Each [CID] shall state the nature of the conduct constituting the alleged violation which is under investigation and the provision of law applicable to such violation."). Instead, the field titled "Subject of Investigation" just says: "See attached." Compl., Ex. D. But the attachments merely include the specific demands, definitions of terms used in the demands, directions for complying with the demands, a template certification of compliance, and a copy of a 2022 FTC resolution directing that "all compulsory processes available to it be used in connection with any inquiry" investigating whether someone has engaged in "collusion or coordination in any way with any other market participant ... in violation of Section 5 of the [FTC] Act." *Id.* The Defendants waited until July 7, 2025, after Media Matters commenced this lawsuit, to offer something resembling an explanation in a letter sent to Media Matters. *See* Pl.'s Mot. Prelim. Inj., Ex. B, ECF No. 22-4. The late-breaking nature of this explanation cuts in favor of finding pretext.

And the Defendants' ultimate explanation does not inspire confidence that they acted in good faith. They summarize their reasons for issuing the CID in their Opposition:

> The CID issued to Media Matters is part of a broader investigation into similar group boycotts in the advertising industry. In particular, it is one of seventeen still outstanding CIDs issued pursuant to the agency's investigation into whether various entities have conspired to withhold, degrade, increase the cost of, or otherwise diminish the quantity of advertising placed on news outlets, media platforms, or other publishers in violation of Section 1 of the Sherman Act ... and Section 5 of the FTC Act, under the guise of promoting "brand suitability" and "brand safety" against "misinformation." In particular, the Commission is investigating whether online advertisers and/or advertising agencies have unlawfully agreed to use certain lists promulgated by other industry participants that categorize or rate content publishers as not "brand suitable" or not "brand safe," to coordinate the placement of ads. Accordingly, the Commission has issued CIDs both to advertising agencies and to other entities that the Commission has reason to believe possess information relating to the use of such lists to coordinate ad placement. The entities receiving CIDs include several advertising trade associations, several brand safety/suitability rating organizations, and several policy/advocacy groups—such as Media Matters.

Defs.' Opp'n at 28 (cleaned up). But they never explain *why* they have "reason to believe" that Media Matters has "information relating to the use of ... lists to coordinate ad placement." *Id.* So the "record is utterly devoid of evidence to support such a claim." *Media Matters for Am.*, 138 F.4th at 585.

Nor does the sweeping scope of the FTC's CID square with the proffered reason. The FTC claims that it believes Media Matters has information about the use of "brand suitable" or "brand safe" lists to "coordinate ad placement." *See* Defs.' Opp'n at 28. And the CID does include some demands that would help the FTC secure that information. *See, e.g.*, Compl., Ex. D at 3 ("Provide all documents relating to other entities that purport to track ... news, media, sources, platforms, outlets, websites, or other content publisher entities for 'brand suitability,' 'reliability,' 'misinformation,' 'hate speech,' 'false' or 'deceptive' content, or similar categories."); *id.* at 4 ("Provide all documents relating to efforts by any person to create or advance brand safety tools."). But it also includes other demands that go well beyond the investigation's purported scope. *See, e.g.*, *id.* at 5 ("Provide each financial statement, budget, profit and loss statement, cost center report, profitability report, and any other financial report regularly prepared by or for Media Matters on any periodic basis. For each such statement, budget, or report, state how often it is prepared, and identify the employees responsible for its preparation."); *id.* at 3 ("Provide all documents that Media Matters either produced or received in discovery in any litigation between Media Matters and X Corp. related to advertiser boycotts since 2023). As a whole, then, the scope of the CID suggests pretext on the part of the FTC, which is fatal to the Defendants' causation arguments.

### B. Irreparable Injury

***22** Having established likelihood of success on the merits, Media Matters must next demonstrate an irreparable injury. This requirement is easily met. "The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Media Matters for Am.*, 138 F.4th at 585 (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)). And Media Matters is "suffering from a campaign of retaliation against [it] in response to [its] exercise of [its] First Amendment rights," which is "an irreparable injury." *Id.* (citing *Cate v. Oldham*, 707 F.2d 1176, 1188–89 (11th Cir. 1983)). The Defendants contest Media Matters' other asserted injuries—reputational harm, financial harm, and self-censorship—as being self-inflicted. *See* Defs.' Opp'n at 41–44. But they do not respond to the argument that the First Amendment injury itself is irreparable, thereby conceding it. *See* LCvR 7(b); *Texas v. United States*, 798 F.3d 1108, 1110 (D.C. Cir. 2015) ("[Local Rule 7(b)] is understood to mean that if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded." (cleaned up)); *cf., e.g.*, *Parham v. District of Columbia*, 648 F. Supp. 3d 99, 106 (D.D.C. 2022) ("Defendants conceded these preliminary injunction factors by failing to respond to Plaintiffs' arguments whatsoever in its opposition papers."), *vacated on other grounds*, No. 22-cv-2481, 2023 WL 10151420 (D.D.C. May 15, 2023); *Endo Par Innovation Co. v. Becerra*, No. 24-cv-999, 2024 WL 2988904, at *4, 2024 U.S. Dist. LEXIS 104947, at *12 (D.D.C. May 1, 2024) (saying this concession rule applies with particular force when a plaintiff "need only demonstrate a likelihood of success on the merits" instead of "an absolute certainty of success" (cleaned up)).

### C. Balance of Equities and the Public Interest

Finally, Media Matters has shown that the balance of the equities and the public interest weigh in its favor. "It is well settled that the balance of equities and public interest factors merge if the government is the opposing party." *Media Matters for Am.*, 138 F.4th at 585 (*citing Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020)). "In other words, '[w]hen a private party seeks injunctive relief against the government,' " the Court "must 'weigh[ ] the benefits to the private party from obtaining an injunction against the harms to the government and the public from being enjoined.' " *Id.* (quoting *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022)). "[E]nforcement of an unconstitutional [action] is always contrary to the public interest." *Karem*, 960 F.3d at 668; *see also Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) ("[The Government] is in no way harmed by issuance of a preliminary injunction which prevents [it] from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." (cleaned up)). And "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

[action].” *Pursuing Am.'s Greatness*, 831 F.3d at 511. So these factors favor Media Matters, as it has shown a likelihood of success on the merits of its First Amendment retaliation claim.

## CONCLUSION

For the foregoing reasons, the Court grants Media Matters' Motion for Preliminary Injunction, ECF No. 22.

A separate order will issue.

### All Citations

Slip Copy, 2025 WL 2378009

Footnotes

1 Media Matters alleged that the date of X. Corp.'s complaint was November 11, 2023, but the Court recognizes that as a typo given the docket says November 20, 2023.

2 Neither party briefed *Block v. Community Nutrition Institute*, 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984), or the line of cases beginning with *Hoffman Group, Inc. v. EPA*, 902 F.2d 567 (7th Cir. 1990). At oral argument, the Court identified these cases and requested supplemental briefing.

3 Even if there were no meaningful distinction between this case and *Hoffman*, the persuasive force of that opinion has been greatly dulled by the Supreme Court. In *Sackett v. EPA*, 566 U.S. 120, 132 S.Ct. 1367, 182 L.Ed.2d 367 (2012), the Court held that the CWA does not preclude review of APA challenges to EPA compliance orders. *See id.* at 128–31, 132 S.Ct. 1367. It rejected the logic of *Hoffman* without naming it, reasoning that (1) the choice presented in Section 309(a)(3) could have been intended for any number of reasons other than creating a non-judicially reviewable option and (2) the express provision for judicial review of administrative penalties should not be read to imply the absence of judicial review for compliance orders because the CWA is “long and complicated.” *Id.* at 128–29, 132 S.Ct. 1367. It is true that *Sackett* relied in part on the presumption of judicial reviewability inherent in the APA, *see id.*, which does not apply to Media Matters' non-APA claims. But that does not change the fact that it was unimpressed by the very arguments advanced in *Hoffman*. For that reason, the Court would be wary of applying *Hoffman*'s reasoning after *Sackett*.

4 As an aside, the third factor's explicit reference to agency expertise reinforces the fact that the Supreme Court intended *Thunder Basin* preclusion to apply to claim-channeling to *agencies*—not federal courts.

5 At oral argument, the Defendants acknowledged the breadth of the CID but urged the Court to overlook that scope because CID recipients are encouraged to meet and confer with the FTC in order to narrow the original demand. *See, e.g.*, Motions Hr'g (Aug. 13, 2025), Rough Tr. at 46:20–24 (“So, again, this is not unusual for a CID to use broad language. It is a request for relevant information. Determining that relevance, determining that scope, is exactly what both the meet-and-confer process and the ultimate enforcement proceeding in district court are for.”). The Court declines to consider a hypothetical narrowed CID instead of the actual demand issued to Media Matters. And more broadly, it is troubled by the Defendants' suggestion that the federal Government routinely issues civil investigative demands it knows to be overbroad with the goal of later narrowing those demands presumably in exchange for compliance.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 4417447
United States District Court, N.D. Illinois, Eastern Division.

IN RE BROILER CHICKEN ANTITRUST LITIGATION
This Document Relates To: All Actions

Case No. 1:16-cv-08637
|
Signed 09/28/2017

**ORDER**

Jeffrey T. Gilbert, United States Magistrate Judge

***1** This matter is before the Court on Plaintiffs' request that certain Defendants produce documents those Defendants have provided or will provide to the Office of the Florida Attorney General in connection with an investigation concerning potential anticompetitive conduct in the Broiler Chicken industry and potential manipulation of the Georgia Dock Index. [415 at 56–61]. The parties raised this issue in their Status Report and Letter Brief filed on June 14, 2017. [415]. At the Court's request [420, ¶ 3], the parties then filed additional briefs [435, 436] on the question of whether the documents should be produced at this time. The Court will characterize Plaintiffs' request for the documents they are seeking as a "motion to compel" for ease of reference. Plaintiffs ask the Court to order the immediate production of the documents they are seeking. Defendants argue the documents should not be produced, if at all, until after their fully-briefed motions to dismiss have been decided. All parties acknowledge that discovery is not formally stayed in this case. For the reasons stated below, Plaintiffs' deemed-motion to compel is granted in part and denied in part.

I.

