**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | |
|---|---|
| IN RE: DEERE & COMPANY REPAIR SERVICES ANTITRUST LITIGATION | MDL No. 3030 <br><br> Case No.: 3:22-cv-50188 <br><br> Hon. Iain D. Johnston |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF SETTLEMENT WITH DEFENDANT DEERE & CO.,
CERTIFICATION OF THE PROPOSED SETTLEMENT CLASS, AND RELATED
RELIEF**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................... 1

I.     BACKGROUND ............................................................................................................. 2

II.    SUMMARY OF THE SETTLEMENT AGREEMENT ....................................................... 5

     A.    Summary of Injunctive Relief: Deere Commits to Making Repair Resources Widely Available ............................................................................................. 5

     B.    Summary of Financial Terms ................................................................................ 6

III.   LEGAL STANDARD FOR PRELIMINARY APPROVAL ........................................... 8

IV.   THE COURT IS LIKELY TO APPROVE THE SETTLEMENT UNDER 23(e)(2) ........ 9

     A.    The Class Representatives and Class Counsel have adequately represented the Class ................................................................................................................ 10

     B.    The Settlement was reached after extensive arm's-length negotiations ............... 10

     C.    The relief provided to the Class is exemplary ....................................................... 11

          1.    The Settlement achieves an excellent result for the Class, given the cost, risks, and duration of continued litigation ................................................. 11

          2.    The proposed method of distributing relief to the Class is effective ........ 14

          3.    There are no other agreements made in connection with the Settlement . 14

     D.    Class Members are treated equitably ..................................................................... 15

V.    THE SETTLEMENT CLASS SATISFIES THE STANDARDS FOR SETTLEMENT CLASS CERTIFICATION UNDER RULE 23(B)(3) ....................................................... 15

     A.    The proposed Class meets the requirements of Rule 23(a) ................................... 16

     B.    The proposed Settlement Class meets the requirements of Rule 23(b)(3) ............ 20

VI.   PROPOSED SETTLEMENT CLASS COUNSEL SATISFY RULE 23(G) ................... 24

VII.  ASSOCIATED BANK IS QUALIFIED TO SERVE AS ESCROW AGENT TO MAINTAIN SETTLEMENT FUNDS .......................................................................... 25

VIII. CONCLUSION .............................................................................................................. 26

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997). ...................................................................................... 15, 19, 21, 24

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013) ............................................................................................................ 21

*Anderson v. Weinert Enters., Inc.*,
   986 F.3d 773 (7th Cir. 2021) ............................................................................................. 17

*Armstrong v. Bd. of Sch. Dirs. of the City of Milw.*,
   616 F.2d 305 (7th Cir. 1980) ....................................................................................... 8, 9, 14

*Balderrama-Baca v. Clarens Davids & Co.*,
   2020 WL 10963973 (N.D. Ill. Nov. 18, 2020) ................................................................. 8, 9

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*,
   784 F.2d 1325 (7th Cir. 1986) ........................................................................................... 13

*Durrell v. U.S. Football League*,
   1987 WL 5667 (N.D. Ill. Jan. 16, 1987) ........................................................................... 22

*Federal Trade Commission, et al. v. Deere & Co.*,
   No. 3:25-cv-50017 (N.D. Ill.) ............................................................................................. 4

*Felzen v. Andreas*,
   134 F.3d 873 (7th Cir. 1998). .............................................................................................. 8

*Gautreaux v. Pierce*,
   690 F.2d 616 (7th Cir. 1982) ............................................................................................... 8

*Hale v. State Farm Mut. Auto. Ins. Co.*,
   2018 WL 6606079 (S.D. Ill. Dec. 16, 2018) ..................................................................... 15

*In re Broiler Chicken Antitrust Litig.*,
   2022 WL 1720468 (N.D. Ill. May 27, 2022) ..................................................................... 22

*In re Cmty. Bank of N. Va.*,
   418 F.3d 277 (3d Cir. 2005) ............................................................................................... 15

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   2024 WL 3509668 (N.D. Ill. Jul. 22, 2024) ............................................................. 17, 22, 23

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   313 F. Supp. 3d 931 (N.D. Ill. 2018) ................................................................................. 12

*In re N.J. Tax Sales Certificates Antitrust Litig.*,
2016 WL 5844319 (D.N.J. Oct. 3, 2016) ................................................................. 12

*In re Namenda Direct Purchaser Antitrust Litig.*,
462 F. Supp. 3d 307 (S.D.N.Y. 2020) ................................................................. 12

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998) ........................................................................ 13

*In re Surescripts Antitrust Litig.*,
No. 19-cv-06627, Dkt. No. 421 (N.D. Ill. Dec. 18, 2025) ...................................... 15

*In re TikTok, Inc., Consumer Privacy Litig.*,
565 F. Supp. 3d 1076 (N.D. Ill. 2021) .................................................................. 9

*In re Titanium Dioxide Antitrust Litig.*,
2013 WL 3182093 (D. Md. Sept. 12, 2013) ........................................................... 12

*Isby v. Bayh*,
75 F.3d 1191 (7th Cir. 1996) ............................................................................. 8

*Kaufman v. Am. Express Travel Related Servs. Co., Inc.*,
264 F.R.D. 438 (N.D. Ill. 2009) ........................................................................ 17

*Kleen Prods. LLC v. Int'l Paper Co.*,
831 F.3d 925 (7th Cir. 2016) .................................................................. 21, 22, 23

*Lacy v. Cook Cnty., Ill.*,
897 F.3d 847 (7th Cir., 2018) ........................................................................... 18

*Lechuga v. Elite Eng'g, Inc.*,
559 F. Supp. 3d 736 (N.D. Ill. 2021) ................................................................... 8

*Lemon v. Int'l Union of Operating Eng'rs, Local 139, AFL-CIO*,
216 F.3d 577 (7th Cir. 2000) ........................................................................... 21

*Little Caesar Enters., Inc. v. Smith*,
172 F.R.D. 236 (E.D. Mich. 1997) .................................................................... 22

*Lucas v. Vee Pak, Inc.*,
2017 WL 6733688 (N.D. Ill. Dec. 20, 2017) ......................................................... 14

*McCue v. MB Fin., Inc.*,
2015 WL 1020348 (N.D. Ill. Mar. 6, 2015). .......................................................... 11

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d. 802 (7th Cir. 2012) ........................................................................... 21

iii

*Mish Int'l Monetary Inc. v. Vega Capital London, Ltd.*,
  2025 WL 1744895 (N.D. Ill. June 24, 2025). .................................................... 19, 21

*Moehrl v. Nat'l Assoc. of Realtors*,
  2023 WL 2683199 (N.D. Ill. Mar. 29, 2023) ............................................................. 22

*Mullins v. Direct Digital, LLC*,
  795 F.3d 654 (7th Cir. 2015) .................................................................................... 20

*Owner-Operator Indep. Drivers' Ass'n v. Allied Van Lines, Inc.*,
  231 F.R.D. 280 (N.D. Ill. 2005). ............................................................................. 18

*Phillips v. Sheriff of Cook Cnty.*,
  828 F.3d 541 (7th Cir. 2016). .................................................................................. 17

