# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

IN RE: DEERE & COMPANY
REPAIR SERVICES
ANTITRUST LITIGATION

Case No. 3:22-cv-50188
MDL No. 3030
Hon. Iain D. Johnston

## OBJECTION TO FINAL APPROVAL OF PROPOSED SETTTLEMENT BY
## NAMED PLAINTIFF WILSON FARMS LAND AND CATTLE CO.

Basel J. Musharbash
Texas Bar No. 24111402

Catherine Larsen
Maryland Bar No. 2106150067

Reed Showalter
District of Columbia Bar No. 90024081

**ANTIMONOPOLY COUNSEL**
500 Clarksville Street
P.O. Box 795
Paris, Texas 75461
Phone: 903.212.3096
Email: basel@antimonopoly.us
catherine@antimonopoly.us
reed@antimonopoly.us
info@antimonopoly.us

*Attorneys for Wilson Farms
Land and Cattle Co.*

## TABLE OF CONTENTS

TABLE OF CONTENTS..........................................................................................2

TABLE OF AUTHORITIES ................................................................................ 4

INTRODUCTION ................................................................................................ 7

BACKGROUND................................................................................................. 10

I.    The Objector.........................................................................................10

    A.    Wilson Farms, a row crop farm owned and operated by Jared Wilson, is a member of the Settlement Class. ...........................................10

    B.    Wilson Farms is a Named Plaintiff in this action whom Class Counsel removed as a Class Representative because Mr. Wilson fulfilled his fiduciary duty and opposed the Proposed Settlement. ..11

    C.    Wilson Farms objects to the Proposed Settlement and intends to appear through counsel at the Fairness Hearing. ................................13

II.    Procedural History .............................................................................13

ARGUMENT ...................................................................................................... 15

I.    The Proposed Settlement provides inadequate relief to the Class................17

    A.    The strength of Plaintiffs' claims substantially outweighs the value of the Proposed Settlement's damages fund................................18

        1.    Plaintiffs' claims are substantial, meritorious, and supported by state and federal antitrust enforcement agencies............................... 19

        2.    The Proposed Settlement exchanges meritorious claims for less than Deere's probable cost of defense—as if they were frivolous claims...............................................................................................23

            a)    *The actual value of the Proposed Settlement's damages fund to the Class is likely to be in the $48 to $79 million range. ....................................................................................... 24*

            b)    *This value represents between 4.1% and 13.9% of the range of repair-labor overcharge damages estimated to be recoverable in this action by Class Counsel's own economic expert. ....................................................................................... 25*

c) When lost crops and other forms of damages suffered by the Class (but ignored by Class Counsel) are considered, the percentage of recoverable damages obtained by the Settlement becomes de minimis. ................................................. 27

3. The Plan of Allocation reduces the value of the Proposed Settlement damages fund by creating an impractical claims process that enables Deere to arbitrarily influence claim distribution. ............................................................................. 29

4. Given Deere's scale and the Proposed Settlement's broad release of claims, the Settlement's monetary payment will not deter Deere from engaging in the same or similar conduct going forward. ............ 31

B. The Proposed Settlement's injunctive component fails to provide effectual relief—adding negligible, if any, value to the Class. ............ 32

1. The Settlement Agreement fails to expand Class members' access to Repair Resources because Deere's "obligation" to provide access to the same under the Agreement is practically unenforceable. ......... 35

2. The Settlement Agreement contains carveouts that permit Deere to unilaterally remove essential Repair Resources from the Settlement's coverage. ............................................................. 38

3. The Settlement Agreement fails to restrain Deere from continuing to impose barriers and handicaps on independent repair providers. ....................................................................................... 42

4. The Settlement Agreement enhances Deere's power to appropriate valuable user data from Class members and impose data-related switching costs on Class members. ...................................................... 44

5. The Settlement Agreement's injunctive relief contains other structural weaknesses that further diminish its value to the Class. ............................................................................................... 46

II. If approved, the Proposed Settlement will wrongfully deprive farmers of the right to challenge Deere's repair monopoly for a generation without adequate remedy or compensation. ...................................................... 50

CONCLUSION .................................................................................................. 53

# TABLE OF AUTHORITIES

**CASES**

*1988 Tr. For Allen Child. Dated 8/8/88 v. Banner Life Inc. Co.*, 28 F.4th 513, 521 (4th Cir. 2022) .................................................................................................................. 15

*Amchem Prods. v. Windsor*, 521 U.S. 591, 597 (1997) ............................................................ 17

*Arata v. Nu Skin Int'l, Inc.*, 96 F.3d 1265, 1268 (9th Cir. 1996) ............................................ 47

*California v. Am. Stores*, 495 U.S. 271, 284 (1990) ................................................................. 32

*Eastman Kodak Co. v. Image Tech Services Inc.*, 504 U.S. 451 (1992) ................................... 19

*Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947) ........................................................ 32

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 860 n.34 (1999) ...................................................... 30

*Crawford v. Equifax Payment Services, Inc.*, 201 F.3d 877, 880 (7th Cir. 2000) ................... 51

*Fletcher v. City of Fort Wayne*, 162 F.3d 975, 976 (7th Cir. 1998) .................................... 22, 26

*Ford Motor Co. v. United States*, 405 U.S. 562, 577 (1972) .................................................... 32

*In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 752-53 (7th Cir. 2011) ............................ 31

*In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1132 n.44 (7th Cir. 1979) .................................................................................................................. 16

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*, 827 F.3d 223, 241 (2d Cir. 2016) .................................................................................................. 51

*In re Subway Footlong Sandwich Mktg. & Sales Practices Litig.*, 869 F.3d 551 (7th Cir. 2017) .................................................................................................................. 9, 16, 31

*Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 381 (1994) ............................................. 47

*Mars Steel Corp. v. Continental Illinois Nat. Bank & Trust Co. of Chicago*, 834 F.2d 677 (7th Cir. 1987) .................................................................................................................. 21

*Maryland v. United States*, 460 U.S. 1001 (1983) .................................................................. 32

*Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781 (7th Cir. 2004) .................................... 15, 22, 50

*Mirfasihi v. Fleet Mortg. Corp.*, 450 F.3d 745 (7th Cir. 2006) ............................................... 15

*Pearson v. NBTY*, 772 F.3d 778 (7th Cir. 2014) ......................................................... 15, 22, 27

*Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014) ............................................ 15, 22

*Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717 (7th Cir. 2004) ............................ 20

*Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277 (7th Cir. 2002) ................................. 16, 17, 21

*Synfuel Techs., Inc. v. DHL Express (USA) Inc.*, 463 F.3d 646 (7th Cir. 2006) ......... 16, 17, 31

*United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131 (D.D.C. 1982) .................................. 32

*United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001) .................................... 32

*United States v. United Shoe Mach. Corp.*, 391 U.S. 244 (1968) ........................................... 32

*Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629 (7th Cir. 2011) ................................. 51

*Wong v. Accretive Health, Inc.*, 773 F.3d 859 (7th Cir. 2014) .............................................. 15

## STATUTES

Neb. Rev, Stat. § 84-712.05 (2026) ...................................................................................... 45

15 U.S.C. § 15(a) (2000)……………………………………………………………………..25

## RULES

Fed. R. Civ. P. 23(e)(2) ....................................................................................................... 29

Fed. R. Civ. P. 23(e)(2) ....................................................................................................... 28

Fed. R. Civ. P. 23(e)(2). ...................................................................................................... 14

Rule 23(e)(5)(a) .................................................................................................................. 15

Rule 26(a)(1)(A)(iv) ............................................................................................................ 30

Rule 30(b)(6) Dep. of Deere & Co. (Kent Brown) ................................................................ 34

## OTHER AUTHORITIES

*The Average Life Expectancy of a John Deere Tractor is Longer than You Think,* TELLUS
    EQUIPMENT (June 1, 2026) ........................................................................................... 46

*AEM, EDA Announce Statement of Principles on 'Right to Repair,'* FORAGE INDUSTRY NEWS
    (Feb. 28, 2018) ............................................................................................................ 33

Mike Scarcella, *Apple Seeks $73.4 Mln in Fees from Epic Games Antitrust Fight*, REUTERS
    (Jan. 17, 2024) ............................................................................................................ 22

*Epic Asks $217M in Fees for App Store Suit, Google to Appeal*, DAILY JOURNAL (Aug. 26, 2025)
    ................................................................................................................................... 22

U.S. DEP'T OF AGRIC. NAT'L AGRIC. STATISTICS SERV., FARMS AND LAND IN FARMS: 2025 SUMMARY, (Feb. 2026) ............................................................................. 24

Eriq Gardener, *How Ticketmaster's Legal Nemesis Will Make Millions*, PUCK (June 16, 2026) ............................................................................................................................... 22

*John Deere Operations Center PRO Service License Agreement*, § 3(A)(2) ("Feedback, Usage Information, and Content"), § 4(D)(2) ("How We Use Your Information") ......................... 43

*PowerGard™ Protection Plans for Agriculture & Turf Equipment*, DEERE.COM .................. 46

Jonathan M. Gitlin, *John Deere Relents, Says Farmers Can Fix Their Own Tractors After All*, ARS TECHNICA (Jan. 9, 2023) ...................................................................................... 33

Kevin O'Reilly, U.S. PIRG, *Out to Pasture: Repair Restrictions Lead to Downtime and Higher Repair Costs. Right to Repair Would Help.* (2023).............................................................. 27

Khan, Levine & Nguyen, *After Notice and Choice: Reinvigorating "Unfairness" to Rein in Data Abuses*, 77 STAN. L. REV 1375 (2025) ......................................................... 44

Kyle Wiens (@kwiens), X (Apr. 14, 2025, 4:44 AM) ..................................................... 42

Memorandum of Understanding Between American Farm Bureau Federation and John Deere (Jan. 8, 2023) ....................................................................................................... 33

Michael Potuck, *Apple Comes Under Fire for Independent Repair Program Contract that Lawyers are Calling 'Crazy,'* 9TO5MAC (Feb 6. 2020) ........................................................ 42

Nilay Patel, John Deere Turned Tractors into Computers–What's Next?, VERGE (Jun. 15, 2021) ........................................................................................................................... 33

Deere & Co., Press Release, Deere Reports Net Income of $1.065 Billion for Fourth Quarter, $5.027 Billion for Fiscal Year (Nov. 26, 2025)................................................................. 30

Rajesh Kumar Singh, *Deere bets on cost cuts, services push to boost profits*, Reuters (Jan. 8. 2020) ............................................................................................................................. 30

*Supporting Our Customers' Right to Safely Repair Their Equipment¸* DEERE.COM............. 33

*USB-Link 3 Wireless Machine Interface Kit*, DEERE.COM....................................................... 36

Wright & Miller, 7B Fed. Prac. & Proc. Civ. § 1797.1 (3d. ed. 2026) .................................... 15

# INTRODUCTION

The Proposed Settlement concerns one of the most important antitrust cases in the Nation. Over the past two decades, Deere & Company ("**Deere**") has worked with its dealer network to acquire and maintain a monopoly in the repair-services aftermarket for Deere-branded tractors, combines, and other large agricultural equipment. Since Deere is the dominant manufacturer of large agricultural equipment in the United States by far, its competitors have followed its lead in this regard—working with their own dealer networks to build and maintain their own monopolies over their own equipment's repair aftermarkets. Deprived of the right to repair their equipment or utilize the independent repair providers of their choice by this parallel monopolization, America's farmers have become dependent on the whim of these distant corporations and their agents for access to repair tools, repair services, and replacement parts. The cost in dollars and cents is immense: Deere's monopolistic conduct has been estimated to cost the Nation's farmers hundreds of millions of dollars in overcharges for repair services annually—and billions of dollars in crops and harvests lost while farmers wait for Deere and its dealerships to provide the services and parts they need. The cost in loss of independence and liberty to our farmers and our rural communities is incalculable.