At least six defendants in this lawsuit—Fieldale Farms Corp.; Koch Foods, Inc.; Wayne Farms, LLC; Sanderson Farms, Inc.; Tyson Foods, Inc.; and Pilgrim's Pride Corp. (collectively, "CID Defendants")—have received Antitrust Civil Investigative Demands ("CIDs") from the Office of the Florida Attorney General ("Florida AG"). [415 at 56]. During a status hearing held on June 16, 2017, the Court asked whether all Defendants had provided documents to the Florida AG in response to a CID. [430 at 163]. Counsel for Sanderson Farms, Inc. said that "[s]ome defendants have not produced any documents to the Florida AG." *Id.* This statement implies, in the Court's view, that at least some CID Defendants already have responded to a CID while some may not have. CID Defendants' filings shed no more light on that issue. The Court assumes, therefore, what Plaintiffs assume: at least some CID Defendants have produced or will produce to the Florida AG the documents requested by the CIDs.

Plaintiffs have obtained copies of the six CIDs that they know have been served on CID Defendants. [415 at 57; 415-6]. According to Plaintiffs' unrebutted representation, "each of the CIDs ... contain[s] nearly identical requests." [415 at 57]. Plaintiffs have attached to one of their filings a copy of the CID served on Defendant Wayne Farms, LLC. [415-4]. The Schedule of Documents to Be Produced contains 15 requests. Requests 1 and 2 demand the production of documents furnished or to be furnished to a governmental entity relating to potential anticompetitive activity within the Broiler industry

and documents related to internal investigations of such activity. *Id.* at 7. Request 2 also demands the production of documents furnished or to be furnished to a governmental entity relating to potential manipulation of the Georgia Dock Index (“GDI”). *Id.* Requests 3 through 6 demand the production of documents relating to certain communications or agreements regarding (1) the GDI, GDI Submissions, or GDI Calculations; (2) the price, supply, or production of Broilers; (3) Broiler production cuts; or (4) the reduction in or liquidation of Broiler breeder flocks. *Id.* Requests 7 through 9 demand the production of documents relating to GDI Calculations and GDI Submissions. *Id.* at 8. Finally, requests 10 through 15 demand the production of documents related to the identification of employees; Broiler sales to “Florida Purchasers;” transactions with Florida Purchasers affected by, based upon, or linked to the GDI; negotiations with Florida Purchasers relating to the GDI; and technology use policies and document retention policies.

***2** On February 28, 2017, Plaintiffs served their First Set of Requests for Production of Documents to All Defendants. [415-3]. In Request No. 35(a), Plaintiffs seek the production of, among other things, all documents provided to, and all communications with, governmental entities regarding alleged violations of antitrust laws, which would cover documents produced by CID Defendants to the Florida AG and these Defendants communications with the Florida AG. *Id.* at 19–20. Additional requests for production in Plaintiffs’ First Set of Requests for Production of Documents to All Defendants also cover the topics encompassed by the CIDs. *See, e.g.*, Request Nos. 1, 3, 12, 17, 19–21, 27, 29, 34, 35(b), 57.

After Defendants responded to Plaintiffs’ First Set of Requests for Production of Documents, Plaintiffs renewed their request for the production of the Florida AG documents in the parties’ Joint Status Report and Letter Brief for June 16, 2017 Status Conference. [415 at 56–61]. Plaintiffs ask the Court to order CID Defendants to produce the Florida AG documents within 14 days. *Id.* at 59. Defendants, as noted above, argue all document production should await the resolution of the pending motions to dismiss. *Id.* at 61. At the status hearing held on June 16, 2017, the Court and the parties discussed the issue at some length, and the Court ordered additional briefing. [430 at 159–76; 420, ¶ 3]. Consistent with the schedule set by the Court, CID Defendants have filed a response brief [435] and Plaintiffs have filed a reply brief [436].[1] This matter thus is ripe for resolution.

II.

Plaintiffs argue the benefits of producing the Florida AG documents now outweigh the burden of doing so. Plaintiffs note the Court has not stayed all discovery or document production. They assert the documents they seek are discoverable and can be produced without undue burden, expense, or delay. Plaintiffs also contend they will be prejudiced if production is delayed until after the motions to dismiss are resolved while CID Defendants will not be harmed by immediate production. According to Plaintiffs, production of the Florida AG documents now will go a long way toward reducing the “informational asymmetries” that have hampered Plaintiffs’ ability to, among other things, discuss intelligently the identification of key word search terms in preparation for fulsome discovery after the motions to dismiss are decided. Implicit in this argument is that the motions to dismiss will be denied in whole or substantial part so that discovery eventually will be allowed to proceed unchecked or at least as permitted by the Federal Rules of Civil Procedure. For all of these reasons, Plaintiffs say the Florida AG documents should be produced in short order since those documents or a large percentage of them eventually will be produced in any event.

CID Defendants argue Plaintiffs’ request for the production of the Florida AG documents is premature, unreasonable, and disproportionate to the needs of the case. CID Defendants say the Court should stay all document production until the Court rules on the motions to dismiss to avoid the first slide down the slippery and expensive slope of document production in a large and complex antitrust case. CID Defendants also contend Plaintiffs do not have a right to “cloned discovery” (by which they apparently mean the wholesale, reflexive production of documents previously produced to a governmental entity) because some of the documents produced to the Florida AG may not be discoverable in this case, particularly if the Court grants in part or in whole the pending motions to dismiss. CID Defendants further assert producing the documents now will prejudice them without benefiting Plaintiffs. Therefore, CID Defendants say, the Court should deny Plaintiffs’ request for production of the documents at this time.

***3** The Court recognizes that discovery in an antitrust case quickly can become enormously expensive. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007); *see also id.* at 573 (Stevens, J., dissenting); *Nexstar Broad., Inc. v. Granite Broad.*

*Corp.*, 2011 WL 4345432, at *2–3 (N.D. Ind. Sept. 15, 2011); *DSM Desotech Inc. v. 3D Sys. Corp.*, 2008 WL 4812440, at *2 (N.D. Ill. Oct. 28, 2008). These hefty costs do not justify a full stay of discovery simply because a defendant has moved to dismiss all of a plaintiffs claims. *DSM Desotech*, 2008 WL 4812440, at *3. Courts must consider the expense of litigating complex antitrust cases and tailor discovery accordingly while motions to dismiss are pending. *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 2014 WL 1797674, at *2 (C.D. Ill. May 6, 2014); *Coss v. Playtex Prod., LLC*, 2009 WL 1455358, at *5 (N.D. Ill. May 21, 2009); *DSM Desotech*, 2008 WL 4812440, at *3.

In light of the procedural posture of this case, the Court has discussed with the parties at length what should (and should not) be done before a decision on the motions to dismiss. The Court has charted the course of discovery while those motions are pending during status hearings held on December 9, 2016, and March 2, April 21, and June 16 of this year. The Court's decisions and guidance can be summarized as follows. The Court has neither stayed discovery completely nor allowed full discovery to proceed. The Court is placing a priority on identifying specific discovery-related tasks that the parties can complete before a decision on the motions to dismiss without substantial burden or expense (both of which the Court understands are relative concepts in a case like this). The Court's focus is on those tasks that will set the table so that discovery will not begin from a complete standing stop if the motions to dismiss are denied in whole or in part. [336 at 12, 15; 384 at 52]. In other words, the Court is trying to identify preparatory tasks that must be completed before the parties can respond to written and oral discovery and that do not impose undue burden or expense on a party or parties. Some of these tasks can take many months or even a year or more in a large case like this. If preparatory steps can be taken now, with due regard to the proportionality analysis required under Federal Rule of Civil Procedure 26(b), that will further expedite the process and avoid unnecessary delay later in the case. The Court will assess what should be done before a decision on the motions to dismiss by balancing the benefit and the burden of completing a given discovery-related task as well as the benefit and burden of the work being done overall. [384 at 52–53]. The Court, though, is willing to draw a clear line if this incremental balancing approach proves unworkable. [384 at 52, 64; 430 at 166].

To date in this case, the Court has focused on completing preparatory discovery tasks that are relatively less expensive, at least in the context of a complex antitrust case like this that includes three putative plaintiff classes and nearly 30 defendants from 14 corporate families, involves multiple theories of liability, covers conduct spanning nearly a decade, and targets an industry with $20 to $30 billion in annual revenue. The Court has entered orders requiring the disclosure of limited information the parties agreed to exchange [264], denying without prejudice a request to issue document preservation subpoenas [382], setting an interim schedule [388], granting a Rule 30(b)(6) deposition to remedy misleading initial discovery disclosures by one defendant group [449], encompassing significant components of an ESI protocol [459], and concerning the appointment of a special master for ESI discovery issues [474]. The Court also has ruled on matters ranging from the number of interrogatories the parties can serve to the appropriate method for preparing a privilege log. *See* [245; 336; 384; 430]; *see also* [243; 387; 420]. The parties have agreed to an overall schedule for discovery, class certification, and summary judgment; significant portions of an ESI protocol; and identification of most document sources. The parties also have served initial disclosures, and served and objected to an initial set of Rule 34 requests. This is not an exhaustive list of what the Court and the parties have done so far in this case on the discovery or scheduling front, but it is a representative sample.

***4** The Court's approach to requests for production under Federal Rule of Civil Procedure 34 has been consistent with its broader approach to discovery. Early this year, the parties served their initial Rule 34 requests. On April 27, 2017, the Court entered an agreed scheduling order that laid out the next steps with respect to Rule 34 requests. Consistent with that order, the parties served their objections to their counterparts' requests during the following month. [388 at 2]; *see also* [430 at 187]. During the June 16, 2017 status hearing, the Court said it did not want to resolve Rule 34 objections in a piecemeal fashion and ordered the parties to exchange letters regarding their Rule 34 requests on or before June 30 and to meet and confer on or before July 31. [420, ¶ 5; 430 at 187]. Interim Scheduling Order on Agreed Dates No. 1, which sets a date for the substantial completion of document production, does not require the production of any documents in response to a Rule 34 request before a ruling on the pending motions to dismiss. *See* [388 at 2].