*Ploss v. Kraft Foods Grp., Inc.*,
  431 F. Supp. 3d 1003 (N.D. Ill. 2020) ..................................................................... 23

*Rosario v. Livaditis*,
  963 F.2d 1013 (7th Cir. 1992). ................................................................................. 18

*Saltzman v. Pella Corp.*,
  257 F.R.D. 471 (N.D. Ill. 2009) ............................................................................... 18

*Schmidt v. Smith & Wollensky LLC*,
  268 F.R.D. 323 (N.D. Ill. 2010) ............................................................................... 16

*Senegal v. JPMorgan Chase Bank, N.A.*,
  939 F.3d 878 (7th Cir. 2019) ...................................................................................... 7

*Suchanek v. Sturm Foods, Inc.*,
  764 F.3d 750 (7th Cir. 2014) .............................................................................. 17, 24

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) .................................................................................................. 17

## Other Authorities

*2022 Census of Agriculture*,
  United States Department of Agriculture .................................................................. 17

## Rules

Fed. R. Civ. P. 23, *Advisory Committee Note to 2018 Amendments* ........................... 15

Federal Rule of Civil Procedure 23 ...................................................................... *passim*

Federal Rule of Evidence 502(d) ..................................................................................... 3

iv

**INTRODUCTION**

Moving Plaintiffs and Defendant Deere & Co. d/b/a John Deere ("Deere" and, together with Plaintiffs, the "Parties") have reached a historic proposed settlement (hereinafter, the "Settlement"), which provides extensive monetary and injunctive relief to the Settlement Class.[1] Specifically, the Settlement will provide: (1) robust injunctive relief ensuring that farmers and independent repair providers ("IRPs") can diagnose and fix Deere-brand Large Ag Equipment[2]; and (2) $99 million (plus interest) to Settlement Class members who paid Deere's authorized dealers for repairs to their Large Ag Equipment from January 10, 2018 until the date of preliminary approval. If approved, the Settlement will fully resolve this litigation.[3]

This Settlement is an excellent result for the Class, providing substantial injunctive *and* monetary relief while avoiding the extensive risks and uncertainties of continued litigation.

---

[1] Unless otherwise repeated herein for the Court's convenience, all capitalized terms have the meanings ascribed to them in the Settlement Agreement between Plaintiffs and Deere, which is attached as Exhibit A to the Joint Declaration in Support of Plaintiffs' Motion for Preliminary Approval of Settlement with Defendant Deere & Co., Certification of the Proposed Settlement Class, and Related Relief ("Joint Decl."). Plaintiff Wilson Farms Land and Cattle Co. LLC has informed Class Counsel that it does not support this proposed Settlement.

[2] "Large Ag Equipment" is defined in the Settlement Agreement as "agricultural equipment manufactured by John Deere, which depend for their functioning, in part, on electronic control units ('ECUs') and which include large and medium tractors (all 6000, 7000, 8000, and 9000 Series models); combines; cotton pickers; cotton strippers; sugarcane harvesters; tillage, seeding (including planters), and application equipment and sprayers." Settlement Agreement at 2.

[3] Plaintiffs only recently received data from Deere concerning customer names and contact information for notice purposes, and Plaintiffs are working diligently to incorporate this information into existing data sets so that Class Counsel can disseminate robust notice that they believe will include, in many cases, pre-populated claim forms for the benefit of Settlement Class members. This data-merging process is ongoing, however, and the results thereof may impact Plaintiffs' notice plan and how the claims process is structured (*e.g.*, to what degree direct notice and pre-populated claim forms might be feasible). Accordingly, within 14 days of the filing of this Motion, Plaintiffs will supplement this Motion with information concerning their notice program, including all facets of the proposed plan to notify the Settlement Class of the Settlement, the proposed notices themselves, the claim form, information concerning the Settlement-administration process, and other information concerning notice and the Settlement. Plaintiffs intend for the Court to include the notice materials in its consideration of whether to grant preliminary approval and propose a single hearing date be set to consider all the factors relating to preliminary approval.

Plaintiffs now move the Court to preliminarily approve the Settlement, certify the Settlement Class, appoint Class Representatives and Settlement Class Counsel, and provide other relief so that Settlement Class members can realize the benefits of the Settlement and the litigation can be brought to conclusion.

## I.      BACKGROUND

This Court is well-versed in the underlying facts and allegations in this case. Plaintiffs are farms and farmers that own Deere tractors and other farm equipment. Compl. ¶¶ 1, 42-50. Plaintiffs filed suit on behalf of themselves and other similarly situated persons and entities residing in the United States who, during the period from January 10, 2018 to the present, purchased repair services from Deere and/or its authorized dealers. *Id.* ¶¶ 4, 190.

Plaintiffs allege Deere violated federal antitrust laws by engaging in an anticompetitive scheme to withhold from farmers and IRPs vital repair tools. *Id.* ¶¶ 3-4. The Complaint alleges that Deere, in concert and agreement with its authorized dealers (alleged co-conspirators), has withheld repair software and other informational resources from both farmers and IRPs. *Id.* ¶¶ 2, 9-10. As a result, farmers are forced to use authorized Deere dealers for repair services when they would otherwise fix their tractors and other farm equipment themselves, utilize the services of lower-cost and/or more convenient IRPs, or enjoy a competitive market that would otherwise discipline Deere's authorized dealers' rates. *Id.* ¶ 5. Because of the moat erected around Deere's repair services, Deere and its authorized dealers can charge supracompetitive prices for repair services and also reap the benefit of the unlawfully restrained repair market for the benefit of their lucrative repair-part business. *Id.* ¶¶ 24, 30, 34, 186.

On December 8, 2022, Deere answered Plaintiffs' Complaint, denying the allegations and asserting eight affirmative defenses. Dkt. No. 103. That same day, Deere moved for judgment on the pleadings, arguing, *inter alia*, that Plaintiffs lacked standing, could not plead a plausible

relevant market, and had raised defective claims under Sections 1 and 2 of the Sherman Act. *See* Dkt. Nos. 104, 105. Plaintiffs opposed the motion on January 23, 2023, Dkt. No.110,[4] and Deere replied on February 23, 2023, Dkt. No. 123. The Court held a three-hour motion hearing on August 7, 2023. Joint Decl. ¶¶ 9-10.

On November 27, 2023, the Court issued an 89-page opinion denying Deere's motion. Dkt. No. 159. The Court held that Plaintiffs possessed Article III standing, rejecting Deere's argument that Plaintiffs had failed to allege an injury traceable to Deere. *Id.* at 10-13. The Court also held that *Illinois Brick*'s direct purchaser rule did not bar Plaintiffs' antitrust standing. *Id.* at 13-23. As to relevant market, the Court found Plaintiffs had sufficiently alleged both a relevant primary market and a relevant single brand aftermarket. *Id.* at 39-61. Furthermore, the Court found that all individual counts—three under Section 1 of the Sherman Act, four under Section 2 of the Sherman Act, and one count for declaratory and injunctive under both Section 1 and Section 2—pled plausible claims for relief. *Id.* at 61-89.