Four years ago, Wilson Farms Land and Cattle Co. ("**Wilson Farms**"), a row crop farm owned and operated by Jared Wilson ("**Mr. Wilson**"), became a Named Plaintiff in this landmark class action to make sure that the claims of the farmers and other absent members of the Class were pursued vigorously and with *their* best interest in mind. Mr. Wilson is objecting to the Proposed Settlement now because the approval of this Settlement would cause manifest injury to the interests of every farmer in America (and every other member of the Class). By extinguishing farmers' rights of action against Deere's monopolization of

---

repair markets for a slap-on-the-wrist in damages and ineffectual injunctive "relief" seemingly designed to prove meaningless in practice, the Settlement Agreement will strengthen Deere's repair monopoly instead of dismantling it—and leave farmers' defenseless against Deere's abuse of that monopoly going forward. To add insult to injury, Class Counsel's filings suggest they are likely to seek $51 million in attorney's fees and costs out of the Settlement Fund—a prospect that would put more than half the entire amount Deere is paying for the Proposed Settlement into the pockets of Class Counsel.[1] Meanwhile, the average member of the Class will get, at best, a $400 check, remain under Deere's thumb, and see no meaningful change in their independence to repair their equipment. As a Named Plaintiff in this action—and, until his removal by Class Counsel for opposing this dangerous Settlement, a putative Class Representative—with a duty to protect the interests of his fellow Class members, Mr. Wilson cannot stand by and allow this miscarriage of justice to proceed.

When a class-action settlement does not provide "effectual relief" to the class and its "principal effect" appears to be to "induce the defendants to pay the class's lawyers enough to make them go away," it cannot be held to satisfy the standards of adequate-relief and adequate-representation required for approval under Rule 23(e).[2] In this brief, Wilson Farms focuses on the former—demonstrating that the Proposed Settlement fails to provide adequate relief to the Class in light of the strength of Plaintiffs' claims. However, the terms of the Proposed Settlement and the proceedings leading up to it also raise serious concerns about

---

[1] Under Seventh Circuit precedent, a settlement that distributes more funds in attorney's fees and costs to class counsel than it distributes in claims to class members is presumptively unreasonable. *See In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*, 867 F.3d 791 (7th Cir. 2017); *Pearson v. NBTY, Inc.*, 772 F.3d 778, 780-82 (7th Cir. 2014); *Redman v. RadioShack Corp.*, 768 F.3d 622, 630-31 (7th Cir. 2014).

[2] *In re Subway Footlong Sandwich Mktg. & Sales Practices Litig.*, 869 F.3d 551, 556 (7th Cir. 2017).

---

self-dealing and inadequate representation by Class Counsel. Accordingly, Wilson Farms intends to file a supplemental brief addressing these important issues within thirty days. For now, however, Wilson Farms submits that the Proposed Settlement is not "fair, adequate, or reasonable" and cannot be approved under Rule 23(e) for the following reasons.

First, the Proposed Settlement's monetary recovery represents a diminutive fraction of the damages potentially available at trial, grossly undercompensating Class members with claims for repair-labor overcharge damages and excluding Class members with disparate claims for consequential lost-crop damages from recovery altogether. Indeed, the Proposed Settlement's monetary recovery is *so* diminutive that it would allow Deere to extinguish the Class's claims—meritorious claims that overcame a motion for judgment on the pleadings from Deere and have been supported by state and federal antitrust enforcers—by paying less in damages than Deere would likely pay to defend the case through trial. Finally, as if to add insult to injury, the Proposed Settlement establishes a methodology for distributing what little recovery it obtains among Class members that is unlikely to accurately compensate those harmed by Deere's conduct—and that will enable Deere to arbitrarily influence claim allocation to boot.

Second, while Class Counsel have (mis)represented to the Court that the Proposed Settlement provides sweeping injunctive relief, a disinterested examination of the injunctive provisions of the Settlement Agreement reveals that they are seemingly d. esigned to be wholly ineffectual. As detailed below, the injunctive provisions of the Proposed Settlement will neither restrain Deere from continuing to engage in the same or similar anticompetitive conduct nor otherwise limit Deere's ability to maintain the same or similar repair-services monopoly. Perversely, the Proposed Settlement appears likely to benefit Deere at the expense of the Class—by legitimizing the core tools with which Deere maintains and exploits its re-

---

**OBJECTION TO PROPOSED SETTLEMENT**              **PAGE 9 OF 53**
**BY WILSON FARMS LAND AND CATTLE CO. LLC**

pair-services monopoly, and requiring Class members to continue doing business with Deere in order to "benefit" from the Settlement's terms.

Despite these shortcomings, the Settlement Agreement would require Class members to release a sweeping range of diverse and disparate claims — most being unlitigated and uncompensated — and thereby terminate Class members' ability to collectively challenge Deere's repair aftermarket monopolization for a generation. In other words, rather than provide any meaningful benefit to the Class, it appears that the Proposed Settlement's most important effect will be to give Deere its most powerful tool yet in its decades-long effort to block farmers from repairing their own equipment: *res judicata* extinguishment of farmers' rights under the law.

For these reasons and the reasons stated in Wilson Farms' forthcoming supplemental brief, Wilson Farms urges the Court to deny approval of the Proposed Settlement.

# BACKGROUND

## I.   The Objector

### A. Wilson Farms, a row crop farm owned and operated by Jared Wilson, is a member of the Settlement Class.

Wilson Farms is a Missouri limited liability company owned and operated by Jared Wilson. Wilson Farms operates a row-crop farm on approximately 3,100 acres in Butler, Missouri, where Mr. Wilson grows corn and soybeans.

Wilson Farms is a member of the Settlement Class. Wilson Farms owns at least one Deere tractor and has purchased Deere Repair Services from at least three Deere-affiliated dealerships during the relevant period for the Settlement Class.[3] Wilson Farms principal

---

[3] Wilson Decl. ¶ 6, Exhibit A.

**OBJECTION TO PROPOSED SETTLEMENT**                                    **PAGE  10 OF 53**
**BY WILSON FARMS LAND AND CATTLE CO. LLC**

place of business and current mailing address is located at 4608 205th Street, Belton, Missouri, 64012. Mr. Wilson's phone number is (660) 424-0213, and his email address is jarednw@gmail.com.

### B. Wilson Farms is a Named Plaintiff in this action whom Class Counsel removed as a Class Representative because Mr. Wilson fulfilled his fiduciary duty and opposed the Proposed Settlement.

On January 19, 2022, Mr. Wilson entered into a Representation Agreement with Gustafson Gluek to bring antitrust claims against Deere in connection with its repair restrictions.[4] As a result, Wilson Farms later became a Named Plaintiff in this class action. Mr. Wilson learned of potential settlement negotiations via email on October 3, 2025, when Class Counsel sought his input on a list of injunctive terms they planned to use as their initial position in settlement negotiations with Deere.[5] On October 27, 2025, Mr. Wilson responded to Class Counsel with detailed concerns about these terms, which he made clear would provide negligible relief to the Class.[6]

Following this exchange, Class Counsel became adversarial toward Mr. Wilson. Over the course of the next several months, Mr. Wilson—in keeping with his duties as a Class Representative—respectfully explained to Class Counsel how the injunctive terms of the settlement they were negotiating would disserve the Class.[7] Class Counsel ignored his concerns. When Class Counsel finally shared the negotiated Settlement Agreement itself with Mr. Wil-

---

[4] Wilson Decl. ¶ 8, Exhibit B.

[5] Wilson Decl. ¶ 12.

[6] Wilson Decl. ¶ 13.

[7] Wilson Decl. ¶ 14-15.

---

**OBJECTION TO PROPOSED SETTLEMENT**                                    **PAGE 11 OF 53**
**BY WILSON FARMS LAND AND CATTLE CO. LLC**

son on March 9, 2026, Mr. Wilson found it reflected the very same deficiencies Mr. Wilson had warned Class Counsel about.[8]

On April 1, 2026, Class Counsel notified Mr. Wilson that they would imminently file a motion seeking preliminary approval of the Settlement Agreement.[9] Class Counsel filed that motion with the Court on April 6, 2026. As a result of Mr. Wilson's opposition to the Settlement Agreement, Class Counsel removed Wilson Farms as a Class Representative for the purposes of the Settlement Agreement via a footnote in its preliminary-approval brief.[10] On April 8, 2026, two days *after* Class Counsel filed its motion seeking preliminary approval of the Settlement Agreement, Class Counsel notified Mr. Wilson that they were ceasing their representation of Wilson Farms in the class action.[11] Curiously, however, Class Counsel have yet to file a motion with the Court to withdraw as Wilson Farm's attorneys in this action.

On May 14, 2026, through undersigned counsel, Mr. Wilson sent Class Counsel a comprehensive letter explaining how the Settlement Agreement fails to deliver meaningful relief to the Class while strengthening Deere's monopoly, and therefore cannot satisfy the standard for preliminary or final approval.[12] Class Counsel did not disclose this letter or its contents to the Court at the preliminary approval hearing on May 15, 2026, nor did they respond to it.[13]

---

[8] Wilson Decl. ¶ 17.

[9] Wilson Decl. ¶ 18.

[10] *See* Memorandum of Law in Support of Mot. ("Memo of Law"), Dkt. No. 331-1, at 1 n.1.

[11] Wilson Decl. ¶ 20.

[12] Wilson Decl. ¶ 22, Exhibit D.

[13] Wilson Decl. ¶ 22.

---

**C. Wilson Farms objects to the Proposed Settlement and intends to appear through counsel at the Fairness Hearing.**

Wilson Farms will be harmed by the Settlement Agreement, and objects to its approval individually, on behalf of the Settlement Class as a whole, and on behalf of the members of the Class with claims against Deere for lost-crop damages and for injunctive relief. Neither Mr. Wilson nor his undersigned counsel have previously objected to a class-action settlement in the United States. They are doing so in this important case because approval of the Settlement Agreement would cause manifest injury to the Nation's farmers and every other absent member of the Settlement Class.

Wilson Farms intends to appear through counsel at the Fairness Hearing on October 29, 2026. Wilson Farms reserves the right to request discovery in advance of the Hearing, to present its own witnesses, experts, exhibits, and affidavits at the Hearing, and to make use of all documents entered on the docket by any party or objector. Wilson Farms also reserves the right to cross-examine witnesses who testify in support of the Settlement Agreement's final approval. Wilson Farms joins any objections not inconsistent with the objections herein.

## II. Procedural History

The Court is well-acquainted with the development of this case. Plaintiffs filed their consolidated class action complaint in November 2022.[14] In that complaint, Plaintiffs alleged that Defendant Deere & Company ("**Deere**"), in conspiracy with its authorized dealerships, unlawfully monopolized and restrained the market for repair and maintenance services for Deere tractors.[15] Specifically, Plaintiffs alleged that Deere designed its equipment so that

---

[14] Consolidated Class Action Complaint ("Compl.")., Dkt. No. 85.

[15] *Id.* ¶¶ 58–63.

---

**OBJECTION TO PROPOSED SETTLEMENT**  
**BY WILSON FARMS LAND AND CATTLE CO. LLC**

diagnosing and performing certain repairs and maintenance requires access to proprietary software and other informational resources controlled by Deere and its dealers.[16] Deere then restricted access to these resources to authorized dealerships and withheld them from farmers and independent repair providers, limiting competition in the repair market.[17] Plaintiffs alleged that this conduct violates Sections 1 and 2 of the Sherman Act.[18]

On December 8, 2022, Defendants moved for judgment on the pleadings.[19] On February 14, 2023, the Department of Justice Antitrust Division filed a Statement of Interest opposing Deere's motion for judgment on the pleadings.[20] The Court denied Deere's motion on November 27, 2023.[21]

On April 6, 2026, Class Counsel filed a motion seeking approval of the proposed Settlement Agreement and certification of a proposed Settlement Class.[22] On May 18, 2026, the Court issued an Order granting preliminary settlement approval and certifying the proposed Settlement Class.[23]

---

[16] *Id.* ¶ 79.

[17] *See, e.g., id.* ¶¶ 4–5, 7–16, 72–92.

[18] *See, e.g., id.* ¶¶ 4, 72–87, 237.

[19] Deere's Mot. for Judgment on the Pleadings, Dkt. No. 104.

[20] Statement of Interest of the United States, Dkt. No. 120.

[21] Memorandum Opinion and Order, Dkt. No. 159.