The Court will continue to apply the benefit-burden balancing approach outlined above that has guided other discovery decisions in this case unless it proves to be unworkable. The Court understands that ordering full document production at this juncture would significantly ratchet up costs for all parties. Cognizant of this expense, the Court has not yet ordered any party to produce documents in response to a Rule 34 request. The Court, though, also has not stayed all document production. [384 at 53; 430 at 166]. The Court does not "subscribe to the notion ... that nothing should be produced" before a ruling on the motions to dismiss. [384 at 52]. An objection based solely on the position that there should not be any document production

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

before a ruling is "not as persuasive." *Id.* at 53; *see also* [430 at 166] (noting the Court does "not buy the argument completely that because a motion to dismiss is pending, no documents shall be produced").

III.

As the Court acknowledged during a recent status hearing, there is more than a little overlap between the Florida AG's document requests, the allegations in Plaintiffs' operative complaints, and the categories of documents covered by Plaintiffs' First Set of Requests for Production of Documents to All Defendants. The CIDs request documents for the time period of January 1, 2007 to the date of production. [415-4 at 4]. The agreed ESI protocol entered by the Court identified the general time period for discovery as ranging from January 1, 2007 to September 2, 2016. [459 at 12]. Almost all of the CID requests seek documents related to potential anticompetitive conduct or the GID. The few requests that are not in this vein seek documents related to basic corporate information or to the identification of employees or sales figures. Subject to potential limitations as to time periods and particular products, if a Defendant remains in the case, the documents produced in response to requests 3 through 10 of the CIDs' Schedule of Documents appear to be relevant to the claims and defenses in this case. CID Defendants do not argue otherwise. Requests 3 through 10 of the CIDs' Schedule of Documents cover: (1) certain communications and agreements related to (a) the GDI, GDI submissions, or GDI calculations, (b) the price, supply, or production of Broilers, (c) Broiler production cuts, or (d) the reduction in or liquidation of Broiler breeder flocks; (2) certain documents related to GDI Calculations and GDI Submissions; and (3) documents sufficient to identify employees with responsibility for these things. Again, as far as the Court can tell, these documents also are encompassed in multiple Rule 34 requests for production that Plaintiffs have served upon Defendants.

In every case in which a motion to dismiss is filed, the scope of discovery could change if the motion is granted in part or in whole. In some cases, such as those under the Private Securities Litigation Reform Act, automatic discovery stays are mandatory while a motion to dismiss is pending. But this is not a PSLRA case. Even the cases cited by CID Defendants recognize that courts need not stay discovery in antitrust cases solely because a motion to dismiss has been filed. *Nexstar*, 2011 WL 4345432, at *2; *DSM Desotech*, 2008 WL 4812440, at *2; *In re Graphics Processing Units Antitrust Litig.*, 2007 WL 2127577, at *3–4 (N.D. Cal. July 24, 2007). Typically, courts that stay some or all discovery in antitrust cases look to the burden involved in conducting that discovery. As explained above, this Court is doing the same by balancing the benefit and burden of certain steps or tasks preparatory to full discovery.

***5** During the status hearing held in this case on June 16, 2017, the Court identified certain facts that would be relevant to its consideration of the burden on CID Defendants of producing the Florida AG documents—such as the volume of documents involved and the expense of producing them now—and it invited Defendants to address those issues in their filing so as to inform the burden analysis. [430 at 166–67, 173–74]. CID Defendants, however, declined in their response brief to quantify, or even describe, the economic or administrative burden of producing the Florida AG documents.

Instead, CID Defendants make other arguments. They maintain the Florida AG documents contain highly sensitive business information. They say not all documents produced to or communications with governmental entities are subject to production in this case. They contend Plaintiffs will not be prejudiced if production of these documents is stayed until after a decision on the motions to dismiss. They assert their motions to dismiss stand a good chance of being granted. And they worry production of these documents will mark the first slip down the inevitably expensive document production slope. The Court is not persuaded that these arguments, separately or together, justify CID Defendants' position that none of the Florida AG documents should be produced while the motions to dismiss are pending. The Court will deal with each of these arguments in turn.

CID Defendants argue that their confidential information will be disclosed if they produce the Florida AG documents. As Plaintiffs point out, the Court has entered a protective order in this case. [202]. Generally, material designated "Confidential" or "Highly Confidential" under the protective order cannot be used or disclosed for any purpose other than the prosecution, defense, or settlement of this case. *Id.* at 5. When material designated Highly Confidential is produced, the receiving party cannot even share that material with another party. *Id.* at 5–6. That means CID Defendants' documents designated Highly Confidential will not be shared with their competitors. In light of Plaintiffs' willingness to allow CID Defendants to bulk-tag all Florida AG documents as Highly Confidential [436 at 9–10], there is no self-evident reason why the protective order will

prove insufficient to prevent harmful disclosures of highly sensitive information. In fact, CID Defendants implicitly concede that they can "ensure appropriate protection for their documents in this case" by designating them under the protective order. [435 at 7].

The Court agrees with CID Defendants that reflexive production of documents previously provided to governmental entities is not appropriate. This argument, though, sets up somewhat of a straw man. The dispute now before the Court turns not on whether documents must be "reflexively" produced but whether the benefit of producing a specific set of documents that appear to be relevant to Plaintiffs' claims outweighs the burden of doing so. In the Court's view, a subset of the documents CID Defendants have produced to the Florida AG appears to be relevant to the claims in this case and production of those documents to Plaintiffs at this time would not impose an undue or unreasonable burden on CID Defendants. In particular, the documents provided to the Florida AG in response to requests 3 through 10 of the CIDs' Schedule of Documents appear to be relevant to Plaintiffs' allegations here and Defendants do not argue that the expense of producing them is undue. The Court will not abandon its benefit-burden approach simply because the documents Plaintiffs are requesting previously have been provided to a governmental entity.

***6** CID Defendants are correct that some of these documents might not be subject to production in this case if a Defendant is dismissed, a particular product is excluded from the definition of "Broilers," or the relevant time period at issue is shortened. Again, though, that is true in every case where a defendant has moved to dismiss all or some of the claims alleged against it. There is no bright line rule that, while a motion to dismiss is pending that may change the scope of the case if granted in whole or in part, no document production should occur unless and until the parties know the exact contours of the case.

Plaintiffs would be prejudiced by delaying production of the Florida AG documents if they can be produced now at a relatively modest additional expense to CID Defendants (again, these Defendants have not argued expense as a reason the documents should not be produced). For example, the Court has encouraged the parties to negotiate key word search terms that can be used to identify documents that will be subject to production if full discovery moves forward. The parties and the Court also are involved in the process of resolving various disputes regarding search methodologies, including those related to the use of Technology Assisted Review ("TAR"). In a case like this, the process of identifying key words and crafting search methodologies could take many months, if not longer. If all of these efforts are delayed until after the motions to dismiss are decided, that in turn will significantly delay this case.

Plaintiffs also are correct that there is an informational asymmetry between the parties at this time that hampers Plaintiffs' ability to discuss meaningfully key words and search methodologies, and to understand and discuss with Defendants the appropriate universe of document custodians and other discovery parameters. If there is at most minimal burden involved in producing the Florida AG documents and the documents are relevant to the claims made in Plaintiffs' operative complaints, then the benefits of producing those documents now in terms of moving the case forward to a fair and efficient resolution consistent with Rule 1 of the Federal Rules of Civil Procedure weigh in favor of not putting off production until after the motions to dismiss are decided. Fed. R. Civ. P. 1 ("These rules ... should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding.")[2]

Again the Court acknowledges that CID Defendants say the motions to dismiss could result in complete and total dismissal, resolving this case on the merits without the need for any discovery. The Court also recognizes that Defendants' motions raise serious, nontrivial issues. *See* [336 at 12]. But the possibility that CID Defendants could prevail on their motions to dismiss does not justify staying all document production in this case even when the benefit of producing the documents now would outweigh any burden associated with that production. If the Court adopted Defendants' construct, meaningful discovery or preparatory steps necessary to engage in meaningful discovery would be delayed indefinitely. In addition, if Defendants' motions to dismiss are granted in part (without prejudice, which is often the case) and denied in part, then the Court can envision Defendants arguing that production of the Florida AG documents should continue to be delayed until the parameters of the case are more firmly set and as necessary to avoid piecemeal and successive productions. The Court does not see the need to continue to kick that can down the road.

***7** In the Court's view, the benefit to Plaintiffs of obtaining access to the relatively discrete set of documents they have requested, as further limited by the Court in this Order, so that Defendants and they can begin the process of intelligently discussing the appropriate parameters of more fulsome discovery that may come in time, including key word search terms that can be used to cull from extraordinarily large document sets potentially relevant documents and appropriate search methodologies, outweighs the incremental expense and burden to CID Defendants of producing these documents which they

already have produced to the Florida AG. Plaintiffs also have successfully rebutted the other arguments Defendants have advanced in their effort to defeat Plaintiffs' request for these documents. In addition, production of these documents now will further the interest of the court system and the parties in the expeditious and eventual resolution of this case on the merits or otherwise. Fed. R. Civ. P. 1. This limited production, in the Court's view, is justified as a partial and early response to Plaintiffs' Request No. 35(a) of Plaintiffs' First Set of Requests for Production of Documents to All Defendants. [415-3].

The Court will not, however, order production of all the documents CID Defendants have produced to the Florida AG or all of the CID Defendants' communications with that governmental entity which are encompassed within Request No. 35(a) of Plaintiffs' First Set of Requests for Production of Documents to All Defendants. [415-3]. As discussed above, the CIDs also request documents produced to any governmental entity, documents related to internal investigations, and documents related to "Florida Purchasers," among other things. Production of documents in those categories is broader than the Court will allow at this point. The production encompassed by this Order will be limited to the documents produced in response to requests 3 through 10 of the CIDs' Schedule of Documents. Those documents are at the core of Plaintiffs' allegations in this case. Defendants do not raise a relevance objection to production of these documents other than to say that some or all of the documents may not be relevant if Defendants' motions to dismiss are granted in whole or in part, thereby limiting the time frame covered by Plaintiffs' complaints or the products at issue, or eliminating a Defendant from the case. No CID Defendant argues that these documents are not relevant to Plaintiffs' claims as currently pled. As discussed above, the possibility that Plaintiffs' claims will be narrowed or even dismissed in whole or in part does not justify delaying production of a relatively discrete set of relevant documents whose production will benefit Plaintiffs and the judicial process in the ways described above, and will not impose an undue or unreasonable burden on CID Defendants. As Plaintiffs suggest, the documents may be produced as "Highly Confidential" under the previously-entered protective order. [202].