While this briefing was underway, the Parties negotiated—and the Court entered—an Agreed Confidentiality Order, a Joint Protocol for Production of Documents and Electronically Stored Information, and an Order pursuant to Federal Rule of Evidence 502(d). Dkt. Nos. 97-99.[5] In the ensuing months, the Parties engaged in extensive fact discovery, with Deere producing more than 2 million pages of documents and Plaintiffs producing more than 35,000 pages. Joint Decl. ¶ 14. Plaintiffs also served document subpoenas on over 20 authorized Deere dealers with hundreds of thousands of pages of documents produced in response to those subpoenas. *Id.* ¶ 15. When the FTC and five state attorneys general filed their case against Deere in January 2025, *see Federal*

---

[4] Plaintiffs filed a corrected opposition on January 27, 2023 to fix certain scrivener's errors. Dkt. No. 113.

[5] The Confidentiality Order was subsequently amended. *See* Dkt. Nos. 239, 296.

*Trade Commission, et al. v. Deere & Co.*, No. 3:25-cv-50017 (N.D. Ill.) (the "FTC litigation"), Plaintiffs sought and received the FTC investigative file, which contained an additional 30,000 pages of documents, including materials from Deere's competitors, Joint Decl. ¶ 16.

The Parties worked hard to cooperate and were successful for the most part. Where they reached impasse, however, Plaintiffs zealously advocated for relevant discovery. For example, Plaintiffs successfully moved to compel the production of a large swath of Deere's communications with various trade organizations, which Deere had argued were protected from disclosure by the common-interest doctrine. Dkt. No. 217. Plaintiffs also defeated Deere's motion for a protective order seeking to prevent the deposition of Deere's CFO concerning the degree to which Deere considers "right-to-repair" legislation in preparing financial reports. Dkt. No. 265. Plaintiffs took 19 depositions of Deere's current and former employees, including both Rule 30(b)(6) and 30(b)(1) depositions; Plaintiffs also defended depositions of each of the named Plaintiffs. Joint Decl. ¶¶ 17-18. The Parties took depositions of nine nonparties. *Id.* ¶ 18. Substantial informal investigation both preceded and occurred contemporaneously with formal discovery. After various case schedule modifications—including those that were made so the litigation schedule would (at that time, hopefully) more closely align with the schedule in the FTC litigation—fact discovery closed on May 19, 2025. Dkt. Nos. 209, 213, 234.

On August 13, 2025, Plaintiffs served their opening expert report in support of class certification and merits issues. In that opening report, Dr. Russell Lamb, Ph.D. opined that Deere has substantial market power in the relevant antitrust markets, that Deere has economic incentives to exercise its market power to foreclose competition in the repair services market, and that Deere's exclusionary conduct causes harm to competition. Joint Decl. ¶ 20. Dr. Lamb developed a yardstick methodology, ultimately concluding that all or nearly all Class members would have

been impacted by Deere's conduct. *Id*. Utilizing that classwide methodology, Dr. Lamb estimated overcharge damages to be in the range of $190.0 million to $387.3 million. *Id*.

## II.     SUMMARY OF THE SETTLEMENT AGREEMENT

After extensive arm's-length negotiations conducted with the assistance of respected and nationally renowned mediators—the Honorable Layn R. Phillips (ret.), the Honorable Sean Coffey (ret.), and Niki Mendoza—Plaintiffs and Deere agreed upon settlement terms that, if approved, would resolve this litigation. The Settlement provides Settlement Class members with substantial monetary and injunctive relief.

### A.     Summary of Injunctive Relief: Deere Commits to Making Repair Resources Widely Available

First, Deere has committed to providing—and is already implementing—significant injunctive relief that will provide Owners, Lessors, and IRPs with the digital tools required for the maintenance, diagnosis, and repair of Large Ag Equipment, and without which such equipment cannot be operated in the manner for which it was designed. *See* Settlement Agreement ¶ 37, App'x A. As outlined in the Settlement Agreement, the capabilities Deere is—and will in the future be—making available will enable farmers and IRPs to diagnose and repair problems without having to use the services of an authorized Dealer,[6] and thus the anticompetitive moat that protected Deere and its authorized Dealers before this litigation began will be dismantled. This sea change in the provision of repair tools and capabilities occurred only after Plaintiffs filed and pursued this litigation.

Subject to limited exceptions set forth in the Settlement Agreement, Deere will:

---

[6] Deere's corporate representative testified under oath that the repair resources provided by the Settlement Agreement will provide farmers and IRPs with the *same* capability to diagnose and repair Deere Large Ag Equipment as authorized Dealer technicians. Rule 30(b)(6) Dep. of Deere & Co. (Kent Brown), 52:6-15, June 13, 2025.

- Make Repair Resources—which permit Deere Large Ag Equipment to be maintained, diagnosed, and repaired such that they can be operated in the manner for which they were designed—available to every Owner, Lessor, and IRP on a license or subscription basis on Fair and Reasonable Terms;[7]

- Make available to every Owner, Lessor, and IRP on Fair and Reasonable Terms Future Repair Resources[8] that Deere provides to Deere Dealers as soon as access is granted to over 50 percent of Deere Dealer locations;

- Provide Owners, Lessors, and IRPs with the ability to access and view Dealer Technical Assistance Center ("DTAC") Solutions, consistent with Section A.3(p) of Appendix A, as incorporated in the definition of Repair Resources, no later than December 31, 2026;

- Enable Owners, Lessors, and IRPs to report potential defects in design and manufacturing to Deere through Deere's Customer Contact Center; and

- Enable Owners, Lessors, and IRPs, through John Deere Operations Center PRO Service, to perform reprogramming and diagnostics in offline mode no later than December 31, 2026.

*Id.* § B.1-B.5. Deere must provide this injunctive relief for a ten-year period, during which this Court will have continued jurisdiction to enforce the terms of the Settlement. *Id.* § D.

## B. Summary of Financial Terms

In addition to injunctive relief, Deere has agreed to pay $99 million, plus interest accruing since January 15, 2026 (the "Settlement Fund Amount"), into a qualified settlement fund for the benefit of the Settlement Class. Settlement Agreement ¶ 27.

---

[7] "Fair and Reasonable Terms" includes, but is not limited to, consideration of the following factors: (1) the net cost (accounting for any discounts, rebates, or other incentive programs) to a Deere Dealer for similar items obtained from Defendant; (2) the cost to Defendant of preparing, maintaining, and distributing the items; (3) the price charged by other manufacturers of agricultural equipment for similar items; (4) the means by which the item is distributed; (5) the extent to which the item is used, which includes the number of users, and frequency, duration, and volume of use; and (6) inflation. Settlement Agreement, App'x A, § A.2.

[8] "Future Repair Resources" means any successor products, versions, improvements, additions, upgrades, or updates to Repair Resources. For the avoidance of doubt, Future Repair Resources includes any new functionality, capability, or product which allows Deere Large Ag Equipment to be maintained, diagnosed, and repaired, without which such equipment cannot be operated in the manner for which it was designed. *Id.* § A.4.