[22] Plaintiffs' Mot. For Prelim. Approval of the Settlement with Defendant Deere & Co., Certification of the Proposed Settlement Class, and Related Relief ("Mot."), Dkt. No. 333

[23] Order Preliminarily Approving Settlement with Defendant Deree & Co., Certifying the Proposed Settlement Class, Approving the Plan to Notify the Settlement Class, and Providing Related Relief ("Order"), Dkt. No. 340.

---

# ARGUMENT

To prevail on a motion for final approval of a class settlement, the proponents of the settlement must prove that the settlement is "fair, reasonable, and adequate."[24] To do so, the movants must demonstrate that: (1) "the class representatives and class counsel have adequately represented the class"; (2) "the proposal was negotiated at arm's length"; (3) the proposed relief is adequate; and (4) the "proposal treats class members equitably relative to each other."[25] The proponents of a class settlement bear the burden of proving its compliance with each of these elements.[26] Moreover, when timely objections identify potential defects in a proposed settlement in accordance with Rule 23(e)(5)(a), the settlement's proponents must respond to each objection and show that it does not demonstrate the settlement's failure to satisfy Rule 23(e)'s requirements.[27]

"Because class actions are rife with potential conflicts of interest between class counsel and class members," the Seventh Circuit does not permit district courts to apply a presumption of fairness to proposed class-action settlements or otherwise defer to their proponents.[28] As the Seventh Circuit has repeatedly emphasized in recent years, class counsel al-

---

[24] Fed. R. Civ. P. 23(e)(2).

[25] Fed. R. Civ. P. 23(e)(2). While the four elements listed in Rule 23(e)(2) identify "the core concerns of procedure and substance that should guide the decision whether to approve" a proposed settlement or not, Fed. R. Civ. P. 23(e)(2) (advisory committee note of 2018), the Court's evaluation of the Proposed Settlement may also be informed by up to seven additional factors identified in Seventh Circuit precedent. *See Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863 (7th Cir. 2014). These factors include, *inter alia*, "the amount of opposition to the settlement" and "the reaction of members of the class to the settlement." *Id.*

[26] *See* Wright & Miller, 7B Fed. Prac. & Proc. Civ. § 1797.1 (3d. ed. 2026) ("In all cases, the burden is on the proponents of a settlement to show that it meets the standards of fairness, reasonableness, and adequacy.").

[27] *1988 Tr. For Allen Child. Dated 8/8/88 v. Banner Life Inc. Co.*, 28 F.4th 513, 521 (4th Cir. 2022).

[28] *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 785 (7th Cir. 2004) (collecting cases); *see also Pearson v. NBTY*, 772 F.3d 778, 787 (7th Cir. 2014) (quoting *Armstrong v. Bd. of Sch. Directors of City of Mil-*

---

**OBJECTION TO PROPOSED SETTLEMENT**
**BY WILSON FARMS LAND AND CATTLE CO. LLC**

ways have a strong economic incentive "to sell out the class by agreeing with the defendant to recommend" the approval of a settlement that provides "a meager recovery for the class but generous compensation for the lawyers."[29] Since that kind of bad-faith settlement is the one that "promotes the self-interest of both class counsel and the defendant and is therefore optimal from the standpoint of their private interests," the Seventh Circuit requires "district courts [to] exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions" to ensure they are "fair, adequate and reasonable, and not a product of collusion."[30] For in evaluating a proposed class-action settlement under Rule 23(e), "the district

---

*waukee,* 616 F.2d 305, 315 (7th Cir. 1980)) (disapproving *Armstrong* instruction that a class-action settlement is a "bargained exchange between litigants" like any other settlement, and that district courts should therefore limit their Rule 23 settlement-approval inquiries to the "minimum necessary" and "not substitute their own judgment … for the judgement of the litigants and their counsel"); *Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014) (explaining that, because the settlement stage of a class action lacks "genuine adverseness" between the parties and is rife with conflicts of interest between class counsel and class members, courts reviewing proposed class settlements may not "assume a passive role" or "rubber stamp" their approval).

[29] *E.g.*, *Eubank v. Pella Corp.,* 753 F.3d 718, 720 (7th Cir. 2014). This alignment between defendant and class counsel is driven by their inherent economic interests. *In re Trans Union Corp. Priv. Litig.*, 629 F.3d 741, 742–43 (7th Cir. 2011) (noting the "positive sum" relationship between defendants and class counsel). On the one hand, the defendant in a class action is "interested only in the bottom line: how much a settlement will cost him" overall, not in how it is distributed between attorney's fees and claim payments. *Redman v. RadioShack Corp.,* 768 F.3d 622, 629 (7th Cir.2014). On the other hand, class counsel is "interested primarily in the size of the attorney's fee" that they will draw from the settlement, which is ultimately the only money that class counsel gets to keep from the case. *Id.* As a result, class counsel "may [well] be willing to settle for less for the class if the defendants will [agree to] help them obtain a generous fee award," and the defendant "will [certainly] be happy to help them [do so] if the sum of the fee award and the relief granted to the class [under this collusive arrangement] is smaller than it would be" were counsel to push "for more generous relief for the class." *In re Trans Union Corp. Priv. Litig.*, 629 F.3d 741, 742–43 (7th Cir. 2011); *see also, e.g.*, *Redman v. RadioShack Corp.,* 768 F.3d 622, 629 (7th Cir.2014) (providing similar analysis); *Pearson v. NBTY, Inc.,* 772 F.3d 778, 787 (7th Cir. 2014) (same); *In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 711–12 (7th Cir. 2015) (same). For these actors, but not for class members, the "optimal settlement" is likely to be "a moderate sum favorable to the defendant but disbursed mostly [or, at least, disproportionately] to class counsel." *In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 711–12 (7th Cir. 2015).

[30] *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 652–53 (7th Cir. 2006) (quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002)); *see also, e.g.*, *Mirfasihi v. Fleet Mortg.*

---

judge functions as a fiduciary of the class," and must independently scrutinize class counsel's conduct and the terms of the proposed settlement to fulfill "the high duty of care that the law requires of fiduciaries."[31]

## I. The Proposed Settlement provides inadequate relief to the Class.

The "most important factor relevant to the fairness of a class action settlement" is "the strength of the plaintiff's case on the merits balanced against the [relief] offered in the settlement."[32] Therefore, the Court should begin its review by "quantify[ing] the net expected value of continued litigation to the class."[33] This requires the Court to "estimat[e] the range of possible outcomes and ascrib[e] a probability to each point on the range."[34] Although it is true that "[a] high degree of precision cannot be expected in valuing a litigation," the Court may not "substitute intuition for evidence and careful analysis."[35] Nor may the Court simply accept the assertions of class counsel at face value.[36] It must "insis[t] that the parties present evidence that would enable possible outcomes to be estimated," so that the Court can at least formulate its own "ballpark valuation." *Id.*

---

*Corp.*, 450 F.3d 745, 748 (7th Cir. 2006) (same); *In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.*, 869 F.3d 551, 555 (7th Cir. 2017) (same).

[31] *See Mirfasihi v. Fleet Mortg. Corp.*, 450 F.3d 745, 748 (7th Cir. 2006); *see also, e.g.*, *In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.*, 869 F.3d 551, 555 (7th Cir. 2017) (same).

[32] *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1132 n.44 (7th Cir. 1979).

[33] *See Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 284-85 (7th Cir. 2002).

[34] *See Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 285 (7th Cir. 2002).

[35] *See Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 283, 285 (7th Cir. 2002); *see also Amchem Prods. v. Windsor*, 521 U.S. 591, 597 (1997) (explaining the standards of Rule 23 are intended to prevent class-related decisions from being based "upon the court's gestalt judgment or overarching impression of the settlement's fairness").

[36] *See Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (overturning approval of class settlement, in part, because district court simply "accepted class counsel's contentions" even though they were "largely unsupported by any evidence or analysis").

---

### A. The strength of Plaintiffs' claims substantially outweighs the value of the Proposed Settlement's damages fund.

The Complaint seeks compensation for hundreds of millions of dollars in repair over-charges and billions of dollars in other direct and consequential damages resulting from Deere's alleged monopolization of repair aftermarkets for its large agricultural equipment. Plaintiffs' claims rest on well-established antitrust theory, survived a comprehensive motion for judgement on the pleadings by Deere, and are bolstered by parallel federal and state enforcement actions. In short, Plaintiffs' claims clearly have substantial merit. But the Proposed Settlement does not treat them as such. Instead, the Proposed Settlement allows Deere to extinguish these claims by paying less in damages than Deere would likely have paid to defend the case had it gone to trial—effectively treating the Class's meritorious claims as if they had nothing more than nuisance value. That should be enough to cast doubt on the Proposed Settlement's fairness, but its actual value proposition to the Class is even worse.

The actual benefit that Class members are likely to receive from the Proposed Settlement is substantially lower than its top-line damages figure suggests. Based on Class Counsel's filings so far, it appears that more than half of the Proposed Settlement's damages fund is likely to be distributed to Class Counsel and its chosen Settlement Administrator before Class members receive anything from it. Then, what remains in the Settlement Fund is set to be distributed to the Class through an impractical plan of allocation that allows Deere to arbitrarily influence claim distributions, further diluting its value to Class members. Finally, to add insult to injury, because Deere's monetary payment under the Settlement equals only a negligible fraction of the monopolistic repair-related profits Deere (allegedly) obtained over the Class period, the Proposed Settlement will embolden Deere to continue engaging in the same or similar anticompetitive conduct—with proof in hand that it can simply buy out class actions that seek to challenge it.

Together, these elements demonstrate that the Proposed Settlement's damages component fails to bear a defensible relationship to the strength of Plaintiff's claims.

### 1. Plaintiffs' claims are substantial, meritorious, and supported by state and federal antitrust enforcement agencies.

On December 8, 2022, Deere answered Plaintiffs' Complaint, denying the allegations and asserting affirmative defenses.[37] Deere simultaneously moved for judgment on the pleadings, arguing that Plaintiffs lacked standing, had not plausibly pleaded a relevant market, and failed to allege claims under the Sherman Act.[38] On February 14, 2023, the Department of Justice Antitrust Division filed a Statement of Interest opposing Deere's motion, stating that "[t]his suit affects the United States' interest in promoting a correct interpretation of federal antitrust laws."[39] On November 27, 2023, the Court issued an 89-page opinion denying Deere's motion for judgment on the pleadings.[40]

The Court first concluded that Plaintiffs had adequately alleged Article III standing, rejecting Deere's contention that Plaintiffs had not plausibly alleged an injury traceable to Deere's conduct.[41] The Court further held that Plaintiffs' antitrust claims were not barred by the direct-purchaser rule established in *Illinois Brick*.[42] On the merits, the Court found that Plaintiffs had plausibly alleged both a relevant primary market and a relevant single-brand aftermarket,[43] and that each substantive count in the Complaint stated a plausible basis for

---

[37] Dkt. No. 103.

[38] *See* Dkt. Nos. 104, 105.

[39] Dkt. No. 120 at 1.

[40] Dkt. No. 159.

[41] *Id*. at 10–13.

[42] *Id*. at 13–23.

[43] *Id.* at 39–61.

---

relief.[44] That ruling did not guarantee success at trial, but it certainly confirmed that Plaintiffs' claims had substantial merit. Notably, the Court's decision found that, based on the allegations in the Complaint, Plaintiffs' could succeed on their *Kodak*-based claims under either a "lack-of-knowledge" standard or the heightened "policy-change" standard adopted in some other Circuits.[45]

Instead of properly contending with the merits of Plaintiffs' case, Class Counsel's approval briefing mostly tries to justify the Settlement simply by pointing to the generalized risk of continued litigation, stating that "there was no guarantee [Plaintiffs] would prevail at subsequent fact-finding stages imposing more rigorous burdens of proof or on appeals."[46] Since this observation is true of nearly every case, it does not tell us much about the risk of loss in this *particular* case. Ultimately, Class Counsel come slightly closer to offering a case-specific analysis by claiming that antitrust lawsuits based on a "single brand aftermarket theory" are "rare," and that "the Seventh Circuit has not yet articulated a standard for determining the contours of the primary market for a claim based on a single brand aftermarket."[47] This argument makes little sense, however. To begin with, as the Court implied in its opinion on Deere's motion, no Circuit has articulated a special standard for defining the primary market for a *Kodak* claim—because none is required.[48] Plaintiffs routinely bring *Kodak*-based claims that define the primary market in the various ways that any relevant market

---

[44] *Id.* at 61–89.