IV.

For all of the reasons stated in this Order, Plaintiffs' deemed-motion to compel is granted in part and denied in part. Within 21 days of the date of this Order, each CID Defendant shall produce to Plaintiffs, as Highly Confidential documents under the protective order previously entered in this case [202], the documents already produced to the Florida AG in response to requests 3 through 10 of the respective CIDs' Schedule of Documents. If any CID Defendant produces additional documents in the future to the Florida AG in response to these particular requests, that CID Defendant shall produce those additional documents to Plaintiffs within 7 days of the date of production to the Florida AG.

It is so ordered.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4417447, 2017-2 Trade Cases P 80,143

Footnotes

1 In the June 16, 2017 Joint Status Report and Letter Brief, Plaintiffs focused solely on documents produced or to be produced by CID Defendants to the Florida AG in response to an already-served CID. Understandably, only CID Defendants filed a response brief on this issue. [435 at 20–22]. Yet, in their reply brief, Plaintiffs ask the Court to order *all* defendants to simultaneously serve Plaintiffs with future productions to the Florida AG made in response to any CID. [436 at 10]. Not only have non-CID Defendants not had an opportunity to litigate this issue, but the Court also has no way of knowing whether CIDs served by the Florida AG in the future will be similar in scope to those already served on CID Defendants. For these reasons, the Court will address Plaintiffs' initial, more narrowly focused request for relief.

2 The Court recognizes that the term "inexpensive" in the context of a multidistrict antitrust case is a relative term.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 2127577
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

# In re GRAPHICS PROCESSING UNITS ANTITRUST LITIGATION.
This Order Relates To: All Actions.

No. C 06-07417 WHA.
|
MDL No. 1826.
|
July 24, 2007.

**Attorneys and Law Firms**

Christopher Lee Lebsock, Jon T. King, Michael Paul Lehmann, Thomas Patrick Dove, Furth Lehmann L.L.P., San Francisco, CA, Blake M. Harper, Dennis Stewart, Randall R. Sjoblom, Attorney at Law, Hulett Harper Stewart L.L.P., San Diego, CA, for Plaintiffs.

James Donato, Cooley Godward Kronish L.L.P., San Francisco, CA, Stephen Cassidy Neal, Cooley Godward Kronish L.L.P., Palo Alto, CA, Charles H. Samel, Latham & Watkins L.L.P., Los Angeles, CA, Clinton P. Walker, Damrell, Nelson, Schrimp, Pallios, Pache, Modesto, CA, for Defendants.

Lauren Clare Russell, Trump, Alioto, Trump & Prescott, L.L.P., San Francisco, CA, for Interested Party.

**PETRIAL ORDER No. 4**

**ORDER GRANTING DEFENDANTS' MOTION TO STAY DISCOVERY AND DISCLOSURES**

WILLIAM ALSUP, United States District Judge.

**INTRODUCTION**

***1** In this antitrust multi-district litigation, defendants move to stay discovery and disclosures pending the resolution of their motions to dismiss. Plaintiffs have asked that defendants be required to turn over all documents already produced to the Antitrust Division of the Department of Justice pursuant to its pending and unindicted criminal investigation. Contrary to defendants, Federal Rule of Criminal Procedure 6(e) does not forbid the production of such documents. Also contrary to defendants, the recent *Twombly* decision does not compel a blanket stay of all discovery in antitrust cases pending resolution

of motions to dismiss. Defendants have, however, shown that the facts surrounding this case warrant a temporary stay of discovery until the current round of motions to dismiss is resolved. Accordingly, a stay of all discovery and all disclosures is entered. This is without prejudice to revisiting the issue of focused, limited discovery in the event the motions to dismiss are granted.

**STATEMENT**

Defendants Nvidia Corporation and ATI Technologies, Inc., manufacture, market, sell, and distribute graphics processing units. ATI merged with defendant Advanced Micro Devices, Inc., in October 2006. GPUs are dedictated graphics rendering devices used for displaying computer graphics in computers, game consoles, and mobile devices. Allegedly, there are only two majors players in the GPU market-AMD and Nvidia.

On November 30, 2006, AMD and Nvidia separately announced that they had received subpoenas asking for documents regarding pricing and customer agreements from the Antitrust Division of the United States Department of Justice. AMD later confirmed in SEC filings that the investigation was criminal in nature. Thus far the investigation has not resulted in any indictments.

The first of these civil antitrust actions was filed on December 4, 2006. Many others quickly followed. A majority of the complaints were filed by indirect purchasers of GPUs; the remainder of them were filed by direct purchasers. By order of the Judicial Panel on Multidistrict Litigation, a number of these actions were consolidated for pretrial purposes on April 18, 2007, pursuant to 28 U.S.C. 1407. Other tag-along actions have been transferred and consolidated into this multi-district litigation proceeding.

An initial case management conference was held on May 24, 2007, in which parties first discussed the issue of discovery and its relationship to defendants' anticipated motions to dismiss. A briefing schedule for both the motion to stay and the motions to dismiss was set at the conference. After the conference, an order dated May 30, 2007, appointed interim class counsel for the indirect and direct purchaser plaintiffs. The motion for a stay of discovery was filed on June 7, 2007, and complaints for both the direct and indirect purchasers were filed on June 14, 2007. The complaints allege that AMD and Nvidia entered into price-fixing agreements in violation of Section 1 of the Sherman Act and various other state-law claims. The motions to dismiss will be heard on September 20, 2007.

***2** A lengthy hearing on the motion to stay discovery was held on July 10, 2007. Attorney Alexandra Shepard appeared specially on behalf of the Antitrust Division of the Department of Justice. She addressed some of the Court's questions regarding the status of the government investigation and stated that the government neither favored nor opposed a stay. Also, parties were invited to submit supplemental briefing on the issue of prejudice to plaintiffs and the effect of the statute of limitations if a blanket stay of discovery were granted.

**ANALYSIS**

Under Rule 26(c), the Court may, on a showing of good cause, enter an order to stay discovery in order to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." District courts have broad discretion to stay discovery pending the resolution of dispositive motions, including motions to dismiss under Rule 12(b)(6). *Jarvis v. Regan,* 833 F.2d 149, 155 (9th Cir.1987).

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**1. Federal Rule of Criminal Procedure 6(e).**

Defendants contend that rules governing secrecy during a grand jury proceeding support a stay of all discovery. Grand jury secrecy is governed by Federal Rule of Criminal Procedure 6(e). Under Rule 6(e)(2)(A), "[n]o obligation of secrecy may be imposed on any person except in accordance with Rule 6(e)(2)(B)." In turn, Rule 6(e)(2)(B) states that unless provided otherwise, grand jurors, interpreters, court reporters, operators of recording devices, persons transcribing recorded testimony, and attorneys for the government must not disclose matters occurring before the grand jury. Simply put, defendants are *not* in the Rule 6(e) list. They are free to reveal the subpoena itself as well as all documents produced in response to it. Indeed, a witness appearing before a grand jury is thereafter free to hold a press conference and reveal everything that was asked of him or her and what his or her answers were. The fact of any subpoena and its requests may likewise be published by the recipient. Since defendants are free to volunteer the information, a court may compel a disclosure. Nothing in Rule 6(e) is otherwise.

Defendants next argue that allowing discovery at this time could disrupt the Antitrust Division's ongoing investigation. As stated, however, Attorney Shepard appeared for the government at the hearing and voiced no such objection. She explained that a grand jury had been empaneled on this matter. She also stated that the Antitrust Division had not discussed the pending motion to stay with the parties. The government took no position on the pending motion and presently has no plans to intervene in this action. Since the Antitrust Division appears to believe discovery in this action can coexist with its grand jury investigation, defendants' argument that discovery here would somehow derail the Antitrust Division's efforts fails.

Defendants next argue that Rule 6(e), as interpreted in case law, supports a general policy of not requiring defendants to disclose documents produced in a grand jury investigation. Requiring disclosure, the argument goes, would open up defendants to scandal merely on account of a grand jury investigation that may go nowhere. This argument is overblown. The records will show only what the records will show. If they show antitrust scandal, then they would reveal nothing more than the facts.

***3** Rule 6(e) has not been interpreted as a complete bar on producing documents given to the grand jury. "[I]f a document is sought for its own sake rather than to learn what took place before the grand jury, and if its disclosure will not compromise the integrity of the grand jury process, Rule 6(e) does not prohibit its release." *United States v. Dynavac,* 6 F.3d 1407, 1411-12 (9th Cir.1993). The Ninth Circuit later explained that "the only exception to *Dynavac* is if the material reveals a secret aspect of the grand jury's workings." *Kersting v. United States,* 206 F.3d 817, 821 (9th Cir.2000). Defendants' policy argument fails because Ninth Circuit decisions reflect a concern in protecting the grand jury proceedings themselves, not the reputations of targets of investigations. Here, plaintiffs do not ask for documents related to any actual proceedings before a grand jury.

Defendants cite *In re Sealed Case,* 801 F.2d 1379, 1381-32 (D.C.Cir.1986), in support of their view. *First,* this decision is not binding here as it is out-of-circuit authority. *Second,* in that decision, the documents sought by the SEC were wide-ranging, and affidavits in connection with the requests failed to establish a need for any specific document. *Id.* at 1382. The D.C. Circuit held that such broad requests were inappropriate. Had the SEC shown particularized need for specific, identifiable documents, the SEC could have possibly received them.

Finally, defendants contend that the decision *In re Sulfuric Acid Antitrust Litigation,* 2004 WL 769376 (N.D.Ill.2004), forbids turning over the documents produced earlier to the Department of Justice. That decision acknowledged that Rule 6(e) does not explicitly allow defendants to resist document production in a civil case, recognizing that civil defendants are not named in the rule. There, a grand jury was in session concurrently with a parallel civil antitrust action. A motion to compel production of *any and all* documents produced to or received from *any* federal or state government entity was denied. *Id.* at *1. Perhaps this was a sound outcome but nothing in Rule 6(e) requires the result.

In short, contrary to defendants, Rule 6(e) simply does not authorize a blanket prohibition on civil production of documents already given to a grand jury. Nor does it bar compliance with a request to make a duplicate set of all documents given to a grand jury.