6

Subject to Court approval, the Settlement Fund Amount will be used to pay eligible Class members, reimburse Co-Lead Counsel for the costs, fees, and expenses related to notice and administration of the Settlement, reimburse the costs and expenses incurred by Class Counsel in litigating the Action, pay Class Counsel's attorneys' fees,[9] pay service awards for each representative Plaintiff, and pay applicable taxes and tax-preparation expenses. *Id.* ¶¶ 12, 34. After subtracting expenses, attorneys' fees, service awards, and other costs, the remaining balance of the Settlement Fund Amount ("Net Settlement Fund") will be distributed to the Settlement Class pursuant to Plaintiffs' proposed Plan of Allocation, which is also subject to Court approval. *See* Joint Decl., Ex. C (Plan of Allocation).

Members of the Settlement Class will have the right to exclude themselves and preserve their right to sue Deere for damages or other relief. *See* Settlement Agreement ¶ 39; *see also Senegal v. JPMorgan Chase Bank, N.A.*, 939 F.3d 878, 880 (7th Cir. 2019). Upon the Effective Date of the Settlement, Settlement Class members and Deere will release each other from the Released Claims, including any claims existing as of the Execution Date that arise out of or relate in any way to the alleged factual predicates, events, actions, or failures to act described in the Complaint. Settlement Agreement ¶¶ 4, 23, 26. All members of the Settlement Class who have not submitted a valid request to be excluded from the Settlement Class will be barred from asserting any Released Claims against Deere. *Id.* ¶ 23.

---

[9] No later than 30 days before Objections and Opt-Outs are due, Class Counsel intend to file a motion for an award of attorneys' fees not to exceed one-third of the total value of the Settlement (*i.e.*, the monetary relief together with the value of the injunctive relief as assessed by an expert economist), reimbursement of costs and expenses in an amount not to exceed $6 million, and the payment of $25,000 service awards to each of the Class Representatives. The timing of that motion will ensure that members of the Settlement Class will be able to consider Plaintiffs' requests when deciding whether to object to or opt out of the Settlement. As will be shown in the fee application, based on the relief Class Counsel have achieved, a fee not to exceed one-third of the total value of the Settlement is reasonable and justified by decisions in the Seventh Circuit.

Having engaged in contentious briefing on the pleadings, undertaken significant fact discovery, navigated the procedural aspects of continuing to advance the litigation while cooperating with the ongoing FTC litigation, and obtaining expert opinions, all Parties had ample opportunity to assess the merits of their claims and defenses. Joint Decl. ¶¶ 8-20, 27. Plaintiffs and Deere executed the Settlement Agreement on March 6, 2026. *Id.* ¶ 23.

## III.    LEGAL STANDARD FOR PRELIMINARY APPROVAL

There is an overriding public interest in settling litigation, and this is particularly true in the class-action context. *See Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation."); *Armstrong v. Bd. of Sch. Dirs. of the City of Milw.*, 616 F.2d 305, 312 (7th Cir. 1980) ("It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement."), *overruled on other grounds*, *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). Such settlements minimize the parties' litigation expenses and help conserve scarce judicial resources. *Armstrong*, 616 F.2d at 313. Nonetheless, a class action may be settled only with court approval. *Id.* at 313-14.

Rule 23(e) requires judicial approval of class-action settlements in a two-step process. *Id.* at 314. The court first performs a preliminary review of the terms of the proposed settlement to determine whether it is within the *range* of possible approval such that notice to the class and a hearing under Rule 23(e)(1) are warranted. *See Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982) ("The first step in district court review of a class action settlement is a preliminary, pre-notification hearing to determine whether the proposed settlement is 'within the range of possible approval.'"); *Armstrong*, 616 F.2d at 314 (the question at preliminary approval is "whether the proposed settlement is 'within the range of possible approval'"); *Lechuga v. Elite Eng'g, Inc.*, 559 F. Supp. 3d 736, 741 (N.D. Ill. 2021) (same); *Balderrama-Baca v. Clarens Davids & Co.*, 2020 WL 10963973, at *1 (N.D. Ill. Nov. 18, 2020) (same). Then, after notice has been provided and a

8

fairness hearing has been held, a court determines whether to grant final approval. *See, e.g.*, *Balderrama-Baca*, 2020 WL 10963973, at *1 (citing *Armstrong*, 616 F.2d at 314).

In determining whether to grant preliminary approval, courts must determine whether "giving notice is justified by the parties' showing that the court will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B) (i), (ii). The purpose of the inquiry is only "to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing,' 'not to conduct a full-fledged inquiry into whether the settlement meets Rule 23(e)'s standards.'" *In re TikTok, Inc., Consumer Privacy Litig.*, 565 F. Supp. 3d 1076, 1083 (N.D. Ill. 2021) (internal citations omitted).

## IV. THE COURT IS LIKELY TO APPROVE THE SETTLEMENT UNDER 23(e)(2)

To determine whether to approve a proposed class-action settlement, courts look to the factors in Rule 23(e)(2), namely whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) whether the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) whether the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). The Settlement here plainly meets these standards.

**A.      The Class Representatives and Class Counsel have adequately represented the Class**

Rule 23(e)(2)(A) requires that "the class representatives and class counsel have adequately represented the class." As this factor overlaps significantly with the class certification analysis on adequacy, and to avoid duplicative briefing, it is discussed there. *See* Section V.A, *infra*.

**B.      The Settlement was reached after extensive arm's-length negotiations**

Rule 23(e)(2)(B) requires that "the proposal was negotiated at arm's length." Here, the Settlement negotiations were both at arm's length and hard fought.

First, Co-Lead Counsel comprehensively vetted the record throughout the settlement process, analyzed Deere's factual and legal arguments, and thoroughly considered the costs and risks of persisting with the litigation. Co-Lead and Liaison Counsel—each with extensive experience litigating antitrust class actions—were well informed of the strengths and weaknesses of the claims and defenses in this Action and conducted the settlement negotiations seeking to achieve the best possible result for the Class in light of the risks, costs, and delays of continued litigation. Joint Decl. ¶¶ 27-29, Ex. B (firm resumes).

Second, the Parties' settlement negotiations were always at arm's length. Indeed, the negotiations were hard fought and highly contentious. *Id.* ¶ 21. To help facilitate mutual understanding, the Parties engaged experienced mediators and fully briefed the relevant issues in advance of the mediation sessions. *Id.* The Parties then participated in an in-person, all-day mediation on October 9, 2025 in New York, before the Honorable former District Court Judge Layn Phillips and his colleagues. Despite extensive efforts, the case did not fully settle at that juncture. This Settlement required the continued negotiation of the Parties and mediators over the ensuing two months, with the Parties ultimately reaching full agreement on December 10, 2025. Afterward, the Parties continued to fine-tune the terms of the Settlement Agreement, including the

injunctive relief, as reflected in the Settlement Agreement date March 6, 2026. The mediators' close involvement throughout this lengthy process further supports the conclusion that the Settlement was achieved fairly, through hard-fought negotiation, and free of collusion. *McCue v. MB Fin., Inc.*, 2015 WL 1020348, at 2 (N.D. Ill. Mar. 6, 2015).

### C. The relief provided to the Class is exemplary

Each of the adequacy factors outlined in Rule 23(e)(2)(C) favors preliminary approval.