[45] *Id.* at 48-61.

[46] Dkt. No. 333-1 at 12.

[47] *Id.* at 12-13.

[48] *Id.* at 42 (explaining that there is not "any persuasive authority from any other court" providing a special standard for defining the primary market for a *Kodak* claim).

---

**OBJECTION TO PROPOSED SETTLEMENT**　　　　　　　　　　**PAGE 20 OF 53**
**BY WILSON FARMS LAND AND CATTLE CO. LLC**

can be defined under the antitrust laws.[49] The Seventh Circuit has, however, articulated a standard for establishing a relevant market through direct evidence of market power, which is more amenable to Plaintiffs' claims in this action, and which the Court, the Antitrust Division, and Plaintiffs previously agreed "is appropriate for a claim based on a single-brand aftermarket."[50]

In other words, the Seventh Circuit is more, not less, hospitable to Plaintiffs' claims than other Circuits, as the Antitrust Division argued in its Statement of Interest.[51] Even if this Seventh Circuit standard did not exist, however, there would still be the Supreme Court's guidance in *Eastman Kodak Co. v. Image Tech Services Inc.*,[52] which the Complaint itself relies on.[53] Yet Class Counsel fails to address *Kodak* in its filings seeking preliminary approval and, in fact, does not cite the case at all in those documents. Neither does Class Counsel address or cite the Seventh Circuit's *Republic Tobacco* decision on defining a relevant market with direct evidence of market power. Class Counsel's abandonment of some of its strongest arguments in its presentation of the Settlement Agreement to the Court reflects a failure to adequately characterize the merits of Plaintiffs' case.

To be sure, Mr. Wilson does not contend that continued litigation carries no risk or that those risks should be ignored. The relevant question is whether the Settlement Agree-

---

[49] *See, e.g.*, *In re Apple & AT&T Antitrust Litig.*, 596 F. Supp. 2d 1288, 1303 (N.D. Cal. 2008) (holding that the plaintiffs "sufficiently alleged . . . claim under § 2 of the Sherman Act" by alleging "an aftermarket for iPhone and voice and data services that would not exist without the primary market for iPhones" without relying on any special considerations in *Kodak*).

[50] *Id.* at 42 (quoting *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 738 (7th Cir. 2004).

[51] *See* Dkt. No. 120 at 14-17.

[52] 504 U.S. 451 (1992).

[53] Compl. ¶ 223.

---

**OBJECTION TO PROPOSED SETTLEMENT**         **PAGE 21 OF 53**
**BY WILSON FARMS LAND AND CATTLE CO. LLC**

ment discounts the value of Plaintiffs' claims based on the *actual* risks they face. To be "fair to the plaintiffs in a substantive sense," a class settlement must "giv[e] them the expected value of their claim if it went to trial, net of the costs of trial."[54] General references to uncertainty paired with mischaracterizations of governing caselaw cannot substitute for the careful, evidence-based analysis of the value of continued litigation required to test the fairness of the Proposed Settlement under this Circuit's precedent.[55]

Independent enforcement activity also undercuts any suggestion that Plaintiff's case is facially weak and deserves a substantial discounting from litigation risk, let alone to be settled for mere nuisance value. In January 2025, the Federal Trade Commission (FTC), along with several state attorneys general, filed an antitrust suit against Deere for the same conduct underlying this case. *Federal Trade Commission, et al. v. Deere & Co.*, No. 3:25-cv-50017 (N.D. Ill.). On May 14, 2026, an Illinois-based landscaping company filed a parallel class action suit related to Deere's repair restrictions on its construction and forestry equipment. *Christy Webber & Co. v. Deere & Co.*, No. 1:26-cv-05637 (N.D. Ill.). While these cases do not prove Deere's liability here, but they do provide independent corroboration of the strength and seriousness of the claims in this case.

The weight of this analysis is made more serious by the scope of the alleged damages here. That gap is made even more substantial when considering the wider damages from lost crops, anticompetitively priced repair parts, license fees, and other monetary harms to the class. As it stands the Proposed Settlement provides no treatment for these substantial ele-

---

[54] *Mars Steel Corp. v. Continental Illinois Nat. Bank & Trust Co. of Chicago*, 834 F.2d 677, 682 (7th Cir. 1987).

[55] *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 283 (7th Cir. 2002) (admonishing that, in reviewing class settlements under Rule 23, district courts must not "pain[t] with too broad a brush" or "substitute[e] intuition for the evidence and careful analysis").

---

**OBJECTION TO PROPOSED SETTLEMENT**
**BY WILSON FARMS LAND AND CATTLE CO. LLC**

ments of the Class's damages. The Court must determine whether specifically-identified, case-specific litigation risks—beyond the mere existence of risk—justify the Proposed Settlement's severe discounting of Plaintiffs' meritorious claims.

### 2. The Proposed Settlement exchanges meritorious claims for less than Deere's probable cost of defense—as if they were frivolous claims.

The Seventh Circuit has a working definition for a settlement this small, and it is not a flattering one. "A compromise for less than the costs of defense is a good working definition of a nuisance-value settlement," the kind of payment a defendant makes only to make a frivolous claim disappear.[56] Defending a single-brand-aftermarket monopolization case through trial and appeal costs a fortune: Apple reported spending roughly $83 million to fight Epic's App Store claims, Epic sought more than $217 million in fees after beating Google, and the lawyers who took on Live Nation and Ticketmaster staked tens of millions on the result.[57] The cost of Deere's defense would likely run to the same order of magnitude. Yet after Class Counsel's fees and expenses, the Class's net recovery under the Proposed Settlement would likely land somewhere between $48 and $78 million—a sum that falls at or below what Deere would spend to litigate this case to judgement. The Class is being asked to give up its claims for less than the price of Deere's continued defense. That is the price of a frivolous suit. As

---

[56] *Fletcher v. City of Fort Wayne*, 162 F.3d 975, 976 (7th Cir. 1998).

[57] *See Apple Seeks $73.4 Mln in Fees from Epic Games Antitrust Fight*, Reuters (Jan. 17, 2024), https://www.reuters.com/legal/transactional/apple-seeks-734-mln-fees-epic-games-antitrust-fight-2024-01-17/; *Epic Asks $217M in Fees for App Store Suit, Google to Appeal*, Daily Journal, https://www.dailyjournal.com/article/387247-epic-asks-217m-in-fees-for-app-store-suit-google-to-appeal; *How Ticketmaster's Legal Nemesis Will Make Millions*, Puck, https://puck.news/how-ticketmasters-legal-nemesis-will-make-millions/.

---

**OBJECTION TO PROPOSED SETTLEMENT**　　　　　　　　　　　　　**PAGE  23 OF 53**
**BY WILSON FARMS LAND AND CATTLE CO. LLC**

discussed above, these claims are demonstrably not frivolous. A settlement that prices substantial claims as though they were nuisances cannot be fair, reasonable, or adequate.[58]

        **a) The actual value of the Proposed Settlement's damages fund to the Class is likely to be in the $48 to $79 million range.**

The $99 million Settlement Fund must pay more than claims. It will also "reimburse Co-Lead Counsel for the costs, fees, and expenses related to notice and administration of the Settlement, reimburse the costs and expenses incurred by Class Counsel in litigating the Action, pay Class Counsel's attorneys' fees, pay service awards for each representative Plaintiff, and pay applicable taxes and tax-preparation expenses."[59] Class Counsel has already indicated they intend to request up to $45 million in attorney's fees,[60] up to $6 million in reimbursement for costs and expenses,[61] and $175,000 in incentive awards for Class Representatives[62]—all amounts that will come out of the Settlement Fund before the Class receives

---

[58] *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 783 (7th Cir. 2004) (explaining that a colorable legal claim tends to "have considerable settlement value (and not merely nuisance settlement value)" because a defendant likely "no more want[s] to assume a nontrivial risk of losing than the plaintiff does").

[59] Memorandum of Law in Support of Mot. at 7, Dkt. No. 331-1 (Memo of Law).

[60] While Class Counsel have not yet submitted their fee application in connection with the Proposed Settlement, their preliminary-approval brief stated that they "intend to file a motion for an award of attorneys' fees [to be paid out of the Settlement Fund] not to exceed one-third of the total value of the Settlement (i.e., the monetary relief together with the value of the injunctive relief as assessed by an expert economist)," subject to a $45 million cap. *See.* Memo. Of Law, at 5, 7 n.9; Exhibit C to Schacter Decl., Dkt. No. 337-5 ("[Proposed] Notice of Proposed Class-Action Settlement"). Considering that Class Counsel's other filings suggest they estimate the "total value of the Settlement" to be between $392.9 million and $747 million, see Exhibit C to Schacter Decl., Dkt. No. 337-5, it seems likely that Class Counsel will, indeed, seek an attorney's fee equal to their cap of $45 million.

[61] Memo. of Law at 5, 7 n.9.

[62] *Id.*

---

**OBJECTION TO PROPOSED SETTLEMENT**
**BY WILSON FARMS LAND AND CATTLE CO. LLC**

anything from it. Thus, the $99 million top-line figure substantially overstates the benefit that the Proposed Settlement would actually deliver to Class members.[63]

The likely per-claimant recovery illustrates this point more acutely. Assume 200,000 Class members submit valid claims, and assume a $48 million-to-$79 million net fund, depending on deductions for attorney's fees, costs and expenses, administration costs, and incentive awards. That means that the average recovery is likely going to be approximately $240 to $395 per claimant before variations under the Plan of Allocation. For an average farm of approximately 470 acres, [64] that equals $0.51 to $0.84 per acre. A check for that amount would likely fail to cover the cost of a single authorized dealer service call made necessary by Deere's monopolization of the repair services market.

### b) This value represents between 4.1% and 13.9% of the range of repair-labor overcharge damages estimated to be recoverable in this action by Class Counsel's own economic expert.

Class Counsel claims that "the Settlement provides for substantial monetary relief" to the Class because it represents a range "from 26% to 53% of overcharge damages" resulting from Deere's anticompetitive conduct.[65] That comparison overstates the recovery in two ways: First, it compares that fund to single damages rather than the treble damages authorized by the Clayton Act. Second, it uses the gross Settlement Fund rather than the net amount that will actually be available to fulfill Class claims.

---

[63] *See Pearson,* 772 F.3d at 787 (stating "[n]otice and fees . . . are costs, not benefits"); *Redman*, 768 F.3d at 630 (stating "administrative costs should [not be] included in calculating the division of the spoils between class counsel and class members" because they are "not part of the value received from the settlement by the members of the class").

[64] *See* Farms and Land in Farms: 2025 Summary, U.S. Dep't of Agric. Nat'l Agric. Statistics Serv. (Feb. 2026), https://www.nass.usda.gov/Publications/Todays_Reports/reports/fnlo0226.pdf (providing that the average farm in America in 2025 consisted of 469 acres).

[65] Memo. of Law at 7.

---

The Settlement Agreement's damages award arises from a report served by Plaintiffs' economic expert, Dr. Russell Lamb, Ph.D. on August 13, 2025 (the "Lamb Damages Report"), in which Dr. Lamb developed a yardstick damages model, found class-wide impact, and estimated "overcharge damages in the range of $190.0 million to $387.3 million."[66] In a successful antitrust case, the Class would be entitled to treble damages.[67] Therefore, an accurate range of recoverable damages for the class—even if based only on the Lamb Report—should be $570 million to $1.162 billion. The $99 million gross fund equals only about 8.5% to 17.4% of that range.

And, as discussed above, Class members will not receive the whole gross fund of $99 million. Even if distributions from the Settlement Fund for attorney's fees and costs, administration expenses, and incentive awards are kept to a minimum, the Net Settlement Fund that is eventually distributed to the Class would likely be around $79 million, which would translate to a recovery percentage between 6.7 percent and 13.9 percent. If Class Counsel requests a total of $51 million in attorneys' fees and costs, as their filings suggest they will,[68] then the Net Settlement Fund will drop to $48 million—yielding a recovery percentage between 4.1 percent and 8.4 percent.