**2. The *Twombly* Decision.**

Defendants next argue that a recent Supreme Court decision, *Bell Atlantic Corp. v. Twombly,* --- U.S., ---- 127 S.Ct. 1955 (May 21, 2006), holds by implication that no discovery may proceed in an antitrust action before the complaint is held viable.

The Supreme Court's decision in *Twombly* addressed pleading standards for antitrust complaints alleging conspiracy under the Sherman Act. It noted that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." The decision criticized a common interpretation of the hoary "no set of facts" language from *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *Twombly* noted that "[o]n such a focused and literal reading of *Conley'* s 'no set of facts,' a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." *Id.* at 1968.

***4** Specific to antitrust actions, the Supreme Court held that merely pleading parallel conduct or interdependence of behavior, even when consistent with antitrust conspiracy, was not sufficient to state a claim for conspiracy. *Id.* at 1964. Stating a claim under Section 1 of the Sherman Act "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 1965. On the facts in *Twombly,* the defendant telecom companies' behavior could have been conceivably construed as consistent with illegal activity, however, their behavior also supported a conclusion that the telecom companies were merely acting rationally in accordance with past behavior. *Id.* at 1971-73. The plaintiffs had "not nudged their claims across the line from conceivable to plausible," so the complaint was dismissed. *Id.* at 1974.

*Twombly* also discussed discovery in antitrust actions. The decision noted that "it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive." *Id.* at 1967 (internal citations omitted). The action involved "a putative class of at least 90 percent of all subscribers to local telephone or high-speed Internet service in the continental United States, in an action against America's largest telecommunications firms (with many thousands of employees generating reams and gigabytes of business records) for unspecified (if any) instances of antitrust violations that allegedly occurred over a period of seven years." *Ibid.* The Court concluded that "it is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the [discovery] process will reveal relevant evidence." *Id.* at 1967.

Defendants' statement that "*Twombly* stands for the proposition that antitrust plaintiffs cannot subject defendants to *any* discovery until the Court determines that the plaintiffs have articulated a 'plausible entitlement to relief' on the face of the complaint" is incorrect (Reply Br. at 2) (emphasis in original). This order does not read *Twombly* to erect an automatic, blanket prohibition on any and all discovery before an antitrust plaintiff's complaint survives a motion to dismiss. Defendants' argument upends the Supreme Court's holding; the decision used concerns about the breadth and expense of antitrust discovery to identify pleading standards for complaints, it did not use pleading standards to find a reason to foreclose all discovery.

To be sure, to allow antitrust discovery prior to sustaining a complaint would defeat one of the rationales of *Twombly,* at least when the discovery would be burdensome. When, however, the discovery would not be so burdensome, a closer question is presented, a question calling for the exercise of discretion and the balancing of competing factors.

**3. Calibrating Discovery in Tandem with the Dismissal Motions.**

***5** Having rejected the arguments for an automatic, blanket stay of all antitrust discovery pending identification of a viable claim, the issue remains whether discovery should, on the instant record, be postponed pending the resolution of the motions to dismiss. This order concludes that first resolving the motions to dismiss is the better course. After full ventilation of the viability *vel non* of the complaint, we will all be in a much better position to evaluate how much, if any, discovery to allow. If, among other possible outcomes, the complaint proves to be solid save for perhaps a single soft element for which evidence

would normally be outside the reach of plaintiffs' counsel without discovery, then it may be that a narrowly-directed and less burdensome discovery plan should be allowed with leave to amend to follow. If, however, the complaint proves to be so weak that any discovery at all would be a mere fishing expedition, then discovery likely will be denied. Of course, if the complaint is sustained, then discovery will proceed apace. The immediate point is that adjudicating the motions to dismiss will shed light on the best course for discovery.

Our immediate circumstances omit any compelling need for prompt discovery, such as might be the case if provisional relief were being sought or if testimony needed to be preserved due to ill health of a witness. It is true that the Court has indicated that it will try to manage this case so that it will end at least by the end of 2008. The leisurely briefing schedule on the motions to dismiss was recommended by both sides-neither side should now try to capitalize on that schedule to advance or to delay discovery. In sum, we have no urgent need for immediate discovery. We have time enough to critique the complaint and to then consider the best course for discovery.

Nor is this a case where it is almost certain that the complaint is viable, such as is often true where guilty pleas have already been entered in a parallel criminal case. Of course, in such conditions, at least some discovery should ordinarily proceed despite any pending motion to dismiss (unless civil discovery would interfere with a criminal case). Here, there has been no indictment, much less any guilty plea by any defendant. This factor seems to distinguish the circumstances in the unreported decision of Judge Claudia Wilken in the SRAM case where she ordered the records given to the Antitrust Division to be produced to plaintiffs' counsel.

It is true that the discovery sought at this time is the same discovery already gathered, assembled, and produced to the government. Therefore, the incremental cost to produce a duplicate set to plaintiffs' counsel would be minor in the overall picture. Still, there would be the issue of various objections (based, for example, on employee privacy) that might be assertable against plaintiffs that were unasserted against the government. Defendants would be entitled to interpose possibly valid objections that would take time to evaluate. And, regardless of the foregoing, the compelled act of turning records over to the government pursuant to the subpoena does not mean that everyone else has an equal right to rummage through the same records. Defendants have a legitimate interest in maintaining the confidentiality of their records. Without question, this interest may eventually have to yield to civil discovery interests but, for the reason stated, whether and the extent to which this should occur will be best decided after ruling on the Rule 12 motions. All other considerations raised by the parties, including issues of prejudice and burden, may be re-asserted at that time, the foregoing being persuasive and dispositive at this juncture.

**CONCLUSION**

***6** For all of the above-stated reasons, defendants' motion to stay all discovery and disclosures pending the resolution of the motions to dismiss is **Granted** subject to a new evaluation after the motions to dismiss are decided.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2127577

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2000 WL 760700
Only the Westlaw citation is currently available.
United States District Court, S.D. Indiana, Indianapolis Division.

MIDWEST GAS SERVICES INC., Midwest Gas Storage Inc., Plaintiffs,
v.
INDIANA GAS COMPANY INC (Counterclaim filed 4/17/00), Indiana Energy Inc dismissed per notice of Voluntary Dismissal of 4/24/00, IGC ENERGY INC dismissed per notice of voluntary dismissal of 4/24/00, Indiana Energy Services Inc, Proliance Energy LLC, Defendants.

No. IP99–0690–C–Y/G.
|
March 7, 2000.

**Attorneys and Law Firms**

Gary Hanner, Hanner, Hanner & Hanner, Rockville, IN.

Peter M. King, Canel, Davis and King, Chicago, IL.

Todd A. Richardson, Lewis & Kappes, Indianapolis, IN.

Joseph J. Jacobi, Barnes & Thornburg, Indianapolis, IN.

Steven M. Sherman, Proliance Energy, Llc, Indianapolis, IN.

Wayne C. Turner, McTurnan & Turner, Indianapolis, IN.

ENTRY AND ORDER on Plaintiffs' Motion to Compel (doc. no. 19).

FOSTER.

***1** In this Cause, the plaintiffs allege that the defendant violated federal and state antitrust laws through its formation of a marketing affiliate and its denial of access to its essential facilities to the plaintiffs. The defendant received a Civil Investigative Demand ("C.I.D.") requesting information relating to the defendant and the affiliate from the United States Department of Justice ("D.O. J."). The plaintiffs served a request for production on the defendant for "any and all documents received from or provided to the United States Justice Department from 1995 to the present." The defendant objects on the grounds of relevancy, work product privilege, attorney-client privilege, and 15 U.S.C. § 1313(c)(3).

"Cloned discovery", requesting all documents produced or received during other litigation or investigations, is irrelevant and immaterial unless the fact that particular documents were produced or received by a party is relevant to the subject matter of the instant case. The plaintiffs in this Cause have not shown that the fact that any particular document was produced by the defendant to the D.O.J. or received by defendant from the D.O.J. is relevant to the subject matter of this Cause. Instead, the plaintiffs are interested in the content of documents and for that they must make proper requests describing the information in which they are interested. The plaintiffs' counsel must do their own work and request the information they seek directly. The

motion to compel is therefore denied.

Alternatively, the Court makes the following rulings and comments regarding the discovery issues surrounding a C.I.D. which will likely be reasserted should the plaintiffs serve revised requests for production.

The defendant argued that 15 U.S.C. § 1313(c)(3) establishes a privilege for the documents requested by the plaintiffs. Although § 1313(c)(3)'s text prohibits the United States from disclosing documents that are produced in compliance with a C.I. D., the defendants argue that the privilege should extend to the same documents in the hands of the producer and should extend to documents received from the United States in relation to the C.I.D. in the same way that Fed.R.Crim.P. 6(e) prohibits disclosures by grand jury targets. The analogy is not convincing. The interests in maintaining the secrecy of grand jury criminal investigations are significantly more important than for civil investigations by officers of the D.O. J.. We agree with the authorities cited by the plaintiff holding that § 1313(c)(3) does not create a privilege for C.I.D. materials in the hands of a private person. The defendant cited no decision holding that § 1313(c)(3) created such a privilege and the Court concludes that it does not.

The defendant also contended that the documents produced to the D .O.J. in response to the C.I.D. constitute work product and attorney-client privileged material. We are unable to determine whether the privileges apply based on the defendant's inadequate privilege log and, at any rate, we will wait to confront the issue if and when the plaintiffs move to compel compliance with a new request for production. The Court notes at this time that any pre-existing documents that were produced in compliance with the C.I .D. do not gain any additional privileged status because of that production. In fact, production in response to a C.I.D. might have effected a waiver of any pre-existing work product and attorney-client protections because such privileges apply to C.I.D. requests just as they apply in federal court. 15 U.S.C. § 1312(c); *In re Steinhardt Partners, L.P.,* 9 F.3d 230 (2nd Cir.1993). Further, there is a split of authority on whether documents newly created or acquired in order to respond to a governmental agency's civil investigation qualifies as work product under Fed.R.Civ.P. 26(b)(3). *Compare Pacamor Bearings, Inc. v. Minebea Co., Ltd.,* 918 F.Supp. 491, 513 (D.N.H.1996) (parties reasonably anticipate litigation from fact of agency investigation), *with State of Florida v. Industrial Chemicals, Inc.,* 145 F.R.D. 585, 587–88 (N.D .Fla.1991) (agencies can issue civil investigative demands for purely investigative purposes without any reasonable anticipation of litigation); *Abel Investment Co. v. United States,* 53 F.R.D. 485, 489–90 (D.Neb.1971). We prefer to receive briefing on this question if and when the plaintiffs move again to compel production of these documents.