#### 1. The Settlement achieves an excellent result for the Class, given the cost, risks, and duration of continued litigation

A key factor in assessing whether to approve a class-action settlement is a plaintiff's likelihood of success on the merits, balanced against the relief offered in settlement. *See* Fed. R. Civ. P. 23(e)(2)(C). Here, Plaintiffs sought redress for harms occasioned by the alleged anticompetitive moat Deere erected to prevent farmers and IRPs from having access to repair tools that would enable them to fix farming equipment without having to use and pay Deere Dealers for their repair needs. The relief afforded by the Settlement directly addresses and dismantles the protective moat Plaintiffs had challenged. Among other things, the Settlement Agreement requires Deere to provide, on Fair and Reasonable Terms, farmers and IRPs with the repair and diagnostic capabilities, including the diagnostic and repair-focused DTAC Solutions, which will enable them to avoid utilizing Deere authorized Dealers.[10] The injunctive relief will be in effect for ten years, ensuring that every owner of Deere Large Ag Equipment will have access to the digital tools required for the maintenance, diagnosis, and repair of such equipment without the need to use an authorized Dealer.[11]

---

[10] *See* Kent Brown Tr. at 52:6-15.

[11] Deere must provide Future Repair Services as part of the injunctive relief, which means any changes to the repair tools and their functionality provided to authorized Dealers must also be given to farmers and IRPs as outlined in the Settlement Agreement. In other words, while the tools will presently be provided

11

In addition to injunctive relief, the Settlement provides for substantial monetary relief. Based on expert work in the litigation, alleged overcharge damages are estimated to be in the range of $190.0 million to $387.3 million. Joint Decl. ¶ 20. By the time of distribution, the total Settlement Fund Amount will exceed $100 million. This represents a monetary recovery ranging from 26% to 53% of overcharge damages, far more than the typical antitrust settlement, which is 5% to 15%.[12]

This relief is substantial and significant and comes years earlier than if the Parties were to proceed to trial and likely appeal. The Settlement essentially accomplishes what the case set out to achieve. And all of this was realized in the framework of complex antitrust litigation—which is inherently costly and risky—and in the "rare" context of a "single brand aftermarket" theory. Dkt. 159 at 39-40 (citing *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 961 (N.D. Ill. 2018)).

While Plaintiffs prevailed on Deere's motion for judgment on the pleadings, there was no guarantee they would prevail at subsequent fact-finding stages imposing more rigorous burdens of proof or on appeal. Defendants were steadfast in their arguments against the legal and factual sufficiency of Plaintiffs' underlying legal theories and intended to assert the insufficiency of Plaintiffs' core claims throughout the litigation and on appeal, if necessary, where this Court recognized that the Seventh Circuit has not yet articulated a standard for determining the contours

---

through the PRO Service platform, any changes to, or new iterations of, that platform and tools also must be provided to Deere customers and IRPs.

[12] *See, e.g.*, *In re Namenda Direct Purchaser Antitrust Litig.*, 462 F. Supp. 3d 307, 315 (S.D.N.Y. 2020) (approving settlement of approximately 10% of the highest damages estimate); *In re N.J. Tax Sales Certificates Antitrust Litig.*, 2016 WL 5844319, at *1 (D.N.J. Oct. 3, 2016) (approving settlement of approximately 2.5% of the "best probable recovery"); *In re Titanium Dioxide Antitrust Litig.*, 2013 WL 3182093, at *4 (D. Md. Sept. 12, 2013) (finding settlement that was 8% of plaintiffs' original best case damages estimate was adequate, as "a verdict in favor of the Plaintiffs was not assured by any means").

of the primary market for a claim based on a single brand aftermarket. *Id.* at 42. A failure of Plaintiffs' underlying legal theories or reversal on appeal would have entailed years more of litigation with no relief for farmers.

Class certification presented another risk. Despite their confidence in the prospects of success, if Plaintiffs failed at class certification, there would be no meaningful avenue for relief for Class members despite Plaintiffs' claims that Deere's systematic misconduct affected farmers nationwide. Summary judgment could have eliminated certain claims entirely. And the trial in this matter would have undoubtedly been complex, with no guarantee of a verdict in Plaintiffs' favor. Even if Plaintiffs prevailed at trial, further resources would be devoted to defending the judgment on appeal, which would result in years of delay in recovery for Settlement Class members. Joint Decl. ¶ 28. In sum, "[t]here can be no doubt that this class action would be enormously expensive to continue, extraordinarily complex to try, and ultimately uncertain of result." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 477 (S.D.N.Y. 1998); *see Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1333 (7th Cir. 1986) ("Antitrust cases are notoriously extended.").

Co-Lead Counsel thoroughly evaluated the relative strengths and weaknesses of the Parties' respective litigation positions and determined that the Settlement brings substantial benefits to the Settlement Class and avoids the delay, uncertainty, and expense of continuing protracted litigation with Deere. *See* Joint Decl. ¶ 28. Co-Lead Counsel came to this conclusion after briefing Deere's motion for judgment on the pleadings, engaging in substantial fact and expert discovery, and undertaking significant mediation-related efforts, among many other tasks. *Id.* ¶¶ 12-20, 21-23. Plaintiffs respectfully submit that Counsel's informed and reasoned judgment that the Settlement is fair, reasonable, and adequate weighs heavily in favor of preliminary approval. *See Armstrong*, 616

13

F.2d at 325 (in determining fairness of class action-settlement, "the court is entitled to rely heavily on the opinion of competent counsel").

### 2. The proposed method of distributing relief to the Class is effective

The proposed Plan of Allocation (attached as Exhibit C to the Joint Declaration) provides a fair and effective means of distributing the Net Settlement Fund to the Settlement Class. The Plan of Allocation provides for a *pro rata* allocation of the Net Settlement Fund to eligible Settlement Class members based on total labor hours spent on repairs of the claimant's Large Ag Equipment during the Class Period, subject to the proof submitted with the claimants' respective claims forms and/or prepopulated data provided by Deere. *See* Joint Decl., Ex. C.[13]

A plan of allocation that reimburses class members *pro rata* based on the extent of their injuries is generally considered reasonable. *Lucas v. Vee Pak, Inc.*, 2017 WL 6733688, at *13 (N.D. Ill. Dec. 20, 2017) (collecting cases). That is precisely what is contemplated by the proposed method of distribution here. Accordingly, the effectiveness of the Plan of Allocation weighs in favor of preliminary approval.

### 3. There are no other agreements made in connection with the Settlement

Rule 23(e)(2)(C)(iv) requires consideration of any other agreements made in connection with the Settlement. As the Settlement Agreement is the *only* agreement the Parties made in connection with the proposed Settlement, this factor also weighs in favor of preliminary approval.

---

[13] Plaintiffs obtained during discovery comprehensive data from Deere (the so-called "ELIPS Data") that sets out, among other things, the labor hours expended on each piece of Deere Large Ag Equipment, by unique Product Identification Number (PIN), during the Class Period. To the extent relevant information of this type is absent from the data Deere has provided, Settlement Class members will be asked to provide it during the claims process. This process, among other things, will be addressed in Plaintiffs' supplemental submissions relating to the proposed notice plan.