Thus, even with the limited comparison of the single category of damages analyzed in the Lamb report and relied on by Class Counsel, the Class would receive between roughly 1/7th and 1/24th of the true treble damages available in the case. In other litigation contexts, the Seventh Circuit has repeatedly found settlements for such low percentages of alleged

---

[66] Memo of Law at 4-5.

[67] *See* 15 U.S.C. § 15(a) (2000).

[68] *See supra* n.56.

---

**OBJECTION TO PROPOSED SETTLEMENT**                                   **PAGE 26 OF 53**
**BY WILSON FARMS LAND AND CATTLE CO. LLC**

damages to "reflec[t] only nuisance value."[69] To justify such an extreme discount, the Settlement's proponents must identify litigation risks and probabilities that bring the risk-adjustment discount on Plaintiffs' claims into the range appropriate for a frivolous claim. Again, generalized assertions about the uncertainties of litigation are not sufficient.

> **c) When lost crops and other forms of damages suffered by the Class (but ignored by Class Counsel) are considered, the percentage of recoverable damages obtained by the Settlement becomes *de minimis.***

Dr. Lamb's yardstick damages model estimated "overcharge damages in the range of $190.0 million to $387.3 million."[70] The Plan of Allocation distributes "each Eligible Claimant's award based on the total labor hours spent on repairs of the Eligible Claimant's Large Agricultural Equipment during the Class Period."[71] This distribution plan suggests that Dr. Lamb's damages estimate flowed from an analysis focused only on labor hours. As a Named Plaintiff in this action, Mr. Wilson reviewed the Lamb Damages Report on February 3, 2026.[72] To his layman understanding, labor hours were the only consideration underlying the damages range in the Lamb report.[73] Assuming this to be true, the damages calculation fails to consider several significant categories of injury inflicted upon the Class.

The most substantial omission from the damages calculation is farmers' lost crops and harvests. The Complaint alleges that, during harvest, farmers may wait days for a dealer

---

[69] *See, e.g.*, *Fletcher v. City of Fort Wayne, Ind.*, 162 F.3d 975, 978 (7th Cir. 1998) (affirming district court in finding that settlements which paid claimants between 3.3% and 8.3% of alleged damages "reflect only nuisance value, so that plaintiffs were not entitled to attorney fees").

[70] Memo of Law at 5.

[71] Exhibit 2 to Suppl. Joint Decl. at 3, Dkt. No 333-5.

[72] Wilson Decl. ¶ 16.

[73] Wilson Decl. ¶

---

**OBJECTION TO PROPOSED SETTLEMENT**
**BY WILSON FARMS LAND AND CATTLE CO. LLC**

technician to perform tasks as simple as resetting an ECU or replacing a sensor and may "watch their crops rot" in the meantime.[74] That alleged injury is economically distinct from an overcharge for repair labor. Mr. Wilson experienced this firsthand in November 2022, when his Deere combine became inoperable. A Deere dealership technician initially misidentified the issue as a sensor problem, then incorrectly cited a Product Improvement Plan ("PIP") mandating an ECU replacement. Ultimately, the ECU was not the issue; the problem was the Exhaust Gas Recirculation valve. Although the dealership had this part in stock from day one, Mr. Wilson could not install it himself as the process requires reflashing the ECU to accept the part. During the four-day wait for the part, the dry weather caused harvest-ready soybean pods to pop open, leading Mr. Wilson to lose nearly $30,000 worth of crops while his Deere equipment sat idle.

According to the Public Interest Research Group, dealer-imposed restrictions on large agricultural equipment repair are estimated to cost farmers $4.2 billion per year, including $3 billion in lost harvests due to tractor downtime and $1.2 billion in increased labor costs.[75] As alleged in the Complaint, Deere "control[s] approximately 55% and 63% of the large tractor and combine market, respectively."[76] That industry-wide estimate is not a substitute for a case-specific model of lost-crop damages (which, remarkably, Class Counsel seemingly never attempted to produce) and cannot simply be multiplied by Deere's equipment market

---

[74] Compl. ¶ 83.

[75] *See* Kevin O'Reilly, U.S. PIRG, *Out to Pasture: Repair Restrictions Lead to Downtime and Higher Repair Costs. Right to Repair Would Help.* at 6 (2023), https://publicinterestnetwork.org/wp-content/uploads/2023/04/Out-to-Pasture.pdf.

[76] Compl. ¶ 83.

---

share. Nevertheless, it underscores why excluding downtime and lost-harvest injuries leads to substantial undervaluation of the released claims.

Other damages suffered by Class members as a result of Deere's monopolistic conduct but ignored by the Lamb Damages Report include: (a) inflated prices for replacement parts; (b) inflated licensing, subscription, and other fees for access to Deere's PRO Service tool, Deere's Operations Center, and Deere's Dealer Technical Assistance Center; and (c) other non-labor costs, such as increased repair-related travel and mileage expenses. The Settlement's proponents have not quantified those categories or explained why they have no settlement value.

Measured against the broader set of economic injuries alleged in the complaint and released by the Proposed Settlement, the monetary recovery represents a much smaller percentage of the potential value of Plaintiffs' claims than the proponents of the Settlement suggest with their misleading 26%-to-53% figure—indeed, seemingly a trivial percentage.

3. **The Plan of Allocation reduces the value of the Proposed Settlement damages fund by creating an impractical claims process that enables Deere to arbitrarily influence claim distribution.**

In determining whether the relief provided to the Class is adequate, the Court must consider the effectiveness of any proposed method of distributing relief to the Class, including the method of processing class member claims.[77] The Settlement Agreement's Plan of Allocation fails to satisfy this condition, saddling Class members with an impractical and imprecise mechanism to substantiate their claims.

---

[77] Fed. R. Civ. P. 23(e)(2)); *Pearson*, 772 F.3d at 787.

---

**OBJECTION TO PROPOSED SETTLEMENT**
**BY WILSON FARMS LAND AND CATTLE CO. LLC**

The Amended Plan of Allocation bases awards solely "on the total labor hours spent on repairs."[78] But the Deere dealer invoices reviewed by Mr. Wilson state total labor charges without itemizing labor hours, and some Class members may no longer possess invoices dating back to January 10, 2018.[79] A labor-hour allocation therefore risks making otherwise valid claims turn on records that farmers were never expected to retain or that never disclosed the relevant metric. This allocation of damages based on labor hours alone could make it difficult, if not impossible, for Class members to accurately substantiate their claims. The Plan of Allocation is also unclear on how labor hours will be calculated for a given claim when claimant documents identify only dollar amounts for labor charges. There is a concerning imbalance in access to the information underlying the calculation of claims which favors Deere over the Class. To the extent that the allocation of claims uses standardized estimates or dealer work-order data, Deere and its dealers possess much more detailed information. This allows Deere to exercise considerable discretion over claims distribution and creates a risk of abuse or manipulation in the claims process. Additionally, Deere's work order database may not reflect the accurate owner of the equipment at the time of service if that equipment has been sold. None of this is dispositive that Deere will manipulate the process but it creates a set of avoidable risks of error in claim processing, disputed adjustments, and rejection of legitimate claims.

In short, an allocation mechanism based on labor hours which, given standard invoicing practices, are known only to Deere and its dealers, will likely yield inaccurate claims with a fragmentary relationship to the actual costs borne by Class members. Without clearer

---

[78] Joint. Decl., Exhibit 2, at 3.

[79] Wilson Decl. ¶ 22, Exhibit D at 6.

---

**OBJECTION TO PROPOSED SETTLEMENT**
**BY WILSON FARMS LAND AND CATTLE CO. LLC**

standards for converting charges into hours, resolving ownership discrepancies, and challenging Deere-derived data, the Plan of Allocation weakens the practical value of the monetary relief and fails to satisfy the adequacy requirement.[80]

> **4. Given Deere's scale and the Proposed Settlement's broad release of claims, the Settlement's monetary payment will not deter Deere from engaging in the same or similar conduct going forward.**

In Fiscal Year 2025, Deere reported a net income of $5.027 billion.[81] Though Deere does not itemize income from repair service sales in its financial statements, sales of "parts and maintenance services" reportedly make up approximately one-fifth of Deere's sales.[82] Relative size alone does not determine the adequacy of a settlement, but it informs the Settlement's likely deterrent effect. The Settlement Agreement's $99 million gross fund accounts for roughly 2% of Deere's net income in fiscal year 2025. If the allegations of the Complaint are true (which we believe they are), these net revenues have only been possible to achieve through years of illegal activity. In this frame, $99 million is a small portion of the cost of doing business for Deere and may well be covered mostly or entirely by insurance.[83] Coupled

---

[80] Fed. R. Civ. P. 23(e)(2).

[81] Press Release, Deere & Co., Deere Reports Net Income of $1.065 Billion for Fourth Quarter, $5.027 Billion for Fiscal Year (Nov. 26, 2025), https://bit.ly/43GdgQL.

[82] *See* Rajesh Kumar Singh, *Deere bets on cost cuts, services push to boost profits*, Reuters (Jan. 8. 2020), https://bit.ly/4et3Mx1.

[83] If the Settlement Agreement's $99 million damage award is covered by Deere's liability insurance, that would make the Settlement Agreement damage award facially inadequate to deter Deere from engaging in the same or similar illegal conduct in the future. *Cf. Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 860 n.34 (1999) ("[I]t it is worth noting that if limited fund certification is allowed in a situation *where a company provides only a* de minimis *contribution to the ultimate settlement fund*, the incentives such a resolution would provide to companies facing tort liability to engineer settlements similar to the one negotiated in this case would, in all likelihood, significantly undermine the protections for creditors built into the Bankruptcy Code.") (emphasis added). The Court should require Class Counsel to release any Deere insurance policy documents they received under Rule 26(a)(1)(A)(iv) to the Class, so that the Class may fully evaluate the adequacy of the Settlement's relief.

---

**OBJECTION TO PROPOSED SETTLEMENT**                                    **PAGE 31 OF 53**
**BY WILSON FARMS LAND AND CATTLE CO. LLC**

with the Settlement Agreement's overbroad release of liability and hollow injunctive terms that preserve Deere's control over the relevant repair markets (both discussed below), the diminutive size of the Proposed Settlement' damages compared to Deere's amassed monopoly profits underscores the failure of the Settlement to obtain "effectual relief" for the Class.[84]

**B. The Proposed Settlement's injunctive component fails to provide effectual relief—adding negligible, if any, value to the Class.**

The purported value of the Settlement Agreement's injunctive relief also requires close scrutiny. In assessing the injunctive provisions of the Proposed Settlement, the Court may not accept the claims of Class Counsel (or Defendant) about the nature, extent, or value of the "operational changes" that the Settlement actually requires.[85] Class Counsel's filings peg the estimated value of the injunctive component of the Settlement at $239.9 to $648 million.[86] However, Class Counsel's papers provide no explanation of how this estimate was arrived at, let alone any information about the assumptions, discount rates, uptake estimates, or compliance scenarios that inform this range. The Court cannot determine the real expected outcome of the injunctive relief over a ten-year period—or otherwise measure the adequacy of the Settlement Agreement—without testing those input factors, and the Court may not simply take Class Counsel's word for it. This is doubly true when Class Counsel has made grandiose claims about anticipated effects of the Settlement's injunctive relief—including going so far as to say that it would dismantle "the anticompetitive moat that protected Deere and its authorized Dealers" and bring about a "sea change in the provision of repair tools and

---

[84] *See In re Subway Footlong Sandwich Mktg. & Sales Practices Litig.*, 869 F.3d 551, 556 (7th Cir. 2017); *see also In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 752-53 (7th Cir. 2011).

[85] *Synfuel Techs., Inc. v. DHL Express (USA) Inc.*, 463 F.3d 646, 654 (7th Cir. 2006).

[86] (Joint Decl., Exhibit C).

---

capabilities"[87]—when a close examination of its injunctive provisions reveals they are almost designed to be practically ineffectual.