***2** If, on any future motion to compel, the defendant claims privileges with respect to documents submitted to the D.O.J., and the documents number no more than those listed in their current privilege log, then the defendant may submit the documents to the Court for *in camera* inspection along with a revised privilege log better describing the subject matter without revealing privileged content (*e.g.,* "Civil Investigative Demand No. 18460" is too thin), with a copy of the log served on the plaintiffs. The defendant should provide full legal and factual support for any claim of privilege.

The plaintiffs' motion is DENIED.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 760700

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2001 WL 1539063
United States District Court, N.D. Illinois, Eastern Division.

# In re: DEMERT & DOUGHERTY, INC. Debtor.
# PHOENIX CONTAINER, INC., Joel Schonfeld, Schonfeld & Weinstein, LLP, Kenneth Sokoloff, Thomas Bartkovich and Hollow Brook Holdings, L.L.C., Defendants–Appellants.
# v.
# Karen R. GOODMAN, as Chapter 7 Trustee of DeMert & Dougherty, Inc., Plaintiff–Appellee.

No. 01CV7289.
|
Nov. 30, 2001.

MEMORANDUM OPINION AND ORDER

HOLDERMAN, District J.

***1** The complaint in the adversary proceeding which is the subject of this appeal was filed on December 6, 2000, in the United States Bankruptcy Court for the Northern District of Illinois before the Honorable Chief Judge Susan P. Sonderby, by Karen R. Goodman, the chapter 7 trustee ("Trustee") for the bankruptcy estate of DeMert & Dougherty, Inc. ("Debtor") against defendants-appellants Phoenix Container, Inc. ("PCI"), Joel Schonfeld ("Schonfeld"), Schonfeld & Weinsten, LLP (S & W), Kenneth Sokoloff ("Sokoloff"), Thomas Bartkovich ("Bartkovich"), and Hollow Brook Holdings, L.L.C. ("Hollow Brook"). In response, defendants-appellants moved to dismiss the Trustee's complaint, raising both procedural and substantive challenges to Trustee's complaint, including an argument that both mandatory and permissive abstention were warranted in this case under 28 U.S.C. § 1334(c)(1) and (2). The bankruptcy court denied defendants-appellants' motion in its entirety.

Defendants-appellants now appeal, arguing that the bankruptcy court erred in denying defendants-appellants' request for mandatory and permissive abstention. This appeal requires this court to determine first whether it has jurisdiction to hear the appeal under 28 U.S.C. 158(a). If this court finds jurisdiction exists, this court must determine whether the bankruptcy court made clearly erroneous factual findings or made errors of law in declining to abstain pursuant to the mandatory abstention provision of 28 U.S.C. § 1334(c)(2) and whether the bankruptcy court abused its discretion when it determined that permissive abstention was not warranted under 28 U.S.C. § 1334(c)(1). Having considered this matter fully, this court finds that it does not have jurisdiction to hear the appeal pursuant to 28 U.S.C. § 158(a)(1) as an appeal from a final order, and this court also declines defendants-appellants request that this court exercise its discretion and grant defendants-appellants leave to appeal the bankruptcy court's order pursuant to 28 U.S.C. § 158(a)(3). Moreover, this court notes that even if it did consider the appeal on the merits, this court would find that, under the circumstances of this case, mandatory abstention was not required and the bankruptcy court did not abuse its discretion in deciding not to exercise permissive abstention. Accordingly, defendants-appellants' appeal is DISMISSED for lack of jurisdiction.

BACKGROUND

On November 25, 1998, Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor's case was later converted to a case under chapter 7 of the Bankruptcy Code.

*The Samarah Adversary*

On March 2, 1999, the Trustee commenced an adversary proceeding ("Samarah Adversary") against Yasar Samarah ("Samarah"), the former CEO of Debtor, complaining that Samarah, while acting as officer and director of Debtor, used $100,000 of the Debtor's funds as earnest money for the purchase of the Pail Division of U.S. Can Company ("U.S.Can") without properly availing the Debtor of the opportunity to participate, thereby breaching his fiduciary duty to Debtor. Ultimately, the assets acquired from U.S. Can were transferred to defendant PCI, an entity formed by Samarah, and Samarah received 500 shares, or 50 percent of the PCI shares ("Samarah Shares"). Based on this alleged breach of fiduciary duty, the Trustee sought an order requiring Samarah to surrender the Samarah Shares to the Trustee.

*The Samarah Settlement*

***2** In or around the beginning of August 2000, the Trustee entered into a Settlement Agreement and General Mutual Release ("Samarah Settlement") with Samarah and other Samarah-related entities("Samarah Parties"). At the same time, the Trustee also entered into a settlement agreement ("AEG Settlement") and general mutual release with a creditor of Debtor, American Equities Group, Inc. ("AEG"), which claimed an ownership in 250 of the 500 shares of the Samarah Shares that AEG had previously bought at a public auction held by U.S. Can. Under the terms of the Samarah Settlement, the Trustee acquired the remaining 250 shares of PCI stock still within Samarah's possession that had not been purchased by AEG, and the Trustee agreed to dismiss the Samarah Adversary. In addition, the Samarah Parties assigned to the Trustee "any and all rights and causes of action against the Phoenix Parties including any rights and causes of action for dilution of the [Samarah Shares] ... and all rights and causes of action against the Schonfeld Defendants and Other Defendants." (Appellant's App. III, Tab F at PCI000846.) Under the AEG Settlement, AEG transferred the 250 shares of the Samarah Shares that it had purchased from U.S. Can to the Trustee. On August 24, 2000, the bankruptcy court reviewed and approved both the Samarah Settlement and the AEG Settlement.

*State Court Suits Filed by Samarah and Related Entities*

In late February, 1999, prior to the Samarah Agreement, Samarah and the entities he controlled had already filed four separate lawsuits in the Circuit Court of Cook County, Illinois, all of which remain pending. Only one of Samarah's four lawsuits, Case No. 99 L 2065 ("State Court Action"), is relevant to this court's discussion today. The State Court Action was filed on February 19, 1999 by Samarah and a limited partnership he controlled, Phoenix Container, L.P. ("PCLP"), against ten different defendants including Sokoloff, Schonfeld, S & W, Hollow Brook, and six other defendants not relevant to this court's discussion. The State Court Action was filed shortly after defendants-appellants allegedly held a secret meeting at which they agreed to eliminate Samarah's ownership interest in PCI stock.

In the State Court Action, Samarah claimed that he hired Schonfeld, an attorney, to represent Samarah in connection with the

purchase of the Pail Division of U.S. Can and according to Samarah, he and Schonfeld agreed that in addition to the 500 shares issued to Samarah upon PCI's incorporation, 500 additional shares of PCI stock would be issued to Schonfeld's law firm, S & W, and to Hollow Brook, an entity allegedly controlled by attorneys associated with Schonfeld. Following a November 15, 1997 meeting, an additional 500 shares of PCI stock were issued and the shareholders of PCI became as follows: (1) PCLP, in which Samarah was general partner, 500 shares (50%); S & W, 150 shares (15%); (3) Hollow Brook, 150 shares (15%); (4) Sokoloff, 150 shares (15%); Steven Wall, 50 shares (5%). Samarah claims the PCI board of directors became comprised of Samarah, Schonfeld, Sokoloff, Bartkovich, and Paul Maton. Also at this meeting, Samarah was elected PCI's chief executive officer, Sokoloff was elected PCI's president, Bartovich was elected Vice–President, and Schonfeld was elected secretary. In the State Court Action, Samarah contends that Schonfeld, Sokoloff, and Bartkovich, on behalf of themselves and/or Hollow Brook, conspired to reduce Samarah's ownership interest in PCI from 50% to 25% and to deprive Samarah control of the company, and "wrongfully oust" Samarah by voting to offer 1,000 additional shares of PCI to dilute Samarah's interest in PCI.

***3** In Count I of the State Court Action, Samarah stated a claim of breach of fiduciary duty, conspiracy, wrongful ousting, and breach of promissory note against all named defendants. Count II of the State Court Action alleged willful and malicious breach of fiduciary duty against Sokoloff, and Count III stated a claim for defamation against Sokoloff. At the time of this appeal, the State Court Action remains pending in the Illinois State Court and there is no evidence that the action has progressed beyond the pleadings stage. The Trustee has not been made a party to the State Court Action and it is not known whether or how the pleadings have been amended to reflect the Samarah Settlement.

*The Instant Adversary Proceeding*

As stated at the outset of this opinion, on December 6, 2000, the Trustee instituted the adversary proceeding at issue, filing a five-count complaint against defendants-appellants Phoenix, Schonfeld, S & W, Sokoloff, Bartkovich, and Hollow Brook ("Phoenix Adversary"). In Count I, the Trustee seeks the imposition of a constructive trust over all of the PCI stock held by defendants-appellants based on multiple breaches of fiduciary duty in using Debtor's money to finance the purchase of the Pail Division of U.S. Can. In Count II, the Trustee seeks a declaratory judgment that the alleged attempt to dilute the Samarah Shares is null and void, and in Count III, the Trustee states a claim for breach of fiduciary duty against Schonfeld, seeking damages and disgorgement of all of Schonfeld's PCI stock. Finally, Counts IV and V are breach of fiduciary duty claims against Sokoloff and Bartkovich, respectfully. Defendants-appellants moved to dismiss Trustee's suit, raising both procedural and substantive challenges. The bankruptcy court denied defendants-appellants motion to dismiss in its entirety on August 10, 2001.