### D. Class Members are treated equitably

Rule 23(e)(2)(D) "calls attention to a concern that may apply to some class action settlements—inequitable treatment of some class members vis-à-vis others." Fed. R. Civ. P. 23, *Advisory Committee Note to 2018 Amendments.* Here, the injunctive relief applies uniformly to all members of the Settlement Class. *See* Settlement Agreement ¶ 37, App'x A. So, too, does the Plan of Allocation pertaining to monetary relief treat Plaintiffs the same as all other members of the Settlement Class. *See* Joint Decl., Ex. C. The release also applies uniformly to Settlement Class members. *See* Settlement Agreement ¶¶ 4, 23, 26.

Subject to Court approval, the Settlement contemplates an application for service awards for each Class Representative, in recognition of their important contributions to the prosecution of the Action. *See id.* ¶ 34. Such service awards are commonplace in class-action litigation. *See, e.g.*, *In re Surescripts Antitrust Litig.*, No. 19-cv-06627, Dkt. No. 421 (N.D. Ill. Dec. 18, 2025) (finding reasonable $35,000 service awards per class representative); *Hale v. State Farm Mut. Auto. Ins. Co.*, 2018 WL 6606079, at *15 (S.D. Ill. Dec. 16, 2018) (collecting cases and finding reasonable and appropriate service awards of $25,000).

For these reasons, the Court should preliminarily approve the Settlement.

## V. THE SETTLEMENT CLASS SATISFIES THE STANDARDS FOR SETTLEMENT CLASS CERTIFICATION UNDER RULE 23(B)(3)

To preliminarily approve the Settlement, the Court must also find that it will likely be able to certify the Settlement Class for purposes of judgment on the proposal. Fed. R. Civ. P. 23(e)(1)(B) (ii). Class actions may be certified for settlement purposes only. *See, e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). To be certified, a proposed settlement class must satisfy each requirement set forth in Rule 23(a) and at least one of the separate provisions of Rule 23(b). *Id.* at 613-16; *see also In re Cmty. Bank of N. Va.*, 418 F.3d 277, 299 (3d Cir. 2005)

15

("[C]ertification of classes for settlement purposes only [is] consistent with Fed. R. Civ. P. 23, provided that the district court engages in a Rule 23(a) and (b) inquiry[.]").

Plaintiffs seek certification of the following Settlement Class pursuant to Rules 23(a) and (b)(3):

> All persons and entities who purchased Repair Services for Deere Large Agricultural Equipment[14] from John Deere or its authorized Dealers in the United States between January 10, 2018 and the date of preliminary approval of this Agreement.

Settlement Agreement ¶ 8. Excluded from the Settlement Class are all governmental entities; Deere and any parent, subsidiary, or affiliate thereof; Deere's officers, directors, employees, and immediate families; and any judicial officer presiding over this action and the members of his/her judicial staff and immediate family. *Id.* As detailed below, the proposed Class satisfies all requirements of Rule 23(a) and Rule 23(b)(3).

For purposes of this Settlement, Deere does not object to certification of the Settlement Class.

### A.      The proposed Class meets the requirements of Rule 23(a)

**Numerosity.** Rule 23(a)(1) requires that a class be so numerous as to make joinder of its members "impracticable." Although no magic number satisfies the numerosity requirement, "a class of more than 40 members is generally believed to be sufficiently numerous for Rule 23 purposes." *Schmidt v. Smith & Wollensky LLC*, 268 F.R.D. 323, 326 (N.D. Ill. 2010) (citations omitted). Regardless, "[t]he key numerosity requirement is 'not the number of class members alone but the practicability of joinder.'" *Anderson v. Weinert Enters., Inc.*, 986 F.3d 773, 777 (7th Cir.

---

[14] "Large Ag Equipment" is defined in the Settlement Agreement as "agricultural equipment manufactured by John Deere, which depend for their functioning, in part, on electronic control units ('ECUs') and which include large and medium tractors (all 6000, 7000, 8000, and 9000 Series models); combines; cotton pickers; cotton strippers; sugarcane harvesters; tillage, seeding (including planters), and application equipment and sprayers." Settlement Agreement at 2.

2021). That inquiry turns on "the nature of the action, the size of the individual claims, and the location of the members of the class or the property that is the subject matter of the dispute." *Id.*

The 2022 Census of Agriculture, released by the U.S. Department of Agriculture, reflects the existence of over 1.9 million farms throughout the United States.[15] The documents produced in discovery and provided by Deere for notice purposes reflect a class size estimated to be well in excess of 200,000 farmers. No court could practicably join that many individual plaintiffs in a lawsuit. Thus, joinder would be impracticable, and Rule 23(a)(1) is satisfied.

**Common questions.** Rule 23(a)(2) requires that there be "questions of law or fact common to the class." "Even a single [common] question will" suffice. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351, 359 (2011). Common questions "need not address every aspect of the plaintiffs' claims," but they "must 'drive the resolution of the litigation.'" *Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 553 (7th Cir. 2016). "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014); *Kaufman v. Am. Express Travel Related Servs. Co., Inc.*, 264 F.R.D. 438, 442 (N.D. Ill. 2009) (characterizing Rule 23(a)(2)'s commonality requirement as a "'low . . . hurdle'"). Rule 23(a)(2) is thus routinely satisfied in antitrust cases. *See, e.g.*, *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2024 WL 3509668, at *9 (N.D. Ill. Jul. 22, 2024) ("[C]ourts within the Seventh Circuit have repeatedly held that 'the question of the existence of a conspiracy in restraint of trade is one that is common to all potential plaintiffs.'").

The key question in this case is whether Deere has foreclosed competition for repair services for Large Ag Equipment. The focus is thus on Deere's uniform conduct toward the

---

[15] *See* U.S. Dep't of Agriculture, 2022 Census of Agriculture, Table 71, *available at* https://www.nass.usda.gov/Publications/AgCensus/2022/Full_Report/Volume_1,_Chapter_1_US/st99_1_071_071.pdf (last accessed Apr. 5, 2026).

putative Class—*i.e.*, Deere's refusal to provide farmers access to certain repair tools—and findings of fact and law related to that issue will yield dispositive answers common to every Class member. This case is, therefore, replete with other questions of law and fact common to the Settlement Class, including: (1) the definition of the relevant antitrust markets for purposes of assessing Deere's alleged misconduct; (2) whether Deere willfully obtained and maintained market power in those markets; (3) whether Deere colluded with co-conspirator dealerships to suppress competition; (4) whether Deere's alleged misconduct is anticompetitive and violated the Sherman Act; (5) whether all or virtually all of the Class suffered antitrust injury as a result of Deere's misconduct; and (6) the appropriate measure of damages. Accordingly, given the multiple common questions of law and fact, the Settlement Class satisfies Rule 23(a)(2).