The Complaint sought an injunction to "dismantle" Deere's illegal monopoly of the Deere Repair Service Market.[88] Appropriate relief in a monopolization case must (1) "unfetter a market from anticompetitive conduct,"[89] (2) "terminate the illegal monopoly," (3) "deny to the defendant the fruits of its statutory violation," and (4) "ensure that there remain no practices likely to result in monopolization in the future."[90] While a settlement does not need to obtain all remedies that would be available through trial, the Proposed Settlement cannot adequately compensate or protect the Class unless it vindicates its members by at least *some measure* of the original relief sought.[91]

The Settlement Agreement's injunctive relief fails to meet this benchmark. Its obligations apply only to "digital tools … without which [large agricultural equipment] cannot be operated in the manner to which it was designed."[92] That definition ties coverage to Deere's own design and characterization of intended operation. A repair resource may be practically

---

[87] (Memo of Law at 5).

[88] Compl. ¶ 35.

[89] *United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001) (quoting *Ford Motor Co. v. United States*, 405 U.S. 562, 577 (1972))

[90] *Id.* (quoting *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968)). In monopolization cases, courts have wide latitude to restore competition by implementing either structural remedies (*e.g.*, divesting a business line or asset) or behavioral remedies (*e.g.*, enjoining particular conduct). *See United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 222–27 (D.D.C. 1982) (ordering the reorganization of AT&T), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983). The court's authority to grant structural remedies extends to cases brought by private plaintiffs. *See California v. Am. Stores*, 495 U.S. 271, 284 (1990).

[91] *Cf. Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947) (stating that, if a decree in an antitrust case fails to "effectively pry open to competition a market that has been closed by defendants' illegal restraints," then the plaintiff "has won a lawsuit and lost a cause").

[92] (Settlement Agreement, App. A, A-6).

---

**OBJECTION TO PROPOSED SETTLEMENT**
**BY WILSON FARMS LAND AND CATTLE CO. LLC**

necessary to restore full functionality, properly calibrate a machine, or avoid dependence on dealers, and still fall outside the scope of relief if Deere claims the machine can still be operated as it was designed to. The Agreement provides no independent technical standards or oversight to classify resources that are disputed in this way.

As the Complaint itself alleges, Deere has a history of "equivocating regarding what Repair Tools are necessary to make and complete repairs on [equipment]," underscoring the importance for clear requirements governing which Repair Resources Deere must make available.[93] Indeed, the Complaint details a consistent pattern of Deere misleading customers regarding their ability to repair its products without Deere-controlled tools, as well as the availability of such tools outside of Deere's dealer network.[94] Deere states publicly that it is "committed to enabling customers to repair the products that they buy."[95] Deere has made this promise for years.[96] Its consistent failure to deliver contributed to the necessity of this lawsuit. This makes precise, enforceable definitions especially important.

---

[93] Compl. ¶ 141.

[94] Compl. ¶¶ 141–154.

[95] Nilay Patel, *John Deere Turned Tractors into Computers–What's Next?,* Verge, (Jun. 15, 2021), https://www.theverge.com/22533735/john-deere-cto-hindman-decoder-interview-right-to-repair-tractors. Deere's website asserts that, "[f]or over 180 years, John Deere has empowered customers to maintain and repair their own machines. We fully support a customer safely maintaining, diagnosing, and repairing their own equipment." *Supporting Our Customers' Right to Safely Repair Their Equipment,* John Deere, https://www.deere.com/en/our-company/repair/right-to-safely-repair/ (last visited June 17, 2026).

[96] In 2018, as multiple state legislatures considered "right to repair" legislation that would have required Deere to provide farmers access to software tools required to repair their own equipment, Deere, through industry associations, released a "Statement of Principles" promising that by January 1, 2021, Deere would "make available through authorized dealers [tools] to empower farmers and ranchers to perform basic service, maintenance and repairs on their equipment." *See AEM, EDA Announce Statement of Principles on 'Right to Repair,'* FORAGE INDUSTRY NEWS (Feb. 28, 2018), https://www.ag-proud.com/articles/32270-aem-eda-announce-statement-of-principles-on-right-to-repair. Since then, Deere has continued to stave off "right to repair" efforts through similar deceptive schemes. In 2023, Deere entered into a nonbinding Memorandum of Understanding (MOU) with the American Farm

---

Class Counsel states that "Deere's corporate representative testified under oath that the repair resources provided by the Settlement Agreement will provide farmers and IRPs with the same capability to diagnose and repair Deere Large Ag Equipment as authorized Dealer technicians."[97]  As detailed below, this is demonstrably false. As it stands, the Settlement Agreement is just the latest iteration in Deere's pattern of hollow, unenforceable promises to respect farmers' right to repair their own equipment. At a minimum, the Court should require a capability-by-capability comparison showing which dealer functions are covered by a genuinely administrable obligation under the Settlement Agreement and which are not.

The following discussion implicates a common question: What is the actual value of the injunctive relief? The point is not that any imperfection necessarily defeats approval. It is to show that various deficiencies in the Proposed Settlement's injunctive provisions combine to render them practically ineffectual. The proponents of the Proposed Settlement must show that their Settlement valuation accounts for these limitations.

> **1. The Settlement Agreement fails to expand Class members' access to Repair Resources because Deere's "obligation" to provide access to the same under the Agreement is practically unenforceable.**

The Settlement Agreement does not limit Deere's ability to design tractors in ways that make software and tools exclusively under Deere's control necessary to repair them. It

---

Bureau Federation (AFBF),  claiming that the agreement "commit[ed] John Deere to ensuring farmers and independent repair facilities have access to many of the tools and software needed to grow the food, fuel and fiber America's families rely on."  In return, AFBF committed to "encourage state Farm Bureau organizations to . . . refrain from introducing, promoting, or supporting federal or state 'Right to Repair' legislation."  Memorandum of Understanding Between American Farm Bureau Federation and John Deere (Jan. 8, 2023), https://www.fb.org/files/AFBF_John_Deere_MOU.pdf; Jonathan M. Gitlin, *John Deere Relents, Says Farmers Can Fix Their Own Tractors After All*, ARS TECHNICA (Jan. 9, 2023), https://arstechnica.com/tech-policy/2023/01/john-deere-relents-says-farmers-can-fix-their-own-tractors-after-all/.

[97] Memo of Law at 5 n. 6 (citing Rule 30(b)(6) Dep. of Deere & Co. (Kent Brown), 52:6-15, June 13, 2025.

---

**OBJECTION TO PROPOSED SETTLEMENT**  **PAGE  35 OF 53**
**BY WILSON FARMS LAND AND CATTLE CO. LLC**

only requires Deere to make the "current versions" of those "Repair Resources" available to Class members on "Fair and Reasonable Terms," defined by six imprecise, unweighted factors.[98] The Agreement does not specify how the factors interact, which are dispositive, or how to handle disputes between them. The standard's ambiguity means Class members will functionally need new rounds of complex litigation over each potentially violative action by Deere to determine which actions are "Fair and Reasonable" and which are not. This imposes substantial time and resource costs on class members all for a process that, at best, *might* allow them to collect on an "obligation" whose substantive content is essentially undefined. The weight of this cost would fall primarily on Class members and disproportionately consume their limited resources, while Deere would be able to use its existing legal capabilities to resist them. This greatly diminishes the value of the Settlement Agreement's injunctive relief the moment it takes effect. And, as discussed in Section II below, the Settlement Agreement's release language may prevent Class Members from litigating the issue altogether.

To make matters worse, the existing factors are skewed in Deere's favor, creating systemic advantages for Deere. For example, one of the factors that a court is supposed to "consider" in determine whether a term is "fair and reasonable" is "the price charged by other manufacturers of agricultural equipment for similar items."[99] This is an inappropriate factor for evaluating the fairness and reasonableness of a monopolist's conduct. Monopolists, by definition, can alter prevailing market prices. Given Deere's market power in the markets for

---

[98] Settlement Agreement, App'x A, § A.2. "Fair and Reasonable Terms" include consideration of (1) the net cost (accounting for any discounts, rebates, or other incentive programs) to a Deere Dealer for similar items obtained from Defendant; (2) the cost to Defendant of preparing, maintaining, and distributing the items; (3) the price charged by other manufacturers of agricultural equipment for similar items; (4) the means by which the item is distributed; (5) the extent to which the item is used, which includes the number of users, and frequency, duration, and volume of use; and (6) inflation."

[99] *Id.*

---

large agricultural equipment, a standard based partly on the prices charged by other manu-facturers of agricultural equipment—all of whom are much smaller than Deere—is more likely to permit industry-wide abuses to validate one another than discipline Deere's terms. The standard also does not require Deere to provide its repair tools on a non-discriminatory basis, which will allow Deere to continue self-preferencing its dealers through tiered pricing or other discriminatory terms. Additionally, the standard fails to adequately protect low-volume purchasers from unfair and unreasonable pricing. Though extent of use is included in the list of factors, it is given too little weight to protect farmers with lower-volume use from prohibitive pricing. While the price of a license subscription may appear fair and reasonable spread over thousands of repairs, that same price would reflect an unreasonable per-unit cost for a farmer with a few units.

Finally, the Settlement Agreement also does not guarantee that necessary physical interface hardware will be made available on fair, reasonable, and nondiscriminatory terms. This empowers Deere to limit access to the hardware necessary to utilize many Repair Resources, or require an unreasonably high price for the tool. For example, Deere's USB-Link 3 Wireless Machine Interface Kit is used to connect equipment to PRO Service for diagnostics and reprogramming, and a PRO Service license is separately required. The price of Deere's USB-Link 3 Wireless Machine Interface Kit is $1,100, and it is currently out of stock.[100]  If hardware like this is unavailable or priced beyond practical reach, then access to software is of limited value. The proponents of the Settlement Agreement have not shown how hardware

---

[100] *USB-Link 3 Wireless Machine Interface Kit*, John Deere, (last visited June 17, 2026), https://shop.deere.com/us/product/USB-Link-3-Wireless-Machine-Interface-Kit/p/PROVC1016.

---

**OBJECTION TO PROPOSED SETTLEMENT**  **PAGE  37 OF 53**
**BY WILSON FARMS LAND AND CATTLE CO. LLC**

cost and availability are considered in their valuation of its injunctive component and how they discount that value.

The absence of administrable standards for determining what is "Fair and Reasonable" in the Settlement Agreement, along with its failure to adequately reflect the real costs borne by farmers, significantly reduce the purported value of the injunctive relief.

### 2. The Settlement Agreement contains carveouts that permit Deere to unilaterally remove essential Repair Resources from the Settlement's coverage.

The Settlement Agreement's injunctive relief contains significant loopholes, carveouts, and omissions that permit Deere to unilaterally narrow the scope of the relief it purports to provide. These are not peripheral drafting issues. They determine which tools must be shared, when access begins, and whether Deere can continue reserving important repair functions to its own network. Rather than ensuring competitive parity between Deere dealers, independent repair providers ("IRPs"), and equipment owners, the Agreement preserves multiple mechanisms through which Deere can maintain control over repair markets, restrict access to critical resources, and render the Settlement Agreement ineffectual.

First, the Settlement Agreement's treatment of "Future Repair Resources" permits a prolonged—indeed, potentially indefinite—gap between dealer access and independent access. Under the Agreement, Deere need not offer a future resource on fair and reasonable terms until access has been granted to more than 50% of Deere dealer locations.[101] Deere could therefore deploy new tools and software that, through intentional equipment design, are necessary to complete repairs on Deere products, and then selectively provide some of those new tools and software to subsets of its authorized dealer network without exceeding

---

[101] Settlement Agreement, at App. A, A-6.

**OBJECTION TO PROPOSED SETTLEMENT**                                    **PAGE 38 OF 53**
**BY WILSON FARMS LAND AND CATTLE CO. LLC**

the 50 percent threshold with respect to any single repair tool rollout. Using this strategy, Deere could easily continue compelling Class members to obtain repairs from authorized dealers at the same or similar rate as they are compelled to do so today. Deere could also use selective rollouts to keep IRPs behind dealers in tools, training, and experience for extended periods, maintaining the current structural handicap they face in trying to compete against Deere dealers.