## JURISDICTION

### I. Collateral Order Doctrine

As a preliminary matter, this court must first determine whether it has jurisdiction to hear defendants-appellants' appeal. This court has "jurisdiction to hear appeals from ... final judgments, orders, and decrees." 28 U.S.C. § 158(a)(1). "[A] decision is ordinarily considered final and appealable under § 1291 [and § 158(a) ] only if it 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." ' *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 712, 116 S.Ct. 1712, 1718 (1996) (quoting *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 633 (1945)). Orders may also be considered "final" if they meet the requirements of the collateral order doctrine. *See, e.g., Quackenbush,* 517 U.S. at 710–12, 116 S.Ct. at 1718; *Digital Equip. Corp. v. Desktop Direct, Inc.,* 511 U.S. 863, 114 S.Ct. 1992 (1994); *Cohen v. Beneficial Indus. Loan*

*Corp.,* 337 U.S. 541, 69 S.Ct. 1221 (1949). An order is "final" under the collateral order doctrine if it (1) conclusively determines a disputed question that is completely separate from the merits of the action, (2) is too important to be denied review, and (3) is effectively unreviewable on appeal from a final judgment. *Quackenbush,* 517 U.S. at 712–16, 116 S.Ct. at 1719–20 (relying on *Richardson–Merrell Inc. v. Koller,* 472 U.S. 424, 431, 105 S.Ct. 2757, 2761 (1985); *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468, 98 S.Ct. 2454, 2457–58 (1978); *Cohen,* 337 U.S. at 546, 69 S.Ct. at 1225–26). Likewise, the Seventh Circuit defines a collateral order as "an order that finally determines an issue that is separate from the merits of the litigation (hence 'collateral') and that cannot be effectively reviewed on appeal from the final judgment in the litigation." *Board of Educ. of Oak Park & River Forest High School Dist. 200 v. Illinois State Bd. of Educ.,* 79 F.3d 654, 656 (7th Cir.1996).

***4** Defendants-appellants do not contend, nor could they, that the bankruptcy court's refusal to abstain is a final decision in the sense that it ends the litigation and leaves the bankruptcy court with nothing more to do than execute judgment. Instead, defendants-appellants argue that the bankruptcy court's decision not to abstain fits into the narrow class of collateral orders which, although not meeting the strict definition of finality, are nevertheless immediately appealable. Defendants-appellants argue that the bankruptcy court conclusively determined the issue of abstention, an issue completely separate from the merits of the action, and that the bankruptcy court's order will be effectively unreviewable on appeal from final judgment because the defendants-appellants seek abstention in favor of the Trustee intervening in the State Court Action and the Trustee's chances of successfully intervening decrease as time passes and the State Court Action progresses. Defendants-appellants also contend that the bankruptcy court's order may be effectively unreviewable because if the final judgment is entered in the defendants-appellants' favor, they will have no opportunity to appeal the order denying abstention, but they would still be subject to incurring liability to Samarah in the State Court Action for the same alleged wrongdoing that would have been resolved in the defendants-appellants' favor in this proceeding. Finally, defendants-appellants urge this court to recognize the relatedness of Trustee's claims to those asserted by Samarah in the State Court Action, and the undue prejudice, irreparable harm and judicial waste that will result from the multiple proceedings. This court finds that while the bankruptcy court's order arguably satisfies the first two *Quakenbush* criterion because the order determines conclusively the disputed abstention issue, an issue which is separable completely from the merits of the action, that order fails to satisfy the third *Quakenbush* criterion requiring the decision to be effectively unreviewable on appeal from final judgment.

While the parties do not cite to, nor has this court found, any Seventh Circuit decision directly on the issue of whether a lower court's ruling not to abstain is effectively unreviewable on appeal, the Trustee urges this court to follow the Fifth Circuit's decision in *Schuster v. Mims* (*In the Matter of the Rupp & Bowman Co.*), 109 F.3d 237 (5th Cir.1997). In *Schuster,* the Fifth Circuit found that "[u]nlike the reverse situation in which the bankruptcy court *abstains* and then is bound as a matter of *res judicata* to honor the judgment of the [state court], thus rendering the abstention decision effectively unreviewable on appeal, *see, e.g., Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 12, 103 S.Ct. 927, 935 (1983)," there is no reason why a bankruptcy courts *refusal* to abstain could not be effectively reviewed on appeal. *Schuster,* 109 F.3d at 240 (emphasis in original). Rather, as the *Schuster* court noted, once the bankruptcy court renders a final decision with respect to the litigation before it, the party who originally sought abstention would be free to appeal and challenge the appropriateness of the decision not to abstain. *See id.* Although acknowledging the costs and delay inherent in having to wait to appeal from the denial of abstention until entry of a final judgment by the bankruptcy court, the *Schuster* court "[did] not view such delays as sufficient to convey jurisdiction under the collateral order doctrine." *Id.* While this court agrees with defendants-appellants' argument that there is no hard and fast rule that orders refusing to abstain are never appealable collateral orders, this court does not find that, under the particular circumstances of this case, the bankruptcy court's refusal to abstain is effectively unreviewable or will cause other equally irreparable injury to the appealing party. Delay and costs to defendants-appellants are not grounds alone for a court to hear the appeal. After the bankruptcy court enters final judgment, defendants-appellants would be free to appeal the abstention decision. Accordingly, this court holds that it does not have jurisdiction to hear the appeal under the collateral order doctrine.

II. Leave to Appeal under 28 U.S.C. § 158(a)(3)

***5** Defendants-appellants contend next that even if the bankruptcy court's refusal to abstain does not satisfy the collateral order doctrine, this court should exercise its discretion and grant leave of appeal pursuant to 28 U.S.C. § 158(a)(3). Under this section, a district court may exercise jurisdiction over an interlocutory order of a bankruptcy court if leave to hear the appeal is granted. 28 U.S .C. § 158(a)(3); Fed.R.Bankr.P. 8001(b) and 8003. Although the Bankruptcy Code does not provide

any guidance for the district court in determining when an interlocutory appeal is appropriate, the standard set forth in 28 U.S.C. § 1292(b), which governs interlocutory appeals from the district court to the court of appeals, is instructive on the issue. *See In re Capen Wholesale, Inc.,* 184 B.R. 547, 549 (N.D.Ill.1995). Courts applying the standard set forth under § 1292(b) in bankruptcy appeals have adopted its three part test. Under that test, an interlocutory appeal is appropriate when it: (1) involves a controlling question of law; (2) over which there is substantial ground for difference of opinion; and (3) an immediate appeal from the order may materially advance the ultimate termination of the litigation. *See* 28 U.S.C. § 1292(b); *In re Capen Wholesale, Inc.,* 184 B.R. at 549. Based upon this court's analysis of the appealability of the bankruptcy court's order in this case using the factors set out in section 1292(b), this court finds that defendants-appellants have not established that the contested legal issue involves a controlling question of law over which one there is substantial ground for difference of opinion.

A question of law is controlling if its resolution is quite likely to affect the outcome or the further course of litigation, even if it is not certain to do so. *See Sokaogon Gaming Enter. Corp. v. Tushie–Montgomery Assoc.,* 86 F.3d 656, 659 (7th Cir.1996). Defendants-appellants argue that the bankruptcy court based its decision to deny mandatory abstention on the fact that the defendants-appellants did not establish that the Trustee is a party to the State Court Action and that this issue is a controlling issue because if the bankruptcy court had held differently on this issue, it would have granted mandatory abstention and the litigation would then proceed in state court. In deciding that mandatory abstention was not warranted, the bankruptcy court stated, "[s]ince the evidence does not establish that the Trustee is a party to parallel litigation in the Illinois State Court, this Court cannot conclude that an action involving the same claims is already commenced in a state court." (Appellants' App. III, Tab F at PCI 000866.) This court notes, first, that defendants-appellants have not established that the bankruptcy court rested its decision declining mandatory abstention solely on the fact that there was no evidence that Trustee was a party to the State Court Action. This court finds that, based on the language in the bankruptcy court's opinion, the bankruptcy court also could have based its decision on the additional conclusion that the State Court Action was not "parallel litigation" because the Samarah's claims and Trustee's claims were not "the same claims." Further, and more importantly, the bankruptcy court went on to state in its opinion that even if the Trustee was joined as a party to the State Court Action, the defendants-appellants would not have satisfied their burden of establishing the third requirement to obtain leave to appeal, a showing that the State Court Action could be timely adjudicated. Therefore, this court finds that defendants-appellants have not established the threshold requirement that the issue over which a substantial ground for difference of opinion exists is the "controlling issue."

***6** Furthermore, defendant-appellants have not established that a substantial ground for difference of opinion exists over the issue of whether § 1334(c)(2) requires the defendants-appellants to show that Trustee is a party to the State Court Action. Several judges in this district have held that the requisite difference of opinion exists when there is "a substantial likelihood" that the trial court's ruling will be reversed on appeal. *See Trustee of Jartran,* 208 B.R. 898, 901 (N.D.Ill.1997); *Boese v. Paramount Pictures Corp.,* 952 F.Supp. 550, 560–61 (N.D.Ill.1996); *Kirkland & Ellis v. CMI Corp.,* 1006 WL 674072, at *4 (N.D.Ill.1996); *In re Brand Name Prescription Drugs Antitrust Litig.,* 878 F.Supp. 1078, 1081–82 (N.D.Ill.1995). Defendants-appellants contend that because no courts applying § 1334(c)(2) have directly addressed the question before the court in this case of whether § 1334(c)(2) requires that a trustee be a party to the state court litigation, substantial ground for difference of opinion therefore exists over this issue. However, "the very fact that [an issue] has never before been presented does not necessarily make it a matter of substance, so as to warrant an interlocutory appeal." *See Baranski v. Serhant,* 602 F.Supp. 33, 36 (N.D.Ill.1985). While the Seventh Circuit has never addressed this issue directly, other federal circuits have held that the mere lack of judicial precedent on the issue does not establish substantial ground for difference of opinion. *See In re Flor,* 79 F.3d 281, 284 (2d Cir.1996) (noting that "the mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial difference of opinion."); *White v. Nix,* 43 F.3d 374, 378 (8th Cir.1994) (commenting that "substantial ground for difference of opinion does not exist merely because there is a dearth of cases"); *see also In re Magic Restaurants, Inc.,* 202 B.R. 24, 26 (C. Del.1996) (concluding that "a scarcity or void of judicial opinion alone is insufficient to justify an interlocutory appeal."). Accordingly, this court declines to exercise its discretion to grant defendants-appellants leave to appeal.