**Typicality.** Rule 23(a)(3) requires that the class representatives' claims be "typical" of class members' claims. "[T]ypicality is closely related to commonality and should be liberally construed." *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 479 (N.D. Ill. 2009), *aff'd*, 606 F.3d 391 (7th Cir. 2010) (per curiam). Typicality is a "low hurdle," requiring "neither complete coextensivity nor even substantial identity of claims." *Owner-Operator Indep. Drivers' Ass'n v. Allied Van Lines, Inc.*, 231 F.R.D. 280, 282 (N.D. Ill. 2005). "A 'plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and [is] based on the same legal theory.'" *Lacy v. Cook Cnty., Ill.*, 897 F.3d 847, 866 (7th Cir. 2018) (citation omitted). Factual variation among different class members does not defeat typicality; courts "look to the defendant's conduct and the plaintiff's legal theory to satisfy Rule 23(a)(3). *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).

Plaintiffs allege Deere engaged in anticompetitive conduct that universally restricted farmers' access to certain vital repair tools for Large Ag Equipment, thereby increasing repair

18

costs for Plaintiffs and putative Class members. Plaintiffs and the putative Class members thus have claims based upon common legal theories, including: monopolization, attempted monopolization, conspiracy to monopolize, and conspiracy and combination in restraint of trade. Because Plaintiffs' claims arise out of the same alleged illegal anticompetitive conduct, are based on the same alleged theories, and will require the same types of evidence to prove those theories, Rule 23(a)(3)'s typicality requirement is satisfied.

**Adequacy.** Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." This inquiry, which "serves to uncover conflicts of interest between named parties and the class they seek to represent," *Amchem*, 521 U.S. at 625, has two parts: (i) the class representatives must have the same interest and injury as other class members, and (ii) proposed class counsel must be adequate to represent absent class members whose rights may be affected by class certification, *Mish Int'l Monetary Inc. v. Vega Capital London, Ltd.*, 2025 WL 1744895, at *4-7 (N.D. Ill. June 24, 2025). Both requirements are satisfied here.

First, Plaintiffs' interests and the Settlement Class members' interests are aligned. Plaintiffs, like all other Settlement Class members, have incurred and are threatened with antitrust injury by Deere's alleged misconduct and have an interest in recovering damages and eliminating the threat of future injury. Plaintiffs seek the same relief for themselves that they seek for the Settlement Class—namely, monetary damages and injunctive relief requiring Deere to provide access to Repair Services. Because their interests and injuries are the same as members of the Settlement Class, the appointment of Plaintiffs Plum Ridge Farms, Ltd., Colvin Farms, LLC, England Farms & Harvesting, LLC, Hapka Farms, Inc., Eagle Lake Farms Partnership, Blake Johnson, and Trinity Dale Wells as Class Representatives for the Settlement Class is appropriate.

Second, Plaintiffs and their counsel have vigorously pursued this litigation since its inception. Each Class Representative has devoted substantial time and effort to the case, producing documents, sitting for depositions, and assisting Co-Lead Counsel. Joint Decl. ¶ 18. Similarly, Co-Lead Counsel have vigorously litigated this highly complex and demanding case since its filing in 2022. Co-Lead Counsel conducted significant pre-filing investigation, defeated Deere's motion for judgment on the pleadings, engaged in significant offensive and defensive discovery efforts, and obtained the expert analyses and opinions in the case. *See id.* ¶¶ 12-20. As they respectfully submit has been demonstrated by their conduct to date, Plaintiffs and Co-Lead Counsel have adequately represented the interests of the Settlement Class in this litigation and will continue to do so.[16]

**B.      The proposed Settlement Class meets the requirements of Rule 23(b)(3)**

Rule 23(b)(3) permits certification when "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Such is the case with the Settlement Class. Certification under Rule 23(b)(3) can be appropriate where, as here, a settlement provides both monetary and injunctive relief. *See Lemon v. Int'l Union of Operating Eng'rs, Local 139, AFL-CIO*, 216 F.3d 577, 581 (7th Cir. 2000) (providing for

---

[16] The Settlement Class also meets the implicit requirement in Rule 23(a) that the proposed class must be "ascertainable," meaning it must be defined clearly and based on objective criteria. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657, 659 (7th Cir. 2015) (refusing to adopt heightened ascertainability requirement). The question of membership in the Class is answered by simple yes-or-no questions. The Class definition avoids vagueness issues by identifying a particular group (purchasers of Repair Services for Deere Large Ag Equipment), harmed during a particular time frame, in a particular location, and in a particular way (being denied access to the tools required for the maintenance, diagnosis, and repair of Deere Large Ag Equipment, and purchasing Repair Services for Deere Large Ag Equipment at artificially inflated prices). *See Mullins*, 795 F.3d at 660. The definition neither relies on subjective criteria—like a person's state of mind—nor creates an impermissible "fail-safe" class dependent on Deere's liability. *See id.* at 660-61. Moreover, records exist at Deere and its authorized Dealers that identify virtually all Settlement Class members. The ascertainability requirement is satisfied.

certification of both forms of relief under Rule 23(b)(3)).

**Predominance.** Predominance must be understood as requiring "a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *See, e.g.*, *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013). (emphasis in original). The focus of the inquiry is whether "'a proposed class is 'sufficiently cohesive to warrant adjudication by representation.'" *Id.* at 469. Sufficient cohesion exists where "'common questions represent a significant aspect of a case and . . . can be resolved for all members of a class in a single adjudication.'" *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 925 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 1582 (2017).

Under these principles, courts regularly find that cases alleging violations of the antitrust laws satisfy the predominance requirement. *See Amchem*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."); *Kleen*, 831 F.3d at 925-29 (affirming finding that common issues predominated in antitrust case under Section 1 of the Sherman Act); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d. 802, 815-16 (7th Cir. 2012) (concluding that common questions concerning whether antitrust laws were violated "clearly predominate[d]"); *Mish*, 2025 WL 1744895, at *8-18 (finding that common question of price impact under the Sherman Act could be resolved in "'one stroke'" and predominated over any individualized inquiries).

This case is no exception. Issues common to the Settlement Class predominate with respect to proof of each element of Plaintiffs' antitrust claims, namely: (1) whether Deere participated in a conspiracy to monopolize the Repair Services market; (2) whether Deere participated in a group boycott and tying arrangement with respect to Repair Services; (3) whether Deere engaged in anticompetitive conduct to maintain its monopoly in, or attempt to monopolize, the Repair Services

21

market; (4) whether there is classwide antitrust impact arising from the alleged conduct; and (5) the amount of damages resulting from the antitrust violations. *See Moehrl v. Nat'l Ass'n of Realtors*, 2023 WL 2683199, at \*13 (N.D. Ill. Mar. 29, 2023) (noting that predominance analysis begins with the underlying elements, which "[f]or a cause of action arising under the Sherman Act, . . . are '(1) a violation of antitrust law; (2) individual injury, or impact, caused by that violation; and (3) measurable damages.'" (internal citation omitted)).