This is especially problematic for geographically specialized equipment. A resource used for a crop specialized in a certain area may never be distributed to 50 percent of Deere's dealers due to the natural geographical limitation of that crop. Notably, the provision does not state whether the denominator of the 50-percent rollout threshold includes only U.S. dealers or Deere's worldwide network. Depending on the scope of the denominator, it is easy to imagine that simple differences in product availability in different countries or regions would keep new repair tools under the 50-percent trigger. Without more specific protections for future product rollouts, there is little preventing Deere from starting over with new repair tools around which it could use the same anticompetitive conduct to build moats mirroring those protecting its current repair tools.

Second, several of Deere's injunctive obligations depend on permissions from "third party component suppliers."[102] The Agreement does not require Deere to use reasonable or best efforts to obtain permission, disclose requests and refusals, or submit a refusal to neutral review. There is little reason to believe Deere is limited in its ability to procure permissions from its third-party suppliers. To the contrary, Deere probably has substantial bargaining power vis-à-vis its suppliers, which Deere could just as easily use to get suppliers to *withhold*

---

[102] *Id.* at App. A, A-2.

required permissions as to *grant* them. Whether Deere chooses the former or the latter is beside the point, which is that the choice is in Deere's discretion. Either way, this provision means that a supplier objection can become an instant and unreviewable basis for Deere to withholding a repair resource from Class members, even when Deere has substantial commercial leverage to procure the supplier's cooperation.

Third, the Settlement Agreement explicitly excludes key repair resources from its injunctive relief. It does not require Deere to offer its full suite of DTAC solutions via PRO Service, confining DTAC access to "direction to potentially applicable DTAC Solutions" via Deere's Customer Contact Center as well "viewing of DTAC solutions for customers and IRPs."[103] That is not equivalent to direct, integrated access to the system used by dealers. Without allowing full independent integration with the DTAC system, the Settlement Agreement denies farmers and IRPs true parity in their practical ability to fix their own equipment. The Settlement Agreement also appears to preserve exclusive dealer-only access to DTAC's Engineering Mode, which provides some of Deere's most extensive capabilities for repairing tractor electronics. Dealers can only access Engineering Mode when working directly with Deere engineers through DTAC. In denying access to Engineering Mode, as well as a right to communicate directly with Deere engineers to identify and effectuate solutions using Engineering Mode, a significant portion of costly and necessary repairs will remain under Deere's exclusive control.

The relief sought by the FTC in its parallel case is a useful contrast. In its complaint, the FTC sought that Deere "make available to owners of Deere Large Tractors and Combines and IRPs on reasonable and nondiscriminatory terms Full-Function Service ADVISOR and

---

[103] *Id.* at App., A-4.

---

any other repair resource that Deere makes available to its dealers, so as to enable agricultural equipment owners and IRPs to perform *the full range of repairs* that a Deere dealer can perform on Deere Large Tractors and Combines, including without limitation access to reprogramming capabilities, the ability to conduct all tests and calibrations, and the ability to access CCMS/DTAC solutions and the CCMS/DTAC 'helpdesk' feature and other similar resources."[104]  In comparison, the denial of comprehensive DTAC access in the Settlement Agreement allows Deere to retain exclusive control and leaves critical dealer advantages intact.

The Settlement Agreement's treatment of Product Improvement Programs ("PIPs") presents similar problems.[105]  While it provides "notice and viewing of PIPs" for equipment, Deere may still determine what repairs or upgrades rise to the level of a PIP.[106]  PIPs comprise a significant, recurring stream of mandatory dealer visits whose rollout timing, parts availability, and warranty coverage are controlled entirely by Deere. Because PIPs can determine timing, parts availability, warranty treatment, and dealer involvement, access to notices alone does not ensure that Deere cannot preserve dealer-dependent work by declining to classify a repair as a PIP.

Taken together, these loopholes, carveouts, and omissions substantially weaken the Settlement Agreement's purported injunctive relief. Rather than eliminating Deere's ability to control repair markets, the Settlement Agreement leaves Deere with multiple avenues to preserve its dominance, restrict meaningful access to essential repair resources, and circum-

---

[104] FTC Compl. at 33 (emphasis added).

[105] Settlement Agreement, App. A, A-4.

[106] *Id.*

---

**OBJECTION TO PROPOSED SETTLEMENT**
**BY WILSON FARMS LAND AND CATTLE CO. LLC**

vent the purported competitive benefits of the Proposed Settlement. The Court should require the proponents to quantify those limitations rather than valuing the injunction as though Deere will ignore all the ways it can withhold access to repair capabilities under the terms of the Agreement and simply make all repair capabilities promptly and reliably available to every farmer and IRP even when it is not actually compelled to do so by the Agreement.

### 3. The Settlement Agreement fails to restrain Deere from continuing to impose barriers and handicaps on independent repair providers.

The Settlement Agreement also fails to meaningfully restrain Deere from continuing to impose barriers to entry into the Deere repairs aftermarket for independent repair providers (IRPs) and handicap their ability to compete with Deere's authorized dealers—barriers and handicaps which box Class members into using Deere's dealership network. Indeed, rather than restraining Deere, the Agreement preserves Deere's ability to control IRPs access to critical repair resources, dictate the terms under which IRPs may operate, and maintain significant advantages for its authorized dealer network through discriminatory treatment. By leaving these structural barriers largely intact, the Settlement Agreement does little, if anything, to ameliorate the harms to competition in the Deere repair aftermarket caused by Deere's conduct alleged in the Complaint.

First, the Settlement Agreement does not require Deere to provide IRPs access to its repair Application Programming Interfaces (APIs), preventing the development of competitive third-party repair tools. It compounds this problem by failing to create true parity with authorized dealers across Deere's full suite of repair tools. Instead, the Settlement Agreement denies the Class full access to several of Deere's most dynamic technical offerings, such as DTAC, protecting Deere's essential control over central aspects of its monopoly. The FTC's amended complaint alleges that, without Deere's assistance and technical information, third

---

parties cannot develop a fully functional substitute for Deere's dealer tool.[107] Preserving that dependency limits entry and innovation by IRPs and repair-tool developers.

Second, the Settlement Agreement provides that "Deere can condition the ability of an IRP to use Repair Resources and Future Repair Resources … on obtaining the Owner's or Lessor's consent."[108] While this sounds benign on paper, in reality Deere already imposes restrictions on owners and lessors of Deere equipment with respect to how they may "consent" to an IRP's performance of repairs and whom they may provide that consent to (*e.g.*, by requiring owners to obtain certain access codes and provide them to IRPs before IRPs can commence work). By expressly permitting Deere to condition IRP's ability to use repair resources in this way, the Settlement Agreement allows Deere to restrict the universe of IRPs which Class members may authorize to perform repairs on their equipment.

To be sure, the Settlement Agreement states that Deere "[may] not impose *unreasonable* barriers or conditions to [IRPs] obtaining such consent,"[109] but this will not prevent Deere from continuing to impose anticompetitive requirements as a condition of IRP access to resources.[110] Such anticompetitive conditions may take the form of requirements that appear reasonable in the abstract (such as a recent training certification from Deere), but in

---

[107] Amended FTC Compl. ¶¶ 56, 59.

[108] Settlement Agreement, App. A, A-7.

[109] *Id*. (emphasis added).

[110] Tech monopolist Apple provides a playbook for hindering competition through the imposition of onerous conditions on its Independent Repair Program. *See* Michael Potuck, *Apple Comes Under Fire for Independent Repair Program Contract that Lawyers are Calling 'Crazy,'* 9TO5MAC (Feb 6. 2020), https://9to5mac.com/2020/02/06/apple-independent-repair-program-criticism/ ("[I]f a business joins the IRP, Apple reserves the right to "unannounced audits and inspections by Apple, which are intended, at least in part, to search for and identify the use of "prohibited" repair parts, which Apple can impose fines for."); Kyle Wiens (@kwiens), X (Apr. 14, 2025, 4:44 AM), https://x.com/kwiens/status/2044351059158585539 ("Apple required independent techs turn over their customer lists in their independent repair contract.").

---

practice allow Deere to limit entry into the market (such as by restricting the number of slots available for training and giving first priority to authorized dealer technicians). Further, the vague standard of "unreasonableness" will discourage IRPs from opposing Deere's conditions, regardless of what those conditions are: realistically, IRPs cannot be expected to bring lawsuits against Deere for each new restrictive condition it imposes with undefined "unreasonableness" as their only sword. The Settlement Agreement provides no objective limits, capacity requirements, or expedited process for challenging such conditions. That uncertainty is likely to continue deterring entry by IRPs into the Deere repairs aftermarket even if a restrictive condition could theoretically be successfully challenged as "unreasonable" (which itself is not guaranteed because the standard is undefined).

4. **The Settlement Agreement enhances Deere's power to appropriate valuable user data from Class members and impose data-related switching costs on Class members.**

The Settlement Agreement does not provide adequate data protection for users and allows Deere to maintain control over the power balance implicated by data ownership.[111] Per Deere's PRO Service License Agreement, Deere grants itself "a fully paid, perpetual, worldwide, transferable license to use any data and content submitted through the platform for any purpose, including product improvement," and reserves the right to "aggregate your data with other data or create derived data and use the same for any lawful purpose, including with the aim of making available such aggregated data or derived data to third parties."[112] A

---

[111] Class Counsel recognized this in its Complaint, stating, "Deere also locks in farmers by offering data services that incentivize using exclusively Deere equipment, while at the same time using that data to pad its own profits. Once a farmer, for example, has invested in an expensive tracking system which provides agronomic data for their fleet of Deere Tractors, they heavily rely on that system, which has no interoperability with other manufacturers' equipment." Compl. ¶ 100.

[112] *John Deere Operations Center PRO Service License Agreement*, § 3(A)(2) ("Feedback, Usage Information, and Content"), § 4(D)(2) ("How We Use Your Information").

---

**OBJECTION TO PROPOSED SETTLEMENT**                **PAGE 44 OF 53**
**BY WILSON FARMS LAND AND CATTLE CO. LLC**

mass of valuable agricultural and technical data has long flowed from farmers to Deere, and that dynamic remains unchanged by the Settlement Agreement, leaving Deere with complete ownership over a central tool of its monopoly.[113]

Machine-generated geospatial and application data are particularly valuable, and Deere's electronic control of Deere-manufactured machines has allowed Deere to compel equipment owners and lessors to provide confidential and sensitive business information to Deere in order to utilize their own equipment. As noted in the Complaint, Deere "locks in farmers by offering data services that incentivize using exclusively Deere equipment, while at the same time using that data to pad its own profits. Once a farmer, for example, has invested in an expensive tracking system which provides agronomic data for their fleet of Deere Tractors, they heavily rely on that system, which has no interoperability with other manufacturers' equipment."[114] This dynamic is left unchanged by the Settlement Agreement. The Settlement Agreement explicitly ensures that Deere retains full control over the intellectual property rights related to Repair Resources and how they are deployed,[115] legitimizing Deere's continued appropriation of farmer data through end-user licensing agreements.[116]

Notably, The status quo in Deere's data collection structure (which the Settlement Agreement abets) is not even legal throughout the Settlement Agreement's nationwide scope.

---

[113] *See, e.g.*, Khan, Levine & Nguyen, *After Notice and Choice: Reinvigorating "Unfairness" to Rein in Data Abuses*, 77 STAN. L. REV 1375 (2025), https://review.law.stanford.edu/wp-content/uploads/sites/3/2025/06/Khan-77-Stan.-L.-Rev.-1375.pdf.

[114] Compl. ¶ 100.

[115] Settlement Agreement, App. A, A-5 ("For the avoidance of doubt, the subscription or license of any Repair Resource does not include title or ownership of any of John Deere's intellectual property rights therein.").

[116] Given the centrality of machine-level information in Deere's data harvesting scheme, any related relief considered by a future agreement must ensure that all equipment owners, including secondary owners, are eligible for data-related redress covering the lifetime of the equipment.

Nebraska's Agricultural Data Privacy Act, passed in April 2026, requires "any company seeking to access or use agricultural data to first enter into a written consent agreement with the producer [and] clearly establishes that producers are the sole owners of data tied to their operations."[117]  This state law offers a framework for data ownership which, if incorporated into future, more robust relief, would yield significant benefits for the class.