ANALYSIS ON MERITS

This court further notes that even if it were to grant defendants-appellants the leave to appeal, this court would nonetheless find that mandatory abstention was not warranted and that the bankruptcy court did not abuse its discretion in denying permissive abstention. The analysis of the issue that follows demonstrates that had this court considered the issues on their merits, this court would have affirmed the bankruptcy court's decision not to abstain.

I. Standard of Review

With respect to the bankruptcy court's decision to decline defendants-appellants' request for mandatory abstention under 28 U.S .C. § 1334(c)(2), this court would review the bankruptcy court's factual findings for clear error and its legal conclusions de novo. *See Meyer v. Rigdon,* 36 F.3d 1375, 1378 (7th Cir.1994). In conducting the *de novo* review of the legal conclusions, this court would engage in the same exercise as the bankruptcy court and give no deference to that court's decision regarding mandatory abstention. *See Groves v. Apfel,* 148 F.3d 809, 811 (7th Cir.1998). In applying the clearly erroneous standard of review, the court would have to accept the factual determinations of the bankruptcy court unless they either were completely devoid of minimum evidentiary support displaying some hue of credibility or they bore no rational relationship to the supportive evidentiary data. *See United States v. Greer,* 53 F.3d 334 (7th Cir.1995) (citing *Krasnov v. Dinan,* 465 F.2d 1298, 1302 (3rd Cir.1972)).

***7** The bankruptcy court's decision to decline permissive abstention under 28 U.S.C. § 1334(c)(1) would be reviewed under an abuse of discretion standard. *See In re Chicago, Milwaukee, St. Paul & Pacific Railroad,* 6 F.3d 1184, 1188 (7th Cir.1993). Although abuse of discretion is a deferential standard, this court would still have to conduct a meaningful review of the bankruptcy court's decision. *See Wilfong v. United States,* 991 F.2d 359, 364 (7th Cir.1993). The Seventh Circuit has cautioned that because federal courts should generally exercise their jurisdiction if properly conferred, abstention is the exception rather than the rule. *See In re Chicago, Milwaukee, St. Paul & Pacific Railroad,* 6 F.3d 1184, 1188 (7th Cir.1993).

II. Mandatory Abstention

Under 28 U.S.C. § 1334(c)(2), abstention is mandatory where the following criteria are met: (1) the suit is based on a state law cause of action that, although related to a case under title 11, does not arise under title 11 or arise in a case under title 11; (2) there is no separate basis for federal jurisdiction apart from the bankruptcy; (3) an action has already commenced in the state court; and (4) the case could be timely adjudicated in the state court. *See Cullen Electric Co. v. Bill Cullen Electrical Contracting Co. (In re Bill Cullen Electrical Contracting Co.*), 160 B.R. 581, 585 (Bankr.N.D.Ill.1993). The bankruptcy court will only be required to abstain if all four requirements are met. The party seeking abstention has the burden of establishing that abstention is appropriate. *See H.J. Rowe, Inc. v. Sea Products, In.c (In re Talon Holdings, Inc.),* 221 B.R. 214, 221 (Bankr.N.D. Ill.1998; *Carlson v. Attorney Registration and Disciplinary Comm'n of the Supreme Court of Illinois (In re Carlson),* 202 B.R. 946, 949 (Bankr.N.D.Ill.1996).

Looking to the facts of this case, defendants-appellants have established the first two criteria for mandatory abstention under § 1334(c)(2). The causes of action in the Trustee's instant adversary proceeding ("Phoenix Adversary") against defendants-appellants arise under state law, and absent bankruptcy, the suit would not fall within the jurisdiction of the federal courts. This court believes, however, that the bankruptcy court did not err in holding that the third factor had not been established. Defendants-appellants argue that the State Court Action commenced by Samarah is "identical" to the Phoenix Adversary in that they involve the same state law claims and the same underlying facts. Defendants-appellants further contend that it "reasonably appears" the Trustee may intervene in Samarah's State Court Action. While this court recognizes that the State Court Action and the Trustee's instant action may involve the same realm of operative facts, this court does not believe defendants-appellants have satisfied their burden of showing that an action involving the same claims as the Trustee's claims is already commenced in state court.

***8** This court notes, first, that the defendants-appellants have not provided any evidence that Trustee has been made a party to the State Court Action. Arguing that it "reasonably appears the Trustee may intervene," as defendants-appellants do,

establishes only that Trustee "may" be able to intervene at some point in the State Court Action and does not sufficiently establish the § 1334(c)(2) requirement that "an action be commenced, and can be timely adjudicated, in a State forum." 28 U.S.C. § 1334(c)(2). Defendants-appellants argue that the bankruptcy court improperly based its decision that mandatory abstention was not warranted on the fact that defendants-appellants did not establish that the Trustee was a party to parallel litigation in state court. Defendants-appellants argue that the plain language of § 1334(c)(2) requires only that "an action be commenced, and can be timely adjudicated, in a State forum ... " not that the Trustee be an existing party to that action and that the bankruptcy court improperly added that condition to § 1334(c)(2).

This court finds that it need not definitively decide whether Trustee was required to be a party to the State Court Action under § 1334(c)(2) because even assuming that the Trustee was not required to be a party to the State Court Action, this court would still conclude that defendants-appellants have not established that Trustee's state law claims are sufficiently related to Samarah's claims in the State Court Action such that this court could conclude that the Trustee's claims will be timely adjudicated in the State Court Action.

The allegations in Count I of Samarah's State Court Action relate to an alleged fraudulently induced issuance of stock via a purported shareholder voting agreement between Samarah and Schonfeld, which Schonfeld subsequently reneged on. Count I of the State Court Action further alleged that Schonfeld's breach of the voting agreement resulted in Samarah's loss of control of the PCI Board, and Samarah sought relief in the form of the cancellation of any shares the named defendants received as a result of the allegedly false promise made by Schonfeld. In the Phoenix Adversary, the Trustee seeks to impose a constructive trust on the PCI stock because of the diversion of $100,000 from Debtor's bank account to allow the buy-out of U.S. Can's pail division. The relief requested in the Phoenix Adversary is not identical to that requested in the State Court Action. The State Court Action was filed prior to the Samarah Settlement and the AEG Settlements, and these two settlements have now transferred to the Trustee those shares of stock owned by defendants-appellants, on the theory that because the Debtor financed the Phoenix Transaction, defendants-appellants have been unjustly enriched. There has not been any activity in prosecuting the State Court Action since the entry of the Samarah Settlement, and there are questions of fact as to whether the pleadings in the State Court Action have been amended to reflect the Samarah Settlement, and what matters remain pending in the State Court Action.

***9** Further, none of the remaining counts of the Phoenix Adversary relate to the unlawful withholding of payroll or benefits, or any purported defamation by Sokoloff, both of which make up the remainder of Samarah's claims in the State Court Action. Accordingly, if this court considered this issue on the merits, this court would conclude that the bankruptcy court did not err in finding that the defendants-appellants did not establish that the Trustee's claims in the Phoenix Adversary would be adjudicated in parallel state court litigation.

III. Permissive Abstention

Under 28 U.S.C. § 1334(c)(1), "[n]othing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11, or arising in or related to a case under title 11." The Seventh Circuit has identified the following twelve "somewhat oblique" factors to consider in determining whether the bankruptcy court abused its discretion in deciding not to abstain:

> (1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable law, (4) the presence of a related proceeding commenced in state court or other nonbankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted "core" proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden of [the bankruptcy court's] docket, (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of nondebtor parties.

> *See Chicago, Milwaukee, St. Paul & Pacific R.R. Co.,* 6 F.3d 1184, 1189 (7th Cir.1993).

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

The Seventh Circuit further notes that "[c]ourts should apply these factors flexibly, for their relevance and importance will vary with the particular circumstances of each case, and no one factor is necessarily determinative." *Id.*

With respect to the Phoenix Adversary, the bankruptcy court found that factors 2, 5, 7, and 12 weighed in favor of abstention, since state law issues predominate in this non-core action against non-debtor defendants-appellants. The court also found that factor 8 was irrelevant because there is no need to sever claims in this non-core proceeding, and that factors 1, 3, and 6 were neutral, since, according to the bankruptcy court, the Phoenix Adversary presents rather straightforward questions under state law, and substantially all the Debtor's assets have already been liquidated. Finally, the bankruptcy court found that factors 4, 9, and 10 weighed against abstention, as there was no evidence of forum shopping and this proceeding could be timely adjudicated in the bankruptcy court.

***10** Defendants-appellants contend that the bankruptcy court erred in finding that factor 4—the presence of a related proceeding—weighed against abstention because the pending State Court Action involved parties and claims similar to those in the Phoenix Adversary. However, because this court would have affirmed the bankruptcy court's holding that defendant-appellants have not established that the State Court Action would adjudicate all the Trustee's claims in the Phoenix Adversary, it follows that this court would find that the bankruptcy court did not abuse its discretion in concluding that factor 4 weighed against abstention.

Defendants-appellants also argue that factor 10—the presence of forum shopping—supports abstention because by choosing a forum other than the State Court Action, the Trustee now has two chances at his claims. However, as the bankruptcy court noted, defendants-appellants have not set forth any evidence of forum shopping aside from their argument that the State Court Action and the Phoenix Adversary contain similar claims and the same underlying facts. This is not enough to find the bankruptcy court abused its discretion. Finally, defendants-appellants maintain that factors 1 and 6 actually favored abstention, rather than being neutral, as determined by the bankruptcy court. This court would conclude that the bankruptcy court did not abuse its discretion in light of the fact that the Phoenix Adversary presents straightforward questions of state law and the bankruptcy court believes, overall, bearing in mind that the Debtor's bankruptcy case has already been pending for three years, that this matter could be just as efficiently adjudicated in the bankruptcy court. Given the significant deference accorded to the bankruptcy court under the abuse of discretion standard, and because courts must apply these factors flexibly, with no one factor being determinative, if this court analyzed this issue on the merits, this court would conclude that the bankruptcy court did not abuse its discretion in declining to exercise its discretion to abstain.

CONCLUSION

For all the reasons stated above, defendants-appellants appeal is DISMISSED for lack of jurisdiction.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 1539063, 47 Collier Bankr.Cas.2d 493

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.