First, evidence proving or disproving the alleged conspiracy and Deere's liability is common to the Settlement Class. This is because the focus is not on the conduct of individual class members but rather the conduct of Deere (and its conduct toward, and relationship with, its authorized dealers). *See Kleen*, 306 F.R.D. at 594 (finding the alleged conspiracy a "prototypical example of an issue where common questions predominate, because it is much more efficient to have a single trial on the alleged conspiracy rather than thousands of identical trials all alleging identical conspiracies based on identical evidence"); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2024 WL 3509668, at \*11 ("Indeed, the answer to [the question of whether Defendants conspired] is 'central' to the class's claims and the trial 'will focus overwhelmingly on common proof of conspiracy—witness testimony, documents, email and phone records, economic evidence, and other evidence relating to Defendants' conduct.'" (internal citations omitted)); *In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468, at \*7 (N.D. Ill. May 27, 2022) (citing *Kleen* and finding predominance element satisfied "because the issue of liability 'can be resolved for all members of a class in a single adjudication'").[17]

Second, evidence of antitrust impact can be presented on a classwide basis. "At the class

---

[17] *See also, e.g.*, *Little Caesar Enters., Inc. v. Smith*, 172 F.R.D. 236, 265-66 (E.D. Mich. 1997) (finding predominance requirement satisfied in Sherman Act tying case); *Durrell v. U.S. Football League*, 1987 WL 5667, at \*1-3 (N.D. Ill. Jan. 16, 1987) (certifying Rule 23(b)(3) class in group-boycott litigation).

certification stage, 'a plaintiff is not required to actually *prove* [antitrust injury]' and instead 'need only demonstrate that the element of antitrust impact is *capable of proof* at trial through evidence that is common to the class rather than individual to its members.'" *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2024 WL 3509668, at *12 (citing *Ploss v. Kraft Foods Grp., Inc.*, 431 F. Supp. 3d 1003, 1018 (N.D. Ill. 2020) (emphasis in original)). Here, based on an extensive assessment of the Repair Services markets, economics and statistical analyses, and careful review of the documentary record, common evidence demonstrates that all or nearly all members of the proposed Class were impacted by the alleged misconduct. Joint Decl. ¶ 20.

Third, Plaintiffs have demonstrated that damages can be calculated reliably using common, classwide evidence. Many courts—including the Seventh Circuit—have approved the use of aggregate damages in antitrust class actions. *See, e.g.*, *Kleen*, 831 F.3d at 929 (finding plaintiffs' aggregate damages analysis appropriate); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2024 WL 3509668, at *15 ("[C]ourts handling antitrust class actions routinely endorse the practice of using regression models to estimate an average overcharge that can establish injury and measure damages on a classwide basis, so long as the regression analysis is based on a rigorous application of economic theory."). Here, Plaintiffs have calculated classwide damages using common evidence. *See* discussion *supra* at Section I.

**Superiority.** The superiority requirement is generally met when a court finds that common questions predominate. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2024 WL 3509668, at *16. This case is no exception. The "class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Id.* (internal quotation marks omitted). Forcing every person or entity who purchased Repair Services to litigate individually would be

cost-prohibitive, especially given the high cost of litigating antitrust actions. *See, e.g.*, *Suchanek*, 764 F.3d at 760 ("The district court might conclude on remand that the class action device is superior, because no rational individual plaintiff would be willing to bear the costs of this lawsuit."). Finally, although Plaintiffs see no management difficulties in this case, this final consideration is not relevant to certification of the proposed Class. *See Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial."). Accordingly, the proposed class action is superior to other available methods (if any) for the fair and efficient adjudication of the controversy.

Accordingly, the proposed Settlement Class should be certified for settlement purposes under Rule 23(b)(3).

## VI. PROPOSED SETTLEMENT CLASS COUNSEL SATISFY RULE 23(G)

Pursuant to Rule 23(g), Plaintiffs also move to appoint Wexler Boley & Elgersma LLP, Gustafson Gluek PLLC, and Cotchett, Pitre & McCarthy, LLP as Settlement Class Counsel. In appointing class counsel, Rule 23(g)(1)(A) instructs a court to consider:

> (i)  the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii) counsel's knowledge of the applicable law; and
>
> (iv) the resources that counsel will commit to representing the class.

Here, each of these considerations weighs strongly in favor of appointing proposed Settlement Class Counsel. Settlement Class Counsel has litigated this case skillfully since its inception, as this Court has witnessed. Settlement Class Counsel performed substantial work identifying and investigating potential claims and properly supporting the allegations in the Complaint, as shown

by the fact that this Court ultimately denied Deere's motion for judgment on the pleadings. *See* Joint Decl. ¶ 11.

As reflected in their firm resumes, Settlement Class Counsel have substantial experience prosecuting class actions and other complex litigation throughout the United States, including antitrust actions. *See* Joint Decl., Ex. B. The firms have also demonstrated their abilities and commitment to this litigation, devoting the resources and personnel necessary to get to this critical juncture. They far exceed the requirements of Rule 23(g).

## VII. ASSOCIATED BANK IS QUALIFIED TO SERVE AS ESCROW AGENT TO MAINTAIN SETTLEMENT FUNDS

Plaintiffs also request that the Court approve Associated Bank as the Escrow Agent for the Settlement Fund, from which any taxes, Court-awarded attorneys' fees, costs and expenses, notice and administration costs, and service awards will be deducted, with the remaining amount available for distribution to the Settlement Class. Associated Bank is well known and highly respected in the field of escrow-account management. With the Court's approval, the Escrow Agent will comply with all requirements for the account identified in the Settlement Agreement. *See* Joint Decl., Ex D.

## VIII.  CONCLUSION

For these reasons, Co-Lead Counsel respectfully request the Court preliminarily approve the Settlement Agreement, certify the Settlement Class, and grant the related relief set out in the accompanying Proposed Order.

Dated: April 6, 2026                                    Respectfully submitted,

By: */s/ Adam J. Zapala*
Adam J. Zapala
Elizabeth T. Castillo
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com

By: */s/ Kenneth A. Wexler*
Kenneth A. Wexler
Justin N. Boley
Tyler J. Story
Margaret L. Shadid
**WEXLER BOLEY & ELGERSMA LLP**
311 South Wacker Dr.
Suite 5450
Chicago, IL 60606
Telephone: (312) 346-2222
kaw@wbe-llp.com
jnb@wbe-llp.com
tjs@wbe-llp.com
ms@wbe-llp.com

By: */s/ Daniel C. Hedlund*
Daniel E. Gustafson
Daniel C. Hedlund
Michelle J. Looby
Frances Mahoney-Mosedale
**GUSTAFSON GLUEK PLLC**
120 South Sixth Street #2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
fmahoneymosedale@gustafsongluek.com

Dennis Stewart
**GUSTAFSON GLUEK PLLC**
600 W. Broadway, Suite 3300
San Diego, CA 92101
dstewart@gustafsongluek.com

*Interim Co-Lead Counsel for Plaintiffs*

Robert Foote, Esq. (3124325)
Kathleen C. Chavez, Esq. (6255735)
**FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC**
10 W. State Steet, Suite 200
Geneva, IL 60134
kcc@fmcolaw.com
rmf@fmcolaw.com

*Interim Liaison Counsel for Plaintiffs*

Marc C. Gravino (6188531)
**WILLIAMSMCCARTHY LLP**
P.O. Box 219 Rockford, IL 61105
(815) 987-8936
mgravino@wilmac.com

*Interim Local Facilitating Counsel for Plaintiffs*

26