Control over user data is extremely valuable, and the Settlement Agreement's legitimization of Deere's control over Class member's user data is a major omission. Without at least giving farmers the opportunity to opt-out of Deere's data collection and use policies, particularly under the PRO Service License Agreement, the Settlement Agreement exposes the Class to continued—and potentially increased—value extraction by Deere to pad its market power. The court should require the Settlement's proponents to disclose whether their valuation of the Settlement Agreement accounts for how its terms enhance Deere's ability to harvest Class member's data and use it to impose switching costs on them.

### 5. The Settlement Agreement's injunctive relief contains other structural weaknesses that further diminish its value to the Class.

Beyond the specific limitations in the scope of the injunctive relief, the Settlement Agreement contains several structural weaknesses that further diminish its value to Class Members. The Agreement provides insufficient safeguards to ensure Deere's long-term compliance, meaningful enforcement of its terms, and practical access to the rights it purports to create. It also fails to address key aspects of Deere's market power that enable the continuation of anticompetitive conduct. As a result, even where the Settlement Agreement offers

---

[117] Neb. Rev, Stat. § 84-712.05 (2026).

relief on paper, significant gaps remain that are likely to undermine its effectiveness in practice.

First, the Settlement Agreement's ten-year injunctive term is not sufficient to ensure compliance in the market for agricultural equipment. These machines are long-term investments for farmers and will likely remain in service for decades across multiple owners. The lifespan of a well-maintained Deere tractor "can easily last 20 to 30 years or more."[118] Deere itself offers certain protection plans for used tractors up to 15 years old, confirming that such equipment commonly remains in service beyond a decade.[119] The Settlement's term will therefore expire while Class member's equipment remains operational and dependent on the repair resources at issue.

Second, the lack of provision for a court-appointed monitor to provide independent, expert oversight of Deere's compliance with the Settlement Agreement further weakens the value of its injunctive component. As the Court recognized at the preliminary approval hearing, the repair-services market is highly technical, and substantial technological developments are likely to occur during the term of the Settlement Agreement. The individual farmers in the Class do not have the resources to monitor these technological developments, let alone all of the technical changes that will be implemented by Deere, how they affect the repair services market, and whether they comply with Deere's (ill-defined) obligations under the Agreement. To compound the problem, the Settlement Agreement does not provide for

---

[118] *The Average Life Expectance of a John Deere Tractor is Longer than You Think*, TELLUS EQUIPMENT, https://www.tellusequip.com/blog/the-average-life-expectancy-of-a-john-deere-tractor-is-longer-than-you-think (last visited on June 1, 2026).

[119] *PowerGard™ Protection Plans for Agriculture & Turf Equipment*, JOHN DEERE, https://www.deere.com/en/parts-and-service/warranty-and-protection-plans/warranties/ag-and-turf-extended-warranties/ (last visited June 23, 2026).

---

**OBJECTION TO PROPOSED SETTLEMENT**
**BY WILSON FARMS LAND AND CATTLE CO. LLC**

the Court to retain jurisdiction to enforce its terms,[120] leaving adjudication of disputes over the Settlement Agreement to actions brought in courts around the country, which may not be as familiar with the relevant markets and technologies.

A court-appointed monitor with adequate resources and sufficient investigative authority would help solve these problems—examining Deere's conduct and determining whether new repair tools fall within the Agreement's definitions, whether Class access to repair tools is functionally equivalent to dealer access, and whether Deere's implementation preserves hidden dealer advantages. Unfortunately, the Agreement leaves those questions to individual cases brought by individual farmers—making it unlikely that noncompliance will be caught, let alone litigated and remedied. Indeed, the Complaint's allegations and Deere's violation of prior voluntary commitments on independent repairability strengthen the need for active oversight. Deere has repeatedly made vague or unenforceable promises to start providing repair tools on "fair and reasonable" terms, only to then use its market power to renege on those commitments with impunity. While that history does not guarantee future misconduct, it does counsel against evaluating the Proposed Settlement's injunction on the assumption that Deere will voluntarily refrain from using loopholes written into the Settlement Agreement or implement ill-defined, unmonitored obligations in a manner favorable to the Class rather than its own self-interest.[121]

---

[120] Absent an order expressly retaining jurisdiction, the Court has no inherent power after rendering final judgment to enforce a settlement agreement made by the parties. *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 381 (1994); *Arata v. Nu Skin Int'l, Inc.*, 96 F.3d 1265, 1268 (9th Cir. 1996) (applying *Kokkonen* to class action settlements).

[121] *See Voss v. Rolland*, 592 F.3d 242, 245 (1st Cir. 2010) (taking historical conduct of defendant into account in evaluating injunctive provisions of class-action settlement).

---

**OBJECTION TO PROPOSED SETTLEMENT**
**BY WILSON FARMS LAND AND CATTLE CO. LLC**

Third, the Settlement Agreement fails to provide explicit protections for Class Members against retaliation by Deere for attempting to exercise or enforce their rights under it, containing no basic standards prohibiting discriminatory treatment by Deere or its co-conspirators. Such conduct by Deere could include restricting the availability of replacement parts, increasing the price of those parts, limiting access to Deere products or services, imposing additional fees, voiding warranties for repairs performed by third parties, delaying repairs or maintenance, or denying or delaying access to Deere technicians. Without protections against these practices, Deere may use such methods to discourage Class members and IRPs from exercising the rights purportedly secured by the Settlement Agreement, further reducing the practical value of the injunctive relief.

Finally, the Settlement Agreement does not require Deere dealers to disclose the full cost of equipment ownership, including repair tools and repair services, at the time of sale. Deere possesses detailed information regarding the "lifecycle pricing [of equipment]—that is . . . the total cost of ownership over the life of the equipment, which includes the costs of repairs and parts over time."[122] Without any disclosure requirement, Deere retains the informational advantage that allows it to continue steering Class members and other farmers into its walled system of costly repairs and maintenance.

*     *     *

Taken together, the above-described deficiencies demonstrate that the Settlement Agreement's injunctive terms will not effectually restrain Deere from engaging in the same or similar anticompetitive conduct as that alleged in the Complaint. At a minimum, they

---

[122] FTC Compl. ¶ 19.

---

**OBJECTION TO PROPOSED SETTLEMENT**                                        **PAGE  49 OF 53**
**BY WILSON FARMS LAND AND CATTLE CO. LLC**

require the Court to apply a severe discount from any valuation of the Settlement Agreement that assumes the Class will get parity, access, and compliance out of it for ten years.

## II.     If approved, the Proposed Settlement will wrongfully deprive farmers of the right to challenge Deere's repair monopoly for a generation without adequate remedy or compensation.

The Settlement Agreement releases all claims that Class members "ever had, now have, or hereafter can, shall, or may ever have . . . in any way arising out of or relating in any way to alleged factual predicates, events, actions, or failures to act described in the Complaint." (Settlement Agreement, p. 2-3). The breadth of a release is not automatically improper, but claims surrendered through it are part of the price paid by the Class and cannot be treated as costless. To the contrary, they are tremendously valuable.

The Agreement's monetary payment provides no damages to Class members for their claims against Deere based on lost crops and harvests, supracompetitively priced parts, repair-tool license fees, and other injuries incurred by the Class, but forces the subgroups within the Class who have such claims to release Deere of all liability for them regardless. The Released Claims also include "without limitation any claims arising under any federal or state …  law."[123] However, the Complaint only seeks relief pursuant to federal antitrust law.[124] A settlement may release un-pleaded claims sharing the same factual predicate, but the proponents must account for their value and show that the Settlement reflects both adequate representation and adequate consideration for the interests being extinguished.

The same issue exists in the injunctive relief. The Settlement Agreement's injunctive provisions are vague, ambiguous, and inadministrable, leaving Deere with broad discretion

---

[123] *Id.* at 3.

[124] *See* Compl. ¶¶ 203–266.

to implement its terms in ways that enable Deere to continue engaging in the same or similar anticompetitive conduct, and maintain the same or similar monopolistic control over the Deere repair services market, that this action was brought to eliminate. Meanwhile, the Settlement Agreement's broad release forecloses farmers' from pursuing a vast range of claims — across antitrust, unjust enrichment, unfair competition, trade practice, common law, and consumer protection theories — related to Deere's conduct so far and Deere's conduct in light of the Settlement's deep ambiguity.[125] Furthermore, while the ambiguity in the Settlement Agreement's injunctive relief creates foreseeable conflict between Deere and the Class, its additional release of "any claims involving the institution, prosecution, and the defense of the Action or advocacy related to the claims made therein," may prevent the Class from bringing claims to settle that ambiguity.[126] At a minimum, the Court should require a clear explanation of how enforcement actions, challenges to later conduct, and claims arising from unresolved ambiguities are preserved. Without that clarity, the Settlement Agreement's overbroad release may well turn the Settlement Agreement into a tool for Deere to prescribe for farmers what is "fair and reasonable" to them, instead of a (nominal) tool for farmers to hold Deere accountable.

Ultimately, the concern is about proportionality. The Settlement Agreement requires Class members to relinquish their antitrust claims based on labor overcharge damages without reasonable proportional compensation—and a vast array of other, disparate claims without any compensation at all. And the disparity between the scope of the release and the benefits obtained by the Class is even more troubling here given the Settlement Agreement's

---

[125] Settlement Agreement at 3.

[126] *Id.*

---

**OBJECTION TO PROPOSED SETTLEMENT**                                    **PAGE 51 OF 53**
**BY WILSON FARMS LAND AND CATTLE CO. LLC**

omissions, ambiguities, and limited enforcement mechanisms. By extinguishing claims that could provide future relief without meaningfully remedying either past or ongoing injury, the Settlement Agreement will grant Deere far greater protection than the Class receives in either remedy or compensation. When a proposed settlement extinguishes the colorable claims of subgroups within the Class at negligible cost to the defendant in this manner, the Seventh Circuit requires district courts to "take special care to determine the relevant claims actually have no settlement value."[127]

The Second Circuit's decision in *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation* illustrates the structural problem.[128] There, present compensation for one group was exchanged for the future rights of others. This Settlement is not identical, but the warning is relevant: A class settlement should not be allowed to trade limited present relief for broad waivers of claims arising from conduct that the settlement's remedies do not actually resolve. Nor can the released claim sets be assigned no value merely because some individual claims may be small or even weak; indeed, as the Seventh Circuit has recognized, almost any facially colorable claim can have "significant settlement value when brought as a class action."[129] The Court should therefore compare the value of the released claims to the value of the relief delivered to each affected Class subgroup, not simply to the $99 million headline figure.

---

[127] *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 634 (7th Cir. 2011) (citing *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 785 (7th Cir. 2004)).

[128] *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*, 827 F.3d 223, 241 (2d Cir. 2016)

[129] *Crawford v. Equifax Payment Services, Inc.*, 201 F.3d 877, 880 (7th Cir. 2000).

Because the proponents of the Proposed Settlement have not demonstrated that the value of the relief it actually delivers to the Class equals or exceeds the expansive value of the broad set of claims and interests it extinguishes for Deere's benefit, the Settlement's breadth weighs against final approval. In combination with the limited net fund and the ineffectiveness of the injunction, the Settlement's overbroad release gives Deere dramatically more relief than the Class receives from the Settlement.

## CONCLUSION

For the foregoing reasons and the reasons stated in Wilson Farms' forthcoming supplemental brief on inadequate representation, the Court should deny approval of the Proposed Settlement.

Dated: June 29, 2026

*Admitted *pro hac vice*

Respectfully Submitted,

/s/ Basel J. Musharbash
Basel J. Musharbash*
Texas Bar No. 24111402
Catherine Larsen
Maryland Bar No. 2106150067
Reed Showalter
District of Columbia Bar No. 90024081
**ANTIMONOPOLY COUNSEL**
500 Clarksville Street
P.O. Box 795
Paris, Texas 75461
Phone: (903) 205-8422
Email: basel@antimonopoly.us
catherine@antimonopoly.us
reed@antimonopoly.us
info@antimonopoly.us

*Attorneys for Wilson Farms
Land and Cattle Co.*

---